## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| Lance Armstrong<br><br>          *Plaintiff*,<br><br>*v.*<br><br>United States Anti-Doping Agency<br>and Travis Tygart, in his official capacity as<br>Chief Executive Officer of the<br>United States Anti-Doping Agency<br><br>          *Defendants*. | Civ. Action No. 1:12-CV-00606<br><br>**JURY DEMAND** |

## COMPLAINT AND JURY DEMAND

Comes now, Plaintiff Lance Armstrong, by his undersigned counsel, and states and alleges as follows:

## Parties

1.     Plaintiff Lance Armstrong, 300 West 6th Street, Suite 2150 Austin, Texas, is a citizen of Travis County, Texas.  He resides in Austin, Texas.

2.     Defendant United States Anti-Doping Agency ("USADA") is a Colorado Corporation with its principal place of business at 5555 Tech Center Drive, Suite 200, Colorado Springs, Colorado 80919.  USADA is the national anti-doping organization for the United States and manages the United States' anti-doping testing program for National Governing Bodies for Olympic, Paralympic, and Pan-American Games Sports.

3.     Defendant Travis Tygart is a resident of the state of Colorado.  Mr. Tygart is named as a Defendant in his official capacity as the Chief Executive Officer ("CEO")

of USADA, with his principal place of business at 5555 Tech Center Drive, Suite 200, Colorado Springs, Colorado 80919.

## Nature of Action

4.     Mr. Armstrong brings this Complaint against USADA and its CEO, Travis Tygart, to prevent imminent violations of Mr. Armstrong's Constitutional and common law due process rights, by which the Defendants would strip Mr. Armstrong of his livelihood, his seven *Tour de France* titles, and the many other honors he has won in his world-renowned cycling career.

5.     Defendants' actions demonstrate their belief that USADA is above the United States Constitution, above the law, above court review, free from supervision from any person or organization, and even above its own rules.  Defendants will no doubt tell this Court it has no power or authority either to review their conduct or force USADA to obey the law, obey the Constitution or even obey its own rules.  Contrary to Defendants' belief that USADA answers to no one outside of an arbitration regime it has created and has populated with arbitrators who predictably find in USADA's favor, this Court does indeed have the power to review USADA's conduct.

6.     Over a period of more than two years, and at a cost of millions of dollars to the American taxpayer, Defendants have targeted Mr. Armstrong in a wide-ranging investigation, in concert with the United States Department of Justice ("DOJ"), the Federal Bureau of Investigation ("FBI") and other federal law enforcement agencies. Among other things, Defendants have relied upon information gathered improperly and coerced in concert with a Federal Agent, Jeff Novitzsky, who has been described by a variety of federal courts as having "callous disregard for the rights of third parties" and

engaging in "unreasonable" tactics amounting to "harassment."  One federal judge even inquired of Agent Novitsky's efforts, "Whatever happened to the Fourth Amendment?  Was it repealed somehow?"

7.     Defendant Tygart shares with Agent Novitsky a well-publicized obsession with "getting" Mr. Armstrong.  Defendant Tygart evidently believes that USADA needs to bring a big case against a "big fish" to justify its existence.  One of, if not the primary, goals of this effort is to convince the United States government to continue and increase the tens of millions of dollars of unsupervised grants that the government already provides to USADA.  In furtherance of this effort, Defendant Tygart and Agent Novitsky offered other cyclists corrupt inducements—offers some cyclists could not refuse—to implicate Mr. Armstrong in exchange for saving the cyclists' careers.  If they refused to do so, USADA would work to ruin their careers, just as it is now attempting to end Mr. Armstrong's career.

8.     Despite Agent Novitsky's and Defendant Tygart's conduct, the federal authorities ultimately decided not to prosecute Mr. Armstrong.  This is not surprising.  After all, Mr. Armstrong has passed every drug test ever administered to him in his career—a total of 500 to 600 tests.  Those tests include a tremendous number of additional tests by USADA over the past several years as part of its "target testing" designed to determine if Mr. Armstrong was cheating or competing fairly.  In its multi-million dollar zeal to "get" Mr. Armstrong, USADA has been unable to turn up a single positive drug test from Mr. Armstrong.  Given that Mr. Armstrong is believed to have been given more drug tests than any other athlete in history, it is a testament to USADA's

brazenness and callous disregard for its own mission that it seeks to strip Mr. Armstrong of his life's work and his future livelihood absent a single positive test.

9.      Undeterred, Defendants have charged Mr. Armstrong with unspecified doping violations and seek to try him through USADA's self-created, self-regulated and self-operated process that it has rigged to ensure that it cannot lose.  One of USADA's own arbitrators describes the process as follows:  "[USADA] is willfully violating the law – behaving as if they are above the law . . . . [T]hey are nothing more than bullies preying upon the vulnerable."  *USADA v. Gatlin*, AAA No. 30 190 00170 07 (Campbell, concurring in part and dissenting in part).  But USADA is not above the law.

10.     USADA's kangaroo court proceeding would violate due process even if USADA had jurisdiction to pursue its charges against Mr. Armstrong.  But in fact, USADA's own governing rules dictate that it does not have jurisdiction.  Under the rules of cycling, the Union Cycliste Internationale ("UCI"), the International Federation for cycling, is the only organization permitted to assess the evidence and decide whether there is reliable evidence that should be the subject of a disciplinary proceeding.  UCI has asked USADA to provide information about its witnesses to UCI so it can conduct the review required under its rules, but USADA has simply ignored UCI.

11.     In a real adversary process, in front of neutral and independent fact-finders, Defendants' misconduct would be exposed and remedied, and USADA's charges against Mr. Armstrong would be revealed as unfounded.  But the process Defendants seek to force upon Mr. Armstrong is not a fair process and truth is not its goal.  Defendants have presented Mr. Armstrong with an impossible and unlawful choice: either accept a lifetime ban and the loss of his competitive achievements, or endure a

rigged process where he would be certain to lose and suffer the same outcome.  This "choice" offends the law, offends due process, and offends fundamental fairness.  This Court has the authority to prevent such a miscarriage of justice.

12.     Mr. Armstrong is not asking for a set of rules not available to other athletes.  The reality, instead, is that in addition to the overall corruption of the system by USADA, the Defendants have singled Mr. Armstrong out from all other athletes, selectively targeting and prosecuting him and engaging in illegal and unconstitutional activity as applied to him.  In these unique circumstances, Mr. Armstrong has every right to fight back, defend himself and seek the protection of this Court.

13.     As such, Mr. Armstrong brings this action to prevent Defendants from enforcing, or taking any further action to pursue, charges USADA has asserted against Mr. Armstrong in its charging letters dated June 12 and June 28, 2012, or from seeking to impose any sanctions or to commence any disciplinary proceedings based on the allegations in those letters.  This includes enjoining Defendants' asserted deadline of July 14, 2012 for Mr. Armstrong to accept their proposed penalty, or to contest the charges through their "process."  Mr. Armstrong seeks injunctive and declaratory relief from Defendants' unlawful actions.  Absent injunctive relief, Mr. Armstrong will suffer irreparable harm.

**Jurisdiction and Venue**

14.     This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it is a matter that arises under the Constitution and laws of the United States.

15.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because it is an action between citizens of different states and the matter in controversy exceeds the sum or value of $75,000.  The damage already caused and the value of the continuing threat to Mr. Armstrong's property, reputation, and livelihood, as well as substantial costs Mr. Armstrong would incur in an unlawful arbitration proceeding as designed by Defendants, far exceed the requirement of $75,000.  Finally, the extent of the deprivation of Mr. Armstrong's constitutional and common law due process rights further increases the amount in controversy.

16.     This court has subject matter jurisdiction over the state law claims asserted by Mr. Armstrong based on principles of ancillary and pendent jurisdiction and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy under Article III of the United States Constitution.

17.     This Court has personal jurisdiction over defendants because Defendants are doing business in the Western District of Texas, and the acts and conduct at issue in this case were directed at Mr. Armstrong in this district and were conducted in part in this district.

18.     Defendants' officials and agents have also repeatedly subjected Mr. Armstrong to no-notice out-of-competition drug testing in the Western District of Texas. He has been subject to target testing by USADA for several years.

19.     Defendants regularly extend their testing and punishment activity to other athletes and events in the Western District of Texas as part of their ordinary business practices.  Upon information and belief, USADA has tested and sanctioned athletes when laboratories hired by USADA reported that those athletes tested positive as a result of in-competition testing at events in this district, and has tested and sanctioned athletes who reside in Texas as a result of out-of-competition testing in Texas.  All elite Olympic, Paralympic, and Pan American Games athletes who live in or travel to Texas must keep USADA informed about their whereabouts and must subject themselves to out-of-competition testing by USADA in Texas.

20.     Defendants have purposefully availed themselves of this forum such that Defendants should reasonably anticipate proceedings against them here, and the exercise of jurisdiction over Defendants is reasonable and comports with traditional notions of fair play and substantial justice.

21.     Venue lies in this district under 28 U.S.C. § 1391 because a substantial part of the dispute concerns Defendants' efforts to (i) target Mr. Armstrong in this district; (ii) to interfere with Mr. Armstrong's contracts that provide him benefits in this district; (iii) to coerce witnesses and to offer things of value to witnesses in this district to testify falsely against him; (iv) to impose a lifetime ban on Mr. Armstrong competing in professional or elite competitive sports in this district, in Texas generally, or anywhere else in the world; and, (v) to force Mr. Armstrong to bring his claims against USADA in an arbitration which would be filed within this district.

22.     The Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220509, *et seq.*, is inapplicable to this action and does not otherwise preempt the Court's authority to review USADA's conduct.

### Other Relevant Organizations

23.     The Union Cycliste Internationale ("UCI") is the international federation for the sport of cycling.

24.     USA Cycling is the United States National Governing Body for the sport of cycling.

25.     The United States Olympic Committee ("USOC") is the national Olympic committee in the United States.

26.     The World Anti-Doping Agency ("WADA") is an international anti-doping organization that establishes rules for the policing and sanctioning of doping in athletic competition, which rules are adopted by its members.

### Lance Armstrong's Career

27.     Mr. Armstrong is a triathlete and a retired professional road-racing cyclist. He has been an exceptional athlete all of his life.

28.     At the age of 12, Mr. Armstrong finished fourth for his age group in the Texas youth swimming championships in the 1,500-meter freestyle event.

29.     At the age of 13, during his first year of involvement in the sport of triathlon,  Mr. Armstrong entered and won the Iron Kids Triathlon.  In 1987–1988, when Mr. Armstrong was 16 and 17 years old, he was the number one ranked triathlete in the 19-and-under group.  His point total for 1987 as an amateur was better than five professionals ranked that year.  At 16, he became a professional triathlete.  In 1989 and

1990, at 18 and 19 years old, he became the United States national sprint-course triathlon champion.

30.     Of the triathlon's three components, Mr. Armstrong most enjoyed cycling and began to enter elite cycling competitions.  In 1991, Mr. Armstrong won the United States Amateur Cycling Championship.  In 1992, he represented the United States at the Summer Olympic Games in Barcelona, Spain.  In 1993, he became one of the youngest riders to ever win the UCI Road World Championship in Norway.  In that same year, he won a stage of the *Tour de France*; in the nineteen years from 1993 to 2012, no rider as young as Mr. Armstrong was in 1993 won a stage of the *Tour de France*.

31.     Mr. Armstrong continued to excel as a professional cyclist from 1993 to 1996.  Mr. Armstrong represented the United States at the 1996 Olympic Summer Games in Atlanta, Georgia.  He competed in both the cycling time trial event and the cycling road race event.  Although expected to do better, he finished sixth in the time trial and twelfth in the road race.

32.     Just over two months after the 1996 Olympic Games, Mr. Armstrong was diagnosed as having testicular cancer, with a tumor that had metastasized to his brain and lungs.  Though his prognosis was originally extremely poor, requiring brain and testicular surgery as well as chemotherapy, Mr. Armstrong successfully completed his treatment and made a full recovery.

33.     After his recovery, Mr. Armstrong re-entered professional cycling and went on to win the *Tour de France* each year from 1999 to 2005.  He is the only person to have won the event seven times, breaking the previous record of five wins shared by four non-American cyclists.  Mr. Armstrong has raced the *Tour de France* with the

United States Postal Service, the Discovery Channel, the Astana and the RadioShack teams. Mr. Armstrong also earned a Bronze Medal in the Individual Time Trial event at the 2000 Summer Olympic Games in Sydney, Australia.

34.     In 1996, Mr. Armstrong founded a public charity, the Mr. Armstrong Foundation. The Mr. Armstrong Foundation provides free services to cancer survivors with financial, emotional and practical challenges. The Mr. Armstrong Foundation is a leader in the global movement on behalf of 28 million people living with cancer today. Since its inception, the Mr. Armstrong Foundation has raised close to $500 million for the fight against cancer. Mr. Armstrong has been the Foundation's largest individual donor, personally contributing over $6.5 million.

35.     Mr. Armstrong originally announced his retirement from professional cycling on July 24, 2005, at the end of the *Tour de France*. However, he returned to professional cycling in January 2009, and finished third in the *Tour de France* that year. He again retired from professional cycling on February 16, 2011.

36.     In 2011, Mr. Armstrong began competing as a professional triathlete. Mr. Armstrong has competed in Ironman 70.3 events organized by the World Triathlon Corporation ("WTC"), a corporation that organizes triathlon events around the world.

37.     Prior to USADA's announcement of the charges against Mr. Armstrong, Mr. Armstrong had competed in, and won, two WTC-sanctioned events in the past two months, with the ultimate goal of qualifying for the WTC-organized Ironman World Championship in October 2012.

