# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | |
|---|---|
| Lance Armstrong,<br><br>   *Plaintiff*,<br><br>*v.*<br><br>United States Anti-Doping Agency, *et al.*,<br><br>   *Defendants*. | Civ. Action No. 1:12-CV-00606 |

## PLAINTIFF LANCE ARMSTRONG'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION TO PRESERVE THE STATUS QUO

Robert D. Luskin (*pro hac vice* pending)
Patrick J. Slevin (*pro hac vice* pending)
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037
Phone: (202) 457-6000
Fax: (202) 457-6315
rluskin@pattonboggs.com

Mark S. Levinstein (*pro hac vice* pending)
Marcie R. Ziegler (*pro hac vice* pending)
Ana C. Reyes (*pro hac vice* pending)
WILLIAMS & CONNOLLY LLP
725 12th St., NW
Washington, DC 20005
Phone: (202) 434-5000
Fax: (202) 434-5029
mlevinstein@wc.com

Timothy J. Herman (Bar No. 09513700)
Sean E. Breen (Bar No. 00783715)
HOWRY BREEN & HERMAN LLP
1900 Pearl Street
Austin, Texas 78705
Phone: (512) 474-7300
Fax: (512) 474-8557
therman@howrybreen.com

Date: July 9, 2012

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY.................................................................................1

BACKGROUND .......................................................................................................................3

    A.      Mr. Armstrong. ...................................................................................................3

    B.      Relevant Organizations.....................................................................................4

    C.      USADA's Participation in the United States Government's Investigation. ............7

    D.      USADA Charges Mr. Armstrong After Violating Its Own Protocol.....................10

    E.      Mr. Armstrong Suffers Immediate, Concrete Harm. ...........................................11

ARGUMENT ...........................................................................................................................12

I.      MR. ARMSTRONG IS LIKELY TO SUCCEED ON THE MERITS OF HIS
      FIFTH AMENDMENT PROCEDURAL DUE PROCESS CLAIM. .........................13

    A.      USADA Is a State Actor Subject to Constitutional Limits..................................15

          1.      USADA Serves Public Functions Traditionally Reserved to the
                State.........................................................................................................16

          2.      USADA Is a State Actor In This Case Because It Has Engaged In a
                Joint Investigation with the Federal Government......................................18

    B.      As Applied Here, USADA's Arbitration Process Violates the Fifth
          Amendment's Due Process Clause. ..................................................................19

          1.      USADA Seeks To Interfere with Mr. Armstrong's Property and
                Liberty Interests. ...................................................................................20

          2.      USADA's Preordained "Arbitration" Contravenes
                Mr. Armstrong's Due Process Rights. .......................................................21

II.      MR. ARMSTRONG IS LIKELY TO SUCCEED ON HIS COMMON LAW
      DUE PROCESS CLAIM..........................................................................................23

    A.      USADA Has Breached the Governing UCI Anti-Doping Rules and Its
          Protocol by Bringing Charges Over Which It Has No Jurisdiction.....................24

          1.      The UCI Anti-Doping Rules on Which USADA Relies. .........................24

2.      USADA Has No Jurisdiction Over the Anti-Doping Violations It Has Asserted Against Mr. Armstrong. ........................................................26

3.      USADA Lacks Jurisdiction Because UCI Discovered This Matter. .........28

4.      USADA Has No Jurisdiction To Bring a Consolidated Action Against Six People Under a Conspiracy Theory. .....................................31

B.      Even If It Had Jurisdiction, USADA's Conduct Has Violated USADA's Own Rules and Fundamental Principles of Due Process. ....................................32

1.      USADA Violated the WADA Code and Its Own Protocol's Statute of Limitations. ...........................................................................................32

2.      USADA Violated the WADA Code by Entering Coercive Agreements  with Potential Witnesses, and It Seeks To Prevent Mr. Armstrong from Learning the Details of USADA's Witness Tampering. ...............................................................................................33

3.      The Review Board Process Violated the USADA Protocol. ....................35

III.    MR. ARMSTRONG IS LIKELY TO SUCCEED ON HIS TORTIOUS INTERFERENCE WITH CONTRACT CLAIM. ........................................................38

IV.     THE COURT HAS JURISDICTION TO HEAR MR. ARMSTRONG'S CHALLENGE TO USADA'S ARBITRATION CLAUSE AND MR. ARMSTRONG'S UNDERLYING CLAIMS. ..........................................................39

V.      THE AMATEUR SPORTS ACT DOES NOT PREEMPT MR. ARMSTRONG'S CLAIMS. ............................................................................43

A.      The Act Does Not Apply to Mr. Armstrong's Claims Against USADA ..............43

B.      Even Were the Act to Apply to USADA, It Would Not Bar Mr. Armstrong's Claims. ...................................................................................44

VI.     MR. ARMSTRONG WILL SUFFER IRREPARABLE HARM ABSENT TEMPORARY INJUNCTIVE RELIEF. ....................................................................45

VII.    THE BALANCE OF EQUITIES FAVORS MR. ARMSTRONG. ..............................46

VIII.   PROTECTING ATHLETES' DUE PROCESS RIGHTS IS IN THE PUBLIC INTEREST. ......................................................................................................46

CONCLUSION ......................................................................................................................48

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)......................................................18

*Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472 (5th Cir. 2008) ...........38

*Associated Builders & Contractors of Texas Gulf Coast, Inc. v. U.S. Dept. of Energy*, 451 F. Supp. 281 (S.D. Tex. 1978) ...............................................................................45

*Auburn Univ. v. S. Ass'n of Colleges & Sch., Inc.*, 489 F. Supp. 2d 1362 (N.D. Ga. 2002) ...23, 24

*Barry v. Barchi*, 443 U.S. 55 (1979)............................................................................20

*Bell v. Burson*, 402 U.S. 535 (1971).............................................................................16

*Brady v. Maryland*, 373 U.S. 83 (1963) .......................................................................14

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001)............16, 18

*Carey v. 24 Hour Fitness*, 669 F.3d 202 (5th Cir. 2012)..............................................42

*City of Los Angeles v. David*, 538 U.S. 715 (2003).....................................................21

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) .......................................21

*Dennis v. Sparks*, 449 U.S. 24 (1980)..........................................................................18

*Dietz v. Am. Dental Ass'n*, 479 F. Supp. 554 (E.D. Mich. 1979) ................................24

*DK Joint Venture 1 v. Weyand*, 649 F.3d 310 (5th Cir. 2011)......................................40

*Dobyns v. E-Systems, Inc.*, 667 F.2d 1219 (5th Cir. 1982)....................................17, 18

*Evans v. Newton*, 382 U.S. 296 (1966) ........................................................................16

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995) ..................................40

*Gibson v. Berryhill*, 411 U.S. 564 (1973) ..............................................................44, 45

*Giglio v. United States*, 405 U.S. 150 (1972) ..............................................................15

*Hamling v. United States*, 418 U.S. 87 (1974)..............................................................22

*Harding v. United States Figure Skating Ass'n*, 851 F. Supp. 1476 (D. Or. 1994), *vacated on other grounds*, 879 F. Supp. 1053 (D. Or. 1995)..............................................44

*Hatley v. Am. Quarter Horse Assoc.*, 552 F.2d 646 (5th Cir. 1977)............................23

iii

*Howerton v. Gabica*, 708 F.2d 380 (9th Cir. 1983)........................................................................18

*In re First S. Sav. Ass'n*, 820 F.2d 700 (5th Cir. 1987) .............................................................15

*In re Murchison*, 349 U.S. 133 (1955).......................................................................................21

*Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011)................................................................2, 12, 45

*John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48 (2d Cir. 2001) ............................................41

*Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123 (1951) (Frankfurter, J., concurring).....................................................................................................................21

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963)...................................................................22

*King Aerospace Commercial Corp., Inc. v. Al-Anwa Aviation, Inc.*, No. 308-CV-0999-L, 2008 WL 2676362 (N.D. Tex. July 9, 2008)........................................................................47

*La. High School Athletic Ass'n v. St. Augustine High School*, 396 F.2d 224 (5th Cir. 1968) ..............................................................................................................................17

*Little v. Streater*, 452 U.S. 1 (1981)..........................................................................................22

*Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980)...........................................................................21

*Meza v. Livingston*, 607 F.3d 392 (5th Cir. 2010) .....................................................................19

*Meyer v. Nebraska*, 262 U.S. 390 (1923) ..................................................................................20

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618 (5th Cir. 1985) ..............................................................................................................................12

*Missouri v. Holland*, 252 U.S. 416 (1920)...................................................................................16

*Molinas v. Williams*, 691 F.2d 931 (10th Cir. 1982) .................................................................17

*Murillo v. Musegades*, 809 F. Supp. 487 (W.D. Tex. 1992)........................................................46

*Murray v. United Food & Commercial Workers Int'l Un., Local 400,* 289 F.3d 297 (4th Cir. 2002) ....................................................................................................................40, 42

*Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82 (5th Cir. 1992)...............................................47

*Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986)..........................................................................................21

*Perry v. Sindermann*, 408 U.S. 593 (1972)..................................................................................20

*Peabody Holding Co., LLC v. United Mine Workers of America, Int'l Un.*, 665 F.3d 96 (4th Cir. 2012) .................................................................................41

*Phillips v. City of San Jose*, 1994 WL 706213 (N.D. Cal. Dec. 13, 1994)....................................19

*Radiant Systems, Inc. v. American Scheduling, Inc.*, 2005 WL 2105953 (N.D. Tex. Aug. 31, 2005) ..................................................................................41

*Rent-A-Ctr., W., Inc. v. Jackson*, 130 S. Ct. 2772 (2010) ..........................................................41

*Six Kingdoms Enterprises, LLC v. City of El Paso, Tex.*, EP-10-CV-485-KC, 2011 WL 65864 (W.D. Tex. Jan. 10, 2011)..................................................... 45-46

*Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580 (7th Cir. 2001) ........................................44

*Thomas M. Cooley Law Sch. v. Am. Bar Ass'n*, 459 F.3d 705 (6th Cir. 2006)...........................24

*Tittle v. Enron Corp.*, 463 F.3d 410 (5th Cir. 2006) ...................................................................40

*Torres v. S.G.E. Mgmt., LLC*, 397 F. App'x 63 (5th Cir. 2010)...................................................42

*United Church of the Medical Center v. Medical Center Commission*, 689 F.2d 693 (7th Cir. 1982) ..................................................................................45

*United States v. Perez*, 526 F.3d 543 (9th Cir. 2008) ................................................................22

*Valley v. Rapides Parish School Bd.*, 118 F.3d 1047 (5th Cir. 1997)..........................12, 22, 45, 47

*Ward v. Vill. of Monroeville*, 409 U.S. 57 (1972).......................................................................22

*Webster v. Doe*, 486 U.S. 592 (1988) ........................................................................................22

*Wells v. Dallas Indep. Sch. Dist.*, 793 F.2d 679 (5th Cir. 1986).................................................22

*West v. Atkins*, 487 U.S. 42 (1988) .....................................................................................17, 18

*Westmoreland v. Sadoux,* 299 F.3d 462 (5th Cir. 2002) .............................................................41

*Wilfred Acad. of Hair & Beauty Culture, Houston, Tex. v. S. Ass'n of Colleges & Sch.*, 957 F.2d 210 (5th Cir. 1992) ..................................................................................23

*Will-Drill Resources, Inc. v. Samson Resources Co.*, 352 F.3d 211 (5th Cir. 2003) ...................40

*Young v. Suffolk Cnty.*, 705 F. Supp. 2d 183 (E.D.N.Y. 2010).....................................................18

## OTHER FEDERAL AUTHORITIES

United States Constitution, Fifth Amendment ...................................................................... *passim*

9 U.S.C. § 10 ...................................................................................................................... 35

18 U.S.C. § 201(c)(2) ......................................................................................................... 34

18 U.S.C. § 3500 ................................................................................................................ 14

36 U.S.C. § 220509 ............................................................................................................ 43

Case 1:12-cv-00606-SS   Document 3   Filed 07/09/12   Page 7 of 55

### INTRODUCTION AND SUMMARY

Though Lance Armstrong has tested negative in every drug test ever administered to him, the United States Anti-Doping Agency ("USADA") seeks to ban him from competitive sports for the rest of his life and to strip him of his seven *Tour de France* titles.  In its June 28, 2012 charging letter, USADA asserts that Mr. Armstrong engaged in a vast conspiracy to use and traffic prohibited substances over many years, mostly more than a decade ago.  The charging letter is utterly conclusory and contains no factual basis or evidentiary support.  The United States Department of Justice ("DOJ"), working with USADA and three other federal agencies, investigated similar allegations for two years and decided in February 2012 not to bring any charges against Mr. Armstrong.

