# EXHIBIT 37

Case 1:12-cv-00606-SS   Document 7-4   Filed 07/09/12   Page 2 of 53

HOW THE UNITED STATES GOVERNMENT SACRIFICES..., 2008 B.Y.U. L. Rev....

2008 B.Y.U. L. Rev. 1465

**Brigham Young University Law Review**
2008

Articles

HOW THE UNITED STATES GOVERNMENT SACRIFICES ATHLETES' CONSTITUTIONAL RIGHTS IN THE PURSUIT OF NATIONAL PRESTIGE

Dionne L. Koller[1]

Copyright (c) 2008 Brigham Young University Law Review; Dionne L. Koller

Abstract: This Article is about the United States Government trading off athletes' constitutional rights in the pursuit of national prestige through sport. The Olympic Movement has for decades provided an incentive for governments of all ideologies to use elite athletes to enhance national prestige or demonstrate national supremacy. This phenomenon is commonly known as "sportive nationalism." Unlike countries such as the former East Germany and Soviet Union, the United States Government has not readily acknowledged its own practice of sportive nationalism, preferring instead to assert that Olympic Movement sport in the United States is a private endeavor. This Article, however, demonstrates that the United States has in fact practiced its own brand of sportive nationalism--previously as a foreign policy tool during the Cold War and today as part of the worldwide fight against athletic doping. This Article explains that the practice of United States sportive nationalism is accomplished through the United States Olympic Committee and now the United States Anti-Doping Agency, both of which serve as "private" Olympic Movement regulators. This private sector status of sport regulation in the United States has created a significant accountability vacuum so that manifestations of sportive nationalism that threaten athletes' eligibility, like the war on doping, largely go unchecked. As a result, athletes' constitutional liberty and property interests are threatened because there is no incentive to give, and in fact athletes are not given meaningful due process protections to protect their eligibility. Accordingly, this Article argues that steps should be taken to promote greater accountability for sportive **1466 nationalism in the United States Olympic Movement, so that the athletes who serve to enhance our nation's prestige do not risk their due process rights in the process.

**Introduction**

In the 1970s, against the backdrop of the Cold War, the United States Government began to engage in a practice known as "sportive nationalism," taking and supporting actions that use Olympic Movement[1] sport and individual athletes' sporting success to demonstrate the United States' supremacy on the world stage. From a legal standpoint, the United States Government's practice of sportive nationalism was benign in terms of its effect on athletes' constitutional rights. The government typically took actions that supported success in Olympic Movement competition--a position that easily aligned with athletes' pursuit of their sporting careers. Moreover, Cold War Era athletes, pursuing their sport as an avocation, did not have a claim of entitlement in their eligibility that would trigger constitutional due process protections. Today, however, the government's practice of sportive nationalism, and sportive nationalism's cost to athletes, has changed dramatically. The government no longer simply uses success in Olympic Movement competition to promote national prestige, but instead uses the punishment of individual athletes and termination of their athletic eligibility[2] to achieve this same end. This action comes at a time when athletes can make a convincing claim that their athletic careers are entitled to constitutional due process protection.

Consider the case of Floyd Landis, the 2006 Tour de France champion and long-time elite cyclist. After his dramatic comeback in Stage 17 of the Tour, it was announced that Landis tested positive for exogenous testosterone, and the United States Anti-Doping Agency ("USADA") subsequently charged him with a doping **1467 offense.[3] The French lab that tested Landis and claimed to have gotten a positive result[4] was the same one that had unsuccessfully accused Lance Armstrong of doping during his run as a seven-time Tour champion.[5] Landis vehemently denied the charges and sought arbitration. Despite finding multiple errors in the lab's handling and testing of Landis's sample and other inconsistencies that the panel found

"troubl[ing]" and amounting to "sloppy practice[s],"6 the arbitration panel ruled 2-1 that Landis had committed a doping offense.7 The dissenting arbitrator stated that "the documents supplied by [the lab] are so filled with errors that they do not support" a finding that Landis was doping.8 "Mr. Landis," stated the arbitrator, "should be found innocent."9 Nevertheless, Landis was banned from cycling for a period of two years and was stripped of the 2006 Tour de France title.10 Landis asserts that the loss of eligibility cost him $5 to $10 million in endorsements and other income and cost about $2 million in legal fees.11

Other lower-profile cases illustrate the same degree of questionable justice. For instance, swimmer Kicker Vencill was a victim of tainted supplements. He tested positive but was able to prove that the multi-vitamins he had taken were contaminated. Nevertheless, he was found guilty of a doping offense and given the same two-year ban from competition as athletes who were found to have intentionally doped.12

**\*1468** Despite these devastating individual outcomes, the United States Government does not view these cases as injustices. Indeed, for the government, such cases provide a more significant international relations benefit than if the athletes had won Olympic gold medals, because in today's Olympic Movement, sanctioning athletes and stripping them of their eligibility is what burnishes the United States' international image.13 This Article explains, however, that the image enhancement achieved by using athletes in this way can directly collide with athletes' constitutional rights, as there is little incentive for the government to provide due process protections to athletes whose eligibility is threatened. On the contrary, the incentive is to trade off athletes' rights to secure national prestige. This phenomenon, illustrated by the United States' response to elite athlete doping, provides an opportunity to begin the dialogue of how best to regulate the United States Olympic Committee (USOC) and United States Anti-Doping Agency (USADA) to achieve accountability for sportive nationalism that infringes on athletes' constitutional rights.

Part I of this Article explains the practice of sportive nationalism and its place in the Olympic Movement. Part II looks at earlier manifestations of sportive nationalism in the United States, explaining how the Amateur Sports Act structured the United States Olympic Movement in a way that subverted athletes' rights to the national interest, setting the stage for the threats to individual rights that have occurred in the recent fight against elite athlete doping. **\*1469** Part III looks at United States sportive nationalism in a new light, through the experiences of the anti-doping movement, and explains what is at stake when the government's practice of sportive nationalism becomes inconsistent with athletes' pursuit of their sporting careers. This part explains that the nature of elite sport has changed so that an argument can be made that athletes have a constitutional liberty and property interest in their sporting careers. This part further explains that in some cases, the anti-doping movement as an expression of sportive nationalism can threaten athletes' constitutional rights. Finally, Part IV will describe proposals for achieving greater accountability in the United States Olympic Movement to prevent abuses of athletes' constitutional rights in the name of national prestige.

## I. Olympic Movement Sport and the National Interest

To understand how athletes' constitutional rights could be threatened by the government's use of Olympic Movement sport as part of a broader foreign policy agenda, it is helpful first to understand how nations are tempted to use elite sport in the pursuit of international relations goals. This temptation has been well-documented in social science literature for decades and is referred to as "sportive nationalism." Sportive nationalism has been defined as "the use of elite athletes by governments to demonstrate national fitness and vitality for the purpose of enhancing national prestige."14 Sportive nationalism is a practice that is ubiquitous,15 as nations have **\*1470** discovered that athletic success, particularly within the Olympic Movement, furthers the national interest.16 Although it is not inherently wrong, sportive nationalism provides a tempting way for nations to make foreign policy points and gain national prestige because elite sport can provide a high-profile public relations payoff.17

Sport has two valuable functions for a nation. First, sport can be a powerful force for nationalism domestically, among a nation's own people.18 Second, sport can be used to enhance a nation's prestige and demonstrate supremacy in the world order.19 James Nafziger and Andrew Strenk have identified six specific political uses of international elite athletic competition "by nation-states: diplomatic recognition and non-recognition, protest, ideology and propaganda, official prestige, international cooperation, and conflict."20 These political uses of sport reflect the fact that "instrumentalist" perceptions of sport are what drive most nations to sponsor national sporting programs, in that very few, if any, nations value sport simply for the sake of sport.21 As would be expected, the practice of sportive nationalism plays out most clearly through the Olympic Games.22

**\*1471** Sportive nationalism takes different forms in different nations, "depending on the nature of the government that seeks prestige benefits from international sporting success."23 Traditionally, sportive nationalism has played an important role in

the political life of Communist, totalitarian regimes.24 One of the most infamous examples of this is the conduct of the former East Germany, which aggressively used sport as a tool to achieve its foreign policy goals.25 As it was in the former Soviet Union and other Eastern Bloc countries, the government was in total control of the nation's sports system, which operated with a "[w]in at [a]ll [c]osts" mentality.26 The goal was to show the world that its system of government was *1472 superior27 and to gain acceptance as part of the international community.28 As part of this pursuit, the government funded and administered sophisticated training programs to develop elite athletes. It built sports facilities, enlisted the best coaches, physicians and scientists, and provided athletes with financial and material rewards for athletic success.29 It was long suspected, and later confirmed, that this government-sponsored training program included the systematic administration of performance enhancing substances, such as anabolic steroids, to many of its male and female athletes in order to increase the athletes' effectiveness in world-class competition.30 As a result of its comprehensive sports program, East Germany achieved enormous success in Olympic Movement competition. By 1971, East Germany's athletes had won 83 Olympic medals, 611 world championship medals, and 983 European championship medals.31 In 1976, with a population just over sixteen million, East Germany won nearly the same share of Olympic medals as the United States, which at that time had a population over eighteen times larger.32 A former East German official credited success in sport with helping to obtain international recognition for East Germany, stating that "sport led the way in increasing the international prestige of our Socialist republic and led to its diplomatic recognition by a majority of the states of the world."33 Indeed, from 1971-1973, East Germany was given diplomatic recognition by ninety countries.34 Similarly, the Soviet Union used international athletic competition to great political advantage, "link[ing] the victories of its athletes with the claimed superiority of *1473 the Soviet social and political system."35 The Soviet Union reportedly invested government funds in sports that would yield the greatest amount of international prestige.36 Today, China is a leading example of Communist sportive nationalism, as its use of sports has evolved from promoting friendship to seeking Olympic victories.37 By hosting the Beijing Olympics and spending close to $60 billion on preparations, the Chinese government hoped to displace reports of human rights abuses by showing images of a modern country and economy to an international television audience of over four billion people.38

Sportive nationalism also has played a significant, if less obvious, role in United States foreign policy.39 In contrast to the former Communist Bloc, the United States Government was slower to view Olympic Movement sport as an international relations tool.40 In the 1970s, commentators argued that the United States Government should take a greater role in Olympic Movement sport.41 At the time, sport in the United States was treated as a private activity without foreign policy implications.42 Although isolated examples, such as the United States' "ping-pong diplomacy" with China,43 *1474 showed that the United States did not ignore the potential benefits of sport in international relations, it was the overwhelming success of the Soviet Bloc44 in international competition during the height of the Cold War that put pressure on the United States and other Western superpowers to match their sporting success.45 In addition to passing the Amateur Sports Act,46 discussed in more detail in part II below, the government has taken a lead role in the Olympic Movement, hosting47 several Olympic Games48 and boycotting another.49 And, of course, sportive nationalism is prevalent in government rhetoric. Regardless of their political affiliation, government officials believe, and expect, that American athletes will reflect what is best about the United States.50

*1475 It is now clear that sport today has become an important tool to promote nationalism,51 as the government over the last three decades has relied more heavily than ever before on the United States Olympic Movement as a way to enhance the nation's prestige.52 Yet despite the importance of sport in promoting United States prestige, sports officials, the media, and the American public either discount or ignore altogether the relationship between sports and international relations.53 Indeed, in the United States, the government and politicians often attempt to minimize the role of elite sport in international affairs.54 The discussion that follows aims to bring sportive nationalism to light and highlight the ways it can cross over from benign pageantry and rhetoric to threatening athletes' constitutional rights.

### II. Early Sportive Nationalism: The Amateur Sports Act and the Privatization of the American Olympic Movement

To understand how sportive nationalism can threaten athletes' constitutional rights through anti-doping enforcement, it is important to examine how early sportive nationalism, manifested in the structure of the United States Olympic Movement, set the stage. When, in the early 1970s, the United States decided to challenge its Cold War enemies' success in Olympic Movement sport, the *1476 government undertook to explore ways to harness and enhance our athletic talents in support of the national interest. The result of those early efforts was the Amateur Sports Act,55 which affected athletes' rights most significantly by subverting them to the national interest.56

Olympic Movement sport in the United States prior to the Amateur Sports Act (the Act) was the product of the free market. Sport governing bodies such as the National Collegiate Athletic Association, the Amateur Athletic Union, and others asserted their jurisdiction over athletes and competitions.57 Disputes among amateur sports regulators led to difficulties in determining

which organization would send teams to international competitions.58 Conducted without a centralizing authority whose goal it was to prepare athletes for international competition, the United States' success in Olympic Movement competition was not as great as many hoped and believed it could be. As stated by the House Judiciary Committee, "[t]he overall decline of American achievement in Olympic and international competition was apparent. For a nation of **1477** almost 250 million people, we were falling seriously below our potential to . . . field strong international teams . . . ."59 This failure on the world stage prompted President Ford to appoint a Commission on Olympic Sports to study the issue.60 The Commission noted at the outset that "in international sport . . . American performances are deteriorating. Against athletes from nations for whom Olympic medals are as precious as moon rocks, U.S competitors seem to have steadily diminishing chances of success."61

The Commission was charged with determining what factors prevented the United States from achieving greater international sporting success,62 and its report strongly reflected the Cold War culture at that time. The report declared at the outset that "a nation's success in international sports competition is not indicative of the merits of its ideology--despite some countries' attempts to convince us otherwise."63 Nevertheless, the Commission still asserted that "America's strengths are clearly reflected in her sport."64 The converse, according to the Commission, was not true however, as the Commission stated that "the weaknesses of American sport are not indications of concomitant weaknesses in the nation."65 Yet despite the declaration that sport does not reflect the merits of a nation's ideology, the Commission set about to recommend a decidedly American style for Olympic Movement sport regulation that focused on fostering "individual athletic achievement"66 through the free market and not federal regulation.67 The Commission explained that "the United States must rely on its greatest strength, free enterprise, to help finance amateur sport."68

The Commission's primary recommendation was to create a centralized sports organization that had the exclusive right to select **1478** athletes for Olympic Movement competition.69 The Commission rejected a role for the federal government, preferring instead to rely on privately incorporated National Governing Bodies (NGBs)70 to develop athletes.71 The Amateur Sports Act accordingly made the USOC a federally chartered, non-profit patriotic corporation72 and gave the USOC exclusive power to coordinate and govern Olympic Movement athletics in the United States.73

As an early manifestation of sportive nationalism, the Act left a long-standing effect: it structured the United States Olympic Movement in a way that promoted the national interest over the rights of athletes. Such an effect is not surprising given that the Act grew out of the government's desire for the United States to perform better in Olympic Movement competition. Moreover, such an effect was not necessarily troubling in the 1970s, when the Act was passed, because sportive nationalism at that time was expressed through the collective sporting success of the nation, so that the incentive created by sportive nationalism was to promote athlete eligibility and maximize athletes' opportunities to compete. In addition, it arguably was appropriate to place national interests over athletes' rights because Cold War-era athletes had little claim to a constitutionally protected property right or liberty interest in their eligibility.

Several features of the Act evidence a clear intent to promote the national interest over the rights of athletes. To begin, the Act highlights that the USOC's focus was to be successful in international competition.74 Thus, the Act states that the purposes of the USOC are, among other things:

**1479** [T]o coordinate and develop amateur athletic activity in the United States, directly related to international amateur athletic competition . . .

[T]o exercise exclusive jurisdiction . . . over all matters pertaining to United States participation in the Olympic Games, Paralympic Games and the Pan-American Games . . . and [over] the organization of the Olympic Games, the Paralympic Games, and the Pan-American Games when held in the United States;

[T]o obtain for the United States, directly or by delegation to the appropriate national governing body, the most competent amateur representation possible in each event of the Olympic Games . . .

[T]o promote and support amateur athletic activities involving the United States and foreign nations.75

Other purposes include establishing national goals for amateur athletics and supporting amateur athletics through development of facilities and coordination of information on coaching, performance, and training,76 all of which serve the national athletic interest by helping develop successful athletes. To support these activities, the Act gave the USOC the exclusive right to use the Olympic trademarks--a right that provides an enormous economic benefit.77

Significantly, the USOC was also given the power to recognize NGBs for each sport represented in the Olympic Movement.78 The NGBs, in turn, establish specific eligibility criteria for athletes in their respective sports. This provision was significant because it gave the USOC the exclusive power to recognize one NGB for each sport, which would put an end

to the disputes between groups such as the Amateur Athletic Union, the National Collegiate Athletic Association, and the Association for Intercollegiate Athletics for Women--disputes that jeopardized talented athletes' ability to participate in international competition.79 The Commission and *1480 Congress believed that these disputes were responsible for the nation's poor showing in international competition.80 To further ensure that our most talented athletes were not prevented from competing because of NGB bureaucracy, the Act mandated that the USOC

establish and maintain provisions . . . for the swift and equitable resolution of disputes involving any of its members [NGBs] and relating to the opportunity of an amateur athlete . . . to participate in the Olympic Games, the Paralympic Games, the Pan American Games, world championship competition, or other protected competition. . . .81

One such provision requires NGBs to "agree to submit to binding arbitration in any controversy" relating to an athlete's opportunity to compete in Olympic Movement competition.82

To be sure, the arbitration provision evidences some concern for athletes' rights and provides athletes with far more protection than they had previously enjoyed in terms of protecting their opportunity to compete.83 However, it is of limited effect. First, the provision, when read in context with the purposes behind the Act, reflects the Government's desire not to protect athletes' sporting careers, but to *1481 protect the United States' ability to field the best possible athletes for international competition.84 Thus, the arbitration provisions are meant to be used by athletes against NGBs, which might be unfairly preventing them from competing in Olympic Movement competition.85 Courts have found that the procedures confer no right to compete,86 and more recently, at least one court has found that the Commercial Arbitration procedures provided for are inapplicable in cases where an athlete faces losing her eligibility because of a doping allegation.87 Finally, given their limited scope, the procedures are arguably outdated and unnecessary. With the vertical sport structure established by the Act, and the USOC's exclusive authority to coordinate amateur athletics and name NGBs, the factional disputes (and resulting disqualification of athletes from international competition) that were meant to be prevented by the procedures have now disappeared.

Aside from the text of the Act itself, courts have interpreted its provisions as preferencing the national interest over athletes' rights. This was apparent in DeFrantz v. U.S. Olympic Commission,88 essentially the only case to challenge sportive nationalism's effects on athletes. In that case, a group of athletes brought claims under the Act and the United States Constitution challenging the government's decision to boycott the 1980 Moscow Olympic Games.89 In December 1979, the Soviet Union invaded Afghanistan. The United States responded by invoking a variety of sanctions, including planning a boycott of the Olympic Games.90 The USOC initially resisted the President's request to boycott, arguing that the best way to counter the Soviet's display of aggression in Afghanistan was to beat them in their Olympic Games.91 However, President *1482 Carter announced in his State of the Union address that he would not support sending a United States team to compete in the Olympic Games as long as the Soviet military forces remained in Afghanistan.92 Moreover, the House of Representatives and Senate passed resolutions opposing participation in the Olympic Games by United States athletes. White House counsel met with the USOC Executive Board and other USOC officers and urged them to vote against sending a team to Moscow. The USOC was allegedly informed that if it did not agree to boycott the Games, the government would terminate its federal funding and possibly revoke its tax exempt status.93 If it did comply, however, the USOC would be provided with increased federal funding.94 President Carter also met with the Athlete's Advisory Council, an official body of the USOC, and told them that the United States would not send a team to the Moscow games.95 Finally, President Carter sent a message to the USOC and stated that he would take all legal action necessary to enforce his decision not to send a team to the Moscow Games.96

The athletes claimed that in complying with the government's request to boycott the Games, the USOC was violating the Act.97 The athletes argued that the Act did not authorize the USOC to decide not to enter a team in an Olympic Games and that the Act guaranteed athletes a right to compete in the Olympic Games.98 The court disagreed, holding that the Act implicitly allowed the USOC the discretion to determine whether it would enter a team in the Olympic Games because Congress had not explicitly limited the USOC's powers to do so through the Act.99 Moreover, the court explained that the USOC's discretion to decline participation in an Olympic Games is not limited to simply "sports-related reasons" but could be for reasons completely unrelated to sports.100 The court also *1483 rejected the athletes' claim that the Act conferred a "right to compete," explaining that the language of the Act101 was limited to "the context of the numerous jurisdictional disputes between athletic bodies, such as the NCAA and AAU." These organizations previously had in some cases deprived elite athletes of the ability to enter international competitions.102 Thus, the "right to compete" was only to prevent athletic organizations from depriving an athlete of the opportunity to enter competitions "for petty and groundless reasons"; it was "not designed to provide any substantive guarantees" and did not extend so far as to confer a right to compete where the USOC refused to enter a team in the Olympic Games.103 The court also concluded that, in any event, the Act did not create a private right of action.104

Despite the text and interpretations of the Act which effectively subvert athletes' rights to the national interest, it can be said

that the Act has protected athletes' rights by codifying the private sector structure of the USOC. The Act reaffirmed the private nature of Olympic Movement sport by not giving the government a role in selecting or training athletes for international competition.105 By statutorily keeping the Government out of this process, it could be argued that Congress at least formally insulated athletes to a great extent from the potential dangers of sportive nationalism.106 However, as DeFrantz illustrates, the "private" status of the USOC *1484 does little to insulate athletes from sportive nationalism where the national interest is implicated. In this regard, the Act's provisions with respect to athletes' rights are largely illusory.107 Congress has refused to grant athletes a cause of action under the Act, and, when originally considered, Congress rejected a provision for an "Amateur Athlete's Bill of Rights."108 Moreover, courts following DeFrantz have held that the Act does not give athletes any private right of action to challenge eligibility decisions.109 Courts have only recognized a cause of action for athletes in narrow circumstances to ensure that sports governing bodies follow their own rules.110 In addition, in 1998, Congress amended the Act to deny a court jurisdiction to grant an injunction allowing an athlete to compete within twenty-one days of the Olympic Games.111 Thus, athletes' rights take a back seat to the national interest through the provisions of the Amateur Sports Act.112

*1485 Finally, although it is not immediately apparent, the Act's conception of sport as a private endeavor, meant to distinguish the United States from its Cold War enemies, also tends to minimize athletes' rights in the face of the national interest. Drawing on the Act, the Supreme Court has solidified this view, as it held in San Francisco Arts & Athletics, Inc. v. United States Olympic Committee that the USOC's role is a private sector one and not a public function.113 Although the Court did not deal with an athlete dispute,114 the Court's opinion in San Francisco Arts was telling. The majority saw the regulation of amateur athletics as fundamentally private and not a government concern.115 The labeling of sport as "private" by courts reflects the image of American sport constructed and perpetuated by the Act as an individual, private-sector pursuit free of government involvement. Yet this view must be put in its Cold War context and should not preclude the possibility of considering changes to the operation and importance of Olympic *1486 Movement sport, both with respect to athletes and the national interest. The dissent in San Francisco Arts recognized this, as its opinion conceived of the Olympic Movement's very real foreign relations functions.116

It might be that for Olympic Movement competition, it is necessary to subvert athletes' rights to the national interest to promote efficiency and allow the USOC the greatest flexibility in fielding high-quality, internationally competitive teams. In most cases, this is not of concern, as athletes do not and should not have a categorical right to compete. In addition, in most cases, the national interest and athletes' interests align, as the interest in success in Olympic Movement competition is consistent with allowing the most qualified athletes to compete. From this perspective, the trade-off of athletes' rights in favor of the national interest might be justified. What is of concern, however, is how the structure of the United States Olympic Movement established by the Act might unjustly empower the USOC (and now the USADA), working in concert with the government, in cases where an athlete's eligibility is being terminated. As we are now in an era where athletes can make a credible claim to constitutional rights in their sporting careers, expressions of the national interest which strip them of their eligibility to compete pose a troubling conflict. In these circumstances the Act, as written and interpreted, does not do enough to address athletes' rights.

