# EXHIBIT 38

# THE INTERNATIONAL CONVENTION AGAINST DOPING IN SPORT: IS IT THE MISSING LINK TO USADA BEING A STATE ACTOR AND WADC COVERAGE OF U.S. PRO ATHLETES?

MICHAEL STRAUBEL[*]

## I. INTRODUCTION

The United States Senate gave its advice and consent to the International Convention Against Doping in Sport (ICADIS or Convention) on July 21, 2008.[1] The Convention came into force for the United States one month after the United States deposits its instrument of ratification with the Director-General of the United Nations Educational, Scientific, and Cultural Organization (UNESCO).[2] The United States is now one of approximately eighty-six countries to ratify ICADIS.[3]

---

[*]   Professor of Law at Valparaiso University School of Law.  This article was the collective effort of members of the Valparaiso University Sports Law Clinic.  While the author oversaw the research and drafting work, the following people significantly contributed to the end product:  Jennifer Collins, Christine Eberts, Jamie Flowers, Tiffini Grimes, Jeffrey Lehrman, Michael Meyer, Reid Murtagh, Alecia Pehr, Brian Raterman, Heather Seals, Rachel Sharron, and Ehiman Uwidia.

1.  154 Cong. Rec. S6980 (July 21, 2008).

2.  *See* UNESCO, International Convention Against Doping in Sport, art. 38, Oct. 19, 2005, *available at* http://unesdoc.unesco.org/images/0014/001425/142594m.pdf [hereinafter ICADIS].

3.  UNESCO, ICADIS State Parties, UNESCO.ORG, *available at* http://portal.unesco.org/la/convention.asp?KO=31037&language=E (last visited Oct. 26, 2008).  As of June 3, 2008, the following countries have ratified the Convention:

**AFRICA**

Algeria, Burundi, Cameroon, Egypt, Gabon, Ghana, Libyan Arab Jamahiriya, Mali, Mauritius, Mozambique, Namibia, Niger, Nigeria, Senegal, Seychelles, South Africa, Tunisia.

**AMERICAS**

Argentina, Bahamas, Barbados, Bolivia, Brazil, Canada, Ecuador, Guatemala, Jamaica, Mexico, Panama, Peru, Saint Lucia, Saint Kitts and Nevis, Trinidad and Tobago, Uruguay.

**ASIA**

Bangladesh, Brunei Darussalam, Cambodia, China, India, Indonesia, Japan, Kuwait, Malaysia, Mongolia, Oman, Pakistan, Qatar, Republic of Korea, Saudi Arabia, Singapore, Thailand.

**EUROPE**

Albania, Austria, Azerbaijan, Bulgaria, Croatia, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Italy, Latvia, Lithuania, Luxembourg, Monaco, The

Designed, in large part, to throw the sovereign power of nation-states behind the fight against performance enhancing drugs in sport, the Convention calls upon state parties to adopt measures that will give force to the principles of the World Anti-Doping Code (WADC) and support the work of the World Anti-Doping Agency (WADA). The International Olympic Committee believes that the mission of the Convention is important enough to require that all Olympic Games host countries become state parties.[4] Therefore, in order for Chicago to successfully bid for the 2016 Games, the United States had to ratify the Convention.

The White House and the Senate have read the Convention to require the United States to do little more than throw its moral support behind the mission of WADA. While, in the short run, this reading of ICADIS's requirements may be politically accurate, in the long run, ICADIS could prove to be the proverbial Trojan Horse. It could lead to, among other things, the United States Anti-Doping Agency (USADA) being declared a state actor, the criminalization of doping offenses within the United States, and the application of the World Anti-Doping Code to U.S. professional leagues like the National Football League (NFL) and Major League Baseball (MLB).

## II.  OUTLINE AND SCOPE

ICADIS is a complicated treaty with many possible implications and effects in the United States. The analysis that follows is intended to identify and to begin analyzing those possible implications and effects. The analysis begins with a brief review of ICADIS's history in order to lay the foundation for its interpretation. Armed with this historical analysis, the next step is to interpret and understand the Convention to determine the scope of the obligations being assumed by the United States. After determining the obligations being assumed by the United States, the next step is to determine the implication of those obligations, particularly whether constitutional protections and limitations will be triggered. The final step will then be to assess the effect, if any, on the various current doping control processes in the United States: the Olympic Movement program managed by USADA, the

---

Netherlands, Norway, Poland, Portugal, Republic of Moldova, Romania, Russian Federation, Slovakia, Spain, Sweden, Ukraine, United Kingdom of Great Britain and Northern Ireland. When the United Kingdom ratified, it was extended to Bailiwick of Jersey Guernsey and Alderney, Isle of Man, Bermuda Cayman Islands Falkland Islands.

**OCEANIA**

Australia, Cook Islands, Nauru, New Zealand, Samoa.

4. *See* World Anti-Doping Agency, *World Anti-Doping Code*, art. 20.1.8 (2009) (allowing the IOC to only accept bids from countries that have ratified the Convention).

United States based professional leagues' programs, the NCAA's program, and even the emerging high school programs across the nation.

## III. HISTORY

ICADIS was drafted by UNESCO and came into force on February 1, 2007. As of June 3, 2008, eighty-six countries, other than the U.S., have ratified the Convention.

The final version of ICADIS that came out of UNESCO was preceded by a preliminary draft in 2003 and is based on two earlier international documents: the Council of Europe's Anti-Doping Convention and the Copenhagen Declaration.[5]  The 2003 version of ICADIS stated that its purpose was to bring governments into the fight against drugs in sport and declared that states have the primary responsibility for the fight against doping.[6]  The 2003 version also stated that ICADIS is based on the Council of Europe's Anti-Doping Convention.[7]

The Council of Europe's Anti-Doping Convention has been ratified by forty-five European countries, and it contains many provisions that mirror ICADIS provisions. Drafted in 1989, it is clear that the primary objective of the Council of Europe's Anti-Doping Convention is to bring governments into the fight against doping.[8]  The Copenhagen Declaration, adopted in 2003, though a non-binding declaration, significantly influenced ICADIS. Among the actions the Declaration calls for are bringing governments into the fight against doping, recognition of the World Anti-Doping Code as domestic law, and domestic legislation limiting the availability of prohibited substances.[9]

## IV. ICADIS'S STATUS AS LAW

ICADIS is an Article II treaty. Under Article II of the U.S. Constitution, ICADIS must be ratified by a two-thirds vote of the Senate before the United

---

5. *See* Koichiro Matsuura, Director-General, Preliminary Report on the Preparation of the International Convention Against Doping in Sport, ¶¶ 5-9, UNESCO reference CL/3728 (July 15, 2004).

6. *Id.* ¶¶ 16-19.

7. *Id.* ¶ 6.

8. *See* Anti-Doping Convention, Council of Europe, arts. 1, 3-4.

9. *See* Copenhagen Declaration on Anti-Doping in Sport, arts. 3-5, *available at* http://www.wada-ama.org/rtecontent/document/copenhagen_en.pdf (last visited Nov. 15, 2008); *see also* World Conference on Doping in Sport Resolution, *available at* http://www.wada-ama.org/en/dynamic.ch22pagecategory.id=614 (last vistited Nov. 15, 2008) (accompanying the Copenhagen Declaration).

