# EXHIBIT 48



# WORLD ANTI-DOPING CODE



**WORLD ANTI-DOPING AGENCY**
play true

**2 0 0 9**

# World Anti-Doping Code

The World Anti-Doping Code was first adopted in 2003 and became effective in 2004. The enclosed incorporates revisions to the World Anti-Doping Code that were approved by the World Anti-Doping Agency Foundation Board on November 17, 2007. The revised World Anti-Doping Code is effective as of January 1, 2009.

Published by:

World Anti-Doping Agency
Stock Exchange Tower
800 Place Victoria (Suite 1700)
PO Box 120
Montreal, Quebec,
Canada H4Z 1B7

URL:       www.wada-ama.org

Tel:       +1 514 904 9232
Fax:       +1 514 904 8650
E-mail:    code@wada-ama.org

# Table of Contents

PURPOSE, SCOPE AND ORGANIZATION OF
THE WORLD ANTI-DOPING PROGRAM AND THE *CODE*....................................11

      THE *CODE*.............................................................................11

      THE WORLD ANTI-DOPING PROGRAM..................................12

      *INTERNATIONAL STANDARD*S.............................................12

      MODELS OF BEST PRACTICE AND GUIDELINES .................13

FUNDAMENTAL RATIONALE FOR THE WORLD ANTI-DOPING *CODE*..............14

► PART ONE: *DOPING CONTROL*

INTRODUCTION...................................................................................................16

ARTICLE 1:   DEFINITION OF DOPING................................................................18

ARTICLE 2:   ANTI-DOPING RULE VIOLATIONS..................................................18

  2.1   PRESENCE OF A *PROHIBITED SUBSTANCE* OR ITS
       *METABOLITE*S OR *MARKER*S IN AN *ATHLETE*'S *SAMPLE*........19

  2.2   *USE* OR *ATTEMPT*ED *USE* BY AN *ATHLETE* OF A
       *PROHIBITED SUBSTANCE* OR A *PROHIBITED METHOD*..........21

  2.3   REFUSING OR FAILING WITHOUT COMPELLING
       JUSTIFICATION TO SUBMIT TO *SAMPLE* COLLECTION.............22

  2.4   VIOLATION OF APPLICABLE REQUIREMENTS
       REGARDING *ATHLETE* AVAILABILITY FOR
       *OUT-OF-COMPETITION TESTING*..................................................23

  2.5   *TAMPERING* OR *ATTEMPT*ED *TAMPERING*
       WITH ANY PART OF *DOPING CONTROL*......................................23

  2.6   *POSSESSION* OF *PROHIBITED SUBSTANCE*S
       AND *PROHIBITED METHOD*S ......................................................24

  2.7   *TRAFFICKING* OR *ATTEMPT*ED *TRAFFICKING* IN ANY
       *PROHIBITED SUBSTANCE* OR *PROHIBITED METHOD*..............25

  2.8   ADMINISTRATION OR *ATTEMPT*ED ADMINISTRATION
       TO ANY *ATHLETE IN-COMPETITION* OF ANY
       *PROHIBITED METHOD* OR *PROHIBITED SUBSTANCE*..............25

ARTICLE 3:   PROOF OF DOPING ........................................................26

3.1   BURDENS AND STANDARDS OF PROOF.............................26

3.2   METHODS OF ESTABLISHING FACTS AND PRESUMPTIONS.......26

ARTICLE 4:   THE *PROHIBITED LIST*...............................................29

4.1   PUBLICATION AND REVISION OF THE *PROHIBITED LIST*........29

4.2   *PROHIBITED SUBSTANCE*S AND *PROHIBITED METHOD*S IDENTIFIED ON THE *PROHIBITED LIST*...............30

4.3   CRITERIA FOR INCLUDING SUBSTANCES AND METHODS ON THE *PROHIBITED LIST*....................................................32

4.4   THERAPEUTIC USE ................................................34

4.5   MONITORING PROGRAM ......................................36

ARTICLE 5:   *TESTING*.....................................................................37

5.1   TEST DISTRIBUTION PLANNING .........................................37

5.2   STANDARDS FOR *TESTING*.................................................38

5.3   RETIRED *ATHLETE*S RETURNING TO *COMPETITION* .........38

ARTICLE 6:   ANALYSIS OF *SAMPLES*..............................................39

6.1   USE OF APPROVED LABORATORIES....................................39

6.2   PURPOSE OF COLLECTION AND ANALYSIS OF *SAMPLE*S .....39

6.3   RESEARCH ON *SAMPLE*S....................................................40

6.4   STANDARDS FOR *SAMPLE* ANALYSIS AND REPORTING....40

6.5   RETESTING *SAMPLE*S ........................................................40

ARTICLE 7:   RESULTS MANAGEMENT ...............................................41

7.1   INITIAL REVIEW REGARDING *ADVERSE ANALYTICAL FINDING*S. ................................................................41

7.2   NOTIFICATION AFTER INITIAL REVIEW REGARDING *ADVERSE ANALYTICAL FINDING*S ........................................41

7.3   REVIEW OF *ATYPICAL FINDING*S .........................................42

7.4   REVIEW OF OTHER ANTI-DOPING RULE VIOLATIONS NOT COVERED BY ARTICLES 7.1–7.3 ....................................44

7.5   PRINCIPLES APPLICABLE TO *PROVISIONAL SUSPENSION*S. .....45

7.6   RETIREMENT FROM SPORT .................................................47

**ARTICLE 8:    RIGHT TO A FAIR HEARING**............................................................**48**

8.1     FAIR HEARINGS.......................................................48

8.2     *EVENT* HEARINGS ................................................49

8.3     WAIVER OF HEARING.............................................49

**ARTICLE 9:    AUTOMATIC *DISQUALIFICATION* OF INDIVIDUAL RESULTS** ......**50**

**ARTICLE 10:   SANCTIONS ON INDIVIDUALS**.......................................................**51**

10.1    *DISQUALIFICATION* OF RESULTS IN *EVENT* DURING
        WHICH AN ANTI-DOPING RULE VIOLATION OCCURS .........51

10.2    *INELIGIBILITY* FOR PRESENCE, *USE* OR *ATTEMPT*ED *USE*,
        OR *POSSESSION* OF *PROHIBITED SUBSTANCE*S
        AND *PROHIBITED METHOD*S .................................................52

10.3    *INELIGIBILITY* FOR OTHER ANTI-DOPING RULE VIOLATIONS .....53

10.4    ELIMINATION OR REDUCTION OF THE PERIOD OF
        *INELIGIBILITY* FOR SPECIFIED SUBSTANCES
        UNDER SPECIFIC CIRCUMSTANCES...................................54

10.5    ELIMINATION OR REDUCTION OF PERIOD OF *INELIGIBILITY*
        BASED ON EXCEPTIONAL CIRCUMSTANCES .......................56

10.6    AGGRAVATING CIRCUMSTANCES WHICH MAY INCREASE
        THE PERIOD OF *INELIGIBILITY* .............................................65

10.7    MULTIPLE VIOLATIONS...........................................................66

10.8    *DISQUALIFICATION* OF RESULTS IN *COMPETITION*S
        SUBSEQUENT TO *SAMPLE* COLLECTION OR COMMISSION
        OF AN ANTI-DOPING RULE VIOLATION ...................................71

10.9    COMMENCEMENT OF *INELIGIBILITY* PERIOD ....................72

10.10   STATUS DURING *INELIGIBILITY*.............................................74

10.11   REINSTATEMENT *TESTING*....................................................76

10.12   IMPOSITION OF FINANCIAL SANCTIONS..............................76

**ARTICLE 11:   *CONSEQUENCES* TO TEAMS**.......................................................**77**

11.1    *TESTING* OF *TEAM SPORT*S...................................................77

11.2    *CONSEQUENCES* FOR *TEAM SPORT*S ..................................77

11.3    *EVENT* RULING BODY MAY ESTABLISH STRICTER
        *CONSEQUENCES* FOR *TEAM SPORT*S ..................................77

**ARTICLE 12:   SANCTIONS AGAINST SPORTING BODIES** ................................**78**

ARTICLE 13: APPEALS........................................................................78

13.1    DECISIONS SUBJECT TO APPEAL........................................78

13.2    APPEALS FROM DECISIONS REGARDING ANTI-DOPING
        RULE VIOLATIONS, *CONSEQUENCES*, AND
        *PROVISIONAL SUSPENSION*S..............................................79

13.3    FAILURE TO RENDER A TIMELY DECISION BY AN
        *ANTI-DOPING ORGANIZATION*..............................................82

13.4    APPEALS FROM DECISIONS GRANTING OR DENYING
        A THERAPEUTIC USE EXEMPTION .......................................83

13.5    APPEALS FROM DECISIONS UNDER PART THREE
        AND PART FOUR OF THE *CODE*............................................83

13.6    APPEALS FROM DECISIONS SUSPENDING OR
        REVOKING LABORATORY ACCREDITATION...........................84

ARTICLE 14: CONFIDENTIALITY AND REPORTING...........................84

14.1    INFORMATION CONCERNING *ADVERSE ANALYTICAL
        FINDING*S, *ATYPICAL FINDING*S, AND OTHER
        POTENTIAL ANTI-DOPING RULE VIOLATIONS.....................84

14.2    PUBLIC DISCLOSURE ...........................................................86

14.3    *ATHLETE* WHEREABOUTS INFORMATION............................87

14.4    STATISTICAL REPORTING.....................................................88

14.5    *DOPING CONTROL* INFORMATION CLEARINGHOUSE.........88

14.6    DATA PRIVACY.......................................................................89

ARTICLE 15: CLARIFICATION OF *DOPING CONTROL* RESPONSIBILITIES.......90

15.1    *EVENT TESTING* ....................................................................90

15.2    *OUT-OF-COMPETITION TESTING*..........................................91

15.3    RESULTS MANAGEMENT, HEARINGS AND SANCTIONS.....92

15.4    MUTUAL RECOGNITION .......................................................94

ARTICLE 16: *DOPING CONTROL* FOR ANIMALS COMPETING IN SPORT.........95

ARTICLE 17: STATUTE OF LIMITATIONS ..............................................95

► PART TWO: EDUCATION AND RESEARCH

ARTICLE 18: EDUCATION ................................................................98

   18.1    BASIC PRINCIPLE AND PRIMARY GOAL...............................98
   18.2    PROGRAMS AND ACTIVITIES................................................98
   18.3    PROFESSIONAL CODES OF CONDUCT...............................100
   18.4    COORDINATION AND COOPERATION ................................100


ARTICLE 19: RESEARCH .................................................................101

   19.1    PURPOSE AND AIMS OF ANTI-DOPING RESEARCH..........101
   19.2    TYPES OF RESEARCH ........................................................101
   19.3    COORDINATION OF RESEARCH AND SHARING OF RESULTS.....101
   19.4    RESEARCH PRACTICES ......................................................102
   19.5    RESEARCH USING *PROHIBITED SUBSTANCE*S
           AND *PROHIBITED METHOD*S................................................102
   19.6    MISUSE OF RESULTS.........................................................102

► PART THREE: ROLES AND RESPONSIBILITIES

ARTICLE 20: ADDITIONAL ROLES AND RESPONSIBILITIES
            OF *SIGNATORIES*........................................................104

   20.1    ROLES AND RESPONSIBILITIES OF
           THE INTERNATIONAL OLYMPIC COMMITTEE....................104
   20.2    ROLES AND RESPONSIBILITIES OF
           THE INTERNATIONAL PARALYMPIC COMMITTEE..............105
   20.3    ROLES AND RESPONSIBILITIES OF
           INTERNATIONAL FEDERATIONS.........................................106
   20.4    ROLES AND RESPONSIBILITIES OF *NATIONAL OLYMPIC
           COMMITTEE*S AND NATIONAL PARALYMPIC COMMITTEES.......108
   20.5    ROLES AND RESPONSIBILITIES OF
           *NATIONAL ANTI-DOPING ORGANIZATION*S.......................110
   20.6    ROLES AND RESPONSIBILITIES OF
           *MAJOR EVENT ORGANIZATIONS*.........................................110
   20.7    ROLES AND RESPONSIBILITIES OF *WADA* .......................111

ARTICLE 21: ADDITIONAL ROLES AND RESPONSIBILITIES
OF *ATHLETE*S AND OTHER *PERSON*S .........................................112

21.1   ROLES AND RESPONSIBILITIES OF *ATHLETE*S.................112

21.2   ROLES AND RESPONSIBILITIES OF
*ATHLETE SUPPORT PERSONNEL*.......................................113

ARTICLE 22: INVOLVEMENT OF GOVERNMENTS.............................................113

22.1   EACH GOVERNMENT WILL TAKE ALL ACTIONS
AND MEASURES NECESSARY TO COMPLY WITH
THE *UNESCO CONVENTION*..................................................113

22.2   EACH GOVERNMENT WILL ENCOURAGE ALL OF
ITS PUBLIC SERVICES OR AGENCIES TO SHARE
INFORMATION WITH ANTI-DOPING ORGANIZATIONS.......113

22.3   EACH GOVERNMENT WILL RESPECT ARBITRATION
AS THE PREFERRED MEANS OF RESOLVING DOPING
RELATED DISPUTES ............................................................114

22.4   ALL OTHER GOVERNMENTAL INVOLVEMENT
WITH ANTI-DOPING WILL BE BROUGHT INTO
HARMONY WITH THE *CODE*....................................................114

22.5   GOVERNMENTS SHOULD MEET THE EXPECTATIONS
OF THIS ARTICLE BY JANUARY 1, 2010.............................114

22.6   FAILURE BY A GOVERNMENT TO RATIFY, ACCEPT,
APPROVE OR ACCEDE TO THE *UNESCO CONVENTION*
BY JANUARY 1, 2010...........................................................114

▶ PART FOUR: ACCEPTANCE, COMPLIANCE, MODIFICATION AND INTERPRETATION

ARTICLE 23: ACCEPTANCE, COMPLIANCE AND MODIFICATION....................116

23.1   ACCEPTANCE OF THE *CODE*..............................................116

23.2   IMPLEMENTATION OF THE *CODE*.......................................117

23.3   COMPLIANCE WITH THE *CODE*...........................................118

23.4   MONITORING COMPLIANCE WITH THE *CODE*
       AND *UNESCO CONVENTION*..............................................118

23.5   ADDITIONAL CONSEQUENCES OF
       A *SIGNATORY*'S NONCOMPLIANCE WITH THE *CODE*........120

23.6   MODIFICATION OF THE *CODE*.............................................121

23.7   WITHDRAWAL OF ACCEPTANCE OF THE *CODE*.................121

ARTICLE 24: INTERPRETATION OF THE *CODE*.................................................122

ARTICLE 25: TRANSITIONAL PROVISIONS.......................................................123

25.1   GENERAL APPLICATION OF THE 2009 *CODE*....................123

25.2   NON-RETROACTIVE UNLESS PRINCIPLE
       OF "LEX MITIOR" APPLIES....................................................123

25.3   APPLICATION TO DECISIONS RENDERED
       PRIOR TO THE 2009 *CODE*..................................................123

25.4   APPLICATION TO SPECIFIC PRE-*CODE* VIOLATIONS.........124

25.5   ADDITIONAL *CODE* AMENDMENTS .....................................124

▶ APPENDIX 1

DEFINITIONS................................................................................................126

## PURPOSE, SCOPE AND ORGANIZATION OF THE WORLD ANTI-DOPING PROGRAM AND THE *CODE*

The purposes of the World Anti-Doping *Code* and the World Anti-Doping Program which supports it are:

• To protect the *Athlete*s' fundamental right to participate in doping-free sport and thus promote health, fairness and equality for *Athlete*s worldwide, and

• To ensure harmonized, coordinated and effective anti-doping programs at the international and national level with regard to detection, deterrence and prevention of doping.

### The *Code*

The *Code* is the fundamental and universal document upon which the World Anti-Doping Program in sport is based. The purpose of the *Code* is to advance the anti-doping effort through universal harmonization of core anti-doping elements. It is intended to be specific enough to achieve complete harmonization on issues where uniformity is required, yet general enough in other areas to permit flexibility on how agreed-upon anti-doping principles are implemented.

*[Comment: The Olympic Charter in force as from July 7, 2007, and the UNESCO Convention adopted in Paris on October 19, 2005, both recognize the prevention of and the fight against doping in sport as a critical part of the mission of the International Olympic Committee and UNESCO and also recognize the fundamental role of the Code.]*

### The World Anti-Doping Program

The World Anti-Doping Program encompasses all of the elements needed in order to ensure optimal harmonization and best practice in international and national anti-doping programs. The main elements are:

**Level 1**: The *Code*

**Level 2**: *International Standard*s

**Level 3**: Models of Best Practice and Guidelines

#### *International Standard*s

*International Standard*s for different technical and operational areas within the anti-doping program will be developed in consultation with the *Signatories* and governments and approved by *WADA*. The purpose of the *International Standard*s is harmonization among *Anti-Doping Organization*s responsible for specific technical and operational parts of the anti-doping programs. Adherence to the *International Standard*s is mandatory for compliance with the *Code*. The *International Standard*s may be revised from time to time by the *WADA* Executive Committee after reasonable consultation with the *Signatories* and governments. Unless provided otherwise in the *Code*, *International Standard*s and all revisions shall become effective on the date specified in the *International Standard* or revision.

*[Comment: The International Standards contain much of the technical detail necessary for implementing the Code. International Standards, while expressly incorporated into the Code by reference, will, in consultation with the Signatories and governments, be developed by experts and set forth in separate technical documents. It is important that the WADA Executive Committee be able to make timely changes to the International Standards without requiring any amendment of the Code or individual stakeholder rules and regulations.]*

### Models of Best Practice and Guidelines

Models of best practice and guidelines based on the *Code* have been and will be developed to provide solutions in different areas of anti-doping. The models will be recommended by *WADA* and made available to *Signatories* upon request but will not be mandatory. In addition to providing models of anti-doping documentation, *WADA* will also make some training assistance available to the *Signatories*.

*[Comment: Following the adoption of the 2009 Code, WADA will prepare amended model anti-doping rules and regulations tailored to the needs of each of the major groups of Signatories (e.g., International Federations and National Anti-Doping Organizations, etc.). These model rules and regulations will conform with and be based on the Code, will be state of the art examples of best practices and will contain all of the detail (including reference to International Standards) necessary to conduct an effective anti-doping program.*

*These model rules and regulations will provide alternatives from which stakeholders may select. Some stakeholders may choose to adopt the model rules and regulations and other models of best practices verbatim. Others may decide to adopt the models with modifications. Still other stakeholders may choose to develop their own rules and regulations consistent with the general principles and specific requirements set forth in the Code.*

*Other model documents or guidelines for specific parts of the anti-doping work may be developed based on generally recognized stakeholder needs and expectations. This could include models or guidelines for national anti-doping programs, results management, Testing (beyond the specific requirements set forth in the International Standard for Testing), education programs, etc. All models of best practice will be reviewed and approved by WADA before they are included in the World Anti-Doping Program.]*

## FUNDAMENTAL RATIONALE
## FOR THE WORLD ANTI-DOPING *CODE*

Anti-doping programs seek to preserve what is intrinsically valuable about sport. This intrinsic value is often referred to as "the spirit of sport", it is the essence of Olympism; it is how we play true. The spirit of sport is the celebration of the human spirit, body and mind, and is characterized by the following values:

• Ethics, fair play and honesty
• Health
• Excellence in performance
• Character and education
• Fun and joy
• Teamwork
• Dedication and commitment
• Respect for rules and laws
• Respect for self and other *Participant*s
• Courage
• Community and solidarity

Doping is fundamentally contrary to the spirit of sport.

To fight doping by promoting the spirit of sport, the *Code* requires each *Anti-Doping Organization* to develop and implement educational programs for *Athlete*s, including youth, and *Athlete Support Personnel*.



PART ONE:
*DOPING CONTROL*



## INTRODUCTION

Part One of the *Code* sets forth specific anti-doping rules and principles that are to be followed by organizations responsible for adopting, implementing or enforcing anti-doping rules within their authority, e.g., the International Olympic Committee, International Paralympic Committee, International Federations, *Major Event Organizations*, and *National Anti-Doping Organization*s. All such organizations are collectively referred to as *Anti-Doping Organization*s.

All provisions of the *Code* are mandatory in substance and must be followed as applicable by each *Anti-Doping Organization* and *Athlete* or other *Person.* The *Code* does not, however, replace or eliminate the need for comprehensive anti-doping rules adopted by each *Anti-Doping Organization*. While some provisions of the *Code* must be incorporated without substantive change by each *Anti-Doping Organization* in its own anti-doping rules, other provisions of the *Code* establish mandatory guiding principles that allow flexibility in the formulation of rules by each *Anti-Doping Organization* or establish requirements that must be followed by each *Anti-Doping Organization* but need not be repeated in its own anti-doping rules.

*[Comment: Those Articles of the Code which must be incorporated into each Anti-Doping Organization's rules without substantive change are set forth in Article 23.2.2. For example, it is critical for purposes of harmonization that all Signatories base their decisions on the same list of anti-doping rule violations, the same burdens of proof and impose the same Consequences for the same anti-doping rule violations. These rules must be the same whether a hearing takes place before an International Federation, at the national level or before the Court of Arbitration for Sport.*

*Code provisions not listed in Article 23.2.2 are still mandatory in substance even though an Anti-Doping Organization is not required to incorporate them verbatim. Those provisions generally fall into two categories. First, some provisions direct Anti-Doping Organizations to take certain actions but there is no need to restate the provision in the Anti-Doping Organization's*

*continued*

Anti-doping rules, like *Competition* rules, are sport rules governing the conditions under which sport is played. *Athlete*s or other *Person*s accept these rules as a condition of participation and shall be bound by these rules. Each *Signatory* shall establish rules and procedures to ensure that all *Athlete*s or other *Person*s under the authority of the *Signatory* and its member organizations are informed of and agree to be bound by anti-doping rules in force of the relevant *Anti-Doping Organization*s.

Each *Signatory* shall establish rules and procedures to ensure that all *Athlete*s or other *Person*s under the authority of the *Signatory* and its member organizations consent to the dissemination of their private data as required or authorized by the *Code* and are bound by and compliant with *Code* anti-

*own anti-doping rules. As an example, each Anti-Doping Organization must plan and conduct Testing as required by Article 5, but these directives to the Anti-Doping Organization need not be repeated in the Anti-Doping Organization's own rules. Second, some provisions are mandatory in substance but give each Anti-Doping Organization some flexibility in the implementation of the principles stated in the provision. As an example, it is not necessary for effective harmonization to force all*

*Signatories to use one single results management and hearing process. At present, there are many different, yet equally effective processes for results management and hearings within different International Federations and different national bodies. The Code does not require absolute uniformity in results management and hearing procedures; it does, however, require that the diverse approaches of the Signatories satisfy principles stated in the Code.]*

*[Comment: By their participation in sport, Athletes are bound by the competitive rules of their sport. In the same manner, Athletes and Athlete Support Personnel should be bound by anti-doping rules based on Article 2 of the Code by virtue of their agreements for membership, accreditation, or participation in*

*sports organizations or sports Events subject to the Code. Each Signatory, however, shall take the necessary steps to ensure that all Athletes and Athlete Support Personnel within its authority are bound by the relevant Anti-Doping Organization's anti-doping rules.]*

doping rules, and that the appropriate *Consequences* are imposed on those *Athlete*s or other *Person*s who are not in conformity with those rules. These sport-specific rules and procedures aimed at enforcing anti-doping rules in a global and harmonized way are distinct in nature from and are, therefore, not intended to be subject to or limited by any national requirements and legal standards applicable to criminal proceedings or employment matters. When reviewing the facts and the law of a given case, all courts, arbitral hearing panels and other adjudicating bodies should be aware and respect the distinct nature of the anti-doping rules in the *Code* and the fact that those rules represent the consensus of a broad spectrum of stakeholders around the world with an interest in fair sport.

## ARTICLE 1: DEFINITION OF DOPING

Doping is defined as the occurrence of one or more of the anti-doping rule violations set forth in Article 2.1 through Article 2.8 of the *Code*.

## ARTICLE 2: ANTI-DOPING RULE VIOLATIONS

*Athlete*s or other *Person*s shall be responsible for knowing what constitutes an anti-doping rule violation and the substances and methods which have been included on the *Prohibited List*.

The following constitute anti-doping rule violations:

*[Comment 'a' to Article 2: The purpose of Article 2 is to specify the circumstances and conduct which constitute anti-doping rule violations.*
*Hearings in doping cases will proceed based on the assertion that one or more of these specific rules has been violated.]*

## 2.1 Presence of a *Prohibited Substance* or its *Metabolite*s or *Marker*s in an *Athlete*'s *Sample*

2.1.1 It is each *Athlete*'s personal duty to ensure that no *Prohibited Substance* enters his or her body. *Athlete*s are responsible for any *Prohibited Substance* or its *Metabolite*s or *Marker*s found to be present in their *Sample*s. Accordingly, it is not necessary that intent, fault, negligence or knowing *Use* on the *Athlete*'s part be demonstrated in order to establish an anti-doping violation under Article 2.1.

*[Comment to Article 2.1.1: For purposes of anti-doping rule violations involving the presence of a Prohibited Substance (or its Metabolites or Markers), the Code adopts the rule of strict liability which was found in the Olympic Movement Anti-Doping Code ("OMADC") and the vast majority of pre-Code anti-doping rules. Under the strict liability principle, an Athlete is responsible, and an anti-doping rule violation occurs, whenever a Prohibited Substance is found in an Athlete's Sample. The violation occurs whether or not the Athlete intentionally or unintentionally Used a Prohibited Substance or was negligent or otherwise at fault. If the positive Sample came from an In-Competition test, then the results of that Competition are automatically invalidated (Article 9 (Automatic Disqualification of Individual Results)). However, the Athlete then has the possibility to avoid or reduce sanctions if the Athlete can demonstrate that he or she was not at fault or significant fault (Article 10.5 (Elimination or Reduction of Period of Ineligibility Based on Exceptional Circumstances)) or in certain circumstances did not intend to enhance his or her sport performance (Article 10.4 (Elimination or Reduction of the Period of Ineligibility for Specified Substances under Specific Circumstances)).*

*The strict liability rule for the finding of a Prohibited Substance in an Athlete's Sample, with a possibility that sanctions may be modified based on specified criteria, provides a reasonable balance between effective anti-doping enforcement for the benefit of all "clean" Athletes and fairness in the exceptional circumstance where a Prohibited Substance entered an Athlete's system through No Fault or Negligence or No Significant Fault or Negligence on the Athlete's part. It is important to emphasize that while the determination of whether the anti-doping rule violation has occurred is based on strict liability, the imposition of a fixed period of Ineligibility is not automatic. The strict liability principle set forth in the Code has been consistently upheld in the decisions of CAS.]*

2.1.2  Sufficient proof of an anti-doping rule violation under Article 2.1 is established by either of the following: presence of a *Prohibited Substance* or its *Metabolite*s or *Marker*s in the *Athlete*'s A *Sample* where the *Athlete* waives analysis of the B *Sample* and the B *Sample* is not analyzed; or, where the *Athlete*'s B *Sample* is analyzed and the analysis of the *Athlete*'s B *Sample* confirms the presence of the *Prohibited Substance* or its *Metabolite*s or *Marker*s found in the *Athlete*'s A *Sample*.

2.1.3  Excepting those substances for which a quantitative threshold is specifically identified in the *Prohibited List*, the presence of any quantity of a *Prohibited Substance* or its *Metabolite*s or *Marker*s in an *Athlete*'s *Sample* shall constitute an anti-doping rule violation.

2.1.4  As an exception to the general rule of Article 2.1, the *Prohibited List* or *International Standard*s may establish special criteria for the evaluation of *Prohibited Substance*s that can also be produced endogenously.

*[Comment to Article 2.1.2: The Anti-Doping Organization with results management responsibility may in its discretion choose to have the B Sample analyzed even if the Athlete does not request the analysis of the B Sample.]*

## 2.2 *Use* or *Attempt*ed *Use* by an *Athlete* of a *Prohibited Substance* or a *Prohibited Method*

2.2.1 It is each *Athlete*'s personal duty to ensure that no *Prohibited Substance* enters his or her body. Accordingly, it is not necessary that intent, fault, negligence or knowing *Use* on the *Athlete*'s part be demonstrated in order to establish an anti-doping rule violation for *Use* of a *Prohibited Substance* or a *Prohibited Method*.

*[Comment to Article 2.2: It has always been the case that Use or Attempted Use of a Prohibited Substance or Prohibited Method may be established by any reliable means. As noted in the Comment to Article 3.2 (Methods of Establishing Facts and Presumptions), unlike the proof required to establish an anti-doping rule violation under Article 2.1, Use or Attempted Use may also be established by other reliable means such as admissions by the Athlete, witness statements, documentary evidence, conclusions drawn from longitudinal profiling, or other analytical information which does not otherwise satisfy all the requirements to establish "Presence" of a Prohibited Substance under Article 2.1. For example, Use may be established based upon reliable analytical data from the analysis of an A Sample (without confirmation from an analysis of a B Sample) or from the analysis of a B Sample alone where the Anti-Doping Organization provides a satisfactory explanation for the lack of confirmation in the other Sample.]*

2.2.2 The success or failure of the *Use* or *Attempt*ed *Use* of a *Prohibited Substance* or *Prohibited Method* is not material. It is sufficient that the *Prohibited Substance* or *Prohibited Method* was *Use*d or *Attempt*ed to be *Use*d for an anti-doping rule violation to be committed.