38.     As a result of Mr. Armstrong's participation in WTC-sanctioned events, the Mr. Armstrong Foundation formed a partnership with the WTC's Ironman triathlon

series to raise more than $1 million for people battling cancer.  Mr. Armstrong also stood

to benefit financially from the contract.  On February 10, 2012, WTC announced that it

would auction off four entry slots at the Ironman World Championship in 2012 and 2013

with proceeds going to the Mr. Armstrong Foundation.  In return, Mr. Armstrong agreed

to race in at least six WTC Ironman and Ironman 70.3 triathlon events in 2012.

39.     As USADA was aware would occur, as a direct result of USADA sending

a copy of its June 12, 2012 notice of charges to WTC, Mr. Armstrong has been

suspended from competing in WTC events, including a June 24, 2012 triathlon in France

for which Mr. Armstrong was training when USADA issued its charges.  Also, as

USADA is aware and intends, Mr. Armstrong will be banned from further WTC

competitions if USADA's sanctions are imposed.

40.     Participating in professional sporting events is Mr. Armstrong's livelihood

and, along with supporting efforts to reduce the incidence of cancer and helping cancer

survivors, his passion.  Mr. Armstrong intends, absent action to enforce USADA's

proposed sanctions, to continue participating in professional sporting events that are

governed by signatories to the World Anti-Doping Code, events in which he will not be

allowed to compete if USADA is allowed to continue its improper and unlawful conduct.

## Comprehensive Drug Testing of Lance Armstrong

41.     Mr. Armstrong is the most drug tested athlete in sports history.

42.     Throughout his twenty-plus year professional career, Mr. Armstrong has

been subjected to 500 to 600 drug tests without a single positive test.  In the time period

from the fall of 2008 through March 2009 alone, Mr. Armstrong was required to submit

to 24 unannounced out-of-competition drug tests by anti-doping authorities.  Each test was negative for performance-enhancing drugs.

43.     Mr. Armstrong's drug testing has included urine testing and blood testing. These tests have been conducted by a variety of anti-doping agencies, including USADA. These agencies have tested for substances professional athletes are banned from using, including erythropoetin ("EPO"), anabolic steroids, and testosterone.

44.     These tests have occurred both in-competition and out-of-competition.

45.     For about twenty years, Mr. Armstrong has been subject to in-competition drug testing because he has been participating in professional and elite Olympic and amateur cycling events, and has recently been competing in professional triathlon events.

46.     A substantial number of cycling events Mr. Armstrong has competed in are called "stage races."  That means that the competition is a multi-day event, in which the portion of the race conducted on each day of racing is referred to as a "stage."  Each competitor's individual times on each stage of the race are aggregated to determine the overall winner at the end of the race.  In stage races, there is often drug testing after each stage involving biological samples—generally urine and/or blood—being collected from competitors and the samples sent to a laboratory.

47.     The *Tour de France* has approximately twenty-one stages in a three-week period, and there is generally testing of competitors before the race and after each stage. Competitors achieving the fastest times for individual stages, or the fastest aggregate time to that point in the race, are subjected to more drug testing than the other competitors. For example, the overall leader, meaning the cyclist with the best aggregate time at the completion of each stage (the rider who as a result wears the yellow jersey during the

next stage) is generally subject to drug testing, along with the rider or riders with the best times for that particular stage.

48.     As a result of Mr. Armstrong's success in stage races, he has often been drug tested many times during a single stage race, far more than the average rider in the race.  For example, in the 1999 *Tour de France*, of about 91 drug tests conducted during the race on the close to 200 competitors, 15 were tests of samples taken from Mr. Armstrong.

49.     In addition, as a result of Mr. Armstrong's cancer diagnosis in 1996, and his cancer treatment including surgery and chemotherapy, his physicians since that time have continued to monitor his physiology in general, and his blood in particular.  Mr. Armstrong's primary physician has stated that the measurements he saw from January 1997-October 2001 were within normal ranges and were simply not consistent with the use of EPO by Mr. Armstrong during that time period.

50.     For many years, except for the short period of time when he (i) was retired from cycling, (ii) was not competing in any other sport, and (iii) had not announced that he would be returning to competition, Mr. Armstrong has also been subject to out-of-competition drug testing by various organizations involved with Olympic sports.  As an elite athlete involved in an Olympic sport, for many years Mr. Armstrong has been required to file "Whereabouts forms" before every three-month period, detailing precisely where he will be every day for the next three months.  Whenever he is aware that his plans have changed, he has to update his "Whereabouts form."  This is required so several different organizations can send someone, without any advance notice, to collect biological samples from Mr. Armstrong any day, 365 days a year, at any time.  If

an athlete is not at the address in the "Whereabouts form" when the collector arrives, the athlete has a short window of time, (now sixty minutes), to present himself for the test.

51.      Since approximately 2000, UCI, USA Cycling, USADA, and recently international triathlon organizations have all subjected Mr. Armstrong to drug testing. All of those tests have been negative.  These organizations involved with drug testing of Mr. Armstrong over the years sent someone to the address on Mr. Armstrong's "Whereabouts form," knocked on the door at that address, or telephoned him, to advise Mr. Armstrong that he had to present himself so that the collector could personally witness and take a urine or blood sample—or both—at that time.

52.      For years, USADA and others have targeted Mr. Armstrong for substantial out-of-competition testing, so he has been subject to many more out-of-competition drug tests than even the average high profile athlete.  On one occasion, a drug tester showed up as Mr. Armstrong and his wife were on their way to the hospital for the birth of one of their children.  At times, two testers from different organizations showed up at the same time, both wanting to take biological samples from Mr. Armstrong.

53.      In recent years, to provide additional proof that athletes were competing cleanly, certain professional cycling teams, including the Astana and Radio Shack Teams for which Lance competed, have paid independent outside experts to conduct additional unannounced out-of-competition testing of their athletes, and have turned those results over to UCI as well.  That has added to the number of drug tests to which Mr. Armstrong has been subjected, and has passed.

54.      Under the WADA Code, UCI is the recognized sample collection authority and results management authority, with sole jurisdiction to conduct anti-doping

tests at international cycling events.  As part of that authority, since 2007 UCI has implemented a biological passport program.

55.     The athlete's biological passport includes the collection of blood values resulting from analyzing a series of blood samples, and information collected from testing of urine samples taken over time from the athletes, and comparing those values with the minimum and maximum values considered normal for the individual athlete concerned.  The biological passport program has at least three objectives: (i) direct detection of a doping violation by banned substance or banned method by the analysis of the biological samples, (ii) targeting an athlete for specific additional testing whenever the experts identify a possibility that an athlete may be using a performance-enhancing substance or method, and (iii) identifying the use of banned substances or methods by use of the overall biological passport.  With respect to the athlete's blood profile, the passport includes the blood values of the athlete and the corresponding maximum and minimum expected values for that athlete, all presented graphically.  The "Athlete Biological Passport Operating Guidelines and Compilation of Required Elements," issued by WADA, defines the method of gathering and evaluating biological passport data.

56.     Each time Mr. Armstrong undergoes a UCI blood test and/or urine test, his biological passport is updated as soon as the test results are available and the data is submitted to UCI's independent experts for review.  If the experts have questions about endogenous steroid levels in an athlete's urine or anything in the blood passport information, they can order additional unannounced in-competition or out-of-competition collection of blood and urine samples on dates and at times they decide.  This additional unannounced targeted testing is used to determine whether banned substances or methods

are causing the physiological measures they are seeing as part of the athlete's biological passport.

57.     The experts also have information about many different factors that can affect these measures of athletes' biology and physiology, including whether the athlete has been sick, when the athlete has trained and competed and for how long, air travel by the athlete, time spent at altitude, use of hypoxic training equipment that simulates altitude (*e.g.*, altitude tents), and other information that can explain the readings achieved during testing of biological samples.

58.     If UCI's experts conclude that the athlete's profile cannot be explained other than by the athlete having used a prohibited substance or a prohibited method, UCI proceeds with a case and charges the athlete with a doping violation.  UCI's experts reviewed all of the blood values and all other biological passport data of Mr. Armstrong in 2009 and 2010, and concluded that the data was not evidence of the use of banned substances or banned methods.

59.     In fact, when UCI sent Mr. Armstrong information about what blood values had been recorded from samples taken from him in 2009 and 2010, Mr. Armstrong posted those values for the general public to view  on the internet, to achieve total transparency.  Mr. Armstrong requested that USADA and WADA post the results of their drug tests of him online as well.

60.     Defendants are aware that UCI has exclusive jurisdiction over the use of the information generated through UCI's biological passport program, to ensure that this health information about professional athletes is not used improperly.  Defendants are also aware that UCI's experts have never concluded that there was a basis for bringing a

16

doping case against Mr. Armstrong based on all of his blood values and other biological passport data.

61.     Mr. Armstrong has never been notified after a doping control test that the laboratory conducting the test had declared a positive test for banned substances or methods.

### The World Anti-Doping Agency

62.     Both Congress and the Executive Branch of the United States Government have had an interest in performance-enhancing drug use in sports.  In the late 1990's, the Executive Branch's Office of National Drug Control Policy ("ONDCP") and Congress focused on, among other things, the use of steroids.  With the United States scheduled to host the 2002 Winter Olympic Games in Salt Lake City, in 1999 the ONDCP announced a "National Strategy" to combat drug use in sports.  The ONDCP "National Strategy" included developing a domestic anti-doping mechanism or body that might include an effective and accountable "U.S. agency" with certain governmental or quasi-governmental powers.

63.     The ONDCP "National Strategy" also involved international efforts by the United States Government to establish an international anti-doping agency that would, among other things, engage in year-round no-notice out-of-competition testing of athletes.

64.     In February 1999 a delegation of government officials, led by ONDCP Director General Barry McCaffrey, went to Lausanne, Switzerland, the home of the International Olympic Committee, for a World Conference on Doping in Sport.  Out of this conference came the Lausanne Declaration, which called for an international anti-

doping agency to be established before the 2000 Summer Olympic Games in Sydney, Australia.

65.     As a result, WADA began operating in late 1999.  WADA receives funding from the International Olympic Committee and world governments, including the United States.

66.     The WADA Code is the primary anti-doping rules, regulations, and policies of the World Anti-Doping Agency.  The first version of the WADA Code became effective in 2004, at or around the time of the 2004 Olympic Summer Games in Athens, Greece.

67.     In August 2000, President Clinton issued Executive Order 13,165 that states that the "United States has played a leading role in the formation of a World Anti-Doping Agency . . ." and authorized the Director of the ONDCP to "serve as the United States Government's representative on the WADA board."  That Executive Order also authorized federal employees, acting in their "official capacities," to serve on WADA committees and as experts to WADA.

68.     The United States has a significant leadership role in WADA, with the right to designate a representative to sit on WADA's Foundation Board, (WADA's "supreme decision making body"), and to designate a representative to WADA's Executive Committee.

## Creation of USADA by the United States Government

69.     In announcing the "National Strategy," ONDCP Director Barry McCaffrey also stated that "among the key initiatives at the national level" was to facilitate the development of a domestic anti-doping mechanism or body separate from the United States Olympic Committee or its national governing bodies.  Both ONDCP and Congress wanted a domestic anti-doping agency established before the 2000 Summer Olympic Games in Sydney, Australia.

70.     In 1999 and 2000 the United States Government, in general, and ONDCP, in particular, were involved in establishing USADA.  As USADA's first Chair, Frank Shorter, admitted in 2000:  "[The formation of USADA] really was through the efforts of [ONDCP Director] Barry McCaffrey and the White House in the United States . . ."

71.     From its creation in October 2000 to the present, the vast majority of the funding of USADA has come from the United States government.

72.     In July 2008, the United States Senate ratified the International Convention Against Doping in Sport ("ICADIS"), an Article II international treaty, and delegated responsibility for the United States' compliance with that treaty to USADA. The Senate Foreign Relations Committee found that no legislation implementing ICADIS was necessary because the United States' obligations under the treaty were already satisfied by the actions of USADA.  In short, Congress relies on USADA to fulfill its affirmative obligations under an Article II treaty.

**USADA Institutes Policies Biased Against Athletes**

73.    From the beginning, USADA was created to serve specific limited

purposes.  The USOC contracted with USADA to perform those limited functions, and

the USOC required its NGBs and their athletes to agree that USADA would perform

certain specific, limited functions.  USADA described its functions as follows:

> "USADA is the independent anti-doping agency for
> Olympic sports in the United States, and is responsible for
> managing the testing and adjudication process for U.S.
> Olympic, Pan Am, and Paralympic athletes.  USADA is
> equally dedicated to preserving the integrity of sport
> through research initiatives and educational programs."

Press Release, United States Anti-Doping Agency (December 11, 2001).

74.    USADA represented (and continues to represent) to all United States

National Governing Bodies ("NGBs") for sport, to the USOC, and to athletes including

Mr. Armstrong, the United States Congress, and the general public that the Mission of

USADA is to hold the public trust to:

> **Preserve the Integrity of Competition** — We preserve
> the value and integrity of athletic competition through just
> initiatives that prevent, deter and detect violations of true
> sport.
>
> **Inspire True Sport** — We inspire present and future
> generations of U.S. athletes through initiatives that impart
> the core principles of true sport — fair play, respect for
> one's competitor and respect for the fundamental fairness
> of competition.
>
> **Protect the Rights of U.S. Athletes** — We protect the
> right of U.S. Olympic and Paralympic athletes to compete
> healthy and clean — to achieve their own personal victories
> as a result of unwavering commitment and hard work — to
> be celebrated as true heroes.

75.     In fact, since it was formed, USADA's objectives, policies and practices became very different from its stated Mission.

76.     Defendant Tygart was previously one of the primary lawyers prosecuting anti-doping cases against athletes for USADA until he became CEO in 2007.  At USADA, and in the private law firm where he worked before joining USADA, Defendant Tygart was involved in drafting the first WADA Code, which was finalized in 2003 and took effect in August 2004.