Nonetheless, USADA now seeks to force Mr. Armstrong into an adjudicative process of its own creation to face these stale charges.  In this process, Mr. Armstrong is in effect convicted before he is tried.  Witnesses may testify for USADA against Mr. Armstrong and refuse to be cross-examined—even if their testimony was procured by inducements that were never disclosed to Mr. Armstrong.  Mr. Armstrong has no right to compel USADA to disclose such inducements or to produce any other exculpatory information it obtained in its joint investigation with DOJ. In any appeal, Mr. Armstrong would not even have a guaranteed right to a hearing in the international arbitration tribunal that can review, *de novo*, the USADA arbitrators' determination. And the only judicial review that USADA would permit is by the courts of Switzerland, not the United States, where Mr. Armstrong resides.

In short, USADA has created a kangaroo court that it asserts has the power to bar Mr. Armstrong for life from his chosen profession and to strip him retroactively of the victories he has earned, including victories earned prior to USADA's creation.  USADA now offers Mr.

1

Armstrong a Hobson's Choice between undergoing this absurd pre-ordained hearing or agreeing to skip the pretense altogether and accept USADA's sanctions.  Mr. Armstrong has until 5:00 pm Eastern time on July 14, 2012 to decide between these alternatives.  If he does not respond, then, on 5:01 pm that same day, USADA will automatically and unilaterally impose up to a lifetime ban on his ability to participate in his profession and strip him of his cycling achievements.

Today, Mr. Armstrong has filed a Complaint alleging that he never agreed with USADA to arbitrate claims, let alone in this egregiously unfair manner; and that USADA and its CEO Travis Tygart are violating his due process rights under the Fifth Amendment and common law. The Complaint also alleges that USADA does not have jurisdiction and, moreover, that its charges violate the governing rules of the international cycling organization, Union Cycliste Internationale ("UCI"), which UCI and Mr. Armstrong agreed would govern any such doping charges against him.  Mr. Armstrong seeks a permanent injunction barring USADA from proceeding against him on these improper charges.

In furtherance of his Complaint, Mr. Armstrong respectfully requests that this Court temporarily enjoin USADA's proceeding and stay the July 14, 2012 deadline for Mr. Armstrong to accept or contest the charges.  He readily meets each of the four elements for temporary injunctive relief.  *See Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011).  First, Mr. Armstrong is likely to succeed on the merits of his Complaint for several independent reasons:  (1) USADA is a state actor and its self-created arbitration process does not comport with the due process to which Mr. Armstrong is entitled under the circumstances here, *see* Part I, Compl. Count I;[1] (2) USADA has violated its own Protocol by bringing charges over which it has no jurisdiction and

---

[1] For ease of reference, defendants USADA and Tygart will be collectively referred to as USADA.  Plaintiff requests relief as to both USADA and Mr. Tygart in his representative capacity as the CEO of USADA.

thus (regardless of whether USADA is a state actor) has violated Mr. Armstrong's common law due process rights, *see* Part II, Compl. Count II; and (3) USADA has tortiously interfered with Mr. Armstrong's contract with UCI, *see* Part III, Compl Count III.[2]  Any argument that Mr. Armstrong agreed to USADA's procedure, or that his claim is preempted, is meritless.  *See* Parts IV & V.

Second, without temporary injunctive relief, Mr. Armstrong will be irreparably harmed. *See* Part VI.  Absent a stay, Mr. Armstrong will be forced either to accept USADA's sanctions, including the permanent loss of his livelihood and the stripping of his numerous cycling titles, or to participate in a process that violates his Constitutional and common law due process rights, that is outside USADA's jurisdiction, and that would effectively waive his claim that USADA lacks jurisdiction to proceed.  Third, the injury to Mr. Armstrong outweighs any alleged injury to USADA, as USADA would suffer no injury at all.  Mr. Armstrong agrees that during the stay, he will not participate in any events from which he would otherwise be banned under USADA's proposed ban.  *See* Part VII.  Fourth, granting the injunction serves the public interest, because it ensures that officials abide by the Constitution and that organizations follow their own rules.  *See* Part VIII.

## BACKGROUND

### A.    Mr. Armstrong.

Mr. Armstrong is an accomplished cyclist, triathlete, and philanthropist.  During his cycling career, Mr. Armstrong won many international races, most notably winning the *Tour de France* a record seven times.  *See* Affidavit of Timothy J. Herman, Esq. ("Herman Aff.") filed concurrently herewith, ¶ 60.  Prior to his retirement in 2011, Mr. Armstrong was a UCI license

---

[2] Plaintiff's Complaint alleges four causes of action.  Count IV seeks declaratory relief based on Counts I to III.

holder.  *See id.* ¶ 61.  Mr. Armstrong obtained a UCI international license every year he competed in the *Tour de France* or any other international cycling events that required such a license.  *See id*.

In 2011, Mr. Armstrong began competing as a professional triathlete, and has competed in triathlon events organized by the World Triathlon Corporation ("WTC").  *See id.* ¶ 5.  Mr. Armstrong has entered into contracts with WTC, by which WTC agrees to pay Mr. Armstrong and his foundation for Mr. Armstrong's participation in its events.  *See id.* ¶ 57.

Mr. Armstrong also founded the Lance Armstrong Foundation ("LAF").  *See id.* ¶ 6. LAF is a leader in the global movement on behalf of 28 million people living with cancer.  *See id*.  To date, LAF has raised close to $500 million for the fight against cancer.  *See id*.  Mr. Armstrong is the foundation's largest individual contributor, having contributed more than $6.5 million to it.  *See id*.

### B.      Relevant Organizations.

The Olympic Games and the individual sports that comprise them are governed by a complicated cast of sports organizations operating at the international, national and sport-specific levels.  The International Olympic Committee ("IOC") sits atop this Olympic pyramid.[3]  The IOC coordinates and oversees two categories of sports organizations.  First, the sport-specific International Sports Federations ("IFs") regulate each of the Olympic sports on a world-wide basis.  The Union Cycliste Internationale ("UCI") is the designated IF for cycling.  It is responsible for overseeing international cycling competitions, including results management, athlete eligibility and anti-doping measures.  Its license-holders are bound by the UCI Anti-Doping Rules ("UCI ADR").

---

[3] *See generally*, the IOC Website (http://www.olympic.org/ioc).

Second, country-specific National Olympic Committees ("NOCs") oversee each country's participation in the Olympics.  The United States Olympic Committee ("USOC")—a federally-charted, nonprofit corporation—is the United States' NOC.  Below the USOC are separate National Governing Bodies ("NGBs") for each Olympic sport.  The United States' NGB for cycling is USA Cycling.

Until 1999, the individual IFs, NOCs, and NGBs were responsible for creating and implementing anti-doping regimes within their respective jurisdictions.  In 1999, the World Anti-Doping Agency ("WADA") was created,[4] with the goal of harmonizing anti-doping rules, and the implementation of those rules, across all sports and nations involved in the Olympic Games.  This new anti-doping regime called for the creation of national anti-doping organizations ("NADOs") for each country, to be approved and overseen by WADA.  USADA was created at the behest of the United States Government in 2000, and in 2001 Congress recognized USADA as the official NADO for the United States.  In 2003, WADA unveiled its first set of anti-doping rules, the World Anti-Doping Code ("WADA Code"), intended to apply across all sports and all nations.  The first iteration of the WADA Code went into effect at the 2004 Summer Olympic Games.  USADA is a signatory to the WADA Code, thereby committing to implement and enforce the WADA Code with respect to United States athletes.

---

[4] In February 1999, IOC organized the First World Conference on Doping in Sport in Lausanne, Switzerland.  *See* Herman Aff., Ex. 30.  Pursuant to the terms of the Lausanne Declaration, the World Anti-Doping Agency was established on November 10, 1999.  *See* WADA History (http://www.wada-ama.org/en/About-WADA/History/WADA-History/) (last visited July 8, 2012).

Typically, when USADA brings charges against individuals, it does so pursuant to the *Protocol for Olympic and Paralympic Movement Testing* ("USADA Protocol").[5]  Pursuant to this Protocol, to bring an anti-doping violation claim, USADA must first initiate a claim before the Anti-Doping Review Board.  *See* USADA Protocol, Arts. 9, 11.  USADA is required to follow a number of steps in connection with this Review Board, which is supposed to be an independent check on USADA's power to bring charges.  *See id*., Art. 11.  USADA files with the Board a letter of proposed changes with supporting evidence, and the athlete is supposed to be given a meaningful opportunity to respond to USADA's charges before the Review Board.  *See id*., Art. 11.c.ii.  If the Review Board determines that USADA has sufficient evidence to proceed, then USADA can move to arbitration.  *See id*., Art. 11.d.  This Protocol, and the USADA arbitration procedure, were designed with a positive drug test in mind.  Thus, Article 9, entitled "Notification," and Article 11, entitled "Results Management / Anti-Doping Review Board Track," each deal almost exclusively with how to handle arbitration in the event that a sample comes back positive.

When USADA has jurisdiction, USADA arbitrations are governed by supplementary arbitration rules in the USADA Protocol.  Under the Protocol, an arbitration decision is appealable exclusively to the Court of Arbitration for Sport ("CAS"),[6] which sits in Lausanne, Switzerland, in accordance with the CAS Procedural Rules.  *See* USADA Protocol, Annex A Art. 13; *id.*, Annex D R-45.  The CAS Procedural Rules permit the appeal panel to conduct a *de*

---

[5] The rules discussed in this brief are each attached to the Herman Affidavit as follows:  Ex. 39, the current USADA Protocol; Exs. 41–44, the current and previous versions of the UCI Anti-Doping Rules; Exs. 48 and 50, the current and former versions of the WADA Code; and Ex. 40, the current Court of Arbitration for Sport rules.

[6] The IOC created CAS in 1983 to resolve sports-related disputes from around the world.  *See* History of CAS (http://www.tas-cas.org/history) (Last visited on July 8, 2012).

*novo* review of the facts and the law.  *See* CAS Rule 57.  The CAS decision is subject to review

only by the Swiss Federal Tribunal, a court of Switzerland.  *See* CAS Frequently Asked

Questions (http://www.tas-cas.org/en/20questions.asp/4-3-231-1010-4-1-1/5-0-1010-13-0-0/)

(last visited on July 8, 2012).

### C.     USADA's Participation in the United States Government's Investigation.

As set forth in Mr. Armstrong's Complaint, WADA and USADA have a vendetta against

Mr. Armstrong for, among other reasons, well-publicized statements he has made criticizing

WADA and demanding an IOC investigation into its practices.  Following up on Mr.

Armstrong's statements, the IOC Ethics Committee criticized the actions of WADA's President,

Richard Pound.  *See* Herman Aff., Ex. 18.  In response, and in conjunction with USADA,

WADA subjected Mr. Armstrong to an unprecedented amount of in- and out-of-competition

drug testing.  No positive test has been identified, however, frustrating for years WADA's and

USADA's efforts to bring a doping case against Mr. Armstrong by any possible means.  *See*

Herman Aff. ¶¶ 63–64.

USADA's latest charges against Mr. Armstrong are a remnant of a joint investigation of

alleged doping in cycling by USADA, the Federal Bureau of Investigation ("FBI"), the DOJ's

Office of Criminal Investigation, the Food and Drug Administration ("FDA"), and the United

States Postal Service Office of Inspector General.  *See* Herman Aff. ¶ 66 and Exs. 21–24 thereto.

All five agencies worked hand-in-hand during the investigation.  For example, in November

2010, representatives of USADA (including CEO Travis Tygart), DOJ, and FDA traveled

together to France to meet with European authorities at the offices of INTERPOL.  *See* Herman

Aff. Exs. 21–23.  Upon information and belief, the agencies jointly interviewed Dr. Martial

Saugy, the Director of the Lausanne Anti-Doping Laboratory, and other witnesses, some of

whom USADA now claims—without identifying them—will testify at the USADA disciplinary

proceeding against Mr. Armstrong.  *See* Herman Aff. ¶ 67.  USADA has refused Mr. Armstrong's request for access to the information compiled by USADA during this joint investigation.[7]  *See id.*, Exs. 5 & 7.