### III. Sportive Nationalism for a New Era: Demonstrating Morality Through the Punishment of Individual Athletes

With the backdrop of the privatized Olympic Movement and the way in which it subverts athletes' rights to the national interest, it is now possible to examine United States sportive nationalism in its current form. Such an examination shows that sportive nationalism in the United States has evolved from using sport to gain national prestige in a way that aligns with athletes' interests to taking punitive *1487 action against individual athletes for that very same purpose. With the Cold War long over, the sportive nationalistic emphasis no longer promotes private enterprise and individual achievement. Instead, the government now uses sport to demonstrate national morality by punishing athletes who "cheat" in sport by using performance-enhancing drugs.117

As a threshold matter, it is important to note that this Article does not challenge the fight against doping in sport as a legitimate public policy issue. Indeed, the fight against doping is a perfectly legitimate domestic and international public policy issue, as an international consensus has now developed against doping in sport.118 It therefore seems clear that, for the near term at least, it is in the United States' interest to be a significant part of worldwide anti-doping efforts. Further, these efforts to control doping in sport are premised on seemingly solid moral foundations. Government officials and regulators stress that the purpose is to protect individual athletes from the harmful effects of using performance-enhancing agents.119 Moreover, it is often explained that controlling doping is important because it eliminates the pressure on "clean" athletes to use harmful performance enhancers in an effort to effectively compete with those who do, and it maintains the integrity of

**\*1488** sport.120 Such an approach values individuals and their well-being, and for that reason doping control programs enjoy the appearance of a strong ethical anchor.

However, the other side of anti-doping initiatives, and the side focused on by this Article, is one with a more consequentialist justification. The procedures used to enforce anti-doping rules appear less concerned with the individuals accused and more concerned with outcomes.121 Such an approach is fundamentally unfair because the government can be viewed as reaping the benefits of sportive nationalism while imposing the burdens on individual athletes. Thus, while the goal of fighting doping in sport is legitimate, it is how that goal is achieved given the unique structure of the privatized Olympic Movement and the strong incentive for the government to be involved because of sportive nationalism that is analyzed here. Accordingly, this section highlights several potential issues related to individual rights that indicate sportive nationalism, at least in this context, has crossed the line from neutral or benign to threatening athletes' rights.

### A. Athlete Doping--A Foreign Relations Problem

The government's fight against athlete doping has taken on the rhetoric of a moral crusade. Anti-doping initiatives are to fight "cheaters" and protect the integrity of competition. Moreover, government officials seek to "protect the rights" of innocent athletes and fans who participate in the Olympic spectacle. Yet, the anti- **\*1489** doping movement in the United States is less about the morality of doping and much more about the international relations consequences now attached to athlete doping and, conversely, the international currency to be gained by being tough on those who allegedly cheat.

The traditional thinking has been that sportive nationalism undermines efforts to fight doping in Olympic Movement sport because it creates incentives for governments to tolerate doping to achieve athletic success.122 Critics have even suggested that sportive nationalism "can only encourage" a nation's tacit acceptance of doping.123 This was certainly the case with the United States, which largely ignored the issue of doping in sports for decades.124 Prior to the formation of the USADA, the USOC administered drug testing through each sport's NGB, which prosecuted athletes for doping violations under the NGBs' own administrative procedures.125 As a result, the entities that were charged with selecting the finest athletes for Olympic and international competition, the USOC and NGBs, also administered drug testing and handed down the sanctions.126 Critics thus argued that the USOC and NGBs had an inherent conflict of interest that prevented them from administering drug tests and punishing dopers effectively.127 There was ample evidence that Congress knew that doping was a problem, but it did nothing to stop it because the United States had become so successful in Olympic competition.128 For instance, strong evidence suggested **\*1490** that numerous Olympic medalists were allowed to compete in Olympic competition after having failed drug tests.129 Over 100 athletes who tested positive for banned substances between 1988 and 2000 reportedly were cleared by internal USOC and NGB processes.130 Whatever the reality, it seems that the United States and other Olympic "superpowers" such as Canada and Australia were not inclined to take steps to fight doping in their own Olympic Movement sport systems because they needed to compete with the Communist states who they believed were routinely doping their athletes.131 At worst, the United States Government was thought to actually sanction cheating by its athletes to achieve success in international competition.132

By the 1990s, there was a growing international perception that the United States was not doing enough to fight the use of performance-enhancing drugs by its Olympic athletes.133 The United States' stance on doping was perceived to be weak,134 and this **\*1491** conflicted with the United States' international image of being tough on illicit drug use.135 Indeed, prior to the formation of the USADA, there were charges that the USOC covered up the fact that drug use among elite athletes was "routine," and that the United States Government's response to the issue was "disingenuous."136 The United States was compared to the East Germans.137 In response to the United States' perceived weakness in tackling the issue of doping, Richard Pound, the Chairman of WADA and Vice Chair of the IOC, even suggested that the United States be prevented from bidding to host the 2012 Olympic Games.138 In short, the international community viewed the United States as "the biggest cheaters in the world."139 In the words of Senator John McCain, Olympic doping scandals "harm our image and will contribute to our image, whether deserved or undeserved, that the United States is a bully and unethical."140 This kind of cheating is a classic manifestation of sportive nationalism.

Yet other manifestations can be more subtle. Because sportive nationalism "reflects the political trends and relationships in the world,"141 the United States shifted from ignoring athlete doping to actively working to combat it. Sports doping therefore transitioned from being a "private [sector] matter" to a significant "public policy **\*1492** issue."142 In discussing this shift, one commentator stated that the United States Government's change on this issue was particularly noteworthy. He explained that "[p]erhaps the most perplexing recalculation of interests was within the United States Government, which had for many years studiously avoided acknowledging the issue of doping in sport only to emerge at the end of the 1990s as a leading supporter of WADA and a more rigorous anti-doping regime."143

Commentators have examined a variety of reasons why the United States became more interested in fighting doping in sport. One reason cited by observers is that the fall of the Soviet Union and the end of the Cold War "diminished the value of international sport as a surrogate for super-power rivalry."144 Moreover, according to neo-liberalism, certain benefits to joining in an international movement to fight doping in sport become clearer because there was likely at that time a "cost of non-compliance due to damage to reputation"145 that would run the risk of "'forfeit[ing] potential future gains from cooperation.'"146 With dozens of countries signed on to the International Convention Against Doping, including China, Russia, Germany, and Canada, international pressure to be a part of the solution was strong.147

It is apparent, then, that the United States' change of heart on doping is not the result of the demise of American sportive nationalism, but in fact is a further manifestation of it. While the private sector was delivering athletes who were winning, they were no longer enhancing national prestige because of the cloud of doping.148 The United States Government therefore ostensibly *1493 recalculated the national interest to reflect that it is no longer sufficient simply to be successful in international athletic competition. The United States' success now must be coupled with the moral authority that it does not cheat.149 Thus, Congress and the Executive Branch Office of National Drug Control Policy (ONDCP) worked together on a new approach. As stated by former ONDCP Director Barry McCaffrey, the formation of WADA and USADA was necessary to help restore the "honor and integrity of U. S. sport."150

The formation of USADA in response to growing international pressure was driven by the ONDCP and the Senate Committee on Commerce, Science and Technology, particularly Senators John McCain and Ted Stevens. ONDCP advocated for the formation of a government agency with "certain governmental or quasi-governmental powers."151 ONDCP asserted that governmental status would significantly enhance such an agency's credibility.152 ONDCP was careful to assert that while the drug testing entity it proposed needed to be an instrumentality of the United States, it must also reflect the free market view of sports regulation embodied in the Amateur Sports Act: "[W]e have to be very respectful of the notion of amateur sports and the independence of amateur sports from Federal intervention."153 Yet, because of its importance to the United States' image internationally, both ONDCP and Congress still had direct influence over how USADA would be structured and what its mission would be,154 with a key concern being that athletes accused of doping violations not be given full constitutional due process or privacy protections, which could impede aggressive *1494 enforcement.155 Thus, government officials who once ignored the doping problem in the pursuit of international sporting success now fear that giving athletes meaningful due process protections will cause us to fall behind in our effort to catch cheaters. As stated by Senator John McCain, "The fact remains that we may be falling behind in what is truly an arms race of doping."156 Similarly, former USOC president Scott Blackmun openly questioned whether protections for accused athletes have a place in the fight against doping, asking whether "those fundamental notions of due process [should] really have application in sport and doping?"157 USADA Executive Terrence Madden has echoed these concerns in testimony before Congress, stating that "the rights of clean athletes are too long, too often ignored or not mentioned in the media. Those are the rights we have to be concerned with, those are the rights that USADA wants to address, the rights of clean athletes."158 In this respect, anti-doping advocates share the view of proponents of privatization, who have argued that due process "is nothing but 'a web of bureaucratic red tape driven by concerns over process and inputs and not outcomes.'"159

Thus, USADA was not given government agency status. It was established and began operations on October 1, 2000,160 as a private, not-for-profit corporation.161 Through legislation, Congress has "designated" USADA as the "independent anti-doping organization" for the United States, mandating that USADA conduct all Olympic Movement drug testing.162 Congress has also *1495 stated that USADA shall "ensure that athletes participating in amateur athletic activities recognized by the United States Olympic Committee are prevented from using performance-enhancing drugs or performance-enhancing genetic modifications accomplished through gene-doping."163 To that end, Congress provides the majority of USADA's funding.164 Curiously, the USADA's status and the requirement that it conduct Olympic Movement drug testing are not part of the Amateur Sports Act. The very brief legislation that outlines its funding and duties is part of an Office of National Drug Control Policy funding statute.165 Notwithstanding its low profile legally, USADA has already paid dividends on the international relations front. As stated by former USOC Chief Executive Jim Scherr, USADA's actions have "largely dispelled what was previously a widespread international impression that some American athletes were drug cheaters with their behavior condoned by their respective sports federations."166

What most distinguishes the sportive nationalism expressed through the federal government's establishing the USADA and its participating in the anti-doping movement is the government's motivation to rely on the private sector. With the President's Commission on Olympic Sports and the resulting Amateur Sports Act, the government chose to rely on the private sector as a means of distinguishing the structure of the United States' Olympic sports system from its state-sponsored, Communist counterparts. The government was expressing sportive nationalism through its choice of how to develop and train Olympic Movement athletes and, in doing so, showing the world the strength of traditional American values--particularly the principles of individualism and free enterprise.

However, with its anti-doping initiatives, the federal government was not interested in establishing the USADA as a private entity to *1496 contrast it with state-controlled systems--the Cold War was long over. Instead, the government was interested in avoiding constitutional restraint and enhancing its international image in the most expedient way possible.167 In the privatization debate, it is this deliberate avoidance of constitutional restraint that is particularly problematic,168 and considered "illegitimate."169 Examples of how the USADA functions as a government "partner" are illustrative. For instance, prior to the 2004 Summer Olympic Games, the federal government raided a San Francisco area entity, the Bay Area Laboratory Cooperative (BALCO),170 that it alleged was distributing illegal performance-enhancing substances to professional and Olympic athletes.171 One of the substances was specifically manufactured to be undetectable in standard drug tests.172 Shortly after this raid, the United States Senate took the "unprecedented"173 step of subpoenaing the secret grand jury documents that were connected to the raid; then it turned the documents over174 to the USADA with the express purpose of disqualifying the athletes who apparently had obtained performance-enhancing substances from BALCO.175 The BALCO investigation was not an exception; in fact, the USADA partners with the government regularly to develop evidence and pursue sanctions against athletes.176 For instance, the USADA has continued to work with the government on a variety of *1497 investigations involving the sale and distribution of performance-enhancing drugs, and it is contemplated that the government will provide the USADA once again with any evidence of purchases by Olympic Movement athletes.177 The use of state power to achieve these results, and the deliberate avoidance of Constitutional restraint by relying on the private sector, poses a troubling threat to athletes' individual rights, as the pursuit of prestige through doping convictions can be viewed as the government achieving indirectly what it could not do directly.178

**B. Targeting High-Profile Athletes**

Sportive nationalism manifest through the anti-doping movement is illustrated in the first instance in efforts to target athletes in sports that, internationally, get the most attention.179 In fact, the WADA Code explicitly supports the practice of targeting high-profile athletes even in the absence of probable cause or reasonable suspicion.180 The strong international consensus against athlete doping has meant this targeting takes ever-greater urgency, as the United States no longer wants to appear as if it ignores athlete doping. In contrast, it wants to show the world that it can and will take action against high-profile athletes. At least one athlete has made such a claim before Congress, essentially alleging that prior to the 2004 Olympics, the government worked to remove athletes in sports with a high international profile and turned a blind eye to the others. As stated by sprinter Kelli White:181

*1498 Although I have been troubled by the disparity of the penalties facing track athletes versus other sports, I am mindful we are not protected by a players' association. I appreciate the many reasons why this committee previously subpoenaed the BALCO documents pertaining only to the track and field athletes and turned them over to USADA, rather than the other sports, but would like to see more equal treatment of all sports.182

Yet, sportive nationalism does not give the government or the USADA, acting on behalf of the government, the incentive to equally pursue other sports. Given the United States' past international reputation as "cheaters," especially in sports like track and field and cycling, the incentive is to target those sports for testing and sanctions because of the greater international currency in doing so. Thus far that has been the case.183

In addition, the USADA has also targeted athletes by attempting to obtain evidence on others by offering plea deals. While this undoubtedly helps USADA "clean up sport," it also reflects that international prestige is an important backdrop upon which the "cleaning up" is done. For instance, it was widely reported that after Floyd Landis allegedly tested positive for performance-enhancing drug use after the 2006 Tour de France, the USADA offered him a "plea deal" of sorts if he would provide information about American cyclist and seven-time Tour de France winner Lance Armstrong.184 Many in the international sporting community believed that Armstrong used performance-enhancing substances, and seeking such evidence, long after Armstrong retired from cycling, seemed less about regulating sport and more about international prestige.

**Page *1499 C. Lack of Meaningful Due Process**

Perhaps the most troubling manifestation of sportive nationalism through the anti-doping movement is the lack of meaningful due process protections for athletes accused of doping violations. In the Cold War Era, United States sportive nationalism presented few threats to athletes' constitutional rights. At that time, the government's interest in participating in the Olympic Movement, and doing so successfully, usually aligned with athletes' interest in competing. Thus, the government's interest at that time was facilitating the development of skilled athletes and supporting their efforts to compete. In addition, during this time, athletes did not pursue their sport as a career but as an avocation. Opportunities for endorsements and other earnings

related to sport were limited, and training generally was not a full time job. Today, however, the practice of sportive nationalism has changed dramatically. The government remains interested in producing successful athletes, but it now wants to do so with moral authority. Thus, the government no longer wants solely to promote eligibility, but in fact can gain international currency from declaring athletes ineligible when it is believed that they have used performance-enhancing substances. Thus, the new sportive nationalism provides little incentive to provide accused athletes with meaningful due process protections. This change of position is increasingly important because it comes at a time when a strong case can be made that athletes have a liberty and property interest185 in their sporting careers.186

**\*1500** 1. Olympic Movement athletes have a property right in their eligibility
In the early 1970s, when the federal government considered ways to use Olympic Movement sport to gain international prestige, athletes truly were amateurs. By and large, sport was not an athlete's career or livelihood. Courts did not recognize any right to compete in Olympic Movement sport.187 The opportunity to compete was considered a mere privilege.188 Today, the landscape has changed dramatically.189 With technical advancements in training and the organization brought about by the Amateur Sports Act,190 United States athletes have become highly successful in Olympic Movement competition. The rewards for athletes are in many cases substantial. The Olympic Games themselves are a billion-dollar enterprise, and Olympic Movement athletes pursue their sports as careers.191 Athletes dedicate years to training to achieve their elite status, making it difficult to hold employment outside of their sport. Frequently, elite athletes delay preparing for a "traditional" career while they pursue their career in sport.192 Elite Olympic Movement athletes rely on training stipends, earnings, and endorsements tied to **\*1501** their sport to make ends meet.193 This is the case for most, if not all, modern Olympians for whom sports competition is equivalent to employment, and the financial benefits can be in the millions.194 Yet competing at this level may only come after an athlete has met the eligibility requirements of the United States Olympic Committee195 and, by extension, the United States Anti-Doping Agency. These entities hold the power of stripping an athlete of his or her eligibility and effectively ending his or her athletic career.196 Unlike **\*1502** professional athletes, Olympic athletes have no union to protect their interest in their sporting careers. This, coupled with the federal government's undeniable practice of sportive nationalism, can threaten athletes' legitimate liberty and property interest in their sporting careers if they are not given meaningful due process to defend their eligibility.197
The Fifth and Fourteenth Amendments to the United States Constitution provide that the state shall not "deprive any person of life, liberty, or property, without due process of law."198 The Supreme Court has made clear that the protections afforded by the Fifth and Fourteenth Amendment Due Process clauses apply only to actions taken by the state, and not private conduct, "no matter how unfair that conduct may be."199 In some circumstances, a strong case can be made that the USADA engages in "state action" sufficient to trigger Constitutional protections.200 The next question, then, assuming there is state action, is whether Olympic Movement athletes are being afforded due process of law when their eligibility is terminated. The Supreme Court has stated that procedural due **\*1503** process issues are examined using a two-step process.201 First, the Court looks at whether the aggrieved individual has "a liberty or property interest which has been interfered with by the State."202 The second step is to determine "whether the procedures attendant upon that deprivation were constitutionally sufficient."203 Olympic Movement athletes today can make a strong case that they have protected property and liberty interests in their athletic eligibility. The Supreme Court has held that it is the "nature" of the interest at stake that determines whether due process requirements apply and not the weight,204 as the procedural protection of property interests is aimed at providing security for the interests an individual has acquired in specific benefits.205 In an oft-quoted passage, the Supreme Court has stressed that "to have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."206 A property interest is created207 and its limits defined by "existing rules or understandings that stem from an independent source"208 such as state law, but "federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' **\*1504** protected by the Due Process Clause."209 The Court has explained that "the hallmark of property" is an entitlement "which cannot be removed except for cause.'"210 The Supreme Court has made clear that a benefit is not an entitlement subject to due process protection if it may be granted or denied in the exercise of government officials' discretion.211 The Court has explained that once an entitlement that cannot be removed except "for cause" is found, the actual types of interests that constitute property subject to constitutional protection "are varied and, as often as not, intangible, relating 'to the whole domain of social and economic fact.'"212
Such varying interests deserving of constitutional protection are illustrated in the Court's due process jurisprudence. For example, in Perry v. Sindermann, the plaintiff's terms of employment, including mutual understandings between him and his employer not included in a contract, defined the relevant property interest.213 In that case, a teacher without formal tenure pointed to specific circumstances and understandings that could establish an entitlement in continued employment.214 The Court held, therefore, that he was entitled to a hearing and opportunity to challenge the grounds for his termination.215 Similarly, in Memphis Light, Gas & Water Division v. Craft, the Supreme Court held that utility customers had a **\*1505**

"legitimate claim of entitlement" in their utility service where state law provided that the service could only be terminated "for cause."216 Moreover, in Hewitt v. Helms the Court held that a prisoner acquired a protected liberty interest in remaining in the general prison population, with greater freedoms, that could not be denied without due process.217 The Court found significant the Pennsylvania statutes and prison regulations which "used language of an unmistakably mandatory character" in requiring that certain procedures must be employed and certain substantive predicates must be met before a prisoner would be segregated from the general population.218

Finally, in Logan v. Zimmerman, the Court found that a plaintiff had a property right in a state statute which allowed him to file a claim of disability discrimination against his employer.219 In that case, the state agency charged with investigating his complaint had not done so within the statutorily created time frame. The state court held that the plaintiff's cause of action was therefore extinguished.220 The plaintiff argued that extinguishing his claim because of the state's failure to follow the statute deprived him of due process.221 The Supreme Court agreed, explaining that the right of the plaintiff to avail himself of the statute's adjudicatory procedures "share [the] characteristics" of other protected property interests.222 The Court explained that his right to redress of his grievance was guaranteed by state law and that his claim would be assessed under what amounts *1506 to a "for cause" standard.223 Moreover, the Court found that his cause of action had value and was "at least as substantial" as the other interests that the Court had found deserving of protection.224 Other protected property interests recognized by the Court include a horse trainer's license,225 disability benefits,226 public education,227 driver's licenses,228 welfare benefits,229 and professional licenses.230

In contrast, the Court declined to recognize a protected property interest in the landmark case of Board of Regents of State Colleges v. Roth, where the Court considered whether a non-tenured assistant professor at a state university had a property right in his appointment such that he was entitled to notice and a hearing on the decision not to rehire him.231 The Court held that he did not have such a right, explaining that, first, the state had not refused to rehire him in connection with any charge that "might seriously damage his standing and associations in his community,"232 and it did not impose a stigma on him that would damage his ability to secure new employment.233 The Court explained that in such a case the university would have to grant notice and a sufficient hearing.234 In addition, noting that property rights are created and defined by "existing rules or understandings that stem from an independent source such as state law,"235 the Court explained that no such rules and understandings were created by the terms of his appointment, which "secured absolutely no interest in re-employment for the next *1507 year. They supported absolutely no possible claim of entitlement to re-employment."236 In these circumstances, the Court found that the professor had no property interest that was sufficient to require the university to give him notice and a hearing before declining to renew his contract.237 Similarly, in the recent case of Town of Castle Rock v. Gonzales, the Court considered whether a woman whose restraining order against her estranged husband had a property interest in its enforcement where the town police officers failed to properly enforce it.238 The Court held that because state law did not make enforcement of the restraining order mandatory but left it to the discretion of police officers, the woman did not have a property right that would trigger due process protections.239

In the case of the United States Olympic Movement, athletes can point to specific rules and understandings that create a legitimate claim of entitlement to their continued eligibility for purposes of the rules against doping.240 This entitlement is created because the totality of the rules and understandings of Olympic Movement competition are that athletes may only have their eligibility terminated, for purposes of a doping violation, for cause. Moreover, the mandatory nature of the language used to outline the procedures under which the eligibility can be terminated support the notion that Olympic Movement athletes have a property interest in their continued eligibility. The United States Olympic Committee National Anti-Doping Policies and the World Anti-Doping Code, which the USOC has adopted241 and the USADA must follow242 in *1508 prosecuting accused athletes, provides for specific substantive predicates to be fulfilled before an athlete may lose her eligibility based on a doping violation.243 These include a finding that a doping violation has occurred under the terms of the World Anti-Doping Code. Less formally, but no less clearly, Olympic regulators have publicly stated that athletes will not lose their eligibility on the basis of a doping violation except for cause, stating that athletes are provided with "all the rights based upon the United States *1509 Constitution and our judicial system."244 Thus, it can be argued that Olympic Movement athletes have a legitimate claim of entitlement to continuation of their eligibility according to the rules and understandings of the United States Olympic Movement, which clearly establish that they will lose their eligible status only for cause. The totality of these explicit rules and understandings entitle an aggrieved athlete to meaningful245 due process before the athlete's eligibility is revoked.