States becomes internationally bound.[10]   Domestically, an Article II treaty, prior to *Medellin v. Texas,* was presumed to be self-executing and "co-equal" with all federal statutory law.[11]   A self-executing treaty does not require implementing legislation in order to have the force of law within the United States legal system.[12]   However, after the Supreme Court's decision in *Medellin,* a treaty is considered to be self-executing only if it "contains stipulations which are self-executing, that is, require no legislation to make them operative."[13]   Though the majority in *Medellin* dramatically altered long-standing Supreme Court doctrine and has been strongly criticized, it is the current standard that must be applied to interpreting ICADIS.[14]   There are no "stipulations" in ICADIS declaring it to be self-executing, nor are there any statements from the President or the Senate declaring ICADIS to be self-executing.  The only indication as to the President's or the Senate's view of the Convention on this point is the conclusion in the report of the Senate Foreign Relations Committee.  It stated that no implementing legislation is required, because U.S. obligations are either satisfied by the Controlled Substances Act and the Food, Drug, and Cosmetic Act or by the actions of USADA.[15]   Therefore, the conclusion must be that ICADIS is not self-executing and that the current U.S. Government believes that all U.S. obligations are being met by a combination of existing U.S. law and the actions of USADA.

## V.   OBLIGATIONS CREATED BY ICADIS

In analyzing the domestic effect of ICADIS, the first necessary question to ask concerns the nature of the obligations imposed by ICADIS on the United States: Does ICADIS fundamentally limit conduct or does it require conduct? To answer this fundamental question, and to interpret the Convention, we have employed a conservative combination of international and United States rules for treaty interpretation.[16]   We will seek the ordinary meaning of the

---

10.  U.S. CONST. art. II, § 2, cl. 2.

11.  *See* RESTATEMENT THIRD OF FOREIGN RELATIONS LAW § 111 (1987).  The Reporter's Notes point out that treaties are presumed to be self-executing unless a contrary intent is manifested and such presumption is strengthened when the executive branch and Senate propose no implementing legislation.

12.  *Id.*

13.  Medellin v. Texas, 128 S. Ct. 1346, 1357 (2008).

14.  *See* Jeremy Telman, *Medellin and Originalism,* RUNNING HEAD (2008).

15.  *See* International Convention Against Doping in Sport, Exec. Rept. 110-11, 5-6, June 27, 2008, *available at* http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=110_cong_reports& docid=fier011.pdf (last visited Oct. 26, 2008).

16.  *See* Vienna Convention on The Law of Treaties, arts. 31-32 May 23, 1969; RESTATEMENT

Convention's text and the shared intent of the parties. In doing so, we will consult ICADIS's drafting history to confirm the Convention's ordinary meaning and shared intent of the parties.

### A.  Enact Public Law

A fair reading of Articles 3 and 5, particularly when the Convention's history is considered, requires ratifying governments to adopt public law to meet specific obligations.[17]  The key language in Article 3 states that "State Parties undertake to: (a) adopt appropriate measures at the national and international levels,"[18] and the language of Article 5 reads: "In abiding by the obligations contained in this Convention, each State Party undertakes to adopt appropriate measures.  Such measures may include legislation, regulation, policies or administrative practices."[19]  This language appears to be in the imperative, requiring a state party to act in the way that only governments can act (through legislation, regulation, etc.).  Nothing in the drafting history contradicts a reading of this language as requiring affirmative governmental acts by state parties.  In fact, the drafting history seems to strengthen such a reading.

It can be argued that Article 7 relieves or softens the United States' obligation to act.  Article 7 allows state parties to rely on anti-doping organizations to fulfill their obligations.[20]  However, neither Article 7, nor any

---

THIRD OF FOREIGN RELATIONS LAW, *supra* note 11, § 325; Michael Straubel, *Textualism, Contextualism, and the Scientific Method in Treaty Interpretation: How Do We Find the Shared Intent of the Parties*, 40 WAYNE L. REV. 1191, 1192-1207 (1994).

17.  ICADIS, *supra* note 2, at arts. 3,5.

*Article 3 – Means to achieve the purpose of the Convention*

In order to achieve the purpose of the Convention, States Parties undertake to:

(a) adopt appropriate measures at the national and international levels which are consistent with the principles of the Code;

(b) encourage all forms of international cooperation aimed at protecting athletes and ethics in sport and at sharing the results of research;

(c) foster international cooperation between States Parties and leading organizations in the fight against doping in sport, in particular with the World Anti-Doping Agency.

*Article 5 – Measures to achieve the objectives of the Convention*

In abiding by the obligations contained in this Convention, each State Party undertakes to adopt appropriate measures.  Such measures may include legislation, regulation, policies, or administrative practices.

18.  *Id.* art. 3.

19.  *Id.* art. 5.

20.  *Id.* art. 7.

*Article 7 – Domestic coordination*

other language in ICADIS relieves state parties of their obligations. Article 7 only permits the delegation of the United States' obligations.[21]  Additionally, Article 11 obligates the United States to fund a national testing program and an anti-doping organization responsible for such a national testing program (the very organization that Article 7 allows to act for a state party), further indicating the imperative of affirmative state action.[22]

### B.   Specific Obligations

After concluding that ICADIS requires the United States to use its sovereign power to carry out its obligations under ICADIS, the next logical question is what specific obligations does ICADIS impose?  Among the obligations contained in ICADIS, those found in Articles 8, 11, and 16 are the most significant to measuring ICADIS's effect within the United States.[23]

---

States Parties shall ensure the application of the present Convention, notably through domestic coordination.  To meet their obligations under this Convention, States Parties may rely on anti-doping organizations as well as sports authorities and organizations.

21.  *Id.*

22.  *Id.* art. 11.

*Article 11 – Financial measures*

State Parties shall, (where appropriate):

(a) provide funding within their respective budgets to support a national testing programme across all sports or assist sports organizations and anti-doping organizations in financing doping controls either by direct subsidies or grants, or by recognizing the costs of such controls when determining the overall subsidies or grants to be awarded to those organizations;

(b) take steps to withhold sport-related financial support to individual athletes or athlete support personnel who have been suspended following an anti-doping rule violation, during the period of their suspension;

(c) withhold some or all financial or other sport-related support from any sports organization or anti-doping organization not in compliance with the Code or applicable anti-doping rules adopted pursuant to the Code.

23.  *Id.* art. 8, 11, & 16.

*Article 8 – Restricting the availability and use in sport of prohibited substances and methods*

1. States Parties shall, where appropriate, adopt measures to restrict the availability of prohibited substances and methods in order to restrict their use in sport by athletes, unless the use is based upon a therapeutic use exemption.  These include measures against trafficking to athletes and, to this end, measures to control production, movement, importation, distribution and sale.

2. States Parties shall adopt, or encourage, where appropriate, the relevant entities within their jurisdictions to adopt measures to prevent and to restrict the use and possession of prohibited substances and methods by athletes in sport, unless the use is based upon a therapeutic use exemption.

Those specific obligations are:

(1) To restrict prohibited substances and methods to athletes.[24]

(2) To adopt measures against trafficking in prohibited substances and methods to athletes.[25]

(3) To control the production, movement, importation, distribution, and

---

3. No measures taken pursuant to this Convention will impede the availability for legitimate purposes of substances and methods otherwise prohibited or controlled in sport.

*Article 16 – International cooperation in doping control*

Recognizing that the fight against doping in sport can only be effective when athletes can be tested with no advance notice and samples can be transported in a timely manner to laboratories for analysis, States Parties shall, where appropriate and in accordance with domestic law and procedures:

(a) facilitate the task of the World Anti-Doping Agency and anti-doping organizations operating in compliance with the Code, subject to relevant host countries' regulations, of conducting in- or out-of-competition doping controls on their athletes, whether on their territory or elsewhere;

(b) facilitate the timely movement of duly authorized doping control teams across borders when conducting doping control activities;

(c) cooperate to expedite the timely shipping or carrying across borders of samples in such a way as to maintain their security and integrity;

(d) assist in the international coordination of doping controls by various anti-doping organizations, and cooperate to this end with the World Anti-Doping Agency;

(e) promote cooperation between doping control laboratories within their jurisdiction and those within the jurisdiction of other States Parties. In particular, States Parties with accredited doping control laboratories should encourage laboratories within their jurisdiction to assist other States Parties in enabling them to acquire the experience, skills and techniques necessary to establish their own laboratories should they wish to do so;

(f) encourage and support reciprocal testing arrangements between designated anti-doping organizations, in conformity with the Code;

(g) mutually recognize the doping control procedures and test results management, including the sport sanctions thereof, of any anti-doping organization that are consistent with the Code.