## 2.3 Refusing or failing without compelling justification to submit to *Sample* collection after notification as authorized in applicable anti-doping rules, or otherwise evading *Sample* collection

*[Comment to Article 2.2.2: Demonstrating the "Attempted Use" of a Prohibited Substance requires proof of intent on the Athlete's part. The fact that intent may be required to prove this particular anti-doping rule violation does not undermine the strict liability principle established for violations of Article 2.1 and violations of Article 2.2 in respect of Use of a Prohibited Substance or Prohibited Method.*

*An Athlete's Use of a Prohibited Substance constitutes an anti-doping rule violation unless such substance is not prohibited Out-of-Competition and the Athlete's Use takes place Out-of-Competition. (However, the presence of a Prohibited Substance or its Metabolites or Markers in a Sample collected In-Competition is a violation of Article 2.1 (Presence of a Prohibited Substance or its Metabolites or Markers) regardless of when that substance might have been administered.)]*

*[Comment to Article 2.3: Failure or refusal to submit to Sample collection after notification was prohibited in almost all pre-Code anti-doping rules. This Article expands the typical pre-Code rule to include "otherwise evading Sample collection" as prohibited conduct. Thus, for example, it would be an anti-doping rule violation if it were established that an Athlete was hiding from a Doping Control official to evade notification or Testing. A violation of "refusing or failing to submit to Sample collection" may be based on either intentional or negligent conduct of the Athlete, while "evading" Sample collection contemplates intentional conduct by the Athlete.]*

2.4 Violation of applicable requirements regarding *Athlete* availability for *Out-of-Competition Testing*, including failure to file required whereabouts information and missed tests which are declared based on rules which comply with the *International Standard* for *Testing*. Any combination of three missed tests and/or filing failures within an eighteen-month period as determined by *Anti-Doping Organization*s with jurisdiction over the *Athlete* shall constitute an anti-doping rule violation

2.5 *Tampering* or *Attempt*ed *Tampering* with any part of *Doping Control*

*[Comment to Article 2.4: Separate whereabouts filing failures and missed tests declared under the rules of the Athlete's International Federation or any other Anti-Doping Organization with authority to declare whereabouts filing failures and missed tests in accordance with the International Standard for Testing shall be combined in applying this Article. In appropriate circumstances, missed tests or filing failures may also constitute an anti-doping rule violation under Article 2.3 or Article 2.5.]*

*[Comment to Article 2.5: This Article prohibits conduct which subverts the Doping Control process but which would not otherwise be included in the definition of Prohibited Methods. For example, altering identification numbers on a Doping Control form during Testing, breaking the B Bottle at the time of B Sample analysis or providing fraudulent information to an Anti-Doping Organization.]*

### 2.6 *Possession* of *Prohibited Substance*s and *Prohibited Method*s

2.6.1 *Possession* by an *Athlete In-Competition* of any *Prohibited Method* or any *Prohibited Substance*, or *Possession* by an *Athlete Out-of-Competition* of any *Prohibited Method* or any *Prohibited Substance* which is prohibited *Out-of-Competition* unless the *Athlete* establishes that the *Possession* is pursuant to a therapeutic use exemption granted in accordance with Article 4.4 (Therapeutic Use) or other acceptable justification.

2.6.2 *Possession* by an *Athlete Support Personnel In-Competition* of any *Prohibited Method* or any *Prohibited Substance*, or *Possession* by an *Athlete Support Personnel Out-of-Competition* of any *Prohibited Method* or any *Prohibited Substance* which is prohibited *Out-of-Competition* in connection with an *Athlete*, *Competition* or training, unless the *Athlete Support Personnel* establishes that the *Possession* is pursuant to a therapeutic use exemption granted to an *Athlete* in accordance with Article 4.4 (Therapeutic Use) or other acceptable justification.

*[Comment to Article 2.6.1 and 2.6.2: Acceptable justification would not include, for example, buying or Possessing a Prohibited Substance for purposes of giving it to a friend or relative, except under justifiable medical circumstances where that Person had a physician's prescription, e.g., buying Insulin for a diabetic child.]*

*[Comment to Article 2.6.2: Acceptable justification would include, for example, a team doctor carrying Prohibited Substances for dealing with acute and emergency situations.]*

2.7   *Trafficking* or *Attempt*ed *Trafficking* in any
      *Prohibited Substance* or *Prohibited Method*

2.8   Administration or *Attempt*ed administration to any
      *Athlete In-Competition* of any *Prohibited Method* or
      *Prohibited Substance,* or administration or *Attempt*ed
      administration to any *Athlete Out-of-Competition* of
      any *Prohibited Method* or any *Prohibited Substance*
      that is prohibited *Out-of-Competition,* or assisting,
      encouraging, aiding, abetting, covering up or any
      other type of complicity involving an anti-doping rule
      violation or any *Attempt*ed anti-doping rule violation

*[Comment 'b' to Article 2: The Code does not make it an anti-doping rule violation for an Athlete or other Person to work or associate with Athlete Support Personnel who are serving a period of Ineligibility. However, a sport organization may adopt its own rules which prohibit such conduct.]*

# ARTICLE 3: PROOF OF DOPING

## 3.1    Burdens and Standards of Proof

The *Anti-Doping Organization* shall have the burden of establishing that an anti-doping rule violation has occurred. The standard of proof shall be whether the *Anti-Doping Organization* has established an anti-doping rule violation to the comfortable satisfaction of the hearing panel bearing in mind the seriousness of the allegation which is made. This standard of proof in all cases is greater than a mere balance of probability but less than proof beyond a reasonable doubt. Where the *Code* places the burden of proof upon the *Athlete* or other *Person* alleged to have committed an anti-doping rule violation to rebut a presumption or establish specified facts or circumstances, the standard of proof shall be by a balance of probability, except as provided in Articles 10.4 and 10.6 where the *Athlete* must satisfy a higher burden of proof.

## 3.2    Methods of Establishing Facts and Presumptions

Facts related to anti-doping rule violations may be established by any reliable means, including admissions. The following rules of proof shall be applicable in doping cases:

*[Comment to Article 3.1: This standard of proof required to be met by the Anti-Doping Organization is comparable to the standard which is applied in most countries to cases involving professional misconduct. It has also been widely applied by courts and hearing panels in doping cases. See, for example, the CAS decision in N., J., Y., W. v. FINA, CAS 98/208, 22 December 1998.]*

*[Comment to Article 3.2: For example, an Anti-Doping Organization may establish an anti-doping rule violation under Article 2.2 (Use or Attempted Use of a Prohibited Substance or Prohibited Method) based on the Athlete's admissions, the credible testimony of third Persons, reliable documentary evidence, reliable analytical data from either an A or B Sample as provided in the Comments to Article 2.2, or conclusions drawn from the profile of a series of the Athlete's blood or urine Samples.]*

3.2.1 *WADA*-accredited laboratories are presumed to have conducted *Sample* analysis and custodial procedures in accordance with the *International Standard* for Laboratories. The *Athlete* or other *Person* may rebut this presumption by establishing that a departure from the *International Standard* for Laboratories occurred which could reasonably have caused the *Adverse Analytical Finding*.

If the *Athlete* or other *Person* rebuts the preceding presumption by showing that a departure from the *International Standard* for Laboratories occurred which could reasonably have caused the *Adverse Analytical Finding*, then the *Anti-Doping Organization* shall have the burden to establish that such departure did not cause the *Adverse Analytical Finding*.

3.2.2 Departures from any other *International Standard* or other anti-doping rule or policy which did not cause an *Adverse Analytical Finding* or other anti-doping rule violation shall not invalidate such results. If the *Athlete* or other *Person* establishes that a departure from another *International Standard* or other anti-doping rule or policy which could reasonably have caused the *Adverse Analytical Finding* or

*[Comment to Article 3.2.1: The burden is on the Athlete or other Person to establish, by a balance of probability, a departure from the International Standard for Laboratories that could reasonably have caused the Adverse Analytical Finding. If the Athlete or other Person does so, the burden shifts to the Anti-Doping Organization to prove to the comfortable satisfaction of the hearing panel that the departure did not cause the Adverse Analytical Finding.]*

other anti-doping rule violation occurred, then the *Anti-Doping Organization* shall have the burden to establish that such departure did not cause the *Adverse Analytical Finding* or the factual basis for the anti-doping rule violation.

3.2.3 The facts established by a decision of a court or professional disciplinary tribunal of competent jurisdiction which is not the subject of a pending appeal shall be irrebuttable evidence against the *Athlete* or other *Person* to whom the decision pertained of those facts unless the *Athlete* or other *Person* establishes that the decision violated principles of natural justice.

3.2.4 The hearing panel in a hearing on an anti-doping rule violation may draw an inference adverse to the *Athlete* or other *Person* who is asserted to have committed an anti-doping rule violation based on the *Athlete*'s or other *Person*'s refusal, after a request made in a reasonable time in advance of the hearing, to appear at the hearing (either in person or telephonically as directed by the hearing panel) and to answer questions from the hearing panel or the *Anti-Doping Organization* asserting the anti-doping rule violation.

*[Comment to Article 3.2.4: Drawing an adverse inference under these* *circumstances has been recognized in numerous CAS decisions.]*

# ARTICLE 4: THE *PROHIBITED LIST*

### 4.1 Publication and Revision of the *Prohibited List*

*WADA* shall, as often as necessary and no less often than annually, publish the *Prohibited List* as an *International Standard.* The proposed content of the *Prohibited List* and all revisions shall be provided in writing promptly to all *Signatories* and governments for comment and consultation. Each annual version of the *Prohibited List* and all revisions shall be distributed promptly by *WADA* to each *Signatory* and government and shall be published on *WADA*'s Web site, and each *Signatory* shall take appropriate steps to distribute the *Prohibited List* to its members and constituents. The rules of each *Anti-Doping Organization* shall specify that, unless provided otherwise in the *Prohibited List* or a revision, the *Prohibited List* and revisions shall go into effect under the *Anti-Doping Organization*'s rules three (3) months after publication of the *Prohibited List* by *WADA* without requiring any further action by the *Anti-Doping Organization.*

*[Comment to Article 4.1: The Prohibited List will be revised and published on an expedited basis whenever the need arises. However, for the sake of predictability, a new Prohibited List will be published every year whether or not changes have been made. WADA will always have the most current Prohibited List published on its Web site. The Prohibited List is an integral part of the International Convention against Doping in Sport. WADA will inform the Director-General of UNESCO of any change to the Prohibited List.]*

### 4.2 *Prohibited Substance*s and *Prohibited Method*s Identified on the *Prohibited List*

4.2.1 *Prohibited Substance*s and *Prohibited Method*s

The *Prohibited List* shall identify those *Prohibited Substance*s and *Prohibited Method*s which are prohibited as doping at all times (both *In-Competition* and *Out-of-Competition*) because of their potential to enhance performance in future *Competition*s or their masking potential and those substances and methods which are prohibited *In-Competition* only. The *Prohibited List* may be expanded by *WADA* for a particular sport. *Prohibited Substance*s and *Prohibited Method*s may be included in the *Prohibited List* by general category (e.g., anabolic agents) or by specific reference to a particular substance or method.

*[Comment to Article 4.2.1: There will be one Prohibited List. The substances which are prohibited at all times would include masking agents and those substances which, when Used in training, may have long-term performance enhancing effects such as anabolics. All substances and methods on the Prohibited List are prohibited In-Competition. Out-of-Competition Use (Article 2.2) of a substance which is only prohibited In-Competition is not an anti-doping rule violation unless an Adverse Analytical Finding for the substance or its Metabolites is reported for a Sample collected In-Competition (Article 2.1).*

*There will be only one document called the "Prohibited List." WADA may add additional substances or methods to the Prohibited List for particular sports (e.g. the inclusion of beta-blockers for shooting) but this will also be reflected on the single Prohibited List. A particular sport is not permitted to seek exemption from the basic list of Prohibited Substances (e.g. eliminating anabolics from the Prohibited List for ''mind sports"). The premise of this decision is that there are certain basic doping agents which anyone who chooses to call himself or herself an Athlete should not take.]*

### 4.2.2  Specified Substances

For purposes of the application of Article 10 (Sanctions on Individuals), all *Prohibited Substance*s shall be "Specified Substances" except substances in the classes of anabolic agents and hormones and those stimulants and hormone antagonists and modulators so identified on the *Prohibited List*. *Prohibited Method*s shall not be Specified Substances.

### 4.2.3  New Classes of *Prohibited Substance*s

In the event *WADA* expands the *Prohibited List* by adding a new class of *Prohibited Substance*s *in* accordance with Article 4.1, *WADA*'s Executive Committee shall determine whether any or all *Prohibited Substance*s within the new class of *Prohibited Substance*s shall be considered Specified Substances under Article 4.2.2.

*[Comment to Article 4.2.2: In drafting the Code there was considerable debate among stakeholders over the appropriate balance between inflexible sanctions which promote harmonization in the application of the rules and more flexible sanctions which better take into consideration the circumstances of each individual case. This balance continued to be discussed in various CAS decisions interpreting the Code. After three years experience with the Code, the strong consensus of stakeholders is that while the occurrence of an anti-doping rule violation under Articles 2.1 (Presence of a Prohibited Substance or its Metabolites or Markers) and 2.2 (Use of a Prohibited Substance or Prohibited Method) should still be based on the principle of strict liability, the Code sanctions should be made more flexible where the Athlete or other Person can clearly demonstrate that he or she did not intend to enhance sport performance. The change to Article 4.2 and related changes to Article 10 provide this additional flexibility for violations involving many Prohibited Substances. The rules set forth in Article 10.5 (Elimination or Reduction of Period of Ineligibility Based on Exceptional Circumstances) would remain the only basis for eliminating or reducing a sanction involving anabolic steroids and hormones, as well as the stimulants and the hormone antagonists and modulators so identified on the Prohibited List, or Prohibited Methods.]*

### 4.3 Criteria for Including Substances and Methods on the *Prohibited List*

*WADA* shall consider the following criteria in deciding whether to include a substance or method on the *Prohibited List.*

4.3.1 A substance or method shall be considered for inclusion on the *Prohibited List* if *WADA* determines that the substance or method meets any two of the following three criteria:

4.3.1.1 Medical or other scientific evidence, pharmacological effect or experience that the substance or method, alone or in combination with other substances or methods, has the potential to enhance or enhances sport performance;

4.3.1.2 Medical or other scientific evidence, pharmacological effect or experience that the *Use* of the substance or method represents an actual or potential health risk to the *Athlete*;

*[Comment to Article 4.3.1.1: This Article anticipates that there may be substances that, when used alone, are not prohibited but which will be prohibited if used in combination with certain other substances. A substance which is added to the Prohibited List because it has the potential to enhance performance only in combination with another substance shall be so noted and shall be prohibited only if there is evidence relating to both substances in combination.]*

4.3.1.3   *WADA*'s determination that the *Use* of the substance or method violates the spirit of sport described in the Introduction to the *Code*.

4.3.2   A substance or method shall also be included on the *Prohibited List* if *WADA* determines there is medical or other scientific evidence, pharma-cological effect or experience that the substance or method has the potential to mask the *Use* of other *Prohibited Substance*s or *Prohibited Method*s.

*[Comment to Article 4.3.2: A substance shall be considered for inclusion on the Prohibited List if the substance is a masking agent or meets two of the following three criteria: (1) it has the potential to enhance or enhances sport performance; (2) it represents a potential or actual health risk; or (3) it is contrary to the spirit of sport. None of the three criteria alone is a sufficient basis for adding a substance to the Prohibited List. Using the potential to enhance performance as the sole criterion would include, for example, physical and mental training, red meat, carbohydrate loading and training at altitude. Risk of harm would include smoking. Requiring all three criteria would also be unsatisfactory. For example, the Use of genetic transfer technology to dramatically enhance sport performance should be prohibited as contrary to the spirit of sport even if it is not harmful. Similarly, the potentially unhealthy abuse of certain substances without therapeutic justification based on the mistaken belief they enhance performance is certainly contrary to the spirit of sport regardless of whether the expectation of performance enhancement is realistic. As part of the process each year, all Signatories, governments and other interested Persons are invited to provide comments to WADA on the content of the Prohibited List.]*

4.3.3 *WADA*'s determination of the *Prohibited Substance*s and *Prohibited Method*s that will be included on the *Prohibited List* and the classification of substances into categories on the *Prohibited List* is final and shall not be subject to challenge by an *Athlete* or other *Person* based on an argument that the substance or method was not a masking agent or did not have the potential to enhance performance, represent a health risk or violate the spirit of sport.

## 4.4 Therapeutic Use

*WADA* has adopted an *International Standard* for the process of granting therapeutic use exemptions.

Each International Federation shall ensure, for *International-Level Athlete*s or any other *Athlete* who is entered in an *International Event*, that a process is in place whereby *Athlete*s with documented medical conditions requiring the *Use* of a *Prohibited Substance* or a *Prohibited Method* may request a therapeutic use exemption. *Athlete*s who have been identified as included in their International Federation's *Registered Testing Pool* may only obtain therapeutic use exemptions in accordance with the rules of their International Federation. Each International Federation shall publish a list of those *International Event*s for which a therapeutic use exemption from the International Federation is required. Each *National Anti-Doping Organization* shall ensure, for all *Athlete*s

*[Comment to Article 4.3.3: The question of whether a substance meets the criteria in Article 4.3 (Criteria for Including Substances and Methods on the Prohibited List) in a particular case cannot be raised as a defense to an anti-doping rule violation. For example, it cannot be argued that the Prohibited Substance detected would not have been performance enhancing in that particular sport. Rather, doping occurs when a substance on the Prohibited List is found in an Athlete's Sample. Similarly, it cannot be argued that a substance listed in the class of anabolic agents does not belong in that class.]*

within its jurisdiction that have not been included in an International Federation *Registered Testing Pool*, that a process is in place whereby *Athlete*s with documented medical conditions requiring the *Use* of a *Prohibited Substance* or a *Prohibited Method* may request a therapeutic use exemption. Such requests shall be evaluated in accordance with the *International Standard* for Therapeutic Use Exemptions. International Federations and *National Anti-Doping Organization*s shall promptly report to *WADA* through *ADAMS* the granting of any therapeutic use exemption except as regards national-level *Athlete*s who are not included in the *National Anti-Doping Organization*'s *Registered Testing Pool*.

*WADA*, on its own initiative, may review at any time the granting of a therapeutic use exemption to any *International-Level Athlete* or national-level *Athlete* who is included in his or her *National Anti-Doping Organization*'s *Registered Testing Pool*. Further, upon the request of any such *Athlete* who has been denied a therapeutic use exemption, *WADA* may review such denial. If *WADA* determines that such granting or denial of a therapeutic use exemption did not comply with the *International Standard* for Therapeutic Use Exemptions, *WADA* may reverse the decision.

If, contrary to the requirement of this Article, an International Federation does not have a process in place where *Athlete*s may request therapeutic use exemptions, an *International-Level Athlete* may request *WADA* to review the application as if it had been denied.

Presence of a *Prohibited Substance* or its *Metabolite*s or *Marker*s (Article 2.1), *Use* or *Attempt*ed *Use* of a *Prohibited Substance* or a *Prohibited Method* (Article 2.2), *Possession* of *Prohibited Substance*s and *Prohibited Method*s (Article 2.6) or Administration or *Attempt*ed Administration of a *Prohibited Substance* or

*Prohibited Method* (Article 2.8) consistent with the provisions of an applicable therapeutic use exemption issued pursuant to the *International Standard* for Therapeutic Use Exemptions shall not be considered an anti-doping rule violation.

### 4.5 Monitoring Program

*WADA*, in consultation with *Signatories* and governments, shall establish a monitoring program regarding substances which are not on the *Prohibited List*, but which *WADA* wishes to monitor in order to detect patterns of misuse in sport. *WADA* shall publish, in advance of any *Testing*, the substances that will be monitored. Laboratories will report the instances of reported *Use* or detected presence of these substances to *WADA* periodically on an aggregate basis by sport and whether the *Sample*s were collected *In-Competition* or *Out–of-Competition*. Such reports shall not contain additional information regarding specific *Sample*s. *WADA* shall make available to International Federations and *National Anti-Doping Organization*s, on at least an annual basis, aggregate statistical information by sport regarding the additional substances. *WADA* shall implement measures to ensure that strict anonymity of individual *Athlete*s is maintained with respect to such reports. The reported *Use* or detected presence of a monitored substance shall not constitute an anti-doping rule violation.

# ARTICLE 5: *TESTING*

### 5.1 Test Distribution Planning

Subject to the jurisdictional limitations for *In-Competition Testing* in Article 15.1, each *National Anti-Doping Organization* shall have *Testing* jurisdiction over all *Athlete*s who are present in that *National Anti-Doping Organization*'s country or who are nationals, residents, license-holders or members of sport organizations of that country. Each International Federation shall have *Testing* jurisdiction over all *Athlete*s who are members of their member National Federations or who participate in their *Event*s. All *Athlete*s must comply with any request for *Testing* by any *Anti-Doping Organization* with *Testing* jurisdiction. In coordination with other *Anti-Doping Organization*s conducting *Testing* on the same *Athlete*s, and consistent with the *International Standard* for *Testing,* each *Anti-Doping Organization* shall:

5.1.1 Plan and conduct an effective number of *In-Competition* and *Out-of-Competition* tests on *Athlete*s over whom they have jurisdiction, including but not limited to *Athlete*s in their respective *Registered Testing Pool*s. Each International Federation shall establish a *Registered Testing Pool* for *International-Level Athlete*s in its sport, and each *National Anti-Doping Organization* shall establish a national *Registered Testing Pool* for *Athlete*s who are present in that *National Anti-Doping Organization*'s country or who are nationals, residents, license-holders or members of sport organizations of that country. In accordance with Article 14.3, any *Athlete* included in a *Registered Testing Pool* shall be subject to the whereabouts requirements set out in the *International Standard* for *Testing*.

5.1.2 Except in exceptional circumstances all *Out-of-Competition Testing* shall be *No Advance Notice.*

5.1.3 Make *Target Testing* a priority.

5.1.4 Conduct *Testing* on *Athlete*s serving a period of *Ineligibility* or a *Provisional Suspension.*

## 5.2 Standards for *Testing*

*Anti-Doping Organization*s with *Testing* jurisdiction shall conduct such *Testing* in conformity with the *International Standard* for *Testing.*

## 5.3 Retired *Athlete*s Returning to *Competition*

Each *Anti-Doping Organization* shall establish a rule addressing eligibility requirements for *Athlete*s who are not *Ineligible* and retire from sport while included in a *Registered Testing Pool* and then seek to return to active participation in sport.

*[Comment to Article 5.1.3: Target Testing is specified because random Testing, or even weighted random Testing, does not ensure that all of the appropriate Athletes will be tested (e.g., world-class Athletes, Athletes whose performances have dramatically improved over a short period of time, Athletes whose coaches have had other Athletes test positive, etc.).*

*Obviously, Target Testing must not be used for any purpose other than legitimate Doping Control. The Code makes it clear that Athletes have no right to expect that they will be tested only on a random basis. Similarly, it does not impose any reasonable suspicion or probable cause requirement for Target Testing.]*

# ARTICLE 6: ANALYSIS OF *SAMPLE*S

*Sample*s shall be analyzed in accordance with the following principles:

### 6.1   Use of Approved Laboratories

For purposes of Article 2.1 (Presence of a *Prohibited Substance* or its *Metabolite*s or *Marker*s), *Sample*s shall be analyzed only in *WADA*-accredited laboratories or as otherwise approved by *WADA*. The choice of the *WADA*-accredited laboratory (or other laboratory or method approved by *WADA*) used for the *Sample* analysis shall be determined exclusively by the *Anti-Doping Organization* responsible for results management.

### 6.2   Purpose of Collection and Analysis of *Sample*s

*Sample*s shall be analyzed to detect *Prohibited Substance*s and *Prohibited Method*s identified on the *Prohibited List* and other substances as may be directed by *WADA* pursuant to Article 4.5 (Monitoring Program), or to assist an *Anti-Doping Organization* in profiling relevant parameters in an *Athlete*'s urine, blood or other matrix, including DNA or genomic profiling, for anti-doping purposes.

*[Comment to Article 6.1: Violations of Article 2.1 (Presence of a Prohibited Substance or its Metabolites or Markers) may be established only by Sample analysis performed by a WADA-approved laboratory or another laboratory specifically authorized by WADA. Violations of other Articles may be established using analytical results from other laboratories so long as the results are reliable.]*

*[Comment to Article 6.2: For example, relevant profile information could be used to direct Target Testing or to support an anti-doping rule violation proceeding under Article 2.2 (Use or Attempted Use of a Prohibited Substance), or both.]*

### 6.3 Research on *Sample*s

No *Sample* may be used for any purpose other than as described in Article 6.2 without the *Athlete*'s written consent. *Sample*s used for purposes other than Article 6.2 shall have any means of identification removed such that they cannot be traced back to a particular *Athlete*.

### 6.4 Standards for *Sample* Analysis and Reporting

Laboratories shall analyze *Doping Control Sample*s and report results in conformity with the *International Standard* for Laboratories.

### 6.5 Retesting *Sample*s

A *Sample* may be reanalyzed for the purpose of Article 6.2 at any time exclusively at the direction of the *Anti-Doping Organization* that collected the *Sample* or *WADA.* The circumstances and conditions for retesting *Sample*s shall conform with the requirements of the *International Standard* for Laboratories.

*[Comment to Article 6.5: Although this Article is new, Anti-Doping Organizations have always had the authority to reanalyze Samples. The International Standard for Laboratories or a new technical document which is made a part of the International Standard will harmonize the protocol for such retesting.]*

# ARTICLE 7: RESULTS MANAGEMENT

Each *Anti-Doping Organization* conducting results management shall establish a process for the pre-hearing administration of potential anti-doping rule violations that respects the following principles:

### 7.1   Initial Review Regarding *Adverse Analytical Finding*s

Upon receipt of an A *Sample Adverse Analytical Finding*, the *Anti-Doping Organization* responsible for results management shall conduct a review to determine whether: (a) an applicable therapeutic use exemption has been granted or will be granted as provided in the *International Standard* for Therapeutic Use Exemptions, or (b) there is any apparent departure from the *International Standard* for *Testing* or *International Standard* for Laboratories that caused the *Adverse Analytical Finding*.

### 7.2   Notification After Initial Review Regarding *Adverse Analytical Finding*s

If the initial review of an *Adverse Analytical Finding* under Article 7.1 does not reveal an applicable therapeutic use exemption or entitlement to a therapeutic use exemption as provided in the *International Standard* for Therapeutic Use Exemptions, or departure that caused the *Adverse*

*[Comment to Article 7: Various Signatories have created their own approaches to results management. While the various approaches have not been entirely uniform, many have proven to be fair and effective systems for results management. The Code does not supplant each of the Signatories' results management systems. This Article does, however, specify basic principles in order to ensure the fundamental fairness of the results management process which must be observed by each Signatory. The specific anti-doping rules of each Signatory shall be consistent with these basic principles.]*

*Analytical Finding*, the *Anti-Doping Organization* shall promptly notify the *Athlete*, in the manner set out in its rules, of: (a) the *Adverse Analytical Finding*; (b) the anti-doping rule violated; (c) the *Athlete*'s right to promptly request the analysis of the B *Sample* or, failing such request, that the B *Sample* analysis may be deemed waived; (d) the scheduled date, time and place for the B *Sample* analysis if the *Athlete* or *Anti-Doping Organization* chooses to request an analysis of the B *Sample*; (e) the opportunity for the *Athlete* and/or the *Athlete*'s representative to attend the B *Sample* opening and analysis within the time period specified in the *International Standard* for Laboratories if such analysis is requested; and (f) the *Athlete*'s right to request copies of the A and B *Sample* laboratory documentation package which includes information as required by the *International Standard* for Laboratories. The *Anti-Doping Organization* shall also notify the other *Anti-Doping Organization*s described in Article 14.1.2. If the *Anti-Doping Organization* decides not to bring forward the *Adverse Analytical Finding* as an anti-doping rule violation, it shall so notify the *Athlete* and the *Anti-Doping Organization*s as described in Article 14.1.2.

**7.3**   **Review of *Atypical Finding*s**

As provided in the *International Standard*s, in some circumstances laboratories are directed to report the presence of *Prohibited Substance*s, which may also be produced endogenously, as *Atypical Finding*s subject to further investigation. Upon receipt of an A *Sample Atypical Finding*, the *Anti-Doping Organization* responsible for results management

shall conduct a review to determine whether: (a) an applicable therapeutic use exemption has been granted, or (b) there is any apparent departure from the *International Standard* for *Testing* or *International Standard* for Laboratories that caused the *Atypical Finding*. If that review does not reveal an applicable therapeutic use exemption or departure that caused the *Atypical Finding*, the *Anti-Doping Organization* shall conduct the required investigation. After the investigation is completed, the *Athlete* and other *Anti-Doping Organization*s identified in Article 14.1.2 shall be notified whether or not the *Atypical Finding* will be brought forward as an *Adverse Analytical Finding*. The *Athlete* shall be notified as provided in Article 7.2.

7.3.1 The *Anti-Doping Organization* will not provide notice of an *Atypical Finding* until it has completed its investigation and decided whether it will bring the *Atypical Finding* forward as an *Adverse Analytical Finding* unless one of the following circumstances exist:

(a) If the *Anti-Doping Organization* determines the B *Sample* should be analyzed prior to the conclusion of its investigation under Article 7.3, the *Anti-Doping Organization* may conduct the B *Sample* analysis after notifying the *Athlete*, with such notice to include a description of the *Atypical Finding* and the information described in Article 7.2(b)-(f).

(b) If the *Anti-Doping Organization* receives a request, either from a *Major Event Organization* shortly before one of its *International Event*s or a request from a sport organization responsible for meeting an imminent deadline for selecting team members for an *International Event*, to disclose whether any *Athlete* identified on a list provided by the *Major Event Organization* or sport organization has a pending *Atypical Finding*, the *Anti-Doping Organization* shall so identify any such *Athlete* after first providing notice of the *Atypical Finding* to the *Athlete*.

## 7.4 Review of Other Anti-Doping Rule Violations Not Covered by Articles 7.1–7.3

The *Anti-Doping Organization* or other reviewing body established by such organization shall conduct any follow-up investigation into a possible anti-doping rule violation as may be required under applicable anti-doping policies and rules adopted pursuant to the *Code* or which the *Anti-Doping Organization* otherwise considers appropriate. At such time as the *Anti-Doping Organization* is satisfied that an anti-doping rule violation has occurred, it shall promptly give the *Athlete* or other *Person* subject to sanction notice, in the manner set out in its rules, of the anti-doping rule violated, and the basis of the violation. Other *Anti-Doping Organization*s shall be notified as provided in Article 14.1.2.