77.     The WADA Code was drafted to include provisions that would make it very difficult for any athlete charged with a doping violation to be found not guilty.  The purposes of these unfair substantive and procedural rules included saving WADA and USADA the embarrassment of losing a doping case, discouraging athletes charged with a doping violation from even asking for a hearing, and reducing the costs to WADA and USADA associated with adjudicating the cases.

78.     The WADA Code mandates that once a WADA-approved laboratory has declared a positive test, the burden effectively shifts to the athlete to prove his or her innocence – either by proving that the sample (blood or urine) that had been tested did not come from that athlete or proving that the laboratory's report of a positive test was erroneous.  None of the following facts, even if proven by the athlete, would provide a defense: (1) the positive test was for a substance that the athlete consumed accidentally and it could not have enhanced the athlete's performance, (2) it would have made absolutely no sense for the athlete to have taken the substance at issue (for example because the substance was only on the banned list because it could help an athlete involved in a different kind of sport – like a beta blocker that would slow the athlete's

heart rate for a sport involving shooting a gun when the athlete at issue was involved in a sport in which a slowed heart rate would be detrimental to performance), and even (3) the substance was erroneously included on the list of banned substances because it can be proven that it does not enhance performance.

79.      As a result, assuming that the chain of custody documents could not be proven to be in error, the athlete's only chance to succeed was to try to prove the laboratory's report was wrong.  To prevent that, the WADA Code started with the strong, burden-shifting presumption that every WADA-approved laboratory was 100% correct.

80.      Over time the WADA Code and the USADA procedures were drafted to restrict dramatically the amount of information that would be provided to the athlete from the laboratory or from any other source.  The athlete and his counsel would not have the right to interview or compel testimony from the people in the laboratory who were involved with the testing of the sample.  The athlete would not have a right to the production of exculpatory evidence, or to depositions of any of the witnesses against him or her before the trial.  And, WADA's rules for laboratory personnel prohibited WADA-approved laboratory personnel from criticizing or reviewing work by other WADA-approved laboratories, thereby dramatically limiting the pool of experts available to testify on behalf of athletes.

81.      In many cases, the laboratory just refused to produce any additional information beyond the initial limited package required by the WADA and USADA rules, even when the arbitrators believed it was important for the athlete to receive additional information.  The burden shifted to the athlete, so the athlete had the burden to prove his or her innocence as soon as the laboratory test was produced.  The rules further

provide that the athlete's testimony is insufficient to permit a finding of no violation, no matter how credible the arbitrators found the athlete to be.

### USADA Seeks Changes to Laboratory Testing Rules
### to Further Bias Charges Against Athletes

82.     The only small protection remaining for athletes has been the requirement of two samples, an "A" sample and a "B" sample, both taken from the athlete and sealed at the same time.  The rules have always required that after the laboratory declares a positive test of the "A" sample, the athlete must be notified and has the right to be present (with an expert or other witness if the athlete can find and bring one) to witness the "B" test.  If the "B" sample test does not confirm the "A" test, the overall test would be declared negative and the athlete would not be charged.  Given that the testing of the "A" sample was done by the laboratory without the athlete present, the only protection, minimal as it might be, was the athlete's right to witness the "B" test, even though it was unlikely the athlete would even understand the test being conducted and it would be very hard for any witness, no matter how expert, to detect and prove the machine was not calibrated properly or there was some other problem with the test that was causing the report of a positive, given the severe limits on access to the people, documents, and equipment that would be relevant to such proof.

83.     Athletes, concerned that a laboratory that had declared a positive "A" sample would be motivated to find that the "B" sample confirmed the "A" sample, routinely asked for the "B" test to be performed by a different laboratory, without that laboratory knowing the results of the "A" test.  USADA and WADA drafted and implemented rules that did not permit the athlete to request that the "B" sample be tested

by a different laboratory; however, USADA or any other anti-doping organization is permitted to test the "B" sample at another laboratory whenever it chooses to do so.

84.     Testing of the "A" sample and the "B" sample often leaves residual sample that is sufficient to be tested.  Athletes often asked to have an independent laboratory test the residual biological material, to give the athlete the chance to prove that the "A" and "B" tests were in error.  USADA and WADA drafted rules that did not permit the testing of any residual sample by an independent laboratory at the request of the athlete or even by another WADA laboratory.  One reason given for this prohibition is that the "A" sample and "B" sample have been unsealed, so a test of the residual cannot be trusted.

85.     Despite their claim that residual "A" and "B" samples have been unsealed and thereby cannot be trusted, so athletes are prohibited from testing them, USADA and WADA wrote rules to give themselves permission to test residual samples without any restriction on what laboratory does the testing and, without any obligation to disclose additional tests that are negative, and to use any positive single sample tests to charge the athlete with a doping violation for a period of eight years after the athlete gives the sample.  So the residual sample is reliable for eight years if WADA or USADA want to retest the residual to find evidence of guilt, but it is not reliable if an athlete wants an expert to test the residual sample to prove the athlete is innocent.

86.     On a few occasions the "B" sample did not confirm the "A" sample (often after the result of the "A" positive test had been leaked publicly and the athlete had been portrayed in the media as a cheater and the athlete's reputation had been damaged irreparably).  This disappointed Defendants and WADA, because it suggested that their

laboratories make mistakes (calling into question their rules that presume their laboratories never make mistakes), and because it meant they could not charge the athlete whose "A" sample had been declared positive.

87.     Again, if Defendants and WADA were conducting a search for the truth, two different laboratory results (one positive, one negative or other significant variations between the findings of the two tests) when performed on urine or blood taken or drawn at the same time from the same person would suggest a problem with the testing.  A fair process in those circumstances would focus on improving the laboratory testing and methods or re-evaluating the reliability of the test.  However, USADA and WADA were not acting in concert in a search for the truth.  Rather, Defendants and WADA were focused on (a) increasing the number of athletes "caught" and punished, (b) creating the illusion that the laboratories were always right and everyone with a positive test was guilty of a violation and had to be sanctioned, and (c) discouraging athletes from ever challenging the laboratories or the anti-doping organizations so they would be perceived as having won all of their cases against the athletes and there would be no need to expend funds on hearings.

88.     The initial response of USADA and WADA was to change the rules to permit the hearing panel to find a violation even if the "B" sample did not confirm the "A."  Now, as the Defendants and WADA continue to work together to eliminate the rights of athletes, the current proposed draft of the WADA Code would allow an athlete to be found guilty of a doping violation based on a positive "A" sample alone, even if the "B" sample does not confirm the "A."  An athlete could also be found guilty of a doping

violation based on a later testing of a "B" sample even if the "A" sample had been declared negative years earlier and there is no residual "A" sample available for retesting.

## USADA's Biased Procedural Rules

89.     Not content to stack the deck against athletes with respect to the substantive rules, Defendants and WADA conspired to create procedural rules and a hearing system in which (a) innocent athletes will rarely have a chance of winning and (b) the burden of participating in the adjudication process with such a low probability of success will discourage athletes from even asking for a hearing, without regard to the merits of their cases. These procedural deficiencies are compounded when USADA brings a case absent any positive drug result, and based on information collected after joint investigation conducted with federal authorities.

90.     As just a limited sample of the impediments to the athlete:

i.      The athlete has no right to a charging document that fairly informs him of the charges against which he must defend, even if, as here, the charging document spans over 16 years;

ii.     USADA limits all other discovery to the discretion of the arbitration panel—the athlete has no right to subpoena documents, serve interrogatories, requests for production of documents and objects of evidence material to the athlete's defense, requests for admissions, request additional results or reports of examinations or tests that are material to the defense or likely to be used at trial, or summaries of expert testimony that will be introduced at trial;

iii.    The athlete has no right to disclosure of all agreements, promises, and understandings between USADA and the witnesses, to determine if the witnesses

have changed their testimony or have been coached, pressured, paid, or otherwise incentivized to say what they are saying at the hearing;

       iv.     The athlete has no right to compel witnesses to attend the hearing and no right to demand that USADA produce all evidence in its possession that shows the athlete is not guilty of a doping violation;

       v.     No matter how many doping tests the athlete has endured in his or her career that were declared not to show the presence of banned substances, the athlete has no right to compel production of those results or to retest residual samples to prove that the claims the athlete was using banned substances or banned methods are false;

       vi.     The athlete has no right to any preliminary hearing—the arbitration panel can determine that the matter will proceed directly to a final hearing;

       vii.     Instead of calling witnesses to testify and giving the athlete the opportunity to confront and cross-examine those witnesses, USADA can simply draft affidavits for its witnesses and have them sign them.  The athlete has no right to receive prior drafts of the witness's affidavit and the arbitrators are permitted to consider that evidence even if the athlete is not given an opportunity to cross-examine the witness;

       viii.     On at least one occasion, USADA has brought a witness to testify at a hearing and then, when it was time for athlete's attorney to cross-examine the witness, the witness refused to answer certain questions and left the hearing—the panel denied the respondent's motion to strike the direct testimony;

       ix.     There are no provisions or procedures protecting athletes when anti-doping organizations and laboratories destroy or conceal evidence;

x.       The athlete does not have the right to obtain investigative witness statements.  Absent such statements, the athlete's counsel lacks the ability, fundamental to any lawyer, to cross-examine his accusers adequately;

xi.       If the athlete wins, USADA can appeal and force the athlete to go through another *de novo* proceeding at the Court of Arbitration for Sport ("CAS"), where he is not guaranteed a hearing; and

xii.       USADA is expected to claim that the athlete does not have a right to review by a United States court of his claims.  CAS is the exclusive appellate tribunal for any USADA arbitration, and the only appeal from a CAS decision is to the courts of Switzerland.

xii.       CAS rules prohibit any dissenting opinion by an arbitrator who disagrees with the majority.   In response to prior dissents that highlighted the flaws in the arbitration system that make it nearly impossible for athletes to prevail, CAS amended its Rules to expressly prohibit arbitrators from filing dissenting opinions.  This extraordinary muzzling of dissident arbitrators serves no purpose other than to shield CAS and its majority arbitrators from criticism of their bias and improper conduct and to prevent the public and the courts from learning of flaws in the majority's decisions.

91.     USADA also drafted its rules to provide for arbitration before arbitrators biased against athletes in doping cases.  Although referring to the USADA arbitration as American Arbitration Association ("AAA) proceedings, the arbitrators are not drawn from a normal AAA pool.  Instead, all arbitrations must be conducted by CAS arbitrators.  The result has been that USADA only appears before biased individuals in both its domestic and CAS proceedings.

92.     The IOC provides most of the funding of CAS, and the IOC and its member sports organizations—International Federations and National Olympic Committees—appoint the vast majority of the CAS arbitrators.  CAS acknowledges these individuals are not independent of sport organizations.  While paying lip service to a supposed requirement that a small percentage of the arbitrators shall be appointed "with a view to safeguarding the interests of the athletes," those arbitrators are not selected by athletes or athlete organizations, and are likewise frequently associated with sport organizations.  In addition, because all CAS arbitrators are appointed only to four-year renewable terms, they are vulnerable to non-renewal if they issue doping decisions favorable to athletes.

93.     The result has been tribunals that have almost never ruled for athletes charged with doping violations, no matter how questionable the evidence offered against them, or how significant the improprieties by the sports organizations or anti-doping organizations prosecuting them.

94.     In fact, of the thirty current CAS arbitrators who hear domestic USADA cases (the CAS arbitrators who are United States citizens), upon information and belief only four have ever voted for a decision that found that an athlete had not committed an

anti-doping violation.  Furthermore, every favorable domestic arbitration decision in a doping case that has ever been appealed to CAS has led to a reversal – a finding by the CAS panel that the athlete had committed a doping violation.  Finally, upon information and belief, in the twelve-year history of USADA, no United States athlete who has ever lost a domestic USADA arbitration has successfully appealed that decision to CAS in Switzerland.

### USADA Remains Unchecked

95.     Congress now gives USADA an annual ten million dollar ($10,000,000.00) unsupervised grant.  In addition, Defendants contend that a single sentence in a 2001 Congressional appropriations provision requires the USOC to contract only with USADA, and requires the USOC to pay USADA's costs beyond what is covered by USADA's federal government grant.  Despite the fact that the legislation says nothing about USADA being totally independent, USADA has operated since then based on the assumption that it does not answer to the USOC, or anyone else.  As a result, there is no effective governmental, public, or even private oversight of USADA.

96.     As the processes became increasingly unfair, athletes and lawyers who represented athletes charged with positive tests expressed concern publicly, to the USOC, and to others about the "process".  The USOC, however, remained unwilling to become involved because of a concern that WADA and USADA would criticize the USOC publicly, alleging the USOC was not interested in catching United States athletes who cheated, and thereby damage the United States' chances to bid successfully to host another Olympic Games after the Winter Olympic Games were awarded to the United States in 1995 and held in Salt Lake City in 2002.

97.     WADA and USADA attacked other challenges to their unfair rules and procedures as being "soft on drugs" or not sufficiently committed to eliminating the use of performance enhancing drugs in sport or trying to conceal cheating by elite athletes. Countries that were perceived as not sufficiently committed to enforcing the rules drafted by WADA in concert with USADA were threatened with ineligibility to host major international sports competitions like the Olympic Games, the World Cup, and world championships in other Olympic sports.

98.     The rules became so anti-athlete that every single athlete charged during the first eight years of USADA's existence was found to have committed a doping violation and sanctioned.  Athletes charged by USADA have only been found not to have committed a doping violation three times in more than twelve years.  Those three cases should never have been brought—an athlete charged with using EPO when USADA had no proof he had ever possessed EPO; an athlete who was charged for not reporting at a post-event doping control station when the evidence was that the athlete was delirious after the event as a result of dehydration and exhaustion and was simply unable to hear or understand what he was supposed to do; and an athlete charged with a doping violation as a result of a positive test when it was clear that the laboratory had violated the mandatory procedures for drug testing.  That is all—three egregious cases in more than twelve years.  And, with respect to the athlete who won because the laboratory rules designed to protect athletes were violated, the response of Defendants and WADA was not to encourage the laboratories to follow the mandatory rules.  Instead, their response was to change the rules so that if the same violation occurred in the future, it would not be a basis for a hearing panel to rule in the athlete's favor.