In February 2012, DOJ announced that it had ended its investigation of Mr. Armstrong and would not bring criminal charges.  *See* Herman Aff. ¶ 68 and Ex. 51.  USADA nonetheless proceeds apace.  Immediately upon DOJ's announcement, USADA's CEO Travis Tygart publicly stated that he "look[ed] forward to obtaining the information developed during the federal investigation."  *See* Herman Aff., Ex. 24.  USADA is using the evidence gathered by the FBI, FDA, DOJ and its investigators and prosecutors, along with USADA, in the course of a grand jury investigation against Mr. Armstrong.  While DOJ in a criminal case would have to disclose exculpatory information and other material evidence to the defense, USADA admits no such obligations in its proceeding.  *See* Herman Aff. Exs. 5 & 7.

USADA has not identified a single positive drug test for Mr. Armstrong, and it proceeds here on a "non-analytical finding," *e.g.*, on allegations unsupported by a positive drug test.[8]  *See* Herman Aff. ¶ 64.  USADA evidently intends to rely in large part on testimony by certain United States cyclists targeted by USADA and government investigators.  On information and belief, these individuals were informed that unless they testified that they had seen Mr. Armstrong use performance enhancing drugs or banned methods and/or that Mr. Armstrong had admitted such

---

[7] USADA has undoubtedly stonewalled in order to obscure from public view its lack of evidence.  For example, USADA claims that Dr. Saugy will allege that one of Mr. Armstrong's urine test samples from the 2001 Tour of Switzerland—*an eleven-year old test*—indicated EPO use.  But Dr. Saugy has emphatically rejected the notion that he would validate that charge, telling *The Washington Post*: "It will never be sufficient to say, in fact, it was positive. . . .  I will never go in front of a court with that type of thing."  Herman Aff., Ex. 26.

[8] USADA alleges that a test declared negative by the Swiss lab in 2001 and tests declared negative by UCI and independent experts in 2008 and 2009 are nevertheless evidence of doping, even though they concede they were not positive tests.  *See* Herman Aff., Ex. 1.

use, they could be charged with crimes and doping violations themselves.  *See* Compl. ¶¶ 171–174.  The alleged violations could strip them of their past accomplishments, publicly label them as cheaters, lead to substantial fines and suspensions from two years to a lifetime from all involvement in their livelihood, and force them to endure an adjudication process in which athletes never win.  *See id.*  Alternatively, if they agreed to testify against Mr. Armstrong, they would obtain reduced (if any) sentences that could be conveniently served at a time when not in conflict with their competition schedules.  *See id.*  The only way the cyclists could avoid these extreme sanctions was to tell USADA what it wanted to hear.  *See id.*

As an example, cyclist Floyd Landis, who tested positive for doping in 2006, has publicly acknowledged that the leadership of USADA offered to reduce dramatically any possible penalty in his case if he would testify that he witnessed Mr. Armstrong using performance-enhancing drugs.  As Mr. Landis explained in his 2007 book, Travis Tygart and USADA were not interested in any serious punishment for Mr. Landis—their only focus was on generating a doping case against Mr. Armstrong, and they were willing to ignore any rules that stood in their way.  *See* Floyd Landis, *Positively False: The Real Story of How I Won the Tour de France* at pages 207–09 (2007) (offering first-hand account of USADA's unprecedented offer of suspension of less than a year to enable Landis to race in 2007 *Tour de France* in exchange for testimony against Lance Armstrong).[9]  Mr. Landis's subsequent allegations against Mr.

---

[9] Relevant excerpts are attached to Mr. Herman's affidavit at Exhibit 20.  In his 2007 book, Mr. Landis emphatically denied that he had any knowledge of doping by Mr. Armstrong, despite having been offered incentives by USADA to offer up evidence on Mr. Armstrong to lessen his own 2006 doping charges that stripped Mr. Landis of his 2006 Tour de France title.   It was not until after Mr. Landis's fortunes spiraled downward over the next several years, including after his request to become a rider on Mr. Armstrong's cycling team was rejected, and after he stood to benefit financially from such a charge, that he implicated Mr. Armstrong.  *See* Compl. ¶¶ 130–143, 147–161.

Armstrong (made after Mr. Landis himself tested positive for doping) are now the primary basis for USADA's current allegations.

### D.   USADA Charges Mr. Armstrong After Violating Its Own Protocol.

On June 12, 2012, USADA proposed to its hand-picked Review Board charges against Mr. Armstrong and five other individuals (none of them cyclists) for alleged doping violations over a 14-year period from 1998 through the present, along with allegations concerning doping from an undisclosed beginning point "through 1996."  Herman Aff., Ex. 1.  These charges were submitted to a three-member Review Board for review, supposedly to determine whether USADA had sufficient evidence to proceed.  Each member of the Review Board was hand-picked by USADA's CEO, Mr. Tygart.  *See* USADA Protocol, Art. 11.c.i.  As set forth in greater detail in Part II, the Review Board process was conducted in complete violation of USADA's Protocol.  USADA did not in fact present sufficient evidence to the Review Board, and Mr. Armstrong did not have a meaningful opportunity to respond to what USADA did present.  As just one example, USADA claimed to have ten witnesses to support its case, but refused to identify them or even set forth what testimony they might provide.  *See* Herman Aff., Ex. 5. Because he did not know the details of these allegations, Mr. Armstrong was of course unable to answer them.

Within hours of Mr. Armstrong's last submission, the Review Board, without explanation, permitted USADA to proceed.  *See* Herman Aff. Exs. 12 & 13.  USADA immediately filed its charging document, accompanied by a press release.  *See id*. Ex. 13. Without describing the underlying acts, or identifying when they allegedly occurred, USADA seeks to charge Mr. Armstrong with doping "use and/or attempted" use, possession, "trafficking and/or attempted trafficking," "administration and/or attempted administration," "assisting, encouraging, aiding, abetting, covering up and other complicity," and, "aggravating

circumstances." *Id.* at 5–6.  USADA claims to be charging him with actions that "commenced

on or before August 1, 1998," through "June 28, 2004"; without identifying any specific acts

taken, USADA alleges that there were violations after June 28, 2004, "at a minimum, with

respect to cover-up activities." *Id.* at 6.[10]

      The charging document gives Mr. Armstrong until July 9, 2012 to decide whether to seek

arbitration under USADA's procedures or accept sanctions.  *See id.* at 7.  The sanctions include

up to a lifetime period of ineligibility from participating in competitive events, disqualification of

all competitive results Mr. Armstrong has obtained (*e.g.*, his seven *Tour de France* titles), and

costs and fines.  *See id.* at 6.  Mr. Armstrong was offered an additional five days to respond,

which he has requested in order to provide this Court the time to review his application, while

reserving his rights and objecting to USADA's jurisdiction.  *See id.* Ex. 15.  Thus, USADA's

current deadline for Mr. Armstrong to respond is 5:00 pm Eastern time on July 14, 2012.  *See id.*

Ex. 16.

### E.      Mr. Armstrong Will Suffer Immediate, Concrete Harm.

      The World Triathlon Corporation ("WTC") is an independent corporation that organizes

triathlon events across the world; it is not an NGB or IF.  Prior to USADA's announcement of

the charges against Mr. Armstrong, Mr. Armstrong had competed in five and won two WTC-

---

[10] In its June 12, 2012 letter to Mr. Armstrong, USADA alleged:  "Lance Armstrong's doping is
further evidenced by the data from blood collections obtained by UCI from Lance Armstrong in
2009 and 2010.  This data is fully consistent with blood manipulation including EPO use and/or
blood transfusions."  A careful reading of the overall document makes it clear that USADA is
basing its claim in part on blood values from UCI blood tests taken pursuant to UCI's Athlete
Biological Passport program, as to which UCI has exclusive jurisdiction.  Mr. Armstrong has
never agreed to arbitrate such tests with USADA.  The data USADA refers to was reviewed by
UCI and its panels of experts and cleared as not indicative of a doping violation.  *See* Herman
Aff., Ex. 49.  USADA has not produced any expert opinion, as required by its own Protocol, that
explains how these blood values can evidence or prove a doping violation by Mr. Armstrong.
USADA appears to have included these legally insufficient allegations to divert attention from
the fact that it lacks any evidence that could be the basis of a doping violation based on conduct
after 2005.

sanctioned events, with the ultimate goal of qualifying for the WTC-organized Ironman World Championship in October 2012. *See id.* ¶ 55. As a result of Mr. Armstrong's participation in WTC-sanctioned events, Mr. Armstrong's Lance Armstrong Foundation ("LAF") formed a partnership with the WTC's Ironman triathlon series that would raise over $1 million benefit people battling cancer. *See id.* ¶ 56. Mr. Armstrong also stood personally to benefit financially from the contract. *See id.*

Once USADA announced its charges against Mr. Armstrong and sent them to WTC, however, WTC suspended Mr. Armstrong indefinitely from competing in WTC-sanctioned events, pursuant to a WTC rule providing that an athlete is ineligible to compete in WTC events while the subject of an open investigation. *See id.* ¶ 57. As long as USADA's disciplinary investigation remains open, he is prevented from participating in any WTC-sanctioned competitions. *See id.*

## ARGUMENT

The Court may issue a temporary restraining order or a preliminary injunction "to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 627 (5th Cir. 1985). To obtain a temporary restraining order or preliminary injunction, a movant must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) the threatened injury to the Plaintiff outweighs the injury to the Defendant; and (4) that granting the injunction does not disserve the public interest. *See Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011); *See also Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997) (granting preliminary injunction on procedural due process claim).

Each of the relevant factors weighs in favor of Mr. Armstrong.

## I.    MR. ARMSTRONG IS LIKELY TO SUCCEED ON THE MERITS OF HIS FIFTH AMENDMENT PROCEDURAL DUE PROCESS CLAIM.

USADA seeks to impose its self-created arbitration process as a substitute for a criminal proceeding that DOJ declined to bring.  That arbitration process, which was designed primarily for handling cases involving positive test results, does not afford due process for a situation like this one, in which there is no positive test result and USADA has worked in concert with the United States government to investigate the athlete.  In this unique case, USADA seeks to leverage the government's unparalleled financial and investigative resources to strip Mr. Armstrong of his livelihood and the honors he has won.  It would deprive Mr. Armstrong of these vital liberty and property rights without the basic procedural protections to which any defendant is entitled in a court proceeding—or even in a traditional arbitration conducted according to the rules of the American Arbitration Association or any reputable arbitral forum. As applied here, USADA's processes are unfair because, among many other deficiencies, Mr. Armstrong would have:

- No right to a charging document that fairly informs him of the claims against which he must defend.  USADA's charging document does not offer sufficient notice to enable Mr. Armstrong to defend himself.  Indeed, the document does not even inform Mr. Armstrong of when any particular violation allegedly occurred, making it impossible for him even to know what version of the rules might apply.  *See* Herman Aff., Ex. 13.

- No right to an appellate hearing.  As discussed above, the result of any USADA hearing is appealable to CAS, which supposedly conducts a *de novo* review.  But once the matter proceeds to CAS, that arbitration panel need not hold a hearing at all:  "After consulting the parties, the Panel ***may***, if it deems itself to be sufficiently well informed, ***decide not to hold a hearing***."  CAS Rules R44.2 & R57 (emphases added).  Thus, Mr. Armstrong is not guaranteed a hearing by the tribunal with final say over USADA's claim.

- No right to cross-examine witnesses and confront his accusers.  As an example, in the Floyd Landis USADA arbitration, Greg LeMond testified as a witness for USADA against Mr. Landis, but refused to answer certain questions on cross-examination from Mr. Landis's attorney.  The arbitration panel denied respondent's motion to strike his

testimony.[11]  *See USADA v. Landis*, No. 30 190 00847 06, ¶¶ 83, 291 (AAA Spet. 20, 2007).  The panel can also simply accept testimony by affidavit, preventing Mr. Armstrong from confronting his accusers.  *See* USADA Protocol, Annex D R-29.