Additionally, athletes' claim to a property right in their eligibility is strengthened by the fact that a finding that an athlete has used performance-enhancing substances imposes an enormous stigma that affects an athlete's future employment prospects. The Supreme Court has recognized that an individual can have a liberty interest sufficient to require due process protections where the state has damaged his or her reputation to the point that it forecloses future employment opportunities.246 In Paul v. Davis, the Court held that an individual who police had wrongfully featured on a flyer noting that he had been charged

with shoplifting did not state a claim under the Fourteenth Amendment.247 The individual featured on the flyer claimed that publicly labeling him an "active shoplifter" violated a liberty interest protected by the Fourteenth Amendment.248 The Court disagreed, explaining that "reputation alone" is not a protected liberty interest, thus holding that defamation alone by a public official fails to support a claim under the Due Process **\*1510** Clause.249 The Court clarified that damage to reputation, in combination with government action that deprives an individual of another right, such as foreclosing future employment opportunities, triggers Due Process protections.250

This same type of harm is at issue in the Olympic Movement today where doping accusations threaten athletes' eligibility.251 A determination by the USADA that an athlete is not eligible to compete because he or she has been found guilty of a doping offense carries just the sort of "stigma" with which the Supreme Court is concerned.252 Sanctions for an initial doping offense are a two-year, and in some cases four-year, ban on competition.253 Subsequent violations can mean a ban for life.254 The charge carries a powerful **\*1511** quasi-criminal, moral stigma,255 and it significantly impedes the ability of an athlete to continue training and resume successful competition or be employed in an occupation related to Olympic Movement competition. There is little opportunity for an athlete found guilty of a doping offense to remain connected with the Olympic Movement in any way.256 Thus, being found guilty of doping essentially eliminates the possibility that an athlete can continue his or her sporting career, either as an athlete, coach, or the like. Moreover, the athlete's endorsements, which can be a significant part of his or her annual income, are usually terminated in such a case. It is this ability to secure alternative employment that convinced the Supreme Court in Roth that the respondent did not have a liberty interest at stake. The Court noted that it does not implicate a liberty interest "when he simply is not rehired in one job but remains as free as before to seek another."257 Here, an Olympic Movement athlete cannot pursue any other "job" related to Olympic Movement sport.258 Thus, an accusation by the USADA of doping is exactly the "nature" or type of injury that the Supreme Court has **\*1512** identified as requiring meaningful due process.259 Moreover, the Supreme Court has recognized that in certain circumstances restricting or terminating an individual's ability to engage in a licensed profession is the deprivation of a liberty interest that is deserving of due process protections.260 Eligibility to participate in Olympic Movement competition can be viewed as holding a license to practice a chosen profession which deserves due process protection.

A property interest in the eligibility of Olympic Movement athletes may not immediately seem like the type of property that is envisioned by due process scholars as justifying procedural protections.261 That is, we may not view sport as, intuitively or normatively, something that is significant enough to merit constitutional protection. And certainly, it might not now be fashionable to argue for a definition of property rights that would include Olympic Movement eligibility.262 However, viewing eligibility at this level of athletic competition can be the new property for the new millennium without unduly expanding our conception of property that qualifies for due process protection. Because of the significant changes in the social and political environment regarding the value and use of elite sport, the characteristics of constitutionally protected property are met. Those changes have brought about a significant economic component to competitive eligibility that was not previously present. Perhaps as a result of this undeniable economic interest that athletes now have, regulators have granted athletes the promise of not revoking eligibility unless it is for cause--a bona fide finding of a doping violation. These elements of "monetary value," "entitlement," and **\*1513** "termination for cause" squarely fit the Supreme Court's conception of property deserving of constitutional protection.263 Therefore, an argument for a property right in Olympic Movement eligibility is not premised on 1960s and 70s notions of government largesse and the welfare state. The claim of "entitlement" with respect to Olympic Movement athletes derives from notions of fundamental fairness. With the practice of sportive nationalism as entrenched as it is, it is simply no longer fair to allow the government to use athletes' athletic careers for international relations benefits264 without giving them meaningful due process protections in return. As will be explained below, it is this lack of meaningful due process and the incentive the government has to withhold meaningful due process that threatens athletes' constitutional rights.

2. Athletes accused of doping are denied the meaningful procedural process to which they are due

There are two components of procedural due process. First, procedural due process requires setting minimum procedures which are calibrated to minimize the risk of an erroneous decision or result given the interests that are at stake. Second, an important **\*1514** component of due process is following the established procedure.265 Scholars have explained that the purpose of procedural due process is to ensure accurate decision-making--with "accurate" process defined as "one that finds the facts as they actually are and applies law to those facts in accordance with the prevailing doctrine."266 Thus, procedural protections such as notice of the proposed action, a hearing, and a right to be represented by counsel are important because they help achieve an accurate result.267 "Underlying this concern for accuracy is a notion that inaccurate determinations are unfair to individuals."268 Procedure, then, is meant to protect individuals from the "tyranny" and "oppression" of state agents exercising unfettered discretion.269 Thus, a person is denied due process of law when the state actor either failed to provide

the required minimum procedural protections or when the state actor failed to follow established applicable rules.270 For athletes accused of doping violations, there is questionable due process in both respects. First, the rules themselves fail to adhere to minimally required due process standards. Second, doping authorities often fail to follow their own rules. With respect to minimum procedures, because Olympic Movement athletes have a strong argument that they have a property interest in their athletic eligibility, under the Due Process Clause they are entitled to "some form" of a hearing before that eligibility is revoked based on an *1515 allegation that the athlete used performance-enhancing substances.271 Thus, the Supreme Court has explained that "due process is flexible and calls for such procedural protections as the particular situation demands."272 Specifically what, or how much, process is due when an individual's liberty or property interests are in jeopardy is determined by balancing the competing interests at stake.273 The Court looks to the private interest that will be affected, the risk of an erroneous deprivation of the interest at stake through the procedures used and the value of additional safeguards, and the government's interest, including the burdens that additional procedures would impose.274

In terms of the private interest at stake when an athlete is accused of doping, scholars have noted that such allegations can be seen as "quasi-criminal" in nature and therefore "require a heightened level of fairness."275 Moreover, the Supreme Court has repeatedly held that depriving an individual of the means to pursue his or her career and livelihood is a significant interest.276 These interests are intensified because the penalties meted out by doping regulators make it extremely difficult to resume successful Olympic Movement competition. While the World Anti-Doping Code previously mandated a two-year suspension for a first offense,277 recent changes to the World Anti-Doping Code made the first-offense sanction in some cases four years, effectively eliminating any significant opportunity for many athletes to resume competition.278 *1516 Such a result denies athletes what is in many cases their primary source of income.

These important private interests are balanced against the interest of the government in promoting "clean" competition and enhancing our nation's image abroad. Thus, participating in worldwide anti-doping regimes has provided a significant international relations benefit to the United States, and that cannot be taken lightly.279 Similarly, the interest in "clean" competition has a variety of public policy implications, as government officials frequently stress that elite athletes are "role models" and that use of performance-enhancing substances by elite athletes encourages such use by children.280 In addition, because the USADA relies on relatively modest government funding as its primary source of revenue, it is undoubtedly interested in minimizing the costs of adjudication.281 The interests at stake, then, can be seen as significant for both the government and individuals.

It is undoubtedly this recognition that prompted doping regulators to adopt the notice and hearing procedures for athletes outlined in the World Anti-Doping Code and adopted by the USADA. These procedures include a "timely" hearing, a "fair and impartial" hearing body, the right to be represented by counsel, the right to be informed of the alleged doping violation and "a right to respond" to the allegation by presenting evidence, as well as calling and questioning witnesses, and a "timely, written, reasoned decision."282 On the face of it, these procedures have all the trappings of "due" process, and a fairly generous amount of it, because athletes are given what appears to be ample opportunity to *1517 present a defense.283 It appears this way because procedural protections--like the opportunity to have a hearing, to be represented by an attorney, and to cross-examine witnesses, for instance-- traditionally comport with the central purpose of procedural due process, which is to minimize the risk of an erroneous decision.284 Moreover, it would seem that, as in traditional due process cases, the interest in preventing an erroneous result is one that would be shared by both athletes and government-backed doping regulators, whose system might not long survive if it produces unjust results.285

However, the Supreme Court has stated that with respect to due process, "we look to substance, not to bare form, to determine whether constitutional minimums have been honored."286 Looking beyond the bare form of the procedures provided to athletes accused of doping, there are serious concerns over how fair this arbitration system really is.287 The Supreme Court has emphasized that the due process requirement is meant to protect the opportunity for an aggrieved individual to be heard in a "meaningful" manner.288 Thus, where an individual's reputation is called into question to the point that he or she suffers a "stigma" that would harm future employment prospects, due process requires procedures that allow the accused individual a meaningful opportunity to refute the charges.289 In the context of student suspensions in public schools, for instance, the Supreme Court has explained that the opportunity to be heard is crucial so that "disciplinarians, although proceeding in utmost good faith," can make informed decisions and avoid those *1518 decisions which are not warranted.290 The "disciplinarians" in the case of anti-doping regulation may not simply be proceeding in a good faith attempt to find facts, but with eyes colored by sportive nationalism. In such a case, the opportunity to be heard in a meaningful way takes on even greater importance, yet procedural rules governing the hearing process significantly and, in most cases, fatally handicap the athlete's opportunity to present his or her side of the doping story. In this respect, the current drug testing and adjudication regime adopted and administered by the USADA, through the World Anti-Doping Code,291 falls short of due process requirements.292

First, the hearing procedures fall short of due process requirements because they rely too heavily on presumptions that in practice are irrebuttable. The Supreme Court has stated that presumptions are permissible under the Due Process Clause where there is a rational connection between the fact proved and the fact presumed.293 In contrast, a presumption fails to meet due process requirements where it is "irrational" or "arbitrary" in that it cannot "be said with substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend."294 In the doping context, the presumptions in the World Anti-Doping Code are troubling because they effectively presume the ultimate fact. First, the tests that are used to determine whether an athlete has committed a doping violation are created by WADA and are presumed to be accurate. There is no formal procedure in place to challenge the accuracy of the test itself. In addition, it does **\*1519** not follow that simply because WADA created a test, it in fact produces scientifically valid, accurate results. Moreover, the same labs that create tests through grants from WADA are also on the WADA-accredited list to conduct testing on athletes' samples. Experience has shown that the tests used by the accredited labs may not comport with accepted scientific principles. For instance, in the case involving cyclist Tyler Hamilton, USADA charged him with a doping offense based on the use of transfused blood. The arbitration panel found, two to one, that the test was scientifically accurate and it imposed sanctions on Hamilton. The dissenting arbitrator, in contrast, stated that "the WADA criteria has not been validated in a manner acceptable to the scientific community. It should not be used to test athletes at this time."295 Moreover, the dissenting arbitrator noted that the criteria used by WADA to find a doping violation was a "subjective, qualitative approach" that was not appropriately peer reviewed and validated with an accounting of the rate of false positives.296 Thus, there is not necessarily a rational connection between the fact proved (that the sample went to a WADA accredited lab) and the fact presumed (that the test used is valid).297

Second, it is upon this presumption--that the tests used are valid--that a second presumption rests: that the tests are conducted accurately. The Code contains a rule presuming that tests done in its labs, including the handling of an athlete's sample as well as the conduct of the actual tests, are done correctly and in accordance with prevailing scientific protocols.298 Again, experience has shown that this presumption is an unfair one, as evidence discovered as part of the Floyd Landis arbitration showed that the employees at the WADA-accredited laboratory who declared his sample positive in **\*1520** many cases did not know how to properly operate the machinery used to test his sample. Moreover, the fact proved (that a test was done) cannot in all cases have a rational connection to the fact presumed (that the test was done correctly) where the presumption is itself based on a presumption that the test is accurate.

These presumptions are also procedurally problematic, not only because they have been shown to be factually incorrect, but also because they are in practice irrebuttable. WADA rules state that the accused athlete may rebut the presumption by establishing that the lab has departed from the required standards.299 However, while the athlete has to rebut the presumption by a preponderance of the evidence, the hearing panel may still disregard the fact that procedures were not followed if it is "comfortably satisfied" that the departure from established rules "did not change the test result."300 This is problematic for two reasons. First, WADA rules prohibit experts employed at any of the thirty-four accredited testing laboratories from testifying on behalf of an athlete accused of doping.301 Further, by USADA rule, athletes are privy only to documentation which pertains to the athlete's own sample.302 No documentation will be provided that might expose any deficiencies or irregularities in the overall processes utilized by the laboratories. Second, as the experiences of Floyd Landis and others demonstrate, these labs and the tests they conduct are not without serious flaws.303 **\*1521** Yet, even if an athlete can show that the testing done on his or her sample was in violation of WADA's own procedures, and, as in the case of Floyd Landis and Tyler Hamilton, if the tests and the results produced do not comport with known science, the accused athlete can still be found guilty of a doping offense,304 rendering the presumption used to build the case against an athlete to be effectively irrebuttable. The strength of these presumptions is reflected in USADA's amazing record in cases it brings against athletes--it has won nearly every one and has deterred countless other athletes from even bringing a challenge.

These aspects of the procedures provided to athletes are particularly troubling because, in the case of an "analytical" positive (a doping offense found through drug testing in a lab), the only opportunity for an innocent athlete to know what happened so that he or she could present a defense is to obtain an explanation from the WADA-controlled laboratory. Thus, in seeking a meaningful opportunity to be heard, athletes are left with little opportunity to defend themselves because the facts that control the finding that there was a doping violation are within the control of doping regulators, who have the sole authority to create the tests, certify results, and then declare a violation. This is quite unlike a typical due process case, where the opportunity to be heard is made more meaningful because the facts that control the government's decision often rest exclusively or at least equally with the aggrieved individual.305 In the doping regulation context, the facts and law are **\*1522** controlled by regulators.306 Therefore, the risk of an erroneous result for an innocent athlete is great because the "facts" of the doping offense, as they happened, are only in the control of doping authorities. Without broad ability to get documents from the laboratories and obtain exculpatory testimony from those who perform the tests,307 an athlete is left with little means to be

heard. As stated by one of the arbitrators in the Floyd Landis proceeding: "[A]s this case demonstrates, even when an athlete proves there are serious errors in a laboratory's document package that refute [the positive finding], it will be extremely difficult for an athlete to prevail in these types of proceedings."308

The risk that the presumptions used in the Code will produce an erroneous and unjust result is heightened by the standards used to ban athletes from competition. The USADA, relying on the World Anti-Doping Code, has stated that it can ban athletes based on *1523 circumstantial evidence if the evidence "comfortably satisfied" doping regulators that a violation had taken place.309 This use of circumstantial evidence is often referred to as a "non-analytical positive,"310 and is considered to be the equivalent of a failed drug test.311 Although they had never failed a drug test, numerous Olympic athletes were banned from competition based on this type of government-provided evidence.312 This low threshold for finding a doping offense is coupled with the strict-liability nature of doping regulations.313 Punishment for unintentional use of a banned substance is often indistinguishable from that for intentional use.314 Anti-doping officials find this feature to be essential, despite the potential for highly inequitable results. In the words of the outgoing head of the World Anti-Doping Agency: "if you're captured by a squad of Nazi frogmen and injected with a steroid, you're going to be found positive."315 This strict liability system and the "comfortable satisfaction" standard together leave athletes with little room to clear their name.316 While standing alone, the strict liability *1524 standard might be justified because of the exigencies of the worldwide fight against doping, the standard, taken with the other presumptions built into the Code, unduly risks an unjust result. Thus, the difficulty in prevailing against a doping charge, even if an athlete is innocent, is due to the presumptions in support of and standards for finding a doping offense at work in the Code. These presumptions and standards alter the nature of the adjudication to such a degree that the procedures not only unduly risk an erroneous result, they actively promote the value of conviction and punishment more than they respect the athlete's right in his or her eligibility. Because the value of punishing and appearing "tough" on doping does not require accurate adjudications, the procedures used intentionally do not serve the accuracy and fairness values that the due process clause guarantees.

Doping regulators' lack of consistency in following their own rules is an additional aspect of anti-doping regime which threatens athletes' due process rights. As explained above, a key component of due process is following the established rules.317 In the doping enforcement context, regulators often fail to follow established rules, especially in cases involving high-profile athletes. The failure to follow established procedures in the testing process itself, as discussed above, is particularly problematic because it is presumed that procedures are followed. When established procedures are not followed, the athlete is denied due process because the presumption operates to prevent an athlete from meaningfully defending her or himself, and also because failing to follow established rules is in itself a due process violation. Thus, the presumption of following *1525 established procedures, compounded with the blatant failure to follow such procedures, seriously risks an erroneous result.

Moreover, failure to follow established rules for "result management" also presents a due process problem. For instance, the World Anti-Doping Code mandates that positive test results are to be kept confidential until an athlete has had notice and a chance to defend the allegation. In the case of high-profile athletes, however, such as Floyd Landis, Justin Gatlin, and Marion Jones, the results were leaked before confidential and testing on the athletes' "B" sample was complete. In Landis's case, the dissenting arbitrator noted that "[a]t every stage of the testing, the results from the testing of Mr. Landis' samples were leaked to the media" in violation of the WADA code.318 The arbitrator went on to explain how damaging these leaks could be, because "within twenty-four hours after the [lab] obtained the results, and before anyone other than the [lab] had the results, the results of the B sample tests were leaked to the media," which significantly damaged Landis's reputation and put in jeopardy his ability to be heard in a meaningful way. "[L]eaking this information was clearly meant to damage Mr. Landis's credibility before an independent tribunal had the opportunity to evaluate the evidence."319

The case of Marion Jones is also a useful example. In 2006, a leak to the press indicated that Jones had failed a drug test at the United States Track and Field Championships.320 It was widely reported that Jones had used erythropoietin (EPO), an endurance-boosting drug.321 The leaked results forced her to pull out *1526 of several meets and eventually cancel her season322 at a time when she was the second-ranked 100-meter sprinter in the world.323 It was later revealed that testing on Jones's "B" sample had not confirmed the result of the "A" sample,324 and she was cleared of a doping violation.325 Despite the fact that she was cleared, Jones's reputation was significantly damaged.326 In the case involving Olympic and world 100-meter champion Justin Gatlin, there was a similar, highly public, rush to judgment. After it was announced that Gatlin had failed a drug test, but before Gatlin had an opportunity for a hearing (his defense was that he was sabotaged), WADA Chairman Dick Pound was quoted as saying that Gatlin "needs to be banned for up to life," and that WADA would review the result of any hearing if "we are not satisfied the right result has been achieved."327

The final aspect of the administration of the World Anti-Doping Code that prevents athletes from meaningfully protecting their sporting careers is that the system, at a minimum, appears biased. The Supreme Court has stated that a fundamental

requirement of due process is the opportunity to be heard by a neutral decision maker.328 Moreover, commentators have stressed that "traditional *1527 procedural protections, however meticulously adhered to, become irrelevant" when the decision maker is not neutral.329 Such a requirement is essential to prevent "unjustified or mistaken deprivations" and to help ensure that "life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law."330 In this regard, the due process offered by anti-doping authorities falls short. As a threshold matter, athletes challenging an eligibility decision resting on a doping allegation are not permitted to avail themselves of the arbitration procedures provided for under the Amateur Sports Act.331 Instead, athletes requesting arbitration must accept the "Supplementary Procedures" provided by USADA for use in arbitration proceedings.332 This is troubling not only because it circumvents the Amateur Sports Act, but because the USADA-approved arbitrators form a much smaller pool from which to draw arbitration panels. This limited pool is pre-approved, paid, and "trained" by USADA.333 As a result, critics have stated that the arbitrators listed as qualified to hear doping cases are, or appear to be, biased.334

Similarly, to the extent that laboratory authorities who perform the tests and declare the results can be viewed as decision makers (and they should, given that the World Anti-Doping Code presumes their work is accurate), their neutrality is called into question because of their relationship with WADA and USADA. For instance, one of *1528 the laboratory directors called to testify on the accuracy of the results in the Landis proceeding by USADA was also a recipient of a $1 million grant from USADA for research.335 Another prominent laboratory director, in testifying on the WADA "Code of Ethics" provision that prohibits laboratory personnel from engaging in "conduct . . . detrimental to the anti-doping program," stated that he was rebuked by WADA after testifying on behalf of an athlete.336 This laboratory director is also the recipient of research funding from USADA. This differs markedly from cases where the Supreme Court has found hearing procedures satisfactory to protect an individual's property right. For instance, in Mathews v. Eldridge, the Court emphasized that the evidence upon which authorities would determine whether to discontinue disability benefits was derived from "routine, standard, and unbiased medical reports by physician specialists,"337 which did not raise "the specter of questionable credibility and veracity . . ."338 This is quite unlike the anti-doping procedures. The appearance, if not the reality, of bias at various levels of the anti-doping system denies athletes a meaningful opportunity to be heard and defend their sporting careers. In the words of one critic: "[a]nti-doping authorities act as prosecutor, judge and jury, enforcing rules that they have written, punishing violations based on sometimes questionable scientific tests that they develop and certify themselves, while barring virtually all outside appeals or challenges."339

Although the vast majority of drug tests and resulting adjudicatory proceedings on athletes in sports with a low international profile may be conducted according to the rules, sportive nationalism can provide a strong incentive to waive procedural protections for high-profile athletes so the United States can appear aggressive on the issue of doping.340 Moreover, even *1529 when doping regulators "follow the rules" as written, those rules, with strong United States Government backing, fall short of meaningful due process. The interest that appears to anchor the procedures provided for accused athletes is not the interest in minimizing the risk of an erroneous or unjust result, but an interest on the part of doping regulators to demonstrate that the United States is "tough" on doping. By serving primarily this interest, the procedures provided to accused athletes fall short of due process requirements because they do not operate to minimize the chance of an erroneous result, but instead stack the deck in a way that actually increases the chance of such an erroneous result. Indeed, the USADA has only lost one arbitration hearing in its history.341

In summary, the procedures here fall short of what is due because they are not meant to ensure accuracy and prevent an erroneous result. They are meant to ensure convictions and burnish the image of countries like the United States who sign on to the Code. The rules in fact can act to shield potentially arbitrary and capricious action by doping regulators by severely limiting the extent an accused athlete can defend himself. The result is that athletes are in actuality left with little procedural protection through which they can clear their name. A hearing where a party, because of procedural rules, cannot clear his name not only unjustifiably risks an erroneous result, it in some cases guarantees it and therefore falls far short of providing the process that is due. Given that athletes are no longer amateurs in the traditional sense, but are individuals pursuing sporting careers, this process is not sufficient.342

## *1530 IV. Enhancing Accountability in Olympic Movement Sports

Achieving accountability for sportive nationalism and better protecting athletes' constitutional rights begins with the recognition that sportive nationalism exists and is at work in the federal government's policies and practices. Given this country's history of ignoring the relationship between sport and international relations, such recognition would be an important first step. Thus, the awareness that sportive nationalism can create troubling incentives for unchecked government involvement in the United States Olympic Movement, as well as the accountability failures of the current Olympic Movement structure, presents an opportunity to rethink the prevailing, and now outdated, view that participation in Olympic Movement sport is a purely private endeavor. To that end, this Article begins the dialogue of searching for accountability

solutions.