24. *Id.* art. 8. Subsection 1 of Article 8 specifically places the obligation upon the state party. Subsection 2 of Article 8 calls upon the state party to encourage "relevant entities" to restrict the use of prohibited substances and methods by athletes. Read together, subsection 2 could be construed as relieving a state party of the obligation contained in subsection 1. However, subsection 2 is only an option of the method to achieve the obligation contained in subsection 1. The basic obligation is not extinguished or relieved. The definition of a prohibited substance and a prohibited method is that found in the 2003 World Anti-Doping Code and accompanying the Prohibited List attached to the Convention as an Annex. One question to be determined is whether this obligation includes detecting, prosecuting, and adjudicating doping violations. However, it seems logical that the general obligation must include these follow-up steps, or the objective would be hollow and unsatisfied.

25. *Id.* This obligation is specifically contained in subsection 1 of Article 8. "Trafficking" is not defined in the Convention. The obligation appears to not require that all trafficking be prohibited, but only trafficking to athletes. This narrower prohibition naturally raises the question of the definition of "athletes." Please see section VII of the paper below.

sale of prohibited substances and methods to athletes.[26]

(4) To fund a national testing program for all sports.[27]

(5) To withhold financial support from suspended athletes and support personnel.[28]

(6) To facilitate the testing of United States athletes by WADA and Anti-Doping Organizations (ADOs) in and outside the United States.[29]

These specific obligations, particularly those contained in numbers (1) through (4) above, are the foundation upon which a doping control system is based: namely, preventing athletes from using prohibited substances. But the question remains whether requiring the United States Government to restrict, arguably to make illegal, the use of prohibited substances by athletes, necessarily includes the required subsequent steps of prosecuting and punishing what it has regulated (the use of prohibited substances by athletes). It will take further analysis of the Convention and constitutional implications to answer this question.

## VI. CCONSTITUTIONAL LIMITS AND PROTECTIONS

Within the United States, government action, whether direct or indirect, must be conducted within the limits of the U.S. Constitution. Therefore, actions taken by the United States to comply with ICADIS, within the United States, will be subject to constitutional constraints. However, the amount and level of constitutional restraint varies according to two measures, the amount of government or state action being exercised and the existence and gravity of the protected interests affected by the government or state action.

### A. State Action

The Constitution applies to the conduct of government entities, such as

---

26. *Id.* This obligation is specifically found in subsection 1 of Article 8. This obligation appears to attack the problem of doping from the supply and production side. This is not a task that can be performed by a sports governing body.

27. *Id.* art. 11(a). What constitutes a "national testing program" is not specifically defined. However, the requirement is for a "programme across all sports." The expansive term "all sports" is not limited or otherwise defined. The use of the term "all sports," rather than using the term "athlete," to describe the scope of coverage, raises the question of whether they define the same group that will be subject to testing.

28. *Id.* art. 11(b). The term "financial support" is not defined. This raises the question of how expansive this will be applied. Will it include endorsement contracts, salaries, and stipends?

29. *Id.* art. 16(a). This obligation appears to require state parties to facilitate border passage of doping control officers and customs procedures for testing samples. This is something that sports organizations cannot perform. The obligation also seems to require that a U.S. athlete who fails to cooperate with the collection efforts of a non-United States ADO to be penalized.

police departments and courts, and to private entities acting under the color of state law.[30]   Once ICADIS obligations are assumed, the United States may perform those obligations itself, or it may delegate those obligations to an otherwise private entity.   If ICADIS obligations are performed by the U.S. Government itself, constitutional limits, such as the Due Process Clause of the Fifth Amendment, apply.   However, if, as is quite likely, the U.S. delegates ICADIS responsibilities, at least some of them, to USADA or other sports governing bodies, like the NFL or National Collegiate Athletic Association (NCAA), the result of that delegation will have to be analyzed to determine if the entity is performing a traditional public function or whether the entity is otherwise engaging in "state action."

When looking closely at the specific obligations of ICADIS listed above, it appears that most, if not all, of the obligations will require two steps: (1) the enactment of regulatory constraints or criminal laws, and (2) the enforcement and policing of those laws or regulations.   The enactment of those laws or regulations cannot be delegated, but the enforcement can conceivably be delegated.   It is that delegation which must be analyzed.

The delegation of ICADIS obligation enforcement will, in a general sense, involve essentially what is already being done by USADA: namely, the testing of athletes, the search for support personnel and others supplying prohibited substances and methods to athletes, and the adjudication of athletes and others in potential violation of the rules.   So, the question now becomes, will these tasks, if done by a private entity such as USADA, constitute a traditional government function or state action?

The test for a traditional government function, though not entirely settled in case law, can be generally described as a search for actions that are traditionally and exclusively performed by the government.[31]   As of today, the testing of athletes and the search for the suppliers of prohibited substances has not been exclusively a governmental function.   The NFL, USADA, and the NCAA have been doing this for some time.   Similarly, these organizations have adjudicated, through alternative dispute settlement processes, violations of rules against doping.   However, these private testing and adjudication processes have never involved the implementation of government regulations or statutes.

While the details of these regulations or statutes could significantly affect the traditional government function analysis, it is sufficient at this point to say that traditionally only the government enforces its regulations and statutes.   It

---

30.  Lugar v. Edmonson Oil Co, 457 U.S. 922, 953 (1981); Jackson v. Metro. Edison Co., 419 U.S. 345, 349 (1974).

31.  *Jackson*, 419 U.S. at 352.

is possible that the delegation of ICADIS obligations could constitute the performance of traditional government functions and trigger constitutional constraints.

If the delegation of ICADIS obligations does not constitute the performance of traditional government functions, it may yet create sufficient government action to trigger constitutional constraints. "State action" cases and tests are widely divergent. But, for this analysis, the "joint activity" test from *National Collegiate Athletic Ass'n v. Tarkanian* is appropriate.[32] Under that test, courts look for whether the government has created the legal framework governing conduct, whether the government delegates authority to police that conduct, and whether the government accepts the benefit of an otherwise private entity's action pursuant to the delegation.[33] Here, the U.S. Government creates the legal framework by either enacting regulations or statutes, or by otherwise requiring compliance with the World Anti-Doping Code. Further, the U.S. Government delegates the responsibility for applying the legal framework pursuant to Article 7 of ICADIS and funds performance of that responsibility pursuant to Article 11 of ICADIS. Then, finally, the U.S. Government accepts the benefit of the private action when it reports compliance with the Convention to the ICADIS parties under Article 31.[34] Therefore, reasonably strong arguments exist that ICADIS will create state action and trigger constitutional constraints. The next question is the extent of those constraints.

### B.   Protected Interests

In the doping control process, an athlete's potential constitutional protections would fall into three general areas: protection against unreasonable searches and seizures, protection against self-incrimination, and due process protections. An athlete's standing (right) to enjoy these protections will not be absolute or certain in all settings. Threshold requirements, such as the implication of recognized and protected interests or express or implied waivers of such protections, could diminish or eliminate the protections.

---

32. Nat'l Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179 (1988); *see also* Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288 (2001).

33. *Tarkanian*, 488 U.S. at 192.