*[Comment to Article 7.3.1(b): Under the circumstance described in Article 7.3.1(b), the option to take action would be left to the Major Event Organization or sport organization consistent with its rules.]*

*[Comment to Article 7.4: As an example, an International Federation typically would notify the Athlete through the Athlete's national sports federation.]*

### 7.5 Principles Applicable to *Provisional Suspension*s

7.5.1 Mandatory *Provisional Suspension*
after A *Sample Adverse Analytical Finding*

*Signatories* shall adopt rules, applicable to any *Event* for which the *Signatory* is the ruling body or for any team selection process for which the *Signatory* is responsible or where the *Signatory* is the applicable International Federation or has results management authority over the alleged anti-doping rule violation, providing that when an A *Sample Adverse Analytical Finding* is received for a *Prohibited Substance,* other than a Specified Substance, a *Provisional Suspension* shall be imposed promptly after the review and notification described in Articles 7.1 and 7.2.

Provided, however, that a *Provisional Suspension* may not be imposed unless the *Athlete* is given either: (a) an opportunity for a *Provisional Hearing* either before imposition of the *Provisional Suspension* or on a timely basis

*[Comment to Article 7.5: Before a Provisional Suspension can be unilaterally imposed by an Anti-Doping Organization, the internal review specified in the Code must first be completed. In addition, a Signatory imposing a Provisional Suspension is required to give the Athlete an opportunity for a Provisional Hearing either before or promptly after the imposition of the Provisional Suspension, or an expedited final hearing under Article 8 promptly after imposition of the Provisional Suspension. The Athlete has a right to appeal under Article 13.2.*

*In the rare circumstance where the B Sample analysis does not confirm the A Sample finding, the Athlete who had been provisionally suspended will be allowed, where circumstances permit, to participate in subsequent Competitions during the Event. Similarly, depending upon the relevant rules of the International Federation in a Team Sport, if the team is still in Competition, the Athlete may be able to take part in future Competitions.*

*Athletes shall receive credit for a Provisional Suspension against any period of Ineligibility which is ultimately imposed as provided in Article 10.9.3.]*

after imposition of the *Provisional Suspension*; or (b) an opportunity for an expedited hearing in accordance with Article 8 (Right to a Fair Hearing) on a timely basis after imposition of a *Provisional Suspension*.

7.5.2 Optional *Provisional Suspension* based on A *Sample Adverse Analytical Finding* for Specified Substances or other anti-doping rule violations

A *Signatory* may adopt rules, applicable to any *Event* for which the *Signatory* is the ruling body or for any team selection process for which the *Signatory* is responsible or where the *Signatory* is the applicable International Federation or has results management authority over the alleged anti-doping rule violation, permitting *Provisional Suspension*s to be imposed for anti-doping rule violations other than an *Adverse Analytical Finding*, or after the review and notification described in Articles 7.1 and 7.2 for Specified Substances, but prior to the analysis of the *Athlete*'s B *Sample* or the final hearing as described in Article 8 (Right to a Fair Hearing).

Provided, however, that a *Provisional Suspension* may not be imposed unless the *Athlete* or other *Person* is given either: (a) an opportunity for a *Provisional Hearing* either before imposition of the *Provisional Suspension* or on a timely basis after imposition of the *Provisional Suspension*; or (b) an opportunity for an expedited hearing in accordance with Article 8 (Right to a Fair Hearing) on a timely basis after imposition of a *Provisional Suspension*.

If a *Provisional Suspension* is imposed based on an A *Sample Adverse Analytical Finding* and a

subsequent B *Sample* analysis (if requested by the *Athlete* or *Anti-Doping Organization*) does not confirm the A *Sample* analysis, then the *Athlete* shall not be subject to any further *Provisional Suspension* on account of a violation of Article 2.1 (Presence of a *Prohibited Substance* or its *Metabolite*s or *Marker*s*)*. In circumstances where the *Athlete* (or the *Athlete*'s team as may be provided in the rules of the applicable International Federation) has been removed from a *Competition* based on a violation of Article 2.1 and the subsequent B *Sample* analysis does not confirm the A *Sample* finding, if, without otherwise affecting the *Competition*, it is still possible for the *Athlete* or team to be reinserted, the *Athlete* or team may continue to take part in the *Competition*.

### 7.6 Retirement from Sport

If an *Athlete* or other *Person* retires while a results management process is underway, the *Anti-Doping Organization* conducting the results management process retains jurisdiction to complete its results management process. If an *Athlete* or other *Person* retires before any results management process has begun, the *Anti-Doping Organization* which would have had results management jurisdiction over the *Athlete* or other *Person* at the time the *Athlete* or other *Person* committed an anti-doping rule violation, has jurisdiction to conduct results management.

*[Comment to Article 7.6: Conduct by an Athlete or other Person before the Athlete or other Person was subject to the jurisdiction of any Anti-Doping Organization would not constitute an anti-doping rule violation but could be a legitimate basis for denying the Athlete or other Person membership in a sports organization.]*

# ARTICLE 8: RIGHT TO A FAIR HEARING

## 8.1 Fair Hearings

Each *Anti-Doping Organization* with responsibility for results management shall provide a hearing process for any *Person* who is asserted to have committed an anti-doping rule violation. Such hearing process shall address whether an anti-doping rule violation was committed and, if so, the appropriate *Consequences*. The hearing process shall respect the following principles:

- a timely hearing;

- a fair and impartial hearing panel;

- the right to be represented by counsel at the *Person*'s own expense;

- the right to be informed in a fair and timely manner of the asserted anti-doping rule violation;

- the right to respond to the asserted anti-doping rule violation and resulting *Consequences*;

- the right of each party to present evidence, including the right to call and question witnesses (subject to the hearing panel's discretion to accept testimony by telephone or written submission);

- the *Person*'s right to an interpreter at the hearing, with the hearing panel to determine the identity, and responsibility for the cost, of the interpreter; and

*[Comment to Article 8.1: This Article contains basic principles relative to ensuring a fair hearing for Persons asserted to have committed anti-doping rule violations. This Article is not intended to supplant each Signatory's own rules for hearings but rather to ensure that each Signatory provides a hearing process consistent with these principles.]*

- a timely, written, reasoned decision, specifically including an explanation of the reason(s) for any period of *Ineligibility*.

### 8.2 *Event* Hearings

Hearings held in connection with *Event*s may be conducted by an expedited process as permitted by the rules of the relevant *Anti-Doping Organization* and the hearing panel.

### 8.3 Waiver of Hearing

The right to a hearing may be waived either expressly or by the *Athlete*'s or other *Person*'s failure to challenge an *Anti-Doping Organization*'s assertion that an anti-doping rule violation has occurred within the specific time period provided in the *Anti-Doping Organization*'s rules. Where no hearing occurs, the *Anti-Doping Organization* with results management responsibility shall submit to the *Person*s described in Article 13.2.3 a reasoned decision explaining the action taken.

*[Comment to Article 8.2: For example, a hearing could be expedited on the eve of a major Event where the resolution of the anti-doping rule violation is necessary to determine the Athlete's eligibility to participate in the Event or during an Event where the resolution of the case will affect the validity of the Athlete's results or continued participation in the Event.]*

se 1:12-cv-00606-SS   Document 7-10   Filed 07/09/12   Page 50 of

# ARTICLE 9: AUTOMATIC *DISQUALIFICATION* OF INDIVIDUAL RESULTS

An anti-doping rule violation in *Individual Sport*s in connection with an *In-Competition* test automatically leads to *Disqualification* of the result obtained in that *Competition* with all resulting *Consequences*, including forfeiture of any medals, points and prizes.

*[Comment to Article 9: When an Athlete wins a gold medal with a Prohibited Substance in his or her system, that is unfair to the other Athletes in that Competition regardless of whether the gold medalist was at fault in any way. Only a "clean" Athlete should be allowed to benefit from his or her competitive results.*

*For Team Sports, see Article 11 (Consequences to Teams). In sports which are not Team Sports but where awards are given to teams, Disqualification or other disciplinary action against the team when one or more team members have committed an anti-doping rule violation shall be as provided in the applicable rules of the International Federation.]*

# ARTICLE 10: SANCTIONS ON INDIVIDUALS

10.1   *Disqualification* of Results in the *Event* During which an Anti-Doping Rule Violation Occurs

An anti-doping rule violation occurring during or in connection with an *Event* may, upon the decision of the ruling body of the *Event*, lead to *Disqualification* of all of the *Athlete*'s individual results obtained in that *Event* with all *Consequences*, including forfeiture of all medals, points and prizes, except as provided in Article 10.1.1.

10.1.1   If the *Athlete* establishes that he or she bears *No Fault or Negligence* for the violation, the *Athlete*'s individual results in the other *Competition*s shall not be *Disqualified* unless the *Athlete*'s results in *Competition*s other than the *Competition* in which the anti-doping rule violation occurred were likely to have been affected by the *Athlete*'s anti-doping rule violation.

*[Comment to Article 10.1: Whereas Article 9 (Automatic Disqualification of Individual Results) Disqualifies the result in a single Competition in which the Athlete tested positive (e.g., the 100 meter backstroke), this Article may lead to Disqualification of all results in all races during the Event (e.g., the FINA World Championships). Factors to be included in considering whether to Disqualify other results in an Event might include, for example, the severity of the Athlete's anti-doping rule violation and whether the Athlete tested negative in the other Competitions.]*

10.2 *Ineligibility* for Presence, *Use* or *Attempted Use*, or *Possession* of *Prohibited Substance*s and *Prohibited Method*s

The period of *Ineligibility* imposed for a violation of Article 2.1 (Presence of *Prohibited Substance* or its *Metabolite*s or *Marker*s), Article 2.2 (*Use* or *Attempt*ed *Use* of *Prohibited Substance* or *Prohibited Method*) or Article 2.6 (*Possession* of *Prohibited Substance*s and *Prohibited Method*s) shall be as follows, unless the conditions for eliminating or reducing the period of *Ineligibility*, as provided in Articles 10.4 and 10.5, or the conditions for increasing the period of *Ineligibility*, as provided in Article 10.6, are met:

First violation: Two (2) years *Ineligibility.*

*[Comment to Article 10.2: Harmonization of sanctions has been one of the most discussed and debated areas of anti-doping. Harmonization means that the same rules and criteria are applied to assess the unique facts of each case. Arguments against requiring harmonization of sanctions are based on differences between sports including, for example, the following: in some sports the Athletes are professionals making a sizable income from the sport and in others the Athletes are true amateurs; in those sports where an Athlete's career is short (e.g., artistic gymnastics) a two-year Disqualification has a much more significant effect on the Athlete than in sports where careers are traditionally much longer (e.g., equestrian and shooting); in Individual Sports, the Athlete is better able to maintain competitive skills through solitary practice during Disqualification than in other sports where practice as part of a team is more important. A primary argument in favor of harmonization is that it is simply not right that two Athletes from the same country who test positive for the same Prohibited Substance under similar circumstances should receive different sanctions only because they participate in different sports. In addition, flexibility in sanctioning has often been viewed as an unacceptable opportunity for some sporting organizations to be more lenient with dopers. The lack of harmonization of sanctions has also frequently been the source of jurisdictional conflicts between International Federations and National Anti-Doping Organizations.]*

### 10.3 *Ineligibility* for Other Anti-Doping Rule Violations

The period of *Ineligibility* for anti-doping rule violations other than as provided in Article 10.2 shall be as follows:

10.3.1   For violations of Article 2.3 (Refusing or Failing to Submit to *Sample* Collection) or Article 2.5 (*Tampering* with *Doping Control*), the *Ineligibility* period shall be two (2) years unless the conditions provided in Article 10.5, or the conditions provided in Article 10.6, are met.

10.3.2   For violations of Articles 2.7 (*Trafficking or Attempt*ed *Trafficking*) or 2.8 (Administration or *Attempt*ed Administration of *Prohibited Substance* or *Prohibited Method*), the period of *Ineligibility* imposed shall be a minimum of four (4) years up to lifetime *Ineligibility* unless the conditions provided in Article 10.5 are met. An anti-doping rule violation involving a *Minor* shall be considered a particularly serious violation and, if committed by *Athlete Support Personnel* for violations other than Specified Substances referenced in Article 4.2.2, shall result in lifetime *Ineligibility* for *Athlete Support Personnel*. In addition, significant violations of Articles 2.7 or 2.8 which may also violate non-sporting laws and regulations, shall be reported to the competent administrative, professional or judicial authorities.

*[Comment to Article 10.3.2: Those who are involved in doping Athletes or covering up doping should be subject to sanctions which are more severe than the Athletes who test positive. Since the authority of sport organizations is generally limited to Ineligibility for credentials, membership and other sport benefits, reporting Athlete Support Personnel to competent authorities is an important step in the deterrence of doping.]*

10.3.3    For violations of Article 2.4 (Whereabouts Filing Failures and/or Missed Tests), the period of *Ineligibility* shall be at a minimum one (1) year and at a maximum two (2) years based on the *Athlete*'s degree of fault.

## 10.4    Elimination or Reduction of the Period of *Ineligibility* for Specified Substances under Specific Circumstances

Where an *Athlete* or other *Person* can establish how a Specified Substance entered his or her body or came into his or her *Possession* and that such Specified Substance was not intended to enhance the *Athlete*'s sport performance or mask the *Use* of a performance-enhancing substance, the period of *Ineligibility* found in Article 10.2 shall be replaced with the following:

*[Comment to Article 10.3.3: The sanction under Article 10.3.3 shall be two years where all three filing failures or missed tests are inexcusable. Otherwise, the sanction shall be assessed in the range of two years to one year, based on the circumstances of the case.]*

*[Comment to Article 10.4: Specified Substances are not necessarily less serious agents for purposes of sports doping than other Prohibited Substances (for example, a stimulant that is listed as a Specified Substance could be very effective to an Athlete in competition); for that reason, an Athlete who does not meet the criteria under this Article would receive a two-year period of Ineligibility and could receive up to a four-year period of Ineligibility under Article 10.6. However, there is a greater likelihood that Specified Substances, as opposed to other Prohibited Substances, could be susceptible to a credible, non-doping explanation. This Article applies only in those cases where the hearing panel is comfortably satisfied by the objective circumstances of the case that the Athlete in taking or Possessing a Prohibited Substance did not intend to enhance his or her sport*

*continued*

First violation: At a minimum, a reprimand and no period of *Ineligibility* from future *Event*s, and at a maximum, two (2) years of *Ineligibility*.

To justify any elimination or reduction, the *Athlete* or other *Person* must produce corroborating evidence in addition to his or her word which establishes to the comfortable satisfaction of the hearing panel the absence of an intent to enhance sport performance or mask the *Use* of a performance-enhancing substance. The *Athlete*'s or other *Person*'s degree of fault shall be the criterion considered in assessing any reduction of the period of *Ineligibility*.

*performance. Examples of the type of objective circumstances which in combination might lead a hearing panel to be comfortably satisfied of no performance-enhancing intent would include: the fact that the nature of the Specified Substance or the timing of its ingestion would not have been beneficial to the Athlete; the Athlete's open Use or disclosure of his or her Use of the Specified Substance; and a contemporaneous medical records file substantiating the non sport-related prescription for the Specified Substance. Generally, the greater the potential performance-enhancing benefit, the higher the burden on the Athlete to prove lack of an intent to enhance sport performance.*

*While the absence of intent to enhance sport performance must be established to the comfortable satisfaction of the hearing panel,*

*the Athlete may establish how the Specified Substance entered the body by a balance of probability.*

*In assessing the Athlete's or other Person's degree of fault, the circumstances considered must be specific and relevant to explain the Athlete's or other Person's departure from the expected standard of behavior. Thus, for example, the fact that an Athlete would lose the opportunity to earn large sums of money during a period of Ineligibility or the fact that the Athlete only has a short time left in his or her career or the timing of the sporting calendar would not be relevant factors to be considered in reducing the period of Ineligibility under this Article. It is anticipated that the period of Ineligibility will be eliminated entirely in only the most exceptional cases.]*

## 10.5 Elimination or Reduction of Period of *Ineligibility* Based on Exceptional Circumstances

### 10.5.1 *No Fault or Negligence*

If an *Athlete* establishes in an individual case that he or she bears *No Fault or Negligence*, the otherwise applicable period of *Ineligibility* shall be eliminated. When a *Prohibited Substance* or its *Marker*s or *Metabolite*s is detected in an *Athlete*'s *Sample* in violation of Article 2.1 (Presence of *Prohibited Substance*), the *Athlete* must also establish how the *Prohibited Substance* entered his or her system in order to have the period of *Ineligibility* eliminated. In the event this Article is applied and the period of *Ineligibility* otherwise applicable is eliminated, the anti-doping rule violation shall not be considered a violation for the limited purpose of determining the period of *Ineligibility* for multiple violations under Article 10.7.

*[Comment to Articles 10.5.1 and 10.5.2: The Code provides for the possible reduction or elimination of the period of Ineligibility in the unique circumstance where the Athlete can establish that he or she had No Fault or Negligence, or No Significant Fault or Negligence, in connection with the violation. This approach is consistent with basic principles of human rights and provides a balance between those Anti-Doping Organizations that argue for a much narrower exception, or none at all, and those that would reduce a two-year suspension based on a range of other factors even when the Athlete was admittedly at fault. These Articles apply only to the imposition of sanctions; they are not applicable to the determination of whether an anti-doping rule violation has occurred. Article 10.5.2 may be applied to any anti-doping rule violation even though it will be especially difficult to meet the criteria for a reduction for those anti-doping rule violations where knowledge is an element of the violation.*

*Articles 10.5.1 and 10.5.2 are meant to have an impact only in cases where the circumstances are truly exceptional and not in the vast majority of cases.*

*To illustrate the operation of Article 10.5.1, an example where No Fault or Negligence would result in the total elimination of a sanction is where an Athlete could prove that, despite all due care, he or she was sabotaged by a competitor. Conversely, a sanction could not be completely eliminated on the basis of No Fault or Negligence in the following circumstances: (a) a*

*continued*

10.5.2   *No Significant Fault or Negligence*

If an *Athlete* or other *Person* establishes in an individual case that he or she bears *No Significant Fault or Negligence,* then the otherwise applicable period of *Ineligibility* may be reduced, but the reduced period of *Ineligibility* may not be less than one-half of the period of *Ineligibility* otherwise applicable. If the otherwise applicable period of *Ineligibility* is a lifetime, the reduced period under this Article may be no less than eight (8) years. When a *Prohibited Substance* or its *Marker*s or *Metabolite*s is detected in an *Athlete*'s *Sample* in violation of Article 2.1 (Presence of a *Prohibited Substance* or its *Metabolite*s or *Marker*s), the *Athlete* must

positive test resulting from a mislabeled or contaminated vitamin or nutritional supplement (Athletes are responsible for what they ingest (Article 2.1.1) and have been warned against the possibility of supplement contamination); (b) the administration of a Prohibited Substance by the Athlete's personal physician or trainer without disclosure to the Athlete (Athletes are responsible for their choice of medical personnel and for advising medical personnel that they cannot be given any Prohibited Substance); and (c) sabotage of the Athlete's food or drink by a spouse, coach or other Person within the Athlete's circle of associates (Athletes are responsible for what they ingest and for the conduct of those Persons to whom they entrust access to their food and drink). However, depending on the unique facts of a particular case, any of the referenced illustrations could result in a reduced sanction based on No Significant Fault or Negligence. (For example, reduction may well be appropriate in illustration (a) if the Athlete clearly establishes that the cause of the positive test was contamination in a common multiple vitamin purchased from a source with no connection to Prohibited Substances and the Athlete exercised care in not taking other nutritional supplements.) For purposes of assessing the Athlete's or other Person's fault under Articles 10.5.1 and 10.5.2, the evidence considered must be specific and relevant to explain the Athlete's or other Person's departure from the expected standard of behavior. Thus, for example, the fact that an Athlete would lose the opportunity to earn large sums of money during a period of Ineligibility or the fact that the Athlete only has a short time left in his or her career or the timing of the sporting calendar would not be relevant factors to be considered in reducing the period of Ineligibility under this Article.

continued

also establish how the *Prohibited Substance* entered his or her system in order to have the period of *Ineligibility* reduced.

10.5.3 *Substantial Assistance* in Discovering or Establishing Anti-Doping Rule Violations

An *Anti-Doping Organization* with results management responsibility for an anti-doping rule violation may, prior to a final appellate decision under Article 13 or the expiration of the time to appeal, suspend a part of the period of *Ineligibility* imposed in an individual case where the *Athlete* or other *Person* has provided *Substantial Assistance* to an *Anti-Doping Organization*, criminal authority or professional disciplinary body which results in the *Anti-Doping Organization* discovering or establishing an anti-doping rule violation by another *Person* or which results in a criminal or disciplinary body discovering or establishing a criminal offense or the breach of

*While Minors are not given special treatment per se in determining the applicable sanction, certainly youth and lack of experience are relevant factors to be assessed in determining the Athlete's or other Person's fault under Article 10.5.2, as well as Articles 10.3.3, 10.4 and 10.5.1*

*Article 10.5.2 should not be applied in cases where Articles 10.3.3 or 10.4 apply, as those Articles already take into consideration the Athlete's or other Person's degree of fault for purposes of establishing the applicable period of Ineligibility.]*

*[Comment to Article 10.5.3: The cooperation of Athletes, Athlete Support Personnel and other Persons who acknowledge their mistakes and are willing to bring other anti-doping rule violations to light is important to clean sport.*

*Factors to be considered in assessing the importance of the Substantial Assistance would include, for example, the number of individuals implicated, the status of those individuals in the sport, whether a scheme involving Trafficking under Article 2.7 or administration under*

*continued*

professional rules by another *Person*. After a final appellate decision under Article 13 or the expiration of time to appeal, an *Anti-Doping Organization* may only suspend a part of the otherwise applicable period of *Ineligibility* with the approval of *WADA* and the applicable International Federation. The extent to which the otherwise applicable period of *Ineligibility* may be suspended shall be based on the seriousness of the anti-doping rule violation committed by the *Athlete* or other *Person* and the significance of the *Substantial Assistance* provided by the *Athlete* or other *Person* to the effort to eliminate doping in sport. No more than three-quarters of the otherwise applicable period of *Ineligibility* may be suspended. If the otherwise applicable period of *Ineligibility* is a lifetime, the non-suspended period under this section must be no less than eight (8) years. If the *Anti-Doping Organization* suspends any part of the otherwise applicable period of *Ineligibility* under this Article, the *Anti-Doping Organization* shall promptly provide a written justification for its decision to each *Anti-Doping Organization* having a right to appeal the decision. If the *Anti-Doping Organization* subsequently reinstates any part of

*Article 2.8 is involved and whether the violation involved a substance or method which is not readily detectible in Testing. The maximum suspension of the Ineligibility period shall only be applied in very exceptional cases. An additional factor to be considered in connection with the seriousness of the anti-doping rule violation is any performance-enhancing benefit which the Person providing*

*Substantial Assistance may be likely to still enjoy. As a general matter, the earlier in the results management process the Substantial Assistance is provided, the greater the percentage of the otherwise applicable period of Ineligibility may be suspended.*

*If the Athlete or other Person who is asserted to have committed an anti-doping rule violation claims*

*continued*

Case 1:12-cv-00606-SS   Document 7-10   Filed 07/09/12   Page 60 of

the suspended period of *Ineligibility* because the *Athlete* or other *Person* has failed to provide the *Substantial Assistance* which was anticipated, the *Athlete* or other *Person* may appeal the reinstatement pursuant to Article 13.2.

*entitlement to a suspended period of Ineligibility under this Article in connection with the Athlete's or other Person's waiver of a hearing under Article 8.3 (Waiver of Hearing), the Anti-Doping Organization shall determine whether a suspension of a portion of the period of Ineligibility is appropriate under this Article. If the Athlete or other Person claims entitlement to a suspended period of Ineligibility before the conclusion of a hearing under Article 8 on the anti-doping rule violation, the hearing panel shall determine whether a suspension of a portion of the otherwise applicable period of Ineligibility is appropriate under this Article at the same time the hearing panel decides whether the Athlete or other Person has committed an anti-doping rule violation. If a portion of the period of Ineligibility is suspended, the decision shall explain the basis for concluding the information provided was credible and was important to discovering or proving the anti-doping rule violation or other offense. If the Athlete or other Person claims entitlement to a suspended period of Ineligibility after*

*a final decision finding an anti-doping rule violation has been rendered and is not subject to appeal under Article 13, but the Athlete or other Person is still serving the period of Ineligibility, the Athlete or other Person may apply to the Anti-Doping Organization which had results management responsibility for the anti-doping rule violation to consider a suspension in the period of Ineligibility under this Article. Any such suspension of the otherwise applicable period of Ineligibility shall require the approval of WADA and the applicable International Federation. If any condition upon which the suspension of a period of Ineligibility is based is not fulfilled, the Anti-Doping Organization with results management authority shall reinstate the period of Ineligibility which would otherwise be applicable. Decisions rendered by Anti-Doping Organizations under this Article may be appealed pursuant to Article 13.2.*

*This is the only circumstance under the Code where the suspension of an otherwise applicable period of Ineligibility is authorized.]*

10.5.4   Admission of an Anti-Doping Rule Violation in the Absence of Other Evidence

Where an *Athlete* or other *Person* voluntarily admits the commission of an anti-doping rule violation before having received notice of a *Sample* collection which could establish an anti-doping rule violation (or, in the case of an anti-doping rule violation other than Article 2.1, before receiving first notice of the admitted violation pursuant to Article 7) and that admission is the only reliable evidence of the violation at the time of admission, then the period of *Ineligibility* may be reduced, but not below one-half of the period of *Ineligibility* otherwise applicable.

10.5.5   Where an *Athlete* or Other *Person* Establishes Entitlement to Reduction in Sanction Under More than One Provision of this Article

Before applying any reduction or suspension under Articles 10.5.2, 10.5.3 or 10.5.4, the otherwise applicable period of *Ineligibility*

*[Comment to Article 10.5.4: This Article is intended to apply when an Athlete or other Person comes forward and admits to an anti-doping rule violation in circumstances where no Anti-Doping Organization is aware that an anti-doping rule violation might have been committed. It is not intended to apply to circumstances where the admission occurs after the Athlete or other Person believes he or she is about to be caught.]*

*[Comment to Article 10.5.5: The appropriate sanction is determined in a sequence of four steps. First, the hearing panel determines which of the basic sanctions (Article 10.2, Article 10.3, Article 10.4 or Article 10.6) applies to the particular anti-doping rule violation. In a second step, the hearing panel establishes whether there is a basis for suspension, elimination or reduction of the sanction (Articles 10.5.1*

*continued*

shall be determined in accordance with Articles 10.2, 10.3, 10.4 and 10.6. If the *Athlete* or other *Person* establishes entitlement to a reduction or suspension of the period of *Ineligibility* under two or more of Articles 10.5.2, 10.5.3 or 10.5.4, then the period of *Ineligibility* may be reduced or suspended, but not below one-fourth of the otherwise applicable period of *Ineligibility*.

through 10.5.4). Note, however, not all grounds for suspension, elimination or reduction may be combined with the provisions on basic sanctions. For example, Article 10.5.2 does not apply in cases involving Articles 10.3.3 or 10.4, since the hearing panel, under Articles 10.3.3 and 10.4, will already have determined the period of Ineligibility based on the Athlete's or other Person's degree of fault. In a third step, the hearing panel determines under Article 10.5.5 whether the Athlete or other Person is entitled to elimination, reduction or suspension under more than one provision of Article 10.5. Finally, the hearing panel decides on the commencement of the period of Ineligibility under Article 10.9.

The following four examples demonstrate the proper sequence of analysis:

Example 1:

Facts: An Adverse Analytical Finding involves the presence of an anabolic steroid; the Athlete promptly admits the anti-doping rule violation as asserted; the Athlete establishes No Significant Fault (Article 10.5.2); and the Athlete provides Substantial Assistance (Article 10.5.3).

Application of Article 10:

1. The basic sanction would be two years under Article 10.2. (Aggravating Circumstances (Article 10.6) would not be considered because the Athlete promptly admitted the violation. Article 10.4 would not apply because a steroid is not a Specified Substance.)

2. Based on No Significant Fault alone, the sanction could be reduced up to one-half of the two years. Based on Substantial Assistance alone, the sanction could be reduced up to three-quarters of the two years.

3. Under Article 10.5.5, in considering the possible reduction for No Significant Fault and Substantial Assistance together, the most the sanction could be reduced is up to three-quarters of the two years. Thus, the minimum sanction would be a six-month period of Ineligibility.

4. Under Article 10.9.2, because the Athlete promptly admitted the anti-doping rule violation, the period of Ineligibility could start as early as the date of Sample collection, but in any event the

continued

Athlete would have to serve at least one-half of the Ineligibility period (minimum three months) after the date of the hearing decision.

### Example 2:

*Facts*: An Adverse Analytical Finding involves the presence of an anabolic steroid; aggravating circumstances exist and the Athlete is unable to establish that he did not knowingly commit the anti-doping rule violation; the Athlete does not promptly admit the anti-doping rule violation as alleged; but the Athlete does provide Substantial Assistance (Article 10.5.3).

*Application of Article 10*:

1. The basic sanction would be between two and four years Ineligibility as provided in Article 10.6.

2. Based on Substantial Assistance, the sanction could be reduced up to three-quarters of the maximum four years.

3. Article 10.5.5 does not apply.

4. Under Article 10.9.2, the period of Ineligibility would start on the date of the hearing decision.

### Example 3:

*Facts*: An Adverse Analytical Finding involves the presence of a Specified Substance; the Athlete establishes how the Specified Substance entered his body and that he had no intent to enhance his sport performance; the Athlete establishes that he had very little fault; and the Athlete provides Substantial Assistance (Article 10.5.3).

*Application of Article 10*:

1. Because the Adverse Analytical Finding involved a Specified Substance and the Athlete has satisfied the other conditions of Article 10.4, the basic sanction would fall in the range between a reprimand and two years Ineligibility. The hearing panel would assess the Athlete's fault in imposing a sanction within that range. (Assume for illustration in this example that the panel would otherwise impose a period of Ineligibility of eight months.)