99.     The changes made in the 2009 version of the WADA Code and the changes that have been proposed by USADA and WADA for the next version of the WADA Code specifically identify cases in which it was determined that the athlete did not violate the doping rules.  Defendants and WADA are changing the rules expressly to ensure that an athlete in the same situation in the future will be found guilty.

100.    Because the substantive rules are so unfair and the process so restrictive that innocent athletes cannot be vindicated, lawyers advising athletes charged by USADA had no reasonable alternative but to advise athletes they cannot win.  Over time, few athletes who are charged, even when innocent, have been willing to challenge the claim that they doped because of the cost and futility of the process.

101.    One United States arbitrator did feel compelled to speak out about the unfairness of USADA's "results management" and the violations of athletes' rights by issuing dissenting opinions.  U.S. Olympian and arbitrator Chris Campbell embarrassed WADA and USADA by writing in his dissenting opinions about the corruption, improprieties and abuses in the system and the improper conduct of the laboratories and anti-doping organizations.  Rather than correct the problems Mr. Campbell identified, the Court of Arbitration for Sport issued a rule that prohibits arbitrators from publishing dissenting opinions.  If Mr. Campbell continues to try to draw attention to the unfairness of a system designed to find all athletes guilty, CAS can remove him as an arbitrator.

### USADA Looks to Enhance Its Profile and Secure Its Funding

102.    Despite Defendants' actions slanting the proceedings against athletes, throughout its history the number of drug tests conducted by USADA has not resulted in the laboratories reporting to USADA anything approaching the number of positive blood

and urine samples from athletes that Defendants and WADA wanted.  Although targeted athletes like Mr. Armstrong were tested on a regular basis, many other athletes were almost never tested, or were only tested once or twice.

103.    In addition, a high percentage of the doping violations USADA was prosecuting and for which USADA was punishing United States athletes were technical violations by athletes who had no intention of cheating and had not achieved any performance enhancement.  Unintended positive test results occurred, for example, when athletes consumed a mislabeled or contaminated drug, food product, or supplement, or when they did not read the list of banned substances carefully and consumed an over-the counter medication with a small amount of a banned substance.

104.    This made it difficult to convince Congress or anyone else that USADA or WADA was achieving their respective missions or should be given additional funding. Defendant Tygart, USADA, and WADA were criticized for the small number of intentionally cheating, performance-enhanced athletes they were detecting.

105.    As a result, Defendant Tygart, USADA and WADA wanted to both (a) increase the numbers of violators they could claim and (b) prove violations by high profile athletes that would raise USADA's and WADA's profile.

106.    Typical athletes subject to USADA testing such as swimmers, track and field athletes, snowboarders, and skiers were simply not as famous as professional baseball, basketball, hockey, and football players, so few paid much attention to USADA even when positive test results were reported.  Defendants have tried to raise USADA's public profile by attacking publicly, on a regular basis, the anti-doping efforts of the major professional sports leagues in the United States.  They claim that Major League

Baseball and the other major professional leagues in the United States have operated drug testing programs inferior to the WADA Code and USADA's testing program and results management. For years, USADA has lobbied Congress, seeking legislation that would require the professional sports leagues to turn their drug testing programs over to USADA.

107.    No players associations or professional sports leagues, however, which want to treat their players fairly and with dignity, would ever consider utilizing the WADA Code or contracting with USADA. All of USADA's lobbying efforts have been unsuccessful. It has become clear that USADA will never be charged with drug testing or results management for MLB, the NBA, the NFL, or the NHL, and Congress will never force the professional leagues in the United States to contract with USADA. Nevertheless, USADA is still working in concert with WADA to try to force the United States Government to require United States sports leagues to subject themselves to the jurisdiction of WADA and USADA.

**Lance Armstrong's Call for Accountability**

108.    In January 2004, Mr. Pound, the President of WADA at the time, made public statements that were reported in the *Le Monde* newspaper in France that "the public knows that the riders in the *Tour de France* and the others are doping."  This was part of a pattern in which Mr. Pound and WADA would make public statements without any evidence that drug use was widespread in various professional sports or by the competitors in a particular professional sports league.  Mr. Pound made these statements as part of an effort to generate public concern and increase public interest in and funding of WADA.

109.    Mr. Pound would later admit that although there was no basis for his attempts at quantification, in his view the end—an increased perception that there is a major problem and that WADA is important to combat the problem—justified the means.

110.    Mr. Armstrong believed that Mr. Pound's statements, accusing all of the many cyclists who were competing in the *Tour de France* of cheating when there was no evidence to serve as a basis for such allegations, were improper and should be addressed. Mr. Armstrong wrote an "open letter," published in the March 5, 2004 edition of the French sports daily *L'Equipe*, criticizing Mr. Pound's comments.  Mr. Armstrong wrote that he felt "compelled to address [the] statements made by Dick Pound."  In the letter, Mr. Armstrong wrote, among other things, that he was "saddened that a person with such responsibilities can issue such long-range declarations that clearly mean me or my colleagues are taking drugs."  He wrote, "Dick Pound, if you truly want athletes to be clean, go fight for that rather than slinging dirt at them in such an irresponsible manner. Focus your efforts on the fight against doping rather than spending your time accusing

innocent athletes without any evidence other than your own speculation. . . . My eyes are wide open . . . [but] the way Mr. Pound is pointing the finger of shame at us is offensive."

111.    Mr. Pound and WADA were stunned that an athlete challenged them—to that point athletes and most others associated with Olympic sports had been unwilling to criticize or challenge WADA or anyone associated with WADA, for fear that they would be identified as a drug cheat because they were criticizing the organization charged with fighting drugs in sport.  Mr. Pound was surprised, and Mr. Pound and WADA were embarrassed.

112.    Mr. Pound responded with an "Open Letter" of his own that was published in the next day or two, trying to recharacterize what he had said, "[i]n the interview that I gave the newspaper Le Monde in January, I simply pointed out that cycling, like other sports, faces substantial difficulties in ridding sport of doping, despite efforts made by the International Cycling Federation and others. . . . at no time have I spoken out personally against you or your accomplishments, which makes your strongly-worded personal attack somewhat of a surprise.  If, indeed, we share the same desire to see all sports free of drugs, I should have thought that we should both be supporting a harmonization of the anti-doping rules and that you should not be making a claim, about your sport generally, that suggests the problem is all but solved."

113.    The dispute between Messrs. Armstrong and Mr. Pound became a major, ongoing subject of focus in the worldwide sports media. From that point on Mr. Pound and WADA were questioned about the fact that Mr. Armstrong had pointed out that they made public statements for which they had no basis.  As a result of Mr. Armstrong's statements, Mr. Pound and WADA faced media and public scrutiny and people had

learned to question whether there was any basis for statements and allegations made by them.

### UCI Investigation of 2005 Re-Testing of 1999 *Tour de France* Samples

114.    The attack by Mr. Armstrong made Mr. Pound and WADA determined to retaliate against UCI and Mr. Armstrong and to generate evidence that Mr. Armstrong was a cheater.  Mr. Armstrong was subjected to targeted in-competition and constant out-of-competition drug testing by multiple anti-doping organizations.  The number of tests to which Mr. Armstrong has been subjected over his career has been extraordinary and far in excess of the testing of any other professional, amateur or Olympic athlete in history.  All of those tests were negative.

115.    In August 2005, the French newspaper, *L'Equipe*,  reported that research tests conducted by the French anti-doping laboratory in 2005 on the 91 urine samples collected from riders at the 1999 *Tour de France* had indicated several positive results for EPO, using a test first available in 2000, including six positive tests from urine samples submitted by Mr. Armstrong.  Because of Mr. Armstrong's success in the 1999 *Tour de France*, about 15 of the 91 samples taken at the *Tour de France* were from him.

116.    Mr. Pound announced that he was confident that Mr. Armstrong had cheated, but acknowledged that WADA and USADA had no jurisdiction (since the 1999 samples were collected before WADA and USADA came into existence), while also indicating that UCI should investigate to find the truth.

117.    It was clear that the only organization with jurisdiction under the applicable rules to address whether Mr. Armstrong had been using EPO in 1999 was UCI.  UCI rules applied, and were clear that UCI was the organization with jurisdiction

over claims about anti-doping violations concerning international drug testing on

professional cyclists prior to 2004 and the UCI's adoption of the WADA Code.

118.    UCI appointed Dutch lawyer Emile Vrijman, the former head of the

Netherlands anti-doping agency, to conduct an independent investigation of the issue of

the 1999 samples.  Mr. Vrijman's investigation was completed at the end of May 2006,

when he issued a 130-page report.

119.    Mr. Vrijman said no proper records were kept by the laboratory about the

samples, most of the samples that were tested in 2005 had been opened in 1999, and there

had been no chain of custody and no process to ensure that the samples were not among

the samples that had been spiked with banned substances at the laboratory itself.

120.    In his report, Mr. Vrijman also said the French laboratory had initially

cooperated with his investigation.  The executives at the French laboratory told Mr.

Vrijman that they were aware that (i) the testing was just for research purposes to

improve the EPO test; (ii) they had not followed the proper procedures for athlete drug

testing; (iii) their results could not be used to suggest any rider had tested positive; (iv)

the testing had only been a preliminary screen without even proper controls for a

screening test; (v) they could not say what had happened to the opened samples over the

six years between their collection and the 2005 testing; (vi) they believed it was

completely improper for their research information to have been associated with any

riders or given to the media; and (vii) they had only associated the results with riders'

identification numbers because they had been directed to do so by Mr. Pound and

WADA, an organization that had supervisory control over their lab and that certified

whether they could continue their lucrative business of Olympic drug testing.  They

conceded to him that they understood that what had happened violated applicable rules for the proper conduct of their laboratory and for the proper protection of athletes.

121.    After that preliminary meeting with the laboratory representatives, however, WADA refused to cooperate with Mr. Vrijman's investigation and the French laboratory followed WADA's lead and also refused to cooperate further.

122.    When Mr. Vrijman issued his comprehensive 130-page independent report, it was highly critical of WADA, Mr. Pound, and the WADA-accredited laboratory.  The report concluded that they had specifically targeted Mr. Armstrong because Mr. Armstrong had been publicly critical of them, and that they had intended to embarrass Mr. Armstrong and UCI.  The report also called for an investigation to "focus on the communications between Mr. Pound and the media" and said there was no basis to take disciplinary action against any athletes.  The report called for an investigation of everyone involved in the testing and leaking of the results of the testing.

123.    Mr. Armstrong posted the following summary of and response to the report:

> Today the independent investigator appointed by the UCI announced the results of his work in a 130-page report.  I want to thank him and his staff for all their hard work and diligence in this process. I have not had an opportunity to study the report yet, but I wanted to let you know my preliminary reactions to the report.
>
> Although I am not surprised by the report's findings, I am pleased that they confirm what I have been saying since this witch-hunt began:  Dick Pound, WADA, the French laboratory, the French Ministry of Sport, L'Equipe, and the *Tour de France* organizers (ASO) have been out to discredit and target me without any basis and falsely accused me of taking performance enhancing drugs in 1999.  Today's comprehensive report makes it clear that there is no truth to that accusation.

The report confirms my innocence, but also finds that Dick Pound
along with the French lab and the French ministry have ignored the
rules and broken the law.  They have also refused to cooperate
with the investigation in an effort to conceal the full scope of their
wrongdoing.  I have now retired, but for the sake of all athletes still
competing who deserve a level playing field and a fair system of
drug testing, the time has come to take action against these kinds
of attacks before they destroy the credibility of WADA and, in
turn, the international anti-doping system.

124.    Mr. Pound and WADA condemned the report, but acknowledged that it

was highly critical of WADA, its officers and employees, as well as the accredited

laboratory involved.

### Lance Armstrong Seeks Investigation of WADA and Dick Pound

125.    After Mr. Vrijman's report was issued, Mr. Armstrong complained to the

International Olympic Committee's Executive Committee about what had occurred and

asked the IOC to take action.  The IOC responded that the issues raised by the

independent investigator, including the evidence that WADA, the French Ministry for

Sport, and the French laboratory had violated the anti-doping rules designed to protect

athletes from improper conduct, should be resolved in a hearing before the Court of

Arbitration for Sport.  Mr. Armstrong agreed and filed a demand for arbitration before

CAS.  WADA, the French laboratory, and the French Ministry for Sport refused to

participate, and CAS decided that it would not assert jurisdiction or take any action.

126.    On June 9, 2006, Mr. Armstrong sent a letter to Jacques Rogge, president

of the IOC, demanding that action be taken against Mr. Pound and WADA.  He wrote

that Mr. Pound, acting on behalf of and with the authority of WADA, was guilty of

"reprehensible and indefensible" behavior and "must be suspended or expelled from the

Olympic movement."  After considering the evidence that was available to it, in February

40

2007, the IOC Ethics Committee criticized Mr. Pound, and recommended that Mr. Pound exercise greater prudence in his public pronouncements.  In response, Mr. Pound said he was accountable to WADA, not to the IOC.

127.    The findings of the IOC Ethics Committee were very embarrassing for WADA and for Mr. Pound, who had been an unsuccessful candidate for President of the IOC in 2001, had campaigned against IOC corruption, and had political aspirations in the IOC and the Court of Arbitration for Sport.  Those findings effective brought an end to Mr. Pound's chances for higher office in the Olympic movement.

### Retaliation Against Lance Armstrong

128.    The result of these very public battles between Mr. Armstrong on the one hand and Mr. Pound, WADA, and a WADA-accredited laboratory on the other hand, damaged the credibility and public image of WADA, were problematic for the United States ONDCP that was represented on the WADA Foundation Board and WADA Executive Committee.  This led to a vendetta by WADA and its affiliated organization, USADA, against Mr. Armstrong and UCI.