- No right to an impartial arbitration panel.  The pool of available arbitrators includes only CAS Arbitrators who are also citizens of the United States.  *See* USADA Protocol D R-3.  That pool of arbitrators is chosen by sports governing bodies, without any official participation by athletes.  *See* CAS Rules at S14.  Arbitrators are appointed for renewable four year terms and CAS may elect to deny a renewal.  The USADA arbitrators are paid for by the USOC.  *See* USADA Protocol, Annex D R-48.  Given the right of CAS to deny a renewal, and the fact that athletes are not repeat players, arbitrators have obvious incentives to side with USADA.  It should not be surprising then, that of the thirty eligible arbitrators, only four have ever voted in favor of an athlete in a proceeding in which the athlete won.  *See* Compl. ¶ 94.[12]  Nor should it be surprising that athletes have won a total of only three USADA proceedings, ever.  *See id.*

- No right to exculpatory evidence, even though USADA obviously has such evidence and even though DOJ would have been required to produce it under *Brady v. Maryland*, 373 U.S. 83 (1963), if it had pursued criminal charges.

- No right to disclosure of cooperation agreements or inducements provided by USADA to its cooperating witnesses, even though USADA has made such agreements and provided such inducements (in violation of the WADA Code) and even though DOJ would have been required to produce this information under *Giglio v. United States*, 405 U.S. 150 (1972), if it had pursued criminal charges.

- No right to obtain investigative witness statements, even though there must be such statements and even though DOJ would have been required to produce them under the Jencks Act, 18 U.S.C. § 3500 (2006), if it had pursued criminal charges.  Absent such statements, Mr. Armstrong's counsel will lack the ability, fundamental to any trial lawyer, to effectively cross-examine his accusers.

- No right to obtain full disclosure of laboratory analyses.  *See* USADA Protocol, Art. 9.c. & Annexes B, C.

---

[11] This incident shows that even where the rules provide for some process, the arbitration panel need not follow it.  USADA Protocol, Annex D R-27 provides that each party shall "submit to questions . . . from the adverse party."  It further provides, however, that "the arbitrator has the discretion to vary this procedure."  *Id.*  The USADA arbitration panel can, and has in the past, sharply limited time for cross-examination of witnesses.

[12] One of those four has described USADA as follows:  "[USADA] is willfully violating the law—behaving as if they are above the law . . . . [T]hey are nothing more than bullies preying upon the vulnerable."  *USADA v. Gatlin*, AAA No. 30 190 00170 07 (Campbell, concurring in part and dissenting in part).

- No right to an impartial assessment of whether laboratory testing procedures are accurate. The WADA code includes a presumption that laboratory testing procedures are accurate. *See* WADA Code (2009), Art. 3.2.1.  Even if a laboratory testing procedure is found to be improper, the arbitration panel can consider it if the arbitrator is comfortably satisfied that the improper procedure did not cause the adverse finding.  *See id.* at cmt. to Art. 3.2.1.

- No possibility of a dissenting opinion by an arbitrator who disagrees with the majority. In response to prior dissents that highlighted the flaws in the arbitration system that make it nearly impossible for athletes to prevail, CAS amended its Rules to expressly prohibit arbitrators from filing dissenting opinions.  "Dissenting opinions are not recognized by CAS and are not notified."  CAS Rules at R46.  This extraordinary muzzling of dissident arbitrators serves no purpose other than to shield CAS and its majority arbitrators from criticism of their bias and improper conduct and to prevent the public and the courts from learning of flaws in the majority's decisions.

- No right to review by a United States court of his claims.  CAS is the exclusive appellate tribunal for any USADA arbitration, and the only appeal from a CAS decision is to the courts of Switzerland.  Thus, an arm of the United States government could bring an action against a United States athlete, who lives in the United States and is accused of taking actions within the United States, without the decision being subject to review by a United States Court.  This would be so even if the proceeding violates Mr. Armstrong's rights under the United States Constitution.[13]

The Supreme Court has emphasized that in considering due process claims, a court must look "to substance, not to bare form, to determine whether constitutional minimums have been honored."  *Bell v. Burson*, 402 U.S. 535, 541 (1971).  Here, in substance, USADA is employing its procedures in furtherance of a joint investigation with DOJ and other federal agencies, but it is providing no meaningful opportunity for Mr. Armstrong to be heard, based on a rigorous truth-seeking process, as he would receive in any federal proceeding.  For purposes of securing temporary injunctive relief, therefore, Mr. Armstrong has "a substantial case on the merits" involving "a serious legal question."  *In re First S. Sav. Ass'n*, 820 F.2d 700, 704 (5th Cir. 1987).

## A.    USADA Is a State Actor Subject to Constitutional Limits.

While USADA in the past has taken the self-serving position that it is a private entity

---

[13] USADA would certainly challenge the jurisdiction of a United States Court to review the decision in light of the exclusive appeal right to CAS under the USADA Protocol.

immune from the Fifth Amendment's requirements, in fact USADA is a quintessential state actor. The Supreme Court has recognized that "when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to constitutional limitations." *Evans v. Newton*, 382 U.S. 296, 299 (1966). Courts will deem an ostensibly private person or entity a "state actor" when "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (internal quotations omitted). A court's inquiry into whether the actions of an otherwise private person or entity constitute state action is "necessarily [a] fact-bound" one, and "no one fact can function as a necessary condition across the board for finding state action." *Id.* at 295, 298.

Here, USADA passes at least two of the state-action criteria the Supreme Court identified in *Brentwood*: the "public function" and the "joint action" tests. Under *Brentwood*, if USADA meets either of these tests, it is a state actor.

### 1.     USADA Serves Public Functions Traditionally Reserved to the State.

Since USADA's inception, its relationship to the federal government has been uniquely close. The federal government was instrumental in creating USADA in October 2000. *See* Herman Aff., Exs. 31–33. USADA receives approximately two-thirds of its funding directly from the federal government. *See* Herman Aff., Ex. 36 (USADA reporting that in 2010 it received a $10 million unrestricted grant from the federal government, and $9.8 million similar grant in 2009; with a total approximate revenue each year of approximately $15 million).

USADA and the federal government then became inseparable in July 2008, when two-thirds of the United States Senate ratified the International Convention Against Doping in Sport ("ICADIS"), an Article II international treaty, *see* 154 Cong. Rec. S6980 (July 21, 2008), and

delegated responsibility to USADA for the United States' compliance with that treaty.  *See* Herman Aff., Ex. 35.  The Senate Foreign Relations Committee found that no legislation implementing ICADIS was necessary because the United States' obligations under the treaty were already satisfied by the actions of USADA.  *See id*., Ex. 34 (excerpts of committee report).  In short, Congress relies on USADA to fulfill its affirmative obligations under an Article II treaty.  *Id.*

Under the Supreme Court's "public function" test, state action is present in the exercise by a private entity of powers traditionally exclusively reserved to the State.  *See West v. Atkins*, 487 U.S. 42, 56 (1988); *Dobyns v. E-Systems, Inc.*, 667 F.2d 1219, 1225 (5th Cir. 1982) (holding that a private corporation was a state actor because of its role as an international "peacekeeper," a traditional state function).  It is hard to conceive of a function more clearly "traditionally exclusively reserved to the State" than ensuring the United States' compliance with an Article II international treaty.   *See* U.S. Const. art. II, § 2; *Missouri v. Holland*, 252 U.S. 416, 432 (1920) (holding that implementation of a treaty is among the powers reserved solely to the federal government).

Because USADA is recognized by Congress as a national organization to carry out an anti-doping drug testing program for Olympic and Paralympic sports, is acting as a regulator under an express grant of power from Congress, enforces the United States' obligations under an international treaty, and is predominantly funded by the United States, it performs a public function and is therefore a state actor.  *See* Pub. L. No. 107-67 § 644, 115 Stat. 514, 555 (Nov. 12, 2001); 154 Cong. Rec. S6980 (July 21, 2008); *West*, 487 U.S. at 56; *Dobyns*, 667 F.2d at 1225; *see also La. High Sch. Athletic Ass'n v. St. Augustine High School*, 396 F.2d 224, 227 (5th Cir. 1968) ("There can be no substantial doubt that conduct of the affairs of [the athletic

17

association] is state action in the constitutional sense."); *Molinas v. Williams*, 691 F. 931, 940 (10th Cir. 1982) (holding that government funding is one factor in determining an entity's status as a "state actor").

### 2.    USADA Is a State Actor In This Case Because It Has Engaged In a Joint Investigation with the Federal Government.

Courts will also deem an entity to be a state actor when it is a "willful participant in joint activity with the State or its agents." *Brentwood*, 531 U.S. at 296; *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970).  Known as the "joint action" test, this axiom prevents the government from ignoring constitutional protections merely by drawing "a simple line between [the State] and people operating outside formally governmental organizations." *Brentwood*, 531 U.S. at 295.

Accordingly, even a private party that works alongside a government agency in an investigative capacity is a state actor.  In *Berger v. Hanlon*, for example, the Ninth Circuit held that members of the media who accompanied federal agents in their search of the plaintiff's property should be considered state actors because the members of the media and the federal law enforcement officers had agreed "to engage jointly in an enterprise that only the government could lawfully institute—the execution of a search warrant—for the[ir] mutual benefit."  129 F.3d 505, 515 (9th Cir. 1997) (noting that "federal entities [also] shared confidential information with the media"), *rev'd on other grounds in* 526 U.S. 808 (*per curiam*), *judgment reinstated in relevant part by Berger v. Hanlon*, 188 F.3d 1155 (9th Cir. 1999); *see also Howerton v. Gabica*, 708 F.2d 380 382–85 (9th Cir. 1983) (finding state action by private individuals where they "cloaked themselves with the authority of the state" by repeatedly requesting, and receiving, aid from the police in evicting a tenant); *Young v. Suffolk Cnty.*, 705 F. Supp. 2d 183, 198–99 (E.D.N.Y. 2010) (holding that plaintiffs had sufficiently pled that private parties were state

18

actors where they allegedly encouraged the police to perform an unlawful search of plaintiff's home and accompanied the police on that search); *Phillips v. City of San Jose*, 1994 WL 706213, *2–3 (N.D. Cal. Dec. 13, 1994) (finding sufficient allegations to establish state action by private entity where that entity and the police allegedly "joined forces" in a manner that "benefited both the police and [the private entity]"), *aff'd*, ___ F. App'x ___, 92 F.3d 1193 (9th Cir. 1996).

Here, USADA investigators have worked for two years in concert with multiple agencies of the United States to investigate and bring criminal and anti-doping charges against Mr. Armstrong.  *See supra*, Background, Part C.  USADA interviewed witnesses jointly with the DOJ and other federal agencies, shared information and resources, and acted entirely in concert. *See id.*  In short, USADA acted as an instrumentality of the federal government conducting a joint federal investigation along with several other government agencies.  USADA took advantage of this cooperative relationship to use the substantial resources of the federal government, including subpoenas, threats of criminal prosecution and use of a federal grand jury, in furtherance of the investigation; it should not now be heard to deny that it was part of this joint governmental effort.

> **B.** **As Applied Here, USADA's Arbitration Process Violates the Fifth Amendment's Due Process Clause.**

The Fifth Amendment to the United States Constitution guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V. The due process analysis requires two determinations:  first, whether there exists a liberty or property interest which has been interfered with by the State; and second, whether the procedures attendant to that deprivation were constitutionally sufficient.  *See Meza v. Livingston*, 607 F.3d 392, 399 (5th Cir. 2010).

19

1.    **USADA Seeks To Interfere with Mr. Armstrong's Property and Liberty Interests.**

Constitutionally protected liberty interests include more than "merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life . . . and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972); *see also Barry v. Barchi*, 443 U.S. 55, 64 (1979) ("[I]t is clear that Barchi had a property interest in his [professional] license sufficient to invoke the protection of the Due Process Clause.").

Here, USADA would interfere with Mr. Armstrong's liberty and property.  USADA seeks to take Mr. Armstrong's hard-earned titles in the *Tour de France*, which are valuable beyond measure and provide an ongoing economic benefit to Mr. Armstrong.  *See* Herman Aff. ¶¶ 52–54, 69–70.   Mr. Armstrong's titles alone are a sufficient property interest for due process purposes.  USADA, moreover, already has caused Mr. Armstrong's suspension from all triathlon competition as a result of its decision to share copies of its allegations with the World Triathlon Corporation and USA Triathlon, and USADA seeks to make that suspension permanent through the charges it has filed.  His inability to compete in these events has had a negative, and substantial, economic effect on Mr. Armstrong.  *See* Herman Aff. ¶¶ 54–58, 69–70.  These interests are squarely within the zone of activity protected by the Due Process Clause.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("We have frequently recognized the severity of depriving a person of the means of livelihood.").