As a starting point, any recommendation should maintain the integrity of our participation in international regimes such as the International Olympic Committee and the World Anti-Doping Agency. These entities serve the United States interest, and their regulation of Olympic Movement sport should not be undermined. Accordingly, potential solutions should seek to balance the interests of individual athletes and the undeniable national interest that is implicated through our participation in the Olympic Movement.

**A. Accountability Through the Public Sector**

Perhaps the ideal accountability solution for sportive nationalism's excesses is through constitutional litigation. This solution is ideal because it does not rely on an electorate which likely is caught up in the same sportive nationalistic impulses as government officials. In this way, courts can truly be independent and do what they purport to do best--protect individual rights. Accountability can be achieved through the courts with a more **\*1531** flexible and pragmatic application of the state action doctrine, so that the USOC and USADA, ostensibly "private" entities, can be held to constitutional standards in circumstances where the federal government has directed their actions. A state action finding would have the benefit of applying the Constitution to actions of the USOC or USADA only in particular cases where sportive nationalism--by definition the work of the government--had eclipsed the entities' "private" status. Such an approach would be targeted in that it would only apply to the individual circumstances of a particular case.343 Whether a court would apply the Constitution to the USOC or USADA in an athlete-eligibility dispute is an open question, although in some circumstances the USOC and USADA may engage in state action.344

Aside from the courts imposing constitutional restrictions on the USOC and USADA through the state action doctrine, one obvious solution to achieving greater accountability for sportive nationalism is to make the USOC and the USADA government agencies, similar to the government entities, or "sports ministries" that regulate Olympic Movement sport in other Olympic super-power nations. In this way, sportive nationalism would not be filtered through ostensibly private entities, but it would be clearly connected with its government source. Making the USOC and USADA a part of the government would ensure that athletes receive constitutional due process and other protections and would therefore remove the accountability vacuum presented by the privatized Olympic Movement.

However, unlike application of the state action doctrine in specific circumstances, such an approach would be an overly broad and dramatic response to sportive nationalism, even if it were politically viable. The USOC by and large functions well as a private entity, and its legal separation from the federal government provides at least some shield against excessive sportive nationalism. The example of the 1980 Moscow Olympics boycott illustrates this shield. The USOC's private status enabled it to advocate for the athletes, and for participation in the Games, and resist the pressure **\*1532** from the Carter Administration to boycott. Although ultimately this was unsuccessful, it still illustrated that the USOC, acting as a private entity, has the opportunity to influence public opinion and attempt to create the political pressure to resist sportive nationalism that is potentially threatening to athletes' rights.

While it may make sense, on balance, for the USOC to remain private, it is worth exploring whether the USADA should formally be made a part of the United States Government. It is in the fight against performance-enhancing drug use in sport that sportive nationalism has taken a more threatening form so that it is not so easily deemed benign. One approach then is to make the regulation of performance-enhancing drugs a function of the government, perhaps administered through the ONDCP, which provides USADA's funding. In the alternative, USADA could operate as its own federal agency. Making the USADA a government agency has the obvious advantage of ensuring that athletes accused of doping violations always receive constitutional due process protections. Making the USADA a government agency would also have an important secondary benefit, in that it would promote greater stability in the movement to fight performance-enhancing drug use in sport. Currently, USADA relies on the support of key members of Congress345 to provide continued, and increased, funding for USADA's work. Moreover, it is not formally part of the United States Olympic Movement in that it is not mentioned in the Amateur Sports Act. While the United States' national interest clearly favors supporting USADA at this juncture, it is hardly clear whether this will continue.346 Given USADA's dependence on government funding, such a relatively precarious position does not ensure the long-term stability of doping initiatives the way making **\*1533** USADA a government agency would. Moreover, such an approach is consistent with our need for our elite athletes to demonstrate what is good and right about the United States form of government. Unlike totalitarian regimes, regulating Olympic Movement sport, or at a minimum the anti-doping process, through the government does not undermine our free-market image. It enhances our image

as a nation committed to individual rights.

Yet, similar to the approach of making the USOC a government agency, bureaucratizing the USADA suffers from the obvious flaw that it is politically not viable. This is not simply because the prevailing political ideology is in favor of privatization. It is also because the federal government does not want to give accused athletes constitutional protections that would potentially impede the aggressive enforcement of anti-doping rules.347 Sportive nationalism, in this case, would defeat any attempt to make the USADA part of the federal government.

**B. Achieving Accountability Through the Private Sector**

Given that making the USOC and the USADA a formal part of the government likely is not a viable or effective solution to checking sportive nationalism, it is worth exploring private sector accountability mechanisms. One way to examine potential accountability mechanisms is to view the Olympic Movement in the United States as a privatized government service. Viewed this way, understanding sportive nationalism's potential impact on individual rights can usefully be examined through the lens of privatization theory.348

Privatization "entails the transfer of governmental functions to the private sector."349 Privatization can take various forms, with the **\*1534** most common being "contracting out," whereby the government provides funding for services but contracts for the implementation with the private sector.350 Privatization is not a new phenomenon, but it has gained greater appeal and become an established movement among political conservatives.351 While some privatization gains little public attention, such as local governments contracting out their trash collection services, other privatization initiatives raise significant concern.352 A primary argument for privatization is that the private sector can provide a higher quality service in a more cost-effective manner.353 In addition, advocates assert that privatization harnesses the power of competition to create incentives for "innovation and increased efficiency."354

Critics note, however, that privatization risks the "dilution of public values" in that important public norms such as due process and free speech do not attach to private actors.355 Most of this concern has centered on privatization of traditional government social service areas such as welfare and education.356 Thus, critics question whether the private sector can provide meaningful accountability when individual rights are involved.357 Those who prefer free-market solutions for the provision of government services believe the market best provides accountability.358 Those who are concerned with social and economic justice "believe that those values are better protected by public rather than private methods of **\*1535** accountability."359 In terms of using privatization to achieve government goals, it is widely accepted that it is not legitimate to privatize in an effort to avoid being subject to constitutional restraints.360

At first blush, the USOC may not appear to be a classic case of privatization, like schools, prisons, or other social services.361 Privatization really concerns moving "public functions into private hands,"362 and in this way, the development and regulation of Olympic Movement athletes does not fit the classic privatization scenario. The Supreme Court has held that regulating amateur athletics is not a "traditional public function" for state action purposes,363 and the government has always left Olympic Movement regulation to the private sector. As a result, it can be argued that Olympic Movement regulation has not been privatized like the provision of welfare benefits or education.

However, upon closer examination, it is both appropriate and helpful to view Olympic Movement sport as a privatized function. The Olympic Movement in the United States serves dual functions. First, there is the important task of developing and regulating Olympic Movement athletes. This function historically has been performed by the private sector. However, there is another use for the Olympic Movement in the United States. As explained above, the Olympic Movement serves an important foreign relations function which clearly always has been the province of the federal government. Thus, when the federal government went from being neutral on the use of elite athletes to enhance national prestige to recognizing, in the Commission Report and the Act, that participation in the Olympic Movement can provide a significant national benefit, it essentially "privatized" that aspect of foreign relations. Justices Brennan and Marshall recognized as much in their dissent in San Francisco Arts, where they stated:

> Although at one time amateur sports was a concern merely of private entities, and the Olympic Games an event of significance **\*1536** only to individuals with a particular interest in athletic competition, that era is passed. In the Amateur Sports Act of 1978, Congress placed the power and prestige of the United States Government behind a single, central sports organization. Congress delegated to the USOC functions that Government actors traditionally perform-- the representation of the Nation abroad . . . .364

Justices Brennan and Marshall further underscored this point, stating that "the [Amateur Sports] Act gave the USOC

authority and responsibilities that no private organization in this country had ever held."365 Accepting then that Olympic Movement regulation is, in a sense, a privatized government function, it is helpful to examine the ways in which accountability may be achieved when sportive nationalism plays out through the private sector, to the detriment of athletes' individual rights.

1. Accountability through the market

Proponents of privatization assert that the market provides all the accountability that is needed.366 Such an argument, however, loses force in the case of a single provider which faces no market competition.367 The Amateur Sports Act created a monopoly for Olympic regulation by eliminating the ability of organizations such as the NCAA and the AAU to claim authority to field Olympic Movement teams.368 In addition, USADA enjoys a monopoly as it is the only entity to receive a grant from Congress to regulate performance-enhancing drug use in United States Olympic Movement sport. Congress also designated USADA as the United States' official anti-doping agency.369 This removes the possibility *1537 that additional entities could easily enter the market and compete to provide anti-doping services for the United States Government. With no opportunity for market accountability, other accountability mechanisms should be explored.

2. Accountability through the political system

Privatization proponents argue that privatization will very likely carry with it a fair amount of political accountability because the conduct of private entities carrying out the public's work will be closely scrutinized.370 However, this is not the case with the USOC or USADA practicing sportive nationalism on behalf of the government. The high-profile Moscow Olympic boycott is instructive, as it produced little in the way of political fallout. The public strongly supported the President's decision to boycott the Olympic Games.371 Indeed, some of the athletes themselves thought this was the best course.372 The majority of athletes, however, tried to fight the decision, with little success.373 The USOC also tried to fight the boycott, but its argument to attend the Olympic Games and beat the Soviets on their home turf had little impact.374 The American media also "played an active part" in supporting the boycott, as few media outlets argued against it.375 More recently, during the Democratic presidential primary campaign in 2007, Governor Bill Richardson stated that the United States should boycott the 2008 Summer Olympics in China if China did not agree *1538 to use its leverage with Sudan to help end the conflict in Darfur.376 In a blog on the issue, many citizens readily agreed, illustrating that using athletes to make foreign policy points is not politically controversial.377 Even those who disagreed with the notion of a boycott saw a role for athletes in foreign policy--they thought the athletes should be used as "ambassadors."378

Outside the realm of a boycott, which is a very high-profile, obvious expression of sportive nationalism, there is little indication that most Americans even see sportive nationalism at work in the federal government's involvement in Olympic Movement athletics. As explained above, the media and the American public often ignore the relationship between sport and international relations.379 The example of the anti-doping movement illustrates the disconnect well. Most individuals see doping in sport as a moral issue, not an international relations issue. Actions taken against athletes in this regard, therefore, are filtered through the lens of right and wrong, and not expedient international politics. Additionally, in the United States, interest in Olympic Movement sport is second to professional sports. Thus, while there might be political fallout for government action against Major League Baseball or the National Football League, there likely would be little for an Olympic swimmer or pentathlete. Accordingly, the electorate is largely uninformed, or under-informed, on the various levels at which Olympic Movement athletes serve the national interest.

Moreover, the American consumers of elite athletic competition care a great deal about protecting their vision of the United States and their vision of how the United States should be perceived, or should act, on the international stage.380 To the extent issues of sport translate at all into political action, the American electorate is likely *1539 therefore to see the issue in terms of their own nationalism, and not in terms of the experience of the elite athlete. As the Darfur bloggers illustrate, using Olympic Movement athletes can be an important vehicle to express our own sense of morality and nationalism. As one blogger stated: "[S]ince when has winning gold medals been more important than saving human lives?"381 Another suggested that "the ATHLETES themselves should refuse to participate in the Olympics, if China refuses to help end the conflict in Darfur."382 One blogger summed up: "[W]hy boycott the Olympics? We could virtually shut China down if we stopped shopping at Walmart. Oh, no! Wait, that would hurt me, not just some athlete on TV. Yeah, let's stick with the Olympics . . . ."383 As the last blogger noted, critics are more readily able to propose foreign policy strategies, such as boycotting the Olympics, that do not affect them personally, but are not as willing to propose solutions that would have an impact on them. On the flip side, it is not clear that policy makers always view public opinion as important on issues related to the practice of sportive nationalism.384 This is because the government sees the issue as primarily affecting its own foreign

relations interests and likely sees little risk of the electorate "throwing the bums out" over issues related to Olympic athletes. Accordingly, an uninformed public combined with unresponsive political leaders cannot provide meaningful political accountability for sportive nationalism.

3. Increased "publicization"

Some privatization commentators suggest that, in fact, privatized entities may be subject to a great deal of government supervision and monitoring for compliance with performance standards.385 For instance, Professor Jack Beermann argues that privatization of important government functions "is likely to entail extensive public monitoring of the private institutions involved."386 Beermann uses the examples of private prisons in Texas and Tennessee, which he *1540 argues are "subject to a very high level of scrutiny" in that the prison operators must operate within specific parameters established by the state.387 Additionally, Beermann cites the example of charter schools, which he argues "may actually be more heavily regulated in some respects than traditional public schools in that they can be abolished for failing to meet performance standards much more easily than traditional public schools."388

The increased accountability of the private actors cited in Beermann's examples, however, do not apply to the Olympic Movement. While the USOC has been subject to a great deal of oversight with respect to ethical improprieties and management structure, for example,389 Congress has never held hearings on whether the federal government's use of Olympic Movement athletes to enhance national prestige violates athletes' rights. The case of the USADA is particularly telling. In hearings to support continued funding for the USADA, one of the items generally cited in support of such funding is that the anti-doping agency is taking "aggressive" action and enhancing the United States' international prestige.390 Congressional oversight has almost never focused on the specifics of how this is being achieved.391 Given that the government has such a *1541 strong national interest in using the USADA to meet its objectives, it is unlikely that a searching review of some of the USADA's questionable practices will take place.

Since extensive oversight and monitoring of the Olympic Movement, at least with respect to how sportive nationalism might affect athletes' rights, does not take place, the next question is how increased monitoring could be put in place. The key concern for critics of privatization is that by relying on private provision of services, the government can avoid constitutional obligations that it would have if it provided the service directly.392 One solution to this, posed by Jody Freeman, is that privatization can be viewed as a means of actually expanding government into traditionally private realms--so-called "publicization."393 Freeman asserts that the government can use its leverage to impose conditions on the private entities with whom it contracts so that the private actors would commit themselves to traditional public values such as accountability, equality, and due process.394 In this way, privatization can actually be a vehicle to extend the application of these important values.

The USOC and USADA are promising candidates for such an approach. With respect to the USOC, Congress already requires it to report in detail on its operations, including an accounting of income and expenditures.395 In addition, the USOC must report on the "participation of women, disabled individuals, and racial and ethnic minorities" and include a "description of the steps taken to *1542 encourage" their participation in amateur athletics.396 This reflects the type of "publicization" that Freeman argues for, in that Congress is requiring the USOC to extend the value of equality to its operations and be accountable for it. Building on this, at a minimum Congress could amend the Amateur Sports Act to require that the USOC report on ways in which it is offering sufficient due process protections to athletes. While such reporting would not guarantee that athletes receive more protection for their eligibility than they currently enjoy, it would send an important message that such protection is important.

In addition, requiring more of the USADA, given the substantial federal funds that support it, would be warranted. Thus far, the federal government's legislation with respect to USADA has been directed more at the international community than at USADA's domestic performance. For instance, as described above, the USADA is "designated" as the United States' official anti-doping agency.397 Such a designation has little domestic legal effect, but it does enable USADA to participate in international anti-doping regimes as a representative of the United States, which serves to enhance the United States' image abroad.398 As a result of this designation, Congress requires the USADA to "serve as the independent anti-doping organization for the amateur athletic competitions recognized by the United States Olympic Committee."399 Congress also requires the USADA to prevent Olympic athletes from using performance-enhancing substances or gene-doping by implementing education, research, and testing programs.400 Beyond that, however, USADA's statutory obligations are very little.401

*1543 Similarly, USADA's obligations through its receipt of government funds are minimal. In the first several years of its

existence, the USADA was funded through memoranda of understanding between ONDCP and USADA. These memoranda simply directed ONDCP to make a direct payment of the congressionally allotted funding to "advance USADA's anti-doping mission."[402] USADA's "responsibilities" under the memoranda were to "manage the drug testing and adjudication process for U.S. Olympic, Pan Am, and paralympic athletes."[403] USADA further agreed to use the funds only for anti-doping purposes and "maintain adequate records of all expenditures and obligations."[404] The FY 2004 Memorandum of Understanding contained the most requirements for USADA: in addition to those mentioned in previous years, the funding was to be used "to increase the number of 'No-Advanced-Notice' tests, to increase research funding at university and research laboratories, and expand their efforts to educate the youth of America on health issues and the ethics of competing fairly in sport."[405] At a minimum, USADA's obligations in receiving federal funding should extend to following all WADA and USADA protocol with respect to testing and adjudication. Additional requirements could be added as necessary to remedy persistent reports of irregularities, such as those evidenced in high-profile cases. Moreover, Congress should strongly consider amending the Amateur Sports Act to place USADA within that scheme, which clearly includes protections for athletes such as the right to arbitration under the Commercial Rules of the American Arbitration Association. This would eliminate the appearance of bias and unfairness that inheres in the use of USADA's "Supplementary Procedures" for arbitration, which circumvents the protections for athletes given by the Act.

## *1544 VI. Conclusion

More than thirty years ago, the debate was over how, and how much, the federal government should use Olympic Movement sport in international relations. Now that sportive nationalism is a part of the United States' foreign policy, the question has become how to ensure that it is not practiced in a way that threatens athletes' constitutional rights. Unlike Cold War Era athletes, Olympic athletes of today can claim a property right and liberty interest in their sporting careers sufficient to trigger meaningful due process protections when a doping accusation threatens their eligibility. Accordingly, understanding what sportive nationalism is, and the incentives it creates, is an important step toward achieving accountability for potential violations of athletes' rights in the name of securing international prestige. In devising accountability mechanisms, we should return to the foundation that guided early expressions of sportive nationalism by constructing an American Olympic Movement that embodies important American values. Those values, it is clear, must encompass more than the spirit of free enterprise and moral superiority, but a healthy respect for individual rights as well.

Footnotes

a1   Assistant Professor of Law, University of Baltimore School of Law. Thanks to Dean Philip Closius for his generous support of this Article. Thanks also to Bryan Davis and Matthew Kneeland for outstanding assistance with research, and Keith Blair, Evan Buxner, Amy Dillard, Michele Gilman, Leigh Goodmark, Margaret Johnson, Robert Lande, Michael Meyerson, Nancy Modesitt, Connie O'Keefe, Amy Sloan, and Adam Todd for helpful comments on earlier drafts of this Article.

1    The Olympic Movement is comprised of athletes, organizations, and others who agree to be guided by the Olympic Charter and to adhere to the regulations of the International Olympic Committee (IOC), recognized International Federations of Sport (IFs) and the National Olympic Committees (NOCs).

2    This punitive action plays out through anti-doping initiatives taken by the United States Anti-Doping Agency (USADA), a nominally private entity that is substantially funded and logistically aided by the United States Government.

3    U.S. Anti-Doping Agency v. Landis, AAA No. 30 190 00847 06, at 4 (Sept. 20, 2007).

4    Id. at 46 (identifying Laboratoire National de Dépistage et du Dopage (LNDD) as the laboratory that obtained positive test results showing that Landis had used testosterone).

5    A Dutch investigation later exonerated Armstrong and stated that the "[World-Anti Doping Agency] and the LNDD may have 'behaved in ways that are completely inconsistent with the rules and regulations of international anti-doping control testing.'" Arthur Max, Report Exonerates Armstrong of Doping, Breitbart, May 31, 2006, http://www.breitbart.com/article.php?id=D8HUPHU00&show_article=1.

6    Landis, AAA No. 30 190 00847 06 at 77-81.

7    Id. at 83-84.

8    Id. at 1 (Campbell, Arb., dissenting).

9    Id. Campbell also stressed that Landis demonstrated through expert testimony that the results produced by the lab did "not comport with known science." Id. at 18-19.

10   Id. at 83.

11   Jim Caple, Pounding the Pedals with Floyd Landis, ESPN, July 16, 2007, available at http://sports.espn.go.com/espn/page2/story?page=caple/070713.

12   Michael Hiltzik, Presumed Guilty: Athletes' Unbeatable Foe, L.A. Times, Dec. 10, 2006, at A1.

13   Amy Shipley, Doping Divide May Taint Olympics, Wash. Post, Nov. 14, 2007, at E01.
     [I]n the matter of anti-doping, perception matters. Countries that haven't adopted a hard line on the issue and whose athletes perform exceptionally well at major competitions might find the results greeted with skepticism....
     ... Police actions in the United States in the last five years have resulted in sanctions or the threat of sanctions against more than a dozen athletes and helped restore the country's reputation on anti-doping matters.
     "For so long, we were thought of as the biggest cheaters in the world," said Scott Burns, deputy director for state and local affairs at the White House Office of National Drug Control Policy.
     Id.; see also Vicki Michaelis, BALCO Creates Inquiry Road Map, USA Today, Sept. 7, 2006, at 3C (quoting Scott Burns, Deputy Director of the Office of National Drug Control Policy, on the effect of "catching" Floyd Landis and Justin Gatlin: "[T]he world looked at the United States as one of the worst (doping) offenders." Exposing the fact that the two athletes used performance-enhancing substances "helps our image.... I have seen literally a 180-degree turn in the last two or three years with respect to our reputation.").

14   John Hoberman, Sportive Nationalism and Doping, Proceedings from the Workshop, Research on Doping in Sport 7 (2001) Nor. [hereinafter Hoberman, Workshop]; see also Alan Bairner, Sportive Nationalism and Nationalist Politics: A Comparative Analysis of Scotland, the Republic of Ireland and Sweden, 20 J. Sport & Soc. Issues 314, 315 (1996) ("Existing nation-states have been shown to use sport for a variety of purposes such as enhancing prestige ...."); John Hoberman, How Drug Testing Fails: The Politics of Doping Control, in Doping in Elite Sport: The Politics of Drugs in the Olympic Movement 241, 260 (Wayne Wilson & Edward Derse eds., 2001) [hereinafter Hoberman, Doping] (defining sportive nationalism as "the familiar doctrine that elite athletes are a significant index of a nation's vitality").

15   Richard Espy, The Politics of the Olympic Games 4 (1979) ("All states use sport as a diplomatic tool ...."); Hoberman, Workshop, supra note 14, at 7, 9 (stating that "to the best of my knowledge, no sitting government has ever renounced sportive nationalism as its fundamental approach to international athletic competition," and that "sportive nationalism continues to prevail as national policy around the world"); Martin Barry Vinokur, More than a Game: Sports and Politics 111 (1988) ("[G]overnments and countries throughout the world--regardless of political system--now seem to recognize that international sports victories have a new political meaning.").