34. ICADIS, *supra* note 2, art. 31.

*Article 31 – National reports to the Conference of Parties*

States Parties shall forward every two years to the Conference of Parties through the Secretariat, in one of the official languages of UNESCO, all relevant information concerning measures taken by them for the purpose of complying with the provisions of this Convention.

Due process protections are triggered when the state action threatens an athlete's life, liberty, or property.[35]  In the doping control process, the threats to an athlete's life, liberty, or property are potentially manifested as damage to his or her right to earn a living, damage to his or her reputation, or denial of any right to participate in athletics.   Should the punishment of a doping offense include the possibility of incarceration, then the athlete's liberty interest is at stake.  The existence or strength of any of these three protected interests seems to vary widely depending on the level of a particular athlete: high school, college, Olympic, or professional.

However, regardless of the level of the athlete, a protected property interest can exist when the athlete is currently earning his or her living as an athlete (this would likely include coaches and support personnel).[36] Therefore, professional athletes and Olympic Movement athletes, who earn their living from athletics, could receive due process protections. Interestingly, scholarship college athletes may also enjoy similar rights.[37] Similarly, any athlete may have a protected liberty interest in his or her reputation if they can show damage to their reputation in a way that damages a property interest, such as their livelihood.[38]   Such damage could befall all level of athletes in certain circumstances.

For high school athletes, establishing a protected property or liberty interest has been rather difficult.   Court decisions on the question have generally found that there is no constitutionally protected right to participate in high school athletics.[39]  However, when participation is tied to a reasonably certain future benefit, such as a college scholarship, or it is part of a remedial or rehabilitative need, then participation in high school athletics becomes a protected activity.[40]   Thus, in some situations, discipline of high school athletes for doping violations will be subject to due process requirements.

Fourth Amendment concerns may also be raised by ICADIS.[41]   Courts

---

35. *See* American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40 (1999); Bd. of Regents of State Colls. v. Ruth, 408 U.S. 564 (1972).

36. *See* NCAA v. Yeo, 171 S.W.3d 863, 868 (Tex. 2005).  The Court in *Yeo* stated that an interest in future financial opportunities, that are not speculative, creates a protected property interest.

37. If a doping suspension would result in a loss of a scholarship, a reasonable argument could be made that a future financial opportunity is at stake.  One hurdle in such an argument would be the NCAA rule that limits an athletic scholarship to renewable one-year awards, which can be renewed each year.  The argument would have to show that it was the University's practice to renew scholarships regularly, which is common.

38. *See* Goss v. Lopez, 419 U.S. 565, 575 (1975); *Yeo*, 171 S.W.3d at 868.

39. *See* Haas v. South Bend Cmty. Sch. Corp., 289 N.E.2d 495, 521 (Ind. 1972); Ind. High Sch. Athletic Ass'n, Inc. v. Avant, 650 N.E.2d 1164, 1167 (Ind. Ct. App. 1995).

40. *See* Tiffany v. Ariz. Interscholastic Ass'n, Inc., 726 P.2d 231, 235 (Ariz. Ct. App. 1986).

41. U.S. CONST. amend. IV.  The Fourth Amendment states,

have held that state-compelled collection and testing of urine are deemed searches under the Fourth Amendment, because they intrude upon expectations of privacy, and the test to be applied to the collection is one of reasonableness.[42]   While U.S. courts have not looked at the Fourth Amendment protections of professional, college, or Olympic Movement athletes, the courts have looked at the protections belonging to high school athletes when tested by high school authorities.   To determine the reasonableness of a school's drug-testing program, it appears that the courts balance three factors: (1) the students' privacy interests, (2) the nature of the intrusion created by the search, and (3) the purpose to be achieved by the search.[43]

Courts have determined that middle and high school athletes have a limited expectation of privacy.[44]   Specifically, those who are involved in school athletics should expect some intrusion upon their privacy rights, just like adults who "participate in a closely regulated industry."[45]   In addition, the court looked at the manner of collection and the information that it discloses as part of the privacy analysis.[46]   An important factor in the analysis is that the tests are only disclosed to those who need to know and not disclosed to law enforcement personnel.[47]   The court found that deterring substance abuse by students was a compelling governmental concern.[48]

Under ICADIS, government-mandated drug testing would face problems of how the drug-testing programs are carried out and what sanctions are possible.   If the sample collection is so invasive and degrading as to be unreasonable, privacy rights could be violated.   Also, should the sanctions possible tend toward punitive penalties, liberty rights could be violated.   However, to counter these possibilities, the government could make a persuasive argument that doping control is a compelling governmental interest.   There is a problem with substance abuse among teenagers.   One factor that the Court looked at in *Vernonia School District* was student abuse

---

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath and affirmation, and particularly describing the place to be searched, and the person or things to be seized.

*Id.*

42.  Skinner v. Ry. Labor Executives Ass'n, 489 U.S. 602, 612-13 (1989).
43.  Vernonia Sch. Dist. v. Acton, 515 U.S. 646, 664-65 (1995).
44.  Bd. of Educ. of Indep. Sch. Dist. v. Earls, 536 U.S. 822, 832 (2002); *Id.* at 657.
45.  *Vernonia*, 515 U.S. at 657.
46.  *Id.* at 658-60.
47.  *Id.* at 658.
48.  *Id.* at 661.

of drugs and alcohol.[49]   The Court concluded that student-athletes served as role models in the schools and that the use of drugs by the student-athletes contributed to the problem of drug abuse among the student body.[50]   For drug testing beyond high school athletes, the government could argue that athletes act as role models for younger children and their use of drugs could influence these children to take performance enhancing drugs.   It is possible that the government could present evidence supporting its argument that doping control is a compelling governmental interest.

If the sanctions are criminal in nature, the analysis changes.   It is likely that drug testing, which added criminal sanctions, would implicate Fourth Amendment concerns and lead to a heightened standard, especially if the drug testing was suspicionless (random).   Random drug testing is a concern, because if criminal penalties are imposed, probable cause is needed for drug testing.   As stated above, drug-testing programs are searches under the Fourth Amendment, so it is highly unlikely that the government could get blanket consent to random drug testing if criminal sanctions are possible.   The Court in *Vernonia* explicitly stated that a warrant based on probable cause was not required in that case, because the search was not undertaken for the purpose of discovering a crime.[51]   If the government were to impose criminal sanctions, the drug testing programs would be attempting to discover evidence of a crime, and as such, a warrant based on probable cause would be needed in order for the search not to be an "unreasonable search and seizure" under the Fourth Amendment.   It is likely that this would be the case even in "closely regulated industries."

## VII. WHO DOES ICADIS COVER?

Another big question raised by ICADIS is who will it apply to: Olympic Movement athletes?   High school athletes?   College athletes?   Professional athletes?   The text of the Convention is not clear on this point.   The U.S. Senate, by including a declaration to ICADIS, attempts to limit the definition of an "athlete" for purposes of doping control to any athlete "determined by USADA to be subject to or to have accepted the World Anti-Doping Code."[52] By so defining an athlete, the Senate is attempting to particularly exclude from ICADIS's coverage U.S. professional athletes, and incidentally, but perhaps not intentionally, college and high school athletes.   This is a political necessity

---

49.   *Id.* at 662-63.

50.   *Id.* at 663.

51.   *Id.* at 653.

52.   154 Cong. Rec. S6980 (July 21, 2008).

for acceptance of the Convention by the United States. The U.S. Professional League sports, both the unions and the owners, do not want to be governed by the terms of the World Anti-Doping Code, nor turn over testing to an entity entirely outside of their control. Therefore, the Senate has attempted to define the athletes subject to testing and ICADIS as only those within the Olympic Movement. While the Senate's attachment of this declaration may limit the reach of ICADIS within the United States for now, the Senate's action may not be a true reading of the intent of the Convention's drafters, and more importantly, the international understanding of the Convention. The very fact that the Senate had to limit ICADIS's reach by such a declaration is telling of what actually is the contrary and international intent.