2. Based on Substantial Assistance, the sanction could be reduced up to three-quarters of the eight months. (No less than two months.) No Significant Fault (Article 10.2) would not be applicable because the Athlete's degree of fault was already taken into consideration in establishing the eight-month period of Ineligibility in step 1.

3. Article 10.5.5 does not apply.

4. Under Article 10.9.2, because the Athlete promptly admitted the anti-doping rule violation, the period of Ineligibility could start as early as the date of Sample collection, but in any event, the Athlete would have to serve at least half of the Ineligibility period after the date of the hearing decision. (Minimum one month.)

### Example 4:

*Facts*: An Athlete who has never had an Adverse Analytical Finding or been confronted with an anti-doping

continued

rule violation spontaneously admits that he intentionally used multiple Prohibited Substances to enhance his performance. The Athlete also provides Substantial Assistance (Article 10.5.3).

*Application of Article 10:*

1. While the intentional Use of multiple Prohibited Substances to enhance performance would normally warrant consideration of aggravating circumstances (Article 10.6), the Athlete's spontaneous admission means that Article 10.6 would not apply. The fact that the Athlete's Use of Prohibited Substances was intended to enhance performance would also eliminate the application of Article 10.4 regardless of whether the Prohibited Substances Used were Specified Substances. Thus, Article 10.2 would be applicable and the basic period of Ineligibility imposed would be two years.

2. Based on the Athlete's spontaneous admissions (Article 10.5.4) alone, the period of Ineligibility could be reduced up to one-half of the two years.

Based on the Athlete's Substantial Assistance (Article 10.5.3) alone, the period of Ineligibility could be reduced up to three-quarters of the two years.

3. Under Article 10.5.5, in considering the spontaneous admission and Substantial Assistance together, the most the sanction could be reduced would be up to three-quarters of the two years. (The minimum period of Ineligibility would be six months.)

4. If Article 10.5.4 was considered by the hearing panel in arriving at the minimum six-month period of Ineligibility at step 3, the period of Ineligibility would start on the date the hearing panel imposed the sanction. If, however, the hearing panel did not consider the application of Article 10.5.4 in reducing the period of Ineligibility in step 3, then under Article 10.9.2, the commencement of the period of Ineligibility could be started as early as the date the anti-doping rule violation was committed, provided that at least half of that period (minimum of three months) would have to be served after the date of the hearing decision.]

### 10.6 Aggravating Circumstances Which May Increase the Period of *Ineligibility*

If the *Anti-Doping Organization* establishes in an individual case involving an anti-doping rule violation other than violations under Articles 2.7 (*Trafficking or Attempt*ed *Trafficking*) and 2.8 (Administration or *Attempt*ed Administration) that aggravating circumstances are present which justify the imposition of a period of *Ineligibility* greater than the standard sanction, then the period of *Ineligibility* otherwise applicable shall be increased up to a maximum of four (4) years unless the *Athlete* or other *Person* can prove to the comfortable satisfaction of the hearing panel that he or she did not knowingly commit the anti-doping rule violation.

An *Athlete* or other *Person* can avoid the application of this Article by admitting the anti-doping rule violation as asserted promptly after being confronted with the anti-doping rule violation by an *Anti-Doping Organization*.

*[Comment to Article 10.6: Examples of aggravating circumstances which may justify the imposition of a period of Ineligibility greater than the standard sanction are: the Athlete or other Person committed the anti-doping rule violation as part of a doping plan or scheme, either individually or involving a conspiracy or common enterprise to commit anti-doping rule violations; the Athlete or other Person Used or Possessed multiple Prohibited Substances or Prohibited Methods or Used or Possessed a Prohibited Substance or Prohibited Method on multiple occasions; a normal individual would be likely to enjoy the performance-enhancing effects of the anti-doping rule violation(s) beyond the otherwise applicable period of Ineligibility; the Athlete or Person engaged in deceptive or obstructing conduct to avoid the detection or adjudication of an anti-doping rule violation.*

*For the avoidance of doubt, the examples of aggravating circumstances described in this Comment to Article 10.6 are not exclusive and other aggravating factors may also justify the imposition of a longer period of Ineligibility. Violations under Articles 2.7 (Trafficking or Attempted Trafficking) and 2.8 (Administration or Attempted Administration) are not included in the application of Article 10.6 because the sanctions for these violations (from four years to lifetime Ineligibility) already build in sufficient discretion to allow consideration of any aggravating circumstance.]*

## 10.7 Multiple Violations

### 10.7.1 Second Anti-Doping Rule Violation

For an *Athlete*'s or other *Person*'s first anti-doping rule violation, the period of *Ineligibility* is set forth in Articles 10.2 and 10.3 (subject to elimination, reduction or suspension under Articles 10.4 or 10.5, or to an increase under Article 10.6). For a second anti-doping rule violation the period of *Ineligibility* shall be within the range set forth in the table below.

| Second Violation / First Violation | RS | FFMT | NSF | St | AS | TRA |
|---|---|---|---|---|---|---|
| RS | 1-4 | 2-4 | 2-4 | 4-6 | 8-10 | 10-life |
| FFMT | 1-4 | 4-8 | 4-8 | 6-8 | 10-life | life |
| NSF | 1-4 | 4-8 | 4-8 | 6-8 | 10-life | life |
| St | 2-4 | 6-8 | 6-8 | 8-life | life | life |
| AS | 4-5 | 10-life | 10-life | life | life | life |
| TRA | 8-life | life | life | life | life | life |

*[Comment to Article 10.7.1: The table is applied by locating the Athlete's or other Person's first anti-doping rule violation in the left-hand column and then moving across the table to the right to the column representing the second violation. By way of example, assume an Athlete receives the standard period of Ineligibility for a first violation under Article 10.2 and then commits a second violation for which he receives a reduced sanction for a Specified Substance under Article 10.4. The table is used to determine the period of Ineligibility for the second violation. The table is applied to this example by starting in the left-hand column and going down to the fourth row which is "St" for standard sanction, then moving across the table to the first column which is "RS" for reduced sanction for a Specified Substance, thus resulting in a 2-4 year range for the period of Ineligibility for the second violation. The Athlete's or other Person's degree of fault shall be the criterion considered in assessing a period of Ineligibility within the applicable range.]*

Definitions for purposes of the second anti-doping rule violation table:

**RS** (Reduced sanction for Specified Substance under Article 10.4): The anti-doping rule violation was or should be sanctioned by a reduced sanction under Article 10.4 because it involved a Specified Substance and the other conditions under Article 10.4 were met.

**FFMT** (Filing Failures and/or Missed Tests): The anti-doping rule violation was or should be sanctioned under Article 10.3.3 (Filing Failures and/or Missed Tests).

**NSF** (Reduced sanction for *No Significant Fault* or *Negligence*): The anti-doping rule violation was or should be sanctioned by a reduced sanction under Article 10.5.2 because *No Significant Fault* or *Negligence* under Article 10.5.2 was proved by the *Athlete*.

**St** (Standard sanction under Articles 10.2 or 10.3.1): The anti-doping rule violation was or should be sanctioned by the standard sanction of two (2) years under Articles 10.2 or 10.3.1.

**AS** (Aggravated sanction): The anti-doping rule violation was or should be sanctioned by an aggravated sanction under Article 10.6 because the *Anti-Doping Organization* established the conditions set forth under Article 10.6.

**TRA** (*Trafficking* or *Attempt*ed *Trafficking* and administration or *Attempt*ed administration): The anti-doping rule violation was or should be sanctioned by a sanction under Article 10.3.2.

*[Comment to Article 10.7.1 RS Definition: See Article 25.4 with respect to application of Article 10.7.1 to pre-Code anti-doping rule violations.]*

10.7.2 Application of Articles 10.5.3 and 10.5.4 to Second Anti-Doping Rule Violation

Where an *Athlete* or other *Person* who commits a second anti-doping rule violation establishes entitlement to suspension or reduction of a portion of the period of *Ineligibility* under Article 10.5.3 or Article 10.5.4, the hearing panel shall first determine the otherwise applicable period of *Ineligibility* within the range established in the table in Article 10.7.1, and then apply the appropriate suspension or reduction of the period of *Ineligibility*. The remaining period of *Ineligibility*, after applying any suspension or reduction under Articles 10.5.3 and 10.5.4, must be at least one-fourth of the otherwise applicable period of *Ineligibility*.

10.7.3 Third Anti-Doping Rule Violation

A third anti-doping rule violation will always result in a lifetime period of *Ineligibility*, except if the third violation fulfills the condition for elimination or reduction of the period of *Ineligibility* under Article 10.4 or involves a violation of Article 2.4 (Filing Failures and/or and Missed Tests). In these particular cases, the period of *Ineligibility* shall be from eight (8) years to life ban.

10.7.4    Additional Rules for Certain
Potential Multiple Violations

- For purposes of imposing sanctions under Article 10.7, an anti-doping rule violation will only be considered a second violation if the *Anti-Doping Organization* can establish that the *Athlete* or other *Person* committed the second anti-doping rule violation after the *Athlete* or other *Person* received notice pursuant to Article 7 (Results Management), or after the *Anti-Doping Organization* made reasonable efforts to give notice, of the first anti-doping rule violation; if the *Anti-Doping Organization* cannot establish this, the violations shall be considered together as one single first violation, and the sanction imposed shall be based on the violation that carries the more severe sanction; however, the occurrence of multiple violations may be considered as a factor in determining aggravating circumstances (Article 10.6).

- If, after the resolution of a first anti-doping rule violation, an *Anti-Doping Organization* discovers facts involving an anti-doping

*[Comment to Article 10.7.4: In a hypothetical situation, an Athlete commits an anti-doping rule violation on January 1, 2008, which the Anti-Doping Organization does not discover until December 1, 2008. In the meantime, the Athlete commits another anti-doping rule violation on March 1, 2008, and the Athlete is notified of this violation by the Anti-Doping Organization on March 30, 2008, and a hearing panel rules on June 30, 2008 that the Athlete committed the March 1, 2008 anti-doping rule violation. The later-discovered violation which occurred on January 1, 2008 will provide the basis for aggravating circumstances because the Athlete did not voluntarily admit the violation in a timely basis after the Athlete received notification of the later violation on March 30, 2008.]*

rule violation by the *Athlete* or other *Person* which occurred prior to notification regarding the first violation, then the *Anti-Doping Organization* shall impose an additional sanction based on the sanction that could have been imposed if the two violations would have been adjudicated at the same time. Results in all *Competition*s dating back to the earlier anti-doping rule violation will be *Disqualified* as provided in Article 10.8. To avoid the possibility of a finding of aggravating circumstances (Article 10.6) on account of the earlier-in-time but later-discovered violation, the *Athlete* or other *Person* must voluntarily admit the earlier anti-doping rule violation on a timely basis after notice of the violation for which he or she is first charged. The same rule shall also apply when the *Anti-Doping Organization* discovers facts involving another prior violation after the resolution of a second anti-doping rule violation.

10.7.5    Multiple Anti-Doping Rule Violations During an Eight-Year Period

For purposes of Article 10.7, each anti-doping rule violation must take place within the same eight-year period in order to be considered multiple violations.

**10.8** *Disqualification* of Results in *Competition*s Subsequent to *Sample* Collection or Commission of an Anti-Doping Rule Violation

In addition to the automatic *Disqualification* of the results in the *Competition* which produced the positive *Sample* under Article 9 (Automatic *Disqualification* of Individual Results), all other competitive results obtained from the date a positive *Sample* was collected (whether *In-Competition* or *Out-of-Competition*), or other anti-doping rule violation occurred, through the commencement of any *Provisional Suspension* or *Ineligibility* period, shall, unless fairness requires otherwise, be *Disqualified* with all of the resulting *Consequences* including forfeiture of any medals, points and prizes.

10.8.1 As a condition of regaining eligibility after being found to have committed an anti-doping rule violation, the *Athlete* must first repay all prize money forfeited under this Article.

10.8.2 Allocation of Forfeited Prize Money

Unless the rules of the International Federation provide that forfeited prize money shall be reallocated to other *Athlete*s, it shall be allocated first to reimburse the collection expenses of the *Anti-Doping Organization* that performed the necessary steps to collect the prize money back, then to reimburse the expenses of the *Anti-Doping Organization* that conducted results management in the case, with the balance, if any, allocated in accordance with the International Federation's rules.

*[Comment to Article 10.8.2: Nothing in the Code precludes clean Athletes or other Persons who have been damaged by the actions of a Person who has committed an anti-doping rule violation from pursuing any right which they would otherwise have to seek damages from such Person.]*

## 10.9 Commencement of *Ineligibility* Period

Except as provided below, the period of *Ineligibility* shall start on the date of the hearing decision providing for *Ineligibility* or, if the hearing is waived, on the date *Ineligibility* is accepted or otherwise imposed. Any period of *Provisional Suspension* (whether imposed or voluntarily accepted) shall be credited against the total period of *Ineligibility* imposed.

### 10.9.1 Delays Not Attributable to the *Athlete* or other *Person*

Where there have been substantial delays in the hearing process or other aspects of *Doping Control* not attributable to the *Athlete* or other *Person*, the body imposing the sanction may start the period of *Ineligibility* at an earlier date commencing as early as the date of *Sample* collection or the date on which another anti-doping rule violation last occurred.

### 10.9.2 Timely Admission

Where the *Athlete* or other *Person* promptly (which, in all events, for an *Athlete* means before the *Athlete* competes again) admits the anti-doping rule violation after being confronted with the anti-doping rule violation by the *Anti-Doping Organization*, the period of *Ineligibility* may start as early as the date of *Sample* collection or the date on which another anti-doping rule violation last occurred. In each case, however, where this Article is applied, the *Athlete* or other *Person* shall serve at least one-half of the period of *Ineligibility* going forward from the date the *Athlete* or other *Person* accepted the imposition of a sanction, the date

*[Comment to Article 10.9.2: This Article shall not apply where the period of Ineligibility already has been reduced under Article 10.5.4 (Admission of an Anti-Doping Rule Violation in the Absence of Other Evidence).]*

of a hearing decision imposing a sanction, or the date the sanction is otherwise imposed.

10.9.3   If a *Provisional Suspension* is imposed and respected by the *Athlete*, then the *Athlete* shall receive a credit for such period of *Provisional Suspension* against any period of *Ineligibility* which may ultimately be imposed.

10.9.4   If an *Athlete* voluntarily accepts a *Provisional Suspension* in writing from an *Anti-Doping Organization* with results management authority and thereafter refrains from competing, the *Athlete* shall receive a credit for such period of voluntary *Provisional Suspension* against any period of *Ineligibility* which may ultimately be imposed. A copy of the *Athlete*'s voluntary acceptance of a *Provisional Suspension* shall be provided promptly to each party entitled to receive notice of a potential anti-doping rule violation under Article 14.1.

10.9.5   No credit against a period of *Ineligibility* shall be given for any time period before the effective date of the *Provisional Suspension* or voluntary *Provisional Suspension* regardless of whether the *Athlete* elected not to compete or was suspended by his or her team.

*[Comment to Article 10.9.4: An Athlete's voluntary acceptance of a Provisional Suspension is not an admission by the Athlete and shall not be used in any way as to draw an adverse inference against the Athlete.]*

*[Comment to Article 10.9: The text of Article 10.9 has been revised to make clear that delays not attributable to the Athlete, timely admission by the Athlete and Provisional Suspension are the only justifications for starting the period of Ineligibility earlier than the date of the hearing decision. This amendment corrects inconsistent interpretation and application of the previous text.]*

## 10.10   Status During *Ineligibility*

### 10.10.1   Prohibition Against Participation During *Ineligibility*

No *Athlete* or other *Person* who has been declared *Ineligible* may, during the period of *Ineligibility*, participate in any capacity in a *Competition* or activity (other than authorized anti-doping education or rehabilitation programs) authorized or organized by any *Signatory*, *Signatory*'s member organization, or a club or other member organization of a *Signatory*'s member organization, or in *Competition*s authorized or organized by any professional league or any international- or national-level *Event* organization.

An *Athlete* or other *Person* subject to a period of *Ineligibility* longer than four (4) years may, after completing four (4) years of the period of *Ineligibility*, participate in local sport events in a sport other than the sport in which the *Athlete* or other *Person* committed the anti-doping rule violation, but only so long as the local sport event is not at a level that could otherwise qualify such *Athlete* or other *Person* directly or indirectly to compete in (or accumulate points toward) a national championship or *International Event.*

An *Athlete* or other *Person* subject to a period of *Ineligibility* shall remain subject to *Testing.*

*[Comment to Article 10.10.1: For example, an ineligible Athlete cannot participate in a training camp, exhibition or practice organized by his or her National Federation or a club which is a member of that National Federation. Further, an ineligible Athlete may not compete in a non-Signatory professional league (e.g., the National Hockey League, the National Basketball Association, etc.), Events organized by a non-Signatory International Event organization or a non-Signatory national-level event organization without triggering the consequences set forth in Article 10.10.2. Sanctions in one sport will also be recognized by other sports (see Article 15.4 Mutual Recognition).]*

10.10.2   Violation of the Prohibition of
          Participation During *Ineligibility*

Where an *Athlete* or other *Person* who has been declared *Ineligible* violates the prohibition against participation during *Ineligibility* described in Article 10.10.1, the results of such participation shall be *Disqualified* and the period of *Ineligibility* which was originally imposed shall start over again as of the date of the violation. The new period of *Ineligibility* may be reduced under Article 10.5.2 if the *Athlete* or other *Person* establishes he or she bears *No Significant Fault or Negligence* for violating the prohibition against participation. The determination of whether an *Athlete* or other *Person* has violated the prohibition against participation, and whether a reduction under Article 10.5.2 is appropriate, shall be made by the *Anti-Doping Organization* whose results management led to the imposition of the initial period of *Ineligibility*.

10.10.3   Withholding of Financial
          Support during *Ineligibility*

In addition, for any anti-doping rule violation not involving a reduced sanction for Specified

*[Comment to Article 10.10.2: If an Athlete or other Person is alleged to have violated the prohibition against participation during a period of Ineligibility, the Anti-Doping Organization which had results management responsibility for the anti-doping rule violation which resulted in the period of Ineligibility shall determine whether the Athlete or other Person violated the prohibition and, if so, whether the Athlete or other Person has established grounds for a reduction in the restarted period of Ineligibility under Article 10.5.2. Decisions rendered by Anti-Doping Organizations under this Article may be appealed pursuant to Article 13.2.*

*Where an Athlete Support Personnel or other Person substantially assists an Athlete in violating the prohibition against participation during Ineligibility, an Anti-Doping Organization with jurisdiction over such Athlete Support Personnel or other Person may appropriately impose sanctions under its own disciplinary rules for such assistance.]*

Substances as described in Article 10.4, some or all sport-related financial support or other sport-related benefits received by such *Person* will be withheld by *Signatories*, *Signatories'* member organizations and governments.

### 10.11  Reinstatement Testing

As a condition to regaining eligibility at the end of a specified period of *Ineligibility*, an *Athlete* must, during any period of *Provisional Suspension* or *Ineligibility*, make him or herself available for *Out-of-Competition Testing* by any *Anti-Doping Organization* having *Testing* jurisdiction, and must, if requested, provide current and accurate whereabouts information. If an *Athlete* subject to a period of *Ineligibility* retires from sport and is removed from *Out-of-Competition Testing* pools and later seeks reinstatement, the *Athlete* shall not be eligible for reinstatement until the *Athlete* has notified relevant *Anti-Doping Organization*s and has been subject to *Out-of-Competition Testing* for a period of time equal to the period of *Ineligibility* remaining as of the date the *Athlete* had retired.

### 10.12 Imposition of Financial Sanctions

*Anti-Doping Organization*s may, in their own rules, provide for financial sanctions on account of anti-doping rule violations. However, no financial sanction may be considered a basis for reducing the period of *Ineligibility* or other sanction which would otherwise be applicable under the *Code*.

*[Comment to Article 10.12: For example, if a hearing panel were to find in a case that the cumulative effect of the sanction applicable under the Code and a financial sanction provided in the rules of an Anti-Doping Organization would result in too harsh a consequence, then the Anti-Doping Organization's financial sanction, not the other Code sanctions (e.g., Ineligibility and loss of results), would give way.]*

# ARTICLE 11: *CONSEQUENCES* TO TEAMS

### 11.1 *Testing* of *Team Sport*s

Where more than one member of a team in a *Team Sport* has been notified of an anti-doping rule violation under Article 7 in connection with an *Event*, the ruling body for the *Event* shall conduct appropriate *Target Testing* of the team during the *Event Period.*

### 11.2 *Consequences* for *Team Sport*s

If more than two members of a team in a *Team Sport* are found to have committed an anti-doping rule violation during an *Event Period*, the ruling body of the *Event* shall impose an appropriate sanction on the team (e.g., loss of points, *Disqualification* from a *Competition* or *Event*, or other sanction) in addition to any *Consequences* imposed upon the individual *Athletes* committing the anti-doping rule violation.

### 11.3 *Event* Ruling Body May Establish Stricter *Consequences* for *Team Sport*s

The ruling body for an *Event* may elect to establish rules for the *Event* which impose *Consequences* for *Team Sport*s stricter than those in Article 11.2 for purposes of the *Event*.

*[Comment to Article 11.3: For example, the International Olympic Committee could establish rules which would require Disqualification of a team from the Games of the Olympiad based on a lesser number of anti-doping rule violations during the period of the Games of the Olympiad.]*

# ARTICLE 12: SANCTIONS AGAINST SPORTING BODIES

Nothing in the *Code* precludes any *Signatory* or government accepting the *Code* from enforcing its own rules for the purpose of imposing sanctions on another sporting body over which the *Signatory* or government has authority.

# ARTICLE 13: APPEALS

### 13.1   Decisions Subject to Appeal

Decisions made under the *Code* or rules adopted pursuant to the *Code* may be appealed as set forth below in Articles 13.2 through 13.4 or as otherwise provided in the *Code.* Such decisions shall remain in effect while under appeal unless the appellate body orders otherwise. Before an appeal is commenced, any post-decision review provided in the *Anti-Doping Organization*'s rules must be exhausted, provided that such review respects the principles set forth in Article 13.2.2 below (except as provided in Article 13.1.1).

*[Comment to Article 12: This Article makes it clear that the Code does not restrict whatever disciplinary rights between organizations may otherwise exist.]*

13.1.1 *WADA* Not Required to
Exhaust Internal Remedies

Where *WADA* has a right to appeal under Article 13 and no other party has appealed a final decision within the *Anti-Doping Organization's* process, *WADA* may appeal such decision directly to *CAS* without having to exhaust other remedies in the *Anti-Doping Organization* process.

## 13.2 Appeals from Decisions Regarding Anti-Doping Rule Violations, *Consequences*, and *Provisional Suspension*s

A decision that an anti-doping rule violation was committed, a decision imposing *Consequences* for an anti-doping rule violation, or a decision that no anti-doping rule violation was committed; a decision that an anti-doping rule violation proceeding cannot go forward for procedural reasons (including, for example, prescription); a decision under Article 10.10.2 (Violation of the Prohibition of Participation during *Ineligibility)*; a decision that an *Anti-Doping Organization* lacks jurisdiction to rule on an alleged anti-doping rule violation or its *Consequences*; a decision by an *Anti-Doping Organization* not to bring forward an *Adverse Analytical Finding* or an *Atypical Finding* as an anti-doping rule violation, or a decision not to go forward with an anti-doping rule violation after an investigation under Article 7.4; and a decision to impose a *Provisional Suspension* as a result of a *Provisional Hearing* or in violation of Article 7.5, may be appealed exclusively as provided in this Article 13.2.

*[Comment to Article 13.1.1: Where a decision has been rendered before the final stage of an Anti-Doping Organization's process (e.g., a first hearing) and no party elects to appeal that decision to the next level of the Anti-Doping Organization's process (e.g., the Managing Board), then WADA may bypass the remaining steps in the Anti-Doping Organization's internal process and appeal directly to CAS.]*

13.2.1 Appeals Involving *International-Level Athlete*s

In cases arising from participation in an *International Event* or in cases involving *International-Level Athlete*s, the decision may be appealed exclusively to CAS in accordance with the provisions applicable before such court.

13.2.2 Appeals Involving National-Level *Athlete*s

In cases involving national-level *Athlete*s, as defined by each *National Anti-Doping Organization*, who do not have a right to appeal under Article 13.2.1, the decision may be appealed to an independent and impartial body in accordance with rules established by the *National Anti-Doping Organization*. The rules for such appeal shall respect the following principles:

- a timely hearing;

- a fair, impartial and independent hearing panel;

- the right to be represented by counsel at the *Person*'s own expense; and

- a timely, written, reasoned decision.

*[Comment to Article 13.2.1: CAS decisions are final and binding except for any review required by law applicable to the annulment or enforcement of arbitral awards.]*

*[Comment to Article 13.2.2: An Anti-Doping Organization may elect to comply with this Article by giving its national-level Athletes the right to appeal directly to CAS.]*

13.2.3 *Person*s Entitled to Appeal

In cases under Article 13.2.1, the following parties shall have the right to appeal to *CAS*: (a) the *Athlete* or other *Person* who is the subject of the decision being appealed; (b) the other party to the case in which the decision was rendered; (c) the relevant International Federation; (d) the *National Anti-Doping Organization* of the *Person*'s country of residence or countries where the *Person* is a national or license holder; (e) the International Olympic Committee or International Paralympic Committee, as applicable, where the decision may have an effect in relation to the Olympic Games or Paralympic Games, including decisions affecting eligibility for the Olympic Games or Paralympic Games; and (f) *WADA*.

In cases under Article 13.2.2, the parties having the right to appeal to the national-level reviewing body shall be as provided in the *National Anti-Doping Organization*'s rules but, at a minimum, shall include the following parties: (a) the *Athlete* or other *Person* who is the subject of the decision being appealed; (b) the other party to the case in which the decision was rendered; (c) the relevant International Federation; (d) the *National Anti-Doping Organization* of the *Person*'s country of residence; and (e) *WADA*. For cases under Article 13.2.2, *WADA* and the International Federation shall also have the right to appeal to *CAS* with respect to the decision of the national-level reviewing body. Any party filing an appeal shall be entitled to assistance from *CAS* to obtain all relevant information from the *Anti-Doping Organization* whose decision is being

appealed and the information shall be provided if *CAS* so directs.

The filing deadline for an appeal or intervention filed by *WADA* shall be the later of:

(a) Twenty-one (21) days after the last day on which any other party in the case could have appealed, or

(b) Twenty-one (21) days after *WADA*'s receipt of the complete file relating to the decision.

Notwithstanding any other provision herein, the only *Person* who may appeal from a *Provisional Suspension* is the *Athlete* or other *Person* upon whom the *Provisional Suspension* is imposed.

### 13.3 Failure to Render a Timely Decision by an *Anti-Doping Organization*

Where, in a particular case, an *Anti-Doping Organization* fails to render a decision with respect to whether an anti-doping rule violation was committed within a reasonable deadline set by *WADA*, *WADA* may elect to appeal directly to *CAS* as if the *Anti-Doping Organization* had rendered a decision finding no anti-doping rule violation. If the *CAS* hearing panel determines that an anti-doping rule violation was

*[Comment to Article 13.3: Given the different circumstances of each anti-doping rule violation investigation and results management process, it is not feasible to establish a fixed time period for an Anti-Doping Organization to render a decision before WADA may intervene by appealing directly to CAS. Before taking such action, however, WADA will consult with the Anti-Doping Organization and give the Anti-Doping Organization an opportunity to explain why it has not yet rendered a decision. Nothing in this Article prohibits an International Federation from also having rules which authorize it to assume jurisdiction for matters in which the results management performed by one of its National Federations has been inappropriately delayed.]*

committed and that *WADA* acted reasonably in electing to appeal directly to CAS, then *WADA's* costs and attorneys fees in prosecuting the appeal shall be reimbursed to *WADA* by the *Anti-Doping Organization*.

### 13.4 Appeals from Decisions Granting or Denying a Therapeutic Use Exemption

Decisions by *WADA* reversing the grant or denial of a therapeutic use exemption may be appealed exclusively to *CAS* by the *Athlete* or the *Anti-Doping Organization* whose decision was reversed. Decisions by *Anti-Doping Organization*s other than *WADA* denying therapeutic use exemptions, which are not reversed by *WADA*, may be appealed by *International-Level Athlete*s to CAS and by other *Athlete*s to the national-level reviewing body described in Article 13.2.2. If the national-level reviewing body reverses the decision to deny a therapeutic use exemption, that decision may be appealed to *CAS* by *WADA*.

When an *Anti-Doping Organization* fails to take action on a properly submitted therapeutic use exemption application within a reasonable time, the *Anti-Doping Organization*'s failure to decide may be considered a denial for purposes of the appeal rights provided in this Article.

### 13.5 Appeals from Decisions under Part Three and Part Four of the *Code*

With respect to a *WADA* report of noncompliance under Article 23.4.5 or any *Consequences* imposed under Part Three (Roles and Responsibilities) of the *Code*, the entity to which the *WADA* report pertains or upon which *Consequences* are imposed under Part Three of the *Code* shall have the right to appeal exclusively to *CAS* in accordance with the provisions applicable before such court.

### 13.6 Appeals from Decisions Suspending or Revoking Laboratory Accreditation

Decisions by *WADA* to suspend or revoke a laboratory's *WADA* accreditation may be appealed only by that laboratory with the appeal being exclusively to *CAS*.

# ARTICLE 14: CONFIDENTIALITY AND REPORTING

The principles of coordination of anti-doping results, public transparency and accountability and respect for the privacy interests of individuals alleged to have violated anti-doping rules are:

### 14.1 Information Concerning *Adverse Analytical Finding*s, *Atypical Finding*s, and Other Potential Anti-Doping Rule Violations

#### 14.1.1 Notice to *Athlete*s and Other *Person*s

An *Athlete* whose *Sample* is brought forward as an *Adverse Analytical Finding* after the initial review under Articles 7.1 or 7.3, or an *Athlete* or other *Person* who is asserted to have committed an anti-doping rule violation after the initial review under Article 7.4, shall be notified by the *Anti-Doping Organization* with results management responsibility as provided in Article 7 (Results Management).