129.    Since the events of 2005 and 2006, WADA and the Defendants have been determined to damage the reputation of Mr. Armstrong, to discredit him, to suggest that he has used performance enhancing drugs, and to find a way to bring doping charges against him.  Having told the world that they are certain that Mr. Armstrong has cheated, it has become an embarrassment for WADA and USADA that all the drug tests conducted on Mr. Armstrong including the biological passport testing of his blood, etc., have never yielded any basis for even claiming he had a positive test.

**Floyd Landis Denies Knowledge of Doping by Lance Armstrong**

130.     Floyd Landis is a former American cyclist who, between 2002 and 2004, was employed by the same cycling team that employed Mr. Armstrong.  The lead sponsor of that team was the United States Postal Service.  After the 2004 *Tour de France*, Mr. Landis signed a contract with the Phonak Hearing Systems team, and from that point forward, Mr. Landis never again competed on the same team as Mr. Armstrong.

131.     In the summer of 2006, approximately two years after Mr. Landis and Mr. Armstrong had competed in their last event as teammates, Mr. Landis won the *Tour de France*.  However, one of Mr. Landis's urine samples taken during that race tested positive for a banned synthetic testosterone.  The laboratory report of a positive test was given to USADA to pursue as a potential doping violation.  Mr. Landis vehemently denied having violated any anti-doping rules.

132.     As Mr. Landis explained in his 2007 book*, Positively False: The Real Story of How I Won the Tour de France*, despite having a positive drug test result during his victory in the *Tour de France* (by far the most popular cycling event each year), the primary interest of USADA in 2006 was not to punish Mr. Landis.  Rather, USADA's primary focus was on generating a doping case against Mr. Armstrong, who had already retired from cycling.  Mr. Landis described being approached by USADA CEO Travis Tygart after his positive test:

> Howard Jacobs [Landis's attorney] was sitting in his Los Angeles law office when the telephone rang.  It was Travis Tygart, the head lawyer for USADA.  Howard had dealt with Tygart for years while representing other accused athletes, and now they were both working on my case. This phone call was unusual, though:  Terry Madden, the CEO of USADA, was also on the line.  Howard knew Madden, but rarely communicated with him.   "From

everything we've read about Floyd, he's a straightforward, no-BS guy," Tygart began. "We think he can help us clean up the sport and get to the bigger names in cycling."

I had just won the *Tour de France*. Who was a bigger name in cycling than me? . . . The only person who would be bigger than me is someone who had won the race more times than I had – say, seven times. It was easy to figure out what he meant. USADA wanted me to give information that would show that Lance Armstrong used performance enhancing drugs during his racing career.

"If he's willing to do that, we can make him a great deal," Tygart said. Howard asked what Madden and Tygart had in mind and they ended up offering a suspension of less than a year, so that I would be cleared and able to race the 2007 *Tour de France*. A suspension that short would be unprecedented. The only thing I had to do in order to end the mess relatively quickly and get my life back were to give them information on "bigger names" and to accept the suspension.

"That's completely out of the question," I told Howard when he presented the deal to me. "In fact, I find everything about it offensive." . . . .

But I didn't have any evidence to give them about Lance, anyway. If Lance had been doping, he sure didn't tell me about it. He would have been a fool to do so. Ever since his first Tour win in 1999, the press and all sorts of different authorities had suspected Lance of doping. The year I joined Postal, in 2002, the team was under doping investigation by French officials, though the case was dropped for lack of evidence. . . . All I know is I never saw anything to indicate that Lance used performance-enhancing drugs, that his blood and urine were tested more than anyone else's, and that he never returned a positive test.

Floyd Landis, *Positively False: The Real Story of How I Won the Tour de France*, 207-209 (Simon & Schuster c. 2007).

133. There was no provision in the WADA Code in effect in 2006 that allowed USADA to offer Mr. Landis a reduced penalty in return for testimony against Mr.

Armstrong.  Defendants were so intent on building a doping case against Mr. Armstrong, however, that they offered Mr. Landis what amounted to an unauthorized sanction reduction, which would have allowed a current *Tour de France* champion with an in-competition positive to compete in the next year's event in exchange for testimony supporting doping violations by Mr. Armstrong, who was retired from cycling at the time and had not competed on the same team with Mr. Landis in years.  At the time, Mr. Landis declined the offer because, in his words, he "never saw anything to indicate that [Armstrong] used performance-enhancing drugs."

134.    By the time he wrote his 2007 book, Mr. Landis had experienced first-hand the inequities in the USADA process.  He was also acutely aware that given USADA's interest in charging athletes based on accusations by others, any athlete could destroy the career and reputation of any other athlete.  As Mr. Landis wrote, foreshadowing what he would do just three years later:

> …[A]ll it takes is a suspicion to halt a rider's career and put his reputation in doubt.  What's to stop me from starting a rumor right now and wrecking someone else's life?

*Id.* at 280.

135.    When Mr. Armstrong's counsel learned in 2007 that USADA had offered Mr. Landis a dramatic reduction in penalty in exchange for testimony against Mr. Armstrong, he wrote to the USOC.  In his letter, Mr. Armstrong's counsel made it clear that (1) Mr. Landis had already acknowledged that he had no basis to allege Mr. Armstrong had used banned substances or banned methods, (2) the applicable rules did not authorize the leniency offered to Mr. Landis, (3) testimony purchased in such a manner would not be reliable, so it could not be used to prove a violation under the

doping rules, which require proof by "reliable means," and (4) USADA's conduct violated the federal criminal prohibition of bribery of witnesses, 18 U.S.C. § 201(c)(2).

136.    The USOC responded to Mr. Armstrong's counsel, promising that the USOC would fulfill its obligation to ensure that United States athletes receive due process and fairness:

> Rest assured, the USOC takes seriously all issues relating to drug testing and adjudication within the US Olympic Movement. Similarly, issues of due process, fairness and athlete rights are very important to us and the Olympic family. Indeed, USADA was created in an effort to ensure fair process and impartiality in the Olympic Anti-Doping program.

137.    The USOC did nothing to prevent the conduct by USADA, but merely forwarded the letter from Mr. Armstrong's counsel to Defendants Tygart and USADA.

138.    Mr. Landis, who professed his innocence of USADA's charge against him, mounted a public campaign to raise money for a legal defense to the doping allegations against him. According to press reports, Mr. Landis raised about $1 million for the "Floyd Fairness Fund." Mr. Landis used this money to hire attorneys to defend him in his proceeding against USADA and, later, in an appeal to the Court of Arbitration for Sport in Lausanne, Switzerland. According to Mr. Landis, the total cost of his legal defense was more than $2 million.

139.    USADA called Greg LeMond as a witness at the arbitration hearing against Mr. Landis. Mr. LeMond, who had nothing to do with Mr. Landis' cycling career, testified that Mr. Landis admitted to Mr. LeMond that he had cheated in a telephone call after the positive test result.

140.    At the end of Mr. LeMond's testimony, when Mr. Landis' attorney tried to cross-examine him, Mr. LeMond refused to answer questions.  The AAA panel did not require Mr. LeMond to do so, and his direct testimony was nevertheless considered by the panel.

141.    More than a year after the positive test, the USADA panel found Mr. Landis guilty of a doping violation, invalidated his 2006 *Tour de France* victory, and suspended him from cycling for two years.  Mr. Landis appealed the panel decision to the CAS, the only tribunal to which the WADA Code and USADA Protocol for Olympic and Paralympic Movement Testing (the "USADA Protocol") allow him to appeal.  It took until June 2008 before the CAS panel ruled against Mr. Landis, confirmed the two-year ban, and fined him $100,000.  Throughout this two-year process, Mr. Landis maintained his innocence.

142.    In 2009, after Mr. Landis' suspension ended, Defendants helped Mr. Landis return to cycling, despite his failure to pay the fine assessed by CAS.  Defendants hoped that, despite Mr. Landis's confirmation that he had no basis for even alleging that Mr. Armstrong had used banned substances or banned methods, perhaps USADA could nevertheless convince Mr. Landis to change his story and claim he saw Mr. Armstrong cheat, or claim that Mr. Armstrong had admitted cheating to Mr. Landis.  Mr. Landis, however, as he had said, "didn't have any evidence to give them about Lance anyway."

143.    Mr. Landis returned to cycling but did not have any significant competitive success.  In 2010, Mr. Landis and his coach sought positions on the cycling team that employed Mr. Armstrong.  When he was not hired, Mr. Landis was angry with Mr. Armstrong.

## USADA Instigates WADA Rule Changes to Support
## Pursuit of Charges Without a Positive Test

144.    After Defendant Tygart, with the offer to Mr. Landis in 2006, had launched his campaign to charge Mr. Armstrong with a doping violation despite the absence of a positive doping test, Tygart worked with his former law firm—USADA's and WADA's outside counsel—to amend the WADA Code to increase Defendants' power to pressure athletes and others to offer evidence against Mr. Armstrong.

145.    WADA and Defendants Tygart and USADA were not happy that while government prosecutors under judicial supervision could engage in plea bargaining with witnesses in investigations, Defendants could not offer athletes reduced penalties to induce them to provide testimony against other athletes or others involved in professional, Olympic or amateur sports.  Therefore, Defendant Tygart worked with his former firm, USADA's and WADA's outside counsel, to change the WADA Code to provide for up to a 75% reduction in the sanction against an athlete or other person if they testify that (a) they witnessed an athlete or other person(s), preferably a very successful, high visibility athlete, commit a doping violation, or (b) the other athlete or person admitted committing a doping violation, and thereby provide substantial assistance to an anti-doping organization.

146.    The rules further provide that an athlete must prove his innocence by objective evidence.  Innocence of an athlete cannot be proven by the athlete's testimony, but guilt of an athlete can be proven by any witness the arbitrators consider credible.

## Desperate for Attention and Money, Floyd Landis Goes
## After Lance Armstrong and Others in Cycling

147.    In April 2010—with his cycling career, finances, and personal life in shambles—Mr. Landis started changing his story.  He began suggesting that he had personal knowledge that many other *Tour de France* riders had used performance enhancing drugs, and he claimed to have allegations about certain UCI officials.

148.    After weeks of making such vague and non-specific allegations and threatening to go public with them if various people in the cycling community would not help him, Mr. Landis officially changed his story.  After years of denials, Mr. Landis sent an email on April 30, 2010 only to Steve Johnson, the CEO of USA Cycling, admitting that he (Mr. Landis) had taken testosterone and EPO, and had had his blood extracted, stored, and later transfused back into him (a practice known as blood-doping).

149.    USA Cycling suggested Mr. Landis take any information he had to USADA.  Mr. Landis was adamant he did not want to do that.

150.    With a couple of minor exceptions, and one important exception, Floyd Landis's April 30, 2010 email is the basis for the entire case against Mr. Armstrong and all of the other individuals that Defendants Tygart and USADA are now, in 2012, charging with anti-doping violations.  Mr. Landis, in his email, identified every person charged by USADA in this case, either by name or by position (*i.e.,* "the doctor" and "the team doctor at the time.")

151.    The only other significant basis for Defendants' claims is an improper effort to charge Mr. Armstrong based on his 2009-2010 biological passport blood values, which are within UCI's exclusive jurisdiction and UCI's independent experts have confirmed do not constitute evidence of doping.

152.    Under the UCI Anti-Doping Rules, the rules that govern these issues and the rules to which Mr. Armstrong agreed every year when he applied for and received his international cycling license, Mr. Landis's email gave jurisdiction over this matter to the UCI.  Mr. Landis was, at the time, competing in cycling events and was a UCI "license holder."  Because Mr. Landis is the source of the allegations which USADA has investigated seeking others to support Mr. Landis' claims, UCI has exclusive jurisdiction over those allegations and any disciplinary proceedings arising out of those allegations, and only UCI can decide if a disciplinary proceeding based on these allegations can proceed.

153.    In addition, Mr. Landis was given the opportunity to present these allegations to USADA, but he specifically decided to instead present them to Mr. Johnson, the CEO of USA Cycling.  Again, UCI rules provide that if allegations or evidence of anti-doping violations originate with a national cycling federation such as USA Cycling, UCI has exclusive jurisdiction over those allegations and any disciplinary proceedings arising out of those allegations, and only UCI can decide if a disciplinary proceeding based on those allegations can proceed.

154.    The Mr. Landis email, however, was forwarded to USADA.  Undoubtedly USADA happily received it, anxious for (a) a high visibility athlete USADA could bring doping charges against, (b) an athlete with a high enough visibility that USADA might be able to convince some federal prosecutors to try to develop a criminal case, and (c) a matter that would finally make it possible for USADA and WADA to go after Mr. Armstrong and UCI, who had so embarrassed Mr. Pound and WADA and had publicly attacked the fairness of the system designed and enforced by WADA and USADA.

155.    The problem, however, was that the allegations were from Floyd Landis, a witness who was completely unreliable, who had changed his story so many times that nothing he said could be believed.  On the one hand. Mr. Landis now wanted to admit that he had been cheating constantly since at least 2002, and was aware of cheating by others.  On the other hand, Mr. Landis maintained that he had not used performance enhancing drugs during the 2006 *Tour de France*.  He still claimed that he had been wrongfully accused in 2006, and the reports of positive tests were wrong.

156.    Furthermore, one of Mr. Landis's allegations, that Mr. Armstrong had tested positive at the 2001 Tour of Switzerland, was investigated and definitively proven to be false.

157.    Mr. Landis's motivations for his abrupt about-face were questioned by many in cycling, including Pat McQuaid, the President of the UCI.  Mr. McQuaid responded to Mr. Landis's new allegations against, among others, Mr. Armstrong, with the following statement:  "I think Landis is in a very sad situation and I feel sorry for the guy because I don't accept anything he says as true.  This is a guy who has been condemned in court, who has stood up in court and stated that he never saw any doping in cycling.  He's written a book saying he won the *Tour de France* clean.  Where does that leave his credibility?  He has an agenda and is obviously out to seek revenge."