     **2.**     **USADA's Preordained "Arbitration" Contravenes Mr. Armstrong's Due Process Rights.**

The touchstone of the Fifth Amendment analysis is the "basic requirement" of "[a] fair trial in a fair tribunal." *In re Murchison*, 349 U.S. 133, 136 (1955).  The Supreme Court has identified "two central concerns": "the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decisionmaking process." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).  As to the former, which may be called the instrumental rationale, the Due Process Clause "serve[s] as a check on the *possibility* that a wrongful deprivation would occur." *Parratt v. Taylor*, 451 U.S. 527, 538 (1981) (emphasis added), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986).  The second "central concern" focuses on the dignity that attends due process of law, and "the feeling, so important in popular government, that justice has been done." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171–72 (1951) (Frankfurter, J., concurring).

At its core, due process requires an "opportunity to be heard at a meaningful time and in a meaningful manner." *City of Los Angeles v. David*, 538 U.S. 715, 717 (2003).  For the reasons set forth above, Mr. Armstrong would not have any such opportunity under the USADA and CAS arbitration procedures as presently constituted.  At CAS he would not have any guaranteed right to a hearing of any kind.  At USADA or CAS, he would not have the right to a charging document that fairly informs him of the charges against which he must defend, to an impartial adjudicative body, to cross-examine witnesses and confront his accusers, to exculpatory evidence, to disclosure of cooperation agreements with USADA's witnesses, to prior inconsistent statements by witnesses, to an impartial assessment of laboratory testing procedures, to compel witnesses with evidence that would support his defense to attend or to testify, or even

21

to any review by a United States court of his claims.  Perhaps most significantly, Mr. Armstrong

would not have an impartial tribunal judging the claims against him.[14]

Individually and in the aggregate, these deficiencies would violate Mr. Armstrong's due

process rights.  *See Hamling v. United States*, 418 U.S. 87, 117 (1974) (right to notice);

*Goldberg*, 397 U.S. at 267–68, 271 (right to confront adverse witnesses, which is particularly

important "where [parties] have challenged [preliminary determinations] as resting on incorrect

or misleading factual premises or on misapplication of rules or policies to the facts of particular

cases"); *Valley*, 118 F.3d at 1052 (holding that "[t]he basic requirement of constitutional due

process is a fair and impartial tribunal, whether at the hands of a court, an administrative agency

or a government hearing officer"); *Wells v. Dallas Indep. Sch. Dist.*, 793 F.2d 679, 683 (5th Cir.

1986) (holding that vague charges raised question of sufficiency of notice in termination

proceeding); *Little v. Streater*, 452 U.S. 1, 10, 14 (1981) (holding that due process required state

to provide potentially exculpatory laboratory evidence in "quasi-criminal" paternity suit "[g]iven

the usual absence of witnesses, the self-interest coloring the testimony of the litigants, and the

State's onerous evidentiary rule," which rendered putative father's testimony insufficient to rebut

prima facie case for paternity established by mere accusation of mother); *United States v. Perez*,

526 F.3d 543, 545 (9th Cir. 2008) (holding that due process required state to allow cross-

examination of laboratory technician who tested urine sample that was the "critical piece of

evidence" used to revoke parolee's supervised release); *Kennedy v. Mendoza-Martinez*, 372 U.S.

144 (1963) (suggesting that criminal procedural protections should apply to civil proceedings

---

[14] Even if Mr. Armstrong had an adequate appeal right, that ability does not mean that its due
process infirmities are irrelevant.  Federal courts have made it unmistakably clear that due
process entitles a party to a meaningful hearing in every tribunal and, thus, the possibility of
appellate review never serves as an excuse to ignore constitutional injuries below.  *See Ward v.
Vill. of Monroeville*, 409 U.S. 57, 61–62 (1972).

sanctioning behavior that, if proved, would constitute a crime, or where the sanction involved has historically been regarded as a punishment); *Webster v. Doe*, 486 U.S. 592 (1988) (noting that denial by the state of a judicial forum for a colorable constitutional claim would raise a "serious constitutional question").

## II.    MR. ARMSTRONG IS LIKELY TO SUCCEED ON HIS COMMON LAW DUE PROCESS CLAIM.

Though USADA is undoubtedly a state actor, USADA's arbitration procedure violates settled principles of common law due process in any event.  Federal courts may review and enjoin private entities from violating their own rules or imposing arbitrary and unfair disciplinary procedures when, as here, valuable property interests are at stake.  *See Hatley v. Am. Quarter Horse Ass'n.*, 552 F.2d 646, 655–56 (5th Cir. 1977) (applying Texas law).  Courts require "something akin to traditional due process" when a private entity initiates disciplinary proceedings.  *Id*.  This common law due process doctrine applies when the private association's approval "is a 'virtual prerequisite' to the practice of a given profession."  *Auburn Univ. v. S. Ass'n of Colls. & Schs., Inc.*, 489 F. Supp. 2d 1362, 1369 (N.D. Ga. 2002).  "Courts developed the right to common law due process as a check on organizations that exercise significant authority in areas of public concern such as . . . professional licensing."  *Thomas M. Cooley Law Sch. v. Am. Bar Ass'n*, 459 F.3d 705, 711–12 (6th Cir. 2006).

The analysis focuses on "whether the [organization's] internal rules provide a fair and impartial procedure and whether it has followed its rules in reaching its decision."  *Wilfred Acad. of Hair & Beauty Culture, Tex. v. S. Ass'n of Colls. & Schs.*, 957 F.2d 210, 214 (5th Cir. 1992); *accord Auburn*, 489 F. Supp. 2d at 1370.  The association must act in a "substantively rational and procedurally fair" manner by exercising its powers "according to its by-laws and

constitution." *Dietz v. Am. Dental Ass'n*, 479 F. Supp. 554, 557 (E.D. Mich. 1979) (collecting cases).

      As explained above, Mr. Armstrong has a property interest in his *Tour de France* titles and in his ability to compete in sanctioned athletic events.  He will lose that property interest if his titles are stripped, and he cannot compete in such events if USADA imposes a lifetime ban on him.  USADA's compliance with its own procedures is therefore subject to judicial scrutiny. *See, e.g.*, *Auburn*, 489 F. Supp. 2d at 1376–79 (enjoining association from investigating matters over which its by-laws indicated that it lacked jurisdiction); *W. State Univ. of S. California v. Am. Bar Ass'n*, 301 F. Supp. 1129, 1137 (C.D. Cal. 2004) (granting temporary injunction to prevent ABA from stripping university's accreditation before case could be heard on the merits).

### A.    USADA Has Breached the Governing UCI Anti-Doping Rules and Its Protocol by Bringing Charges Over Which It Has No Jurisdiction.

      USADA purports to charge, and exercise jurisdiction over, Mr. Armstrong pursuant to the UCI Rules in effect during the period between 1999 and 2012.  *See* Herman Aff., Ex. 1 at 12–13.  But USADA apparently has not read the very rules on which it relies, because under those rules, USADA has no jurisdiction to assert the charges it has brought against Mr. Armstrong.

### 1.    The UCI Anti-Doping Rules On Which USADA Relies.

      Prior to his retirement, Mr. Armstrong was eligible to compete in sanctioned events through yearly international licenses he obtained from UCI.  Under the terms of Mr. Armstrong's UCI license prior to 2004, he agreed to follow the "UCI antidoping regulations," and further agreed "that the sole jurisdiction for resolving disputes that may arise shall be in the courts of the domicile of the UCI."  Herman Aff., Ex.47.  Although USADA purports to bring charges against Mr. Armstrong for the period between 1996 and 2005, Mr. Armstrong's license agreements with

UCI prior to 2004 made no reference to USADA and contained no agreement conferring any authority on USADA.  Similarly, prior to August 13, 2004, UCI's governing rules conferred no authority on USADA.

Prior to August 13, 2004, the UCI administered its own anti-doping test system, and UCI's Anti-Doping Regulations provided that "[t]hese Regulations and these alone shall apply" to international events.  *E.g.*, UCI Antidoping Examination Regulations (1999) (Herman Aff., Ex. 44), Art. 4.  Under the UCI regulations, USADA had no jurisdiction over any doping matters prior to August 13, 2004.  *See also* UCI Antidoping Examination Regulations (July 1, 2001) (Herman Aff., Ex. 43), Art. 2.

On August 13, 2004, UCI adopted new "Anti-Doping Rules" (the "UCI ADR").  The UCI ADR provided, for the first time, that testing for national events would be initiated by NADOs, *e.g.*, USADA, and gave the NADOs the limited responsibility of adjudicating their tests that laboratories declared to be positive.  *See* August 13, 2004 UCI ADR (Herman Aff., Ex. 42), Rule 2.  It further provided, however, that testing at international events would be "initiated and directed by the UCI, or by the National Federation of the country or any other organization or person so authorized by the UCI.  *Doping Control*[15] [for international events] shall be governed by these Anti-Doping Rules exclusively."  *Id.*, Rule 3.  UCI issued new ADR in 2012 that reflect this language and added additional exclusivity for UCI's jurisdiction.  *See* 2012 UCI ADR (Herman Aff., Ex. 41), *e.g.*, Rules 4, 10, 12, & 16.[16]

---

[15] *Doping Control* is defined as "[t]he process including test distribution planning, Sample collection and handling, laboratory analysis, results management, hearings and appeals."  August 13, 2004 UCI ADR (Herman Aff., Ex. 42), Appendix 1.

[16] Unless otherwise indicated, the discussion hereafter refers to the 2012 UCI ADR.

**2.    USADA Has No Jurisdiction Over the Anti-Doping Violations It Has Asserted Against Mr. Armstrong.**

Mr. Armstrong retired from competitive cycling in February 2011.  *See* Herman Aff. ¶ 65.  USADA sent its charging letter in this case on June 12, 2012, over a year after Mr. Armstrong's retirement.  The charging letter initiated a procedure described in the rules as a "results management process."  The UCI ADR provides that:

> [i]f a *License-Holder* retires before any results management process has begun the *Anti-Doping Organization* which would have had results management jurisdiction over the *License-Holder* at the time the *License-Holder* committed an antidoping rule violation, has jurisdiction to conduct results management, without prejudice to the default jurisdiction of the UCI under [Rule] 17.

UCI ADR, Rule 16.[17]  In other words, since Mr. Armstrong retired from cycling before USADA initiated its action against him, the organization that had jurisdiction over him during the time of the rule violations has jurisdiction to determine whether to proceed against Mr. Armstrong.  That organization is UCI, not USADA.

USADA claims that Mr. Armstrong used prohibited practices or substances "during the period from before 1998 through 2005, and previously used EPO, testosterone and [HGH] through 1996."  Herman Aff., Ex. 1 at 10–11.  Thus, "the time [in which Mr. Armstrong allegedly] committed an anti-doping rule violation" was from some time before 1996 through 2005.

This date range may be divided into two parts for purposes of the applicable Rules.  First, for the time period *prior to August 13, 2004*, UCI's Anti-Doping Regulations provided that "[t]hese Regulations and these alone shall apply" to international events.  *E.g.*, UCI Antidoping Examination Regulations (1999) (Herman, Aff. Ex. 44), Rule 4.  The regulations further

---

[17] Article 7.6 of the USADA Protocol provides the same result.  *See* Herman, Aff. Ex. 39.

provided that they "shall be binding upon all National Federations which may neither deviate therefrom nor add thereto." *Id.* As of July 2001, the UCI Anti-Doping Examination Regulations provided that, in addition to applying to international events, the UCI regulations "and these alone" applied to "all aspects of antidoping controls in national events and to out of competition tests by the national federations," as well as "out of competition tests by the UCI." UCI Antidoping Examination Regulations (July 1, 2001) (Herman, Aff., Ex. 43), Rule 2.

USADA therefore has no jurisdiction over any alleged doping violations by Mr. Armstrong that took place prior to August 13, 2004. Under the current UCI ADR, Rule 16, the entity with jurisdiction at the time of the alleged violation has jurisdiction today; and that entity was UCI, not USADA. That should end the matter because USADA's charges identify the entire period between 1996 and 2005, without specifying any alleged violations that occurred after August 13, 2004.