16   Espy, supra note 15, at viii ("[T]he nations of the world have interpreted participation in the Games as an opportunity to express national identification."); James A.R. Nafziger, Legal Aspects of a United States Foreign Sports Policy, 8 Vand. J. Transnat'l L. 837, 838 (1975); Maria Tai Wolff, Note, Playing By the Rules? A Legal Analysis of the United States Olympic Committee--Soviet Olympic Committee Doping Control Agreement, 25 Stan. J. Int'l L. 611, 620 (1989) ("[T]he Olympics provide a highly visible international forum for the expression of a political message."). See generally Peter J. Beck, 'The Most Effective Means of Communication in the Modern World'? British Sport and National Prestige, in Sport and International Relations: An Emerging Relationship 78 (Roger Levermore & Adrian Budd eds., 2004); James A.R. Nafziger & Andrew Strenk, The Political Uses and

Abuses of Sports, 10 Conn. L. Rev. 259 (1977).

17    See Vinokur, supra note 15, at 126 (citing the example of the 1980 Moscow Olympic boycott, and explaining that the real reason for the boycott "was Carter's need for a bold public relations stroke").

18    Bairner, supra note 14, at 314. This Article will focus on the use of sport for international relations purposes and the domestic legal concerns this raises.

19    Espy, supra note 15, at 7; Beck, supra note 16, at 78 (noting sports "propaganda potential" for reflecting, enhancing and diminishing a nation's international prestige); Nafziger, supra note 16, at 839-40.

20    Nafziger & Strenk, supra note 16, at 261.

21    Barrie Houlihan, Building an International Regime to Combat Doping in Sport, in Sport and International Relations: An Emerging Relationship 74-75 (Roger Levermore & Adrian Budd eds., 2004); see also William J. Morgan, Sports and the Making of National Identities: A Moral View, 24 J. Phil. Sport 1, 3 (1997) ("[N]ations are dependent upon the international sports world to confirm their national stature.... The establishment of an international athletic presence is not, therefore, a gratuitous matter for nations, but rather the path they must currently follow if they expect to be treated as a nation.").

22    Alan Tomlinson & Christopher Young, National Identity and Global Sports Events (State Univ. of N.Y. Press 2006); Jeffrey M. Marks, Political Abuse of Olympic Sport, 14 N.Y.U. J. Int'l L. & Pol. 155, 158 (1982) (noting that the Olympic Charter rule 1 describes the key aims of the Olympic Movement as promoting Olympic ideals and creating international goodwill); id. at 159 (discussing rule nine of the Charter which specifies that "the Games are contests between individuals and not between countries."); see Espy, supra note 15; Houlihan, supra note 21, at 74-75 ("Over the last 40 years many, indeed most, of the major sporting states have, at worst, ruthlessly exploited international sport in general and the Olympic Games in particular for a variety of ideological and nationalistic purposes .... [F]ew states have been prepared to value sport for its intrinsic qualities ...."); Wolff, supra note 16, at 622 (explaining that former USOC Vice President George Steinbrenner's comments on the United States' performance in the Olympic Games illustrates that "prestige in Olympic competition is somehow linked to its prestige among world powers: winning Olympic countries are winning countries"); see also Olympic Charter Chap. 5 § 51(3) (prohibiting any "kind of demonstration or political, religious, or racial propaganda ... in any Olympic ... areas"). Many commentators have pointed out that despite these lofty ideals, the Olympic Games have always been a potent force to promote nationalism. See generally Stephen Wagg & David L. Andrews, East Plays West: Sport and the Cold War (2007).

23    Hoberman, Doping, supra note 14, at 315-16.

24    There are, of course, examples of sportive nationalism outside of the former Soviet Bloc, such as with Hitler's use of the 1936 Olympic Games as a Nazi propaganda vehicle. See Rob Beamish & Ian Ritchie, Fastest, Highest, Strongest: A Critique of High-Performance Sport 32 (2006). However, the Soviet Union and East Germany had the most sustained and developed system of using elite athletes to enhance national prestige.

25    Vinokur, supra note 15, at 59; Nafziger & Strenk, supra note 16, at 262 ("The German Democratic Republic has used sports to gain diplomatic recognition more aggressively and successfully than any country in the world." East Germany worked "to use sport as a lever to remove the barriers which isolated them from the [W]estern [W]orld.").

26    Vinokur, supra note 15, at 98.

27    Id. at 88.

28    Id.; see also Espy, supra note 15, at 32-35.

29     Nafziger & Strenk, supra note 16, at 263.

30     Beamish & Ritchie, supra note 24, at 86; Hoberman, Doping, supra note 14, at 257 ("[There is now] incontrovertible proof of the
       systematic steroid doping of former East German Olympic champions and world record holders"); Houlihan, supra note 21, at 64
       (describing East Germany and the Soviet Union as "subversives" within the early movements to combat doping in sport, and
       explaining that in both nations "state-organized doping was firmly established behind a public front of pompous condemnation of
       drug use as contrary to the spirit of Olympism and a problem confined to the commercialized West").

31     Nafziger & Strenk, supra note 16, at 264.

32     Vinokur, supra note 15, at 83-84.

33     Id. at 59.

34     Nafziger & Strenk, supra note 16, at 264 ("Each competition, each medal, and each world record struck a blow for the diplomatic
       recognition of East Germany.").

35     Beck, supra note 16, at 84 (quoting Background Briefing: Sport in the Soviet Union (London: Foreign and Commonwealth Office,
       1980), p. 1); see also Vinokur, supra note 15, at 98, 109 ("[T]he leaders of the Soviet Union have always considered sport to be a
       key aspect of international politics .... [A] frequent Soviet media tactic ... is to proclaim that Soviet sports victories are another
       verification of the superiority of the Soviet system.").

36     See Vinokur, supra note 15, at 15.

37     Id. at 104.

38     See generally Tim Ferguson, Running in Place, Forbes, Nov. 12, 2007; S.L. Price, Olympic China, Sports Illustrated, Aug. 13,
       2007, at 72.

39     Nafziger & Strenk, supra note 16, at 259 ("United States sports officials, journalists, politicians, and the public often ignore the
       relationship between sports and international politics.").

40     See Nafziger, supra note 16, at 838-54.

41     See id. at 854 ("[T]he United States Government clearly should develop a comprehensive and coherent foreign sports policy ....").

42     See The President's Commission on Olympic Sport, The Final Report of the President's Commission on Olympic Sports
       1875-1977, at 12, 18 (1977); Nafziger, supra note 16, at 839.

43     Ping-pong diplomacy refers to the competition between American and Chinese ping-pong players in the 1970s. Many credit the
       competition with thawing relations between the two countries, which had not had diplomatic relations with one another since 1949.
       See, e.g., Theodore Blumoff, Judicial Review, Foreign Affairs and Legislative Standing, 25 Ga. L. Rev. 227, 306 (1991); James
       Nafziger & Li Wei, China's Sports Law, 46 Am. J. Comp. L. 453, 457-58 (1998).

44     The success was so great that many argued the Soviet Bloc athletes should not be allowed to compete in Olympic competition

because the athletes were the equivalent of professionals. See The President's Commission on Olympic Sport, supra note 42, at 4 ("[T]here is widespread perception among Americans that it is unfair for U.S. amateur athletes to compete against state-subsidized professionals from other countries."); Espy, supra note 15, at 26-27 (explaining the international community's concern after World War II that the Soviet Union would be allowed to participate in the Olympic movement because its athletes were viewed as professionals and not amateurs in the Olympic spirit: "'[S]port like everything else in Russia is organized by the State. There are no clubs like in our countries. It is a committee appointed by the State that runs everything with government money.... All athletes that compete in foreign countries are specifically trained at the expense of the State and they are taught to compete in a fighting spirit.... Amateurism is not at all understood.'" (quoting then-IOC President Sigfrid Edstrom in a letter to then-IOC Vice President Avery Brundage)).

45    See Beck, supra note 16, at 84-88.

46    36 U.S.C. §§ 220501-220529 (2000).

47    Houlihan, supra note 21, at 69 ("While success in competition remains important, it is hosting the event itself that is increasingly significant and valuable ....").

48    In a 1999 report to Congress, the General Accounting Office stated that the United States Government had spent at least $2.1 billion (in 1999 dollars) to stage the Los Angeles (1984), Atlanta (1996) and Salt Lake City (2002) Olympic Games. United States Government Accountability Office Report, Olympic Games: Preliminary Information on Federal Funding and Support: Report to Congressional Requesters 2-3 (1999).

49    The United States boycotted the 1980 Moscow Olympic Games.

50    For instance, in 1992, President George H.W. Bush stated in addressing the American Olympians of the 1992 Winter Olympic Games:
      [I]n the broad and in the truest sense, all of you here today mirror America's Olympic spirit: the work ethic, the desire to give of yourself and of your heart, the love of victory and, above all, competition. Each quality makes the Olympics great. Each, in turn, makes our country great .... [You are] Americans who showed what we mean by competition, decency, self-reliance, self-discipline, proving that the Olympics, like America, are truly number one.
      President George H.W. Bush, Remarks Congratulating United States Olympic Athletes (April 8, 1992), in Public Papers of the Presidents, Administration of George H.W. Bush, 1992, at 560 (1998). Similarly, as stated by President Bill Clinton in an address to Olympic athletes competing in the 1996 Atlanta Olympic Games:
      So tonight when you walk into that opening ceremony ... you carry the symbol of all that we have become not only in fact, but in the eyes and the spirit and the hopes of the rest of the world. And just as surely as those of us who work in the diplomatic area or the fine people who wear the uniform of the United States military, you will become a symbol .... [Y]ou are a source of enormous pride to our country and an inspiration to the world.
      President William J. Clinton, Remarks to the United States Olympic Team in Atlanta, Georgia (July 19, 1996), in Public Papers of the Presidents, Administration of William J. Clinton, 1996, at 1158 (1998).

51    Vinokur, supra note 15, at 108; Espy, supra note 15, at 4.

52    Such a development is consistent with the United States' growing awareness of sport as an international relations tool. See Vinokur, supra note 15, at 18 ("As the awareness by governments of the significance of sports in domestic and international politics grows, they will tend to increase control of sports to advance their own political goals.").

53    Nafziger & Strenk, supra note 16, at 259; see also Vinokur, supra note 15, at xii ("[Sport's] relationship to politics has been little explored.").

54    Nafziger & Strenk, supra note 16, at 259 (quoting President's Commission on Olympic Sports, supra note 42, at 1).

55    36 U.S.C. §§ 220501-220529 (2000).

56    Previous legal examinations of the practice of sportive nationalism by the United States highlighted the fact that that there are no domestic law restraints on the federal government using sport to further foreign policy goals. Paul Mastrocola, The Lord of the Rings: The Role of Olympic Site Selection as a Weapon Against Human Rights Abuses: China's Bid for the 2000 Olympics, 15 B.C. Third World L.J. 141, 166; Nafziger, supra note 16, at 845. ("As a matter of domestic law, the executive branch of the federal government may, under the foreign relations power or under delegated congressional authority, employ amateur athletics as another tool of foreign policy.") (citations omitted). Scholars have explained that while the Amateur Sports Act designates the USOC as having the exclusive authority over Olympic Movement sport in the United States, this legislation cannot limit the federal government in exercising other powers, such as the foreign relations power, granted under the Constitution. Mastrocola, supra, at 150. The ability of the federal Government to use sport as part of its foreign policy arsenal, however, is only one side of the coin. The authority of the foreign policy power presumably only supports action that applies to the use of sport in general to achieve foreign policy goals, such as through an Olympic boycott. Sportive nationalism as traditionally practiced in the United States has been practiced at this more general level and has therefore been benign with respect to individual rights. This Article addresses the instances when sportive nationalism results in punishing individual athletes.

57    The President's Commission on Olympic Sports, supra note 42, at 37-38.

58    Id. at 3 (explaining that jurisdictional disputes between amateur sports regulators acted to "stymie" athletes' careers). The Commission cited the example of high school and college students who "have lost their eligibility to compete in school sports because they have represented the nation in international competition .... Athletes have been prevented by the [National Governing Body] from competing in their sport simply because it was sponsored by a rival organization." Id.

59    H.R. Rep. No. 95-1627, 8-9 (1978).

60    Exec. Order No. 11,868, 3A C.F.R. 174 (1975).

61    The President's Commission on Olympic Sports, supra note 42, at 1.

62    Id. at ix.

63    Id. at 1.

64    Id. at 11.

65    Id.

66    Id. at 1.

67    Id. at 29.

68    Id. at 79.

69    Id. at 2.

70    Id. A national governing body is a non-profit amateur sports organization which acts as this country's representative in the corresponding international sports federation for that particular sport. 1978 U.S.C.C.A.N. 6761, 7482 n.1. The NGB sets goals and

eligibility criteria for the sport it governs. Id.

71 The Commission also recommended that more be done to increase private sector funding for sports, increase participation by women and disabled individuals in sports, and enhance the pipeline for developing world-class athletes. Additionally, the Commission made specific recommendations, ultimately incorporated in the Amateur Sports Act, for settling disputes between athletes and NGBs and entities vying to be NGBs.

72 36 U.S.C. § 220507 (2000).

73 36 U.S.C. § 220503(3); see also S.F. Arts & Athletics v. U.S. Olympic Comm., 483 U.S. 522, 554 (1987) (Brennan, J., dissenting).

74 36 U.S.C. § 220503(2) (2000).

75 36 U.S.C. § 220503.

76 Id.

77 S.F. Arts & Athletics, 483 U.S. at 522.

78 36 U.S.C. § 220505(c)(4).

79 S. Rep. No. 95-770, at 2 (1978) ("Because no real structure exists which serves to define the jurisdictional limits of the various organizations, disputes have arisen. In their struggles for power and control over a sport, organizations have frequently told their athletes that if they choose to compete in a rival organization's program, they will be declared ineligible for future competition. Thus, athletes, upon whom the existence of each organization depends, have often found themselves the victims of that same organization and the amateur athletic system."); Michels v. U.S. Olympic Comm., 741 F.2d 155 (7th Cir. 1984) ("The principal purpose of the Act was to provide a means of settling disputes between organizations seeking to be recognized as the NGB for a particular sport and to shield amateur athletes from being harmed by these struggles.").

80 See H.R. Rep. No. 95-1627, at 8 (1978), reprinted in 1978 U.S.C.C.A.N. 6761, 7482 (discussing the "disorganization and serious factional disputes" that contributed to the "decline of American achievement in Olympic and international competition").

81 36 U.S.C. § 220509(a) (2000). The USOC responded to this provision of the Act by stating that "no member of the [USOC] may deny or threaten to deny any amateur athlete the opportunity to participate in the Olympic Games, ... a World Championship competition, or other such protected competition .... The [USOC] shall, by all reasonable means at its disposal, protect the right of an amateur athlete to participate if selected (or to attempt to qualify for selection to participate) as an athlete representing the United States in any of the aforesaid competitions.").

82 36 U.S.C. § 220522(a)(4). These procedures were essential in a case involving a wrestler who was wrongly denied the opportunity to compete on the 2000 Olympic team by USA Wrestling. Lindland v. U.S. Wrestling Ass'n, 227 F.3d 1000 (7th Cir. 2000). The wrestler took his case to arbitration and won an award that was confirmed in federal court. Id. at 1008.

83 S. Rep. No. 95-770, at 6 (1978) (explaining that this provision "is a positive step forward.... [A]thletes will no longer be used as pawns by one organization to gain advantage over another.... [A]thletes should, in the future, realize more opportunities to compete than ever before.").

84 1978 U.S.C.C.A.N. 7482.

85    Lindland, 227 F.3d at 1000.

86    DeFrantz. v. U. S. Olympic Comm., 492 F. Supp. 1181 (D.D.C. 1980).

87    Jacobs v. U.S. Track & Field, 374 F.3d 85 (2nd Cir. 2004).

88    492 F. Supp. 1181.

89    Id. at 1182.

90    Id. at 1183 (explaining that the Carter Administration was concerned that "the presence of American competitors would be taken
      by the Soviets as evidence that their invasion had faded from memory or was not a matter of great consequence or concern to this
      nation" and that "the Soviet Union has made clear that it intends the Games to serve important national political ends. For the
      U.S.S.R., international sports competition is an instrument of government policy and a means to advance foreign policy goals.").

91    Vinokur, supra note 15, at 117.

92    DeFrantz, 492 F. Supp. at 1184.

93    Id.

94    Id.

95    Id. Commentators explained that the boycott acted to "serv[e] notice to the Soviet Union and Eastern European countries that it
      also can use sport for political goals." Vinokur, supra note 15, at 120.

96    DeFrantz, 492 F. Supp. at 1184.

97    Id. at 1185.

98    Id.

99    Id. at 1188.

100   Id.

101   The relevant provisions cited by the athletes stated that the USOC shall "provide for the swift resolution of conflicts and disputes
      involving amateur athletes ... and protect the opportunity of any amateur athlete ... to participate in amateur athletic competition."
      Id. at 1189-90 (citing 36 U.S.C. § 374(8)).

102   Defrantz, 492 F. Supp. at 1190.

103   Id. at 1190-91.

104  Id. at 1191.

105  The Amateur Sports Act of 1978 gives the USOC "exclusive jurisdiction" and authority over the participation and representation of athletes in the Olympic Games. The USOC delegates the exclusive power to determine individual eligibility and participation to the recognized NGB for each sport. This is from the Amateur Sports Act and is further supported in the USOC bylaws.

106  This danger is illustrated by Lindland v. U.S. Wrestling Association, 227 F.3d 1000 (2000). The question in Lindland was who should be the United States entrant to the 2000 Olympic Games in Greco-Roman wrestling. Id. at 1002. The United States Court of Appeals for the Seventh Circuit ultimately heard the case after the USOC failed to follow an arbitrator's decision awarding the spot to Matt Lindland. Id. at 1001-02. The USOC favored a competing wrestler, Keith Sieracki. Senator Stevens sent a letter to the district court urging it to support the USOC's choice. Id. at 1008. The Seventh Circuit upheld the selection procedures outlined in the Act, and Lindland was awarded the spot. Id.

107  The interpretation of the Act in some respects might be seen as fundamentally unfair in that its provisions as written and applied seem to guarantee athlete eligibility from the perspective of the United States obtaining the best possible representation for international competition, but not to protect eligibility when it is the athlete that is aggrieved. So, for instance, the Act protects the right of high school students to compete in the Olympic Games even if such participation would conflict with state "outside competition" rules. See Letendre v. Mo. St. High Sch. Activities Ass'n, 86 S.W. 3d 63 (Mo. Ct. App. 2002).

108  Michels v. USOC, 741 F.2d 155, 156 (7th Cir. 1984) ("Congress omitted the bill of rights provision in the Act's final version. Congress thus considered and rejected a cause of action for athletes to enforce the Act's provisions.").

109  DeFrantz, 492 F. Supp. at 1181 (holding there is no right held by amateur athletes to compete in the Olympic Games); see also Slaney v. Int'l Amateur Athletic Fed'n, 244 F.3d 580, 588 (7th Cir. 2001) (noting that the plaintiff was not claiming a private right of action and sought to distance herself from such claims because they are not successful); see also Walton-Floyd v. USOC, 965 S.W.2d 35, 39 (Tex. Ct. App. 1998); Martinez v. USOC, 802 F.2d 1275, 1281 (10th Cir. 1986); Oldfield v. Athletic Cong., 779 F.2d 505, 508 (9th Cir. 1985); Michels, 741 F.2d at 155, 157-58.

110  Lindland, 227 F.3d at 1007; Foschi v. U.S. Swimming, Inc., 916 F. Supp. 232, 239 (E.D.N.Y. 1996); Harding v. U.S. Figure Skating Ass'n, 851 F. Supp. 1476, 1480 (D. Or. 1994), vacated on other grounds, 879 F. Supp. 1053 (D. Or. 1995).

111  36 U.S.C. § 220509. The Act was also amended to provide for an "ombudsman" for athletes to provide advice about the provisions of the Act and the applicable constitution and bylaws of the USOC and relevant NGBs and international federations relating to the athletes' opportunity to participate in Olympic Movement competition. 36 U.S.C. § 220509(b).

112  Indeed, there is a general hostility toward athletes using the courts to provide them with any relief in cases where their individual rights may be threatened. The case of figure skater Tonya Harding is illustrative. In 1994, Tonya Harding was implicated in an attack on rival skater Nancy Kerrigan at the United States Figure Skating Championships. Adam Epstein, Sports Law 211-12 (2002). Not knowing immediately that Harding was involved in the attack, the United States Figure Skating Association certified Harding for a place on the 1994 Olympic Team. Id. Subsequently, the United States Figure Skating Association initiated disciplinary proceedings against her for her role in the attack. Id. The United States Figure Skating Association's bylaws provided that a hearing would be set for a time that was "reasonably convenient for all parties." Harding v. U.S. Figure Skating Ass'n, 851 F. Supp. 1476, 1478 (D. Or. 1994). In an effort to prevent Harding from competing in the upcoming World Championships, United States Figure Skating unilaterally set a hearing date that made it virtually impossible for Harding to provide a defense. Id. at 1479. Moreover, the timing of the hearing would have "severely prejudiced her chances for a fair trial" in the upcoming criminal proceedings she faced. Id. Recognizing that United States Figure Skating was not following its own bylaws, and that such failure would cause irreparable harm to Harding, the United States District Court for the District of Oregon granted Harding an injunction to stop the planned hearing. Id. In a later congressional hearing on the Amateur Sports Act and the provisions related to athlete eligibility disputes, a representative from United States Figure Skating explained that to avoid judicial intrusion in such matters in the future it had, with the tacit approval of Congress, amended its bylaws to provide the United States Figure Skating Association with complete authority to hold expedited hearings "to allow competitions to go forward unencumbered by legal process." Amateur Sports Act: Hearing Before the Subcomm. on Consumer Affairs, Foreign Commerce and Tourism of the Sen. Comm. of Commerce, Sci., and Transp., 104th Cong. 177 (1995) (statement of William Hybl, Chairman, U.S. Figure Skating Ass'n).

113   483 U.S. 522 (1987).

114   The facts of San Francisco Arts pertain to the use of the word "Olympic" by a non-USOC entity. The non-profit sponsor of an event it called the "Gay Olympic Games" found itself embroiled in a lawsuit with the USOC, which denied the "Gay Olympic Games" sponsor the use of the Olympic trademark. Id. at 527-28.

115   Id. at 543-45 ("[N]either the conduct nor the coordination of amateur sports has been a traditional government function ... [and] the fact that Congress granted it a corporate charter does not render the USOC a [g]overnment agent.").

116   Id. at 550 (Brennan, J., dissenting) ("The USOC performs a distinctive, traditional governmental function: it represents this Nation to the world community.... As the Olympic Games have grown in international visibility and importance, the USOC's role as our national representative has taken on increasing significance. Although the Olympic ideals are avowedly non-political, Olympic participation is inescapably nationalist.").

117   Such demonstrations are needed now more than ever. Surveys from The Pew Global Attitudes Project (part of the Pew Research Center which has conducted surveys in fifty-four countries to gauge attitudes about globalization, trade, and democracy) show that the rest of the world has serious questions about the morality of the United States. The international public opinion of the United States has reached all-time lows. Pew Global Attitude Project, U.S. Image Up Slightly, But Still Negative, http:// pewglobal.org/reports/display.php?ReportID=247 (2005). Recent surveys show increasing levels of dislike toward American values and a rejection of American ideas and customs. In countries such as Turkey, a long time American ally in the Muslim world, only 9% of the population has a favorable view of the United States. This is down from 52% in 2000. Another example is Indonesia, where favorable views have declined to 29% from 75% in 2000. Bay Fang, U.S. Out to Buff Its Global Image, Chi. Trib., July 2, 2007, at A1.