A search for an understanding of the reach of ICADIS, outside the United States, begins by looking at the text of ICADIS. ICADIS speaks in broad terms and does not, anywhere in its text, limit those broad terms. Article 1 states that the Convention's purpose is the "prevention of . . . doping in sport."[53] "Sport" is not defined or limited. Later, in Article 8, the Convention calls for state parties to restrict prohibited substances used by "athletes."[54] "Athletes" is defined as "any person who participates in sport at the international or national level as defined by each national anti-doping organization and accepted by States parties and any additional person who participates in a sport or event at a lower level accepted by states parties."[55] Finally, Article 12 asks "sports organizations" to implement doping controls consistent with the "Code" (World Anti-Doping Code).[56]  A "sports organization" is defined as "any organization that serves as the ruling body for one or several sports."

The purpose of ICADIS and its definitions of whom it covers is broadly

---

53. ICADIS, *supra* note 2, at art. 1.

54. *Id.* art. 8.

55. *Id.* art. 2(4). Further, the definition of "Athletes" is inclusive, not restrictive. The group of persons included, defined as "athletes," first falls into two categories:  (1) those qualifying as international or national level according to the state party's NADO and accepted by states parties, and (2) any additional person who participates in a sport at a lower level and accepted by states parties. To fall into the first group, a person must fit into the NADO's definition of an international or national level athlete. However, the NADO's definition is modified by that which is "accepted by states parties." Therefore, any country's NADO definition must be accepted by the "states parties" to the Convention. This is possibly the collective definition of all the signatories to ICADIS.

The second group of persons are those not within the definition of international or national level athletes (potentially all the rest) as modified by being "accepted by states parties." Again, this is a definition that must be accepted by "states parties," or in other words, all of the parties to ICADIS. Finally, it is clear that the definition of an athlete is a fluid, not a static, definition. The definition will be subject to changes made by NADO and the "states parties" to ICADIS.

56. *Id.* art. 12.

inclusive with few apparent limitations.  Limiting the coverage of ICADIS to only Olympic Movement athletes and not professional or high school athletes cannot be supported by the text of ICADIS alone, particularly after applying canons of interpretations.  The burden would be on those arguing that it does not cover them.[57]   The rule of *ejusdem generis*, a cannon of statutory construction, requires that when a general term of description is followed by more specific terms of description, the specific terms restrict the general term and guide interpretation.  In ICADIS, the general terms of athlete and sports

---

57.  Testimony of Scott M. Burns, Deputy Director, Office of National Drug Control Policy, *Hearing on the International Convention Against Doping in Sport Before S. Comm. on Foreign Relations* (May 22, 2008).  In written testimony before the Senate Foreign Relations Committee, Scott Burns, Deputy Director of the Office of National Drug Control Policy opined that ICADIS would not apply to U.S. professional athletes.  Deputy Director Burns rested his opinion on a reading of the definition of an athlete from Article 2(4) and the definition of a "sports organization" from Article 2(20).

Deputy Director Burns reads the Article 2(4) definition of an athlete to include only international or national level athletes as defined by the relevant NADO.  This reading of Article 2(4) neglects to include the modifying language "as accepted by states parties" and the additional language in Article 2(4) that expands the definition to include non-international or national level athletes.

Deputy Director Burns's reading of the definition of a sports organization in Article 2(20) relies upon the assumption that the term "ruling body" is a term of art with a restricted meaning that does not include entities such as the NBA, MLB, or even MCS.  While it is true that the term ruling body might be considered a term of art, it is also quite possible that it is not a term of art with the definition assigned to it by Deputy Director Burns.  The term of art, to which Deputy Director Burns is likely referring, is used in the Amateur Sports Act is "national governing body."  *See* Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220521 (2008).  "National governing bodies" within the scheme of the Amateur Sports Act, are the domestic arm (agent) of the International Federation (IF) for the sport.  *Id.* §220523(a)(1).  IFs must be recognized by the IOC to have international legitimacy.  If the term "governing body," which by itself is a broad term that could include all sports organizations such as the NCAA and state high school athletic associations, is the equal of national governing body, Deputy Director Burns could be correct.  However, outside the U.S., the term used in the place of national governing body is "national federation."  *See* International Olympic Committee, *Olympic Charter*, Rule 29(2), July 7, 2007, *available at* http://multimedia.olympic.org/pdf/en_report_122.pdf.  Because the term "governing body" is found in an international instrument, it could not have the definition applied to it within the United States.

Overall, Deputy Director Burns's interpretation of the term athlete and sports organization could be too parochial and wishful.  A reading of ICADIS that excludes U.S. professional athletes will make ratification much easier than the alternative.

Additionally, in a Congressional Research Service Report for Congress on ICADIS, Liana Sun Wyler, an Analyst in International Crime and Narcotics, Foreign Affairs, Defense, and Trade Division, implies that Article 20 of ICADIS supports the conclusion that ICADIS does not apply to U.S. professional athletes until they compete in Olympic Movement Sancted Competition.  Liana Sun Wyler, CRS Report RS22887, International Convention Against Doping in Sport: Issues for Congress (May 28, 2008).  Article 20 calls upon states parties to encourage "relevant competent professional associations and institutions to develop and implement appropriate codes of conduct, good practice and ethics related to anti-doping."  *Id.*  Ms. Wyler seems to read "relevant competent professional associations and institutions" to be, in her words, "professional sports associations and institutions." *Id.*  The text of Article 20 does not include the word "sport" as suggested by Ms. Wyler.

organization are not followed by restricting specific terms or otherwise limited. Therefore, a general and inclusive reading of terms is consistent with the requirement of using the plain meaning of the words. When interpreting any document, it is presumed that a general term is inclusive and that any exceptions must be specifically stated in the text.[58]  Additionally, the "mischief rule" and principle of maximum effect mitigate against limiting the reach of ICADIS. The "mischief rule" requires that a provision be interpreted in light of preventing the mischief that it was intended to prevent.[59]  The principle of maximum effect requires that the fullest possible effect be given to the obligation assumed.[60]  Limiting the reach of ICADIS to only one group of athletes, or rather, excluding groups of athletes from the fight against doping, would incompletely prevent the mischief of doping in sport and would give only limited effect to the obligation to stem doping in sport. If the parties had intended to exclude non-Olympic Movement athletes and professional athletes, it could have clearly and explicitly stated so in the text of the Convention.

Beyond the text of a treaty, interpretation also looks to the practice of co-signatories. Outside the United States, with only a few possible exceptions, all athletes, professionals and amateurs alike, are treated the same for doping control.  In Europe, professional football players, cyclists, and basketball players are governed by the WADC, just as Olympic-bound athletes are. Therefore, there is reason to believe that not only the will majority of the world interpret ICADIS to govern all athletes, excusing none, but that the rest of the world will consider the United States in breach of its obligations under ICADIS should it excuse professionals. While the rest of the world may see the exclusion of U.S. professional athletes as the price to pay to get the United States on board ICADIS, the life of that compromise has to be considered limited.

Finally, when interpreting a statute in the United States, the interpretation given to a statute by an administrative agency charged with its implementation is given great weight.  WADA will play a large role in implementing the provisions of ICADIS.  WADA's Presidents have for a long time believed that the WADC should govern United States professional athletes.

Therefore, it is fair to say that ICADIS could be interpreted to cover all athletes in the United States, without exception.  At the least, it will be the

---

58. *See* 73 AM. JUR. 2d §§ 135-36.