*[Comment to Article 13: The object of the Code is to have anti-doping matters resolved through fair and transparent internal processes with a final appeal. Anti-doping decisions made by Anti-Doping Organizations are made transparent in Article 14. Specified Persons and organizations, including WADA, are then given the opportunity to appeal those decisions. Note that the definition of interested Persons and organizations with a right to appeal under Article 13 does not include Athletes, or their federations, who might benefit from having another competitor disqualified.]*

14.1.2   Notice to *National Anti-Doping Organization*s, International Federations and *WADA*

The same *Anti-Doping Organization* shall also notify the *Athlete*'s *National Anti-Doping Organization*, International Federation and *WADA* not later than the completion of the process described in Articles 7.1 through 7.4.

14.1.3   Content of Notification

Notification shall include: the *Athlete*'s name, country, sport and discipline within the sport, the *Athlete*'s competitive level, whether the test was *In-Competition* or *Out-of-Competition*, the date of *Sample* collection and the analytical result reported by the laboratory.

14.1.4   Status Reports

The same *Person*s and *Anti-Doping Organization*s shall be regularly updated on the status and findings of any review or proceedings conducted pursuant to Articles 7 (Results Management), 8 (Right to a Fair Hearing) or 13 (Appeals) and shall be provided with a prompt written reasoned explanation or decision explaining the resolution of the matter.

14.1.5   Confidentiality

The recipient organizations shall not disclose this information beyond those *Person*s with a need to know (which would include the appropriate personnel at the applicable *National Olympic Committee*, National Federation, and team in a *Team Sport*) until

*[Comment to Article 14.1.5: Each Anti-Doping Organization shall provide, in its own anti-doping rules, procedures for the protection of confidential information and for investigating and disciplining improper disclosure of confidential information by any employee or agent of the Anti-Doping Organization.]*

the *Anti-Doping Organization* with results management responsibility has made public disclosure or has failed to make public disclosure as required in Article 14.2 below.

## 14.2 Public Disclosure

14.2.1 The identity of any *Athlete* or other *Person* who is asserted by an *Anti-Doping Organization* to have committed an anti-doping rule violation, may be *publicly disclose*d by the *Anti-Doping Organization* with results management responsibility only after notice has been provided to the *Athlete* or other *Person* in accordance with Articles 7.2, 7.3 or 7.4, and to the applicable *Anti-Doping Organization*s in accordance with Article 14.1.2.

14.2.2 No later than twenty (20) days after it has been determined in a hearing in accordance with Article 8 that an anti-doping rule violation has occurred, or such hearing has been waived, or the assertion of an anti-doping rule violation has not been timely challenged, the *Anti-Doping Organization* responsible for results management must publicly report the disposition of the anti-doping matter including the sport, the anti-doping rule violated, the name of the *Athlete* or other *Person* committing the violation, the *Prohibited Substance* or *Prohibited Method* involved and the *Consequences* imposed. The same *Anti-Doping Organization* must also publicly report within twenty (20) days appeal decisions concerning anti-doping rule violations. The *Anti-Doping Organization* shall also, within the time period for publication, send all hearing and appeal decisions to *WADA*.

14.2.3 In any case where it is determined, after a hearing or appeal, that the *Athlete* or other *Person* did not commit an anti-doping rule violation, the decision may be disclosed publicly only with the consent of the *Athlete* or other *Person* who is the subject of the decision. The *Anti-Doping Organization* with results management responsibility shall use reasonable efforts to obtain such consent, and if consent is obtained, shall publicly disclose the decision in its entirety or in such redacted form as the *Athlete* or other *Person* may approve.

14.2.4 For purposes of Article 14.2, publication shall be accomplished at a minimum by placing the required information on the *Anti-Doping Organization*'s Web site and leaving the information up for at least one (1) year.

14.2.5 No *Anti-Doping Organization* or *WADA*-accredited laboratory, or official of either, shall publicly comment on the specific facts of a pending case (as opposed to general description of process and science) except in response to public comments attributed to the *Athlete*, other *Person* or their representatives.

### 14.3 *Athlete* Whereabouts Information

As further provided in the *International Standard* for *Testing*, *Athlete*s who have been identified by their International Federation or *National Anti-Doping Organization* for inclusion in a *Registered Testing Pool* shall provide accurate, current location information. The International Federations and *National Anti-Doping Organization*s shall coordinate the identification of *Athlete*s and the collecting of current location information and shall submit these to *WADA*.

This information will be accessible, through *ADAMS* where reasonably feasible, to other *Anti-Doping Organization*s having jurisdiction to test the *Athlete* as provided in Article 15. This information shall be maintained in strict confidence at all times; shall be used exclusively for purposes of planning, coordinating or conducting *Testing*; and shall be destroyed after it is no longer relevant for these purposes.

### 14.4 Statistical Reporting

*Anti-Doping Organization*s shall, at least annually, publish publicly a general statistical report of their *Doping Control* activities with a copy provided to *WADA*. *Anti-Doping Organization*s may also publish reports showing the name of each *Athlete* tested and the date of each *Testing*.

### 14.5 *Doping Control* Information Clearinghouse

*WADA* shall act as a central clearinghouse for *Doping Control Testing* data and results for *International-Level Athlete*s and national-level *Athlete*s who have been included in their *National Anti-Doping Organization*'s *Registered Testing Pool*. To facilitate coordinated test distribution planning and to avoid unnecessary duplication in *Testing* by the various *Anti-Doping Organization*s, each *Anti-Doping Organization* shall report all *In-Competition* and *Out-of-Competition* tests on such *Athlete*s to the *WADA* clearinghouse as soon as possible after such tests have been conducted. This information will be made accessible to the *Athlete*, the *Athlete*'s National Federation, *National Olympic Committee* or National Paralympic Committee, *National Anti-Doping Organization*, International Federation, and the International Olympic Committee or International Paralympic Committee.

To enable it to serve as a clearinghouse for *Doping Control Testing* data, *WADA* has developed a database management tool, *ADAMS*, that reflects emerging data privacy principles. In particular, *WADA* has developed *ADAMS* to be consistent with data privacy statutes and norms applicable to *WADA* and other organizations using *ADAMS*. Private information regarding an *Athlete, Athlete Support Personnel,* or others involved in anti-doping activities shall be maintained by *WADA,* which is supervised by Canadian privacy authorities, in strict confidence and in accordance with the *International Standard* for the protection of privacy. *WADA* shall, at least annually, publish statistical reports summarizing the information that it receives, ensuring at all times that the privacy of *Athlete*s is fully respected and make itself available for discussions with national and regional data privacy authorities.

### 14.6 Data Privacy

When performing obligations under the *Code*, *Anti-Doping Organization*s may collect, store, process or disclose personal information relating to *Athlete*s and third parties. Each *Anti-Doping Organization* shall ensure that it complies with applicable data protection and privacy laws with respect to their handling of such information, as well as the *International Standard* for the protection of privacy that *WADA* shall adopt to ensure *Athlete*s and non-athletes are fully informed of and, where necessary, agree to the handling of their personal information in connection with anti-doping activities arising under the *Code*.

# ARTICLE 15: CLARIFICATION OF *DOPING CONTROL* RESPONSIBILITIES

### 15.1   *Event Testing*

The collection of *Sample*s for *Doping Control* does and should take place at both *International Event*s and *National Event*s. However, except as otherwise provided below, only a single organization should be responsible for initiating and directing *Testing* during the *Event Period*. At *International Event*s, the collection of *Doping Control Sample*s shall be initiated and directed by the international organization which is the ruling body for the *Event* (e.g., the International Olympic Committee for the Olympic Games, the International Federation for a World Championship, and Pan-American Sports Organisation for the Pan American Games). At *National Event*s, the collection of *Doping Control Sample*s shall be initiated and directed by the designated *National Anti-Doping Organization* of that country.

*[Comment to Article 15: To be effective, the anti-doping effort must involve many Anti-Doping Organizations conducting strong programs at both the international and national levels. Rather than limiting the responsibilities of one group in favor of the exclusive competency of the other, the Code manages potential problems associated with overlapping responsibilities, first by creating a much higher level of overall harmonization and, second, by establishing rules of precedence and cooperation in specific areas.]*

15.1.1    If an *Anti-Doping Organization* which is not responsible for initiating and directing *Testing* at an *Event* nevertheless desires to conduct additional *Testing* of *Athlete*s at the *Event* during the *Event Period*, the *Anti-Doping Organization* shall first confer with the ruling body of the *Event* to obtain permission to conduct, and to coordinate, any additional *Testing*. If the *Anti-Doping Organization* is not satisfied with the response from the ruling body of the *Event*, the *Anti-Doping Organization* may ask *WADA* for permission to conduct additional *Testing* and to determine how to coordinate such additional *Testing*. *WADA* shall not grant approval for such additional *Testing* before consulting with and informing the ruling body for the *Event*.

### 15.2 *Out-of-Competition Testing*

*Out-of-Competition Testing* shall be initiated and directed by both international and national organizations. *Out-of-Competition Testing* may be initiated and directed by: (a) *WADA*; (b) the International Olympic Committee or International Paralympic Committee in connection with

*[Comment to Article 15.1.1: Before giving approval to a National Anti-Doping Organization to initiate and conduct Testing at an International Event, WADA shall consult with the international organization which is the ruling body for the Event. Before giving approval to an International Federation to initiate and conduct Testing at a National Event, WADA shall consult with the National Anti-Doping Organization of the country where the Event takes place. The Anti-Doping Organization "initiating and directing Testing" may, if it chooses, enter into agreements with other organizations to which it delegates responsibility for Sample collection or other aspects of the Doping Control process.]*

*[Comment to Article 15.2: Additional authority to conduct Testing may be authorized by means of bilateral or multilateral agreements among Signatories and governments.]*

the Olympic Games or Paralympic Games; (c) the *Athlete*'s International Federation; or (d) any other *Anti-Doping Organization* that has *Testing* jurisdiction over the *Athlete* as provided in Article 5.1 (Test Distribution Planning). *Out-of-Competition Testing* shall be coordinated through *ADAMS* where reasonably feasible in order to maximize the effectiveness of the combined *Testing* effort and to avoid unnecessary repetitive *Testing* of individual *Athlete*s.

### 15.3 Results Management, Hearings and Sanctions

Except as provided in Article 15.3.1 below, results management and hearings shall be the responsibility of and shall be governed by the procedural rules of the *Anti-Doping Organization* that initiated and directed *Sample* collection (or, if no *Sample* collection is involved, the organization which discovered the violation). If that *Anti-Doping Organization* does not have the authority to conduct results management, then results management authority shall default to the applicable International Federation. Regardless of which organization conducts results management or hearings, the principles set forth in Articles 7 and 8 shall be respected and the rules identified in the Introduction to Part One to be incorporated without substantive change must be followed.

*[Comment to Article 15.3: In some cases, the procedural rules of the Anti-Doping Organization which initiated and directed the Sample collection may specify that results management will be handled by another organization (e.g., the Athlete's National Federation). In such event, it shall be the Anti-Doping Organization's responsibility to confirm that the other organization's rules are consistent with the Code.*

*The Athlete's or other Person's International Federation has been made the authority of last resort for results management to avoid the possibility that no Anti-Doping Organization would have authority to conduct results management. Of course, an International Federation is free to provide in its own anti-doping rules that the Athlete's or other Person's National Federation shall conduct results management.]*

15.3.1    Results management and the conduct of hearings for an anti-doping rule violation arising from a test by, or discovered by, a *National Anti-Doping Organization* involving an *Athlete* who is not a national, resident, license-holder or member of a sport organization of that country shall be administered as directed by the rules of the applicable International Federation. Results management and the conduct of hearings from a test by the International Olympic Committee, the International Paralympic Committee, or a *Major Event Organization*, shall be referred to the applicable International Federation as far as sanctions beyond *Disqualification* from the *Event* or the results of the *Event*.

*[Comment to Article 15.3.1: No absolute rule is established for managing results and conducting hearings where a National Anti-Doping Organization tests a foreign national Athlete over whom it would have had no jurisdiction but for the Athlete's presence in the National Anti-Doping Organization's country. Under this Article, it is left to the International Federation to determine under its own rules whether, for example, management of the case should be referred to the Athlete's National Anti-Doping Organization, remain with the Anti-Doping Organization that collected the Sample, or be taken over by the International Federation.]*

**PART 1**

*Doping Control*

Article 15: Clarification of *Doping Control* Responsibilities
Article 16: *Doping Control* for Animals Competing in Sport
Article 17: Statute of Limitations

e 1:12-cv-00606-SS Document 7-10 Filed 07/09/12 Page 94 of

## 15.4 Mutual Recognition

15.4.1 Subject to the right to appeal provided in Article 13, *Testing*, therapeutic use exemptions and hearing results or other final adjudications of any *Signatory* which are consistent with the *Code* and are within that *Signatory*'s authority, shall be recognized and respected by all other *Signatories*.

15.4.2 *Signatories* shall recognize the same actions of other bodies which have not accepted the *Code* if the rules of those bodies are otherwise consistent with the *Code*.

*[Comment to Article 15.4.1: There has in the past been some confusion in the interpretation of this Article with regard to therapeutic use exemptions. Unless provided otherwise by the rules of an International Federation or an agreement with an International Federation, National Anti-Doping Organizations do not have "authority" to grant therapeutic use exemptions to International-Level Athletes.]*

*[Comment to Article 15.4.2: Where the decision of a body that has not accepted the Code is in some respects Code compliant and in other respects not Code compliant, Signatories should attempt to apply the decision in harmony with the principles of the Code. For example, if in a process consistent with the Code a non-Signatory has found an Athlete to have committed an anti-doping rule violation on account of the presence of a Prohibited Substance in his body but the period of Ineligibility applied is shorter than the period provided for in the Code, then all Signatories should recognize the finding of an anti-doping rule violation and the Athlete's National Anti-Doping Organization should conduct a hearing consistent with Article 8 to determine whether the longer period of Ineligibility provided in the Code should be imposed.]*

## ARTICLE 16: *DOPING CONTROL* FOR ANIMALS COMPETING IN SPORT

**16.1** In any sport that includes animals in *Competition*, the International Federation for that sport shall establish and implement anti-doping rules for the animals included in that sport. The anti-doping rules shall include a list of *Prohibited Substance*s, appropriate *Testing* procedures and a list of approved laboratories for *Sample* analysis.

**16.2** With respect to determining anti-doping rule violations, results management, fair hearings, *Consequences*, and appeals for animals involved in sport, the International Federation for that sport shall establish and implement rules that are generally consistent with Articles 1, 2, 3, 9, 10, 11, 13 and 17 of the *Code.*

## ARTICLE 17: STATUTE OF LIMITATIONS

No action may be commenced against an *Athlete* or other *Person* for an anti-doping rule violation contained in the *Code* unless such action is commenced within eight (8) years from the date the violation is asserted to have occurred.



PART TWO:
EDUCATION
AND RESEARCH



# ARTICLE 18: EDUCATION

### 18.1   Basic Principle and Primary Goal

The basic principle for information and education programs for doping-free sport is to preserve the spirit of sport, as described in the Introduction to the *Code*, from being undermined by doping. The primary goal of such programs is prevention. The objective shall be to prevent the intentional or unintentional *Use* by *Athlete*s of *Prohibited Substance*s and *Prohibited Method*s.

All *Signatories* shall within their means and scope of responsibility and in cooperation with each other, plan, implement, evaluate and monitor information and education programs for doping-free sport.

### 18.2   Programs and Activities

These programs shall provide *Athlete*s and other *Person*s with updated and accurate information on at least the following issues:

*[Comment to Article 18.2: Anti-doping informational and educational programs should not be limited to national- or International-Level Athletes but should include all Persons, including youth, who participate in sport under the authority of any Signatory, government or other sports organization accepting the Code. (See definition of Athlete.) These programs should also include Athlete Support Personnel.*

*These principles are consistent with the UNESCO Convention with respect to education and training.]*

- Substances and methods on the *Prohibited List*

- Anti-doping rule violations

- *Consequences* of doping, including sanctions, health and social consequences

- *Doping Control* procedures

- *Athlete*s' and *Athlete Support Personnel*'s rights and responsibilities

- Therapeutic use exemptions

- Managing the risks of nutritional supplements

- Harm of doping to the spirit of sport

The programs should promote the spirit of sport in order to establish an environment that is strongly conducive to doping-free sport and will have a positive and long-term influence on the choices made by *Athlete*s and other *Person*s.

These programs should be directed at young people, appropriate to their stage of development, in school and sports clubs, parents, adult athletes, sport officials, coaches, medical personnel and the media. (The media should also cooperate in supporting and diffusing this information.)

*Athlete Support Personnel* should educate and counsel *Athlete*s regarding anti-doping policies and rules adopted pursuant to the *Code*.

All *Signatories* shall promote and support active participation by *Athlete*s and *Athlete Support Personnel* in education programs for doping-free sport.

### 18.3 Professional Codes of Conduct

All *Signatories* shall cooperate with each other and governments to encourage relevant, competent professional associations and institutions to develop and implement appropriate Codes of Conduct, good practice and ethics related to sport practice regarding anti-doping, as well as sanctions, which are consistent with the *Code*.

### 18.4 Coordination and Cooperation

*WADA* shall act as a central clearinghouse for informational and educational resources and/or programs developed by *WADA* or *Anti-Doping Organization*s.

All *Signatories* and *Athlete*s and other *Person*s shall cooperate with each other and governments to coordinate their efforts in anti-doping information and education in order to share experience and ensure the effectiveness of these programs in preventing doping in sport.

# ARTICLE 19: RESEARCH

### 19.1 Purpose and Aims of Anti-Doping Research

Anti-doping research contributes to the development and implementation of efficient programs within *Doping Control* and to information and education regarding doping-free sport.

All *Signatories* shall, in cooperation with each other and governments, encourage and promote such research and take all reasonable measures to ensure that the results of such research are used for the promotion of the goals that are consistent with the principles of the *Code*.

### 19.2 Types of Research

Relevant anti-doping research may include, for example, sociological, behavioral, juridical and ethical studies in addition to medical, analytical and physiological investigation. Studies on devising and evaluating the efficacy of scientifically-based physiological and psychological training programs that are consistent with the principles of the *Code* and respectful of the integrity of the human subjects, as well as studies on the *Use* of emerging substances or methods resulting from scientific developments should be conducted.

### 19.3 Coordination of Research and Sharing of Results

Coordination of anti-doping research through *WADA* is encouraged. Subject to intellectual property rights, copies of anti-doping research results should be provided to *WADA* and, where appropriate, shared with relevant *Signatories* and *Athlete*s and other *Person*s.

### 19.4 Research Practices

Anti-doping research shall comply with inter-nationally-recognized ethical practices.

### 19.5 Research Using *Prohibited Substance*s and *Prohibited Method*s

Research efforts should avoid the administration of *Prohibited Substance*s or *Prohibited Method*s to *Athlete*s.

### 19.6 Misuse of Results

Adequate precautions should be taken so that the results of anti-doping research are not misused and applied for doping.



# PART THREE: ROLES AND RESPONSIBILITIES

All *Signatories* shall act in a spirit of partnership and collaboration in order to ensure the success of the fight against doping in sport and the respect of the *Code*.

*[Comment: Responsibilities for Signatories and Athletes or other Persons are addressed in various Articles in the Code and the responsibilities listed in this part are additional to these responsibilities.]*



# ARTICLE 20: ADDITIONAL ROLES AND RESPONSIBILITIES OF *SIGNATORIES*

## 20.1 Roles and Responsibilities of the International Olympic Committee

20.1.1 To adopt and implement anti-doping policies and rules for the Olympic Games which conform with the *Code*.

20.1.2 To require as a condition of recognition by the International Olympic Committee, that International Federations within the Olympic Movement are in compliance with the *Code*.

20.1.3 To withhold some or all Olympic funding of sport organizations that are not in compliance with the *Code*.

20.1.4 To take appropriate action to discourage noncompliance with the *Code* as provided in Article 23.5.

20.1.5 To authorize and facilitate the *Independent Observer Program*.

20.1.6 To require all *Athletes* and each *Athlete Support Personnel* who participates as coach, trainer, manager, team staff, official, medical or paramedical personnel in the Olympic Games to agree to be bound by anti-doping rules in conformity with the *Code* as a condition of such participation.

20.1.7 To vigorously pursue all potential anti-doping rule violations within its jurisdiction including

investigation into whether *Athlete Support Personnel* or other *Person*s may have been involved in each case of doping.

20.1.8 To accept bids for the Olympic Games only from countries where the government has ratified, accepted, approved or acceded to the *UNESCO Convention* and the *National Olympic Committee,* National Paralympic Committee and *National Anti-Doping Organization* are in compliance with the *Code*.

20.1.9 To promote anti-doping education.

20.1.10 To cooperate with relevant national organizations and agencies and other *Anti-Doping Organization*s.

## 20.2 Roles and Responsibilities of the International Paralympic Committee

20.2.1 To adopt and implement anti-doping policies and rules for the Paralympic Games which conform with the *Code*.

20.2.2 To require as a condition of recognition by the International Paralympic Committee, that National Paralympic Committees within the Paralympic Movement are in compliance with the *Code*.

20.2.3 To withhold some or all Paralympic funding of sport organizations that are not in compliance with the *Code*.

20.2.4 To take appropriate action to discourage noncompliance with the *Code* as provided in Article 23.5.

**PART 3** Roles &
Article 20: Additional Roles and Responsibilities of *Signatories*
e 1:12-cv-00606-SS Document 7-10 Filed 07/09/12 Page 106 of

20.2.5 To authorize and facilitate the *Independent Observer Program*.

20.2.6 To require all *Athlete*s and each *Athlete Support Personnel* who participates as coach, trainer, manager, team staff, official, medical or paramedical personnel in the Paralympic Games to agree to be bound by anti-doping rules in conformity with the *Code* as a condition of such participation.

20.2.7 To vigorously pursue all potential anti-doping rule violations within its jurisdiction including investigation into whether *Athlete Support Personnel* or other *Person*s may have been involved in each case of doping.

20.2.8 To promote anti-doping education.

20.2.9 To cooperate with relevant national organizations and agencies and other *Anti-Doping Organization*s.

### 20.3 Roles and Responsibilities of International Federations

20.3.1 To adopt and implement anti-doping policies and rules which conform with the *Code*.

20.3.2 To require as a condition of membership that the policies, rules and programs of National Federations are in compliance with the *Code*.

20.3.3 To require all *Athlete*s and each *Athlete Support Personnel* who participates as coach, trainer, manager, team staff, official, medical or paramedical personnel in a *Competition* or activity authorized or organized by the International Federation or one of its member organizations to agree to be bound by anti-

doping rules in conformity with the *Code* as a condition of such participation.

20.3.4    To require *Athlete*s who are not regular members of the International Federation or one of its member National Federations to be available for *Sample* collection and to provide accurate and up-to-date whereabouts information as part of the International Federation's *Registered Testing Pool* consistent with the conditions for eligibility established by the International Federation or, as applicable, the *Major Event Organization*.

20.3.5    To require each of its National Federations to establish rules requiring all *Athlete*s and each *Athlete Support Personnel* who participates as coach, trainer, manager, team staff, official, medical or paramedical personnel in a *Competition* or activity authorized or organized by a National Federation or one of its member organizations to agree to be bound by anti-doping rules in conformity with the *Code* as a condition of such participation.

20.3.6    To take appropriate action to discourage noncompliance with the *Code* as provided in Article 23.5.

20.3.7    To authorize and facilitate the *Independent Observer Program* at *International Event*s.

20.3.8    To withhold some or all funding to its member National Federations that are not in compliance with the *Code*.

20.3.9    To vigorously pursue all potential anti-doping

*[Comment to Article 20.3.4:     Athletes from professional*
*This would include, for example,    leagues.]*

rule violations within its jurisdiction including investigation into whether *Athlete Support Personnel* or other *Person*s may have been involved in each case of doping.

20.3.10 After 1 January 2010, to do everything possible to award World Championships only to countries where the government has ratified, accepted, approved or acceded to the *UNESCO Convention* and the *National Olympic Committee*, National Paralympic Committee and *National Anti-Doping Organization* are in compliance with the *Code*.

20.3.11 To promote anti-doping education.

20.3.12 To cooperate with relevant national organizations and agencies and other *Anti-Doping Organization*s.

### 20.4 Roles and Responsibilities of *National Olympic Committees* and National Paralympic Committees

20.4.1 To ensure that their anti-doping policies and rules conform with the *Code*.

20.4.2 To require as a condition of membership or recognition that National Federations' anti-doping policies and rules are in compliance with the applicable provisions of the *Code*.

20.4.3 To require *Athlete*s who are not regular members of a National Federation to be available for *Sample* collection and to provide accurate and up-to-date whereabouts information as part of the National *Registered Testing Pool* during the year before the Olympic

Games and Paralympic Games as a condition of participation in the Olympic Games and Paralympic Games.

20.4.4 To cooperate with their *National Anti-Doping Organization*.

20.4.5 To require each of its National Federations to establish rules requiring each *Athlete Support Personnel* who participates as coach, trainer, manager, team staff, official, medical or para-medical personnel in a *Competition* or activity authorized or organized by a National Federation or one of its member organizations to agree to be bound by anti-doping rules in conformity with the *Code* as a condition of such participation.

20.4.6 To withhold some or all funding, during any period of his or her *Ineligibility*, to any *Athlete* or *Athlete Support Personnel* who has violated anti-doping rules.

20.4.7 To withhold some or all funding to its member or recognized National Federations that are not in compliance with the *Code*.

20.4.8 To vigorously pursue all potential anti-doping rule violations within its jurisdiction including investigation into whether *Athlete Support Personnel* or other *Person*s may have been involved in each case of doping.

20.4.9 To promote anti-doping education.

20.4.10 To cooperate with relevant national organizations and agencies and other *Anti-Doping Organization*s.

20.5    Roles and Responsibilities of
        *National Anti-Doping Organization*s

20.5.1    To adopt and implement anti-doping rules and
          polices which conform with the *Code*.

20.5.2    To cooperate with other relevant national
          organizations and agencies and other *Anti-
          Doping Organization*s.

20.5.3    To encourage reciprocal *Testing* between
          *National Anti-Doping Organization*s.

20.5.4    To promote anti-doping research.

20.5.5    Where funding is provided, to withhold some or
          all funding, during any period of his or her
          *Ineligibility*, to any *Athlete* or *Athlete Support
          Personnel* who has violated anti-doping rules.

20.5.6    To vigorously pursue all potential anti-doping
          rule violations within its jurisdiction including
          investigation into whether *Athlete Support
          Personnel* or other *Person*s may have been
          involved in each case of doping.

20.5.7    To promote anti-doping education.

20.6    Roles and Responsibilities of *Major Event Organization*s

20.6.1    To adopt and implement anti-doping policies
          and rules for their *Event*s which conform with
          the *Code*.

20.6.2    To take appropriate action to discourage
          noncompliance with the *Code* as provided in
          Article 23.5.

20.6.3   To authorize and facilitate the *Independent Observer Program*.

20.6.4   To require all *Athlete*s and each *Athlete Support Personnel* who participates as coach, trainer, manager, team staff, official, medical or paramedical personnel in the *Event* to agree to be bound by anti-doping rules in conformity with the *Code* as a condition of such participation.

20.6.5   To vigorously pursue all potential anti-doping rule violations within its jurisdiction including investigation into whether *Athlete Support Personnel* or other *Person*s may have been involved in each case of doping.

20.6.6   After 1 January 2010, to do everything possible to award *Event*s only to countries where the government has ratified, accepted, approved or acceded to the *UNESCO Convention* and the *National Olympic Committee*, National Paralympic Committee and *National Anti-Doping Organization* are in compliance with the *Code*.

20.6.7   To promote anti-doping education.

20.6.8   To cooperate with relevant national organizations and agencies and other *Anti-Doping Organization*s.

### 20.7   Roles and Responsibilities of *WADA*

20.7.1   To adopt and implement policies and procedures which conform with the *Code*.

20.7.2   To monitor *Code* compliance by *Signatories*.

Article 20: Additional Roles and Responsibilities of *Signatories*
Article 21: Additional Roles and Responsibiliti of *Athletes* and other *Persons*
Article 22: Involvement of Governments

**3** Roles &

e 1:12-cv-00606-SS Document 7-10 Filed 07/09/12 Page 112 of

20.7.3    To approve *International Standard*s applicable to the implementation of the *Code*.

20.7.4    To accredit and reaccredit laboratories to conduct *Sample* analysis or to approve others to conduct *Sample* analysis.

20.7.5    To develop and approve models of best practice.

20.7.6    To promote, conduct, commission, fund and coordinate anti-doping research and to promote anti-doping education.

20.7.7    To design and conduct an effective *Independent Observer Program*.

20.7.8    To conduct *Doping Control*s as authorized by other *Anti-Doping Organization*s and to cooperate with relevant national and international organizations and agencies, including but not limited to, facilitating inquiries and investigations.

# ARTICLE 21: ADDITIONAL ROLES AND RESPONSIBILITIES OF *ATHLETE*S AND OTHER *PERSON*S

## 21.1   Roles and Responsibilities of *Athlete*s

21.1.1    To be knowledgeable of and comply with all applicable anti-doping policies and rules adopted pursuant to the *Code*.

21.1.2    To be available for *Sample* collection.

21.1.3　To take responsibility, in the context of anti-doping, for what they ingest and use.

21.1.4　To inform medical personnel of their obligation not to *Use Prohibited Substance*s and *Prohibited Method*s and to take responsibility to make sure that any medical treatment received does not violate anti-doping policies and rules adopted pursuant to the *Code*.

### 21.2　Roles and Responsibilities of *Athlete Support Personnel*

21.2.1　To be knowledgeable of and comply with all anti-doping policies and rules adopted pursuant to the *Code* and which are applicable to them or the *Athlete*s whom they support.

21.2.2　To cooperate with the *Athlete Testing* program.

21.2.3　To use their influence on *Athlete* values and behavior to foster anti-doping attitudes.

## ARTICLE 22: INVOLVEMENT OF GOVERNMENTS

Each government's commitment to the *Code* will be evidenced by its signing the Copenhagen Declaration on Anti-Doping in Sport of March 3, 2003, and by ratifying, accepting, approving or acceding to the *UNESCO Convention*. The following Articles set forth the expectations of the *Signatories*.