158.     Representatives of USADA should have had the same concerns regarding Mr. Landis's obvious lack of credibility and ulterior motives for changing his story, but Defendants ignored them because their primary concern was to bring down Mr. Armstrong by any means necessary.

159.     Support for McQuaid's observation that Mr. Landis had an "agenda" for his reversal have now appeared—namely, a plan by which he could benefit financially. Upon information and belief, Mr. Landis filed a qui tam lawsuit under seal in August or September of 2010 under the False Claims Act, asking the federal government to pursue Mr. Armstrong and all the other people identified by Mr. Landis, claiming they had defrauded the US Postal Service.  Mr. Landis stood to claim a significant percentage of whatever the government recovered as an alleged "whistleblower."

160.     Over time, Mr. Landis's claims regarding Mr. Armstrong changed in ways that were intended to help USADA and federal prosecutors in their investigation of Mr. Armstrong, and, at the same time, improve the qui tam lawsuit.  Upon information and belief, Mr. Landis intentionally changed his story as a means of assisting Defendants in their  efforts to coerce other cyclists to testify against Mr. Armstrong.  Mr. Landis implicated athletes and others associated with the team in 2002 to 2004, as well as Mr. Landis's team in 2005 and 2006, and Mr. Landis even alleged that he had only taken banned substances because he was pressured to do so by Mr. Armstrong and various team officials.

161.     Once Mr. Landis agreed to implicate not only Mr. Armstrong but all of his former teammates, team doctors, and trainers in his concocted doping conspiracy in May 2010, a joint investigation among USADA, DOJ and the Food & Drug Association was launched.  The Defendants and the multiple government agencies worked in concert for two years with the common purpose of developing a case against Mr. Armstrong that could be prosecuted in at least two forums:  the federal criminal courts of the United

States and Defendants' rigged arbitration process, and perhaps a third—the qui tam suit on behalf of the US Postal Service reportedly filed by Mr. Landis.

162.   Upon information and belief, in furtherance of the joint investigation, federal law enforcement officials and representatives of USADA conducted several joint interviews of witnesses, shared information and resources, and acted entirely in concert with the United States Government and with WADA, with the primary goal of building a case against Mr. Armstrong to be pursued both criminally and by USADA.

163.   The federal government, led by FDA investigator Jeff Novitsky, contributed all of its investigative and prosecutorial weapons, with powers and resources that are otherwise not available to USADA or FDA, including subpoenas, search warrants, threats of criminal prosecution, international cooperation agreements with prosecutors in other countries, the coercive power of interviews by agents of the FBI and the use of a federal grand jury, and the ability to offer immunity from criminal prosecution.

164.   USADA contributed, among other things, its ability to (a) conduct target testing and compel Mr. Armstrong to provide his whereabouts at all times and to provide to a substantial number of biological samples without notice, and retest samples already taken, tested and determined to be negative, pursuant to its right to conduct out-of-competition testing, as part of an effort to prove the used of banned substances or methods by means of a positive test, (b) threaten all other cyclists with loss of a lifetime of athletic achievements, destruction of the athlete's reputation, a lifetime ban from the athlete's profession, and the adjudication of these claims in a forum in which athletes charged with doping spend hundreds of thousands or even millions of dollars and still

have no chance of winning, and (c) offer other cyclists and others involved in the business and sport of cycling a combination of reduced sanctions, amnesty, absolution, and/or recognition as a hero who came forward to clean up the sport of cycling.

165.    Upon information and belief, USADA and the federal government spent millions of dollars of taxpayer money, not to achieve USADA's mission as announced on its website or to achieve integrity in sport, but rather to find a way to bring a case at all costs against Mr. Armstrong.

166.    In March 2011, Congressman Jack Kingston, the House Republican in charge of agricultural appropriations, slammed FDA Commissioner Margaret Hamburg for the millions of dollars the FDA was spending and the number of government employees who were being diverted from much more important FDA priorities, based on what Congressman Kingston described as FDA agent Jeff Novitsky's "one man's tear" against a celebrity athlete.  Congressman Kingston said he was concerned that it looked like "one great way to make a name for yourself in this town and in politics is to bring down a celebrity."

167.    FDA Commissioner Hamburg confirmed that she also had questions about how the FDA's investigative arm prioritized its investigations and that she appreciated Congressman Kingston's concerns and had raised some similar concerns herself.  Nevertheless, the Government continued spending many more millions of dollars of taxpayer money pursuing Mr. Armstrong for another eleven months before the federal criminal investigation was shut down.

168.    By tactical leaks to the media on a running basis, the people involved with the joint USADA-FDA-FBI-Office of Criminal Investigations-US Attorney's Office

investigation against Mr. Armstrong spread the word that they were considering a criminal conspiracy claim under the RICO statute against anyone implicated by Mr. Landis (which was every doctor, trainer, administrator or cyclist associated with Mr. Landis's teams in 2002-2006) and anyone else associated with Mr. Landis's teams.  They also spread the word, directly and through the media, that beyond the offers of criminal immunity for testimony against Mr. Armstrong, USADA was offering minimal suspensions from cycling, amnesty, and/or absolution to any cyclist who would come forward and testify against Mr. Armstrong.

169.    Defendants fully participated in using all of the federal government's resources and powers to try to coerce everyone implicated by Mr. Landis and anyone else associated with Mr. Armstrong's cycling teams from the 1990's forward to testify either that they had witnessed Mr. Armstrong using performance enhancing drugs or that he had admitted his use to them.  They also offered these same potential witnesses substantial inducements, in the form of reduced sanctions and elimination of other penalties from USADA, if they agreed to testify against Mr. Armstrong.

170.    Witnesses still involved in cycling were subjected to the implicit or explicit threat of criminal and USADA prosecution.

171.     Mr. Landis was not the only cyclist who USADA approached and offered reduced sanctions in exchange for cooperation with USADA's investigation.  At least two other cyclists confirmed to the *New York Times* that they "had been contacted by anti-doping officials who had asked them to cooperate with an investigation in exchange for leniency."

172.     On information and belief, witnesses were informed that unless they testified that they had seen Mr. Armstrong use performance enhancing drugs or banned methods and/or that Mr. Armstrong had admitted such use, and thereby could provide substantial assistance to Defendants in their efforts to pursue Mr. Armstrong, the witnesses could be charged with doping violations themselves.

173.     Coercive threats and promises of benefits from USADA may have been simply too substantial for certain riders and others to withstand.  If a cyclist did not confirm Mr. Landis's story, admit that he had cheated as Mr. Landis alleged, and state either that (a) he saw Mr. Armstrong cheat or (b) Mr. Armstrong had admitted cheating, the cyclist faced the possibility, based on Mr. Landis' testimony, of criminal prosecution under RICO, for defrauding the US Postal Service (if he was on the US Postal Service team), for perjury, or for obstruction of justice.  In addition, he faced the likelihood that he would be charged by USADA with doping violations based on Mr. Landis' testimony, found guilty in USADA's unfair arbitration process, and branded publicly as a cheat and a pariah, and fined and suspended by USADA from professional, Olympic or competitive cycling for two years or even life.  To challenge USADA would involve spending at least hundreds of thousands of dollars on lawyers in a process where all athletes charged with doping lose.  He would lose his source of income, his sponsorships, and his involvement in cycling-related businesses.

174.     USADA, however, assisted the federal criminal investigation with a carrot as well as a stick:  if a cyclist agreed to say what USADA and the government wanted, he would never be prosecuted, USADA would say he was a hero, all of his past transgressions would be forgiven, and at most he would serve a much-reduced suspension

or perhaps no suspension at all.  The witness would be responsible for ensuring that his testimony provided substantial assistance to USADA to keep the benefits being offered by Defendants.  Such offers of benefits violate the applicable anti-doping rules and United States criminal law concerning bribery of witnesses.

175.    In November 2011, Mr. Landis and his former coach were convicted of benefiting from hacking into the computers of the French laboratory that declared the positive test in the Mr. Landis's urine sample from the 2006 *Tour de France*.

176.    In April 2012, the press reported that federal prosecutors are investigating Mr. Landis in connection with possible mail and wire fraud arising out his raising of funds for the "Floyd Fairness Fund."

177.    Upon information and belief, Defendant Tygart has personally contacted the federal prosecutors considering mail and wire fraud charges against Mr. Landis in an attempt to persuade them to refrain from charging Mr. Landis, as consideration for Mr. Landis's testimony against Mr. Armstrong.

178.    In February 2012, the United States Attorney announced that its criminal investigation of Mr. Armstrong had been closed.

179.     WADA immediately issued a statement calling for the evidence gathered to be used by USADA in a doping case against Mr. Armstrong. "Now that the federal government's investigation has concluded, [WADA President John] Fahey said that WADA anticipates any evidence 'can be handed over quickly for the anti-doping agencies to take appropriate action."

180.    Defendants do not abide by, however, the obligations of DOJ prosecutors to produce exculpatory evidence and prior written statements in their possession to athletes or others against whom they bring charges.

**USADA Refuses the Request for Referral
to USADA's Ethics & Audit Committee**

181.    In a letter to Mr. Armstrong's representatives, dated June 4, 2012, and in a conversation the following day, USADA General Counsel Bock informed Mr. Armstrong that he had four days to appear before General Counsel Bock before USADA would launch disciplinary proceedings against him.

182.    At the time of USADA's demand, Mr. Armstrong no longer participated in cycling, the false allegations of drug use were more than eight years old and unsupported by any positive drug test or physical evidence, and the United States Attorney had abandoned his investigation four months earlier.

183.    Mr. Bock made clear that the purpose of the meeting was not to discuss any allegations with respect to Mr. Armstrong, but rather to receive his confession—in Mr. Bock's words, to "move forward to clean up cycling" and to "come clean." Anything else would be viewed as a false statement.

184.    Mr. Bock flatly refused Mr. Armstrong's request for a constructive dialogue.  Moreover, despite the request of Mr. Armstrong's counsel for an explanation, Mr. Bock refused to offer a reason why Mr. Armstrong needed to meet with him on less than a week's notice, particularly since Mr. Armstrong had already left the country to prepare for an upcoming triathlon competition.

185.    Mr. Bock also refused to discuss Mr. Armstrong's counsel's concern that USADA's investigation has been advanced through the unlawful disclosure and use of

grand jury information.  General Counsel Bock denied that USADA had relied upon grand jury information, but then professed not to be familiar with the fact that Defendant Tygart participated in witness interviews with Jeff Novitzky, the principal case agent against Mr. Armstrong in the criminal case, and that Agent Novitsky offered inducements to witnesses to furnish damaging testimony against Mr. Armstrong in the criminal case.

186.    In a letter dated June 8, 2012, counsel for Mr. Armstrong expressed his concerns regarding Mr. Bock's refusal to discuss these issues.  The letter requested that General Counsel Bock share Mr. Armstrong's concerns with the Chair of USADA's Audit and Ethics Committee and that Mr. Armstrong be heard before that body. USADA's bylaws and ethical rules require the submission of these issues to the Audit and Ethics Committee because they concern the conduct of the USADA General Counsel and Mr.  Bock never submitted the issues to the USADA Committee to avoid any possibility of oversight or interference with USADA's improper conduct.

187.    Mr. Bock refused to forward the allegations for independent review by the Audit and Ethics Committee or to indentify its Chair on the grounds that, in his view, the allegations were without merit and did not warrant independent scrutiny.  Mr. Bock's response made a mockery of USADA's bylaws and ethical rules.

### USADA Issues and Publicizes Vague, Unspecified Charges

188.    After Mr. Armstrong declined to meet with USADA for the purposes of providing a false confession, he received notice of a request sent by USADA to its Anti-Doping Review Board on June 12, asking that body to authorize USADA to open a formal action against Mr. Armstrong and five other individuals for participating in an alleged doping conspiracy involving violations over a 14-year period from 1998 through

the present.  The Defendants' June 12 letter even makes vague allegations about events prior to 1996, more than sixteen years ago.  As part of the charges, USADA falsely claimed that Mr. Armstrong declined to cooperate with its investigation.

189.    Within a matter of hours after Mr. Armstrong received USADA's notice, the entire letter—including the names of each respondent, including Mr. Armstrong—appeared publicly on the websites of the *Wall Street Journal* and ESPN, despite the USADA Protocol's commitment to preserve Mr. Armstrong's anonymity during the process.  The USADA Protocol, § 11(c)(ii), states "The Athlete's or other Person's name will not be provided to the Review Board by USADA and will be redacted from any documents submitted to the Review Board by USADA."

190.    Defendants also contemporaneously shared copies of the allegations with the World Triathlon Corporation, the International Triathlon Union, and USA Triathlon, intending to cause Mr. Armstrong immediate damage, including his immediate suspension from competing in triathlon events.  The Defendants were successful and caused Mr. Armstrong immediate damage, as they intended, even though the USADA Review Board had yet to review the charges.

191.    The June 12, 2012 letter included only a vague description of the charges that did not offer sufficient notice to enable Mr. Armstrong to defend himself. Defendants only claimed generally that Mr. Armstrong participated in a conspiracy to traffic and administer performance-enhancing drugs and that he committed doping violations beginning in the late 1990s.  The letter made no effort to allege specific conduct.  Defendants instead offered the most generic possible allegations of misconduct, essentially alleging that Mr. Armstrong violated rules against possession, use, trafficking,

and administration of prohibited substances; that he covered up doping violations; that he conspired with the other respondents to engage in doping violations; and that he contributed to unspecified "aggravating circumstances."

192.    Likewise, although Defendants darkly alleged a conspiracy to cover up doping violations, they provided absolutely no specificity, alleging only that since 1999 the conspiracy involved "false statements to the media, false statements and false testimony given under oath and in legal proceedings" and attempts to intimidate witnesses.