Even if USADA had alleged a violation occurring in the time period between August 13, 2004 and 2005, USADA would lack jurisdiction. After August 13, 2004, UCI continued to retain jurisdiction over Doping Control (including investigations, charges, and hearings) relating to testing at international events and testing performed by UCI outside of competition. *See, e.g.*, UCI ADR (2012) Rules 2, 4, 5, 134, 135, 202–34. The charges brought by USADA against Mr. Armstrong involve a 2001 test conducted at an international event, as well as testing done by UCI in 2009 and 2010. *See* Herman Aff., Ex. 1 at 11. Indeed, USADA relies on those tests as purported evidence of doping violations by Mr. Armstrong. *See id.* But, under the governing UCI Rules, only UCI has jurisdiction over the 2001, 2009, and 2010 tests and any charges relating to those tests. UCI has not brought charges against Mr. Armstrong relating to those

tests, and indeed has determined that those tests do not contain any evidence of purported doping.[18] *See id.*

### 3.    USADA Lacks Jurisdiction Because UCI Discovered This Matter.

USADA also lacks jurisdiction to assert its charges against Mr. Armstrong for a second, and independent reason: because UCI "discovered" the allegations that led to USADA's current charges.  The UCI Rules contain special jurisdictional provisions that apply to "non-analytical positive" cases like this one—that is, cases without a positive drug test.  *See* UCI ADR, Rule 23. Under governing UCI rules, in a non-analytical positive case, UCI and not USADA has jurisdiction over any alleged violations that UCI "discovered."  This is a crucial protection, which UCI promised to athletes when UCI, for the first time, decided to allow disciplinary hearings for doping in the absence of a positive test.  UCI did not want to open the floodgates to disciplinary proceedings based on unsubstantiated allegations or unreliable evidence, so it retained control of such proceedings in (among other circumstances) cases where UCI and another agency like USADA are both aware of the alleged violation.

In this case, the "discovery" rule gives jurisdiction exclusively to UCI, not USADA. USADA cites to Rules 10 and 13 of the UCI ADR as the basis for its authority to pursue charges against Mr. Armstrong in the absence of a positive test.  *See* Herman Aff., Ex. 1 at 12–13.  Rule 10 states:

---

[18] Under the applicable protocol for the handling of these samples, Mr. Armstrong would have received notification from UCI long before now if UCI had concluded that the samples were positive or were evidence of use of a banned substance or method.  *See* Herman Aff., Ex. 49.

> The UCI has jurisdiction for and these Anti-Doping Rules shall apply to any anti-doping violation committed by a *License-Holder* where no *Sample* collection is involved and that is discovered: (i) by the UCI, by one of its constituents or member Federations, [or] *License-Holders*, …; or (ii) by a body or individual that is not an *Anti-Doping Organization*.

UCI ADR, Rule 10.  Furthermore, under Rule 12 of the UCI ADR, if evidence of an anti-doping violation is "discovered" by both UCI and another anti-doping organization, such as USADA, UCI has jurisdiction over the decision about whether to initiate a disciplinary proceeding, and would have jurisdiction even if the other anti-doping organization "discovers" the violation first. *See* UCI ADR, Rule 12.  "Discovery" is defined as "the finding of elements that turn out to be evidence for facts that apparently constitute an anti-doping rule violation, regardless of the *Anti-Doping Organization* who qualifies that evidence as such." *Id.*[19]

Here, USADA suggests that it "discovered" the alleged anti-doping violation by Mr. Armstrong when USADA received an e-mail from Floyd Landis that was sent to it by the CEO of USA Cycling.  *See* Herman Aff. ¶ 11 and Ex. 10.  USA Cycling is a "member Federation" of UCI.  The April 30, 2010 e-mail from Mr. Landis was sent by Mr. Landis first to USA Cycling, and then was later forwarded the next day to, among others, USADA.  This e-mail confirms that both Mr. Landis (a UCI "License-Holder") and USA Cycling (a "member Federation" of UCI) "discovered" the alleged violation before USADA.  The e-mail from USA Cycling is crystal clear that Mr. Landis had refused to submit his allegations to USADA.  Thus, under UCI ADR Rule 10, the very rule on which USADA purports to rely for its jurisdiction, UCI, not USADA, has exclusive jurisdiction to determine whether to proceed.

---

[19] Mr. Armstrong assumes solely for purposes of argument that an alleged violation was "discovered."

Even if somehow USADA had "discovered" the alleged violation before either Mr. Landis or USA Cycling, under Rule 12 of the UCI ADR, UCI nevertheless assumed exclusive jurisdiction over any disciplinary proceedings that might arise from that alleged violation. *See* UCI ADR, Rule 12. When UCI and another Anti-Doping Organization both "discover" an anti-doping violation, "UCI **may** decide to leave the case to the *Anti-Doping Organization* concerned." *Id.* (bolding emphasis added). In other words, UCI retains jurisdiction unless it specifically decides to delegate that jurisdiction to another anti-doping organization. Here, however, UCI never delegated its jurisdiction to USADA.

Once UCI has jurisdiction over a potential anti-doping rule violation, UCI cannot, under its rules, delegate its authority until UCI has independently concluded that it is likely that a violation of the UCI ADR has occurred. Rule 229 of the UCI ADR directs that, in the absence of a positive test (as here): "UCI ***shall examine*** concrete elements indicating that an anti-doping violation may have been committed . . . ." *Id.* (emphasis added). Only if "upon conclusion of the results management process, the UCI makes an assertion that an anti-doping rule violation has taken place" is UCI permitted to refer the matter to the individual's national federation "to instigate disciplinary proceedings." UCI ADR, Rule 234. On the other hand, "[i]f . . . the UCI considers that no anti-doping rule violation . . . has taken place, then the case ***shall be taken no further***." UCI ADR, Rule 232 (emphasis added). In short, *UCI must* examine the evidence and *UCI must* make its own assessment of whether a case should proceed. If UCI does not determine that a rule violation has taken place, then the case must be stopped.

In this case, none of the requirements for a delegation of authority has been satisfied. UCI has not determined for itself, based on an independent review of the evidence, whether an anti-doping rule violation has taken place; asserted that an anti-doping rule violation has taken

30

place; or expressly requested that USA Cycling (or, for that matter, USADA) initiate disciplinary

proceedings against Mr. Armstrong.

### 4. USADA Has No Jurisdiction To Bring a Consolidated Action Against Six People Under a Conspiracy Theory.

According to its charging letters, USADA seeks to prosecute six individuals in "a single

consolidated action" for their alleged participation in a world-wide "doping conspiracy" from

"January 1, 1998, through the present."  Herman Aff., Ex. 1 at 11.  Even if USADA had any

jurisdiction to bring charges against Mr. Armstrong, USADA's consolidated conspiracy claim is

not only unprecedented, it also violates express provisions of the UCI ADR.

The UCI ADR are clear that, even where UCI delegates authority for prosecuting an

alleged violation to another anti-doping organization (which has not occurred here), the hearing

panel shall hear the case exclusively under the UCI ADR.  *See* UCI ADR, Rule 257.  UCI's

Rules do not recognize the existence of an independent anti-doping violation for participation in

a so-called "doping conspiracy," and such a theory is antithetical to the notion, replete

throughout the UCI ADR, that an individual may only be disciplined for his or her actions, not

the acts of others.[20]  Indeed, the UCI ADR specifically enumerate the anti-doping violations that

are actionable, and a "doping conspiracy" (or anything similar) is not among them.  *Id.*, Rule 21.

Likewise, the repeated use of the defined terms "*License-Holder*" and "*Rider*," in the singular,

demonstrates that UCI envisions a separate hearing for each person accused of a doping

violation.  *See id.*, Arts. 249, 251 and 273.

---

[20] *See, e.g.*, UCI ADR, Rule 10 (recognizing that "UCI has jurisdiction for and these Anti-Doping Rules shall apply to any anti-doping violation committed by *a License-Holder*"); *id.*, Rule 21.1.1. ("It is each *Rider's* personal duty to ensure that no *Prohibited Substance* enters his body.").

**B.**     **Even If It Had Jurisdiction, USADA's Conduct Has Violated USADA's Own Rules and Fundamental Principles of Due Process.**

USADA not only lacks jurisdiction to bring its charges in the first place, it has also violated its own rules, as well as fundamental notions of fairness and due process, in many respects.  These violations include the following breaches:  (1) USADA's charges contravene its own statute of limitations; (2) USADA has provided improper inducements to witnesses, in direct violation of the governing rules; and (3) USADA subverted the process of its own Review Board that supposedly is designed as a check upon USADA's abusive charging decisions.

**1.**     **USADA Violated the WADA Code and Its Own Protocol's Statute of Limitations.**

Under the USADA Protocol (the rules governing USADA's testing and results management):

> No action may be commenced against an *Athlete* or other *Person* for an anti-doping rule violation contained in the *Code* unless such action is commenced within eight (8) years from the date the violation is asserted to have occurred.

USADA Protocol, Annex A Art. 17.[21]  Because USADA's charges were issued on June 28, 2012, the eight-year limitations period extends to June 28, 2004.  Yet, USADA charges conduct allegedly occurring long before the limitations period.  It complains of doping "from before 1998" or "through 1996," and a cover up "[b]eginning in 1999."  Herman Aff., Ex. 1 at 11–12.

To save its stale claims, USADA falsely invokes the concept of fraudulent concealment.  *See id.* at 14.  As an initial matter, that theory is contrary to the plain text of the Protocol, which does not permit for any tolling of the statute.  In any event, whether fraudulent concealment is available under USADA's theory is a question governed by Swiss law.  *See* UCI ADR, Rule 345

---

[21] Annex A of the USADA Protocol incorporates the WADA Code.  *See* USADA Protocol, Annex A.

(disputes under the UCI ADR are governed by Swiss law).  USADA has not established that Swiss law permits such tolling.

Whatever law applies, USADA's claims fail.  USADA's theory is that because Mr. Armstrong has denied that he has engaged in doping violations, he has fraudulently concealed his alleged doping.  Because civil cases always involve a defendant's denial of liability to some degree, USADA's argument, if accepted, would eviscerate the statute of limitations.

> ## 2. USADA Violated the WADA Code by Entering Coercive Agreements with Potential Witnesses, and It Seeks To Prevent Mr. Armstrong from Learning the Details of USADA's Witness Tampering.

USADA's conduct in coercing and bribing potential witnesses, such as Mr. Landis, to testify against Mr. Armstrong violated the WADA Code and Mr. Armstrong's rights.  USADA's conduct would, of course, be powerful ammunition for cross-examination if Mr. Armstrong were privy to all of the details, as he would be in any criminal or civil judicial proceeding.  But, unlike the prosecutors with whom it collaborated, USADA is not required to inform Mr. Armstrong of this exculpatory information.  And since the relevant witnesses can simply refuse to testify about USADA's conduct on cross-examination, even assuming the witnesses are presented to testify live instead of through affidavit, Mr. Armstrong may not have any opportunity to learn how USADA procured their testimony against Mr. Armstrong.

Even if USADA's conduct were fully disclosed, it would be improper under WADA rules, which govern USADA's conduct.  The WADA Code constrains USADA's ability to offer athletes the equivalent of sentencing reductions in exchange for their cooperation.  The Code provides that any reduction of an athlete's period of ineligibility must take place only *after* charges have been brought and the period of ineligibility has been determined.  Thus, USADA cannot make promises of reduced penalties to individuals who have not been charged as a way of inducing testimony against Mr. Armstrong.

33

Article 10.5.5 of the WADA Code provides that, "[b]efore applying any reduction or suspension under Article[]    . . . 10.5.3 [substantial assistance] . . . **the otherwise applicable period of *Ineligibility* shall be determined**  . . . ."  *Id.* (emphasis added).  Similarly, Article 10.5.3 provides that an *Anti-Doping Organization* with results management responsibility may . . . suspend a part of the period of *Ineligibility* **imposed in an individual case** where the *Athlete* or other *Person* has provided *Substantial Assistance* . . . ."  *Id.* (emphasis added).  Both of these provisions require a determination of the applicable ineligibility period before any part of that period may be suspended for substantial assistance.  USADA's "deals" with potential witnesses, including any arrangement in which a rider is not charged or his admission of guilt is concealed until a more convenient time, violate the WADA Code.