118   An indication of this consensus is the number of countries which have adopted the WADA Code. As of this writing, 205 National Olympic Committees and 72 anti-doping agencies had adopted the Code. See http:// www.wada-ama.org (last visited Nov. 15, 2008); see also Testimony of Frank Shorter, Before the House Commerce, Trade and Consumer Protection Subcommittee of the House Energy and Commerce Committee, May 18, 2005 on the Drug Free Sports Act of 2005 ("[A]ll Olympic sports organizations throughout the world and most governments, including the United States, have agreed to these principles and endorse this model as the most effective framework for the fight against doping in sports.").

119   Maria Tai Wolff, Playing by the Rules? A Legal Analysis of the United States Olympic Committee-Soviet Olympic Committee Doping Control Agreement, 25 Stan. J. Int'l L. 611, 626 (1988-89).

120   Id.

121   This is demonstrated by the fact that doping violations are considered strict liability offenses by the WADA Code. "It is not necessary that intent, fault, negligence or knowing use on the athlete's part be demonstrated." Article 2.1.1.1. Michael Hiltzik. Presumed Guilty: Athletes See Doping Case Appeals as Futile Exercise, L.A. Times, Dec. 11, 2006 (citing the example of sprinter Torri Edwards who was suspended for two years despite the arbitrators in her case acknowledging "[s]he ha[d] not sought to gain any improper advantage or to 'cheat' in any way"). Giorgia Squizzato was banned for a year after her use of an over-the-counter foot ointment resulted in a positive test for steroids. Arbitrators acknowledged that "the cream did not enhance the athlete's capacity" nor "favor her performance." Id. American cyclist Amber Neben was suspended for six months after testing positive for steroids. The arbitration panel voted two to one to suspend her with the dissenting voter stating the fight against doping should not harm "innocent victims of a poorly regulated supplement industry." Id. Zach Lund, an American skeleton competitor was suspended for one year and forced to miss the 2006 Olympics when the anti-baldness medication he had been using for five years caused a positive steroid test. The arbitration panel in his case called Lund an "honest athlete" and noted that the substance had no performance enhancing effect. Id.

122   See Hoberman, Workshop, supra note 14.

123    Hoberman, Doping, supra note 14, at 262.

124    Houlihan, supra note 21, at 64 (categorizing the United States as an "apathetic government" during the 1980s that recognized the problem but rarely did more than "ritual[ly] condemn" it).

125    Travis T. Tygart, Winners Never Dope and Finally, Dopers Never Win: USADA Takes Over Drug Testing of United States Olympic Athletes, 1 DePaul J. Sports L. & Contemp. Probs. 124, 126 (2003).

126    36 U.S.C. § 220503(4) (2000). The USOC is directed "to obtain ... the most competent amateur representation possible in each event of the Olympic Games ...."

127    Tygart, supra note 125, at 126-27; see also National Strategy: Hearing before the S. Comm. on Commerce, Science, and Transportation, 106th Cong. 23 (1999); Alan Abrahamson, Sprinter's Ineligibility Won't Cost U.S. Team; International Panel Rules the Other Gold Medalists in Sydney's 1,600-Meter Relay Can Keep Their Medals, L.A. Times, Jul. 22, 2005.

128    Amateur Sports Act: Hearing Before the Subcomm. on Consumer Affairs, Foreign Commerce and Tourism of the Comm. on Commerce, Science and Transportation, 104th Cong. 154 (1995) (prepared statement of L. Richard Rader, Sport of Modern Pentathlon, Arlington Virginia) (explaining that in 1986, all members of the men's modern pentathlon world championship team tested positive for banned substances, yet the USOC allowed them to participate in competition). Rader noted that "Americans tested positive in the 1984 and 1988 Olympics. The USOC took no action." Id. He also explained that these incidents "gave credence to estimates of doping in pentathlon as high as seventy to eighty percent during the 1970s and 1980s. Id.

129    Lewis and others were identified in documents released to Sports Illustrated by former USOC anti-doping chief Dr. Wade Exum in 2003. CBC Sports Online, 10 Drug Scandals, Jan. 19, 2003, available at http://www.cbc.ca/sports/indepth/drugs/stories/top10.html; see also Tim Layden & Don Yaeger, Playing Favorites?, Sports Illustrated, Apr. 21, 2003, at 21.

130    CBC Sports Online, 10 Drug Scandals, Jan. 19, 2003, available at http://www.cbc.ca/sports/indepth/drugs/stories/top10.html.

131    Houlihan, supra note 21, at 66.

132    Dionne L. Koller, Does the Constitution Apply to the Actions of the United States Anti-Doping Agency?, 50 St. Louis U. L.J. 91, 97-98 (2005).

133    Tygart, supra note 125, at 124; see also S. 529, to Authorize Appropriations for the U.S. Anti-Doping Agency: Hearing Before the Comm. on Commerce, Science, and Transportation, 109th Cong. 3 (2005) [hereinafter S. 529] (statement of Jim Scherr, Chief Executive Officer, U.S. Olympic Committee). Jim Scherr stated that during a congressional hearing in 1999, prior to the formation of USADA, witnesses explained that the USOC was responsible for drug testing United States Olympic movement athletes, and that "[t]hey observed that this practice would appear to represent a conflict, because the USOC is charged with the responsibility of fielding a team whose objective is to win medals, and one might not have the greatest confidence that this same organization would penalize a potential medal winner for a drug infraction." Id.

134    See Drug Free Sports Act of 2005: Hearings Before the Subcomm. on Commerce, Trade, and Consumer Protection of the Comm. on Energy and Commerce, 109th Cong. 16 (2005) [hereinafter Sports Act] (statement of Frank Shorter, Former Chairman, United States Anti-Doping Agency) ("In the 1990's, the world did not view the United States as being committed to preventing doping amongst its Olympic athletes. The system of self-regulation by the various sports led to perceptions of conflict and allegations of attempts to hide doping behavior amongst United States athletes.").

HOW THE UNITED STATES GOVERNMENT SACRIFICES..., 2008 B.Y.U. L. Rev....

135    Steroid Use in Professional Baseball and Anti-Doping Issues in Amateur Sports: Hearing Before the Subcomm. on Consumer
       Affairs, Foreign Commerce and Tourism of the Comm. on Commerce, Science, and Transportation, 107th Cong. 34-35 (2002)
       (statement of Frank Shorter, Chairman, United States Anti-Doping Agency) ("It is important to the image of America ... to not be
       perceived as a society that condones the use of steroids and steroid precursors."). Mr. Shorter also noted that failing to adequately
       regulate steroids in the United States "undermines the image of the United States and our athletes as being committed to drug-free
       sport." Id. at 35.

136    CL Cole, Drafting Kelli White, 28 J. Sport & Soc. Issues 219, 219-20 (2004); Sports Act, supra note 134, at 16.

137    S. 529, supra note 133 (statement of Terrence Madden, CEO, U.S. Anti-Doping Agency) [hereinafter Terrence Madden] ("[S]ome
       people wanted to equate us with the East German System.").

138    Cole, supra note 136, at 220. Indeed, doping scandals were widely viewed as damaging a nation's bid to host an Olympic Games,
       as it did with China's bid to host the 2000 Olympic Games. Houlihan, supra note 21, at 69.

139    Terrence Madden, supra note 137, at 7.

140    Cole, supra note 136, at 221.

141    Espy, supra note 15.

142    Houlihan, supra note 21, at 62.

143    Id. at 72.

144    Id. at 66.

145    Id. at 67.

146    Id. (quoting Andreas Hasenclever et al., Theories of International Relations 36 (1997)).

147    UNESCO.org, http://portal.unesco.org/la/convention.asp? KO=31037&language=E&order=alpha; see also Philip Hersh, Chicago
       Bid Gets Bush's Push: President Urges Key Passage of Anti-Doping Accord, Chi. Trib., Feb. 8, 2008, at 6 (reporting that the
       pressure to ratify the UNESCO anti-doping convention and participate in the worldwide fight against doping is so strong that the
       United States' bid to host the 2016 Olympic Games will be in jeopardy if the convention is not ratified soon).

148    See Houlihan, supra note 21, at 69 (explaining that in the 1900s, states "realized that the strengthening association between elite
       sport and drugs was undermining the utility of sport" in international relations).

149    See id. at 69-70 (explaining the change of heart on doping by the United States and other Olympic superpowers as "seeking to
       ensure the continuing utility of international sport as a framework for diplomacy"). Houlihan also noted that the participation by
       the United States and other Olympic superpowers was due to a "reassessment" of national interests. Id. at 71-72.

150    Cole, supra note 136, at 219.

151    Effects of Performance Enhancing Drugs on the Health of Athletes and Athletic Competition: Hearing Before the Senate Comm.

on Commerce, Science and Transportation, 106th Cong. 20 (1999) (statement of General Barry R. McCaffrey, Director, Office of National Drug Control Policy, Executive Office of the President).

152    Id.

153    Id. at 12.

154    See Koller, supra note 132, at 105-06; see also S. 529, supra note 133, at 3 (statement of Jim Scherr, Chief Executive Officer, U.S. Olympic Comm.) (noting that the committee "had a hand in creating" the USADA).

155    Koller, supra note 132, at 109-10 ("Even before USADA was created, there were concerns that the United States would not be able to establish an effective anti-doping agency because of constitutional rights of privacy and due process.").

156    S. 529, supra note 133, at 3 (opening statement of Hon. John McCain, U.S. Senator from Arizona).

157    White House Task Force on Drug Use in Sports, Proceedings: First Meeting of the White House Task Force on Drug Use in Sports 56 (Dec. 7, 2000) (statement of Scott Blackmun).

158    Terrence Madden, supra note 137, at 3.

159    Ellen Dannin, Red Tape or Accountability: Privatization, Public-ization and Public Values, 15 Cornell J.L. & Pub. Pol'y 111, 120 (quoting Michael J. Trebilcock & Edward M. Iacobucci, Privatization and Accountability, 116 Harv. L. Rev. 1422 (2003)).

160    USADA--Who We Are: USADA History, http:// www.usantidoping.org/who/history.html (last visited Nov. 15, 2008).

161    Tygart, supra note 125, at 127.

162    Office of National Drug Control Policy Reauthorization Act of 2006, Pub. L. No. 109-469, § 701, 120 Stat. 3502, 3534 (2006).

163    Office of National Drug Control Policy Reauthorization Act of 2006, § 701(b)(2).

164    Terrence Madden, supra note 137, at 3 ("As Jim stated, most of our funding now comes from the federal government."); see also Office of National Drug Control Policy Reauthorization Act of 2006, § 703 (authorizing appropriations of $9,700,000 for fiscal year 2007 and $10,300,000 for fiscal year 2008).

165    Office of National Drug Control Policy Reauthorization Act of 2006, Title VII, Sec. 701.

166    S. 529, supra note 133, at 4. Scherr also noted that the USADA has "expanded its scope of activity, increased its aggressiveness and greatly improved its overall effectiveness of operation, earning widespread respect both domestically and internationally." Id.

167    See infra notes 192-93.

168    Jody Freeman, Extending Public Law Norms Through Privatization, 116 Harv. L. Rev. 1285, 1309 (2003).

169    Ellen Dannin, Red Tape or Accountability: Privatization, Public-ization and Public Values, 15 Cornell J.L. & Pub. Pol. 111, 123-24 (2005).

170    Mark Zeigler, Raid on Nutrition Firm a Battle in the Doping War, S.D. Union-Tribune, Sept. 6, 2003, at D3.

171    David Wharton & Alan Abrahamson, Four Accused of Supplying Illegal Drugs to Athletes, L.A. Times, Feb. 13, 2004, at A1.

172    Michael O'Keefe, Report: Feds Raid 'Clear' Lab, N.Y. Daily News, Oct. 1, 2005, at 66.

173    S. 529, supra note 133, at 2 (statement of Hon. Ted Stevens, U.S. Senator from Alaska) ("The actions we took as a Committee last year ensured that the United States did not send athletes who were not drug free to Athens. Those were unprecedented actions ....").

174    See Michaelis, supra note 13 (quoting USADA CEO Terrence Madden stating that the documents subpoenaed by the Senate Commerce Committee and forwarded to the USADA were "'the whole ballgame' in terms of convicting some athletes").

175    Terrence Madden, supra note 137 (thanking the committee for providing the documents that enabled the USADA to win all of its BALCO-related actions against athletes).

176    Michaelis, supra note 13 ("[BALCO] highlighted the importance of government involvement in building anti-doping cases.").

177    See Amy Shipley, A Wider Front in the Doping Battle: Law Enforcement Takes the Lead in Sports Probes, Wash. Post, Mar. 2, 2007, at A1.

178    I have argued previously that USADA's "partnering" with the federal government in some cases might be viewed by courts as "joint action" sufficient for a finding of state action. Koller, supra note 132.

179    This targeting can amount to "selective prosecution," and it can have troubling racial implications, with athletes in sports such as track and field, heavily composed of African-American athletes, the most frequently tested. See United States v. Christopher Lee Armstrong, 517 U.S. 456, 476 (1996) (citing United States v. Chemical Foundation, Inc., 272 U.S. 1, 14-15 (1926)); see also Yick Wo v. Hopkins, 118 U.S. 356, 373 (1886).

180    See World Anti-Doping Code § 5.1.3 [hereinafter WADA Code]. The comment to this provision suggests testing "world class [a]thletes, [a]thletes whose performances have dramatically improved over a short period of time, [and] [a]thletes whose coaches have had other [a]thletes test positive." Id.

181    See Cole, supra note 136, at 221 (commenting on the negative perceptions of the United States in general and with respect to doping, and illustrating how the Government's actions surrounding the BALCO scandal were meant to counter this negative image). Cole states that Kelli White "has just been drafted in America's latest 'truth' campaign. White ... became the first official victim of the BALCO scandal .... [Her] admission that she used steroids and erythropoietin ... and her willingness to actively clean up sport (she has apparently agreed to be an informant) were made into a progress report." Id.

182    S. 529, supra note 133, at 8.

183    USADA's most recent testing data shows that for 2006, approximately 30% of USADA's testing efforts were directed at Track and Field and Cycling. See http://www.usantidoping.org/files/active/who/annual_report_2006.pdf (last visited Nov. 15, 2008). See generally, Michaelis, supra note 13 (describing the testing and investigation of various track and field athletes).

184    Bonnie DeSimone, Landis Says Lawyer Asked Him to Implicate Armstrong, ESPN.com, May 10, 2007, http://sports.espn.go.com/oly/cycling/news/story?id=2866845 (noting Floyd Landis's claim that the USADA had offered him and his lawyer a reduction in Landis's penalty if he provided information that Lance Armstrong had engaged in doping during his career).

185    The due process interests that would be implicated in this context are those protected under the Fifth Amendment Due Process Clause, as the regulation of Olympic Movement athletes arguably involves action by the federal government.

186    I have previously made the case that although the United States Olympic Committee and the United States Anti-Doping Agency are nominally private entities, they operate with such significant federal government involvement that in some cases they can be held to be "state actors" such that Constitutional restrictions would apply to their actions. Koller, supra note 132; Dionne L. Koller, Frozen in Time: The State Action Doctrine's Application to Amateur Sports, 82 St. John's L. Rev. 183 (2008). This Article accordingly assumes that state action, at least in some cases, is present and focuses on the constitutional liberty and property interests that are at stake when an athletes' eligibility is limited or terminated.

187    Michels v. USOC, 741 F.2d 155, 157 (7th Cir. 1984) (holding that the principal purpose of the Amateur Sports Act was to provide a means of settling disputes between organizations seeking to be NGBs for a particular sport and contains no express private right of action); DeFrantz v. USOC, 492 F. Supp. 1181 (D.D.C. 1980) (holding there is no right held by amateur athletes to compete in the Olympic Games).

188    DeFrantz, 492 F. Supp. at 1194 (quoting Mitchell v. La. High Sch. Athletics Ass'n, 430 F.2d 1155, 1158 (5th Cir. 1970)).

189    C. Christine Ansley, International Athletic Dispute Resolution: Tarnishing the Olympic Dream, 12 Ariz. J. Int'l & Comp. L. 277 (1995).

190    36 U.S.C. §§ 220501-220529 (2000).

191    Michael Straubel, Doping Due Process: A Critique of the Doping Control Process in International Sport, 106 Dick. L. Rev. 523, 546 (2002) ("By granting athletes ... a limited right to compete, we recognize the reality that Olympic caliber athletes now earn a living and make a career of their sport. To argue that Olympic athletes do not have the same job and career interests in participating in their sports as accountants, doctors, or lawyers have in working in their professions devalues the years of preparation Olympic athletes have invested.").

192    Comprehensive Study Reveals Career Challenges for Olympians; Monster.com and the USOC Create Tools for Athletes to Prepare for Life After the Olympic Games, Bus. Wire, Oct. 16, 2001, available at http://www.allbusiness.com/sports-recreation/amateur-sports-olympics/6180836-1.html (explaining that seventy percent of Olympic athletes surveyed were concerned that their competitive careers delayed their pursuit of their professional goals: "Given the rigorous training schedule of Olympic athletes, it is easy to understand why preparing for a career may be put on hold"); Olympic Stars Get a Restart in the Race for Jobs, Fin. Times, May 9, 2005 (noting that for Olympic athletes, dedicating a significant part of their lives to their sporting careers comes at "the expense of formal education").

193    Once they achieve a certain level, athletes receive money from the USOC and their NGB training stipends and other benefits to support them as long as they maintain their eligibility for Olympic Movement competition. United States Olympic Committee National Anti-Doping Policies, Annex C at 23. For instance, athletes receive direct support that is not tied to particular competitive results as well as "result based" support, tuition grants and access to the Olympic Training Center and Olympic Training sites, including residences.

194    For instance, it is estimated that Michael Phelps could earn between $30 million and $50 million in endorsements after eclipsing Marc Spitz's record of seven gold medals during the 2008 Beijing Olympic Games. Michael Sokolove, Built to Swim, N.Y. Times, Aug. 8, 2004. Track and field athletes such as Carl Lewis earned $50,000 to $100,000 for appearances with annual incomes over $1 million. Trip Gabriel, The Runner Stumbles, N.Y. Times, July 19, 1992. Even lesser known athletes, like Brad Ludden, a whitewater kayaker, can earn $100,000 for endorsements and speaking appearances. Wendy Knight, Paddling in the Doldrums,

Case 1:12-cv-00606-SS Document 7-4 Filed 07/09/12 Page 37 of 53

HOW THE UNITED STATES GOVERNMENT SACRIFICES..., 2008 B.Y.U. L. Rev....

N.Y. Times, June 28, 2004.

195    Those eligibility standards are determined by the National Governing Bodies for sport recognized by the USOC, 36 U.S.C. § 220501(b)(1) (explaining that an "amateur athlete" for purposes of the Amateur Sports Act is one "who meets the eligibility standards established by the national governing body or paralympic sports organization for the sport in which the athlete competes"). Eligibility is also determined by the USOC pursuant to its agreement with the USADA with respect to drug testing. United States Olympic Committee National Anti-Doping Policies §§ 1, 14.

196    The Amateur Sports Act provides that the USOC has the exclusive authority to regulate the Olympic Movement in the United States. 36 U.S.C. § 220503(3)(A) ("The purposes of the [USOC] are ... to exercise exclusive jurisdiction ... over all matters pertaining to the United States participation in the Olympic Games, the Paralympic Games, and the Pan-American Games, including representation of the United States in the Games; and ... (4) to obtain for the United States ... the most competent amateur representation possible in each event of the Olympic Games, the Paralympic Games and Pan-American Games."). In addition, Congress has provided that the USADA is the independent entity responsible for the regulation of Olympic athlete doping in the United States. P.L. 109-469, Office of National Drug Control Policy Reauthorization Act of 2006, Dec. 29, 2006 § 701(b)(1). Under the United States Olympic Committee's National Anti-Doping Policies,
if an athlete ... is found to be 'ineligible' on account of an anti-doping rule violation, the athlete will not be permitted to (i) participate in the Olympic, Pan American, or Paralympic Games, trials, or qualifying events; (ii) be a member of an Olympic, Pan American, or Paralympic Games Team or staff; or (iii) have access to the training facilities of an Olympic Training Center or other programs and activities of the USOC, including, but not limited to grants, awards or employment.
United States Olympic Committee National Anti-Doping Policies, § 6.

197    Whether an athlete has a property interest in competing in their chosen sport has been the subject of substantial litigation. Most cases have found that athletes at the high school and college level do not have such a protected interest. These cases are premised on the notion that student participation in athletics is an extracurricular activity and not a student's career. Maroney v. Univ. Interscholastic League, 764 F.2d 403, 406 (5th Cir. 1985); In re U.S. ex rel. Mo. State High Sch. Activities Ass'n, 682 F.2d 147, 153 n.8 (8th Cir. 1982) ("A student's interest in participating ... in a single year of interscholastic athletics amounts to a mere expectation rather than a constitutionally protected claim of entitlement."); Walsh v. La. High Sch. Athletics Ass'n, 616 F.2d 152, 159 (5th Cir. 1980) ("A student's interest in participating ... in interscholastic athletics amounts to a mere expectation rather than a constitutionally protected claim of entitlement."), cert. denied, 449 U.S. 1124; Brands v. Sheldon Cmty. Sch., 671 F. Supp. 627, 631 (N.D. Iowa 1987) ("A clear majority of courts addressing this question in the context of interscholastic and intercollegiate athletics have found that athletes have no legitimate entitlement to participate."); Nat'l Collegiate Athletic Ass'n v. Yeo, 171 S.W.3d 863, 865 (Tex. 2005) ("We held twenty years ago ... like 'the overwhelming majority of jurisdictions' construing other constitutional guarantees of due process, that 'students do not possess a constitutionally protected interest in their participation in extracurricular activities.'"); Letendre v. Mo. State High Sch. Activities Ass'n, 86 S.W. 3d 63, 69 (Mo. App. 2002). However, courts have been willing to recognize that there may be a property right where, for instance, a college scholarship is involved, Hall v. Univ. of Minn., 530 F. Supp. 104 (D. Minn. 1982) (holding the award of a college scholarship may create a property interest in its continuation); Hysaw v. Washburn Univ. of Topeka, 690 F. Supp. 940 (D. Kan. 1987).

198    U.S. Const. amend. V.

199    Nat'l Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179, 193 (1988); see also Jackson v. Metro. Edison Co., 419 U.S. 345, 349 (1974) (citations omitted).

200    Koller, supra note 132.

201    Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982) (explaining that due process issues are resolved using "what has become a familiar two-part inquiry: we must determine whether [the claimant] was deprived of a protected interest, and, if so, what process was his due").

202    Ky. Dep't. of Corrections v. Thompson, 490 U.S. 454, 460 (1989) (citing Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 571 (1972)); Mathews v. Eldridge, 424 U.S. 319, 332 (1976).