59. The mischief rule was perhaps first used in Heydon's Case, 76 Eng. Rep. 637 (Exch. 1584). *See* BLACK'S LAW DICTIONARY (8th ed. 2004).

60. *See* G.G. Fitzmaurice, *The Law and Procedure of the International Court of Justice: Treaty Interpretation and Certain other Treaty Points*, 28 BRIT. Y.B. INT'L L. 1, 8 (1951).

burden of those seeking excuse from ICADIS coverage to make a case for such exclusion at the outset and probably throughout the foreseeable future as the rest of the world will pressure the United States to treat all athletes the same.

## VIII. CURRENT UNITED STATES COMPLIANCE

In written testimony submitted to the U.S. Senate Foreign Relations Committee, the Deputy Director of the Office of National Drug Control Policy asserted that the United States is already in compliance with all of the obligations in the Convention.[61]  But if the United States is not in compliance, also according to the Deputy Director, the Convention does not include any formal sanctions that may be taken against the United States for noncompliance.[62]  This conclusion, of course, rests first upon an interpretation of the nature and scope of the obligations contained in the Convention, which is rather limited.  Such an interpretation may not be wholly accurate, as is discussed earlier in this document, and that interpretation may not be accepted by other state parties or the IOC and WADA.  Even if the Convention does not contain formal sanctions for noncompliance, the Olympic Movement and other state parties could bring substantial pressure on the United States to comply with its interpretation of the Convention's obligations.  Therefore, current United States compliance should be evaluated against a broader interpretation of the Convention, for the very least, to anticipate ways in which the United States might easily, before problems develop, satisfy the obligations of the Convention.

One example of a problematic area of compliance for the United States, that may not yet be regulated, could be the obligation to restrict prohibited methods to athletes.[63]  According to the WADA Prohibited List, attached to the Convention as an Annex, among prohibited methods are "(a) Blood doping, including the use of autologous, homologous or heterologous blood or red blood cell products of any origin, other than for medical treatment. (b) Artificially enhancing the uptake, transport or delivery of oxygen, including but not limited to." This language has been interpreted by WADA to prohibit blood doping.[64]  At its simplest, blood doping involves taking one's own blood, reducing that whole blood to the oxygen carrying red blood cells, storing those red blood cells, and then injecting the red blood cells back into

---

61. *See* Testimony of Scott M. Burns, Deputy Director, Office of National Drug Control Policy, *supra* note 57, at 5.

62. *Id.*

63. *See supra* Part V.

64. *See* Hamilton v. USADA & UCI, CAS 2005/A/884 (2006).

the body before an important competition. The result is enhanced transport of oxygen to working muscle.[65] While the manufacture of some of the equipment used in blood doping is regulated by the Federal Drug Administration,[66] the sale of the equipment appears not to be regulated.[67]

Therefore, the United States may not restrict the means of performing a prohibited method to the general public and in turn to athletes. Nor does the United States prohibit the performance of the prohibited method of blood doping by the public or by athletes. Thus, under any interpretation of ICADIS beyond that which allows the United States to rely on what USADA is already doing, the United States is not complying with the most basic of the ICADIS objectives and obligations.

## IX. Waiving Constitutional Rights

If ICADIS's adoption and implementation by the United States does lead to doping control agencies like USADA or even the NCAA being declared state actors or to be engaging in state action, then important follow-up questions arise. First, will applying Constitutional standards to the current doping control process force significant changes? Second, could the necessary changes in the current doping control process significantly affect the efficacy of the doping control process? Third, can these agencies modify their doping control procedures to comply with Constitutional standards while maintaining their efficacy? Fourth, are there yet ways for these agencies to avoid application of Constitutional standards?

The best outcome here, the proverbial "win-win" situation, would be that athletes receive full constitutional protections and doping control agencies adapt to constitutional protection in ways that maintain their efficacy. Regardless of whether ICADIS forces doping control agencies to comply with full Constitutional standards or not, one would hope that, as part of their mission to serve and protect athletes, these agencies would always strive to comply with Constitutional standards. Efforts to protect Constitutional rights and at the same time to effectively police doping should never end. Nevertheless, international pressures and difficulties may persuade or in some manner force these agencies, particularly USADA, to look for alternatives to

---

65. Dan Kois, *What is Blood Doping? And How Does it Work?*, Slate Magazine, Sept. 23, 2004, *available at* http://www.slate.com/id/2107096/.

66. *See* Blood Bank Supplies 21 C.F.R. § 864.9050-9875 (2008), Authority 21 U.S.C. § 351, 360, 360(c), 360(e), 360(i), & 371.

67. A survey of those that sell and purchase equipment, such as automated blood cell separators and standard centrifuges, revealed that the sale of sophisticated, expensive equipment may be indirectly regulated, but that low-end equipment, like table-top centrifuges, are not.

modifying their procedures to comply with Constitutional standards. If so, one way to avoid complying with Constitutional standards could be through requiring all athletes to waive their Constitutional rights as a condition of participation. Therefore, putting off for now the ethics of compelling a waiver of Constitutional rights, the question becomes can, and if so, how can a waiver be implemented?

There appears to be a two-step test for determining whether a waiver of Constitutional rights will be enforced. In *Newton v. Rumery*, the Supreme Court employed an analysis which first asked whether the interest or benefit of enforcing the waiver outweighed the harm that would be done to the public policy underlying the Constitutional right, such that public policy was not being undermined.[68] This might be called the "is this good public policy" test. Then, should the waiver not appreciably undermine public policy, the second step is to determine if the waiver was voluntary.[69]

### A.    Could Doping Control Waivers Undermine Constitutional Principles?

The "is this good public policy test" begins with examining the benefits of an athlete waiving his or her Constitutional rights. In *Newton v. Rumery*, the Supreme Court looked at the benefit of the agreement from both the perspective of the person waiving the rights and the perspective of the legal system.[70] Here, the benefit of agreeing to waive Constitutional rights to the athlete is arguably the opportunity to compete what the agreement brings. However, counting this as a benefit brought by agreeing to relinquish Constitutional rights is illusory. The athlete has little choice. There is no bargaining between the athlete and the sports governing body that can result in anything other than the complete waiver of Constitutional rights by the athlete. The athlete will not be allowed to receive a lesser right to competition in exchange for retaining some Constitutional rights. Also, this is a precondition created and imposed by the sports governing body. It is not a condition inherent in participating in a sport, nor a condition inherently necessary to participate in a sport. This aspect of the waiver is really a matter of voluntariness, which is addressed in the second step of the *Newton* test.

The benefits to the doping control system operated by sports governing bodies would likely fall into two categories: (1) quicker and easier sample collection, and (2) a quicker, stream-lined adjudication process. Without rigorous Fourth and Fifth Amendment protection and requirements,

---

68. Newton v. Rumery, 480 U.S. 386, 392 (1986).

69. *Id.* at 397-398.

70. *Id.* at 393-395.

whereabouts information for out-of-competition testing can be more easily collected and used. Doping Control Officers will not have to concern themselves with when, how, and where they collect samples. Athletes' privacy concerns can be dismissed during the collection process. Any notion of reasonable or probable cause to ask for a sample will be unnecessary.

The doping adjudication process will not be slowed down by procedural steps and protections found in court proceedings. Traditional due process requirements such as discovery, the right to counsel during all phases of the process, rules of evidence, the right not to testify, and the right to a jury will not be required. Doing without these rights will speed the process.