**22.1**　Each government will take all actions and measures necessary to comply with the *UNESCO Convention.*

**22.2**　Each government will encourage all of its public services or agencies to share information with *Anti-Doping Organization*s which would be useful in the

fight against doping and where to do so would not otherwise be legally prohibited.

**22.3** Each government will respect arbitration as the preferred means of resolving doping-related disputes.

**22.4** All other governmental involvement with anti-doping will be brought into harmony with the *Code*.

**22.5** Governments should meet the expectations of this Article by January 1, 2010.

**22.6** Failure by a government to ratify, accept, approve or accede to the *UNESCO Convention* by January 1, 2010, or to comply with the *UNESCO Convention* thereafter may result in ineligibility to bid for *Event*s as provided  in Articles 20.1.8 (International Olympic Committee), 20.3.10 (International  Federation), and 20.6.6 (*Major Event Organization*s) and may result in additional consequences, e.g., forfeiture of offices and positions within *WADA*; ineligibility or non-admission of any candidature to hold any *International Event* in a  country, cancellation of *International Event*s; symbolic consequences and other consequences pursuant to the Olympic Charter.

*[Comment to Article 22: Most governments cannot be parties to, or be bound by, private non-governmental instruments such as the Code. For that reason, governments are not asked to be Signatories to the Code but rather to sign the Copenhagen Declaration and ratify, accept, approve or accede to the UNESCO Convention. Although the acceptance mechanisms may be different, the effort to combat doping through the coordinated and harmonized program reflected in the Code is very much a joint effort between the sport movement and governments.]*



PART FOUR:
ACCEPTANCE,
COMPLIANCE,
MODIFICATION &
INTERPRETATION



# ARTICLE 23: ACCEPTANCE, COMPLIANCE AND MODIFICATION

## 23.1 Acceptance of the *Code*

23.1.1 The following entities shall be *Signatories* accepting the *Code*: *WADA*, The International Olympic Committee, International Federations, The International Paralympic Committee, *National Olympic Committees*, National Paralympic Committees, *Major Event Organization*s, and *National Anti-Doping Organization*s. These entities shall accept the *Code* by signing a declaration of acceptance upon approval by each of their respective governing bodies.

23.1.2 Other sport organizations that may not be under the control of a *Signatory* may, upon *WADA*'s invitation, also accept the *Code*.

23.1.3 A list of all acceptances will be made public by *WADA*.

*[Comment to Article 23.1.1: Each accepting Signatory will separately sign an identical copy of the standard form common declaration of acceptance and deliver it to WADA. The act of acceptance will be as authorized by the organic documents of each organization. For example, an International Federation by its Congress and WADA by its Foundation Board.]*

*[Comment to Article 23.1.2: Those professional leagues that are not currently under the jurisdiction of any government or International Federation will be encouraged to accept the Code.]*

### 23.2 Implementation of the *Code*

23.2.1 The *Signatories* shall implement applicable *Code* provisions through policies, statutes, rules or regulations according to their authority and within their relevant spheres of responsibility.

23.2.2 The following Articles (and corresponding Comments) as applicable to the scope of the anti-doping activity which the *Anti-Doping Organization* performs must be implemented by *Signatories* without substantive change (allowing for any non-substantive changes to the language in order to refer to the organization's name, sport, section numbers, etc.):

- Article 1 (Definition of Doping)

- Article 2 (Anti-Doping Rule Violations)

- Article 3 (Proof of Doping)

- Article 4.2.2 (Specified Substances)

- Article 4.3.3 (WADA's Determination of the *Prohibited List*)

- Article 7.6 (Retirement from Sport)

- Article 9 (Automatic *Disqualification* of Individual Results)

- Article 10 (Sanctions on Individuals)

*(continued)*

*[Comment to Article 23.2.2: Nothing in the Code precludes an Anti-Doping Organization from adopting and enforcing its own specific disciplinary rules for conduct by Athlete Support Personnel related to doping but which does not, in and of itself, constitute an anti-doping rule violation under the Code. For example, a National or International Federation could refuse to renew the license of a coach when multiple Athletes have committed anti-doping rule violations while under that coach's supervision.]*

- Article 11 (*Consequences* to Teams)
- Article 13 (Appeals) with the exception of 13.2.2 and 13.5
- Article 15.4 (Mutual Recognition)
- Article 17 (Statute of Limitations)
- Article 24 (Interpretation of the *Code*)
- Appendix 1 - Definitions

No additional provision may be added to a *Signatory*'s rules which changes the effect of the Articles enumerated in this Article.

23.2.3 In implementing the *Code*, the *Signatories* are encouraged to use the models of best practice recommended by *WADA*.

### 23.3 Compliance with the *Code*

23.3.1 *Signatories* shall not be considered in compliance with the *Code* until they have accepted and implemented the *Code* in accordance with Articles 23.1 and 23.2. They shall no longer be considered in compliance once acceptance has been withdrawn.

### 23.4 Monitoring Compliance with the *Code* and *UNESCO Convention*

23.4.1 Compliance with the *Code* shall be monitored by *WADA* or as otherwise agreed by *WADA*. Compliance with the commitments reflected in the *UNESCO Convention* will be monitored as determined by the Conference of Parties to the *UNESCO Convention*, following consultation with the state parties and *WADA*.

*WADA* shall advise governments on the implementation of the *Code* by the *Signatories* and shall advise *Signatories* on the ratification, acceptance, approval or accession to the *UNESCO Convention* by governments.

23.4.2 To facilitate monitoring, each *Signatory* shall report to *WADA* on its compliance with the *Code* every second year and shall explain reasons for noncompliance.

23.4.3 Failure by a *Signatory* to provide compliance information requested by *WADA* for purposes of Article 23.4.2, or failure by a *Signatory* to submit information to *WADA* as required by other articles of the *Code*, may be considered noncompliance with the *Code*.

23.4.4 All *WADA* compliance reports shall be approved by the *WADA* Foundation Board. *WADA* shall dialog with a *Signatory* before reporting that *Signatory* noncompliant. Any *WADA* report which concludes that a *Signatory* is noncompliant must be approved by the *WADA* Foundation Board at a meeting held after the *Signatory* has been given an opportunity to submit its written arguments to the Foundation Board. The conclusion by the *WADA* Foundation Board that a *Signatory* is noncompliant may be appealed pursuant to Article 13.5.

23.4.5 *WADA* shall make reports on compliance to the International Olympic Committee, the International Paralympic Committee, International Federations, and *Major Event Organization*s. These reports shall also be made available to the public.

23.4.6 *WADA* shall consider explanations for noncompliance and, in extraordinary situations, may recommend to the International Olympic Committee, International Paralympic Committee, International Federations, and *Major Event Organization*s that they provisionally excuse the noncompliance.

## 23.5 Additional Consequences of a *Signatory*'s Noncompliance with the *Code*

Noncompliance with the *Code* by any *Signatory* may result in consequences in addition to ineligibility to bid for *Event*s as set forth in Articles 20.1.8 (International Olympic Committee), 20.3.10 (International Federations) and 20.6.6 (*Major Event Organizations)*, for example: forfeiture of offices and positions within *WADA*; ineligibility or non-admission of any candidature to hold any *International Event* in a country; cancellation of *International Event*s; symbolic consequences and other consequences pursuant to the Olympic Charter.

The imposition of such consequences may be appealed to *CAS* by the affected *Signatory* pursuant to Article 13.5.

*[Comment to Article 23.4.6: WADA recognizes that amongst Signatories and governments, there will be significant differences in anti-doping experience, resources, and the legal context in which anti-doping activities are carried out. In considering whether an organization is compliant, WADA will consider these differences.]*

### 23.6 Modification of the *Code*

23.6.1 *WADA* shall be responsible for overseeing the evolution and improvement of the *Code*. *Athlete*s and all *Signatories* and governments shall be invited to participate in such process.

23.6.2 *WADA* shall initiate proposed amendments to the *Code* and shall ensure a consultative process to both receive and respond to recommendations and to facilitate review and feedback from *Athlete*s, *Signatories* and governments on recommended amendments.

23.6.3 Amendments to the *Code* shall, after appropriate consultation, be approved by a two-thirds majority of the *WADA* Foundation Board including a majority of both the public sector and Olympic Movement members casting votes. Amendments shall, unless provided otherwise, go into effect three (3) months after such approval.

23.6.4 *Signatories* shall modify their rules to incorporate the 2009 *Code* on or before January 1, 2009, to take effect on January 1, 2009. *Signatories* shall implement any subsequent applicable amendment to the *Code* within one (1) year of approval by the *WADA* Foundation Board.

### 23.7 Withdrawal of Acceptance of the *Code*

*Signatories* may withdraw acceptance of the *Code* after providing *WADA* six-month written notice of their intent to withdraw.

# ARTICLE 24: INTERPRETATION OF THE *CODE*

24.1    The official text of the *Code* shall be maintained by *WADA* and shall be published in English and French. In the event of any conflict between the English and French versions, the English version shall prevail.

24.2    The comments annotating various provisions of the *Code* shall be used to interpret the *Code.*

24.3    The *Code* shall be interpreted as an independent and autonomous text and not by reference to the existing law or statutes of the *Signatories* or governments.

24.4    The headings used for the various Parts and Articles of the *Code* are for convenience only and shall not be deemed part of the substance of the *Code* or to affect in any way the language of the provisions to which they refer.

24.5    The *Code* shall not apply retrospectively to matters pending before the date the *Code* is accepted by a *Signatory* and implemented in its rules. However, pre-*Code* anti-doping rule violations would continue to count as "First violations" or "Second violations" for purposes of determining sanctions under Article 10 for subsequent post-*Code* violations.

24.6    The Purpose, Scope and Organization of the World Anti-Doping Program and the *Code* and APPENDIX I - DEFINITIONS shall be considered integral parts of the *Code.*

# ARTICLE 25: TRANSITIONAL PROVISIONS

### 25.1 General Application of the 2009 *Code*

The 2009 *Code* shall apply in full after January 1, 2009 (the "Effective Date").

### 25.2 Non-Retroactive Unless Principle of "Lex Mitior" Applies

With respect to any anti-doping rule violation case which is pending as of the Effective Date and any anti-doping rule violation case brought after the Effective Date based on an anti-doping rule violation which occurred prior to the Effective Date, the case shall be governed by the substantive anti-doping rules in effect at the time the alleged anti-doping rule violation occurred unless the panel hearing the case determines the principle of "lex mitior" appropriately applies under the circumstances of the case.

### 25.3 Application to Decisions Rendered Prior to the 2009 *Code*

With respect to cases where a final decision finding an anti-doping rule violation has been rendered prior to the Effective Date, but the *Athlete* or other *Person* is still serving the period of *Ineligibility* as of the Effective Date, the *Athlete* or other *Person* may apply to the *Anti-Doping Organization* which had results management responsibility for the anti-doping rule violation to consider a reduction in the period of *Ineligibility* in light of the 2009 *Code*. Such application must be made before the period of *Ineligibility* has expired. The decision rendered by the *Anti-Doping Organization* may be appealed pursuant to Article 13.2. The 2009 *Code* shall have no application to any anti-doping rule violation case where a final decision finding an anti-doping rule violation has been rendered and the period of *Ineligibility* has expired.

Case 1:12-cv-00606-SS   Document 7-10   Filed 07/09/12   Page 124 of

### 25.4 Application to Specific Pre-*Code* Violations

For purposes of applying Article 10.7.1, a pre-*Code* anti-doping rule violation where the violation involved a substance which is categorized as a Specified Substance under the 2009 *Code* and the period of *Ineligibility* imposed was less than two (2) years, the pre-*Code* violation shall be considered a Reduced Sanction (RS).

### 25.5 Additional *Code* Amendments

Any additional *Code* Amendments shall go into effect as provided in Article 23.6.

*[Comment to Article 25.4: Other than the situation described in Article 25.3, where a final decision finding an anti-doping rule violation has been rendered prior to the Code or under the Code before the 2009 Code and the period of Ineligibility imposed has been completely served, the 2009 Code may not be used to re-characterize the prior violation.]*



# APPENDIX ONE: DEFINITIONS



# APPENDIX 1: DEFINITIONS

**ADAMS:** The Anti-Doping Administration and Management System is a Web-based database management tool for data entry, storage, sharing, and reporting designed to assist stakeholders and *WADA* in their anti-doping operations in conjunction with data protection legislation.

**Adverse Analytical Finding:** A report from a laboratory or other *WADA*-approved entity that, consistent with the *International Standard* for Laboratories and related Technical Documents, identifies in a *Sample* the presence of a *Prohibited Substance* or its *Metabolite*s or *Marker*s (including elevated quantities of endogenous substances) or evidence of the *Use* of a *Prohibited Method*.

**Anti-Doping Organization:** A *Signatory* that is responsible for adopting rules for initiating, implementing or enforcing any part of the *Doping Control* process. This includes, for example, the International Olympic Committee, the International Paralympic Committee, other *Major Event Organizations* that conduct *Testing* at their *Event*s, *WADA*, International Federations, and *National Anti-Doping Organization*s.

**Athlete:** Any *Person* who participates in sport at the international level (as defined by each International Federation), the national level (as defined by each *National Anti-Doping Organization,* including but not limited to those *Person*s in its *Registered Testing Pool*), and any other competitor in sport who is otherwise subject to the jurisdiction of any *Signatory* or other sports organization accepting the *Code*. All provisions of the *Code*, including, for example, *Testing* and therapeutic use exemptions, must be applied to international- and national-level competitors. Some *National Anti-Doping Organization*s may elect to test and apply anti-doping rules to recreational-level or masters

competitors who are not current or potential national caliber competitors. *National Anti-Doping Organization*s are not required, however, to apply all aspects of the *Code* to such *Person*s. Specific national rules may be established for *Doping Control* for non-international-level or non-national-level competitors without being in conflict with the *Code.* Thus, a country could elect to test recreational-level competitors but not require therapeutic use exemptions or whereabouts information. In the same manner, a *Major Event Organization* holding an *Event* only for masters-level competitors could elect to test the competitors but not require advance therapeutic use exemptions or whereabouts information. For purposes of Article 2.8 (Administration or *Attempt*ed Administration) and for purposes of anti-doping information and education, any *Person* who participates in sport under the authority of any *Signatory*, government, or other sports organization accepting the *Code* is an *Athlete*.

*[Comment to Athlete: This definition makes it clear that all international- and national-caliber athletes are subject to the anti-doping rules of the Code, with the precise definitions of international- and national-level sport to be set forth in the anti-doping rules of the International Federations and National Anti-Doping Organizations, respectively. At the national level, anti-doping rules adopted pursuant to the Code shall apply, at a minimum, to all persons on national teams and all persons qualified to compete in any national championship in any sport. That does not mean, however, that all such Athletes must be included in a National Anti-Doping Organization's Registered Testing Pool. The definition also allows each National Anti-Doping Organization, if it chooses to do so, to expand its anti-doping program beyond national-caliber athletes to competitors at lower levels of competition. Competitors at all levels of competition should receive the benefit of anti-doping information and education.]*

***Athlete Support Personnel:*** Any coach, trainer, manager, agent, team staff, official, medical, paramedical personnel, parent or any other *Person* working with, treating or assisting an *Athlete* participating in or preparing for sports *Competition*.

***Attempt:*** Purposely engaging in conduct that constitutes a substantial step in a course of conduct planned to culminate in the commission of an anti-doping rule violation. Provided, however, there shall be no anti-doping rule violation based solely on an *Attempt* to commit a violation if the *Person* renounces the *Attempt* prior to it being discovered by a third party not involved in the *Attempt.*

***Atypical Finding:*** A report from a laboratory or other *WADA*-approved entity which requires further investigation as provided by the *International Standard* for Laboratories or related Technical Documents prior to the determination of an *Adverse Analytical Finding*.

***CAS:*** The Court of Arbitration for Sport.

***Code:*** The World Anti-Doping *Code*.

***Competition:*** A single race, match, game or singular athletic contest. For example, a basketball game or the finals of the Olympic 100-meter race in athletics. For stage races and other athletic contests where prizes are awarded on a daily or other interim basis the distinction between a *Competition* and an *Event* will be as provided in the rules of the applicable International Federation.

***Consequences of Anti-Doping Rules Violations:*** An *Athlete*'s or other *Person*'s violation of an anti-doping rule may result in one or more of the following: (a) *Disqualification* means the *Athlete*'s results in a particular *Competition* or *Event* are invalidated, with all resulting *Consequences* including forfeiture of any medals, points and prizes; (b) *Ineligibility* means the *Athlete* or other *Person* is barred for a specified period of time from participating in any *Competition* or

other activity or funding as provided in Article 10.9; and (c) _Provisional Suspension_ means the *Athlete* or other *Person* is barred temporarily from participating in any *Competition* prior to the final decision at a hearing conducted under Article 8 (Right to a Fair Hearing).

**Disqualification:** See *Consequences of Anti-Doping Rules Violations* above.

**Doping Control:** All steps and processes from test distribution planning through to ultimate disposition of any appeal including all steps and processes in between such as provision of whereabouts information, *Sample* collection and handling, laboratory analysis, therapeutic use exemptions, results management and hearings.

**Event:** A series of individual *Competition*s conducted together under one ruling body (e.g., the Olympic Games, FINA World Championships, or Pan American Games).

**Event Period:** The time between the beginning and end of an *Event*, as established by the ruling body of the *Event*.

**In-Competition:** Unless provided otherwise in the rules of an International Federation or other relevant *Anti-Doping Organization*, "*In-Competition*" means the period commencing twelve hours before a *Competition* in which the *Athlete* is scheduled to participate through the end of such *Competition* and the *Sample* collection process related to such *Competition*.

**Independent Observer Program:** A team of observers, under the supervision of *WADA*, who observe and may provide guidance on the *Doping Control* process at certain *Event*s and report on their observations.

**Ineligibility:** See *Consequences of Anti-Doping Rules Violations,* above.

*Individual Sport:* Any sport that is not a *Team Sport*.

*International Event:* An *Event* where the International Olympic Committee, the International Paralympic Committee, an International Federation, a *Major Event Organization,* or another international sport organization is the ruling body for the *Event* or appoints the technical officials for the *Event.*

*International-Level Athlete:* *Athlete*s designated by one or more International Federations as being within the *Registered Testing Pool* for an International Federation.

*International Standard:* A standard adopted by *WADA* in support of the *Code*. Compliance with an *International Standard* (as opposed to another alternative standard, practice or procedure) shall be sufficient to conclude that the procedures addressed by the *International Standard* were performed properly. *International Standard*s shall include any Technical Documents issued pursuant to the *International Standard.*

*Major Event Organizations:* The continental associations of *National Olympic Committee*s and other international multi-sport organizations that function as the ruling body for any continental, regional or other *International Event.*

*Marker:* A compound, group of compounds or biological parameter(s) that indicates the *Use* of a *Prohibited Substance* or *Prohibited Method.*

*Metabolite:* Any substance produced by a biotransformation process.

*Minor:* A natural *Person* who has not reached the age of majority as established by the applicable laws of his or her country of residence.

***National Anti-Doping Organization:*** The entity(ies) designated by each country as possessing the primary authority and responsibility to adopt and implement anti-doping rules, direct the collection of *Sample*s, the management of test results, and the conduct of hearings, all at the national level. This includes an entity which may be designated by multiple countries to serve as regional *Anti-Doping Organization* for such countries. If this designation has not been made by the competent public authority(ies), the entity shall be the country's *National Olympic Committee* or its designee.

***National Event:*** A sport *Event* involving international- or national-level *Athlete*s that is not an *International Event.*

***National Olympic Committee:*** The organization recognized by the International Olympic Committee. The term *National Olympic Committee* shall also include the National Sport Confederation in those countries where the National Sport Confederation assumes typical *National Olympic Committee* responsibilities in the anti-doping area.

***No Advance Notice:*** A *Doping Control* which takes place with no advance warning to the *Athlete* and where the *Athlete* is continuously chaperoned from the moment of notification through *Sample* provision.

***No Fault or Negligence:*** The *Athlete*'s establishing that he or she did not know or suspect, and could not reasonably have known or suspected even with the exercise of utmost caution, that he or she had *Use*d or been administered the *Prohibited Substance* or *Prohibited Method*.

***No Significant Fault or Negligence:*** The *Athlete*'s establishing that his or her fault or negligence, when viewed in the totality of the circumstances and taking into account the criteria for *No Fault or Negligence*, was not significant in relationship to the anti-doping rule violation.

**Out-of-Competition:** Any *Doping Control* which is not *In-Competition*.

**Participant:** Any *Athlete* or *Athlete Support Personnel*.

**Person:** A natural *Person* or an organization or other entity.

**Possession:** The actual, physical *Possession*, or the constructive *Possession* (which shall be found only if the *Person* has exclusive control over the *Prohibited Substance or Prohibited Method* or the premises in which a *Prohibited Substance or Prohibited Method* exists); provided, however, that if the *Person* does not have exclusive control over the *Prohibited Substance or Prohibited Method* or the premises in which a *Prohibited Substance or Prohibited Method* exists, constructive *Possession* shall only be found if the *Person* knew about the presence of the *Prohibited Substance or Prohibited Method* and intended to exercise control over it. Provided, however, there shall be no anti-doping rule violation based solely on *Possession* if, prior to receiving notification of any kind that the *Person* has committed an anti-doping rule violation, the *Person* has taken concrete action demonstrating that the *Person* never intended to have *Possession* and has renounced *Possession* by explicitly declaring it to an *Anti-Doping Organization*. Notwithstanding anything to the contrary in this definition, the purchase (including by any electronic or other means) of a *Prohibited Substance* or *Prohibited Method* constitutes *Possession* by the *Person* who makes the purchase.

*[Comment to Possesion: Under this definition, steroids found in an Athlete's car would constitute a violation unless the Athlete establishes that someone else used the car; in that event, the Anti-Doping Organization must establish that, even though the Athlete did not have exclusive control over the car, the Athlete knew about the steroids and intended to have control over the steroids. Similarly, in the example of steroids found in a home medicine cabinet under the joint control of an Athlete and spouse, the Anti-Doping Organization must establish that the Athlete knew the steroids were in the cabinet and that the Athlete intended to exercise control over the steroids.]*

**Prohibited List***:* The List identifying the *Prohibited Substance*s and *Prohibited Method*s.

**Prohibited Method***:* Any method so described on the *Prohibited List*.

**Prohibited Substance***:* Any substance so described on the *Prohibited List*.

**Provisional Hearing***:* For purposes of Article 7.5, an expedited abbreviated hearing occurring prior to a hearing under Article 8 (Right to a Fair Hearing) that provides the *Athlete* with notice and an opportunity to be heard in either written or oral form.

**Provisional Suspension***:* See *Consequences* of *Anti-Doping Rules Violations* above.

**Publicly Disclose or Publicly Report***:* To disseminate or distribute information to the general public or *Person*s beyond those *Person*s entitled to earlier notification in accordance with Article 14.

**Registered Testing Pool***:* The pool of top-level *Athlete*s established separately by each International Federation and *National Anti-Doping Organization* who are subject to both *In-Competition* and *Out-of-Competition Testing* as part of that International Federation's or *National Anti-Doping Organization*'s test distribution plan. Each International Federation shall publish a list which identifies those *Athlete*s included in its *Registered Testing Pool* either by name or by clearly defined, specific criteria.

**Sample or Specimen***:* Any biological material collected for the purposes of *Doping Control*.

*[Comment to Sample or Specimen: It has sometimes been claimed that the collection of blood Samples violates the tenets of certain religious or cultural groups. It has been determined that there is no basis for any such claim.]*

**Signatories:** Those entities signing the *Code* and agreeing to comply with the *Code*, including the International Olympic Committee, International Federations, International Paralympic Committee, *National Olympic Committee*s, National Paralympic Committees, *Major Event Organizations*, *National Anti-Doping Organization*s, and *WADA*.

**Substantial Assistance:** For purposes of Article 10.5.3, a *Person* providing *Substantial Assistance* must: (1) fully disclose in a signed written statement all information he or she possesses in relation to anti-doping rule violations, and (2) fully cooperate with the investigation and adjudication of any case related to that information, including, for example, presenting testimony at a hearing if requested to do so by an *Anti-Doping Organization* or hearing panel. Further, the information provided must be credible and must comprise an important part of any case which is initiated or, if no case is initiated, must have provided a sufficient basis on which a case could have been brought.

**Tampering:** Altering for an improper purpose or in an improper way; bringing improper influence to bear; interfering improperly; obstructing, misleading or engaging in any fraudulent conduct to alter results or prevent normal procedures from occurring; or providing fraudulent information to an *Anti-Doping Organization*.

**Target Testing:** Selection of *Athlete*s for *Testing* where specific *Athlete*s or groups of *Athlete*s are selected on a non-random basis for *Testing* at a specified time.

**Team Sport:** A sport in which the substitution of players is permitted during a *Competition*.

**Testing:** The parts of the *Doping Control* process involving test distribution planning, *Sample* collection, *Sample* handling, and *Sample* transport to the laboratory.

*Trafficking:* Selling, giving, transporting, sending, delivering or distributing a *Prohibited Substance* or *Prohibited Method* (either physically or by any electronic or other means) by an *Athlete, Athlete Support Personnel* or any other *Person* subject to the jurisdiction of an *Anti-Doping Organization* to any third party; provided, however, this definition shall not include the actions of "bona fide" medical personnel involving a *Prohibited Substance* used for genuine and legal therapeutic purposes or other acceptable justification, and shall not include actions involving *Prohibited Substance*s which are not prohibited in *Out-of-Competition Testing* unless the circumstances as a whole demonstrate such *Prohibited Substance*s are not intended for genuine and legal therapeutic purposes.

**UNESCO Convention:** The International Convention against Doping in Sport adopted by the 33rd session of the UNESCO General Conference on October 19, 2005 including any and all amendments adopted by the States Parties to the Convention and the Conference of Parties to the International Convention against Doping in Sport.

*Use:* The utilization, application, ingestion, injection or consumption by any means whatsoever of any *Prohibited Substance* or *Prohibited Method.*

*WADA:* The World Anti-Doping Agency.

NOTES

# EXHIBIT 49



The World Anti-Doping Code

# ATHLETE BIOLOGICAL PASSPORT

## OPERATING GUIDELINES

### AND COMPILATION OF REQUIRED ELEMENTS

January 2012

Version 3.0

# Contents

**PART ONE: INTRODUCTION, PROVISIONS AND DEFINITIONS ...............5**

**1.0     Introduction to the *Athlete* Biological *Passport* ...................5**

**2.0     Objective and Scope ........................................................... 7**

**PART TWO: GUIDELINES FOR PASSPORT OPERATION............................9**

**3.0     Terms and Definitions........................................................ 9**

3.1         Defined Terms from the 2009 Code ..................................... 9

3.2         Defined Terms Specific to the *International Standard* for *Testing* (IST) ... 12

*3.3*         Defined Terms Specific to the *International Standard* for Laboratories .... 14

**4.0     Roles and Responsibilities of the Partners ........................ 18**

4.1         Objective.................................................................... 18

4.2         Specific Partner Responsibilities ...................................... 18

*5.0*     ***Athlete* Biological *Passport* Administration ........................ 21**

5.1         Objective.................................................................... 21

5.2         Recommended Administrative Sequence ............................ 21

5.3         Sharing and Exchange of Passports .................................. 24

**6.0     Program Implementation of the Haematological Module .................. 26**

6.1         Introduction................................................................. 26

6.2         Haematological Markers.................................................. 26

6.3         Athlete Information........................................................ 28

6.4         Testing and Defining the Target Population......................... 28

6.5         Resources ................................................................... 29

*7.0*     ***Athlete* Biological *Passport* Documentation ...................... 31**

7.1         Objective.................................................................... 31

7.2         General...................................................................... 31

7.3         Requirements .............................................................. 31

**PART THREE: REQUIREMENTS FOR PASSPORT OPERATION FROM INTERNATIONAL STANDARD FOR TESTING AND INTERNATIONAL STANDARD FOR LABORATORIES** .......................................................... **33**

**APPENDIX A** ................................................................. **34**

1.          Objective ................................................................. 34

2.          Scope ...................................................................... 34

3.          The Timing of the *Sample* Collection .................................................. 35

4.          The Commencement of the Collection Process and the 10 Minute Time-out 35

5.          The Athlete Biological Passport Doping Control Documentation .............. 35

6.          The *Sample* Collection Equipment ...................................................... 36

7.          The *Sample* Collection Procedure ...................................................... 37

8.          Post Venipuncture Procedure ............................................................ 37

**APPENDIX B** ................................................................. **38**

1.          Objective ................................................................. 38

2.          Scope ...................................................................... 38

3.          Responsibility ................................................................. 38

4.          Storage ...................................................................... 39

5.          Type of Storage Devices .................................................... 39

6.          Capabilities of the Storage Device ...................................................... 39

7.          Transport Procedure ............................................................. 40

**APPENDIX C** ................................................................. **41**

1.          Introduction ................................................................. 41

2.          Instrument check ............................................................. 42

3.          External Quality Assessment Scheme ................................................. 43

4.          Analysis of Blood Samples ............................................................ 43

5.          Reporting ...................................................................... 44

**APPENDIX D** ................................................................. **45**

1.          Administrative management ............................................................ 45

2.      Review by the Adaptive Model .......................................................... 46

3.      The expert review............................................................................... 47

4.      Formal review by a group of three experts ....................................... 48

5.      Follow up on expert opinions ............................................................ 49

6.      Review of Explanation from *Athlete* ................................................ 51

7.      Disciplinary Proceeding..................................................................... 51

# PART ONE: INTRODUCTION, PROVISIONS AND DEFINITIONS

## 1.0  Introduction to the *Athlete* Biological *Passport*

The term "athlete biological passport" was first proposed in the early 2000s by the scientific community when monitoring of selected haematological variables measurements (*Markers* of blood doping) was identified as a means to define an individual's haematological profile. WADA, in conjunction with a number of stakeholders and medical experts began to further develop, harmonize and validate this concept. The result was a formal guideline and mandatory standards that form the model known as the *Athlete* Biological *Passport*, which was first published in late 2009.