193.    Defendants' allegations also lacked a well-defined timeframe.  Instead, USADA claims that violations occurred over the course of an extraordinarily broad period that stretches from the present all the way back to 1996.  In some portions of the letter, Defendants failed even to provide a date.  In some instances the letter proposed contradictory timeframes.  Defendants' failure to narrow the timeframe of the alleged conduct particularly prejudices Mr. Armstrong because, as even the letter itself demonstrates, the applicable rules have changed repeatedly and significantly during the more than fourteen-year period covered by the USADA letter.  It is, therefore, not possible for Mr. Armstrong to know what code applied to what alleged acts. By essentially repeating a list of offenses from the Code and then claiming that Mr. Armstrong admitted them over the course of more than sixteen years, USADA had not fairly provided sufficient information to enable Mr. Armstrong to defend himself.

194.    Although alleging a long-running and wide-ranging conspiracy involving four different teams, USADA charged only one rider:  Mr. Armstrong.

60

195.    Furthermore, although Defendants' June 12, 2012 charge against Mr. Armstrong claimed to have evidence from other athletes to support the charges, neither the evidence nor the identity of any such witnesses was specified.  The letter did not identify any of the individuals who supposedly witnessed or participated in the doping violations.

196.    Dr. Martial Saugy, the Director of the Lausanne Anti-Doping Laboratory, is the only witness USADA identified by name, or for whom USADA provided a summary of his proposed testimony, in its June 12th charging letter.  In that letter, USADA claimed that during an interview, "Dr. Saugy stated that Mr. Armstrong's urine sample results from the 2001 Tour of Switzerland were indicative of EPO use."

197.    However, Dr. Saugy has rejected the notion that he will testify to the existence of a positive test by Mr. Armstrong, telling the Washington Post that, "it will never be sufficient to say, in fact, it was positive . . . .  I will never go in front of a court with that type of thing."

198.    In addition, the allegations related to a 2001 drug test which was administered by UCI in Switzerland are within the exclusive jurisdiction of UCI, were investigated by UCI, and were found to be baseless.

199.    After sending the June 12, 2012 charges to the respondents, USADA contacted one or more of the other respondents charged, and told them USADA would not pursue the charges against them if they would confirm Mr. Landis's allegations and support the charges against Mr. Armstrong.

200.    Upon receiving the charges from USADA, UCI sent a letter to USADA, asking for information about the undisclosed riders and whether any of them were

61

competing in the 2012 *Tour de France* which started on Saturday, June 30, 2012.  Upon information and belief, USADA has not responded to UCI's inquiry.

### USADA's Hand-Picked Review Board Abdicates Its Role

201.    Under the USADA Protocol, a party has ten days from receipt of a charging notice to file a written submission with the USADA Anti-Doping Board ("Review Board").

202.    The review process is supposed to ensure that the Review Board can exercise some meaningful oversight over USADA.  The USADA Protocol requires USADA to present evidence to the Board with its proposed charges, and then simultaneously to disclose the evidence to the athlete.  The athlete then has ten days to respond.

203.    When Defendants submitted the June 12 charges to USADA's Review Board, that body failed to be impartial and conduct a meaningful review, or to in any manner fulfill its basic obligation under the USADA Protocol to conduct an independent review of the evidence.

204.    Defendants have designed the USADA Protocol so that USADA cannot possibly meet its obligation to establish an impartial Review Board.  By having its chief executive officer, Defendant Tygart, appoint those individuals who will review the very matter that he wishes to prosecute, USADA violates the bedrock due process principle that deprivations of liberty and property may only occur after an impartial adjudication.

205.    The Review Board as to Mr. Armstrong also acted in total secrecy. Throughout the course of its review of the proposed charges, Defendants refused to inform Mr. Armstrong who presided over the very serious allegations against him.  By

foreclosing any scrutiny of the Review Board, Defendants prevented Mr. Armstrong from learning essential information, such as the level of each Board member's independence from Defendants and whether or not each member had sufficient expert credentials, both of which the USADA Protocol mandates.

206.    The secrecy and lack of impartiality led to *ex parte* communications between USADA and the Review Board.  The USADA Protocol requires not only that the Review Board operate independently, but that all information provided to it by USADA shall be provided simultaneously to the Athlete.  In the brief period between the filing of proposed charges with the Review Board and its final decision, the USADA General Counsel acted as gatekeeper for all communications from defense counsel to the anonymous Review Board.

207.    USADA ultimately confirmed all suspicions of *ex parte* contacts when it sent an electronic mail message to counsel, explaining that: (i) the Board requested evidence directly from USADA; (ii) USADA provided two documents to the Board; and (iii) the Board asked USADA to inform the respondents that they had one day to respond to the two belated documents.  USADA did not explain when any of these communications occurred and ignored Mr. Armstrong's request for a description of its *ex parte* communications, which plainly violate the USADA Protocol and any notion of due process.

208.    The Review Board did not provide Mr. Armstrong adequate time to respond to the proposed charges.  In complete defiance of the USADA Protocol, the Review Board gave Mr. Armstrong only one day to respond to these submissions and ignored counsel's request for an extension of time.  In addition to the impossibility of

responding within ten days to vague allegations that cover a sixteen-year period, and one day to respond to additional allegations, USADA and the Review Board compounded Mr. Armstrong's burden by delaying its presentation of evidence to the Board until after Mr. Armstrong filed his June 22, 2012 objection to USADA's jurisdiction and response to the proposed charges on June 12, 2012.

209.    The Review Board obviously did not consider Mr. Armstrong's position with respect to the evidence put before it.  Left with only one day to respond to the belatedly filed evidence, counsel for Mr. Armstrong submitted to the Board a thirteen-page, single-spaced defense at just before 5:00p.m. eastern on June 27, 2012.  Counsel presented a detailed argument that challenged USADA's jurisdiction based on the UCI's Anti-Doping Rules, explained that the information contained in the submitted materials fell outside the statute of limitations, detailed the record of lies told by a rider upon whom USADA relies, and demonstrated that statements in the submission concerning certain 2001 drug tests are verifiably wrong.

210.    Under the USADA Protocol, the Review Board had to have sufficient evidence to establish the violations alleged and the sanctions sought.  In this case, that would require evidence of the alleged violations, evidence in support of USADA's jurisdiction, evidence sufficient to support USADA's effort to ignore and extend the statute of limitations, that the rules permit conspiracy charges and charging six individuals in a single consolidated case, and evidence to support a lifetime ban.  It is clear, as a matter of law, that sufficient evidence was not submitted by USADA to the Review Board.

211.    As if to emphasize its total disregard for Mr. Armstrong's views, the Review Board issued its decision approving the charges within hours of receiving Mr. Armstrong's submission on June 27, 2012.  Far from reflecting an analysis of experts independent of USADA, the Review Board decision came in the a form letter that limply tracks the language of the USADA Protocol, perfunctorily ruling in one sentence that the Review Board considered the written information submitted to it, and concluded that there was sufficient evidence. Perhaps the most flagrant aspect of the Review Board's decision is that it ignores the applicable eight-year statute of limitations.

212.    USADA issued its charging decision on June 28, 2012.  The haste in charging, the failure to follow its own USADA Protocol, the departure from disclosure of evidence, the failure to produce substantial evidence to support the charges, the willful disregard for whether the investigation and the undisclosed evidence that is the result of that investigation are the product of unlawful conduct, and the blind embrace of secret, perhaps intimidated and/or coerced witnesses, or witnesses unworthy of belief, led Mr. Armstrong to conclude that this was not, in fact, an investigation, but a vendetta that had nothing to do with learning the truth and everything to do with settling a score and garnering publicity at Mr. Armstrong's expense.

213.    Defendants' charging letter of June 28, 2012  seeks to force Mr. Armstrong—using the only extension made available to him—to elect by 5:00 pm eastern on July 14, 2012 either to participate in USADA's pre-ordained proceeding or to agree to skip the pretense altogether and accept USADA's sanctions.  Those sanctions would include a lifetime ban on his participation in elite international and domestic competitive sports and the stripping of his cycling achievements, including his seven *Tour de France*

titles.  If Mr. Armstrong does not respond, then, on 5:01 pm eastern of the same day, USADA will automatically and unilaterally impose these sanctions

214.    Most fundamentally, Defendants' June 28 charge now seeks to railroad Mr. Armstrong to make a Hobson's choice:  participate in a hearing concerning charges spanning 16 years over which USADA has no jurisdiction, and in a forum lacking critical due process guarantees that is certain to result in an adverse decision, and thereby forfeit his claim that the tribunal has no jurisdiction and allow the result to be appealed to another infirm forum over which USADA will argue United States courts lack jurisdiction, or forego any type of hearing at all.  Either choice is certain to result in Mr. Armstrong incurring a lifetime suspension from international and elite domestic competition, the stripping of his seven *Tour de France* titles*,* and irreparable reputational damage.

215.    It is in the public interest that USADA be required to follow the rules governing its jurisdiction and conduct, and that athletes receive a "fair resolution of anti-doping matters."  The public should be able to trust in the legitimacy of the anti-doping system, and has an interest in ensuring that the system for adjudicating allegations of athletic doping is fair and meets procedural due process requirements.  More generally, it is in the public interest that government actors abide by procedural due process protections for those accused of wrong-doing and threatened, as a result, with the loss of their livelihood.

## No Jurisdiction Exists for a USADA Arbitration

216.    USADA's June 28, 2012 charge asserts that Mr. Armstrong must either acquiesce in sanctions or submit to arbitration with USADA to avoid them.  For a number

of reasons, Mr. Armstrong is not compelled to participated in a USADA proceeding. Some of those reasons are set forth herein.

217.    USADA's alleged arbitration agreement is unconscionable.  For example, by limiting the choice of arbitrators to a group pre-disposed against athletes in disputes with sports organizations and training its own arbitrators, USADA has retained essentially the exclusive right to select a panel of biased arbitrators in this matter.  Likewise, because USADA can unilaterally modify its arbitration provisions, any obligations in arbitration are purely "illusory."  Furthermore, the USADA arbitration will not provide remedies equal to those available in court in that Armstrong will be deprived of substantive rights available in Court.

218.    Furthermore, Mr. Armstrong and USADA have no agreement to arbitrate this dispute.  To the contrary, Mr. Armstrong's agreement is with UCI, not USADA. Thus, no meeting of the minds between USADA and Mr. Armstrong, or adequate consideration, supports an agreement to arbitrate between Mr. Armstrong and USADA.

219.    Mr. Armstrong has a binding, enforceable contract with UCI pursuant to Mr. Armstrong's international license and his involvement in international cycling.  Mr. Armstrong has performed his obligations under the contract and is entitled to performance by UCI.

220.    Mr. Armstrong's license with UCI was a prerequisite to the practice of his given profession, and significantly affected the practice of his profession.  Mr. Armstrong was required to become a license-holder of UCI, the international governing body for cycling, in order to participate in international professional cycling and to earn a livelihood.

221.    USADA attached the UCI Rules in effect during the period between 1999 and 2012 to its June 12, 2012 charging letter, and USADA purports to exercise jurisdiction over Mr. Armstrong pursuant to those Rules.

222.    USADA does not have jurisdiction to assert the charges it has brought against Mr. Armstrong under UCI Rules.

223.    USADA is not a signatory to Armstrong's agreement with the UCI, which is the operative agreement in this case.  The obligations between Armstrong and UCI are wholly independent of USADA and it is UCI which has original jurisdiction over the claims asserted by USADA.

224.    Once UCI has jurisdiction over a potential anti-doping rule violation, UCI cannot, under its rules, delegate its authority to a national federation or anti-doping organization until UCI has independently concluded that it is likely that a violation of the UCI Anti-Doping Rules has occurred and is based upon reliable evidence.

225.    UCI has not fulfilled any of the prerequisites necessary for it to validly delegate its authority to initiate a disciplinary proceeding to USADA.  To Mr. Armstrong's knowledge, UCI has not yet determined for itself, based on an independent review of the evidence, whether an anti-doping rule violation has taken place; asserted that an anti-doping rule violation has taken place; or after having conducted an independent review, expressly requested that USA Cycling (or, for that matter, USADA) initiate disciplinary proceedings against Mr. Armstrong.

226.    There has been a failure of an essential condition precedent to the institution of the proposed procedures by USADA.  Specifically, disposition by UCI as

provided in its procedures is an essential precondition to any proceeding or charge by USADA.

**USADA and WADA's Ongoing Conspiracy and Proposed Rule Changes**

227.    The conspiracy between USADA and WADA to change the rules in improper ways is ongoing.  WADA and USADA are continuing to work together to change the rules to (a) insulate their improper conduct from challenge, (b) give USADA the benefits and powers that government prosecutors have, (c) increase the number of cases USADA can bring without having to rely on a positive result or reliable evidence, (d) eliminate defenses available to athletes, and (e) make the rules even more unfair to athletes.

228.    For example, in this case USADA seeks to charge Mr. Armstrong with doping violations from 1998-2005.  That would require a fourteen-year, not the eight-year statute of limitations, as in the current WADA Code.  So, USADA and WADA have proposed that the statute of limitations in the next WADA Code for the primary claims be 14 years, to be applied *retroactively*.  *See* Articles 17 & 25.2, Draft Version 1.0 of the 2015 WADA Code (May 31, 2012), found at: http://www.wada-ama.org/Documents/World_Anti-Doping_Program/WADP-The-Code/Code_Review/Code%20Review%202015/Code-Draft-1.0/WADA-Code-2015-Draft-1.0-redlined-to%202009-Code-EN.pdf

229.    In this case, upon information and belief, USADA has made secret deals with athletes and others, promising them reductions in suspensions, amnesty, and not to disclose their admissions that they cheated until an agreed-upon date in the future to allow the athletes to continue to compete, including in the *Tour de France*, and to

otherwise continue to be involved in cycling.  As discussed above, those agreements and promises violate not only all applicable rules, but also the United States statute about bribery of witnesses.  UCI ha*s* written to USADA, demanding that USADA disclose whether any of the unidentified witnesses who allegedly confirm Mr. Landis's story that all riders were cheating are currently competing in the *Tour de France* and, upon information and belief, USADA has refused to respond, continuing to conceal its violation of all applicable rules.  Rather than comply with the International Federation for Cycling's rules or United States law about bribery of fact witnesses, Defendants and WADA have drafted changes in the rules, specifically new Articles 10.5.3.2 and 10.5.3.3 of the next WADA Code, to authorize the wrongful conduct in which they are engaged.