USADA's secret deals with witnesses also violated the WADA Code by nullifying UCI's notice and appeal rights.  Article 10.5.3 of the WADA Code provides that, "[i]f an *Anti-Doping Organization* suspends any part of the otherwise applicable period of *Ineligibility* under this Article, the *Anti-Doping Organization* shall promptly provide a written justification for its decision to each *Anti-Doping Organization* having a right to appeal the decision."  Under Article 13.2.3 of the WADA Code, UCI is an Anti-Doping Organization with a right to file such an appeal.  USADA improperly denied UCI its right to notice and an opportunity to be heard on these issues by making secret deals with riders that include promises of leniency without complying with requirements of the WADA Code.

Apart from violating the WADA Code, USADA's inducements raise serious concerns under federal criminal law.  Offers such as the one provided to Mr. Landis may well violate  the federal bribery statute, 18 U.S.C. § 201(c)(2), which criminalizes the exchange or offer of "anything of value" for sworn testimony given to an officer authorized by federal law to receive

it.  The hearings in which these athletes would testify occur before officers authorized by the laws of the United States to hear evidence.  Consequently, if USADA generates testimony by providing inducements to witnesses—particularly when unauthorized—in violation of federal law, their conduct violates federal criminal law, and any arbitration decision sought or issued on that basis would be nullified as having been "procured by corruption, fraud or undue means."  9 U.S.C. § 10 (2006).

### 3.      The Review Board Process Violated the USADA Protocol.

Under the USADA Protocol, the Review Board is designed to serve as a screening mechanism to prevent the agency from asserting meritless or improvident charges.  *See* USADA Protocol, 11.c.ii & iii.  The Review Board is supposed to review information provided to it by USADA and the athlete, and on the basis of that information it should make a "written recommendation," as to whether "there is sufficient evidence of doping to proceed with the adjudication process."  *Id*., at 11.c.vii.  The Review Board is to be composed of "experts independent of USADA, with medical, technical and legal knowledge of anti-doping matters."  *Id*. 11.a.

Contrary to its Protocol and rudimentary due process, USADA's June 12, 2012 notification letter did not provide any information that would allow Mr. Armstrong to respond or the Review Board to consider the proposed charges.  Instead, USADA only generally asserted that unnamed witnesses will say that Mr. Armstrong participated in a conspiracy to traffic and administer performance-enhancing drugs and that he committed doping violations beginning in the late 1990s.  USADA's letter wholly failed to provide Mr. Armstrong enough detail to understand these extraordinarily broad charges, much less to provide a response within the Protocol's ten-day deadline.  *See id.* 11.c.iii; Herman Aff., Ex. 8.

USADA's nebulous allegations also lack any defined timeframe.  The agency claims that violations occurred over the course of an extraordinarily broad period that stretches from the present all the way back to *before* 1996.[22]  USADA's failure to identify when the various alleged violations occurred within this vast time period is particularly prejudicial because the case is apparently based primarily on other undisclosed riders testifying that Mr. Armstrong admitted to these violations at undisclosed times and in undisclosed locations.  In addition, the applicable rules changed repeatedly and significantly during the approximately fifteen-year period covered by the USADA letter.  *See* Herman Aff., Ex. 1 at 5–6, n.2 (listing codes and differing years of applicability); *see* USADA Protocol, Art. 25.2 ("[C]ase shall be governed by the substantive anti-doping rules in effect at the time the alleged anti-doping rule violation occurred . . . .").  It is, therefore, impossible for Mr. Armstrong to know what code applied to what alleged acts.

Most stunningly, the letter does not identify any of the individuals who supposedly witnessed or participated in the doping violations.  It only claims vaguely that "numerous riders, team personnel and others will testify."  Herman Aff., Ex. 1 at 2, 10 ("more than ten (10) cyclists as well as cycling team employees").  It is simply impossible for Mr. Armstrong, or any defendant, to respond meaningfully to unspecified allegations made by unidentified witnesses.

In addition to the lack of notice, the Review Board itself operated in violation of the USADA Protocol and in a manner inconsistent with due process.  At a minimum, the agency owed Mr. Armstrong an impartial and thorough review of the evidence upon which USADA planned to proceed.  *See* USADA Protocol, at 11.c.vi; *see supra*, Part I.  Yet the Review Board took only hours to approve USADA's charges, and it apparently never asked to review (let alone

---

[22] *See, e.g.*, Herman Aff., Ex. 1 at 10–11 (use of banned substances "during the period from before 1998 through 2005"); *id.* at 11 (use of banned substances "through 1996").

actually reviewed) USADA's purported evidence against Mr. Armstrong.  The Review Board provided no reasoning or explanation for its decision blindly to bless USADA's charges.

The Review Board's conduct is hardly surprising, because USADA has designed its Protocol so that the Review Board cannot possibly be impartial.  Under Protocol section 11.b., review of USADA's proposed charges occurs through "three Review Board members appointed in each case by USADA's CEO."  In this instance, USADA's CEO, Travis Tygart, is one of the USADA employees who has worked with federal prosecutors to pursue Mr. Armstrong.  *See supra*, Background, Part C.  Mr. Tygart is in no position to appoint "independent" Review Board members to decide whether he could bring charges he had spent over two years investigating.

The Review Board, moreover, acted in total secrecy; Mr. Armstrong was not even informed of the identity of its members so that he could communicate with them directly with a copy to USADA.  Instead, Mr. Armstrong was forced to submit all requests in writing to USADA, who then *may* have submitted them to the Review Board.  USADA would not confirm whether, in fact, it had done so.

The secrecy and lack of impartiality led to *ex parte* communications between USADA and the Review Board that violate the Protocol.  The Protocol requires that all "information" provided to it by USADA "shall be provided simultaneously to the Athlete."  USADA Protocol 11.c.ii.  Yet USADA had *ex parte* contacts with the Review Board throughout the process.  *See* Herman Aff. Exs. 10 and 11.  After Mr. Armstrong learned of the existence (but not the substance) of the communications, USADA refused to explain when these communications occurred, much less their content.  To make matters worse, the Review Board then provided Mr. Armstrong only one day to respond to the only evidence that USADA put before the Review Board, thus violating the Protocol's requirement of ten days.  *See id.* Ex. 12.

37

**III.     MR. ARMSTRONG IS LIKELY TO SUCCEED ON HIS TORTIOUS INTERFERENCE WITH CONTRACT CLAIM.**

Finally, Mr. Armstrong is likely to prevail on the merits of his claim that USADA has tortiously interfered with the contract between UCI and Mr. Armstrong.

A claim for tortious interference requires proof "'(1) that a contract subject to interference exists; (2) that the alleged act of interference was willful and intentional; (3) that the willful and intentional act proximately caused damage; and (4) that actual damage or loss occurred.'" *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 489 (5th Cir. 2008) (applying Texas law).  To prove such a claim, "a plaintiff is not required to prove intent to injure, but rather 'only that the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it.'"  *Id.* at 490.  The interfering party must have "actual knowledge of the contract or business relation in question."  *Id.*

During each of the years in question, Mr. Armstrong signed an International License Application with UCI that constituted a binding contract.  USADA's charges against Mr. Armstrong in violation of UCI rules interfere with UCI's performance of its obligations under those contracts.

Rule 202 of the UCI ADR states that "UCI shall conduct results management where the UCI has jurisdiction for *Testing* or otherwise under these Anti-Doping Rules."  UCI ADR, Rule 202.  Yet UCI has not "conduct[ed the] results management" for the evidence relied upon by USADA because USADA has usurped UCI's exclusive jurisdiction over this matter.

Rule 229, in the section titled "Results management where no *Adverse Analytical Finding* is involved," states that UCI "shall examine concrete elements indicating that an anti-doping violation may have been committed, in particular any failure to comply with these Anti-Doping Rules . . . ."  *Id.*  UCI has not "examine[d the] concrete elements" that USADA has relied upon

in charging Mr. Armstrong with an anti-doping violation, and, in fact, USADA has not identified

that its charges have any "concrete elements."

Rule 234 states that if "UCI makes an assertion that an anti-doping rule violation has

taken place[,]" the National Federation—here, USA Cycling—will be permitted to "instigate

disciplinary proceedings." *Id.*, Rule 234. Rule 234 permits disciplinary proceedings to begin

*only* if UCI has authorized them. *Id.* UCI has not asserted that an anti-doping rule violation has

taken place, and has not requested that USA Cycling, or USADA, initiate disciplinary

proceedings.

## IV.   THIS COURT HAS JURISDICTION TO HEAR MR. ARMSTRONG'S CHALLENGE TO USADA'S ARBITRATION PROCESS AND MR. ARMSTRONG'S UNDERLYING CLAIMS.

Mr. Armstrong does not have any agreement with USADA. During his cycling career,

Mr. Armstrong obtained UCI licenses that allowed him to compete in sanctioned events. Before

2004, those licenses made no mention of the USADA Protocol and did not confer any

jurisdiction on USADA to proceed against Mr. Armstrong. *See supra*, Part II.A. Plaintiff

nonetheless anticipates that USADA will attempt to force all of the claims against Mr.

Armstrong—regardless of their alleged timing—into a single arbitration pursuant to the USADA

Protocol. That argument fails for each of the following independent reasons.

First, Mr. Armstrong's claim is that USADA does not have jurisdiction here at all.

USADA cannot rely on a Protocol that it does not have jurisdiction to invoke to compel Mr.

Armstrong into arbitration. USADA may argue that whether Mr. Armstrong agreed to arbitrate

is a question for the arbitrators, because Rule 7 of Annex D to the USADA Protocol refers

questions of jurisdiction to the arbitrators. *See* USADA Protocol, Annex D, R-7. However,

invoking Rule 7 in this case assumes that the Protocol applies here in the first instance. The

Court has jurisdiction to make that initial determination. As the Fifth Circuit recently noted,

"where a party attacks the very existence of an agreement [to arbitrate], as opposed to its continued validity or enforcement, the courts must first resolve that dispute." *DK Joint Venture 1 v. Weyand*, 649 F.3d 310, 317 (5th Cir. 2011); *see also Will-Drill Resources, Inc. v. Samson Resources Co.*, 352 F.3d 211, 218-19 (5th Cir. 2003) ("[A]rbitration is a matter of contract which cannot be forced upon a party absent its consent."); *Tittle v. Enron Corp.*, 463 F.3d 410 (5th Cir. 2006) (same).

Second, Mr. Armstrong's claims are directed squarely and solely at the invalidity of the USADA arbitration procedure, and not at his license with UCI generally. Here, there is no valid agreement to have an arbitrator decide Mr. Armstrong's due process attack upon USADA's arbitration scheme and it is therefore presumptively for the courts to decide. The crux of Mr. Armstrong's claim, moreover, is that the USADA arbitration process is rigged in violation of procedural and common law due process claims. The rigged process cannot be the same process that decides whether it is, in fact, rigged. *See Murray v. United Food & Commercial Workers Int'l Union, Local 400,* 289 F.3d 297, 302-03 (4th Cir. 2002) (invalidating arbitration provision because parties to an arbitration agreement do not forego their right to have their dispute fairly resolved by an impartial third party).

Third, an exception to the general rule that courts decide issues of arbitrability applies only in the limited circumstances where there is clear and unmistakable evidence that the parties have contracted to have an arbitrator decide threshold issues of arbitrability. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). USADA can point to no such evidence here. Mr. Armstrong signed only the UCI licensing agreement, which does not even mention arbitration and which only gives USADA limited jurisdiction not applicable here. A provision that never mentions arbitration cannot meet the high standard required to demonstrate that the

parties "clearly intended" to arbitrate questions of arbitrability.  *See Peabody Holding Co., LLC v. United Mine Workers of America, Intern. Union*, 665 F.3d 96, 102 (4th Cir. 2012) ("The 'clear and unmistakable' standard is exacting, and the presence of an expansive arbitration clause, without more, will not suffice."); *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 56 (2d Cir. 2001) (same); *Radiant Sys., Inc. v. Am. Scheduling, Inc.*, 2005 WL 2105953, at *2 (N.D. Tex. Aug. 31, 2005) (same).

Fourth, USADA has no standing to compel Mr. Armstrong to arbitrate his claims.  Mr. Armstrong entered into an agreement with UCI.  Even if, *arguendo*, that that agreement permits UCI to compel arbitration, only UCI has standing to make that motion.  "An agreement to arbitrate is a waiver of valuable rights that are both personal to the parties and important to the open character of our state and federal judicial systems—an openness this country has been committed to from its inception.  It is then not surprising that to be enforceable, an arbitration clause must be in writing and *signed by the party invoking it*."  *Westmoreland v. Sadoux,* 299 F.3d 462, 465 (5th Cir. 2002) (emphasis added) (also identifying exceptions to this general rule inapplicable here).