203    Thompson, 490 U.S. at 458 (citing Hewitt v. Helms, 459 U.S. 460, 472 (1983)).

204    Roth, 408 U.S. at 571 ("[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake.").

205    Id. at 575.

206    Id.

207    In considering the variety of property and liberty interests that qualify for due process protections, the Court has "eschewed rigid or formalistic limitations," id. at 572, noting that "'liberty' and 'property' are broad and majestic terms. They are among the 'great [constitutional] concepts ... purposely left to gather meaning from experience.... They relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged.'" Id. at 571 (quoting Nat'l Mut. Ins. Co. v. Tidewater Co., 337 U.S. 582, 646 (1949)) (Frankfurter, J., dissenting). Justice Frankfurter's words are particularly pertinent in the Olympic Movement context, as the nature of the interests at stake have dramatically changed over the last several decades.

208    Id. at 577; see also Perry v. Sindermann, 408 U.S. 593, 602 (1972); Goldberg v. Kelly, 397 U.S. 254, 264 (1970).

209    Town of Castle Rock v. Gonzales, 545 U.S. 748, 755 (2005) (quoting Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 9 (1978)).

210    Logan v. Zimmerman Brush Co., 455 U.S. 422, 430 (1982) (citing Memphis Light, 436 U.S. at 11-12; Goss v. Lopez, 419 U.S. 565, 573-74 (1975); Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 576-78 (1972)).

211    Town of Castle Rock, 545 U.S. at 756; see, e.g., Olim v. Wakinekoma, 461 U.S. 238, 248-52 (1983) (finding no protected interest in a state's process for transferring prisoners to out-of-state prisons because the decision can be made "for whatever reason or for no reason at all"); Conn. Bd. of Pardons v. Damschat, 452 U.S. 458, 465 (1981) (finding no liberty interest in a state's process for pardons because the decision is left to the discretion of administrators); Leis v. Flynt, 439 U.S. 438, 442-44 (1979) (no protected interest under the Fourteenth Amendment to pro hac vice appearance of counsel because it is left to the discretion of the trial court).

212    Logan, 455 U.S. at 430 (quoting Nat'l Mut. Ins. Co. v. Tidewater Co., 337 U.S. 582, 646 (Frankfurter, J., dissenting)).

213    Perry v. Sindermann, 408 U.S. 593 (1972).

214    Id. at 599-600 (explaining that the teacher relied upon a provision in the faculty handbook that assured a faculty member "tenure" as long as his teaching was "satisfactory" and he maintained a positive attitude with respect to his work).

215    Id. at 602-03 ("[S]uch proof would obligate college officials to grant a hearing at his request, where he could be informed of the grounds for his nonretention and challenge their sufficiency.").

216    Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 11-12 (1978) ("Because petitioners may terminate service only 'for cause,' respondents assert a 'legitimate claim of entitlement' within the protection of the Due Process Clause.").

217    Hewitt v. Helms, 459 U.S. 460, 470-71 (1983) ("[W]e conclude in the light of the Pennsylvania statutes and regulations here in question ... that respondent did acquire a protected liberty interest in remaining in the general prison population.").

218    Id. at 471-72 ("[O]n balance we are persuaded that the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest."); see also Ky. Dep't of Corrections v. Thompson, 490 U.S. 454, 460 (1989) ("[T]he most common manner in which a State creates a liberty interest is by establishing 'substantive predicates' to govern official decision-making, and further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met.").

219    Logan v. Zimmerman, 455 U.S. 422, 427 (1982).

220    Id.

221    Id. at 426-27.

222    Id. at 429.

223    Id.

224    Id.

225    Barry v. Barchi, 443 U.S. 55, 68 (1979).

226    Mathews v. Eldridge, 424 U.S. 319, 349 (1976).

227    Goss v. Lopez, 419 U.S. 565, 584 (1975).

228    Bell v. Burson, 402 U.S. 535, 543 (1971).

229    Goldberg v. Kelly, 397 U.S. 254, 271 (1970).

230    Connecticut v. Gabbert, 526 U.S. 286, 293 (1999); In re Ruffalo, 390 U.S. 544, 551-52 (1968).

231    Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 567 (1972).

232    Id. at 573 ("Had it done so, this would be a different case. For 'where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.'").

233    Id. ("[T]o be deprived not only of present government employment but of future opportunity for it certainly is no small injury.").

234    Id. at 572.

235    Id. at 577 (explaining that this "independent source" must provide for "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits").

236    Id. at 578 ("[There was no] state statute or University rule or policy that secured his interest in re-employment or that created any legitimate claim to it.").

237 Id. at 578.

238 Town of Castle Rock v. Gonzales, 545 U.S. 748, 752-55 (2005).

239 Id. at 763-65.

240 Although eligibility in terms of athletic skill is determined by an athletes' NGB, and is usually subject to the NGB's discretion, the rules which determine eligibility under applicable doping rules are not subject to discretion. This Article, then, makes a distinction between a claim of entitlement in eligibility based on skill, and one based on doping, and argues that it is a claim of entitlement in eligibility for purposes of the doping rules that is legitimate.

241 United States Olympic Committee National Anti-Doping Policies, § 1 ("[T]he United States Olympic Committee hereby adopts the rules [of the World Anti-Doping Code]"), available at http:// www.usantidoping.org/files/active/policies_procedures/USOCAnti-DopingPolicies.pdf.

242 United States Anti-Doping Agency Protocol for Olympic Movement Testing, § 3(a) ("In conducting drug testing and results management under this Protocol for Olympic Movement Testing ... USADA will be bound by ... [t]hose Articles of the WADA Code which must be incorporated into the rules of every Anti-Doping Organization ..."), available at http:// www.usantidoping.org/files/active/policies_procedures/2004usadaprotocol[3].pdf.

243 The United States Olympic Committee National Anti-Doping Policies specifically state that "[n]o athlete ... shall be denied eligibility within the meaning of ... these policies without first being afforded the opportunity for a hearing pursuant to the USADA Protocol for Olympic Movement Testing ("USADA Protocol") incorporated into the contract between the USOC and USADA." § 8. The USADA Protocol for Olympic Movement Testing states first that "all samples collected by USADA shall be analyzed only in WADA-accredited laboratories or as otherwise approved by WADA. § 7. The Protocol goes on to require that
Upon receipt of a positive laboratory A report ... USADA will promptly notify the ... athlete ... and shall advise the athlete of the date on which the laboratory will conduct the B sample analysis.... USADA shall provide to the athlete the A sample laboratory documentation .... A sample shall not be considered positive until after the B sample analysis confirms the A sample analysis or the athlete has expressly waived the B sample analysis.
§ 8(b). Upon receiving the report on the "B" sample, the Protocol requires that "USADA shall promptly notify the athlete .... USADA shall then provide to the athlete the B sample documentation package ..." § 8(c). Once the laboratory has confirmed the positive test result, the Protocol then specifies that "USADA shall address that case through the following results management procedures ...." § 9(a)-(c). Finally, if USADA decides to proceed with the case, the Protocol provides that "USADA shall notify the athlete ... what specific charges or alleged violations will be adjudicated and what sanction ... USADA is seeking to have imposed." § 10(a). At that point, the athlete may invoke the hearing procedures provided for under the Protocol. Id. With respect to the hearing, the World Anti-Doping Code ("WADA Code") states that "the Anti-Doping Organization shall have the burden of establishing that an anti-doping rule violation has occurred." WADA Code § 3.1, available at http://www.wada-ama.org/rtecontent/document/code_v3.pdf. Also pursuant to the WADA, there is a specific procedure for analyzing an athlete's urine sample before a positive result may be found. Section 6.1 states that "Doping Control Samples shall be analyzed in accordance with the following principles: ... Doping Control Samples shall be analyzed only in WADA-accredited laboratories or as otherwise approved by WADA." Moreover, the WADA states that "[l]aboratories shall analyze Doping Control Samples and report results in conformity with the International Standard for laboratory analysis." § 6.4. Olympic regulators could not plausibly argue that the property right held by athletes is limited by the procedures outlined for its "deprivation," as the "bitter with the sweet" approach to due process rights has been rejected by the Supreme Court. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985).

244 Terrence Madden, supra note 137.

245 Mathews v. Eldridge, 424 U.S. 319, 332 (1976) ("The fundamental requirement of due process is the opportunity to be heard in a meaningful time and in a meaningful manner." (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965))). The Supreme Court has explained that the heart of meaningful due process is giving an individual an opportunity to be heard, before action is taken against

him, so that factual errors can be corrected and discretion can be exercised, in light of the individual circumstances, to decline to take the planned action. Loudermill, 470 U.S. at 532; Goss v. Lopez, 419 U.S. 565, 581-83 (1975); Bell v. Burson, 402 U.S. 535, 541-42 (1971).

246     Paul v. Davis, 424 U.S. 693, 705 (1976) (citing Wieman v. Updegraff, 344 U.S. 183, 190-91 (1952)) (explaining that the case before the Court simply involved damage to reputation, and was not "a case where government action has operated to bestow a badge of disloyalty or infamy, with an attendant foreclosure from other employment opportunity").

247     Id. at 695-99.

248     Id. at 695-97 (noting that the police flyer included the individual on the flyer because he had been arrested for shoplifting, although his guilt had never been established and the charges were ultimately dropped).

249     Id. at 701 ("The words 'liberty' and 'property' as used in the Fourteenth Amendment do not in terms single out reputation as a candidate for special protection over and above other interests that may be protected by state law .... [T]his line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause.").

250     Id. at 706 (explaining that in prior cases it was the damage to reputation plus denial of other rights that triggered due process); see also Bd. of Regents v. Roth, 408 U.S. 564, 573 (1972) (explaining that defamation of an individual in connection with refusal to rehire could trigger Due Process protections); Goss v. Lopez, 419 U.S. 565, 576 (1975) (explaining that due process protections were triggered because the damage to the students' reputation that resulted from being charged with misconduct was coupled with suspension from school); Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971) (holding that an individual was entitled to due process protections where she was labeled a hazard because of excessive drinking and forbidden to purchase alcoholic beverages, thus altering her rights under state law).

251     Roth, 408 U.S. at 573 (citations omitted) ("[W]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.").

252     See id. (explaining that in the case before the Court, there was no showing that "the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities"); Paul, 424 U.S. at 711 (explaining that government-imposed stigma coupled with the alteration or extinguishing of a distinct right or status such as employment is sufficient to invoke the procedural protections of the Due Process Clause). Indeed, the "stigma" imposed by the doping allegation has been recognized by arbitrators in doping cases. Richard H. McLaren, An Overview of Non-Analytical Positive and Circumstantial Evidence Cases in Sports, 16 Marq. Sports L. Rev. 193, 209 (2006) (quoting USADA v. Montgomery, CAS 2004/O/645, ¶ 36) ("In some civil cases--as here--the issues may involve questions of character and reputation and the ability to pursue one's chosen career that can approach, if not transcend in importance even questions of personal liberty.").

253     WADA Code §§ 10.2-10.4.2 (2003).

254     Id. at § 10.2.

255     See, e.g., Michael Straubel, Enhancing the Performance of the Doping Court: How the Court of Arbitration for Sport Can Do Its Job Better, 36 Loy. U. Chi. L.J. 1203, 1223 (2005).

256     See WADA Code § 10.9.
        No Person who has been declared ineligible may, during the period of Ineligibility, participate in any capacity in a Competition or activity (other than authorized anti-doping education or rehabilitation programs) authorized or organized by any Signatory or Signatory's member organization. In addition, for any anti-doping rule violation ... some or all sport-related financial support or

other sport-related benefits received by such Person will be withheld ....
Id. Indeed, even athletes who might be able to come back to competitive form after a doping ban will find that they are prevented from competing. AP Interview: Major European Meets Won't Invite Athletes with Previous Doping Bans, March 3, 2008, http://sports.espn.go.com/espn/print? id=3275222&type=story (explaining that track and field athletes who have served doping suspensions would not be invited to participate in major European meets even when their eligibility is restored).

257    Roth, 408 U.S. at 575.

258    See United States Olympic Committee Anti-Doping Policies § 6 (2004). This ban on competition includes participation in other sports in which the athlete might achieve elite status, with the exception that if an athlete receives a ban of longer than four years, he or she may, after completing four years of ineligibility, compete in local sports events in a sport other than the one in which the athlete received the doping violation, but only as long as the local event was not "at a level that could otherwise qualify such Person directly or indirectly to compete in (or accumulate points toward) a national championship or International Event." WADA Code § 10.9.

259    See Roth, 408 U.S. at 574 (quoting Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 185 (1951)) ("For 'to be deprived not only of present government employment but of future opportunity for it certainly is no small injury ....'").

260    See id. at 573-74 (quoting Schware v. Bd. of Bar Exam'rs, 353 U.S. 232, 238 (1957)) ("[A] State, in regulating eligibility for a type of professional employment, cannot foreclose a range of opportunities 'in a manner ... that contravene[s] ... due process ....'"); Conn v. Gabbert, 526 U.S. 286, 292 (1999) (noting that the government cannot completely prohibit a person from engaging in a particular calling, but can reasonably regulate the profession); In re Ruffalo, 390 U.S. 544, 550-551 (1968) (holding that disbarment proceedings must provide sufficient due process protections. But see United States v. Gonzales-Lopez, 584 U.S. 140, 141 (2006).

261    See generally Charles Reich, The New Property, 73 Yale L.J. 733 (1964).

262    See generally Richard J. Pierce, Jr., The Due Process Counterrevolution of the 1990s, 96 Colum. L. Rev. 1973 (1996).

263    See Thomas W. Merrill, The Landscape of Constitutional Property, 86 Va. L. Rev. 885, 961 (2000) (explaining that the Supreme Court's jurisprudence suggests a definition of a property right that looks to "whether nonconstitutional sources of law confer on the claimant an entitlement having a monetary value that can be terminated only upon a finding that some specific condition has been satisfied").

264    See Shipley, supra note 13, at E01.
In the matter of anti-doping, perception matters. Countries that haven't adopted a hard line on the issue and whose athletes perform exceptionally well at major competitions might find the results greeted with skepticism .... Police actions in the United States in the last five years have resulted in sanctions or the threat of sanctions against more than a dozen athletes and helped restore the country's reputation on anti-doping matters. "For so long, we were thought of as the biggest cheaters in the world," said Scott M. Burns, deputy director for state and local affairs at the White House Office of National Drug Control Policy.
Id.; Michaelis, supra note 13 (quoting Scott Burns as saying that "catching" Floyd Landis and Justin Gatlin helped the United States appear to be tougher on drug-using athletes). Such an image-enhancement can be achieved through sanctioning professional athletes as well, as doping regulators noted that the indictment of baseball star Barry Bonds proves that "the U.S. government is committed to healthy sport." Paul Logothetis, U.S. Officials: Bonds Indictment Shows How Attitudes Have Changed in America, USA Today, Nov. 17, 2007, http:// www.usatoday.com/sports/baseball/2007-11-16-750269443_x.htm.

265    Edward L. Rubin, Due Process and the Administrative State, 72 Cal. L. Rev. 1044, 1047 (1984) ("Our generally accepted standards for fairness are that the government must follow applicable rules and provide a minimal level of procedural protection.").

266    Id. at 1102.

267   See id. at 1109 (explaining that the connection between procedures such as notice, a hearing and an impartial decision-maker have a "virtually self-evident" connection to the due process goal of accurate decision making); Martin H. Redish & Lawrence C. Marshall, Adjudicatory Independence and the Values of Procedural Due Process, 95 Yale L.J. 455, 474 (1986) (explaining that the "instrumental conception" of procedural due process "focuses on the individual's interest in having an opportunity to convince the decision-maker that he deserves the right at issue"); see generally Sanford H. Kadish, Methodology and Criteria in Due Process Adjudication--A Survey and Criticism, 66 Yale L. J. 319 (1957).

268   Rubin, supra note 265, at 1102-03; see also Thomas C. Grey, Procedural Fairness and Substantive Rights, Nomos XVIII: Due Process 182-84 (1977); Kadish, supra note 267, at 347-48.

269   See Rubin, supra note 265, at 1104 ("Procedure is our traditional method for ensuring that the decision in question is accurate, thus protecting individuals from the potential oppressions of direct interaction with state agents.").

270   Id. at 1110.

271   See Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (citing Wolff v. McDonnell, 418 U.S. 539, 557-58 (1974)). The Supreme Court went on to explain that "the right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society." Id. at 333 (quoting Joint Anti-Fascist Comm. v. McGrath, 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring)).

272   Id. at 334 (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).

273   Those interests include "the private interest that will be affected by the official action; second, the risk of an erroneous deprivation ... and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest ...." Mathews, 424 U.S. at 335; see also Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542-43 (1985); Goldberg v. Kelly, 397 U.S 254, 263-66 (1970).

274   Mathews, 424 U.S. at 334.

275   Straubel, supra note 255, at 1223.

276   See, e.g., Cleveland Bd. of Educ., 470 U.S at 542 (citations omitted).

277   See WADA Code § 10.2 (2003).

278   Id. § 10.4.2.

279   Indeed, beyond the international relations benefits generally, participating in the worldwide fight against doping means that we are eligible to host future Olympic Games. Hersh, supra note 147, at 6 (explaining that under the WADA Code, the International Olympic Committee may only accept bids to host an Olympic Games only from countries which have ratified the UNESCO International Convention against Doping in Sport and are in compliance with the World Anti-Doping Code).

280   Effects of Performance Enhancing Drugs on the Health of Athletes and Athletic Competition: Hearing before the Senate Committee on Commerce, Science and Transportation, 106th Cong. 23 (1999) (statement of Sen. Ron Wyden) ("We are seeing a public health crises with respect to these drugs in American youths.").

281   WADA Code § 2.1.1, cmt. 2.1.1.

282     WADA Code § 8.

283     See Henry J. Friendly, "Some Kind of Hearing," 123 U. Penn. L. Rev. 1267, 1306 (1974) (explaining the elements of a fair hearing, including an unbiased tribunal, notice of the proposed action, and an opportunity to present reasons why the action should not be taken).

284     See Mathews v. Eldridge, 424 U.S. 319, 344 (1976) ("[P]rocedural due process rules are shaped by the risk of error inherent in the truthfinding process ....").

285     See Cleveland Bd. of Educ. v. Loudermill, 470 U.S 532, 544 (1985) (explaining that the government employer also shares the interest in avoiding erroneous decisions).

286     Bell v. Burson, 402 U.S. 535, 540 (1971).

287     See Straubel, supra note 255, at 1223.

288     Parratt v. Taylor, 451 U.S. 527, 540-41 (1981); Mathews, 424 U.S. at 333 ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner'" (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965) (emphasis supplied)).

289     Bd. of Regents v. Roth, 408 U.S. 564, 573-74 (1972).

290     Goss v. Lopez, 419 U.S. 565, 579 (1975). It is evident that mistakes are made. John Ruger, the USOC Athlete Ombudsman, speculates that the anti-doping system currently in place catches "two, three, five people every year who are not intentionally cheating." Hiltzik, supra note 12.

291     Straubel supra note 255, at 1220 (explaining that "the substantive rules governing the question of whether a doping offense has occurred" are governed by the WADA Code).

292     The United States Government has considerable influence over the content of the Code and the conduct of WADA. Dionne L. Koller, Does the Constitution Apply to the Actions of the United States Anti-Doping Agency?, 50 St. Louis U. L.J. 91, 95 (2005). The United States has an ONDCP representative on the WADA Board and it is WADA's greatest financial supporter. Moreover, the WADA Code in many respects reflects important United States Government policy initiatives, such as banning marijuana, despite its very questionable performance-enhancing effects, so that the WADA Code would be in line with overall United States drug policy. Id.

293     Leary v. U.S., 395 U.S. 6, 36 (1969); Tot v. U.S., 319 U.S. 463, 466 (1943).

294     Leary, 395 U.S. at 36.

295     U.S. Anti-Doping Agency v. Hamilton, AAA No 30 190 00130 05, at 6 (2005) (Campbell, arb., dissenting).

296     Id. at 5.

297     There is also a question over the test used to detect erythropoietin (EPO), a drug that increases stamina, requiring more than twenty-four hours, numerous complicated steps, sophisticated equipment and a high level of technical skill. Even with that, the results are highly susceptible to interpretation, and do not produce a clear "positive" or "negative" result. The test has been said to

be prone to "false positives." Hiltzik, supra note 12; Amy Shipley, Detection of HGH Met with Skepticism, Wash. Post, Dec. 21, 2007 ("The current blood test for HGH has significant shortcomings.").

298   American Arbitration Association Supplementary Procedures for Arbitration of Olympic Sport Doping at R-33(e).

299   WADA Code § 3.2.1.

300   WADA Code, § 3.2.1 Comment.

301   U.S. Anti-Doping Agency v. Landis, AAA No. 30 190 00847 06, at 6 (Sept. 20, 2007) (Campbell, arb., dissenting) (quoting International Standards for Laboratories, Version 4.0 adopted by the WADA Code); Michael Hiltzik, Presumed Guilty: Athletes See Doping Case Appeals as Futile Exercise, L.A. Times, Dec. 11, 2006. The two arbitrators that ruled against Landis explained that "if WADA personnel were allowed to testify on behalf of Athletes this would have a significant impact on its ability to maintain solidarity and remain an 'impartial tester' of samples." Landis, AAA No. 30 190 00847 06, at 82.

302   Hiltzik, supra note 12.

303   The dissenting opinion in Floyd Landis' arbitration noted failures on several levels including: an incomplete chain of custody ("the documents used to show the chain of custody for Mr. Landis's sample have no relationship to what actually happened to the samples in this Laboratory."), the use of incorrect procedures to edit and destroy documents ("when your [results documentation] contains documents with a different sample number, documents with strike outs, [and] documents without proper forensic corrections ... you do not have a reliable documentation package"), and the exclusion of Landis' experts from the B sample testing stage. Landis, AAA No. 30 190 00847 06, at 4, 6, 9-12 (2007) (Campbell, arb. dissenting). Landis even proved that the technicians who found his sample to be positive did not understand or lacked competence in significant areas of the testing process, as the panel noted that the labs training of its employees "lacked vigor" and the errors caused did "give some cause for concern," but that nevertheless, these flaws did not result in Landis's positive finding. Id. at 81. The tests themselves are in question due to the stringent requirements. For example, the EPO test requires more than twenty-four hours to complete, numerous complicated steps, sophisticated equipment and a high level of technical skill. In spite of the rigorous steps, the results of the EPO test are highly susceptible to interpretation, and do not produce a clear result. There are allegations that the test is prone to "false positives." Hiltzik, supra note 12; Shipley, supra note 297 ("[T]he current blood test for HGH has significant shortcomings.").

304   Landis, AAA No. 30 190 00847 06, 4, at 76-77 (explaining that despite the "39 different errors within the lab documentation package," the errors did not cause Landis' positive result, and therefore he was still found guilty of a doping offense).

305   For instance, in Goss v. Lopez, the Court discussed the students' right to tell administrators their side of the story and to bring facts to light that might otherwise have been overlooked. 419 U.S. 565, 579 (1975). Similarly, in Cleveland Board of Education v. Loudermill, the hearing served the purpose of allowing Loudermill an opportunity to explain why he omitted his prior felony conviction from his employment form. 470 U.S. 532, 544 (1985). Similarly, in Mathews v. Eldridge, a Social Security Disability benefits recipient was given the opportunity through a hearing to show that he was, in fact, disabled under the meaning of the statute. 424 U.S. 319, 327-28 (1976).