After assessing the benefits of the waiver, those benefits must be weighed against the potential harm caused by the waiver to the public policy underlying the implicated Constitutional rights. An assessment of the potential harm of such a waiver should begin, not with an analysis of the potential harm to athletes under these facts, but with an analysis of whether conditioning participation in any legal and socially valuable activity, like sports, on a waiver of Constitutional rights is good precedent. Would allowing this waiver lay the foundation for conditioning participation in activities such as buying a house in a select subdivision, joining a social club, going to a movie, or being hired for a job on waiving Constitutional rights? When, as here, there is a sever imbalance in bargaining power and no alternatives, establishing such a precedent should be carefully considered.

As for the harm of a waiver to public policy in the particular case of athletes being drug tested, the focus should and will likely be privacy and due process public policy concerns. Therefore, the questions become, will the privacy rights of athletes be eroded in a way that cannot tolerate; and will the doping adjudication process so fundamentally lack due process that it produces unreliable and unfair results. Considering the conclusion of the Supreme Court in *Vernonia School Dist. 47J v. Acton*, that athletes consent to a lesser expectation of privacy,[71] the privacy abuses committed during doping sample collection would indeed have to be shocking before courts would find the public policy of privacy protection undercut. This is not to say that 2:00 a.m. visits from a DCO or a requirement of stripping from knee to chest, in front of a DCO, when giving a sample, may not be deemed violative of the public policy underlying privacy protects. But, considering the current outrage against doping in sport, athletes are not sympathetic figures.

An assessment of the threat to the principle of due process created by athletes waiving their due process rights will depend on two measures: a

---

71. Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 657 (1995).

measure of whether the current doping adjudication process is basically fair and reliable, and a measure of athletes' privileged status. When assessing the doping adjudication system, the courts will be influenced by the general belief that it is a privilege to compete and that those who compete are privileged. Therefore, the value that we place upon due process in making important decisions will not be offended if the results are basically reliable, because these are only the privileged having their privileges taken away. As cynical as that evaluation is, it unfortunately reflects general public opinion created by cases such as Roger Clemens and Marion Jones.

Therefore, the likely conclusion to the first prong of the *Newton v. Rumery* waiver analysis is that the benefit will outweigh the harm. This conclusion will largely be a factor of the current view of athletes, particularly professional and college athletes, as privileged. The strongest countervailing consideration will be the dangerous precedent that such a blanket waiver of Constitutional protections could create. If athletes are seen as a bell weather for other groups, the waivers may be found *per se* unenforceable.

### B.   Would an Athlete's Waiver of Constitutional Rights be Considered Voluntary?

Assuming that requiring an athlete to waive Constitutional rights as a precondition to competing undermine Constitutional principles, does not the next question become, will such a waiver be considered voluntary? Finding the answer to this question will require first determining the legal nature of the doping process and doping adjudication proceeding. Is the doping process criminal, quasi-criminal, or civil in nature?

The rigor of the test for voluntarily waiving a Constitutional right can, at times, depend on first whether a fundamental right is involved and, second, whether the nature of the proceeding is criminal, quasi-criminal, or civil in nature. While the first part of this standard, the involvement of a fundamental right, may beg the second part of the standard, it seems fair for the sake of analysis and the rigor of the analysis, to assume that the doping process implicates the fundamental rights of the right to be present at trial, the right to counsel, and the right against compulsory self-incrimination. Therefore, the focus of the voluntariness analysis becomes whether the proceeding is criminal, quasi-criminal, or civil in nature. The nature of the proceeding is important because a subjective standard must be used to judge voluntariness in criminal and quasi-criminal proceedings and an objective standard can be used in civil proceedings: the subjective standard being the more demanding test. However, the subjective standard can apply to civil proceedings at times.

The United States Supreme Court has stated that the courts "do not

presume acquiescence in the loss of fundamental rights,"[72] "indulge every reasonable presumption against waiver,"[73] and therefore require that a "contractual waiver of due process rights [be] voluntarily, intelligently, and knowingly made."[74]  In applying these principles and requirements, the Court looked at whether there was equal bargaining power between the parties (which involves determining if the agreement was a contract of adhesion),[75] whether the party waiving rights was actually aware or made aware of the significance of the waiver,[76] and whether the waiver was clear.[77]

On the other hand, the objective standard requires only an objective manifestation of assent to a waiver.[78]  Signing a contract will usually suffice. There is no need to show that the athlete read or understood the waiver. However, the waiver can be avoided if it is shown to be unconscionable, which often involves showing a combination of sharp practice, a lack of understanding, and unequal bargaining power.[79]

### 1.   The Legal Nature of Doping Proceedings

While doping has been criminalized by some other parties to ICADIS,[80] it is not yet a criminal offense in the United States.  But, doping may be quasi-criminal, thereby triggering the more rigorous subjective standard.  Some CAS panels have declared doping allegations to be quasi-criminal, while other panels have come to the conclusion that doping is only a breach of contract matter falling within the category of a law of associations.[81]  USADA has vigorously argued that doping is not quasi-criminal, because it knows that the quasi-criminal label would bring with it greater procedural protections for athletes, thus increasing its burden.  Interestingly, the World Anti-Doping

---

72. Fuentes v. Shevin, 407 U.S. 67, 94 n.31 (1972) (quoting Ohio Bell Tel. Co. v. Public Utilities Comm'n, 301 U.S. 292, 307 (1937)).

73. *Id.* (quoting Aetna Ins. Co. v. Kennedy, 301 U.S. 389, 393 (1937)).

74. *Id.* at 94-95.

75. Overmyer v. Frick, 405 U.S. 174, 186 (1972).

76. *Fuentes*, 407 U.S. at 95.

77. *Id.*

78. Stephen J. Ware, *Employment Arbitration and Voluntary Consent*, 25 Hofstra L. Rev. 83, 113 (1996).

79. E. Allen Farnsworth, Contracts § 4.28 (3d ed. 1999).

80. Doping is now a criminal offense in Greece, France, and Italy, for example.

81. CAS and AAA/CAS decisions finding doping matters to be quasi-criminal include *Demetis v. FINA*, CAS 2002/A/432 and *USADA v. Vencill*, AAA-CAS 30 190 00291 03 (July 24, 2003).  CAS and AAA/CAS decisions finding doping matters to be non-criminal in nature include *N., J., Y., W. v. FINA*, CAS 98/208 (Dec. 22, 1998), *Blackwelder v. USADA*, AAA-CAS 30 190 00012 02 (May 17, 2002).

Code requires proof in a doping case of proof to a comfortable satisfaction, the burden the Code reports used in professional disciplinary proceedings.[82]   The Code also points out that the comfortable satisfaction burden is higher than the burden of a balance of probabilities, the burden used in breach of contract claims of a civil nature.[83]   But CAS rulings and the WADC may not have force in determining whether a doping claim is quasi-criminal in the United States.  U.S. doctrine will need to be examined.

The United States Supreme Court has found attorney discipline and disbarment proceedings to be "quasi-criminal."[84]   Being quasi-criminal, attorney discipline proceedings must afford the accused protections similar to those afforded criminal defendants.[85]   Attorney discipline proceedings are quasi-criminal, largely because the process is designed to protect the public and the nature of the potential penalty: which are aspects similar to the fully criminal proceedings.[86]   Therefore, it seems reasonable to evaluate whether athlete disciplinary proceedings for doping offenses are quasi-criminal by comparing them with attorney discipline proceedings.   The comparison between attorney and athlete discipline can be done by looking at three aspects of both processes: the purpose or objective of the process, the nature of the conduct being disciplined, and the penalties and effects of the proceedings.

### (a)   *The purpose or objective of the process.*

Attorney discipline proceedings are intended to protect the public, protect the integrity of the judicial system, deter other attorneys, punish, and rehabilitate offending attorneys.  Because the work attorneys do put them in sensitive positions of trust and literally involves matters of life and death, breaches of trust can have severe consequences to their clients and in turn the public and judicial system.  Attorney discipline is designed to ferret out these breaches of trust, to punish them, maybe fix them, deter them in the future, and in some cases teach the attorney a lesson, rehabilitate him.   These objectives necessitate a public process, at least the final results, publicized to the bar and general public.