The typical *Doping Control* approach based on the detection of *Prohibited Substances* or their *Metabolites* in an *Athlete*'s *Sample* remains an effective approach; however it has limitations when an *Athlete* may be using substances on an intermittent and low-dose basis. Furthermore, new substances or modifications of *Prohibited Substances* (designer drugs) may be difficult to detect by conventional analytical means. In recent years, doping regimes have become much more scientifically planned and have taken full advantage of the weaknesses in traditional protocols. This underscores the need for a more sophisticated and complementary strategy to effectively fight doping – the *Athlete* Biological *Passport*.

The objective of integrating the *Athlete* Biological *Passport* into the larger framework of a robust anti-doping program may include the following:

a)   To identify and target *Athletes* for specific analytical *Testing* (e.g., recombinant EPO test, homologous blood transfusion test) by intelligent and timely interpretation of blood *Passport* data;

b)   To pursue possible *Anti-Doping Rule Violation*s in accordance with *Code* Article 2.2.

An *Anti-Doping Organization* is free to build its own structure to implement the *Athlete* Biological *Passport*. However, the framework proposed in this guideline aims to build upon existing anti-doping infrastructure and promote harmonization in ABP programs to facilitate exchange of information, mutual recognition of data, and consequently to enhance efficiencies in the operation of anti-doping activities. *Anti-Doping Organizations* should consider how to best integrate the *Athlete* Biological *Passport* into their existing programs by weighing all factors including the required resources and capacity to operate such a program.

## 2.0   Objective and Scope

The _Athlete_ Biological _Passport_ is presented in order to equip _Anti-Doping Organization_s with a robust and viable framework in which to pursue anti-doping rule violations in accordance with Article 2.2 of the World Anti-Doping _Code_ and simultaneously use biological data for intelligent, targeted _Testing_. While the processes and framework outlined in this guideline are intended for a haematological module, it will also be applicable to future modules, such as steroid and endocrine. This document is divided into two sections.

The first section provides a guideline which aims to explain the principles behind the _Athlete_ Biological _Passport_ and how an _Anti-Doping Organization_ may consider implementation within the context of their ongoing activities. This guideline is created both to assist organizations, and to foster consistency and harmonization in application without mandating specific administrative or procedural elements. This allows for some discretion in how the _Athlete_ Biological _Passport_ may be implemented.

The second section is a compilation of Technical Documents which are a series of mandatory protocols which must be followed by the _Anti-Doping Organizations_ choosing to apply the _Athlete_ Biological _Passport_. The sharing and mutual recognition of information between programs is only possible through this standardization of procedure.  These Technical Documents set out the minimum requirements for _Sample_ Collection, _Sample_ Transport, _Sample_ Analysis, and results management. Whilst these protocols are included herein for ease of reference, they are incorporated in whole in the _International Standard_ for _Testing_ and _International Standard_ for Laboratories as appropriate. These mandatory protocols have been established to harmonize the results of monitored variables within the _Athlete_ Biological _Passport_ to ensure both legal fortitude and scientific certainty. Each _Anti Doping Organization_ remains free to adapt the recommended process suggested herein to reflect its own resources and context, but to operate an _Athlete_ Biological _Passport_ as defined in this document the attached protocols provided herein as Appendices must be rigorously observed.

Finally, although this guideline seeks to harmonize longitudinal profiling programs, it in no way undermines the validity of existing *Anti-Doping Organization* programs. There are a number of useful and sound methodologies available to review blood data, manage intelligent *Doping Control* programs and pursue anti-doping rule violations; however the model offered in this document has the endorsement of *WADA*, as well as the infrastructure necessary within the network of *WADA* accredited <u>Laboratories</u> and is harmonized in such a fashion that *ADOs* may work cooperatively to enhance program efficiency and effectiveness.

The <u>*Athlete* Biological *Passport,*</u> when implemented in accordance with the Technical Documents, is a reliable method for indirectly detecting doping that can withstand legal and scientific challenges at the highest level.

# PART TWO: GUIDELINES FOR PASSPORT OPERATION

## 3.0   Terms and Definitions

### 3.1   Defined Terms from the 2009 Code

**ADAMS**: The Anti-Doping Administration and Management System is a Web-based database management tool for data entry, storage, sharing, and reporting designed to assist stakeholders and *WADA* in their anti-doping operations in conjunction with data protection legislation.

**Anti-Doping Organization (ADO):** A *Signatory* that is responsible for adopting rules for initiating, implementing or enforcing any part of the *Doping Control* process. This includes, for example, the International Olympic Committee, the International Paralympic Committee, other *Major Event Organizations* that conduct *Testing* at their *Events*, *WADA*, <u>International Federations</u>, and *National Anti-Doping Organizations*.

**Athlete**: Any *Person* who participates in sport at the international level (as defined by each <u>International Federation</u>), the national level (as defined by each *National Anti-Doping Organization,* including but not limited to those *Persons* in its *Registered Testing Pool*), and any other competitor in sport who is otherwise subject to the jurisdiction of any *Signatory* or other sports organization accepting the *Code*. All provisions of the *Code*, including, for example, *Testing* and therapeutic use exemptions, must be applied to international- and national-level competitors. Some *National Anti-Doping Organizations* may elect to test and apply anti-doping rules to recreational-level or masters competitors who are not current or potential national-calibre competitors. *National Anti-Doping Organizations* are not required, however, to apply all aspects of the *Code* to such *Persons*. Specific national rules may be established for *Doping Control* for non-international-level or non-national-level competitors without being in conflict with the *Code*. Thus, a country could elect to test recreational-level competitors but not require therapeutic use exemptions or whereabouts information.

In the same manner, a *Major Event Organization* holding an *Event* only for masters-level competitors could elect to test the competitors but not require advance therapeutic use exemptions or whereabouts information. For purposes of Article 2.8 (Administration or *Attempted* Administration) and for purposes of anti-doping information and education, any *Person* who participates in sport under the authority of any *Signatory*, government, or other sports organization accepting the *Code* is an *Athlete*.

*[Comment: This definition makes it clear that all international- and national-calibre athletes are subject to the anti-doping rules of the Code, with the precise definitions of international- and national-level sport to be set forth in the anti-doping rules of the <u>International Federations</u> and National Anti-Doping Organizations, respectively. At the national level, anti-doping rules adopted pursuant to the Code shall apply, at a minimum, to all Persons on national teams and all Persons qualified to compete in any national championship in any sport. That does not mean, however, that all such Athletes must be included in a National Anti-Doping Organization's Registered Testing Pool. The definition also allows each National Anti-Doping Organization, if it chooses to do so, to expand its anti-doping program beyond national-calibre athletes to competitors at lower levels of competition. Competitors at all levels of competition should receive the benefit of anti-doping information and education.]*

**Code:** The World Anti-Doping *Code*.

**Doping Control**: All steps and processes from test distribution planning through to ultimate disposition of any appeal including all steps and processes in between such as provision of whereabouts information, *Sample* collection and handling, laboratory analysis, therapeutic use exemptions, results management and hearings.

**Event**: A series of individual *Competitions* conducted together under one ruling body (e.g., the Olympic Games, FINA World Championships, or Pan American Games).

**In-Competition**: Unless provided otherwise in the rules of an <u>International Federation</u> or other relevant *Anti-Doping Organization*, "*In-Competition*" means the period commencing twelve hours before a *Competition* in which the *Athlete* is scheduled to participate through the end of such *Competition* and the *Sample* collection process related to such *Competition*.

**International Standard:** A standard adopted by *WADA* in support of the *Code*. Compliance with an *International Standard* (as opposed to another alternative standard, practice or procedure) shall be sufficient to conclude that the procedures addressed by the *International Standard* were performed properly. *International Standards* shall include any Technical Documents issued pursuant to the *International Standard*.

**Marker**: A compound, group of compounds or biological parameter(s) that indicate the use of a *Prohibited Substance* or *Prohibited Method.*

**No Advance Notice:** A *Doping Control* which takes place with no advance warning to the *Athlete* and where the *Athlete* is continuously chaperoned from the moment of notification through *Sample* provision.

**Out-of-Competition:**  Any *Doping Control* which is not *In-Competition*.

**Prohibited List:** The List identifying the *Prohibited Substances* and *Prohibited Methods*.

**Prohibited Method:** Any method so described on the *Prohibited List*.

**Prohibited Substance:** Any substance so described on the *Prohibited List*.

**Sample or Specimen:** Any biological material collected for the purposes of *Doping Control*.

[*Comment: It has sometimes been claimed that the collection of blood Samples violates the tenets of certain religious or cultural groups. It has been determined that there is no basis for any such claim.*]

**Target Testing:** Selection of *Athletes* for *Testing* where specific *Athletes* or groups of *Athletes* are selected on a non-random basis for *Testing* at a specified time.

**Testing:** The parts of the *Doping Control* process involving test distribution planning, *Sample* collection, *Sample* handling, and *Sample* transport to the Laboratory.

**WADA:** The World Anti-Doping Agency.

## 3.2    Defined Terms Specific to the *International Standard* for *Testing* (IST)

**Blood Collection Officer (BCO)**: An official who is qualified to and has been authorized by the *Anti-Doping Organization* to collect a blood *Sample* from an *Athlete.*

**Chain of Custody**: The sequence of individuals or organizations who have the responsibility for a *Sample* from the provision of the *Sample* until the *Sample* has been received for analysis.

***Doping Control* Officer (DCO)**: An official who has been trained and authorized by the *Anti-Doping Organization* with delegated responsibility for the on-site management of a *Sample* Collection Session.

***Doping Control* Station**: The location where the *Sample* Collection Session will be conducted.

**International Federation (IF)**: An international non-governmental organization administering one or more sports at world level.

**Sample Collection Authority**: The *Anti-Doping Organization* or independent agency or subcontractor with responsibility for all processes related to *Sample* Collection, as specified in Clauses 5.0, 6.0, 7.0, 8.0 and 9.0.

***Sample* Collection Equipment**: Containers or apparatus used to directly collect or hold the *Sample* at any time during the *Sample* collection process. *Sample* Collection Equipment shall, as a minimum, consist of:

- For urine *Sample* collection:

    - Collection vessels for collecting the *Sample* as it leaves the *Athlete's* body;
    - Sealable and tamper-evident bottles and lids for securing the *Sample*;
    - Partial *Sample* kit;

- For blood *Sample* collection:

    - Needles for collecting the *Sample*;
    - Blood tubes with sealable and tamper-evident devices for holding the *Sample*.

***Sample* Collection Personnel**: A collective term for qualified officials authorized by the *Anti-Doping Organization* who may carry out or assist with duties during the *Sample* Collection Session.

***Sample* Collection Session**: All of the sequential activities that directly involve the *Athlete* from notification until the *Athlete* leaves the *Doping Control* Station after having provided his/her *Sample/s*.

**Test Distribution Plan**: As defined in Clause 4.2.1.

### 3.3    Defined Terms Specific to the *International Standard* for Laboratories

**Adaptive Model:**    A mathematical model that was designed to identify unusual longitudinal results from *Athletes*. The model calculates the probability of a longitudinal profile of *Marker* values assuming that the athlete has a normal physiological condition.

**Adverse *Passport* Finding:** A report from an *Athlete Passport* Management Unit (APMU) that is the end result of the evaluation of the longitudinal profile of *Markers*, other *Passport* information (such as training and competition schedules), and expert review that is inconsistent with a normal physiological condition or known pathology and compatible with the use of a *Prohibited Substance* or *Prohibited Method*.

***Athlete* Biological *Passport* (ABP)**: The program and methods of gathering and collating *passports* as described in this document which includes the Operating Guidelines and the Technical Documents (Appendices).

**_Athlete_ Biological _Passport_ Documentation Package:** The material produced by the <u>Laboratory</u> and _Athlete Passport_ <u>Management Unit</u> (APMU) to support an <u>Adverse _Passport_ Finding</u> such as, but not limited to, analytical data, <u>Expert Panel</u> comments, evidence of confounding factors as well as other relevant supporting information.

**_Athlete Passport_ Management Unit (APMU):** A unit composed of a person or persons designated by the _Anti-Doping Organization_ to administer an _Athlete_ Biological _Passport_. The unit is responsible for the administrative management of the _Passports_, advising the _Anti-Doping Organization_ for intelligent, targeted _Testing_, liaising with the <u>Expert Panel</u>, compiling and authorizing an <u>_Athlete_ Biological _Passport_ Documentation Package</u> and reporting <u>Adverse _Passport_ Findings</u>.

**<u>Confirmation Procedure</u>:** An analytical test procedure whose purpose is to identify the presence or concentration of one or more specific _Prohibited Substance_, _Metabolite_(s) of a _Prohibited Substance_, or _Marker(s)_ of the _Use_ of a _Prohibited Substance_ or _Method_ in a _Sample_.

_[Comment: A Confirmation Procedure may also indicate a quantity of Prohibited Substance greater than a threshold value and quantify the amount of a Prohibited Substance in a Sample.]_

**<u>Expert Panel</u>:** The experts, with knowledge in the concerned field, chosen by the _Anti-Doping Organization_ and/or <u>APMU</u>, who are responsible for providing an evaluation of the _Passport_. For the haematological module, experts will have knowledge in one or more of the fields of clinical hematology (diagnosis of blood pathological conditions), sports medicine or exercise physiology.

This <u>Panel</u> may include a pool of appointed experts and any additional ad-hoc expert who may be required upon request of any of the appointed _Experts_ or by the _Athlete Passport_ <u>Management Unit</u> of the _Anti-Doping Organization_.

**Initial Testing Procedure (Screen Testing Procedure)**: An analytical test procedure whose purpose is to identify those *Sample*s which may contain a *Prohibited Substance*, *Metabolite*(s) of a *Prohibited Substance*, or *Marker(s)* of the *Use* of a *Prohibited Substance* or *Prohibited Method* or the quantity of a *Prohibited Substance*, *Metabolite*(s) of a *Prohibited Substance*, or *Marker(s)* of the *Use* of a *Prohibited Substance* or *Prohibited Method* in excess of a defined threshold.

**_International Standard_ for Laboratories (ISL):** The *International Standard* applicable to Laboratories as set forth herein.

**Laboratory Internal Chain of Custody**: Documentation of the sequence of *Persons* in custody of the *Sample* and any aliquot of the *Sample* taken for analytical *testing*.

*[Comment: Laboratory Internal Chain of Custody is generally documented by a written record of the date, location, action taken, and the individual performing an action with a Sample or aliquot.]*

**Laboratory(ies):** *WADA* accredited Laboratory(ies) applying test methods and processes to provide evidentiary data for the detection of *Prohibited Substances, Methods* and *Markers* on the *Prohibited List*, and if applicable, quantification of a Threshold Substance, in urine and other biological *Sample*s in the context of anti-doping activities.

**Passport**: A collation of all relevant data unique to an individual *Athlete* that may include longitudinal profiles of *Markers*, heterogeneous factors unique to that particular *Athlete* and other relevant information that may help in the evaluation of *Markers*.

**Testing Authority(ies)**: The *Anti-Doping Organization* that has authorized *a particular test* from their *Test Distribution Plan, as specified in IST Article 4.0.* For example, the International Olympic Committee, *World Anti-Doping* Agency, International Federation, National Sport Organization, *National Anti-Doping Organization*, *National Olympic Committee*, Major *Event* Organization, or other authority defined by the *Code* responsible for planning and initiating *Sample* Testing either *In-Competition* or *Out-of-Competition* .

**WADA Approved Laboratory for the ABP**: Laboratory(ies) not otherwise accredited by WADA; applying test methods and processes in support of an *Athlete* Biological *Passport* program and in accordance with the criteria for approval of non-accredited Laboratories for the *Athlete* Biological *Passport*.

# 4.0   Roles and Responsibilities of the Partners

## 4.1     Objective

In order to protect the rights of the *Athlete* and implement a credible and viable passport program, a reasonable distinction between the roles and responsibilities of the various partners should be established. These responsibilities include test planning, profile interpretation and results management.

## 4.2     Specific Partner Responsibilities

The purpose of the *Athlete Biological Passport* program is to establish the possible use of a *Prohibited Method* or *Substance* indirectly and also to use biological data to apply traditional doping controls and/or targeting more intelligently. Distinctions with respect to the various roles and responsibilities in the *ABP* process clarify the precise functions of all partners in order to establish accountability, consistency and credibility.

### *4.2.1 The Anti-Doping Organization(s) is/are responsible for:*

a)  Adopting, implementing and administrating an *Athlete Biological Passport* in accordance with these Guidelines including compliance with the *International Standard for Testing*;

b)  Ensuring that recommendations received from the *APMU* is converted into effective, targeted, timely and appropriate follow-up testing; and

c)  Following up on *Adverse Passport Findings* in accordance with TD2012RMR (Appendix D) and Article 7.4 of the Code.

**4.2.2 The <u>Athlete Passport Management Unit (APMU)</u> is responsible for:**

a) Providing recommendations that can be converted into effective, targeted, timely and appropriate follow-up testing by the ADO;

b) Real-time administrative management of the *Passports* and liaising with <u>Expert Panels</u> as required;

c) Compiling all necessary information to establish an <u>ABP Documentation Package</u>; and

d) Issuing all <u>Adverse *Passport* Findings</u> to the *ADO* and *WADA*.

**4.2.3 The WADA Accredited <u>Laboratory</u> is responsible for:**

a) Adhering to TD2012BAR (Appendix C) and *WADA* EQAS program to ensure robust, standardized, and credible biological data is incorporated into an *Athlete*'s *Passport*; and

b) Providing the necessary information to compile all required <u>Documentation Packages</u>.

**4.2.4  The WADA Approved <u>Laboratory</u> for the <u>ABP</u> is responsible for:**

a) Adhering to TD2012BAR (Appendix C) and *WADA* EQAS program to ensure robust, standardized, and credible biological data is incorporated into an *Athlete*'s *Passport*;

b) Meeting and maintaining the criteria for approval of non-*WADA* accredited <u>Laboratories</u> for the <u>*Athlete* Biological *Passport*</u> program; and

c) Providing the necessary information to compile all required <u>Documentation Packages</u>.

### 4.2.5 The __Expert Panel__ is responsible for:

a) Reviewing *Passport* data and results from the __Adaptive Model__ provided by the __APMU__ in order to identify any possible pathological or confounding conditions which may have impacted an *Athlete*'s results;

b) Recommending any follow-up *Testing* or suggest possible clinical testing that may be required to confirm assessment or to collect further evidence to support or confirm possible pathologies;

c) Reviewing any explanations of the *Athlete* and give an opinion on whether any *Atypical Finding*(s) was highly probable given that a *Prohibited Substance* or *Prohibited Method* had been used; and

d) Working with the relevant __APMU__ as required and provide evidentiary support as necessary throughout any results management process.


### 4.2.6 WADA is responsible for:

a) Providing access to *ADAMS* to relevant *ADOs* to support coordinated and secure exchange of information between the aforementioned partners;

b) Providing access to the __Adaptive Model__ (__ABP__ software) to those *ADOs* adhering to the mandatory __ABP__ Technical Documents;

c) Carrying out its monitoring and appeal rights and responsibilities as set forth in *Code* Article 20.7;

d) Providing ongoing support to *ADOs* operating __ABP__ programs as required; and

e) Continuing to enhance and develop the __ABP__ for all stakeholders.

## 5.0   *Athlete* Biological *Passport* Administration

### 5.1   Objective

Although the administrative organization of the *Athlete* Biological *Passport* may be adapted to best suit the relevant *Anti-Doping Organization*, this guideline seeks to foster harmonization in the interests of mutual recognition of *Athletes' Passport*s, standardized practice and to ensure efficiency in program application more generally.

The majority of administrative standardization should be achieved with the use of the ABP software (Adaptive Model) and by processing of all steps and data in *ADAMS* in order to ensure that all mandatory requirements are met and that the *Athlete Passports* are shared and stored appropriately in accordance with the *International Standard* for the Protection of Privacy and Personal Information (ISPPI). Furthermore, *ADAMS* will facilitate prompt exchange of information between *Anti-Doping Organization*s, *Athlete Passport* Management Unit, *WADA* accredited Laboratories, *Sample* Collection Personnel and *WADA*.   *ADAMS* will also furnish access to the *Athlete* to their biological data upon request.

### 5.2   Recommended Administrative Sequence

The following outlines the suggested sequence of interactions between the *Athlete,* Doping Control Personnel, *Anti-Doping Organizations,* Laboratory(ies)*, ADAMS, Athlete Passport* Management Units and Expert Panels in order to establish an individual *Athlete*'s *Passport* in an effective and efficient manner*.*

The recommended sequence outlined below may be modified or adapted to merge with existing anti-doping infrastructure, procedures, and mechanisms as required. However this Guideline strongly suggests that the *ADO* establishes a process which ensures transparency in process and ideally independence between the planning, interpretation, and results management aspects of an *Athlete* Biological *Passport*.

To create a framework for such independence, the sequence set out herein includes the incorporation of an *Athlete Passport* Management Unit which should be the central hub connecting Laboratory-generated biological data with active test planning advice and intelligence.

This central hub (the APMU) may be associated with a *WADA* accredited Laboratory's operations, or be managed under the responsibility of an *ADO*. While all such options are acceptable provided that their processes conform to the necessary requirements set out in Appendix D (TD2010rmr), *WADA* will support the establishment of Laboratory-affiliated APMUs as the preferred method of ABP practice and engagement going forward.

1. The *Anti-Doping Organization* identifies the *Athlete* of interest and identifies what may be necessary for his or her *Passport* based on what information is already available including the information outlined in Article 3.2. This may include information such as the *Athlete*'s past *Testing* history, existing *Passport* information, available whereabouts and past *Athlete Passport* Management Unit recommendations.

2. The *Anti-Doping Organization* identifies suitable timing for *Sample* collection upon the recommendation of the *Athlete Passport Management Unit* as appropriate.

3. The *Anti-Doping Organization* issues a *Sample* collection request ("mission order") based on the recommendations of the *Athlete Passport* Management Unit, to a *Sample* collection agency or to *Doping Control Personnel*. Preferably this will be delivered via *ADAMS* to restrict the dissemination of this information.

4. The *Sample Collection Authority* accesses the pertinent whereabouts information of the *Athlete* via *ADAMS* for only the period defined by the issuing organization as well as any other relevant *Testing* instructions.

5. The _Doping Control_ Officer and/or Blood Collection Officer locate the _Athlete_ and collect the biological _Sample_ following the appropriate protocol (Appendix A herein). This _Sample_ is accompanied by passport documentation to be completed in an ABP _Doping Control_ form as outlined in Article 7.3.

6. The _Sample_ Collection Personnel are responsible for the transport of the biological _Sample_(s) to a _WADA_ accredited or approved Laboratory following the appropriate protocol (Appendix B herein).

7. Following the _Sample_ Collection Session, the _Sample_ collection agency or the _Sample_ Collection Personnel should transcribe the _Athlete_ Biological _Passport Doping Control_ form into _ADAMS_ immediately to provide prompt access to the relevant data for the Laboratory, APMU and _Anti-Doping Organization_ as required.

8. The _WADA_ accredited Laboratory analyzes the _Sample_(s) following the appropriate analytical protocol (Appendix C herein) and reports the biological results without delay into _ADAMS_.

9. Once the new biological data are entered in _ADAMS_, a notification is sent to the APMU which updates the _Athlete_'s _Passport_ and applies the Adaptive Model using the _ABP_ software.

_Comment: If there_ is a _departure from the WADA Requirements for the collection, transport and analysis for the_ Athlete Biological Passport, the _corresponding result should not be considered in the calculations by the_ Adaptive Model. _The non-conforming biological result however should be included (whenever possible) in the Athlete's Passport for reference and targeting purposes. Any non-conforming result (for example, a result analyzed after 36 hours) may be included in the_ Expert Panel _assessment of a profile provided that the Expert Panel attention is drawn to this particular result. The_ Athlete Passport Management Unit (APMU) _will coordinate with the appropriate_ Laboratory _and haematological experts in order to ensure the validity of any non-conforming result._

10. The <u>Athlete Passport Management Unit</u> reviews the new or updated Passport including the results of the <u>Adaptive Model</u> processing, and advises the ADO on intelligent Testing strategies.

11. In the event that the Athlete's Haemoglobin (HGB) and/or OFF-hr-Score (OFFS) values are beyond the 99.9 percentile of the expected ranges returned by the <u>Adaptive Model</u>, the <u>Athlete Passport Management Unit</u> shall proceed with the mandatory steps outlined in Appendix D herein which includes liaising with the <u>Expert Panel</u> of the ADO.

12. The <u>APMU</u> should also regularly provide a random set of profiles, that do not exceed the 99.9 percentile, in order to provide experts with a more balanced view of the Athlete population.

## 5.3   Sharing and Exchange of Passports

For any individual *Athlete,* only one *Passport* should be established. By adopting standardized protocols and procedures, as well as utilizing *ADAMS* for the management of *Passport* information, *ADOs* can enhance efficiencies and program effectiveness through exchange of information and mutual recognition of program outcomes. Such coordination and reciprocal agreement reduces unnecessary duplication in resource expenditure and fosters enhanced confidence among *ADO*s and *Athletes* alike.

Within the framework provided by the *International Standard* on Privacy and Data Protection (ISPPI), *ADOs* are encouraged to coordinate their activities where multiple *ADOs* have *Testing* jurisdiction over a single *Athlete* and multiple *ADO*s may wish to perform *Passport Testing*. In the interests of a 'one *Athlete* – one *Passport*' principle, *ADOs* are encouraged to work cooperatively to see that *Testing* is coordinated appropriately.

All results should be shared between respective *ADOs* where agreement has been reached with respect to the provision of such information. In lieu of such an agreement, when an abnormality is identified that is a result of biological data from multiple *ADO*s, the <u>International Federation</u> will have the primary responsibility for these follow-up actions.

*[4.3 Comment:  If an Athlete is subject to testing by multiple ABP Programs, then his/her <u>IF</u> and NADO(s) should seek to reach an agreement in advance on who will be responsible for the establishment of the Passport and any necessary follow-up action such as a Target Testing or results management proceedings.  If no agreement can be found, any one of the ADOs may ask WADA to determine which ADO is responsible for the Athlete. WADA shall not rule on this without consulting with the ADOs involved.*


### 5.3.1 Mutual Recognition and Respect of Program Activities

In addition to the provisions set out in *Code* Article 15.4.1, for the purposes of the <u>*Athlete* Biological *Passport*</u> certain pre-conditions should be established in order for multiple *ADOs* to recognize one another's activities and cooperate on a joint *ABP* program for a single *Athlete.* These include, at a minimum, that all *Samples* collected by *ADOs* and subsequently incorporated into a single *Passport* have:

    a)  Adhered to Appendix A (*Sample* Collection Requirements);

    b)  Adhered to Appendix B (*Sample* Transportation Requirements); and

    c)  Adhered to Appendix C (Analytical Requirements).

Additionally, the concerned *ADO*s should:

    a)  Agree upon a specific <u>APMU</u> that will be responsible for the management of a single *Passport* of interest to more than one party;

    b)  Ensure that this <u>APMU</u> will liaise with an agreed upon <u>Expert Panel</u> as required by Appendix D; and

    c)  Ensure that this <u>APMU</u> be advised on appropriate *Target Testing*.

# 6.0   Program Implementation of the Haematological Module

## 6.1   Introduction

The _Athlete Biological Passport_ involves regular monitoring of biological _Markers_ on a longitudinal basis to facilitate indirect detection of _Prohibited Substances and Methods_. From this perspective, the _Prohibited Substance_ itself is not detected but rather its effects on the body become evident. The effect of the drug remains longer than the substance itself, which may be quickly excreted or degraded and therefore go undetected unless _Testing_ is carried out at a very specific time.

In order to establish an effective longitudinal monitoring program, the list of relevant _Markers_ for a specific class of substance (e.g. substances enhancing oxygen transfer such as recombinant EPO) must be identified and monitored on a regular basis for a given _Athlete_. The collection and monitoring of values corresponding to these identified _Markers_ will constitute an individual longitudinal profile. Such profiles are the cornerstones of the _Athlete Biological Passport,_ with a subject becoming his/her own point of reference.

The _Markers_ will be specifically selected based on the relevant doping scenario. For instance, _Markers_ of an altered erythropoiesis will be taken into consideration to confirm blood manipulation or aerobic performance enhancement. Steroid _Markers_ in urine, on the other hand, may be used to demonstrate the use of anabolic steroid(s).

## 6.2   Haematological Markers

The Haematological Module collects information on _Markers_ of blood doping. It aims to identify enhancement of oxygen transport, including use of erythropoiesis stimulating agents and any form of blood transfusion or manipulation. In addition to identifying the use of 'Erythropoiesis-stimulating agents' included under _S2._

*Peptide Hormones, Growth Factors and related Substances,* of the *Prohibited List,* the haematological module also seeks to identify the *Use* of *Methods* categorized under section M1. of the *Prohibited List,* 'Enhancement of Oxygen Transfer.'

The following *Markers* are considered within the <u>*Athlete* Biological *Passport*</u> haematological module:

|  |  |
|---|---|
| HCT: | Hematocrit |
| HGB: | Haemoglobin |
| RBC: | Red blood cells count |
| RET%: | The percentage of reticulocyte |
| RET#: | Reticulocytes count |
| MCV: | Mean corpuscular volume |
| MCH: | Mean corpuscular haemoglobin |
| MCHC: | Mean corpuscular haemoglobin concentration |

Further calculated *Markers* specific to the haematological module include OFF-hr Score (OFFS), which is a combination of HGB and RET%[1], and Abnormal Blood Profile Score (ABPS), which is a combination of HCT, HGB, RBC, RET%, MCV, MCH, and MCHC[2].

---

[1] Gore C, Parisotto R, Ashenden M, Stray-Gundersen, J, Sharpe K, Hopkins W, Emslie K, Howe C, Trout G, Kazlauskas R, Hahn A. Second-generation blood tests to detect erythropoietin abuse by athletes. Haematologica 2003; 88: 333-43.

[2] Sottas PE, Robinson N, Giraud S, Taroni F, Kamber M, Mangin P, Saugy M. Statistical Classification of Abnormal Blood Profiles in Athletes. The International Journal of Biostatistics 2006; 2(1):3.