230.    As other examples, the new draft rules would allow confidentiality agreements with riders delaying the disclosure of their coerced admissions of cheating, and their redlined proposed changes for the next WADA Code adds both "[a]ssisting" and "conspiring" as new anti-doping violations as part of a new category they intend to create called "Complicity in an Anti-Doping Rule Violation.

231.    In the new WADA Code, USADA is also seeking the ability to make arguments based even on Athlete Biological Passport data that the independent experts and scientific standards conclude does not constitute evidence of doping, something they are trying to do in this case, despite its impropriety and UCI's exclusive jurisdiction over the data and any claims arising out of it.

## COUNT I
(Fifth Amendment Procedural Due Process)

232.     Mr. Armstrong repeats and re-alleges the allegations of paragraphs 1 to 231 as set forth above, and incorporates them by reference, as though set forth herein.

233.     Defendants act under color of the State in that, among other things, the United States government was instrumental in the creation of USADA, relies on USADA to carry out its obligations under an international treaty, USADA acts as a regulator under an express grant of power from Congress, the federal government provides a substantial portion of USADA's funding, and USADA otherwise fulfills functions ordinarily reserved to the State.

234.     Defendants further act under color of state law in that, among other things, the charges brought against Mr. Armstrong by Defendants are based on evidence gathered as part of a joint investigation with the United States government in which Defendants were willful participants in joint coordinated activity with the State and its agents designed to develop and support the charges Defendants now seek to assert against Mr. Armstrong.  The United States government provides significant encouragement to Defendants, and the Defendants' functions are entwined with the State policies and activities.

235.     Defendants may not deprive Mr. Armstrong of liberty or property without abiding by the Due Process Clause of the Fifth Amendment to the United States Constitution.

236.     Defendants' actions threaten proximate harm to Mr. Armstrong's valuable property interests, including but not limited to his participation in his profession of competitive athletic competition and loss of cycling achievements and titles.

71

237.    Defendants' conduct already has led to Mr. Armstrong's suspension from all triathlon competition as a result of Defendants' decision to share copies of their unauthorized allegations with the World Triathlon Corporation, the International Triathlon Union, and USA Triathlon.  Defendants have undertaken to ban Mr. Armstrong from competition for life, disqualify his competitive results, seize his medals and prizes, and impose upon him costs and fines, without according Due Process to Mr. Armstrong.

238.    Defendants have violated, and unless enjoined, will continue to be in violation of Mr. Armstrong's Due Process rights for the reasons set forth above, including but not limited to the infirmities of USADA's arbitration procedures, the lack of a charging document that fairly informs Mr. Armstrong of the charges against which he must defend, the absence of a right to cross-examine and confront his accusers, the failure to produce exculpatory evidence, the failure to disclose cooperation agreements or inducements provided by USADA to witnesses, the failure to provide investigative witness statements, the failure to provide full disclosure of laboratory analysis, the lack of impartial assessment of the accuracy of laboratory testing procedures, and the absence of a right to a hearing upon appeal to CAS.

239.    The violations of Constitutional due process standards applicable here are continuing and have caused and  unless enjoined, will continue to cause irreparable harm to Mr. Armstrong for which there is no adequate remedy at law.

## COUNT II
(Common Law Due Process)

240.    Mr. Armstrong repeats and re-alleges the allegations of paragraphs 1 to 239 as set forth above, and incorporate them by reference, as though set forth herein.

241.    Defendants' actions threaten proximate harm to Mr. Armstrong's valuable property interests, including but not limited to his participation in his profession of competitive athletic competition and loss of cycling achievements and titles.

242.    Prior to his retirement from competitive cycling, Mr. Armstrong was required to become a license-holder of UCI, the international governing body for cycling, in order to compete and to earn a livelihood.  As a condition of his license, Mr. Armstrong was required to agree to comply with, and to be bound by, UCI's anti-doping regulations.

243.    Defendants purport to derive authority to bring disciplinary proceedings against Mr. Armstrong from UCI's rules.  In bringing charges against Mr. Armstrong, Defendants have violated, and will continue to be in violation of UCI's rules for the reasons set forth above, including but not limited to lack of jurisdiction under UCI's rules to assert the charges brought against Mr. Armstrong, lack of jurisdiction over UCI test results in 2001 and 2009-2010, lack of jurisdiction over alleged violations prior to August 2005 that do not involve a positive test; UCI has not independently reviewed the evidence, determined that there is reliable evidence upon which the matter could proceed, or determined that Mr. Armstrong is in likely violation of any anti-doping regulations within its jurisdiction, and has not delegated any disciplinary proceedings to USADA in connection with any such alleged violations.

244.     Defendants' conspiracy charges against Mr. Armstrong and the bringing of a consolidated action against six respondents, including other respondents as to whom USADA lacks jurisdiction, are also unauthorized under UCI's rules, and violate common law principles of due process.

245.     In bringing charges against Mr. Armstrong, Defendants have violated, and will continue to be in violation of USADA's rules, including, but not limited to, the statute of limitations, the Review Board process, procurement of unreliable evidence from witnesses by improper means,, and agreements as to disciplinary actions relating to witnesses.

246.     Defendants' actions and continuing course of conduct as to Mr. Armstrong violate common law principles of due process.

247.     The violations of common law due process standards applicable here have caused and, unless enjoined, will continue to cause irreparable harm to Mr. Armstrong for which there is no adequate remedy at law.

## COUNT III
### (Tortious Interference With Contract)

248.     Mr. Armstrong repeats and re-alleges the allegations of paragraphs 1 to 247 as set forth above, and incorporates them by reference, as though set forth herein.

249.     At all times relevant to this Complaint, Mr. Armstrong had a contractual and business relationship with UCI that governs the matters over which Defendants now purport to charge Mr. Armstrong, including but not limited to through Mr. Armstrong's International License Application with UCI.

250.     Mr. Armstrong's contractual and business relationship with UCI included, but is not limited to, UCI's control over results management, UCI's exclusive jurisdiction

over alleged doping violations by Mr. Armstrong prior to 2005; its exclusive jurisdiction over the drug tests upon which USADA relies including tests in 2001 and 2009-10; its authority to delegate disciplinary responsibility to USA Cycling; its duty to review proposed discplinary proceedings against its license-holders; its obligation to review the evidence and determine whether it constitutes reliable means of proving an anti-doping violation before any anti-doping charge is brought against Mr. Armstrong; UCI's exclusive jurisdiction and obligation to determine whether to authorize any disciplinary proceedings against Mr. Armstrong; and UCI's obligation to abide by the statute of limitations applicable to any alleged charge against Mr. Armstrong.

251.    USADA has proceeded with its charges in contravention of the UCI rules, thereby interfering with UCI's performance of its obligations, including, *inter alia*, its commitment to abide by the eight-year statute of limitations.

252.    Defendants' charges against Mr. Armstrong, and actions leading to them have interfered and will continue to interfere with Mr. Armstrong's contractual and business relations with UCI.

253.    As a result of Defendants' interference, Defendants have caused UCI to be in breach of its obligations to Mr. Armstrong.

254.    Defendants had actual knowledge of Mr. Armstrong's contract and business relationship with UCI.

255.    Defendants' interference with Mr. Armstrong's business and contractual relationship with UCI was willful and intentional.  Defendants desired to cause the consequences of its interference with the business and contractual relationship with UCI and believed that the consequences are substantially certain to result from it.

256.    Defendants' willful and intentional acts have proximately caused and are continuing to cause damage to Plaintiff.

257.    Defendants' actions have caused, and unless enjoined will continue to cause irreparable harm to Mr. Armstrong for which there is no adequate remedy at law.

### COUNT IV
(Declaratory Judgment)

258.    Mr. Armstrong repeats and re-alleges the allegations of paragraphs 1 to 257 as set forth above, and incorporates them by reference, as though set forth herein.

259.    Mr. Armstrong is faced with efforts by the Defendants to sanction him and declare that he has been stripped of all of his athletic achievements and that he is suspended for life from elite competitive sport, which is his livelihood, if he does not submit to the jurisdiction of their improper arbitration proceeding.  This is a case of actual controversy within the jurisdiction of this court, as it is a dispute that arises under the Constitution and laws of the United States.

260.    Mr. Armstrong asks this court to declare the rights and other legal relations of the Plaintiff with respect to the Defendants, pursuant to 28 U.S.C. § 2201.

261.    In particular, Mr. Armstrong asks this Court to enter Judgment in favor of Plaintiff and against the Defendants and declare:

a.    Defendants lack jurisdiction to bring the charges asserted against Mr. Armstrong in the June 12, 2012 and June 28, 2012 letters.

b.    Mr. Armstrong has no agreement with USADA that authorizes arbitration with respect to the charges against Mr. Armstrong in the June 12, 2012 and June 28, 2012 letters.

c. Defendants have violated USADA's own rules in an effort to bring charges improperly against Mr. Armstrong;

d. The charges asserted against Mr. Armstrong are barred by the applicable statute of limitations.

e. Defendants have asserted charges against Mr. Armstrong in violation of the Due Process Clause of the United States Constitution, and common law principles of due process.

f. The arbitration and other processes to which Defendants assert the right to subject Mr. Armstrong are in violation of the Due Process Clause of the United States Constitution, and common law principles of due process.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Armstrong seeks the following relief in this action

a. As to Counts I, II, and III, preliminary and permanent injunctive relief staying the asserted requirement that Mr. Armstrong elect, by July 14, 2012, or any other date, arbitration of the June 12, 2012 and June 28, 2012  charges, or accept the sanctions specified in those documents;

b. As to Counts I, II, and III, preliminary and permanent injunctive relief enjoining Defendants from imposing any sanction, or imposing any costs of fines on Mr. Armstrong, or taking any action with respect to disqualification of competitive results, awards, titles, medals, or prizes held by Mr. Armstrong, based on the allegations in the June 12, 2012 and June 28, 2012 letters;

c. As to Counts I, II, and III, preliminary and permanent injunctive relief enjoining Defendants from all other actions in furtherance of pursuing doping

charges, imposing sanctions, or taking any action with respect to disqualification of competitive results, awards, titles, medals, or prizes held by Mr. Armstrong based on the allegations from the June 12, 2012 and June 28, 2012 letters;

d.      As to Count III, judgment in favor of Mr. Armstrong and against Defendants, ordering Defendants to pay Mr. Armstrong all damages proximately caused by Defendants, in an amount to be determined at trial;

e.      As to Count IV, a declaratory judgment in favor of Mr. Armstrong that Defendants lacks jurisdiction to bring the charges asserted against Mr. Armstrong in the June 12, 2012 and June 28, 2012 letters;

f.      As to Count IV, a declaratory judgment in favor of Mr. Armstrong that Mr. Armstrong has no agreement with USADA that authorizes arbitration with respect to the charges against Mr. Armstrong in the June 12, 2012 and June 28, 2012 letters;

g.      As to Count IV, a declaratory judgment that Defendants have violated USADA's own rules in an effort to bring charges improperly against Mr. Armstrong;

h.      As to Count IV, a declaratory judgment that the charges asserted against Mr. Armstrong are barred by the applicable statute of limitations;

i.      As to Count IV, a declaratory judgment that Defendants have asserted charges against Mr. Armstrong in violation of the Due Process Clause of the United States Constitution, and common law principles of due process; and

j.      As to Count IV, a declaratory judgment that the arbitration and other processes to which Defendants assert the right to subject Mr. Armstrong are in

violation of the Due Process Clause of the United States Constitution, and common law principles of due process.

        k.     As to all Counts, attorneys' fees and costs associated with this action and with responding and challenging USADA's June 2012 initiation of charges and charging decision;

        l.     As to all Counts, such other and further equitable relief to which Mr. Armstrong may be entitled.

## **JURY DEMAND**

Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Lance Armstrong demands a trial by jury in this action of all issues so triable.

Dated:  July 9, 2012

                                Respectfully submitted,

                                _____/s/ Timothy J. Herman_____
                                Timothy J. Herman (Bar No. 09513700)
                                Sean E. Breen (Bar No. 00783715)
                                HOWRY BREEN & HERMAN LLP
                                1900 Pearl Street
                                Austin, Texas  78705
                                Phone:  (512) 474-7300
                                Fax:  (512) 474-8557
                                therman@howrybreen.com

                                Mark S. Levinstein (*pro hac vice* pending)
                                Marcie R. Ziegler (*pro hac vice* pending)
                                Ana C. Reyes (*pro hac vice* pending)
                                WILLIAMS & CONNOLLY LLP
                                725 12th St., NW
                                Washington, DC  20005
                                Phone:  (202) 434-5000
                                Fax:  (202) 434-5029
                                mlevinstein@wc.com

Robert D. Luskin (*pro hac vice* pending)
Patrick J. Slevin (*pro hac vice* pending)
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037
Phone:  (202) 457-6000
Fax:  (202) 457-6315
rluskin@pattonboggs.com

**Attorneys for Plaintiff Lance Armstrong**

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of July, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and that I have served a true and correct copy of the foregoing document on counsel listed below via email:

William Bock, III
General Counsel
United States Anti-Doping Agency
555 Tech Center Drive, Suite 200
Colorado Springs CO  80919
wbock@usada.org