Fifth, even if, *arguendo*, Mr. Armstrong had "clearly" agreed to delegate issues of arbitrability to arbitration and even if USADA, as a non-signatory, could enforce such an agreement, the delegation clause itself is unconscionable and a contract of adhesion.  In *Rent-A-Ctr., W., Inc. v. Jackson*, 130 S. Ct. 2772 (2010), the Supreme Court recognized that, even when two parties have contracted to arbitrate issues of arbitrability, federal courts maintain jurisdiction over claims that the delegation clause itself was invalid "upon such grounds as exist at law or in equity for the revocation of any contract."  *Id.* at 2776 (internal quotations omitted).  Here, among many other points, Mr. Armstrong had zero ability to negotiate the arbitration provision

and could not participate in competitive cycling events without obtaining the UCI license, CAS[23] maintains full control in deciding who is eligible to be chosen as an arbitrator, CAS can refuse to rename arbitrators to the pool, and USADA can ignore the arbitration result altogether by appealing it for *de novo* review to the CAS.  *See Murray,* 289 F.3d at 302–03.  Indeed, a CAS USADA arbitrator has opined as follows:  "It can no longer be disputed that the USADA Protocol and/or the WADA Code is a contract of adhesion . . . .  To the extent that the USADA Protocol or the WADA Code strips an athlete of his statutory rights they are substantively unconscionable.  It is an illegal contract."  *USADA v. Gatlin*, AAA No. 30 190 00170 7 (Campbell, concurring in part and dissenting in part).

Sixth, an essential condition precedent has not been satisfied.  Disposition by UCI, as provided in its ADR procedures, is an essential precondition to any proceeding or charge by USADA.

Seventh, because USADA can, with the consent of WADA and without Mr. Armstrong's consent, unilaterally modify its arbitration requirement, its obligation to Mr. Armstrong is purely "illusory" and therefore the arbitration clause is not enforceable.  *See Carey v. 24 Hour Fitness, USA, Inc*., 669 F.3d 202, 205 (5th Cir. 2012); *Torres v. S.G.E. Mgmt., LLC*, 397 F. App'x 63, 68 (5th Cir. 2010) ("Here, the arbitration clause may be eliminated or modified 'upon notice,' and the agreement contains no clause preventing a modification from applying to disputes arising before the modification.").  While the current version of the Protocol states that the 2009 changes

---

[23] CAS maintains this control through the ICADIS, the administrative and financial authority for CAS.  *See* CAS Frequently Asked Questions (http://www.tas-cas.org/en/20questions.asp/4-3-231-1010-4-1/5-0-1010-13-0-0/) (last visited on July 8, 2012).

shall not apply retroactively, that does not prevent USADA from making them retroactive in the future.[24]

## V.      THE AMATEUR SPORTS ACT DOES NOT PREEMPT MR. ARMSTRONG'S CLAIMS.

### A.      The Act Does Not Apply to Mr. Armstrong's Claims Against USADA.

Based on its prior correspondence, we anticipate that USADA may assert that the Olympic and Amateur Sports Act, 36 U.S.C. § 220509, *et seq.* (the "Act") preempts the Court's authority to review USADA's conduct.  Any such argument would be incorrect.  The Act bestows certain limited rights, as well as certain obligations, upon the UCOC and its member NGBs.  Among other things, the Act requires arbitration of disputes between NGBs and between athletes and an NGB.  It does not mention USADA (or the notion of a NADO), much less require that a dispute between an athlete and USADA be arbitrated.[25]  Moreover, even where the Act does provide for mandatory arbitration of a given dispute, it limits the availability of judicial oversight of such an arbitration only in narrowly defined circumstances not present here.

The Act only prohibits courts from granting injunctive relief against *the USOC*, and only then when the "dispute involve[s] the opportunity of an amateur athlete to participate" in the Olympic Games, Paralympic Games, or Pan-American Games, and the injunction would be entered within 21 days of any of those events.  36 U.S.C. § 220509(a).  This narrow exception to the availability of judicial review—the only such limitation anywhere in the Act—obviously has no application here.

---

[24] Mr. Armstrong reserves his rights to make further argument regarding the inapplicability of USADA's arbitration procedures based on argument (if any) raised by USADA on this point.

[25]  It is not surprising that the Act does not mention USADA, since it was passed before USADA was created.  Notably, Congress amended the Act in 2006—approximately five years after the creation of USADA—to correct certain cross references, typographical errors, and stylistic matters, but did not include USADA within its scope.  *See* Pub. L. No. 109–284 (2006).

**B.      Even Were the Act to Apply to USADA, It Would Not Bar Mr. Armstrong's Claims.**

Even in cases governed by the Act, courts have recognized that they "can still play a role in ensuring that [an amateur athletic] organization follows its rules." *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 595 (7th Cir. 2001); *Harding v. U.S. Figure Skating Ass'n*, 851 F. Supp. 1476, 1479 (D. Or. 1994), *vacated on other grounds*, 879 F. Supp. 1053 (D. Or. 1995). That is all Mr. Armstrong is seeking here.

*Harding* was a challenge by figure skater Tonya Harding to the conduct of the United States Figure Skating Association ("USFSA"), the NGB for figure skating.  There, Harding, who had qualified to compete on behalf of the United States in the 1994 Winter Olympics, sought to enjoin a disciplinary proceeding initiated against her by USFSA on the basis that the contemplated proceeding would violate the USFSA's own bylaws.  While the court in *Harding* cautioned that courts should generally be hesitant to intervene in disciplinary hearings held by private associations, the court recognized that judicial intervention is nevertheless warranted "where the association has clearly breached its own rules, that breach will imminently result in *serious* and irreparable harm to the plaintiff, and the plaintiff has exhausted all internal remedies." *Id.* at 1479.[26]  The only limitation on this principle is that courts "should not intervene in the merits of the underlying dispute."  *Id.*  The *Harding* court, therefore, explicitly rejected USADA's anticipated position here that Mr. Armstrong "has no remedy even if [USADA] refuses to follow its own procedures."  *Id.* at 1480.

---

[26] Mr. Armstrong meets each of these criteria.  Mr. Armstrong obviously is not required to exhaust remedies where such exhaustion would require him to participate in the very *ultra vires* proceeding that he is seeking to enjoin based on the tribunal's lack of jurisdiction.  *See Gibson v. Berryhill*, 411 U.S. 564, 574–75 (1973).

## VI.   MR. ARMSTRONG WILL SUFFER IRREPARABLE HARM ABSENT TEMPORARY INJUNCTIVE RELIEF.

To obtain a preliminary injunction, the plaintiff must demonstrate "that if the district court denied the grant of a preliminary injunction, irreparable harm would result." *Janvey v. Alquire*, 647 F.3d 585, 600 (5th Cir. 2001).  "In general, a harm is irreparable where there is no adequate remedy at law." *Id.*  Nothing less than Mr. Armstrong's livelihood and legacy is at stake in this litigation.  Currently, USADA is forcing Mr. Armstrong to make a Hobson's Choice:  participate in a hearing concerning charges over which USADA has no jurisdiction, which violates due process, and which is certain to result in an adverse decision, or forego any type of hearing at all.  Either choice is certain to result in Mr. Armstrong incurring a lifetime suspension from international competition and the stripping of his seven *Tour de France* titles.

Mr. Armstrong faces much the same circumstances that were deemed sufficient to constitute irreparable harm in *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047 (5th Cir. 1997). There, the plaintiff faced "the threat of injury to [her] reputation," a threat to "her ability to procure comparable employment," and an "egregious and constitutionally infirm hearing." *Id.* at 1056.  The court concluded this was "sufficient to satisfy irreparable injury." *Id.*; *see also United Church of the Med. Ctr. v. Med. Ctr. Comm'n,* 689 F.2d 693, 701 (7th Cir. 1982).

The Supreme Court has made clear that a party need not endure a blatantly unfair procedure before securing injunctive relief.  *See Gibson*, 411 U.S. at 574–75 (recognizing authority of courts to address due process claim without forcing plaintiffs to complete unconstitutional process).  As the U.S. District Court for the Southern District of Texas has explained, if Mr. Armstrong has "been deprived of procedural due process, [that] is in itself irreparable injury." *Associated Builders & Contractors of Texas Gulf Coast, Inc. v. U.S. Dep't. of Energy*, 451 F. Supp. 281, 286 (S.D. Tex. 1978); *Six Kingdoms Enters., LLC v. City of El*

*Paso*, 2011 WL 65864, at *9 (W.D. Tex. Jan. 10, 2011) (noting that constitutional violations generally qualify as *per se* irreparable injuries).

## VII.   THE BALANCE OF EQUITIES FAVORS MR. ARMSTRONG.

Mr. Armstrong faces grave and irreparable harm to his reputation and livelihood should he be required to participate in this unconstitutional and unauthorized process.  USADA, however, will suffer no harm if the Court adjudicates Mr. Armstrong's claims.  First, Mr. Armstrong is not requesting that the Court lift any rule-imposed ban caused by USADA's decision to bring charges.  Instead, Mr. Armstrong requests only that the Court enjoin the USADA proceedings until the Court has had an opportunity to consider and decide the merits of Mr. Armstrong's common law and constitutional due process claims and common law tortious interference claim.  Second, Mr. Armstrong agrees not to compete in sanctioned events during the pendency of this proceeding.  Thus, the sanction USADA seeks is, in effect, in place.

## VIII.   PROTECTING ATHLETES' DUE PROCESS RIGHTS IS IN THE PUBLIC INTEREST.

Granting the requested relief will not harm any public interest.  To the contrary, it is in the public interest that USADA be required to follow the rules governing its jurisdiction and conduct, and that athletes receive a "fair resolution of anti-doping matters."  USADA Protocol ¶ 10.  This is necessary so that accused athletes are able to vindicate their rights—and reputations—in a fair proceeding.  It also is necessary to ensure that the public can trust in the legitimacy of the anti-doping system and the integrity of sporting events.

The public has an interest in ensuring that the system for adjudicating allegations of athletic doping is fair and meets procedural due process requirements.  *See Murillo v. Musegades*, 809 F. Supp. 487, 497 (W.D. Tex. 1992) ("The public interest will be served by protection of Plaintiffs' constitutional rights.").  More generally, it is in the public interest that

government actors abide by procedural due process protections for those accused of wrong-doing and threatened, as a result, with the loss of their livelihood.  *See Valley,* 118 F.3d at 1056 (holding that the public interest "is enhanced by an adjudication . . . which comports with basic protections of due process to which all citizens are entitled"); *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 93-94 (5th Cir. 1992) (same).  Finally, it is in the public interest that USADA not interfere with, or violate, the terms of UCI's contract with Mr. Armstrong or the governing UCI Rules, which also bind USADA.  *See King Aerospace Commercial Corp., v. Al-Anwa Aviation, Inc.*, 2008 WL 2676362 (N.D. Tex. July 9, 2008) ("Enforcing a contract promotes rather than disserves the public interest.").

## CONCLUSION

For the reasons set forth above, Mr. Armstrong respectfully requests that this Court enter

a Temporary Restraining Order and Preliminary Injunction.

Respectfully submitted,

_____/s/ Timothy J. Herman_____
Timothy J. Herman (Bar No. 09513700)
Sean E. Breen (Bar No. 00783715)
HOWRY BREEN & HERMAN LLP
1900 Pearl Street
Austin, Texas  78705
Phone:  (512) 474-7300
Fax:  (512) 474-8557
therman@howrybreen.com

Mark S. Levinstein (*pro hac vice* pending)
Marcie R. Ziegler (*pro hac vice* pending)
Ana C. Reyes (*pro hac vice* pending)
WILLIAMS & CONNOLLY LLP
725 12th St., NW
Washington, DC  20005
Phone:  (202) 434-5000
Fax:  (202) 434-5029
mlevinstein@wc.com

Robert D. Luskin (*pro hac vice* pending)
Patrick J. Slevin (*pro hac vice* pending)
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037
Phone:  (202) 457-6000
Fax:  (202) 457-6315
rluskin@pattonboggs.com

*Attorneys for Plaintiff Lance Armstrong*

Date:  July 9, 2012