306   David Black, the president and chief executive of a large independent doping lab not affiliated with WADA, stated that when you have a closed system where very few people in the world know what the science is, and the system has a vested interest to make sure its findings are confirmed ... the lab should just be a fact-gatherer, but the WADA system is designed in a way that the labs are not just objective fact gatherers, but part of the body of prosecution.
Hiltzik, supra note 12. This "stacked deck" nature of the process afforded to athletes leads many to forego an appeal and simply take their suspension. For instance, swimmer Rachael Burke tested positive for trace amounts of boldione, an anabolic steroid, that she believed may have come from a tainted nutritional drink. She had never previously tested positive. She was concerned that trying to fight the allegation would cost tens of thousands of dollars and had little chance of success, so she simply agreed to a two-year suspension that took her out of world-class swimming. Id.

307   U.S. Anti-Doping Agency v. Landis, AAA No. 30 190 00847 06, at 5-6 (Sept. 20, 2007) (Campbell, arb., dissenting).
      It was disclosed during the hearing that Laboratory Directors are bound by an Ethics Code of Conduct that has been interpreted to
      preclude them from disclosing the errors of one of their fellow laboratories on behalf of an athlete. In other words, if a laboratory
      had made an error and that error was causing an innocent athlete to be convicted of a doping offense, they could not testify on
      behalf of the athlete and disclose the error... Dr. Ayotte admitted that because of this provision she would not testify for an athlete
      even if she knew that a WADA accredited laboratory made a mistake.
      Id. Indeed, in the Landis arbitration, it was noted that none of the three laboratory directors involved in the case, who had reviewed
      the data, disclosed any of the problems with the data used to support the doping allegation in that case. Id. at 7.

308   Id. at 22.

309   WADA Code, § 3.2.1 Comment; Tom Weir, Runners in the Cross Hairs, USA Today, June 9, 2004, at 1C. Officials have further
      explained that this standard is certainly less stringent than the "beyond a reasonable doubt" standard, but more than a "mere
      balance of probabilities." Richard H. McLaren, An Overview of Non-Analytical Positive and Circumstantial Evidence Cases in
      Sports, 16 Marq. Sports L.J. 193, 203 (2006).

310   The circumstantial evidence is primarily composed of documentary evidence which might include calendar entries, drug schedules,
      or canceled checks.

311   Linda Robertson, A Sport Comes Clean, Miami Herald, July 18, 2004, at C8.

312   Terrence Madden, supra note 137 (explaining that the USADA won "all 13 cases" prosecuted using documents provided by the
      Senate Committee in connection with the BALCO grand jury investigation and that "you subpoenaed those documents from the
      Department of Justice ... and over 9000 documents were delivered to USADA. They have been used in prosecutions to date, they
      will be used in further prosecutions").

313   Doping regulators assert that there is a powerful justification for the strict liability standard, specifically the compelling need to
      protect the integrity of sport for all competitors. Moreover, regulators note that requiring a showing of intent before a sanction
      could be imposed would "invite costly litigation" that would "cripple" sporting federations. WADA Code § 2.1.1 cmt. 2.1.1.

314   See WADA Code § 4.4 (directing that substances on the prohibited list shall not be subject to challenge by an athlete or other
      person based on an argument that the substance or method was not a masking agent or did not have the potential to enhance
      performance, represent a health risk, or violate the spirit of sport); Hiltzik, supra note 12 (citing the example of sprinter Torri
      Edwards who was suspended for two years despite the arbitrators in her case acknowledging "[s]he has not sought to gain any
      improper advantage or to 'cheat' in any way").

315   Hiltzik, supra note 12 (quoting former WADA Chairman Dick Pound).

316   See WADA Code § 3.1. The dissenting arbitrator in the Floyd Landis hearing concluded:
      Because everyone assumes an athlete who is alleged to have tested positive is guilty, it is not fashionable to argue that laboratories
      should comply with strict rules. However, if you are going to hold athletes strictly liable with virtually no possibility of
      overcoming a reported alleged positive test even in the face of substantial and laboratory errors, fairness and human decency
      dictates [sic] that strict rules be applied to laboratories as well.
      Id.; U.S. Anti-Doping Agency v. Landis, AAA No. 30 190 00847 06, 4, at 11 (Sept. 20, 2007) (Campbell, arb., dissenting).

317   Hewitt v. Helms, 459 U.S. 460, 471-72 (1983); Yellin v. U.S., 374 U.S. 109, 143-44 (1963); Kelly v. Railroad Retirement Bd., 625
      F.2d 486, 491-92 (3d Cir. 1980); Mathews v. Walter, 512 F.2d 941, 946 (D.C. Cir. 1975); Edward L. Rubin, Due Process and the
      Administrative State, 72 Cal. L. Rev. 1044, 1109 (1984) ("Numerous cases extending into the post-Roth era affirm the principle of
      rule obedience.") (citing Morton v. Ruiz, 415 U.S. 199, 235 (1974)).

HOW THE UNITED STATES GOVERNMENT SACRIFICES..., 2008 B.Y.U. L. Rev....

318    Landis, AAA No. 30 190 00847 06, 4, at 11.

319    Id. at 12. A similar opinion was voiced in the case against cyclist Tyler Hamilton. Before his hearing, doping officials made numerous public statements regarding Hamilton's guilt and called into question his entire career as a cyclist. The dissenting arbitrator in the case stated in his opinion that "if it is at all desirable for athletes to believe they will obtain a fair hearing, it is imperative that high-ranking officials within the Olympic community refrain from making statements demonstrating bias against an athlete before that athlete has a hearing." He also stated that "athletes should not have to worry that high ranking officials are sending clear messages to the arbitrators to find the athlete guilty regardless of the facts of the case." U.S. Anti-Doping Agency v. Hamilton, AAA No 30 190 00130 05, at 6-7.

320    See WADA Code § 14.2 (stipulating that public disclosure of adverse results may be released "no earlier than the completion of the administrative review").

321    Amy Shipley, Jones is Cleared of Drug Violation: Former Olympian's "B" Sample is Negative, Wash. Post, Sept. 7, 2006 [hereinafter Shipley, Jones is Cleared] ("[A]nti-doping officials do not officially release A sample results because of the possibility the B won't support the A, but Jones's results were leaked.").

322    Amy Shipley, Jones Says She's in No Condition to Race, Wash. Post, Sept. 15, 2006 ("I was in top condition when my season was interrupted more than three weeks ago by the leak of my positive test. I was ready but missed top competitions .... Unfortunately, I just don't feel that my condition is there.").

323    Shipley, Jones is Cleared, supra note 321.

324    USADA has established a standardized procedure for collecting samples. All athletes are closely observed during the actual provision of the sample. The sample is then split between two bottles which are labeled "A" and "B" and given a unique code number. Athletes are instructed to inspect and secure the samples with their signature over a seal. If the "A" sample returns a positive result, the athlete may request that the "B" sample be tested before any disciplinary measures are taken. USADA, Doping Control Process (2008), available at http://www.usantidoping.org/what/process/processing.html.

325    Shipley, Jones is Cleared, supra note 321 (quoting Jones's attorney that the reported positive on the "A" test was controversial, in that it was "right on the threshold" of a positive result). Critics say such discrepancies, which have happened in other cases, are due to the complexity of the test for EPO and the fact that some say the test cannot always distinguish artificial EPO from naturally produced EPO. See id.

326    Amy Shipley, Inquiry into Jones's Test Results, Wash. Post, Sept. 8, 2006 (noting that Jones's attorney stated that "if this is the climate, that every high-profile [athlete's] A sample is leaked, you better make sure the test works").

327    See Liz Byrnes, Anti-Doping Chief Calls for Life Ban on Sprint Ace Gatlin, W. Mail, July 31, 2006, at 9.

328    Hamdi v. Rumsfeld, 542 U.S. 507, 533 (2004) (quoting Ward v. Monroeville, 409 U.S. 57, 61-62 (1972)). The Supreme Court has further explained that the general rule is that "even purportedly fair adjudicators 'are disqualified by their interest in the controversy to be decided.'" Id. at 538 (quoting Tumey v. Ohio, 273 U.S. 510, 522 (1927)).

329    Martin H. Redish & Lawrence C. Marshall, Adjudicatory Independence and the Values of Procedural Due Process, 95 Yale L. J. 455, 477 (1986).

330    Marshall v. Jerrico, Inc., 446 U.S. 238, 242 (1980).

331     Those procedures require that an athletes' National Governing Body "submit to binding arbitration in any controversy involving ... the opportunity of any amateur athlete ... to participate in amateur athletic competition, upon demand of ... any aggrieved amateur athlete ... conducted in accordance with the Commercial Rules of the American Arbitration Association ...." 36 U.S.C. § 220522(4); Bylaws of the United States Olympic Committee § 9.1.

332     See United States Anti-Doping Agency Protocol for Olympic Movement Testing § 10(a); Jacobs v. USA Track & Field, 374 F.3d 85, 86 (2d Cir. 2004).

333     Leslie Ann Dougiello, Note, Jacobs v. United States Track & Field, 24 Quinnipiac L. Rev. 887, 891 (2006). In contrast to the USADA-approved pool, the pool provided for under the Commercial Rules are not selected and trained by USADA. See also Michael Straubel, Enhancing the Performance of the Doping Court: How the Court of Arbitration for Sport Can Do Its Job Better, 36 Loy. U. Chi. L.J. 1203, 1223 (2005).

334     Straubel, supra note 255, at 1223.

335     U.S. Anti-Doping Agency v. Landis, AAA No. 30 190 00847 06, at 11 (Sept. 20, 2007) (Campbell, arb., dissenting).

336     Id. at 6.

337     Mathews v. Eldridge, 424 U.S. 319, 322 (1976).

338     Id. at 344.

339     Michael Hiltzik, Athletes' Unbeatable Foe, L.A. Times, Dec. 10, 2006, at A1.

340     See Vicki Michaelis, BALCO Creates Inquiry Road Map, USA Today, Sept. 7, 2006 (explaining that "catching" Floyd Landis and Justin Gatlin is "helping to lift the black marks ... on the U.S. image globally ..." and that "[a]t a time when the U.S. Olympic Committee is contemplating a bid for the 2016 Summer Games, that offers some comfort").

341     Hiltzik, supra note 12. LaTasha Jenkins recently won an arbitration case against the USADA because of faulty procedures used to test her sample. Press Release, Valparaiso School of Law, LaTasha Jenkins and Valpo Sports Law Clinic Win Case Against U.S. Anti-Doping Agency (Dec. 14, 2007), available at http://www.valpo.edu/law/news/121407.php.

342     As stated in Cafeteria and Restaurant Workers Union, Local 473, A.F.L.-C.I.O. v. McElroy, 367 U.S. 886, 895 (1961), the determination of due process rights, "under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by government action." Many Supreme Court decisions serve to emphasize that when substantial private interests are affected, as is arguably the case with these Olympic athletes, by governmental action, procedural due process demands "notice and opportunity for hearing appropriate to the nature of the case." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950). This notice and opportunity for hearing "must be granted at a meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U.S. 545, 552 (1965). Examples of due process requirement in sport include Harding v. U.S. Figure Skating Ass'n, 851 F. Supp. 1476, 1481 (D. Or. 1994) (injunction was proper when NGB did not follow requirement that a hearing be set at a time reasonably convenient for all parties); Schulz v. U.S. Boxing Ass'n, 105 F.3d 127, 136 (3d Cir. 1997) (holding that an athlete possesses a contractual right to have a governing body follow its own rules); Lindemann v. Am. Horse Shows Ass'n, 624 N.Y.S. 2d 723, 724 (N.Y. Sup. Ct. 1994) (holding that the suspension of an athlete was arbitrary and capricious because determination was not made without a meaningful hearing or substantial evidence).

343     See Brentwood Academy v. Tenn. Secondary Sch. Ass'n, 531 U.S. 288, 298 (2001) (citing Lugar v. Edmondson Oil Co., 457 U.S. 922, 939 (1982)) (explaining that the state action inquiry is "necessarily fact-bound," and depends on particular facts and

circumstances).

344    Koller, supra note 132, at 93.

345    Most prominently, Senators John McCain and Ted Stevens have been at the forefront of advocating for the establishment and
       continued funding of the USADA. See http://www.cbc.ca/sports/story/2005/05/24/john_mccain050524.html (last visited Nov. 15,
       2008).

346    See Houlihan, supra note 22, at 75 ("[C]ommitment to anti-doping policy might lessen if the perceived utility of international sport
       diminishes or if the opportunity cost is seen as too great. There are already one or two countries where the amount of public money
       being spent on doping control is being challenged on the grounds that it exceeds the sum devoted to encouraging mass
       participation. Alternatively, commitment to drug-free sport might be reduced because of a desire to maintain the existing levels of
       success."); Statement of Robert Housman in Panel II: Regulations Governing Drugs and Performance Enhancers in Sports,
       Fordham Intell. Prop. Media & Ent. L.J. 337, 367 (2002) (questioning whether the United States Government will keep
       "momentum" on fighting doping in sport).

347    See supra, text accompanying notes 148-57.

348    In discussing privatization, Ellen Dannin asserts that the issue is not how to make private service providers accountable, "but,
       rather, does the issue of accountability help us understand how a service should be provided." Dannin, supra note 159, at 151.

349    Michele Gilman, Legal Accountability in an Era of Privatized Welfare, 89 Cal. L. Rev. 569, 594 (2001). See also Martha Minow,
       Symposium: Public Values in an Era of Privatization: Public and Private Partnerships: Accounting for the New Religion, 116 Harv.
       L. Rev. 1229, 1230 (2003) ("Although the term 'privatization' covers a variety of different activities, a useful definition
       encompasses the range of efforts by governments to move public functions into private hands and to use market-style competition.
       Current privatization efforts involve both for-profit and nonprofit organizations-- including religious entities--in performing public
       responsibilities or addressing public needs.").

350    Gilman, supra note 349.

351    Jody Freeman, Symposium: Public Values in an Era of Privatization: Extending Public Law Norms Through Privatization, 116
       Harv. L. Rev. 1285, 1291-92 (2003) ("In the last two decades, privatization has been championed by conservative policymakers,
       academics, and public intellectuals as instrumental to reducing the size of government and broadly restructuring society in line
       with a conservative agenda. Privatization coincides with other political and economic developments--including globalization, free
       trade, market integration, and deregulation--that similarly reinforce an ideological preference for private over public ordering and
       market over noneconomic values.").

352    Gilman, supra note 349; Minow, supra note 349, at 1242.

353    Minow, supra note 349, at 1242.

354    Id. at 1243.

355    Id. at 1247 ("The result may improve efficiency and reduce costs, but it may also vitiate public values.").

356    Id. at 1230.

357   Dannin, supra note 159, at 113 ("[A]rguments for or against privatization are actually about accountability.").

358   Id.

359   Id.

360   Id. at 123-24 ("Most would agree privatization should not be used as a tool to avoid being subject to the law.").

361   Gilman, supra note 349; Minow, supra note 342, at 1230.

362   Minow, supra note 342, at 1230.

363   S.F. Arts & Athletics v. U.S. Olympic Comm., 483 U.S. 522, 545 (1987).

364   Id. at 559-60.

365   Id. at 557.

366   Dannin, supra note 348, at 118 ("Privatization proponents argue that we can rely on the market to provide all necessary oversight and controls in addition to lower cost and better quality products.")

367   Id. at 598 (noting that the most important factor for not losing accountability with privatization is competition).

368   Indeed, the sports market has been described as a "natural monopoly," in that there is "'a single seller, a unique product and barriers to easy entry to the market.'" See Simon Gardiner, Mark James, John O'leary & Roger Welch, Sports Law 52 (3d ed. 2006) (quoting Kevin Foster, How Can Sport Be Regulated?, in Law and Sport in Contemporary Society 268-70 (Steve Greenfield & G. Osborn eds., 2000).

369   The USADA Web site defines itself as "the independent anti-doping agency for Olympic related sport in the United States." USADA--Who We Are: USADA History, http://www.usantidoping.org/who/history.html (emphasis added); see also Office of National Drug Control Policy Reauthorization Act of 2006, Pub. L. No. 109-469, § 701(b)(1), 120 Stat. 3502, 3534 (2006).

370   Jack M. Beermann, Administrative-Law-Like Obligations on Private [ized] Entities, 49 UCLA L. Rev. 1717, 1734 (2002) ("The fact that privatization is likely to be politically controversial means that its effects are likely to be muted with close scrutiny of privatized entities and strong demands for increased regulation or deprivatization if serious failures occur.").

371   Vinokur, supra note 16, at 116 ("[There was] a ground swell of public and editorial opinion in favor of the action, as indicated in the polls. In an election year, Carter may have wished to demonstrate his will to resist Soviet aggression.").

372   Id. at 117 (noting that Olympic runner Craig Masback was in the minority by supporting the boycott).

373   Id.

374   Id.

HOW THE UNITED STATES GOVERNMENT SACRIFICES..., 2008 B.Y.U. L. Rev....

375   Id. at 119 (noting that support of the boycott was the position of "most major U.S. media" and that, with respect to foreign relations, "when the government calls, the media is the first to report for duty" (internal quotation marks and citation omitted)).

376   Edward Luce & Andrew Ward, Democratic Rivals United in Tough Line on Beijing, Fin. Times, Aug. 16, 2007, at 5.

377   CNN.com      politicalticker,      Boycott      Beijing      Olympics?,      June      3,      2007, http://politicalticker.blogs.cnn.com/2007/06/03/richardson-on-darfur-us-should-boycott-beijing-2008-olympics/ (last visited Nov. 15, 2008).

378   Id.

379   Nafziger & Strenk, supra note 16, at 259.

380   See Drug Free Sports Act Hearing, supra note 115, at 1-2 (statement of Rep. Cliff Stearns, Chairman, Subcomm. on Commerce, Trade and Consumer Protection). ("[Steroid use] cheats our sports ... and it cheats all of us as fans .... [W]e are all here today as fans who want to protect the sports that we care so very much about."). Stearns also explained that "sport, both amateur and professional, belongs to all of us here in America." Id.

381   CNN.com politicalticker, supra note 377.

382   Id.

383   Id.

384   Houlihan, supra note 21, at 76 (explaining the political disconnect with the issue of the anti-doping movement: "[T]here is also no sign that policy-makers perceive public support as an important factor" in the anti-doping movement).

385   Beermann, supra note 370, at 1719.

386   Id. at 1726.

387   Id. (noting that the prison contractors must file reports with the state and may lose the contract to operate their respective prisons if they do not meet certain standards). In addition, the prison operators are prohibited, by statute, from raising the defense of sovereign immunity in defense of any lawsuit arising out of the operation of the prison. Id.

388   Id. at 1728.

389   See generally Olympic Family--Functional or Dysfunctional?: Hearing Before the Subcomm. on Immigration, Border Security, and Claims of the H. Comm. on the Judiciary, 109th Cong. (2005); Legislative Efforts to Reform the U.S. Olympic Committee: Hearing Before the Subcomm. on Commerce, Trade and Consumer Protection of the H. Comm. on Energy and Commerce, 108th Cong. (2003); Does the U. S. Olympic Committee's Organizational Structure Impede its Mission?: Hearing Before the Subcomm. on Commerce, Trade, and Consumer Protection of the H. Comm. on Energy and Commerce, 108th Cong. (2003).

390   S. 529, to Authorize Appropriations for the U.S. Anti-Doping Agency: Hearing on S. 529 Before the Comm. on Commerce, Science and Transportation, 109th Cong. 3-4 (2005) [hereinafter Hearing to Authorize Appropriations] (testimony of Jim Scherr, Chief Executive Officer, U.S. Olympic Committee) (stating that USADA has "largely dispelled what was previously a widespread international impression that some American athletes were drug cheaters" and that the USADA is doing the job it was created to

perform and in doing so has become the model national anti-doping agency and organization for the world).

391    Indeed, the emphasis is on protecting the rights of "clean" athletes. See Sports Act, supra note 134, at 16 (testimony of Frank Shorter, Former Chairman, U.S. Anti-Doping Agency) ("[USADA's] function is to protect the rights of clean athletes by conducting its testing and adjudication programs with integrity and transparency to stop those athletes who dope and then hold them accountable for their decision to use these drugs."). Only once did Congress inquire into USADA's procedural protections for athletes, in a question by Senator John McCain asking about Marion Jones's accusation that the USADA was a "secret kangaroo court." Hearing to Authorize Appropriations, supra note 390, at 22. Terrence Madden of the USADA quickly dismissed this accusation, stating that "[o]ur procedures in regards to the legal aspects are foolproof" and that athletes "have all the inherent rights within the United States justice system." Id. at 22 (testimony of Terry Madden, Chief Executive Officer, U.S. Anti-Doping Agency). This testimony was not challenged or otherwise followed up by any member of the committee. Id.

392    Jody Freeman, Extending Public Law Norms through Privatization, 116 Harv. L. Rev. 1285, 1309 (2003) ("[I]t is the transition from government to private provision that the public law perspective finds problematic, especially when considered cumulatively, because it allows government to avoid obligations it would undertake if it provided services directly.").

393    Id. at 1285-86.

394    Id.; see also Beermann, supra note 370, at 1735 ("Just as the federal government attaches strings, in the form of federal standards, to the money it provides to state and local governments, so too is government likely to attach strings to the government money that ends up in the hands of privatized entities.").

395    36 U.S.C. § 220511(a)(1) (2000).

396    36 U.S.C. § 220511(a)(3) and (4).

397    Office of National Drug Control Policy Reauthorization Act of 2006, Pub. L. No. 109-469, § 701(b)(4), 120 Stat. 3502, 3534 (2006).

398    Koller, supra note 132, at 100 (2005) (quoting from ONDCP's National Strategy to combat drug use in sports); Office of National Drug Control Policy Reauthorization Act of 2006, Pub. L. No. 109-469, § 701(b)(4), 120 Stat. 3502, 3534 (2006) (providing that the United States Anti-Doping Agency shall "serve as the United States representative responsible for coordination with other anti-doping organizations").

399    Office of National Drug Control Policy Reauthorization Act of 2006, Pub. L. No. 109-469, § 701(b)(1), 120 Stat. 3502, 3534 (2006).

400    Id. § 701(b)(3).

401    USADA additionally is required to "keep correct and complete records of account" and submit an annual report to Congress. Id. § 702(a)-(b)(1).

402    See Memorandum of Understanding (MOU) Between the Executive Office of the President Office of National Drug Control Policy (ONDCP) and United States Anti-Doping Agency, (Dec. 11, 2001) (on file with author) [hereinafter MOU 2002; MOU between the Executive Office of the President ONDCP and USADA (March 20, 2003) (on file with author) [hereinafter MOU 2003]; MOU Between the Executive Office of the President ONDCP and USADA (Feb. 5, 2004) (on file with author) [hereinafter MOU 2004].

403    MOU 2002, supra note 402; MOU 2003, supra note 402; MOU 2004, supra note 402.

HOW THE UNITED STATES GOVERNMENT SACRIFICES..., 2008 B.Y.U. L. Rev....

404     MOU 2002, supra note 402; MOU 2003, supra note 402; MOU 2004, supra note 402.

405     MOU 2004, supra note 402.

End of Document                                          © 2012 Thomson Reuters. No claim to original U.S. Government Works.