The objectives of the athlete doping discipline process are similar in many ways, save possibly the severity of the harm being deferred and the group being protected.  Athlete doping discipline is intended to protect the public.  It

---

82.  World Anti-Doping Code § 3.1, 3.1 Comment (2003 Version).

83.  *Id.*

84.  In re Ruffalo, 390 U.S. 544, 550-51 (1968).

85.  *Id.*

86.  *Id.*

protects fans from fraudulent performances and "fixed" outcomes. It protects children and others from being influenced by their idols to take substances dangerous to their health. It protects athletes from harming their own health. It is often said that athletes have a special status in society, a public trust so to speak, that places upon athletes a duty of good public behavior. But, perhaps unlike attorney discipline, athlete doping discipline is intended to also protect other athletes from being cheated out of a win.

Athlete doping discipline, like attorney discipline, is designed to ferret out rule breaches, punish the breaches, and deter them in the future. Like attorney discipline, athlete doping discipline results are made public to deter others. Athletes are punished, like attorneys, when they are suspended or banned from pursuing their chosen livelihood for two years, four years in particularly egregious situations, for first-time rule violations, and for life in second offenses.

Therefore, the purpose of attorney discipline and athlete doping discipline are similar enough to conclude that, pending a comparison of the other two aspects of attorney discipline, athlete doping discipline is quasi-criminal in nature. However, there is a difference in the gravity of harm being deterred and punished. The harm caused by an attorney's ethical violations, a client's loss of his liberty or property, appears more serious than the harm caused by an athlete's ethical violation. When an athlete commits an ethical violation, the most serious harm caused is that a competitor is cheated and that a child tries steroids. But these differences may only be differences of degree and not differences in kind. Both are serious kinds of harm.

### (b) *Nature of Conduct Disciplined.*

The American Bar Association's Model Code of Professional Responsibility is the foundation for most, if not all, State Bar disciplinary rules. The Model Code, in its Preamble and Preliminary Statement, explains that the Canons, Ethical Considerations, and Disciplinary Rules of the Model Code define a lawyer's relationship with the legal system and standard of professional conduct within that system. A lawyer is subject to disciplinary action when conduct falls below the minimum standards found in the Disciplinary Rules. Disciplinary Rule 1-102 forbids dishonesty, fraud, deceit, misrepresentation, and conduct of moral turpitude.[87]

---

87. DR 1-02 reads:
    (A) A lawyer shall not:
        (1) Violate a Disciplinary Rule.
        (2) Circumvent a Disciplinary Rule through actions of another.

The World Anti-Doping Code, in a section titled Fundamental Rational for the World Anti-Doping Code, declares that one purpose of the Code is to preserve the value and spirit of sport, which naturally includes the value of "ethics, fair play and honesty." Doping is contrary to the spirit of sport.[88]

Both the attorney discipline system and the athlete doping discipline system proscribe and police breaches of ethical conduct. Both systems are protecting the integrity of their respective professions and systems. Both systems punish acts of dishonesty, deceit, and moral turpitude. Therefore, the nature of the conduct regulated by athlete doping discipline is similar enough to the conduct regulated by attorney discipline to conclude that athlete doping discipline is a quasi-criminal proceeding.

### (c)   *Penalties and Effects of Proceedings.*

When an attorney is disciplined, he or she can be reprimanded, suspended from practice for a period of time, or disbarred. The primary effect on the attorney is that he or she can no longer pursue their chosen livelihood and that their professional and personal reputation has been severely damaged.

When an athlete is disciplined for doping, he or she can be reprimanded, suspended from competition for a period of time, or banned for life.[89] The primary effect on the athlete is that he or she can no longer pursue their chosen livelihood and that their professional and personal reputation has been severely damaged.

Therefore, the punishment of both attorneys and athletes and the effect upon both attorneys and athletes are similar enough to conclude that athlete doping discipline is a quasi-criminal process. The primary argument against the conclusion that the punishments and effects are similar is that participation in athletics is a privilege. The short answer to that argument is that admission to the bar is a privilege that once achieved cannot be taken away but by proper procedure. Admission to competition, membership in a sports federation, is a privilege hat once achieved cannot be taken away but by proper procedure.

The nature of athletic doping discipline is quasi-criminal. The purpose of the discipline, the conduct being disciplined, and the results of the discipline

---

(3) Engage in illegal conduct involving moral turpitude.

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

(5) Engage in conduct that is prejudicial to the administration of justice.

(6) Engage in any other conduct that adversely reflects on his fitness to practice law.

ABA Model Code of Professional Responsibility (1983).

88. World Anti-Doping Code 2003.

89. *Id.* art. 10.

process are quasi-criminal in nature. Therefore, any waiver of the Constitutional rights implicated during the process, from start of the process to its conclusion, must meet the more rigorous subjective standard for voluntariness.

## 2. Application of the Subjective Standard

The subjective standard looks at the waiver of Constitutional rights from the athlete's perspective. The U.S. Supreme Court requires that the waiver be voluntarily, intelligently, and knowingly made.[90] In *Fuentes v. Shevin*, the Supreme Court specifically looked at whether the waiver was the result of negotiations between parties of equal bargaining power or rather the result of unequal power, whether the person signing the waiver was actually aware or made aware of the significance of the waiver of Constitutional rights, and whether the waiver was clear.[91]

Any waiver of Constitutional rights by an athlete as a condition of competing will likely never be the result of equal bargaining power with a sports governing body. An athlete will not be able to negotiate a middle ground with the governing body, saving some rights. There will be no alternative: it will be a take it or leave it situation. However, it will be possible, within the control of the sports governing body, to make sure that an athlete is actually and fully aware of the significance of the Constitutional rights being waived and that the actual, written waiver is clear on its face. This will probably require that the written waiver explicitly say that Constitutional rights are being waived and include a sample listing of those rights. There will likely have to also be a separate acknowledgment that the signer has read and understands the rights being waived and understands the full consequences of waiving those rights.

But the question will always remain of whether even a knowing waiver is indeed voluntary given the unequal bargaining power and adhesion nature of the waiver. The reality of the alternative to not allowing such waivers will likely lead to the judicial acceptance of these waivers. However, considering the gravity of the rights being waived and the potential for abuse of those rights by sports governing bodies, there should be high scrutiny of the sports governing bodies' operation of the athlete doping discipline procedure. The sports governing bodies should be held to a high standard of care, ensured by outside-neutral party scrutiny.

---

90. Fuentes v. Shevin, 407 U.S. 67, 94-95 (1972).
91. *Id.*

CONCLUSION

The International Convention Against Doping in Sport has received relatively little attention in the United States. This is because it is not fully understood and because it is being interpreted in a way that will limit its impact within the United States. However, a fuller understanding of the treaty, particularly its obligations, and a better understanding of how the Convention could be used as leverage by the IOC and other countries is important to both athletes and sports governing bodies. The Convention could serve as a tool for athletes, who have been relatively powerless in ensuring that their interests are fully protected by the doping control process, to guard against abuses of their rights. The Convention could serve as a tool for the sports governing bodies to beef up their programs. However, the Convention could also be the source of conflict and division. Ensuring that positive steps come out of the Adoption of the Convention depends on understanding its full affect and taking "pro-active" steps to achieve the intended objectives before the Convention is perhaps misused. Therefore, it is suggested that all sports governing bodies in the United States work to ensure that their doping control process fully protects athletes' privacy and due process interests. The result of this effort will only lead to a system and process that is not only more effective, but also trusted by athlete and non-athlete alike.