## 6.3    Athlete Information

The *Passport* for a haematological module should also incorporate individual *Athlete* profile information to provide context for the interpretation of the *Markers* outlined in 3.1. This additional information which may be collected by various means, both prior to and after testing as appropriate, includes but is not limited to:

a) Gender, date of birth, sport, and discipline
b) Location and date of each *Sample* collection;
c) Information on the transport conditions of the *Sample*(s);
d) Whereabouts information for the month prior to each *Sample* collection which includes:
   - In- and out-of-competition activities; and
   - Location information that demonstrates relevant altitude exposure.
e) Information on blood loss or gain (pathology or transfusion) in the three months preceding each *Sample* collection; and
f) Information on use of hypoxic devices (altitude simulation).

## 6.4    Testing and Defining the Target Population

An *Athlete* Biological *Passport* *Testing* program must follow the *International Standard* for *Testing* (IST) and the applicable Technical Documents specific to the *Athlete* Biological *Passport*.

*Targeted* tests that follow the recommendations of the *Athlete Passport Management Unit* should be privileged over random tests to improve the sensitivity of the *Athlete* Biological *Passport*.  In general, the sensitivity of the *Athlete* Biological *Passport* to detect doping is improved where both *In-* and *Out-of Competition* tests and *No-Advance Notice* tests are distributed throughout the year. Data points are most statistically independent when *Samples* have been collected at least five days apart.

The criteria listed below may be considered in determining the target population for the _Athlete_ Biological _Passport_ and the context of an _Anti-Doping Organization_'s overall Test Distribution Plan.

a) Sports and/or disciplines within the jurisdiction of the _ADO_ at higher risk for blood-based doping (i.e. sports with an aerobic or endurance component);

b) _Athletes_ who may warrant inclusion in such a program with respect to their possible risk for doping practice;

c) Age of _Athlete_ and their prospects for long term, elite level participation;

d) Whether any _Athlete_s under _ADO_s jurisdiction are already subject to the _Athlete_ Biological _Passport_ program of another _ADO;_

e) Inclusion of the _Athlete_ in the _ADO_'s Registered Testing Pool to support intelligent _Testing_ and provide supporting information for Expert interpretation; and

f) Inclusion of _Athletes_ that are currently screened by other methods or programs.

## 6.5    Resources

The following resources are required in order to adopt and implement the _Athlete_ Biological _Passport_:

a) Access to a network of *Doping Control* Officers (DCO) and Blood Collection Officers (BCO) operating in locations where target *Athletes* will be present;

b) An effective whereabouts management system to facilitate *Athlete* location (i.e. *ADAMS*);

c) Database *management* capacity for storing the *Athletes' Passports* (i.e. *ADAMS* and ABP Software);

> [7.5 c. Comment: The ABP software is made freely available by WADA to any ADO that follow these Guidelines. The ABP Software allows the user to create, manage, evaluate and share Athletes' Passports. This software will be integrated into ADAMS in the future.]

d) Access to an *Athlete Passport* Management Unit with relevant expertise and availability for 'real-time' management of ABP processes as highlighted in Article 4.2 below;

e) Access to a Expert Panel for interpretive and consultative capacity via the *Athlete Passport* Management Unit; and

f) Results management capacity including resources for enforcing the program.

# 7.0  *Athlete* Biological *Passport* Documentation

## 7.1    Objective

Given that additional information is required from *Athletes* beyond what is collected on traditional anti-doping documentation pursuant to the IST, supplemental or revised documentation may be required. The <u>*Athlete* Biological *Passport*</u> documentation therefore should ensure that the required information is collected on-site to accompany all *Athlete Samples* for <u>Laboratory</u> information and *Anti-Doping Organization* assessment as required.

## 7.2    General

Depending on whether *Samples* are also being collected for conventional analysis and the <u>*Athlete* Biological *Passport*</u> at the same time, some information for the <u>*Athlete* Biological *Passport*</u> may already be included on the standard collection form.

## 7.3    Requirements[1]

In addition to the mandatory information set out in Article 7.4.5 of the *International Standard for Testing* that must be recorded as a part of all <u>*Sample* Collection Sessions</u>, the following minimum information, should be included on the <u>*Athlete* Biological *Passport*</u> *Doping Control* Form and/or on associated *Sample* collection paperwork such as a Chain of Custody Form or other required Supplementary Report:

---

[1] Template documentation which meets the requirements of Article 7.3. is available from *WADA* for all *Anti-Doping Organizations* wishing to implement the <u>*Athlete* Biological *Passport*</u> program.

a) Location of *Testing*;

b) *Event* (if relevant);

c) Blood loss or gain (pathology or transfusion) in the three months (with estimated volume) preceding each sample collection;

d) Information on the use of simulated hypoxic conditions in the previous two weeks - if so, the type of device and the manner in which it was used (frequency, duration, simulated altitude) shall be recorded;

e) Information on exposure to a high altitude (>1000 meters) in the previous two weeks including estimated altitude and duration; and

f) Information in relation to most recent training or physical activity as applicable.

# PART THREE: REQUIREMENTS FOR PASSPORT OPERATION FROM INTERNATIONAL STANDARD FOR TESTING AND INTERNATIONAL STANDARD FOR LABORATORIES

Adoption of the following Technical Documents (level two documents) is mandatory in order to comply with the requirements of the Haematological Module of the _Athlete Biological Passport_. All technical requirements identified herein are found in the relevant _International Standards_ as Technical Documents but are included in these Appendices for ease of reference. The requirements of these Appendices are applicable to the _Athlete Biological Passport_ only and are not applicable to blood collected for any other _Doping Control_ purpose.

# APPENDIX A

## Blood Collection Requirements for the *Athlete* Biological *Passport*

### WADA Technical Document – TD2010BSCR

| Document Number: | TD2010BSCR | Version Number: | 2.0 |
|---|---|---|---|
| Written by: | WADA | Approved by: | *WADA Executive Committee* |
| Date: 15.11.2011 | | Effective Date: | 01.01.2012 |

## Blood *Sample* Collection Requirements for the *Athlete* Biological Passport

### 1. Objective

These requirements are intended to assist in the collection of blood *Samples* for the measurement of individual *Athlete* haematological variables within the framework of the *Athlete* Biological *Passport* (ABP).

### 2. Scope

The *International Standard* for *Testing* is applicable to the collection of blood *Samples* carried out in connection with the measurement of individual *Athlete* blood variables within the framework of the ABP. This Appendix describes additional requirements for blood storage and transport related to the *Athlete* Biological *Passport*. The best practice for *Sample* collection set out in the *WADA* Guidelines for Blood *Sample* Collection should also be considered, although remains non-mandatory. In the event of any discrepancy between the requirements set out in this Appendix and those set out in the IST or Blood *Sample* Collection Guidelines, this Appendix shall prevail for sample collection related to the *Athlete* Biological *Passport*.

### 3.  The Timing of the *Sample* Collection

If collection occurs after training or *Competition*, test planning shall consider the *Athlete*'s whereabouts information to ensure *Testing* does not occur within two hours of such activity. In case the *Athlete* has trained or competed less than two hours before the time the *Athlete* has been notified of his/her selection, the <u>DCO</u> or the <u>BCO</u> or a Chaperone shall monitor the *Athlete* until this two hour period has elapsed, after which the blood collection shall take place.  The nature of the exertion (*Competition*, training, etc.) as well as the duration and general intensity shall also be recorded by the <u>*Doping Control Officer*</u>.

### 4.  The Commencement of the Collection Process and the 10 Minute Time-out

Following notification to the *Athlete* that they have been selected for *Doping Control* and following the <u>DCO/BCO's</u> explanation of the *Athlete's* rights and responsibilities in the *Doping Control* process, the <u>DCO/BCO</u> shall ask the *Athlete* to remain in a normal seated position with feet on the floor for at least 10 minutes prior to providing a *Sample*.

### 5.  The <u>Athlete Biological Passport</u> Doping Control Documentation

The <u>DCO/BCO</u> shall use the *Doping Control* Form related to the <u>ABP</u>, if such a form is available. If a *Doping Control* Form related to the <u>*Athlete* Biological *Passport*</u> is not available, the <u>DCO/BCO</u> shall use a regular *Doping Control* Form but he/she shall collect and record the following additional information on a related form or supplementary report to be signed by the *Athlete* and the <u>DCO/BCO</u>:

     a)  Confirm that there was no training or *Competition* in the last two hours before the blood test.

b) Did the *Athlete* train, compete or reside at an altitude greater than 1000 meters within the previous two weeks?  If so, or if in doubt, the name and location of the place where the *Athlete* had been as well as the duration of this/her stay shall be recorded. The estimated altitude shall be entered, if known.

c) Did the *Athlete* use any form of altitude simulation such as a hypoxic tent, mask, etc. during the previous two weeks? If so, as much information as possible on the type of device and the manner in which it was used (frequency, duration, intensity, etc.) should be recorded.

d) Did the *Athlete* receive any blood transfusion(s) during the previous three months?  Was there any blood loss due to accident, pathology or donation in the previous three months?  What was the estimated volume?

### 6.  The *Sample* Collection Equipment

The <u>DCO/BCO</u> instructs the *Athlete* to select the <u>*Sample* Collection Equipment</u> in accordance with Article E.4.6 of the IST. Vaccutainer(s) shall be labelled with a unique *Sample* code number by the <u>DCO/BCO</u> prior to the blood being drawn if they are not pre-labelled and the *Athlete* shall check that the code numbers match.

> *[Comment: The WADA Blood Collection Guidelines have been updated to reflect these requirements and include practical information on the integration of <u>Athlete Biological Passport</u> Testing into 'traditional' Testing activities. In these Guidelines, a table has been included which identifies which particular equipment is appropriate when combining particular test types (The <u>Athlete Biological Passport</u> + hGH, the <u>Athlete Biological Passport</u> + HBT etc.)*
>
> *Although the <u>ABP</u> requires only a single tube of blood, the Blood Collection Guidelines outline how the <u>ABP</u> may be coordinated with other blood analyses that may be performed at the same time.]*

### 7. The *Sample* Collection Procedure

The *Sample* Collection Procedure for the collection of blood for the purposes of the <u>*Athlete* Biological *Passport*</u> is consistent with the procedure set out in IST Appendix E.4.1 through E.4.15 with the additional elements:

    a) The <u>BCO</u> ensures that the 10 minute (or more) time-out period has elapsed prior to performing venipuncture and drawing blood; and

    b) After the blood flow into the tube ceases, the <u>BCO</u> removes the tube from the holder and gently homogenizes the blood in the tube manually by inverting the tube gently at least three (3) times.

### 8. Post Venipuncture Procedure

    a) The Athlete and the DCO/BCO sign the blood collection form(s).

    b) The blood Sample is deposited and sealed in the Sample collection container in accordance with the IST.

# APPENDIX B

# Blood Transport Requirements for the *Athlete* Biological *Passport*

## WADA Technical Document — TD2010BSTR

| Document Number: | TD2010BSTR | Version Number: | 2.0 |
|---|---|---|---|
| Written by: | WADA | Approved by: | WADA Executive Committee |
| Date: | 15.11.2011 | Effective Date: | 01.01.2012 |

## Blood Sample Transport Requirements for the *Athlete* Biological *Passport*

### 1. Objective

This Technical Document is intended to assist the storage and transport of blood *Samples* collected for the measurement of individual *Athlete* blood variables within the framework of the *Athlete* Biological *Passport* (ABP).

### 2. Scope

This protocol covers the storage and transport of blood *Samples* both *In-Competition* and *Out-of-Competition*.

### 3. Responsibility

The *International Standard* for *Testing* (IST) is applicable to the storage and transport of blood *Samples* carried out in connection with the measurement of individual *Athlete* blood variables within the framework of the ABP. This protocol describes certain specificities of blood storage and transport related to the *Athlete* Biological *Passport*.

### 4.  Storage

Once a blood *Sample* has been collected in accordance with the Blood *Sample* Collection Requirements for the *Athlete* Biological *Passport*, it shall be stored in accordance with Article 8 of the IST and the present protocol.

The storage procedure is the responsibility of the *Doping Control* Officer.

### 5.  Type of Storage Devices

The DCO shall place the blood *Sample* in a storage device, which may be:

    a)  A refrigerator;

    b)  An insulated cool box;

    c)  An isotherm bag;

    d)  Any other device that possesses the capabilities mentioned below.

### 6.  Capabilities of the Storage Device

The storage and transport device shall be capable of maintaining blood *Samples* at a cool temperature during storage. Whole blood *Samples* shall not be allowed to freeze. A temperature data logger shall be used to record the temperature during transport. In choosing the storage device the DCO shall take into account the time of storage, the number of *Samples* to be stored in the device and the prevailing environmental conditions (hot or cold temperatures).

### *6.1   Security of the storage device*

The storage device shall be located in the blood _Doping Control_ Station and shall be kept secured appropriately (in accordance with the IST).

## 7. Transport Procedure

Blood _Samples_ shall be transported in accordance with Article 9 of the IST, consistent with the practices of the _WADA_ Blood Collection Guideline and in conjunction with this protocol. The transport procedure is the responsibility of the DCO. Blood _Samples_ shall be transported in a device that maintains the integrity of _Samples_ over time due to changes in external temperature.

### 7.1   Security of the transport device

The transport device shall be transported by secure means using an _Anti-Doping Organization_ authorized transport method.

### 7.2   Remarks concerning the storage and transport procedure

Blood _Samples_ shall be transported rapidly to a Laboratory so that analysis can ideally be performed within 36 hours of _Sample_ collection.

> _[Comment:  The WADA Blood Collection Guidelines have been revised to reflect these protocols and include practical information on the integration of Athlete Biological Passport Testing into 'traditional' Testing activities. A table has been included which identifies which particular timelines for delivery are appropriate when combining particular test types (the Athlete Biological Passport + hGH, the Athlete Biological Passport + HBT etc) and which types of Samples may be suited for simultaneous transport]._

## APPENDIX C

## Blood Analytical Requirements for the _**Athlete**_ **Biological** _**Passport**_

### WADA Technical Document – TD2010BAR

| Document Number: | TD2010BAR | Version Number: | 2.0 |
|---|---|---|---|
| Written by: | WADA | Approved by: | WADA Executive Committee |
| Date: 15.11.2011 | | Effective Date: | 01.01.2012 |

**Blood Analytical Requirements for the _Athlete_ Biological _Passport_**

### 1. Introduction

This Technical Document has been established to harmonize the analysis of blood _Sample_s collected, both _In-Competition_ and _Out-of-Competition_, for the measurement of individual _Athlete_ blood variables within the framework of the _Athlete_ Biological _Passport_ (_ABP_).

The International _Standard_ for Laboratories (ISL) is applicable to the analysis of blood _Sample_s carried out in connection with the measurement of individual _Athlete_ blood variables within the framework of the ABP. This Technical Document describes certain specificities of blood analysis related to the ABP.

Blood _Sample_s shall be analyzed in a _WADA_ accredited Laboratory or _WADA_ approved Laboratory. If not reasonably possible for technical and/or geographical reasons, blood _Sample_s can be analyzed at a satellite facility of a _WADA_ accredited Laboratory or using mobile units operated under applicable ISO accreditation by _WADA_ accredited Laboratories.

The blood _Sample_ shall be analyzed within 36 hours of _Sample_ collection.

If the Laboratory has taken delivery of the _Sample_ after 36 hours from the time of _Sample_ collection, the Laboratory shall analyze the _Sample_ as soon as possible, however the _Athlete Passport_ Management Unit (APMU) and

_Testing_ Authority shall be advised of such delay and departure from the requirement.

The _Athlete Passport_ Management Unit (APMU) will coordinate with the appropriate Laboratory and haematological experts in order to ensure the validity of any result analyzed after 36 hours.

**Analytical procedure**

In order to standardize analytical results in the _Athlete_ Biological _Passport_ framework, it is important to have blood _Sample_s analyzed in an appropriate dedicated network of Laboratories (e.g. _WADA_ accredited Laboratories or as otherwise approved by _WADA_) using analyzers with comparable technical characteristics. It is necessary that the instrumentation is validated to provide comparable results prior to analysis of _Doping Control Sample_s).

## 2.  Instrument check

Before performing any blood analyses, all reagents shall be verified to ensure that they are within their expiration dates and that they comply with the reagent manufacturer's recommendations. Then, the operational parameters of the instrument shall be properly controlled (background level, temperature of the incubation chambers, pressure, etc.) and fall within manufacturer's specifications.

All internal quality controls shall be analyzed twice following the specifications provided by the manufacturer. These internal quality controls shall exclusively be furnished by the manufacturer of the instrument. These controls shall be handled in strict accordance with the specifications provided by the manufacturer (e.g. expiration dates, storage conditions). All results shall be in agreement with reference value ranges provided by the manufacturer.

On a regular basis (as determined by the head of the Laboratory), one fresh blood _Sample_ shall be homogenized for a minimum period of 15 minutes on an appropriate mixer (e.g. roller mixer) and then analyzed seven consecutive times. Coefficients of variation shall be below 1.5 % for haemoglobin and HCT and below 15 % for percentage reticulocyte count in order to confirm the appropriate precision of the instrument.

At least one internal quality control from the manufacturer (either level 1, 2 or 3) shall be conducted after every 30 to 50 blood *Sample* analyses. Once a day and after all blood Sample analyses are completed, one internal quality control (either level 1, 2 and 3) shall be analyzed once again to demonstrate continuous stability of the instrument and the quality of the analyses done.

### 3. External Quality Assessment Scheme

The Laboratories (or as otherwise approved by *WADA*) shall take part in and meet the requirements of the WADA External Quality Assessment Scheme (EQAS) for blood variables. The external quality controls shall be analyzed seven times consecutively and then the mean results of the following blood variables (full blood count) shall be returned:

| | |
|---|---|
| Red Blood Cell (Erythrocyte) Count | RBC |
| Mean Corpuscular Volume | MCV |
| Hematocrit | HCT |
| Haemoglobin | HGB |
| Mean Corpuscular Haemoglobin | MCH |
| Mean Corpuscular Haemoglobin Concentration | MCHC |
| White Blood Cell (Leukocyte) Count | WBC |
| Platelet (Thrombocyte) Count | PLT |
| Reticulocytes Percentage | %RETI |

Laboratories (or as otherwise approved by *WADA*) may also participate in ring tests between laboratories (hospitals, clinics, etc.) using the same technology and the same procedure.

### 4. Analysis of Blood Samples

All blood *Sample*s shall be homogenized for a minimum period of 15 minutes using an appropriate mixer (e.g. roller mixer) prior to analysis. Each blood *Sample* shall be analyzed twice.

Absolute differences between the results of the two analyses shall be equal or less than the following for the relevant analyses to be accepted:

- 0.1g/dL for HGB analysis;
- 0.15 absolute difference for % Reti analysis (if first measurement lower or equal to 1.00%); and
- 0.25 absolute difference for % Reti analysis (if first measurement higher than 1.00%).

The data from the second injection is used to confirm the first injection data. Therefore, if the absolute differences between the results of the analyses are within the criteria above, then only the first injection data is reported. If absolute differences between the results of the two analyses are greater than those defined above for a specific *Sample*, the analysis shall be started again in accordance with this section 5. The reason for repetition shall be documented.

The requirements for an <u>Initial *Testing* Procedure</u>, A *Sample* <u>Confirmation Procedure</u> and B *Sample* <u>Confirmation Procedure</u> as defined in the ISL shall not be applicable to blood *Samples* analyzed for the purposes of the <u>*Athlete Biological Passport*</u>.

## 5. Reporting

The results of the *WADA* accredited or approved <u>Laboratory</u> analysis shall be reported promptly in *ADAMS*.

# APPENDIX D

# Results Management Requirements for the _**Athlete**_ **Biological** _**Passport**_

## WADA Technical Document – TD2010RMR

| Document Number: | TD2010BAR | Version Number: | 2.0 |
|---|---|---|---|
| Written by: | WADA | Approved by: | WADA Executive Committee |
| Date: | 15.11.2011 | Effective Date: | 01.01.2012 |

## Results Management Requirements for the _**Athlete**_ **Biological** _**Passport**_

### 1. Administrative management

An _Athlete Passport_ Management Unit (APMU) shall be responsible for administering and managing elements of the _Athlete_ Biological _Passport_ within or on behalf of an _Anti-Doping Organizatio_n. This mechanism should allow for all _Athletes' Passports_ to be distributed to experts for review as soon as the analysis results are known and the _Athlete_'s profile to be updated by the _Anti-Doping Organization_ as required. Management of biological data shall be the responsibility of the APMU and such information shall be stored in _ADAMS_ and/or the ABP software. The APMU will initially review all profiles in order to facilitate targeting recommendations to the _ADO_ when appropriate, or to refer to the Expert Panel as appropriate. The members of the APMU involved in this task will conduct all their activities in strict confidence.

In this appendix a step-wise approach to review of an Athlete's Passport is described. It begins with the creation of a longitudinal profile and the application of the Adaptive Model. There is an initial screening by an expert who will return an evaluation based on the information available at that time.

The process may culminate in the creation of an Athlete Biological Passport Documentation Package and the opinion of an Expert Panel following the reception of all information, including any explanation from the Athlete.

*WADA* accredited <u>Laboratories</u> or approved <u>Laboratories</u> are presumed to have conducted the *Sample* analysis and custodial procedures in accordance with the *International Standard* for <u>Laboratories</u> and technical documents. The *Athlete* or other *Person* may rebut this presumption by establishing that a departure from the *International Standard* for <u>Laboratories</u> and technical documents occurred which could reasonably have significantly modified the result, in such case the *ADO* shall have the burden to establish why such a departure does not invalidate such result.

## 2. Review by the <u>Adaptive Model</u>

The <u>Adaptive Model</u> is capable of identifying atypical values or profiles that warrant further attention and review. The <u>Adaptive Model</u> predicts for an individual an expected range within which a series of *Marker* values falls assuming a normal physiological condition. Outliers correspond to those values out of the 99.9-range (0.05-99.95 percentiles).

A *Sample* is considered as atypical if it returns a HGB and/or OFFS value outside the expected intra-individual ranges. Similarly, a longitudinal profile composed of HGB and/or OFFS values is considered as atypical when deviating from the expected ranges as determined by the <u>Adaptive Model</u>.

A value lower than 99.9 can be chosen by the individual *Anti-Doping Organization* to identify atypical *Samples* and/or profiles that warrant further investigation and/or results management.

In the event that the longitudinal "profile" consists of a unique value (athlete tested only once) and that this unique value was deemed atypical by the Adaptive Model, the *Anti-Doping Organization* may collect an additional sample before sending it to a member of the Expert Panel for review. The APMU should suggest the optimal timing of the subsequent sample.

### 3. The expert review

In the event that a result rendered by a *WADA* accredited or approved Laboratory is an atypical value or triggers an atypical longitudinal profile, the *Passport* must be reviewed by an expert chosen by the *Athlete Passport Management Unit* of the *Anti-Doping Organization*. The *Athlete Passport Management Unit* is responsible to liaise with this expert to ensure a review of the *Passport* in a timely manner.

The expert shall review the *Passport* anonymously (without reference to the specific *Athlete* by name) and conduct his or her activities in strict confidence. The expert shall evaluate the *Passport* and respond back to the APMU which will trigger further APMU action:

| Expert Evaluation | APMU Action |
|---|---|
| Normal | Continue normal *Testing* pattern |
| *Passport* suspicious: Further data is required | *Target Test as recommended by APMU and/or expert* |
| Considering the information within the *Athlete's Passport*, it is highly unlikely that the longitudinal profile is the result of a normal physiological or pathological condition and may be the result of the use of a *Prohibited Substance or Prohibited Method.* | Send to two other experts (refer to section 4) |
| Considering the information within the *Passport* it is highly likely that the *Athlete* has a pathological condition | Inform the *Athlete* via the *ADO* (or send to other experts) |

*Comment: The ABP is not intended as a health check or for medical monitoring but rather is a tool to detect the possible use of Prohibited Substances or Methods. The experts, via the APMU, will contact the Athlete, via the ADO, if there is a high likelihood of pathology. Nevertheless, it is important that the ADO educates the Athletes to ensure that they undergo regular health monitoring and not to rely on the ABP for this purpose.*

## 4.  Formal review by a group of three experts

In the event that the evaluation of the appointed expert in the initial review supports the proposition that the profile is unlikely to be the result of a normal physiological condition or pathological condition, the *Passport* shall then be reviewed by a group of three experts, composed of the expert appointed in the initial review and two other experts chosen by the *Athlete Passport* Management Unit from the Expert Panel. The group of three experts should be composed of individuals with knowledge in the fields of clinical haematology (diagnosis of blood pathological conditions), sport medicine or exercise physiology. The *Athlete Passport* Management Unit is responsible for liaising with the experts and for advising the *Anti-Doping Organization* of the subsequent expert assessment. The review of the group of three experts must follow the same logic as presented in 3. The group of three experts can confer before they finalize their opinion. The group of three experts can also seek advice from an appropriate outside expert although this must be done on an anonymous basis with strict confidentiality and in collaboration with the APMU.

If more information is required to review the file, the experts can request further details such as those related to medical issues, sport practice and/or training. Such request is handled jointly by the *Athlete Passport* Management Unit and *Anti-Doping Organization*. The experts will conduct the review based on the *Athlete*'s blood profile data, and any additional information requested from *Anti-Doping Organization(s)* or Laboratories relating to any *Sample* in the profile.

A unanimous opinion among the three experts is necessary in order to proceed with possible results management which means that all three experts come to the conclusion that considering the available information contained within the *Passport at this stage*, it is highly likely that a *Prohibited Substance or Prohibited Method* had been used and unlikely that it is the result of any other cause. The conclusion of the experts must be reached with the three experts assessing the *Athlete*'s *Passport* with the same data (i.e three expert opinions cannot be accumulated over time as data is added to a profile).

If there is no unanimity among the three experts, the <u>APMU</u> may follow-up on requests for additional information or recommend additional <u>Testing</u> be pursued by the *Anti-Doping Organization.*

### 5.  Follow up on expert opinions

In the event that the evaluation of the group of three experts supports the proposition that the *Athlete* has likely used a *Prohibited Substance* or *Prohibited Method and it is unlikely due to any another cause*, the <u>*Athlete Passport* Management Unit</u> shall be responsible for the compilation of the <u>*Athlete* Biological *Passport* Documentation Package</u>. The <u>APMU</u> might confer with the group of experts to determine the scope of such compilation, including the recommended elements and the number of tests that need to be included.

The *Athlete* Biological *Passport* Documentation Package shall contain:

 a) The age and gender of the *Athlete,* the sport and discipline;
 b) The biological data and the results obtained by the <u>Adaptive Model</u>;
 c) Information on possible exposure to altitude of the *Athlete* for the period defined by the <u>Expert Panel</u>;
 d) Competition information; documentation on the <u>Chain of Custody</u>, temperature conditions during the transport of the *Samples*;

e) The <u>Laboratory</u> documentation including blood results, the scatter grams, the <u>Chain of Custody</u>, the internal and external quality controls;

f) Information from the *Doping Control* forms for each *Sample* collected during the period, as defined by the <u>APMU</u> and <u>Expert Panel</u>, including information if the athlete received a blood transfusion and/or suffered significant blood loss in the previous three months; and

g) Any other relevant information provided by the <u>ADO</u>.

The <u>*Athlete* Biological *Passport* Documentation Package</u> shall be sent to the same panel of three experts who will subsequently review the additional information. The panel of three experts is responsible to provide a joint evaluation that shall be signed by all three experts and included in the <u>*Athlete* Biological *Passport* Documentation Package</u>. If the panel of three experts confirms their previous position that considering the information within the *Passport at this stage*, it is highly likely that a *Prohibited Substance or Prohibited Method* had been used and unlikely that it is the result of any other cause, the <u>*Athlete Passport* Management Unit</u> will declare an <u>Adverse *Passport* Finding</u>. The <u>*Athlete* Biological *Passport* Documentation Package</u> is then reviewed by the *Anti-Doping Organization.*

The review at this stage is anonymous, however it is accepted that in some cases some specific information provided may allow one to identify the *Athlete*. This shall not affect the validity of the process.

The *ADO* will then be responsible for:

a) Advising the *Athlete* and *WADA* that the *Anti-Doping Organization* is considering the assertion of an anti-doping rule violation against the *Athlete*;

b) Providing the *Athlete and WADA* the <u>*Athlete* Biological *Passport* Documentation Package</u>; and

c) Inviting the *Athlete* to provide his/her own explanation, in a timely manner, of the data provided to the *ADO*.

## 6. Review of Explanation from *Athlete*

Upon receipt of explanation and supporting information from the *Athlete* (or in the event no explanatory information is provided), the panel of three experts shall review the information provided by the *Anti-Doping Organization*, the information (if any), provided by the *Athlete* and any additional information that the panel considers necessary to render its opinion in coordination with both the *ADO* and the <u>APMU</u>. It is accepted that this review may no longer be anonymous. The panel shall then reassess or reassert its previous opinion that includes one of the following statements:

    a) Unanimous opinion of the panel that based on the information in the Passport, it is highly likely the Athlete used a *Prohibited Substance* or *Prohibited Method* and that is was unlikely to find the Passport abnormal assuming any other cause; or

    b) Based on the available information, the panel is unable to unanimously reach an opinion and, in such a case, the panel may or may not recommend further investigation or testing.

## 7. Disciplinary Proceeding

If the panel expresses the opinion set forth in (a) above, then the *Anti-Doping Organization* shall be informed by the <u>APMU</u>. The *ADO* will then proceed to results management in accordance with Article 7.4 of the *Code*.

In the event the *Athlete* has been found to have committed an ADRV *based on the Passport,* the *Athlete*'s *Passport* shall be re-set upon their return to *Sport* following completion of the relevant period of suspension in order to maintain their anonymity for potential <u>APMU</u> and <u>Expert Panel</u> reviews conducted in the future.

When an athlete is sanctioned by means other than the ABP, the *Athlete's Passport* will remain in effect except in those cases where the *Prohibited Substance* or *Method* resulted in a manipulation of the haematological variables. In those instances, the *Athlete's* profile would be reset from the time of the sanction.