# EXHIBIT 50

# World Anti-Doping Code



WORLD
ANTI-DOPING
AGENCY
play true

2003

# TABLE OF CONTENTS

## INTRODUCTION

PURPOSE, SCOPE AND ORGANIZATION OF THE WORLD
ANTI-DOPING PROGRAM AND THE CODE .......................................... 1

THE WORLD ANTI-DOPING PROGRAM ............................................... 1

THE CODE ...................................................................................... 1

INTERNATIONAL STANDARDS ........................................................... 2

MODELS OF BEST PRACTICE ............................................................. 2

FUNDAMENTAL RATIONALE FOR THE WORLD ANTI-DOPING CODE .......... 3

## PART ONE: *DOPING CONTROL*

INTRODUCTION ............................................................................... 6

ARTICLE 1:  DEFINITION OF DOPING ............................................... 8

ARTICLE 2. ANTI-DOPING RULE VIOLATIONS ................................... 8

2.1 .......... THE PRESENCE OF A *PROHIBITED SUBSTANCE*
OR ITS *METABOLITES* OR *MARKERS* IN AN
*ATHLETE'S BODILY SPECIMEN*. ................................. 8

2.2 .......... *USE* OR ATTEMPTED *USE* OF A *PROHIBITED
SUBSTANCE* OR A *PROHIBITED METHOD*. ................. 10

2.3 ......................................................................... 10

2.4 ......................................................................... 11

2.5 .......... *TAMPERING*, OR ATTEMPTING TO *TAMPER*,
WITH ANY PART OF *DOPING CONTROL*. ..................... 11

2.6 .......... *POSSESSION* OF *PROHIBITED SUBSTANCES*
AND *METHODS* .................................................... 11

2.7 .......... *TRAFFICKING* IN ANY *PROHIBITED SUBSTANCE*
OR *PROHIBITED METHOD*. ..................................... 12

2.8 ......................................................................... 12

ARTICLE 3:  PROOF OF DOPING ..................................................... 12

3.1 .......... BURDENS AND STANDARDS OF PROOF ....................... 12

3.2 .......... METHODS OF ESTABLISHING FACTS
AND PRESUMPTIONS. .............................................. 12

World Anti-Doping Code
March 2003

Published by:

World Anti-Doping Agency
Stock Exchange Tower
800 Place Victoria (Suite 1700)
PO Box 120
Montreal, Quebec,
Canada  H4Z 1B7

URL: www.wada-ama.org

Tel:     +1.514.904.9232
Fax:    +1.514.904.8650
E-mail:  code@wada-ama.org

Contents

**ARTICLE 4. THE *PROHIBITED LIST*** ... 14
4.1 ...... PUBLICATION AND REVISION OF THE *PROHIBITED LIST* ... 14
4.2 ...... *PROHIBITED SUBSTANCES AND PROHIBITED METHODS* IDENTIFIED ON THE *PROHIBITED LIST* ... 14
4.3 ...... CRITERIA FOR INCLUDING SUBSTANCES AND METHODS ON THE *PROHIBITED LIST* ... 15
4.4 ...... THERAPEUTIC USE ... 17
4.5 ...... MONITORING PROGRAM ... 18

**ARTICLE 5. *TESTING*** ... 19
5.1 ...... TEST DISTRIBUTION PLANNING ... 19
5.2 ...... STANDARDS FOR TESTING ... 20

**ARTICLE 6. ANALYSIS OF SAMPLES** ... 20
6.1 ...... USE OF APPROVED LABORATORIES ... 20
6.2 ...... SUBSTANCES SUBJECT TO DETECTION ... 20
6.3 ...... RESEARCH ON SAMPLES ... 20
6.4 ...... STANDARDS FOR SAMPLE ANALYSIS AND REPORTING ... 21

**ARTICLE 7. RESULTS MANAGEMENT** ... 21
7.1 ...... INITIAL REVIEW REGARDING ADVERSE ANALYTICAL FINDINGS ... 21
7.2 ...... NOTIFICATION AFTER INITIAL REVIEW ... 21
7.3 ...... FURTHER REVIEW OF ADVERSE ANALYTICAL FINDING WHERE REQUIRED BY *PROHIBITED LIST* ... 22
7.4 ...... REVIEW OF OTHER ANTI-DOPING RULE VIOLATIONS ... 22
7.5 ...... PRINCIPLES APPLICABLE TO PROVISIONAL SUSPENSIONS ... 23

**ARTICLE 8. RIGHT TO A FAIR HEARING** ... 24

**ARTICLE 9. AUTOMATIC DISQUALIFICATION OF INDIVIDUAL RESULTS** ... 25

**ARTICLE 10. SANCTIONS ON INDIVIDUALS** ... 26
10.1 ...... DISQUALIFICATION OF RESULTS IN *EVENT* DURING WHICH AN ANTI-DOPING RULE VIOLATION OCCURS ... 26
10.2 ...... IMPOSITION OF *INELIGIBILITY* FOR *PROHIBITED SUBSTANCES AND PROHIBITED METHODS* ... 26
10.3 ...... SPECIFIED SUBSTANCES ... 27
10.4 ...... *INELIGIBILITY* FOR OTHER ANTI-DOPING RULE VIOLATIONS ... 28

10.5 ...... ELIMINATION OR REDUCTION OF PERIOD OF *INELIGIBILITY* BASED ON EXCEPTIONAL CIRCUMSTANCES ... 29
10.6 ...... RULES FOR CERTAIN POTENTIAL MULTIPLE VIOLATIONS ... 32
10.7 ...... DISQUALIFICATION OF RESULTS IN *COMPETITIONS* SUBSEQUENT TO SAMPLE COLLECTION ... 34
10.8 ...... COMMENCEMENT OF *INELIGIBILITY* PERIOD ... 34
10.9 ...... STATUS DURING *INELIGIBILITY* ... 35
10.10 ...... REINSTATEMENT TESTING ... 36

**ARTICLE 11. CONSEQUENCES TO TEAMS** ... 36

**ARTICLE 12. SANCTIONS AGAINST SPORTING BODIES** ... 37

**ARTICLE 13. APPEALS** ... 37
13.1 ...... DECISIONS SUBJECT TO APPEAL ... 37
13.2 ...... APPEALS FROM DECISIONS REGARDING ANTI-DOPING RULE VIOLATIONS, CONSEQUENCES, AND *PROVISIONAL SUSPENSIONS* ... 37
13.3 ...... APPEALS FROM DECISIONS GRANTING OR DENYING A THERAPEUTIC *USE EXEMPTION* ... 39
13.4 ...... APPEALS FROM DECISIONS IMPOSING CONSEQUENCES UNDER PART THREE OF THE CODE ... 40
13.5 ...... APPEALS FROM DECISIONS SUSPENDING OR REVOKING LABORATORY ACCREDITATION ... 40

**ARTICLE 14. CONFIDENTIALITY AND REPORTING** ... 40
14.1 ...... INFORMATION CONCERNING *ADVERSE ANALYTICAL FINDINGS* AND OTHER POTENTIAL ANTI-DOPING RULE VIOLATIONS ... 40
14.2 ...... PUBLIC DISCLOSURE ... 41
14.3 ...... *ATHLETE* WHEREABOUTS INFORMATION ... 42
14.4 ...... STATISTICAL REPORTING ... 42
14.5 ...... DOPING CONTROL INFORMATION CLEARING HOUSE ... 42

**ARTICLE 15. CLARIFICATION OF *DOPING CONTROL* RESPONSIBILITIES** ... 43
15.1 ...... *EVENT TESTING* ... 43
15.2 ...... *OUT-OF-COMPETITION TESTING* ... 44
15.3 ...... RESULTS MANAGEMENT, HEARINGS AND SANCTIONS ... 44
15.4 ...... MUTUAL RECOGNITION ... 45

Contents

Contents

ARTICLE 16: *DOPING CONTROL FOR ANIMALS COMPETING IN SPORT* ............ 45
16.1 ............................................................................ 45
16.2 ............................................................................ 46
ARTICLE 17: STATUTE OF LIMITATIONS ............................. 46

**PART TWO: EDUCATION AND RESEARCH** ... 50

ARTICLE 18: EDUCATION ............................................... 50
18.1 BASIC PRINCIPLE AND PRIMARY GOAL ................... 50
18.2 PROGRAM AND ACTIVITIES ..................................... 50
18.3 COORDINATION AND COOPERATION ......................... 50

ARTICLE 19: RESEARCH .................................................. 51
19.1 PURPOSE OF ANTI-DOPING RESEARCH ................... 51
19.2 TYPES OF RESEARCH ............................................ 51
19.3 COORDINATION .................................................... 51
19.4 RESEARCH PRACTICES .......................................... 51
19.5 ADMINISTRATION OF *PROHIBITED SUBSTANCES* AND *PROHIBITED METHODS* ........................................ 51
19.6 MISUSE OF RESULTS ............................................. 51

**PART THREE: ROLES AND RESPONSIBILITIES** ... 54

ARTICLE 20: ADDITIONAL ROLES AND RESPONSIBILITIES OF *SIGNATORIES* ............................................ 54
20.1 ROLES AND RESPONSIBILITIES OF THE INTERNATIONAL OLYMPIC COMMITTEE ...................... 54
20.2 ROLES AND RESPONSIBILITIES OF THE INTERNATIONAL PARALYMPIC COMMITTEE ................... 54
20.3 ROLES AND RESPONSIBILITIES OF INTERNATIONAL FEDERATIONS .............................. 55
20.4 ROLES AND RESPONSIBILITIES OF NATIONAL OLYMPIC COMMITTEES AND NATIONAL PARALYMPIC COMMITTEES ... 56
20.5 ROLES AND RESPONSIBILITIES OF NATIONAL ANTI-DOPING ORGANIZATIONS .......................... 57

20.6 ROLES AND RESPONSIBILITIES OF MAJOR *EVENT ORGANIZATIONS* ...................................... 57
20.7 ROLES AND RESPONSIBILITIES OF WADA ............... 57

ARTICLE 21: ROLES AND RESPONSIBILITIES OF *PARTICIPANTS* ....................................... 58
21.1 ROLES AND RESPONSIBILITIES OF *ATHLETES* ......... 58
21.2 ROLES AND RESPONSIBILITIES OF *ATHLETE* SUPPORT PERSONNEL .................................. 58

ARTICLE 22: INVOLVEMENT OF GOVERNMENTS ............ 59
22.1 ............................................................................ 59
22.2 ............................................................................ 60
22.2 ............................................................................ 60

**PART FOUR: ACCEPTANCE, COMPLIANCE, MODIFICATION & INTERPRETATION**

ARTICLE 23: ACCEPTANCE, COMPLIANCE AND MODIFICATION ... 64
23.1 ACCEPTANCE OF THE *CODE* .................................. 64
23.2 IMPLEMENTATION OF THE *CODE* ........................... 64
23.3 ACCEPTANCE AND IMPLEMENTATION DEADLINES .... 65
23.4 MONITORING COMPLIANCE WITH THE *CODE* .......... 65
23.5 CONSEQUENCES OF NONCOMPLIANCE WITH THE *CODE* ... 66
23.6 MODIFICATION OF THE *CODE* ............................... 66
23.7 WITHDRAWAL OF ACCEPTANCE OF THE *CODE* ....... 67

ARTICLE 24: INTERPRETATION OF THE *CODE* ............. 67
24.1 ............................................................................ 67
24.2 ............................................................................ 67
24.3 ............................................................................ 67
24.4 ............................................................................ 68
24.5 ............................................................................ 68
24.6 ............................................................................ 68

APPENDIX 1: DEFINITIONS ............................................ 72

Contents

# INTRODUCTION

## THE PURPOSE, SCOPE AND ORGANIZATION OF
## THE WORLD ANTI-DOPING PROGRAM AND THE *CODE*

The purposes of the World Anti-Doping Program and the *Code* are:

- To protect the *Athletes'* fundamental right to participate in doping-free sport and thus promote health, fairness and equality for *Athletes* worldwide; and

- To ensure harmonized, coordinated and effective anti-doping programs at the international and national level with regard to detection, deterrence and prevention of doping.

## THE WORLD ANTI-DOPING PROGRAM

The World Anti-Doping Program encompasses all of the elements needed in order to ensure optimal harmonization and best practice in international and national anti-doping programs. The main elements are:

Level 1: The *Code*

Level 2: *International Standards*

Level 3: Models of Best Practice

## THE *CODE*

The *Code* is the fundamental and universal document upon which the World Anti-Doping Program in sport is based. The purpose of the *Code* is to advance the anti-doping effort through universal harmonization of core anti-doping elements. It is intended to be specific enough to achieve complete harmonization on issues where uniformity is required, yet general enough in other areas to permit flexibility on how agreed upon anti-doping principles are implemented.

## INTERNATIONAL STANDARDS

*International Standards* for different technical and operational areas within the anti-doping program will be developed in consultation with the *Signatories* and governments and approved by *WADA*. The purpose of the *International Standards* is harmonization among *Anti-Doping Organizations* responsible for specific technical and operational parts of the anti-doping programs. Adherence to the *International Standards* is mandatory for compliance with the Code. The *International Standards* may be revised from time to time by the *WADA* Executive Committee after reasonable consultation with the *Signatories* and governments. Unless provided otherwise in the Code, *International Standards* and all revisions shall become effective on the date specified in the *International Standard* or revision.

## MODELS OF BEST PRACTICE

Models of Best Practice based on the Code will be developed to provide state of the art solutions in different areas of anti-doping. The Models will be recommended by *WADA* and made available to *Signatories* upon request but will not be mandatory. In addition to providing models of anti-doping documentation, *WADA* will also make some training assistance available to the *Signatories*.

*International Standards Comment:*
*International Standards will contain much of the technical detail necessary for implementing the Code. This would include, for example, the detailed requirements for Sample collection, laboratory analysis and laboratory accreditation currently found in the Olympic Movement Anti-Doping Code 1999 ("OMADC"). International Standards, while expressly incorporated into the Code by reference, will, in consultation with the Signatories and governments, be developed by experts and set forth in separate technical documents. It is*

*important that the technical experts be able to make timely changes to the International Standards without requiring any amendment of the Code or individual stakeholder rules and regulations.*

*All applicable International Standards will be in place by January 1, 2004.*

*Models of Best Practice Comment:*
*WADA will prepare model anti-doping rules and regulations tailored to the needs of each of the major groups of Signatories (e.g. International Federations for individual sports,*

## FUNDAMENTAL RATIONALE FOR THE WORLD ANTI-DOPING CODE

Anti-doping programs seek to preserve what is intrinsically valuable about sport. This intrinsic value is often referred to as "the spirit of sport"; it is the essence of Olympism; it is how we play true. The spirit of sport is the celebration of the human spirit, body and mind, and is characterized by the following values:

- Ethics, fair play and honesty.
- Health.
- Excellence in performance.
- Character and education.
- Fun and joy.
- Teamwork.
- Dedication and commitment.
- Respect for rules and laws.
- Respect for self and other participants.
- Courage.
- Community and solidarity.

Doping is fundamentally contrary to the spirit of sport.

*International Federations for team sports, National Anti-Doping Organizations, etc.). These model rules and regulations will conform with and be based on the Code, will be state of the art examples of best practices and will contain all of the detail (including reference to International Standards) necessary to conduct an effective anti-doping program.*

*These model rules and regulations will provide alternatives from which stakeholders may select. Some stakeholders may choose to adopt the model rules and regulations and other models of best practices verbatim. Others may decide to adopt the models with modifications. Still other stakeholders may choose to develop*

*their own rules and regulations consistent with the general principles and specific requirements set forth in the Code.*

*Other model documents for specific parts of the anti-doping work may be developed based on generally recognized stakeholder needs and expectations. This could include models for national anti-doping programs, results management, Testing (beyond the specific requirements set forth in the International Standard for Testing), education programs, etc. All Models of Best Practice will be reviewed and approved by WADA before they are included in the World Anti-Doping Program.*

## PART ONE

# DOPING CONTROL

## INTRODUCTION

Part One of the Code sets forth specific anti-doping rules and principles that are to be followed by organizations responsible for adopting, implementing or enforcing anti-doping rules within their authority - - e.g., the International Olympic Committee, International Paralympic Committee, International Federations, *Major Event Organizations,* and *National Anti-Doping Organizations.* All of these organizations are collectively referred to as *Anti-Doping Organizations.*

Part One of the Code does not replace, or eliminate the need for, comprehensive anti-doping rules adopted by each of these *Anti-Doping Organizations.* While some provisions of Part One of the Code must be incorporated essentially verbatim by each *Anti-Doping Organization* in its own anti-doping rules, other provisions of Part One establish mandatory guiding principles that allow flexibility in the formulation of rules by each *Anti-Doping Organization* or establish requirements that must be followed by each *Anti-Doping Organization* but need not be repeated in its own anti-doping rules. The following Articles, as applicable to the scope of anti-doping activity which the *Anti-Doping Organization* performs, must be incorporated into the rules of each *Anti-Doping Organization* without any substantive editing changes (allowing for necessary non-substantive editing

*Introduction Comment: For example it is critical to harmonization that all Signatories base their decisions on the same list of anti-doping rule violations, the same burdens of proof and impose the same Consequences for the same anti-doping rule violations. These substantive rules must be the same whether a hearing takes place before an International Federation, at the national level or before CAS. On the other hand, it is not necessary for effective harmonization to force all Signatories to use one single results management and hearing process.*

*At present, there are many different, yet equally effective processes for results management and hearings within different International Federations and different national bodies. The Code does not require absolute uniformity in results management and hearing procedures: it does, however, require that the diverse approaches of the Signatories satisfy principles stated in the Code.*

*With respect to Article 13, subpart 13.2.2 is not included in the provisions required to be adopted essentially*

---

changes to the language in order to refer to the organization's name, sport, section numbers, etc.). Articles 1 (Definition of Doping), 2 (Anti-Doping Rule Violations), 3 (Proof of Doping), 9 (Automatic *Disqualification* of Individual Results), 10 (Sanctions on Individuals), 11 (*Consequences* to Teams), 13 (Appeals) with the exception of 13.2.2, 17 (Statute of Limitations) and Definitions.

Anti-doping rules, like competition rules, are sport rules governing the conditions under which sport is played. *Athletes* accept these rules as a condition of participation. Anti-doping rules are not intended to be subject to or limited by the requirements and legal standards applicable to criminal proceedings or employment matters. The policies and minimum standards set forth in the Code represent the consensus of a broad spectrum of stakeholders with an interest in fair sport and should be respected by all courts and adjudicating bodies.

*Participants* shall be bound to comply with the anti-doping rules adopted in conformance with the *Code* by the relevant *Anti-Doping Organizations.* Each *Signatory* shall establish rules and procedures to ensure that all *Participants* under the authority of the *Signatory* and its member organizations are informed of and agree to be bound by anti-doping rules in force of the relevant *Anti-Doping Organizations.*

*verbatim, as 13.2.2 establishes mandatory guiding principles that allow some flexibility in the formulation of rules by the Anti-Doping Organization.*

*Participants Comment: By their participation in sport, Athletes are bound by the competitive rules of their sport. In the same manner, Athletes and Athlete Support Personnel should be bound by anti-doping rules based on Article 2 of the Code by virtue of their agreements for membership, accreditation, or participation in sports organizations or sports events subject to the Code. Each Signatory, however, shall take the necessary steps to ensure that all Athletes and Athlete Support Personnel within its authority are bound by the relevant Anti-Doping Organization's anti-doping rules.*

# ARTICLE 1: DEFINITION OF DOPING

Doping is defined as the occurrence of one or more of the anti-doping rule violations set forth in Article 2.1 through Article 2.8 of the Code.

# ARTICLE 2: ANTI-DOPING RULE VIOLATIONS

The following constitute anti-doping rule violations:

2.1    The presence of a *Prohibited Substance* or its *Metabolites* or *Markers* in an *Athlete's* bodily *Specimen.*

   2.1.1   It is each *Athlete's* personal duty to ensure that no *Prohibited Substance* enters his or her body. *Athletes* are responsible for any *Prohibited Substance* or its *Metabolites* or *Markers* found to be present in their bodily *Specimens.* Accordingly, it is not necessary that intent, fault, negligence or knowing *Use* on the *Athlete's* part be demonstrated in order to establish an anti-doping violation under Article 2.1.

**2 Comment.** *The purpose of Article 2 is to specify the circumstances and conduct which constitute violations of anti-doping rules. Hearings in doping cases will proceed based on the assertion that one or more of these specific rules have been violated. Most of the circumstances and conduct on this list of violations can be found in some form in the OMADC or other existing anti-doping rules.*

**2.1 Comment.** *For purposes of anti-doping violations involving the presence of a Prohibited Substance (or its Metabolites or Markers), the Code adopts the rule of strict liability which is found in the OMADC and the vast majority of existing anti-doping rules. Under the strict liability principle, an anti-doping rule violation occurs whenever a Prohibited Substance is found in an Athlete's bodily Specimen. The violation occurs whether*

or not the *Athlete* intentionally or unintentionally used a *Prohibited Substance* or was negligent or otherwise at fault. If the positive *Sample* came from an *In-Competition* test, then the results of that *Competition* are automatically invalidated (Article 9 [Automatic Disqualification of Individual Results]). However, the *Athlete* then has the possibility to avoid or reduce sanctions if the *Athlete* can demonstrate that he or she was not at fault (Article 10.5 [Elimination or Reduction of Period of Ineligibility Based on Exceptional Circumstances]).

The strict liability rule for the finding of a *Prohibited Substance* in an *Athlete's Specimen,* with a possibility that sanctions may be modified based on specified criteria, provides a reasonable balance between effective anti-doping

---

2.1.2   Excepting those substances for which a quantitative reporting threshold is specifically identified in the *Prohibited List,* the detected presence of any quantity of a *Prohibited Substance* or its *Metabolites* or *Markers* in an *Athlete's Sample* shall constitute an anti-doping rule violation.

2.1.3   As an exception to the general rule of Article 2.1, the *Prohibited List* may establish special criteria for the evaluation of *Prohibited Substances* that can also be produced endogenously.

*enforcement for the benefit of all "clean" Athletes and fairness in the exceptional circumstance where a Prohibited Substance entered an Athlete's system through no fault or negligence on the Athlete's part. It is important to emphasize that while the determination of whether the anti-doping rule has been violated is based on strict liability, the imposition of a fixed period of Ineligibility is not automatic.*

*The rationale for the strict liability rule was well stated by the Court of Arbitration for Sport in the case of Quigley v. UIT:*

*"It is true that a strict liability test is likely in some cases to be unfair in an individual case, such as that of Q, where the Athlete may have taken medication as the result of mislabeling or faulty advice for which he or she is not responsible – particularly in the circumstances of sudden illness in a foreign country. But it is also in some sense "unfair" for an Athlete to get food poisoning on the eve of an important competition. Yet in neither case will the rules of the competition be altered to undo the unfairness. Just as the competition will not be postponed to await the Athlete's recovery, so the prohibition of banned substances will not be lifted in recognition of its accidental absorption. The vicissitudes of competition, like those of life generally,*

*may create many types of unfairness, whether by accident or the negligence of unaccountable Persons, which the law cannot repair.*

*Furthermore, it appears to be a laudable policy objective not to repair an accidental unfairness to an individual by creating an intentional unfairness to the whole body of other competitors. This is what would happen if banned performance-enhancing substances were tolerated when absorbed inadvertently. Moreover, it is likely that even intentional abuse would in many cases escape sanction for lack of proof of guilty intent. And it is certain that a requirement of intent would invite litigation that may well cripple federations – particularly those run on modest budgets – in their fight against doping."*

**2.1.3 Comment.** *For example, the Prohibited List might provide that a T/E ratio greater than 6:1 is doping unless a longitudinal analysis of prior or subsequent test results by the Anti-Doping Organization demonstrates a naturally elevated ratio or the Athlete otherwise establishes that the elevated ratio is the result of a physiological or pathological condition.*

**2.2** Use or Attempted Use of a Prohibited Substance or a Prohibited Method.

**2.2.1** The success or failure of the Use of a Prohibited Substance or Prohibited Method is not material. It is sufficient that the Prohibited Substance or Prohibited Method was Used or Attempted to be Used for an anti-doping rule violation to be committed.

**2.3** Refusing, or failing without compelling justification, to submit to Sample collection after notification as authorized in applicable anti-doping rules or otherwise evading Sample collection.

**2.2.1 Comment:** The prohibition against "Use" has been expanded from the text in the OMADC to include Prohibited Substances as well as Prohibited Methods. With this inclusion there is no need to specifically delineate "admission of Use as a separate anti-doping rule violation. "Use" can be proved, for example, through admissions, third party testimony or other evidence.

Demonstrating the "Attempted Use" of a Prohibited Substance requires proof of intent on the Athlete's part. The fact that intent may be required to prove this particular anti-doping rule violation does not undermine the strict liability principle established for violations of Article 2.1 and Use of a Prohibited Substance or Prohibited Method.

An Athlete's Out-of-Competition Use of a Prohibited Substance that is not prohibited Out-of-Competition would not constitute an anti-doping rule violation.

**2.3 Comment:** Failure or refusal to submit to Sample collection after notification is prohibited in almost all existing anti-doping rules. This Article expands the typical rule to include "otherwise evading Sample collection" as prohibited conduct. Thus, for example, it would be an anti-doping rule violation if it were established that an Athlete was hiding from a Doping Control official who was attempting to conduct a test. A violation of "refusing or failing to submit to Sample collection "may be based on either intentional or negligent conduct of the Athlete, while "evading" Sample collection contemplates intentional conduct by the Athlete.

**2.4** Violation of applicable requirements regarding Athlete availability for Out-of-Competition Testing including failure to provide required whereabouts information and missed tests which are declared based on reasonable rules.

**2.5** Tampering, or Attempting to tamper, with any part of Doping Control.

**2.6** Possession of Prohibited Substances and Methods:

**2.6.1** Possession by an Athlete at any time or place of a substance that is prohibited in Out-of-Competition Testing or a Prohibited Method unless the Athlete establishes that the Possession is pursuant to a therapeutic use exemption granted in accordance with Article 4.4 (Therapeutic Use) or other acceptable justification.

**2.6.2** Possession of a substance that is prohibited in Out-of-Competition Testing or a Prohibited Method by Athlete Support Personnel in connection with an Athlete, Competition or training, unless the Athlete Support Personnel establishes that the Possession is pursuant to a therapeutic use exemption granted to an Athlete in accordance with Article 4.4 (Therapeutic Use) or other acceptable justification.

**2.4 Comment:** Unannounced Out-of-Competition Testing is at the core of effective Doping Control. Without accurate Athlete location information such Testing is inefficient and sometimes impossible. This Article, which is not typically found in most existing anti-doping rules, requires Athletes that have been identified for Out-of-Competition Testing to be responsible for providing and updating information on their whereabouts so that they can be located for No Advance Notice Out-of-Competition Testing. The "applicable requirements" are set by the Athlete's International Federation and National

Anti-Doping Organization in order to allow some flexibility based upon varying circumstances encountered in different sports and countries. A violation of this Article may be based on either intentional or negligent conduct by the Athlete.

**2.5 Comment:** This Article prohibits conduct which subverts the Doping Control process but which would not be included in the typical definition of Prohibited Methods. For example, altering identification numbers on a Doping Control form during Testing or breaking the B Bottle at the time of B Sample analysis.

2.7 Trafficking in any *Prohibited Substance* or *Prohibited Method.*

2.8 Administration or *Attempted* administration of a *Prohibited Substance* or *Prohibited Method* to any *Athlete,* or assisting, encouraging, aiding, abetting, covering up or any other type of complicity involving an anti-doping rule violation or any *Attempted* violation.

## ARTICLE 3: PROOF OF DOPING

3.1 Burdens and Standards of Proof.

The *Anti-Doping Organization* shall have the burden of establishing that an anti-doping rule violation has occurred. The standard of proof shall be whether the *Anti-Doping Organization* has established an anti-doping rule violation to the comfortable satisfaction of the hearing body bearing in mind the seriousness of the allegation which is made. This standard of proof in all cases is greater than a mere balance of probability but less than proof beyond a reasonable doubt. Where the *Code* places the burden of proof upon the *Athlete* or other *Person* alleged to have committed an anti-doping rule violation to rebut a presumption or establish specified facts or circumstances, the standard of proof shall be by a balance of probability.

3.2 Methods of Establishing Facts and Presumptions.

Facts related to anti-doping rule violations may be established by any reliable means, including admissions. The following rules of proof shall be applicable in doping cases:

*3.1 Comment: This standard of proof required to be met by the Anti-Doping Organization is comparable to the standard which is applied in most countries to cases involving professional misconduct. It has also been widely applied by courts and tribunals in doping cases. See, for example, the CAS decision in N., J., Y., W. v. FINA, CAS 98/208, 22 December 1998.*

3.2.1 *WADA*-accredited laboratories are presumed to have conducted *Sample* analysis and custodial procedures in accordance with the *International Standard* for laboratory analysis. The *Athlete* may rebut this presumption by establishing that a departure from the *International Standard* occurred.

If the *Athlete* rebuts the preceding presumption by showing that a departure from the *International Standard* occurred, then the *Anti-Doping Organization* shall have the burden to establish that such departure did not cause the *Adverse Analytical Finding.*

3.2.2 Departures from the *International Standard* for *Testing* which did not cause an *Adverse Analytical Finding* or other anti-doping rule violation shall not invalidate such results. If the *Athlete* establishes that departures from the *International Standard* occurred during *Testing* then the *Anti-Doping Organization* shall have the burden to establish that such departures did not cause the *Adverse Analytical Finding* or the factual basis for the anti-doping rule violation.

*3.2.1 Comment: The burden is on the Athlete to establish, by a preponderance of the evidence, a departure from the International Standard. If the Athlete does so, the burden shifts to the Anti-Doping Organization to prove to the comfortable satisfaction of the hearing body that the departure did not change the test result.*

## ARTICLE 4: THE PROHIBITED LIST

4.1 Publication and Revision of the *Prohibited List*.

*WADA* shall, as often as necessary and no less often than annually, publish the *Prohibited List* as an *International Standard*. The proposed content of the *Prohibited List* and all revisions shall be provided in writing promptly to all *Signatories* and governments for comment and consultation. Each annual version of the *Prohibited List* and all revisions shall be distributed promptly by *WADA* to each *Signatory* and government and shall be published on *WADA*'s website, and each *Signatory* shall take appropriate steps to distribute the *Prohibited List* to its members and constituents. The rules of each *Anti-Doping Organization* shall specify that, unless provided otherwise in the *Prohibited List* or a revision, the *Prohibited List* and revisions shall go into effect under the *Anti-Doping Organization*'s rules three months after publication of the *Prohibited List* by *WADA* without requiring any further action by the *Anti-Doping Organization*.

4.2 *Prohibited Substances* and *Prohibited Methods* Identified on the *Prohibited List*.

The *Prohibited List* shall identify those *Prohibited Substances* and *Prohibited Methods* which are prohibited as doping at all times (both *In-Competition* and *Out-of-*

**4.1 Comment**: *The Prohibited List will be revised and published on an expedited basis whenever the need arises. However, for the sake of predictability, a new list will be published every year whether or not changes have been made. The virtue of the IOC practice of publishing a new list every January is that it avoids confusion over which list is the most current. To address this issue, WADA will always have the most current Prohibited List published on its website.*

**4.2 Comment**: *There will be one Prohibited List. The substances which are prohibited at all times*

*Competition*) because of their potential to enhance performance in future *Competitions* or their masking potential and those substances and methods which are prohibited *In-Competition* only. Upon the recommendation of an International Federation, the *Prohibited List* may be expanded by *WADA* for that particular sport. *Prohibited Substances* and *Prohibited Methods* may be included in the *Prohibited List* by general category (e.g., anabolic agents) or by specific reference to a particular substance or method.

4.3 Criteria for Including Substances and Methods on the *Prohibited List*.

*WADA* shall consider the following criteria in deciding whether to include a substance or method on the *Prohibited List*.

4.3.1 A substance or method shall be considered for inclusion on the *Prohibited List* if *WADA* determines that the substance or method meets any two of the following three criteria:

4.3.1.1 Medical or other scientific evidence, pharmacological effect or experience that the substance or method has the potential to enhance or enhances sport performance;

*would include masking agents and those substances which, when used in training, may have long term performance enhancing effects such as anabolics. All substances and methods on the Prohibited List are prohibited In-Competition. This distinction between what is tested for In-Competition and what is tested for Out-of-Competition is carried over from the OMADC. There will be only one document called the "Prohibited List." WADA may add additional substances or methods to the Prohibited List for particular sports (e.g. the inclusion of beta-blockers for*

*shooting) but this will also be reflected on the single Prohibited List. Having all Prohibited Substances on a single list will avoid some of the current confusion related to identifying which substances are prohibited in which sports.*
*Individual sports are not permitted to seek exemption from the basic list of Prohibited Substances (e.g. eliminating anabolics from the Prohibited List for "mind sports"). The premise of this decision is that there are certain basic doping agents which anyone who chooses to call himself or herself an Athlete should not take.*

4.3.1.2 Medical or other scientific evidence, pharmacological effect, or experience that the Use of the substance or method represents an actual or potential health risk to the Athlete.

4.3.1.3 WADA's determination that the Use of the substance or method violates the spirit of sport described in the Introduction to the Code.

4.3.2 A substance or method shall also be included on the Prohibited List if WADA determines there is medical or other scientific evidence, pharmacological effect or experience that the substance or method has the potential to mask the Use of other Prohibited Substances and Prohibited Methods.

4.3.2 Comment: A substance shall be considered for inclusion on the Prohibited List if it meets two of the following three criteria: (1) it has the potential to enhance or enhances sport performance, (2) it represents a potential or actual health risk, or (3) it is contrary to the spirit of sport. None of the three criteria alone is a sufficient basis for adding a substance to the Prohibited List. Using the potential to enhance performance as the sole criteria would include, for example, physical and mental training, red meat, carbohydrate loading and training at altitude. Risk of harm would include smoking. Requiring all three criteria would also be unsatisfactory. For example the use of genetic transfer technology to dramatically enhance sport performance should be prohibited as contrary to the spirit of sport even if it is not harmful. Similarly, the potentially unhealthy abuse of certain substances without therapeutic justification based on the mistaken belief they enhance performance is certainly contrary to the spirit of sport regardless of whether the expectation of performance enhancement is realistic.

4.3.3 WADA's determination of the Prohibited Substances and Prohibited Methods that will be included on the Prohibited List shall be final and shall not be subject to challenge by an Athlete or other Person based on an argument that the substance or method was not a masking agent or did not have the potential to enhance performance, represent a health risk, or violate the spirit of sport.

4.4 Therapeutic Use

WADA shall adopt an International Standard for the process of granting therapeutic use exemptions.

Each International Federation shall ensure, for International-Level Athletes or any other Athlete who is

4.3.3 Comment: The question of whether a substance meets the criteria in Article 4.3 (Criteria for Including Substances and Methods on the Prohibited List) in a particular case cannot be raised as a defense to an anti-doping rule violation. For example, it cannot be argued that the Prohibited Substance detected would not have been performance enhancing in that particular sport. Rather, doping occurs when a substance on the Prohibited List is found in an Athlete's bodily Specimen. The same principle is found in the OMADC.

4.4 Comment: It is important that the processes for granting therapeutic use exemptions become more harmonized. Athletes who use medically prescribed Prohibited Substances may be subject to sanctioning unless they have previously obtained a therapeutic use exemption. However, currently many sporting bodies have no rules permitting therapeutic use exemptions; others follow unwritten policies; and only a few have written policies incorporated into their anti-doping rules. This Article seeks to harmonize the basis upon which therapeutic use exemptions will be granted or denied and gives responsibility for granting or denying exemptions to the International Federations for International-Level Athletes and to the National Anti-Doping Organizations for national-level Athletes (that are not also International-Level Athletes) and other Athletes subject to Doping Control under the Code.

Examples of commonly prescribed Prohibited Substances which might be specifically addressed in the International Standard for therapeutic use exemptions are medications prescribed for acute severe asthma and inflammatory bowel disease. When a therapeutic use exemption has been denied or granted in contravention of the International Standard, that decision may be submitted to WADA for review as provided in the International Standard and thereafter appealed as provided in Article 13.3 (Appeals). If the granting of a therapeutic use exemption is reversed, the reversal shall not apply retroactively and shall not disqualify the Athlete's results during the time that the therapeutic use exemption was in effect.

entered in an *International Event*, that a process is in place whereby *Athletes* with documented medical conditions requiring the *Use* of a *Prohibited Substance* or a *Prohibited Method* may request a therapeutic use exemption. Each *National Anti-Doping Organization* shall ensure, for all *Athletes* within its jurisdiction that are not *International-Level Athletes*, that a process is in place whereby *Athletes* with documented medical conditions requiring the *Use* of a *Prohibited Substance* or a *Prohibited Method* may request a therapeutic use exemption. Such requests shall be evaluated in accordance with the *International Standard* on therapeutic use. International Federations and *National Anti-Doping Organizations* shall promptly report to *WADA* the granting of therapeutic use exemptions to any *International-Level Athlete* or national-level *Athlete* that is included in his or her *National Anti-Doping Organization's Registered Testing Pool*.

*WADA*, on its own initiative, may review the granting of a therapeutic use exemption to any *International-Level Athlete* or national-level *Athlete* that is included in his or her *National Anti-Doping Organization's Registered Testing Pool*. Further, upon the request of any such *Athlete* that has been denied a therapeutic use exemption, *WADA* may review such denial. If *WADA* determines that such granting or denial of a therapeutic use exemption did not comply with the *International Standard* for therapeutic use exemptions, *WADA* may reverse the decision.

4.5    Monitoring Program

*WADA*, in consultation with other *Signatories* and governments, shall establish a monitoring program regarding substances which are not on the *Prohibited List*, but which *WADA* wishes to monitor in order to detect patterns of misuse in sport. *WADA* shall publish, in advance of any *Testing*, the substances that will be monitored. Laboratories will report the instances of reported *Use* or detected presence of these substances to

*WADA* periodically on an aggregate basis by sport and whether the *Samples* were collected *In-Competition* or *Out-of-Competition*. Such reports shall not contain additional information regarding specific *Samples*. *WADA* shall make available to International Federations and *National Anti-Doping Organizations*, on at least an annual basis, aggregate statistical information by sport regarding the additional substances. *WADA* shall implement measures to ensure that strict anonymity of individual *Athletes* is maintained with respect to such reports. The reported use or detected presence of the monitored substances shall not constitute a doping violation.

ARTICLE 5: TESTING

5.1    Test Distribution Planning. *Anti-Doping Organizations* conducting *Testing* shall in coordination with other *Anti-Doping Organizations* conducting *Testing* on the same *Athlete* pool:

5.1.1    Plan and implement an effective number of *In-Competition* and *Out-of-Competition* tests. Each International Federation shall establish a *Registered Testing Pool* for *International-Level Athletes* in its sport, and each *National Anti-Doping Organization* shall establish a national *Registered Testing Pool* for *Athletes* in its country. The national-level pool shall include *International-Level Athletes* from that country as well as other national-level *Athletes*. Each International Federation and *National Anti-Doping Organization* shall plan and conduct *In-Competition* and *Out-of-Competition Testing* on its *Registered Testing Pool*.

5.1.2    Make No Advance Notice *Testing* a priority.

5.1.3    Conduct *Target Testing*.

*5.1.3 Comment:* Target Testing is specified because random Testing, or even weighted random Testing, does not ensure that all of the appropriate Athletes will be tested. (For example, world class Athletes, whose

**5.2 Standards for Testing**

Anti-Doping Organizations conducting Testing shall conduct such Testing in conformity with the International Standard for Testing.

## ARTICLE 6: ANALYSIS OF SAMPLES

Doping Control Samples shall be analyzed in accordance with the following principles:

**6.1 Use of Approved Laboratories**

Doping Control Samples shall be analyzed only in WADA-accredited laboratories or as otherwise approved by WADA. The choice of the WADA-accredited laboratory (or other method approved by WADA) used for the Sample analysis shall be determined exclusively by the Anti-Doping Organization responsible for results management.

**6.2 Substances Subject to Detection**

Doping Control Samples shall be analyzed to detect Prohibited Substances and Prohibited Methods identified on the Prohibited List and other substances as may be directed by WADA pursuant to Article 4.5 (Monitoring Program).

**6.3 Research on Samples**

No Sample may be used for any purpose other than the detection of substances (or classes of substances) or methods on the Prohibited List, or as otherwise identified

*performances have dramatically improved over a short period of time. Athletes whose coaches have had other Athletes test positive, etc.).*

*Obviously, Target Testing must not be used for any purpose other than legitimate Doping Control. The Code makes it clear that Athletes have no right to expect that they will be tested only on a random basis. Similarly, it does not impose any reasonable suspicion or probable cause requirement for Target Testing.*

*5.2 Comment: The required methods and processes for the various types of In-Competition and Out-of-Competition Testing will be described in greater detail in the International Standard for Testing.*

*6.1 Comment: The phrase "or other method approved by WADA" is intended to cover, for example, mobile blood Testing procedures which WADA has reviewed and considers to be reliable.*

---

by WADA pursuant to Article 4.5 (Monitoring Program), without the Athlete's written consent.

**6.4 Standards for Sample Analysis and Reporting**

Laboratories shall analyze Doping Control Samples and report results in conformity with the International Standard for laboratory analysis.

## ARTICLE 7: RESULTS MANAGEMENT

Each Anti-Doping Organization conducting results management shall establish a process for the pre-hearing administration of potential anti-doping rule violations that respects the following principles:

**7.1 Initial Review Regarding Adverse Analytical Findings**

Upon receipt of an A Sample Adverse Analytical Finding, the Anti-Doping Organization responsible for results management shall conduct a review to determine whether: (a) an applicable therapeutic use exemption has been granted, or (b) there is any apparent departure from the International Standards for Testing or laboratory analysis that undermines the validity of the Adverse Analytical Finding.

**7.2 Notification After Initial Review**

If the initial review under Article 7.1 does not reveal an applicable therapeutic use exemption or departure that undermines the validity of the Adverse Analytical Finding.

*7 Comment: Various of the Signatories have created their own approaches to results management for Adverse Analytical Findings. While the various approaches have not been entirely uniform, many have proven to be fair and effective systems for results management. The Code does not supplant each of the Signatories' results management systems. This Article does, however, specify basic principles in order to ensure the fundamental*

*fairness of the results management process which must be observed by each Signatory. The specific anti-doping rules of each Signatory shall be consistent with these basic principles.*

*7.2 Comment: The Athlete has a right to request a prompt B Sample analysis regardless of whether follow-up investigation may be required under Articles 7.3 or 7.4.*

the *Anti-Doping Organization* shall promptly notify the *Athlete*, in the manner set out in its rules, of: (a) the *Adverse Analytical Finding*; (b) the anti-doping rule violated, or, in a case under Article 7.3, a description of the additional investigation that will be conducted as to whether there is an anti-doping rule violation; (c) the *Athlete's* right to promptly request the analysis of the B *Sample* or, failing such request, that the B *Sample* analysis may be deemed waived; (d) the right of the *Athlete* and/or the *Athlete's* representative to attend the B *Sample* opening and analysis if such analysis is requested; and (e) the *Athlete's* right to request copies of the A and B *Sample* laboratory documentation package which includes information as required by the *International Standard* for laboratory analysis.

7.3     Further Review of *Adverse Analytical Finding* Where Required by *Prohibited List*

The *Anti-Doping Organization* or other reviewing body established by such organization shall also conduct any follow-up investigation as may be required by the *Prohibited List*. Upon completion of such follow-up investigation, the *Anti-Doping Organization* shall promptly notify the *Athlete* regarding the results of the follow-up investigation and whether or not the *Anti-Doping Organization* asserts that an anti-doping rule was violated.

7.4     Review of Other Anti-Doping Rule Violations

The *Anti-Doping Organization* or other reviewing body established by such organization shall conduct any follow-up investigation as may be required under applicable anti-doping policies and rules adopted pursuant to the *Code* or which the *Anti-Doping Organization* otherwise considers appropriate. The *Anti-Doping Organization* shall promptly give the *Athlete* or other *Person* subject to sanction notice.

*7.4 Comment*: As an example, an *International Federation* typically

would notify the *Athlete* through the *Athlete's* national sports federation.

in the manner set out in its rules, of the anti-doping rule which appears to have been violated, and the basis of the violation.

7.5     Principles Applicable to *Provisional Suspensions*

A *Signatory* may adopt rules, applicable to any *Event* for which the *Signatory* is the ruling body or for any team selection process for which the *Signatory* is responsible, permitting *Provisional Suspensions* to be imposed after the review and notification described in Articles 7.1 and 7.2 but prior to a final hearing as described in Article 8 (Right to a Fair Hearing). Provided, however, that a *Provisional Suspension* may not be imposed unless the *Athlete* is given either: (a) an opportunity for a *Provisional Hearing* either before imposition of the *Provisional Suspension* or on a timely basis after imposition of the *Provisional Suspension*; or (b) an opportunity for an expedited hearing in accordance with Article 8 (Right to a Fair Hearing) on a timely basis after imposition of a *Provisional Suspension*.

If a *Provisional Suspension* is imposed based on an A *Sample Adverse Analytical Finding* and a subsequent B *Sample* analysis does not confirm the A *Sample* analysis, then the *Athlete* shall not be subject to any further disciplinary action and any sanction previously imposed shall be rescinded. In circumstances where the *Athlete* or the *Athlete's* team has been removed from a *Competition* and the subsequent B *Sample* analysis does not confirm the A *Sample* finding, if, without otherwise affecting the *Competition*, it is still possible for the *Athlete* or team to be reinserted, the *Athlete* or team may continue to take part in the *Competition*.

*7.5 Comment*: This Article continues to permit the possibility of a *Provisional Suspension* before a final decision at a hearing under Article 8 (Right to a Fair Hearing). *Provisional Suspensions* have been authorized in the OMADC and by the rules of many *International Federations*. However,

before a *Provisional Suspension* can be unilaterally imposed by an *Anti-Doping Organization*, the internal review specified in the *Code* must first be completed. In addition, a *Signatory* imposing a *Provisional Suspension* is required to give the *Athlete* an opportunity for a *Provisional Hearing*

## ARTICLE 8: RIGHT TO A FAIR HEARING

Each *Anti-Doping Organization* with responsibility for results management shall provide a hearing process for any *Person* who is asserted to have committed an anti-doping rule violation. Such hearing process shall address whether an anti-doping violation was committed and, if so, the appropriate *Consequences*. The hearing process shall respect the following principles:

• a timely hearing;

• fair and impartial hearing body;

• the right to be represented by counsel at the *Person's* own expense;

• the right to be fairly and timely informed of the asserted anti-doping rule violation;

• the right to respond to the asserted anti-doping rule violation and resulting *Consequences*;

*either before or promptly after the imposition of the Provisional Suspension, or an expedited final hearing under Article 8 promptly after imposition of the Provisional Suspension. The Athlete has a right to appeal under Article 13.2. As an alternative to the process for imposing a Provisional Suspension under this Article, the Anti-Doping Organization may always elect to forego a Provisional Suspension and proceed directly to the final hearing utilizing an expedited process under Article 8.*

*In the rare circumstance where the B Sample analysis does not confirm the A Sample finding, the Athlete that had been provisionally suspended will be allowed, where circumstances permit, to participate in subsequent Competitions during the Event. Similarly, depending upon the relevant rules of the International Federation in a Team Sport, if the team is still in Competition, the Athlete may be able to take part in future Competitions.*

*8 Comment: This Article contains basic principles relative to ensuring a fair hearing for Persons asserted to have violated anti-doping rules. This Article is not intended to supplant each Signatory's own rules for hearings but rather to ensure that each Signatory provides a hearing process consistent with these principles.*

• the right of each party to present evidence, including the right to call and question witnesses (subject to the hearing body's discretion to accept testimony by telephone or written submission);

• the *Person's* right to an interpreter at the hearing, with the hearing body to determine the identity, and responsibility for the cost, of the interpreter; and

• a timely, written, reasoned decision.

Hearings held in connection with *Events* may be conducted by an expedited process as permitted by the rules of the relevant *Anti-Doping Organization* and the hearing body.

## ARTICLE 9: AUTOMATIC *DISQUALIFICATION* OF INDIVIDUAL RESULTS

An anti-doping rule violation in connection with an *In-Competition* test automatically leads to *Disqualification* of the individual result obtained in that *Competition* with all resulting consequences, including forfeiture of any medals, points and prizes.

*The reference to CAS as an appellate body in Article 13 does not prevent a Signatory from also specifying CAS as the initial hearing body.*

*For example a hearing could be expedited on the eve of a major Event where the resolution of the anti-doping rule violation is necessary to determine the Athlete's eligibility to participate in the Event or during an Event where the resolution of the case will affect the validity of the Athlete's results or continued participation in the Event.*

*9 Comment: This principle is found in the OMADC. When an Athlete wins a gold medal with a Prohibited Substance in his or her system, that is unfair to the other Athletes in that Competition regardless of whether the gold medalist was at fault in any way. Only a "clean" Athlete should be allowed to benefit from his or her competitive results.*

*For Team Sports, see Article 11 (Consequences to Teams).*

## ARTICLE 10: SANCTIONS ON INDIVIDUALS

10.1   *Disqualification* of Results in *Event* During which an Anti-Doping Rule Violation Occurs

An anti-doping rule violation occurring during or in connection with an *Event* may, upon the decision of the ruling body of the *Event*, lead to *Disqualification* of all of the *Athlete's* individual results obtained in that *Event* with all consequences, including forfeiture of all medals, points and prizes, except as provided in Article 10.1.1.

10.1.1   If the *Athlete* establishes that he or she bears *No Fault or Negligence* for the violation, the *Athlete's* individual results in the other *Competitions* shall not be *Disqualified* unless the *Athlete's* results in *Competitions* other than the *Competition* in which the anti-doping rule violation occurred were likely to have been affected by the *Athlete's* anti-doping rule violation.

10.2   *Imposition of Ineligibility for Prohibited Substances and Prohibited Methods*

Except for the specified substances identified in Article 10.3, the period of *Ineligibility* imposed for a violation of Articles 2.1 (presence of *Prohibited Substance* or its *Metabolites* or

*10.1 Comment:* Whereas Article 9 (Automatic Disqualification of Individual Results) Disqualifies the result in a single Competition in which the Athlete tested positive (e.g., the 100 meter backstroke), this Article may lead to Disqualification of all results in all races during the Event (e.g., the FINA World Championships).

*Factors to be included in considering whether to Disqualify other results in an Event might include, for example, the severity of the Athlete's anti-doping rule violation and whether the Athlete tested negative in the other Competitions.*

*Markers).* 2.2 *(Use or Attempted Use of Prohibited Substance or Prohibited Method* and 2.6 *(Possession of Prohibited Substances and Methods)* shall be:

• First violation: Two (2) years' *Ineligibility*.

• Second violation: Lifetime *Ineligibility*.

However, the *Athlete* or other *Person* shall have the opportunity in each case, before a period of *Ineligibility* is imposed, to establish the basis for eliminating or reducing this sanction as provided in Article 10.5

10.3   Specified Substances

The *Prohibited List* may identify specified substances which are particularly susceptible to unintentional anti-doping rules violations because of their general availability in medicinal products or which are less likely to be successfully abused as doping agents. Where an *Athlete* can establish that the *Use* of such a specified

*10.2 Comment:* Harmonization of sanctions has been one of the most discussed and debated areas of anti-doping. Arguments against requiring harmonization of sanctions are based on differences between sports including for example the following: in some sports the Athletes are professionals making a sizable income from the sport and in others the Athletes are true amateurs: in those sports where an Athlete's career is short (e.g. artistic gymnastics) a two year Disqualification has a much more significant effect on the Athlete than in sports where careers are traditionally much longer (e.g. equestrian and shooting): in individual sports, the Athlete is better able to maintain competitive skills through solitary practice during Disqualification than in other sports where practice as part of a team is more important. A primary argument in favor of harmonization is that it is simply not right that two Athletes from the same country who test positive for the same Prohibited Substance under similar circumstances should receive different sanctions only because they participate in different sports. In addition, flexibility in sanctioning has often been viewed as an unacceptable opportunity for some sporting bodies to be more lenient with dopers. The lack of harmonization of sanctions has also frequently been the source of jurisdictional conflicts between International Federations and National Anti-Doping Organizations.

*The consensus of the World Conference on Doping in Sport held in Lausanne in February 1999 supported a two year period of Ineligibility for a first serious anti-doping rule violation followed with a lifetime ban for a second violation. This consensus was reflected in the OMADC.*

*10.3 Comment: This principle is carried over from the OMADC and allows, for example, some flexibility in disciplining Athletes who test positive as a result of the inadvertent use of a cold medicine containing a prohibited stimulant. "Reduction" of a sanction under Article 10.5.2 applies only to a second or third violation because the sanction for a first*

substance was not intended to enhance sport performance, the period of *Ineligibility* found in Article 10.2 shall be replaced with the following:

• First violation: At a minimum, a warning and reprimand and no period of *Ineligibility* from future *Events*, and at a maximum, one (1) year's *Ineligibility*.

• Second violation: Two (2) years' *Ineligibility*.

• Third violation: Lifetime *Ineligibility*.

However, the *Athlete* or other *Person* shall have the opportunity in each case, before a period of *Ineligibility* is imposed, to establish the basis for eliminating or reducing (in the case of a second or third violation) this sanction as provided in Article 10.5.

10.4 *Ineligibility* for Other Anti-Doping Rule Violations

The period of *Ineligibility* for other anti-doping rule violations shall be:

10.4.1 For violations of Article 2.3 (refusing or failing to submit to *Sample* collection) or Article 2.5 (*Tampering* with *Doping Control*), the *Ineligibility* periods set forth in Article 10.2 shall apply.

10.4.2 For violations of Articles 2.7 (*Trafficking*) or 2.8 (administration of *Prohibited Substance* or *Prohibited Method*, the period of *Ineligibility* imposed shall be a minimum of four (4) years up to

*violation already builds in sufficient discretion to allow consideration of the Person's degree of fault.*

*10.4.2 Comment: Those who are involved in doping Athletes or covering up doping should be subject to sanctions which are more severe than the Athletes who test positive.*

*Since the authority of sport organizations is generally limited to Ineligibility for credentials, membership and other sport benefits, reporting Athlete Support Personnel to competent authorities is an important step in the deterrence of doping.*

28

lifetime *Ineligibility*. An anti-doping rule violation involving a *Minor* shall be considered a particularly serious violation, and, if committed by *Athlete Support Personnel* for violations other than specified substances referenced in Article 10.3, shall result in lifetime *Ineligibility* for such *Athlete Support Personnel*. In addition, violations of such Articles which also violate non-sporting laws and regulations, may be reported to the competent administrative, professional or judicial authorities.

10.4.3 For violations of Article 2.4 (whereabouts violation or missed test), the period of *Ineligibility* shall be at a minimum 3 months and at a maximum 2 years in accordance with the rules established by the *Anti-Doping Organization* whose test was missed or whereabouts requirement was violated. The period of *Ineligibility* for subsequent violations of Article 2.4 shall be as established in the rules of the *Anti-Doping Organization* whose test was missed or whereabouts requirement was violated.

10.5 Elimination or Reduction of Period of *Ineligibility* Based on Exceptional Circumstances.

10.5.1 No Fault or Negligence

If the *Athlete* establishes in an individual case involving an anti-doping rule violation under Article

*10.4.3 Comment: The whereabouts and missed test policies of different Anti-Doping Organizations may vary considerably, particularly at the outset as these policies are being put into place. Thus, considerable flexibility has been provided for sanctioning these anti-doping rule violations. Those Anti-Doping Organizations with more sophisticated policies including built in safeguards, and those organizations with longer track*

*records of Athlete experience with a whereabouts policy, could provide for Ineligibility periods at the longer end of the specified range*

*10.5.1 Comment: Article 10.5.1 applies only to violations under Articles 2.1 and 2.2 (presence and Use of Prohibited Substances) because fault or negligence is already required to establish an anti-doping rule violation under other anti-doping rules.*

29

2.1 (presence of *Prohibited Substance* or its *Metabolites* or *Markers*) or *Use* of a *Prohibited Substance* or *Prohibited Method* under Article 2.2 that he or she bears *No Fault or Negligence* for the violation, the otherwise applicable period of *Ineligibility* shall be eliminated. When a *Prohibited Substance* or its *Markers* or *Metabolites* is detected in an *Athlete's Specimen* in violation of Article 2.1 (presence of *Prohibited Substance*), the *Athlete* must also establish how the *Prohibited Substance* entered his or her system in order to have the period of *Ineligibility* eliminated. In the event this Article is applied and the period of *Ineligibility* otherwise applicable is eliminated, the anti-doping rule violation shall not be considered a violation for the limited purpose of determining the period of *Ineligibility* for multiple violations under Articles 10.2, 10.3 and 10.6.

### 10.5.2 No Significant Fault or Negligence

This Article 10.5.2 applies only to anti-doping rule violations involving Article 2.1 (presence of *Prohibited Substance* or its *Metabolites* or *Markers*), *Use* of a *Prohibited Substance* or

*10.5.2 Comment:* The trend in doping cases has been to recognize that there must be some opportunity in the course of the hearing process to consider the unique facts and circumstances of each particular case in imposing sanctions. This principle was accepted at the World Conference on Doping in Sport 1999 and was incorporated into the OMADC which provides that sanctions can be reduced in "exceptional circumstances." The Code also provides for the possible reduction or elimination of the period of Ineligibility in the unique circumstance where the Athlete can establish that he or she

had No Fault or Negligence, or No Significant Fault or Negligence, in connection with the violation. This approach is consistent with basic principles of human rights and provides a balance between those Anti-Doping Organizations that argue for a much narrower exception, or none at all, and those that would reduce a two year suspension based on a range of other factors even when the Athlete was admittedly at fault. These Articles apply only to the imposition of sanctions; they are not applicable to the determination of whether an anti-doping rule violation has occurred.

---

*Prohibited Method* under Article 2.2, failing to submit to *Sample* collection under Article 2.3, or administration of a *Prohibited Substance* or *Prohibited Method* under Article 2.8. If an *Athlete* establishes in an individual case involving such violations that he or she bears *No Significant Fault or Negligence*, then the period of *Ineligibility* may be reduced, but the reduced period of *Ineligibility* may not be less than one-half of the minimum period of *Ineligibility* otherwise applicable. If the otherwise applicable period of *Ineligibility* is a lifetime, the reduced period under this section may be no less than 8 years. When a *Prohibited Substance* or its *Markers* or *Metabolites* is detected in an *Athlete's Specimen* in violation of Article 2.1 (presence of *Prohibited Substance*), the *Athlete* must also establish how the *Prohibited Substance* entered his or her system in order to have the period of *Ineligibility* reduced.

*Article 10.5 is meant to have an impact only in cases where the circumstances are truly exceptional and not in the vast majority of cases.*

*To illustrate the operation of Article 10.5, an example where No Fault or Negligence would result in the total elimination of a sanction is where an Athlete could prove that, despite all due care, he or she was sabotaged by a competitor. Conversely, a sanction could not be completely eliminated on the basis of No Fault or Negligence in the following circumstances: (a) a positive test resulting from a mislabeled or contaminated vitamin or nutritional supplement (Athletes are responsible for what they ingest (Article 2.1.1) and have been warned against the possibility of supplement contamination); (b) the administration of a prohibited substance by the Athlete's personal physician or*

*trainer without disclosure to the Athlete (Athletes are responsible for their choice of associates (Athletes are responsible for what they ingest and for the conduct of those persons to whom they entrust access to their food and drink). However, depending on the unique facts of a particular case, any of the referenced illustrations could result in a reduced sanction based on No Significant Fault or Negligence. (For example, reduction may well be appropriate in illustration (a) if the Athlete clearly establishes that the cause of the positive test was contamination in a common multiple vitamin purchased from a source with no connection to*

**10.5.3** *Athlete's* Substantial Assistance in Discovering or Establishing Anti-Doping Rule Violations by *Athlete Support Personnel* and Others.

An *Anti-Doping Organization* may also reduce the period of *Ineligibility* in an individual case where the *Athlete* has provided substantial assistance to the *Anti-Doping Organization* which results in the *Anti-Doping Organization* discovering or establishing an anti-doping rule violation by another *Person* involving *Possession* under Article 2.6.2 (*Possession* by *Athlete Support Personnel*). Article 2.7 (*Trafficking*), or Article 2.8 (administration to an *Athlete*). The reduced period of *Ineligibility* may not, however, be less than one-half of the minimum period of *Ineligibility* otherwise applicable. If the otherwise applicable period of *Ineligibility* is a lifetime, the reduced period under this section may be no less than 8 years.

**10.6** Rules for Certain Potential Multiple Violations

**10.6.1** For purposes of imposing sanctions under Articles 10.2, 10.3 and 10.4, a second anti-doping rule violation may be considered for purposes of imposing sanctions only if the *Anti-Doping*

*Prohibited Substances* and the *Athlete* exercised care in not taking other nutritional supplements.]

*Article 10.5.2 applies only to the identified anti-doping rule violations because these violations may be based on conduct that is not intentional or purposeful. Violations under Article 2.4 (whereabouts information and missed tests) are not included, even though intentional conduct is not required to establish these violations, because the sanction for violations of Article 2.4*

*(from three months to two years) already builds in sufficient discretion to allow consideration of the Athlete's degree of fault.*

*10.6.1 Comment: Under this Article, an Athlete testing positive a second time before notice of the first positive test would only be sanctioned on the basis of a single anti-doping rule violation.*

*Organization* can establish that the *Athlete* or other *Person* committed the second anti-doping rule violation after the *Athlete* or other *Person* received notice, or after the *Anti-Doping Organization* made a reasonable *Attempt* to give notice, of the first anti-doping rule violation: if the *Anti-Doping Organization* cannot establish this, the violations shall be considered as one single first violation, and the sanction imposed shall be based on the violation that carries the more severe sanction.

**10.6.2** Where an *Athlete*, based on the same *Doping Control*, is found to have committed an anti-doping rule violation involving both a specified substance under Article 10.3 and another *Prohibited Substance* or *Prohibited Method*, the *Athlete* shall be considered to have committed a single anti-doping rule violation, but the sanction imposed shall be based on the *Prohibited Substance* or *Prohibited Method* that carries the most severe sanction.

**10.6.3** Where an *Athlete* is found to have committed two separate anti-doping rule violations, one involving a specified substance governed by the sanctions set forth in Article 10.3 (Specified Substances) and the

*10.6.3 Comment: Article 10.6.3 deals with the situation where an Athlete commits two separate anti-doping rule violations, but one of the violations involves a specified substance governed by the lesser sanctions of Article 10.3. Without this Article in the Code, the second offense arguably could be governed by the sanction applicable to a second violation for the Prohibited Substance involved in the second violation. the sanction applicable to a second offense for the substance involved in the first violation. or a combination of the sanctions applicable to the two*

*offenses. This Article imposes a combined sanction calculated by adding together the sanctions for a first offense under 10.2 (two years) and a first offense under 10.3 (up to one year). This provides the same sanction to the Athlete that commits a first violation under 10.2 followed by a second violation involving a specified substance. and the Athlete that commits a first violation involving a specified substance followed by a second violation under 10.2. In both cases, the sanction shall be from two years to three years' Ineligibility.*

other involving a *Prohibited Substance* or *Prohibited Method* governed by the sanctions set forth in Article 10.2 or a violation governed by the sanctions in Article 10.4.1, the period of *Ineligibility* imposed for the second offense shall be at a minimum two years' *Ineligibility* and at a maximum three years' *Ineligibility*. Any *Athlete* found to have committed a third anti-doping rule violation involving any combination of specified substances under Article 10.3 and any other anti-doping rule violation under 10.2 or 10.4.1 shall receive a sanction of lifetime *Ineligibility*.

**10.7** *Disqualification of Results in Competitions Subsequent to Sample Collection*

In addition to the automatic *Disqualification* of the results in the *Competition* which produced the positive *Sample* under Article 9 (Automatic *Disqualification* of Individual Results), all other competitive results obtained from the date a positive *Sample* was collected (whether *In-Competition* or *Out-of-Competition*), or other doping violation occurred, through the commencement of any *Provisional Suspension* or *Ineligibility* period, shall, unless fairness requires otherwise, be *Disqualified* with all of the resulting consequences including forfeiture of any medals, points and prizes.

**10.8** *Commencement of Ineligibility Period*

The period of *Ineligibility* shall start on the date of the hearing decision providing for *Ineligibility* or, if the hearing is waived, on the date *Ineligibility* is accepted or otherwise imposed. Any period of *Provisional Suspension* (whether imposed or voluntarily accepted) shall be credited against

*10.8 Comment: Currently, many Anti-Doping Organizations start the two-year period of Ineligibility at the time a hearing decision is rendered. Those Anti-Doping Organizations also*

*frequently invalidate results retroactively to the date a positive Sample was collected. Other Anti-Doping Organizations simply start the two-year suspension on the date the*

the total period of *Ineligibility* to be served. Where required by fairness, such as delays in the hearing process or other aspects of *Doping Control* not attributable to the *Athlete*, the body imposing the sanction may start the period of *Ineligibility* at an earlier date commencing as early as the date of *Sample* collection.

**10.9** *Status During Ineligibility*

No *Person* who has been declared *Ineligible* may, during the period of *Ineligibility*, participate in any capacity in a *Competition* or activity (other than authorized anti-doping education or rehabilitation programs) authorized or organized by any *Signatory* or *Signatory's* member organization. In addition, for any anti-doping rule violation not involving specified substances described in Article 10.3, some or all sport-related financial support or other sport-related benefits received by such *Person* will be withheld by *Signatories*. *Signatories'* member organizations and governments. A *Person* subject to a period of *Ineligibility* longer than four years may, after completing four years of the period of *Ineligibility*,

*positive Sample was collected. The OMADC, as clarified by its Explanatory Document, does not mandate either approach. The approach provided in the Code gives Athletes a strong disincentive to drag out the hearing process while they compete in the interim. It also encourages them to voluntarily accept Provisional Suspensions pending a hearing. On the other hand, the body imposing the sanction can start the sanction running before the date the hearing decision is reached so that an Athlete is not penalized by delays in the Doping Control process which are not his or her fault, for example.*

*10.9 Comment: The rules of some Anti-Doping Organizations only ban an Athlete from "competing" during a period of Ineligibility. For example, an Athlete in those sports could still coach during the Ineligibility period. This Article adopts the position set forth in the OMADC that an Athlete who is made ineligible for doping should not participate in any capacity in an authorized Event or activity during the Ineligibility period. This would preclude, for example, practicing with a national team, or acting as a coach or sport official. Sanctions in one sport will also be recognized by other sports (see Article 15.4). This article would not prohibit the Person from participating in sport on a purely recreational level.*

*inordinate delay by the laboratory in reporting a positive test or delays in scheduling the hearing caused by the Anti-Doping Organization.*

participate in local sport events in a sport other than the sport in which the *Person* committed the anti-doping rule violation, but only so long as the local sport event is not at a level that could otherwise qualify such *Person* directly or indirectly to compete in (or accumulate points toward) a national championship or *International Event*.

10.10 *Reinstatement Testing*

As a condition to regaining eligibility at the end of a specified period of *Ineligibility*, an *Athlete* must, during any period of *Provisional Suspension* or *Ineligibility*, make him or herself available for *Out-of-Competition Testing* by any *Anti-Doping Organization* having testing jurisdiction, and must, if requested, provide current and accurate whereabouts information. If an *Athlete* subject to a period of *Ineligibility* retires from sport and is removed from *Out-of-Competition Testing* pools and later seeks reinstatement, the *Athlete* shall not be eligible for reinstatement until the *Athlete* has notified relevant *Anti-Doping Organizations* and has been subject to *Out-of-Competition Testing* for a period of time equal to the period of *Ineligibility* remaining as of the date the *Athlete* had retired.

## ARTICLE 11 CONSEQUENCES TO TEAMS

Where more than one team member in a *Team Sport* has been notified of a possible anti-doping rule violation under Article 7 in connection with an *Event*, the Team shall be subject to *Target Testing* for the *Event*. If more than one team member in a *Team Sport* is found to have committed an anti-doping rule violation during the *Event*, the team may be subject to *Disqualification* or other disciplinary action. In sports which are not *Team Sports* but

*10.10 Comment: On a related issue, the Code does not establish a rule, but rather leaves it to the various Anti-Doping Organizations to establish their own rules, addressing eligibility requirements for Athletes who are not ineligible and retire from sport while included in an Out-of-Competition pool and then seek to return to active participation in sport.*

---

where awards are given to teams, *Disqualification* or other disciplinary action against the team when one or more team members have committed an anti-doping rule violation shall be as provided in the applicable rules of the International Federation.

## ARTICLE 12 SANCTIONS AGAINST SPORTING BODIES

Nothing in this *Code* precludes any *Signatory* or government accepting the *Code* from enforcing its own rules for the purpose of imposing sanctions on another sporting body over which the *Signatory* or government has authority.

## ARTICLE 13 APPEALS

13.1 Decisions Subject to Appeal

Decisions made under the *Code* or rules adopted pursuant to the *Code* may be appealed as set forth below in Articles 13.2 through 13.4. Such decisions shall remain in effect while under appeal unless the appellate body orders otherwise. Before an appeal is commenced, any post-decision review provided in the *Anti-Doping Organization's* rules must be exhausted, provided that such review respects the principles set forth in Article 13.2.2 below.

13.2 Appeals from Decisions Regarding Anti-Doping Rule Violations, *Consequences*, and *Provisional Suspensions*

A decision that an anti-doping rule violation was committed, a decision imposing *Consequences* for an anti-doping rule violation, a decision that no anti-doping rule violation was committed, a decision that an *Anti-Doping Organization* lacks jurisdiction to rule on an alleged anti-doping rule violation or its *Consequences*.

*12 Comment: This Article makes it clear that the Code does not restrict whatever disciplinary rights between organizations may otherwise exist.*

*13.1 Comment: The comparable OMADC Article is broader in that it provides that any dispute arising out of the application of the OMADC may be appealed to CAS.*

and a decision to impose a *Provisional Suspension* as a result of a *Provisional Hearing* or in violation of Article 7.5 may be appealed exclusively as provided in this Article 13.2.

**13.2.1 Appeals Involving International-Level Athletes**

In cases arising from competition in an *International Event* or in cases involving *International-Level Athletes*, the decision may be appealed exclusively to the Court of Arbitration for Sport ("CAS") in accordance with the provisions applicable before such court.

**13.2.2 Appeals Involving National-Level Athletes**

In cases involving national-level *Athletes*, as defined by each *National Anti-Doping Organization*, that do not have a right to appeal under Article 13.2.1, the decision may be appealed to an independent and impartial body in accordance with rules established by the *National Anti-Doping Organization*. The rules for such appeal shall respect the following principles:

• A timely hearing;

• Fair, impartial and independent hearing body;

• The right to be represented by counsel at the *Person's* own expense; and

• A timely, written, reasoned decision.

**13.2.3 Persons Entitled to Appeal**

In cases under Article 13.2.1, the following parties shall have the right to appeal to CAS: (a) the *Athlete*

*13.2.1 Comment: CAS decisions are final and binding except for any review required by law applicable to the annulment or enforcement of arbitral awards.*

*13.2.2 Comment: An Anti-Doping Organization may elect to comply with this Article by giving its national-level Athletes the right to appeal directly to CAS.*

---

or other *Person* who is the subject of the decision being appealed; (b) the other party to the case in which the decision was rendered; (c) the relevant International Federation and any other *Anti-Doping Organization* under whose rules a sanction could have been imposed; (d) the International Olympic Committee or International Paralympic Committee, as applicable, where the decision may have an effect in relation to the Olympic Games or Paralympic Games, including decisions affecting eligibility for the Olympic Games or Paralympic Games; and (e) *WADA*. In cases under Article 13.2.2, the parties having the right to appeal to the national-level reviewing body shall be as provided in the *National Anti-Doping Organization's* rules but, at a minimum, shall include: (a) the *Athlete* or other *Person* who is the subject of the decision being appealed; (b) the other party to the case in which the decision was rendered; (c) the relevant International Federation; and (d) *WADA*. For cases under Article 13.2.2, *WADA* and the International Federation shall also have the right to appeal to CAS with respect to the decision of the national-level reviewing body.

Notwithstanding any other provision herein, the only *Person* that may appeal from a *Provisional Suspension* is the *Athlete* or other *Person* upon whom the *Provisional Suspension* is imposed.

**13.3 Appeals from Decisions Granting or Denying a Therapeutic Use Exemption**

Decisions by *WADA* reversing the grant or denial of a therapeutic use exemption may be appealed exclusively to CAS by the *Athlete* or the *Anti-Doping Organization* whose decision was reversed. Decisions by *Anti-Doping Organizations* other than *WADA* denying therapeutic use exemptions, which are not reversed by *WADA*, may be appealed by *International-Level Athletes* to CAS and by

other *Athletes* to the national level reviewing body described in Article 13.2.2. If the national level reviewing body reverses the decision to deny a therapeutic use exemption, that decision may be appealed to CAS by *WADA*.

13.4 Appeals from Decisions Imposing *Consequences* under Part Three of the *Code*

With respect to consequences imposed under Part Three of the *Code*, the entity upon which consequences are imposed under Part Three of the *Code* shall have the right to appeal exclusively to CAS in accordance with the provisions applicable before such court.

13.5 Appeals from Decisions Suspending or Revoking Laboratory Accreditation

Decisions by *WADA* to suspend or revoke a laboratory's *WADA* accreditation may be appealed only by that laboratory with the appeal being exclusively to CAS.

ARTICLE 14 CONFIDENTIALITY AND REPORTING

The *Signatories* agree to the principles of coordination of anti-doping results, public transparency and accountability and respect for the privacy interests of individuals alleged to have violated anti-doping rules as provided below:

14.1 Information Concerning *Adverse Analytical Findings* and Other Potential Anti-Doping Rule Violations

An *Athlete* whose *Sample* has resulted in an *Adverse Analytical Finding*, or an *Athlete* or other *Person* who may

then given the opportunity to appeal those decisions. Note, that the definition of interested Persons and organizations with a right to appeal under Article 13 does not include Athletes, or their federations, who might benefit from having another competitor disqualified.

*13.5 Comment:* The object of the Code is to have anti-doping matters resolved through fair and transparent internal processes with a final appeal. Anti-doping decisions by Anti-Doping Organizations are made transparent in Article 14. Specified Persons and organizations, including WADA, are

have violated an anti-doping rule, shall be notified by the *Anti-Doping Organization* with results management responsibility as provided in Article 7 (Results Management). The *Athlete's National Anti-Doping Organization* and International Federation and *WADA* shall also be notified not later than the completion of the process described in Articles 7.1 and 7.2. Notification shall include: the *Athlete's* name, country, sport and discipline within the sport, whether the test was *In-Competition* or *Out-of-Competition*, the date of *Sample* collection and the analytical result reported by the laboratory. The same *Persons* and *Anti-Doping Organizations* shall be regularly updated on the status and findings of any review or proceedings conducted pursuant to Articles 7 (Results Management), 8 (Right to a Fair Hearing) or 13 (Appeals), and, in any case in which the period of *Ineligibility* is eliminated under Article 10.5.1 (*No Fault or Negligence*). or reduced under Article 10.5.2 (*No Significant Fault or Negligence*), shall be provided with a written reasoned decision explaining the basis for the elimination or reduction. The recipient organizations shall not disclose this information beyond those persons within the organization with a need to know until the *Anti-Doping Organization* with results management responsibility has made public disclosure or has failed to make public disclosure as required in Article 14.2 below.

14.2 Public Disclosure

The identity of *Athletes* whose *Samples* have resulted in *Adverse Analytical Findings*, or *Athletes* or other *Persons* who were alleged by an *Anti-Doping Organization* to have violated other anti-doping rules, may be publicly disclosed by the *Anti-doping Organization* with results management responsibility no earlier than completion of the administrative review described in Articles 7.1 and 7.2. No later than twenty days after it has been determined in a hearing in accordance with Article 8 that an anti-doping rule violation has occurred, or such hearing has been

waived, or the assertion of an anti-doping rule violation has not been timely challenged, the *Anti-Doping Organization* responsible for results management must publicly report the disposition of the anti-doping matter.

### 14.3  *Athlete* Whereabouts Information

*Athletes* who have been identified by their International Federation or *National Anti-Doping Organization* for inclusion in an *Out-of-Competition Testing* pool shall provide accurate, current location information. The International Federations and *National Anti-Doping Organizations* shall coordinate the identification of *Athletes* and the collecting of current location information and shall submit it to *WADA*. *WADA* shall make this information accessible to other *Anti-Doping Organizations* having authority to test the *Athlete* as provided in Article 15. This information shall be maintained in strict confidence at all times; shall be used exclusively for purposes of planning, coordinating or conducting *Testing*; and shall be destroyed after it is no longer relevant for these purposes.

### 14.4  Statistical Reporting

*Anti-Doping Organizations* shall, at least annually, publish publicly a general statistical report of their *Doping Control* activities with a copy provided to *WADA*.

### 14.5  *Doping Control* Information Clearing House

*WADA* shall act as a central clearing house for *Doping Control Testing* data and results for *International-Level Athletes* and national-level *Athletes* that have been included in their *National Anti-Doping Organization's Registered Testing Pool*. To facilitate coordinated test distribution planning and to avoid unnecessary duplication in *Testing* by the various *Anti-Doping Organizations*, each *Anti-Doping Organization* shall report all *In-Competition* and *Out-of-Competition* tests on such *Athletes* to the *WADA* clearinghouse as soon as possible after such tests have been conducted. *WADA* shall make this information accessible to the *Athlete*, the *Athlete's National Committee* or *National*

Paralympic Committee, *National Anti-Doping Organization*, International Federation, and the International Olympic Committee or International Paralympic Committee. Private information regarding an *Athlete* shall be maintained by *WADA* in strict confidence. *WADA* shall, at least annually, publish statistical reports summarizing such information.

## ARTICLE 15.  CLARIFICATION OF *DOPING CONTROL* RESPONSIBILITIES

### 15.1  *Event Testing*

The collection of *Samples* for *Doping Control* does and should take place at both *International Events* and *National Events*. However, only a single organization should be responsible for initiating and directing *Testing* during an *Event*. At *International Events*, the collection of *Doping Control Samples* shall be initiated and directed by the international organization which is the ruling body for the *Event* (e.g., the IOC for the Olympic Games, the International Federation for a World Championship, and PASO for the Pan American Games). If the international organization decides not to conduct any *Testing* at such an *Event*, the *National Anti-Doping Organization* for the country where the *Event* occurs may in coordination with and with the approval of the international organization or *WADA*, initiate and conduct such *Testing*. At *National Events*, the collection of *Doping Control Samples* shall be initiated and directed by the designated *National Anti-Doping Organization* of that country.

*15 Comment: To be effective, the anti-doping effort must involve many Anti-Doping Organizations conducting strong programs at both the international and national levels. Rather than limiting the responsibilities of one group in favor of the exclusive competency of the other, the Code manages potential problems associated with overlapping responsibilities, first by creating a much higher level of overall harmonization and second, by establishing rules of precedence and cooperation in specific areas.*

*15.1 Comment: The Anti-Doping Organization "initiating and directing testing" may, if it chooses, enter into agreements with other organizations to which it delegates responsibility for Sample collection or other aspects of the Doping Control process.*

### 15.2 Out-of-Competition Testing

*Out-of-Competition Testing* is and should be initiated and directed by both international and national organizations. *Out-of-Competition Testing* may be initiated and directed by: (a) *WADA*: (b) the IOC or IPC in connection with the Olympic Games or Paralympic Games: (c) the *Athlete's* International Federation: (d) the *Athlete's National Anti-Doping Organization: or (e) the National Anti-Doping Organization* of any country where the *Athlete* is present. *Out-of-Competition Testing* should be coordinated through *WADA* in order to maximize the effectiveness of the combined *Testing* effort and to avoid unnecessary repetitive *Testing* of individual *Athletes.*

### 15.3 Results Management, Hearings and Sanctions

Except as provided in Article 15.3.1 below, results management and hearings shall be the responsibility of and shall be governed by the procedural rules of the *Anti-Doping Organization* that initiated and directed *Sample* collection (or, if no *Sample* collection is involved, the organization which discovered the violation). Regardless of which organization conducts results management or hearings, the principles set forth in Articles 7 and 8 shall be respected and the rules identified in the Introduction to Part One to be incorporated without substantive change must be followed.

15.3.1 Results management and the conduct of hearings for an anti-doping rule violation arising from a test by, or discovered by, a *National Anti-Doping Organization* involving an *Athlete* that is not a citizen

*15.2 Comment: Additional authority to conduct Testing may be authorized by means of bilateral or multilateral agreements among Signatories and governments.*

*15.3 Comment: In some cases, the procedural rules of the Anti-Doping Organization which initiated and directed the Sample collection may*

specify that results management will be handled by another organization (e.g. the *Athlete's* national federation). In such event, it shall be the *Anti-Doping Organization's* responsibility to confirm that the other organization's rules are consistent with the *Code.*

*15.3.1 Comment: No absolute rule is established for managing results and*

or resident of that country shall be administered as directed by the rules of the applicable International Federation. Results management and the conduct of hearings from a test by the International Olympic Committee, the International Paralympic Committee, or a *Major Event Organization*, shall be referred to the applicable International Federation as far as sanctions beyond *Disqualification* from the *Event* or the results of the *Event.*

### 15.4 Mutual Recognition

Subject to the right to appeal provided in Article 13. the *Testing*, therapeutic use exemptions and hearing results or other final adjudications of any *Signatory* which are consistent with the *Code* and are within that *Signatory's* authority, shall be recognized and respected by all other *Signatories. Signatories* may recognize the same actions of other bodies which have not accepted the *Code* if the rules of those bodies are otherwise consistent with the *Code.*

### ARTICLE 16.   DOPING CONTROL FOR ANIMALS COMPETING IN SPORT

16.1 In any sport that includes animals in competition, the International Federation for that sport shall establish and implement anti-doping rules for the animals included in that sport. The anti-doping rules shall include a list of *Prohibited Substances*, appropriate *Testing* procedures and a list of approved laboratories for *Sample* analysis.

conducting hearings where a *National Anti-Doping Organization* tests a foreign national athlete over whom it would have no jurisdiction but for the *Athlete's* presence in the *National Anti-Doping Organization's* country. Under this Article, it is left to the International Federation to determine under its own rules whether, for example, management of the case

should be referred to the *Athlete's National Anti-Doping Organization*, remain with the *Anti-Doping Organization* that collected the *Sample*, or be taken over by the International Federation.

World Anti-Doping Code        2003

**16.2**  With respect to determining anti-doping rule violations, results management, fair hearings, *Consequences*, and appeals for animals involved in sport, the International Federation for that sport shall establish and implement rules that are generally consistent with Articles 1, 2, 3, 9, 10, 11, 13 and 17 of the *Code*.

## ARTICLE 17: STATUTE OF LIMITATIONS

No action may be commenced against an *Athlete* or other *Person* for a violation of an anti-doping rule contained in the *Code* unless such action is commenced within eight years from the date the violation occurred.

*17 Comment: This does not restrict the Anti-Doping Organization from considering an earlier anti-doping violation for purposes of the sanction for a subsequent violation that occurs more than eight years later. In other words, a second violation ten years after a first violation is considered a second violation for sanction purposes.*

PART TWO

# EDUCATION & RESEARCH

## ARTICLE 18: EDUCATION

### 18.1 Basic Principle and Primary Goal

The basic principle for information and education programs shall be to preserve the spirit of sport as described in the Introduction to the *Code*, from being undermined by doping. The primary goal shall be to dissuade *Athletes* from using *Prohibited Substances* and *Prohibited Methods*.

### 18.2 Program and Activities

Each *Anti-Doping Organization* should plan, implement and monitor information and education programs. The programs should provide *Participants* with updated and accurate information on at least the following issues:

- Substances and methods on the *Prohibited List*
- Health consequences of doping
- *Doping Control* procedures
- *Athletes'* rights and responsibilities

The programs should promote the spirit of sport in order to establish an anti-doping environment which influences behavior among *Participants*.

*Athlete Support Personnel* should educate and counsel *Athletes* regarding anti-doping policies and rules adopted pursuant to the *Code*.

### 18.3 Coordination and Cooperation

All *Signatories* and *Participants* shall cooperate with each other and governments to coordinate their efforts in anti-doping information and education.

## ARTICLE 19: RESEARCH

### 19.1 Purpose of Anti-Doping Research

Anti-doping research contributes to the development and implementation of efficient programs within *Doping Control* and to anti-doping information and education.

### 19.2 Types of Research

Anti-doping research may include, for example, sociological, behavioral, juridical and ethical studies in addition to medical, analytical and physiological investigation.

### 19.3 Coordination

Coordination of anti-doping research through *WADA* is encouraged. Subject to intellectual property rights, copies of anti-doping research results should be provided to *WADA*.

### 19.4 Research Practices

Anti-doping research shall comply with internationally recognized ethical practices.

### 19.5 Research Using *Prohibited Substances* and *Prohibited Methods*

Research efforts should avoid the administration of *Prohibited Substances* or *Prohibited Methods* to *Athletes*.

### 19.6 Misuse of Results

Adequate precautions should be taken so that the results of anti-doping research are not misused and applied for doping.

PART THREE

# ROLES & RESPONSIBILITIES

## ARTICLE 20: ADDITIONAL ROLES AND RESPONSIBILITIES OF *SIGNATORIES*

20.1   Roles and Responsibilities of the International Olympic Committee

20.1.1 To adopt and implement anti-doping policies and rules for the Olympic Games which conform with the *Code*.

20.1.2 To require as a condition of recognition by the International Olympic Committee, that International Federations within the Olympic Movement are in compliance with the *Code*.

20.1.3 To withhold some or all Olympic funding of sport organizations that are not in compliance with the *Code*.

20.1.4 To take appropriate action to discourage non-compliance with the *Code* as provided in Article 23.5.

20.1.5 To authorize and facilitate the *Independent Observer Program*.

20.2   Roles and Responsibilities of the International Paralympic Committee

20.2.1 To adopt and implement anti-doping policies and rules for the Paralympic Games which conform with the *Code*.

20.2.2 To require as a condition of recognition by the International Paralympic Committee, that National Paralympic Committees within the Olympic Movement are in compliance with the *Code*.

*20 Comment: Responsibilities for Signatories and Participants are addressed in various articles in the* *Code and the responsibilities listed in this part are additional to these responsibilities.*

---

20.2.3 To withhold some or all Paralympic funding of sport organizations that are not in compliance with the *Code*.

20.2.4 To take appropriate action to discourage non-compliance with the *Code* as provided in Article 23.5.

20.2.5 To authorize and facilitate the *Independent Observer Program*.

20.3   Roles and Responsibilities of International Federations

20.3.1 To adopt and implement anti-doping policies and rules which conform with the *Code*.

20.3.2 To require as a condition of membership that the policies, rules and programs of National Federations are in compliance with the *Code*.

20.3.3 To require all *Athletes* and *Athlete Support Personnel* within their jurisdiction to recognize and be bound by anti-doping rules in conformance with the *Code*.

20.3.4 To require *Athletes* who are not regularly members of the International Federation or one of its member National Federations to be available for *Sample* collection and provide accurate and up-to-date whereabouts information if required by the conditions for eligibility established by the International Federation or, as applicable, the *Major Event Organization*.

20.3.5 To monitor the anti-doping programs of National Federations.

*20.3.4 Comment: This would include, for example, Athletes from professional leagues.*

World Anti-Doping Code    2003

20.3.6 To take appropriate action to discourage non-compliance with the *Code* as provided in Article 23.5.

20.3.7 To authorize and facilitate the *Independent Observer* program at *International Events*.

20.3.8 To withhold some or all funding to its member National Federations that are not in compliance with the *Code*.

20.4 Roles and Responsibilities of *National Olympic Committees* and National Paralympic Committees

20.4.1 To ensure that their anti-doping policies and rules conform with the *Code*.

20.4.2 To require as a condition of membership or recognition that National Federations' anti-doping policies and rules are in compliance with the applicable provisions of the *Code*.

20.4.3 To require *Athletes* who are not regular members of a National Federation to be available for *Sample* collection and provide accurate and up-to-date whereabouts information on a regular basis if required during the year before the the Olympic Games as a condition of participation in the Olympic Games.

20.4.4 To cooperate with their *National Anti-Doping Organization*.

20.4.5 To withhold some or all funding, during any period of his or her *Ineligibility*, to any *Athlete* or *Athlete Support Personnel* who has violated anti-doping rules.

20.4.6 To withhold some or all funding to its member or recognized National Federations that are not in compliance with the *Code*.

World Anti-Doping Code    2003

20.5 Roles and Responsibilities of *National Anti-Doping Organizations*

20.5.1 To adopt and implement anti-doping rules and polices which conform with the *Code*.

20.5.2 To cooperate with other relevant national organizations and other *Anti-Doping Organizations*.

20.5.3 To encourage reciprocal testing between *National Anti-Doping Organizations*.

20.5.4 To promote anti-doping research.

20.6 Roles and Responsibilities of *Major Event Organizations*

20.6.1 To adopt and implement anti-doping policies and rules for their *Events* which conform with the *Code*.

20.6.2 To take appropriate action to discourage non-compliance with the *Code* as provided in Article 23.5.

20.6.3 To authorize and facilitate the *Independent Observer Program*.

20.7 Roles and Responsibilities of *WADA*

20.7.1 To adopt and implement policies and procedures which conform with the *Code*.

20.7.2 To monitor the processing of *Adverse Analytical Findings*.

20.7.3 To approve *International Standards* applicable to the implementation of the *Code*.

20.7.4 To accredit laboratories to conduct *Sample* analysis or to approve others to conduct *Sample* analysis.

20.7.5 To develop and approve Models of Best Practice.

20.7.6 To promote, conduct, commission, fund and coordinate anti-doping research.

20.7.7 To conduct an effective *Independent Observer Program*.

20.7.8 To conduct *Doping Controls* as authorized by other *Anti-Doping Organizations*.

## ARTICLE 21: ROLES AND RESPONSIBILITIES OF *PARTICIPANTS*

21.1 Roles and Responsibilities of *Athletes*

21.1.1 To be knowledgeable of and comply with all applicable anti-doping policies and rules adopted pursuant to the *Code*.

21.1.2 To be available for *Sample* collection.

21.1.3 To take responsibility, in the context of anti-doping, for what they ingest and use.

21.1.4 To inform medical personnel of their obligation not to *Use Prohibited Substances* and *Prohibited Methods* and to take responsibility to make sure that any medical treatment received does not violate anti-doping policies and rules adopted pursuant to the *Code*.

21.2 Roles and Responsibilities of *Athlete Support Personnel*

21.2.1 To be knowledgeable of and comply with all anti-doping policies and rules adopted pursuant to the *Code* and which are applicable to them or the *Athletes* whom they support.

21.2.2 To cooperate with the *Athlete Testing* program.

21.2.3 To use their influence on *Athlete* values and behavior to foster anti-doping attitudes.

## ARTICLE 22: INVOLVEMENT OF GOVERNMENTS

Each government's commitment to the *Code* will be evidenced by its signing a Declaration on or before the first day of the Athens Olympic Games to be followed by a process leading to a convention or other obligation to be implemented as appropriate to the constitutional and administrative contexts of each government on or before the first day of the Turin Winter Olympic Games.

It is the expectation of the *Signatories* that the Declaration and the convention or other obligation will reflect the following major points:

22.1 Affirmative measures will be undertaken by each government in support of anti-doping in at least the following areas:

- Support for national anti-doping programs;

- The availability of *Prohibited Substances* and *Prohibited Methods*;

- Facilitate access for *WADA* to conduct *Out-of-Competition Doping Controls*;

- The problem of nutritional supplements which contain undisclosed *Prohibited Substances*; and

- Withholding some or all financial support from sport organizations and *Participants* that are not in compliance with the *Code* or applicable anti-doping rules adopted pursuant to the *Code*.

**22 Comment:** Most governments cannot be parties to, or be bound by, private non-governmental instruments such as the *Code*. For that reason, governments are not asked to be *Signatories* to the *Code*. However, the effort to combat doping through the coordinated and harmonized program reflected in the *Code* is very much a joint effort between the sport movement and governments. An example of one type of obligation referred to above is the convention discussed in the Final Communiqué of the UNESCO Round Table of Ministers and Senior Officials Responsible for Physical Education and Sport held in Paris on 9/10 January 2003.

World Anti-Doping Code    2003

**22.2**  All other governmental involvement with anti-doping will be brought into harmony with the *Code*.

**22.3**  Ongoing compliance with the commitments reflected in the convention or other obligation will be monitored as determined in consultation between *WADA* and the applicable government(s).

PART FOUR

# ACCEPTANCE, COMPLIANCE, MODIFICATION & INTERPRETATION

## ARTICLE 23: ACCEPTANCE, COMPLIANCE AND MODIFICATION

### 23.1   Acceptance of the Code

23.1.1 The following entities shall be *Signatories* accepting the *Code*: *WADA*, The International Olympic Committee, International Federations, The International Paralympic Committee, *National Olympic Committees*, National Paralympic Committees, *Major Event Organizations*, and *National Anti-Doping Organizations*. These entities shall accept the *Code* by signing a declaration of acceptance upon approval by each of their respective governing bodies.

23.1.2 Other sport organizations that may not be under the control of a *Signatory* may, upon *WADA's* invitation, also accept the *Code*.

23.1.3 A list of all acceptances will be made public by *WADA*.

### 23.2   Implementation of the Code

23.2.1 The *Signatories* shall implement applicable *Code* provisions through policies, statutes, rules or regulations according to their authority and within their relevant spheres of responsibility.

*23.1.1 Comment: Each accepting Signatory will separately sign an identical copy of the standard form common declaration of acceptance and deliver it to WADA. The act of acceptance will be as authorized by the organic documents of each organization. For example, an International Federation by its Congress and WADA by its Foundation Board.*

*23.1.2 Comment: Those professional leagues that are not currently under the jurisdiction of any government or International Federation will be encouraged to accept the Code.*

23.2.2 In implementing the *Code*, the *Signatories* are encouraged to use the Models of Best Practice recommended by *WADA*.

### 23.3   Acceptance and Implementation Deadlines

23.3.1 *Signatories* shall accept and implement the *Code* on or before the first day of the Athens Olympic Games.

23.3.2 The *Code* may be accepted after the above-referenced deadlines; however, *Signatories* shall not be considered in compliance with the *Code* until they have accepted the *Code* (and that acceptance has not been withdrawn).

### 23.4   Monitoring Compliance with the Code

23.4.1 Compliance with the *Code* shall be monitored by *WADA* or as otherwise agreed by *WADA*.

23.4.2 To facilitate monitoring, each *Signatory* shall report to *WADA* on its compliance with the *Code* every second year and shall explain reasons for noncompliance.

23.4.3 *WADA* shall consider explanations for non-compliance and, in extraordinary situations, may recommend to the International Olympic Committee, International Paralympic Committee, International Federations, and *Major Event Organizations* that they provisionally excuse the non-compliance.

*23.4.3 Comment: WADA recognizes that amongst Signatories and governments, there will be significant differences in anti-doping experience, resources, and the legal context in*

*which anti-doping activities are carried out. In considering whether an organization is compliant, WADA will consider these differences.*

23.4.4 *WADA* shall, after dialogue with the subject organization, make reports on compliance to the International Olympic Committee, the International Paralympic Committee, International Federations, and *Major Event Organizations*. These reports shall also be made available to the public.

23.5 Consequences of Noncompliance with the Code

23.5.1 Noncompliance with the *Code* by either the government or *National Olympic Committee* of a country may result in consequences with respect to Olympic Games, Paralympic Games, World Championships or the *Events* of *Major Event Organizations* as determined by the ruling body for each *Event*. The imposition of such consequences may be appealed by the *National Olympic Committee* or government to CAS pursuant to Article 13.4.

23.6 Modification of the Code

23.6.1 *WADA* shall be responsible for overseeing the evolution and improvement of the *Code*. *Athletes* and all *Signatories* and governments shall be invited to participate in such process.

23.6.2 *WADA* shall initiate proposed amendments to the *Code* and shall ensure a consultative process to both receive and respond to recommendations and to facilitate review and feedback from *Athletes*, *Signatories* and governments on recommended amendments.

23.6.3 Amendments to the *Code* shall, after appropriate consultation, be approved by a two-thirds majority of the *WADA* Foundation Board including a majority of both the public sector and Olympic Movement members casting votes. Amendments shall, unless provided otherwise, go into effect three months after such approval.

23.6.4 *Signatories* shall implement any applicable amendment to the *Code* within one year of approval by the *WADA* Foundation Board.

23.7 Withdrawal of Acceptance of the Code

23.7.1 *Signatories* may withdraw acceptance of the *Code* after providing *WADA* six-month's written notice of their intent to withdraw.

ARTICLE 24: INTERPRETATION OF THE *CODE*

24.1 The official text of the *Code* shall be maintained by *WADA* and shall be published in English and French. In the event of any conflict between the English and French versions, the English version shall prevail.

24.2 The comments annotating various provisions of the *Code* are included to assist in the understanding and interpretation of the *Code*.

24.3 The *Code* shall be interpreted as an independent and autonomous text and not by reference to the existing law or statutes of the *Signatories* or governments.

24.4   The headings used for the various Parts and Articles of the *Code* are for convenience only and shall not be deemed part of the substance of the *Code* or to affect in any way the language of the provisions to which they refer.

24.5   The *Code* shall not apply retrospectively to matters pending before the date the *Code* is accepted by a *Signatory* and implemented in its rules.

24.6   APPENDIX I Definitions shall be considered an integral part of the *Code*.

*24.5 Comment: For example, conduct which is an anti-doping rule violation described in the Code, but which is not a violation under an International Federation's pre-Code rules, would not be a violation until the International Federation's rules are changed.*

*Pre-Code anti-doping rule violations would continue to count as "First violations" or "Second violations" for purposes of determining sanctions under Article 10 for subsequent post-Code violations.*

APPENDIX 1

# DEFINITIONS

World Anti-Doping Code    2003

**Adverse Analytical Finding**: A report from a laboratory or other approved *Testing* entity that identifies in a *Specimen* the presence of a *Prohibited Substance* or its *Metabolites or Markers* (including elevated quantities of endogenous substances) or evidence of the *Use* of a *Prohibited Method*.

**Anti-Doping Organization**: A *Signatory* that is responsible for adopting rules for initiating, implementing or enforcing any part of the *Doping Control* process. This includes, for example, the International Olympic Committee, the International Paralympic Committee, other *Major Event Organizations* that conduct *Testing* at their *Events*, WADA, International Federations, and *National Anti-Doping Organizations*.

**Athlete**: For purposes of *Doping Control*, any *Person* who participates in sport at the international level (as defined by each International Federation) or national level (as defined by each *National Anti-Doping Organization*) and any additional *Person* who participates in sport at a lower level if designated by the *Person's National Anti-Doping Organization*. For purposes of anti-doping information and education, any *Person* who participates in sport under the authority of any *Signatory*, government, or other sports organization accepting the *Code*.

**Athlete Support Personnel**: Any coach, trainer, manager, agent, team staff, official, medical or para-medical personnel working with or treating *Athletes* participating in or preparing for sports competition.

*Athlete Comment: This definition makes it clear that all international and national-calibre athletes are subject to the anti-doping rules of the Code, with the precise definitions of international and national level sport to be set forth in the anti-doping rules of the International Federations and National Anti-Doping Organizations, respectively. At the national level, anti-doping rules adopted pursuant to the Code shall apply, at a minimum, to all persons on national teams and all*

*persons qualified to compete in any national championship in any sport. The definition also allows each National Anti-Doping Organization, if it chooses to do so, to expand its anti-doping control program beyond national-calibre athletes to athletes at lower levels of competition. Athletes at all levels of competition should receive the benefit of anti-doping information and education.*

**Attempt**: Purposely engaging in conduct that constitutes a substantial step in a course of conduct planned to culminate in the commission of an anti-doping rule violation. Provided, however, there shall be no anti-doping rule violation based solely on an *Attempt* to commit a violation if the *Person* renunciates the attempt prior to it being discovered by a third party not involved in the *Attempt*.

**Code**: The World Anti-Doping Code.

**Competition**: A single race, match, game or singular athletic contest. For example, the finals of the Olympic 100-meter dash. For stage races and other athletic contests where prizes are awarded on a daily or other interim basis the distinction between a *Competition* and an *Event* will be as provided in the rules of the applicable International Federation.

**Consequences of Anti-Doping Rules Violations**: An *Athlete's* or other *Person's* violation of an anti-doping rule may result in one or more of the following: (a) *Disqualification* means the *Athlete's* results in a particular *Competition* or *Event* are invalidated, with all resulting consequences including forfeiture of any medals, points and prizes. (b) *Ineligibility* means the *Athlete* or other *Person* is barred for a specified period of time from participating in any *Competition* or other activity or funding as provided in Article 10.9; and (c) *Provisional Suspension* means the *Athlete* or other *Person* is barred temporarily from participating in any *Competition* prior to the final decision at a hearing conducted under Article 8 (Right to a Fair Hearing).

**Disqualification**: See *Consequences of Anti-Doping Rules Violations* above.

**Doping Control**: The process including test distribution planning, *Sample* collection and handling, laboratory analysis, results management, hearings and appeals.

**Event**: A series of individual *Competitions* conducted together under one ruling body (e.g., the Olympic Games, FINA World Championships, or Pan American Games).

**In-Competition:** For purposes of differentiating between *In-Competition* and *Out-of-Competition Testing*, unless provided otherwise in the rules of an International Federation or other relevant *Anti-Doping Organization*, an *In-Competition* test is a test where an *Athlete* is selected for testing in connection with a specific *Competition*.

**Independent Observer Program:** A team of observers, under the supervision of *WADA*, who observe the *Doping Control* process at certain *Events* and report on observations. If *WADA* is testing *In-Competition* at an *Event*, the observers shall be supervised by an independent organization.

**Ineligibility:** See *Consequences of Anti-Doping Rules Violations* above.

**International Event:** An *Event* where the International Olympic Committee, the International Paralympic Committee, an International Federation, a *Major Event Organization*, or another international sport organization is the ruling body for the *Event* or appoints the technical officials for the *Event*.

**International-Level Athlete:** *Athletes* designated by one or more International Federations as being within the *Registered Testing Pool* for an International Federation.

**International Standard:** A standard adopted by *WADA* in support of the Code. Compliance with an *International Standard* (as opposed to another alternative standard, practice or procedure) shall be sufficient to conclude that the procedures addressed by the *International Standard* were performed properly.

*In-Competition Comment: The distinction between "In-Competition" and "Out-of-Competition Testing is significant because the full Prohibited Lists is only tested for "In-Competition." Prohibited stimulants, for example, are not tested for Out-of-Competition because they have no performance enhancing benefit unless they are in the Athlete's system while the Athlete is actually competing. So long as the prohibited stimulant has cleared the Athlete's system at the time the Athlete competes, it makes no difference whether that stimulant could have been found in the Athlete's urine the day before or the day after the Competition.*

---

**Major Event Organizations:** This term refers to the continental associations of *National Olympic Committees* and other international multi-sport organizations that function as the ruling body for any continental, regional or other *International Event*.

**Marker:** A compound, group of compounds or biological parameters that indicates the *Use of a Prohibited Substance or Prohibited Method*.

**Metabolite:** Any substance produced by a biotransformation process.

**Minor:** A natural *Person* who has not reached the age of majority as established by the applicable laws of his or her country of residence.

**National Anti-Doping Organization:** The entity(ies) designated by each country as possessing the primary authority and responsibility to adopt and implement anti-doping rules, direct the collection of *Samples*, the management of test results, and the conduct of hearings, all at the national level. If this designation has not been made by the competent public authority(ies), the entity shall be the country's *National Olympic Committee* or its designee.

**National Event:** A sport *Event* involving international or national-level *Athletes* that is not an *International Event*.

**National Olympic Committee:** The organization recognized by the International Olympic Committee. The term *National Olympic Committee* shall also include the National Sport Confederation in those countries where the National Sport Confederation assumes typical *National Olympic Committee* responsibilities in the anti-doping area.

**No Advance Notice:** A *Doping Control* which takes place with no advance warning to the *Athlete* and where the *Athlete* is continuously chaperoned from the moment of notification through *Sample* provision.

**No Fault or Negligence.** The Athlete's establishing that he or she did not know or suspect, and could not reasonably have known or suspected even with the exercise of utmost caution, that he or she had *Used* or been administered the *Prohibited Substance* or *Prohibited Method*.

**No Significant Fault or Negligence.** The Athlete's establishing that his or her fault or negligence, when viewed in the totality of the circumstances and taking into account the criteria for *No Fault or Negligence*, was not significant in relationship to the anti-doping rule violation.

**Out-of-Competition:** Any *Doping Control* which is not *In-Competition*.

**Participant:** Any *Athlete* or *Athlete Support Personnel*.

**Person:** A natural *Person* or an organization or other entity.

**Possession:** The actual, physical possession, or the constructive possession (which shall be found only if the *Person* has exclusive control over the *Prohibited Substance/Method* or the premises in which a *Prohibited Substance/Method* exists); provided, however, that if the *Person* does not have exclusive control over the *Prohibited Substance/Method* or the premises in which a *Prohibited Substance/Method* exists, constructive possession shall only be found if the *Person* knew about the presence of the *Prohibited Substance/Method* and intended to exercise control over it. Provided, however, there shall be no anti-doping rule violation based solely on possession if, prior to receiving

*Possession Comment: Under this definition, steroids found in an Athlete's car would constitute a violation unless the Athlete establishes that someone else used the car in that event, the Anti-Doping Organization must establish that, even though the Athlete did not have exclusive control over the car, the Athlete knew about the steroids and*

*intended to have control over the steroids. Similarly, in the example of steroids found in a home medicine cabinet under the joint control of an Athlete and spouse, the Anti-Doping Organization must establish that the Athlete knew the steroids were in the cabinet and that the Athlete intended to exercise control over the steroids.*

76

notification of any kind that the *Person* has committed an anti-doping rule violation, the *Person* has taken concrete action demonstrating that the *Person* no longer intends to have *Possession* and has renounced the *Person's* previous *Possession*.

**Prohibited List:** The List identifying the *Prohibited Substances* and *Prohibited Methods*.

**Prohibited Method:** Any method so described on the *Prohibited List*.

**Prohibited Substance:** Any substance so described on the *Prohibited List*.

**Provisional Hearing:** For purposes of Article 7.5, an expedited abbreviated hearing occurring prior to a hearing under Article 8 (Right to a Fair Hearing) that provides the *Athlete* with notice and an opportunity to be heard in either written or oral form.

**Provisional Suspension:** See Consequences above.

**Publicly Disclose or Publicly Report:** To disseminate or distribute information to the general public or persons beyond those persons entitled to earlier notification in accordance with Article 14.

**Registered Testing Pool:** The pool of top level *Athletes* established separately by each International Federation and National Anti-Doping Organization who are subject to both *In-Competition* and *Out-of-Competition Testing* as part of that International Federation's or Organization's test distribution plan.

**Sample Specimen:** Any biological material collected for the purposes of Doping Control.

*Registered Testing Pool Comment: Each International Federation shall clearly define the specific criteria for inclusion of Athletes in its Registered Testing Pool. For example, the*

*criteria could be a specified world ranking cut-off, a specified time standard, membership on a national team, etc.*

77

**Signatories:** Those entities signing the *Code* and agreeing to comply with the *Code*, including the International Olympic Committee, International Federations, International Paralympic Committee, *National Olympic Committees*, National Paralympic Committees, *Major Event Organizations*, *National Anti-Doping Organizations*, and *WADA*.

**Tampering:** Altering for an improper purpose or in an improper way; bringing improper influence to bear; interfering improperly to alter results or prevent normal procedures from occurring.

**Target Testing:** Selection of *Athletes* for *Testing* where specific *Athletes* or groups of *Athletes* are selected on a non-random basis for *Testing* at a specified time.

**Team Sport:** A sport in which the substitution of players is permitted during a *Competition*.

**Testing:** The parts of the *Doping Control* process involving test distribution planning, *Sample* collection, *Sample* handling, and *Sample* transport to the laboratory.

**Trafficking:** To sell, give, administer, transport, send, deliver or distribute a *Prohibited Substance* or *Prohibited Method* to an *Athlete* either directly or through one or more third parties, but excluding the sale or distribution (by medical personnel or by *Persons* other than an *Athlete's Support Personnel* of a *Prohibited Substance* for genuine and legal therapeutic purposes.

**Use:** The application, ingestion, injection or consumption by any means whatsoever of any *Prohibited Substance* or *Prohibited Method*.

**WADA:** The World Anti-Doping Agency.

# EXHIBIT 51



UNITED STATES DEPARTMENT of JUSTICE



THE UNITED STATES ATTORNEY'S OFFICE

CENTRAL DISTRICT of CALIFORNIA

SEARCH THE SITE

Search    SEARCH

HOME    ABOUT    NEWS    MEET THE U.S. ATTORNEY    DIVISIONS    PROGRAMS    CONTACT US

Home » News » Press Release

NEWS



Community Outreach

**Giving Back to the Community through a variety of venues & initatives.**

## U.S. Attorney Closes Investigation Of Professional Cycling Team

FOR IMMEDIATE RELEASE                                          February 3, 2012

*LOS ANGELES* – United States Attorney André Birotte Jr. today announced that his office is closing an investigation into allegations of federal criminal conduct by members and associates of a professional bicycle racing team owned in part by Lance Armstrong.

The United States Attorney determined that a public announcement concerning the closing of the investigation was warranted by numerous reports about the investigation in media outlets around the world.

Mr. Birotte commended the joint investigative efforts of his prosecutors and special agents with the U.S. Food and Drug Administration, the Federal Bureau of Investigation and the United States Postal Service - Office of the Inspector General.

Release No. 12-024

Return to Top



**VWA**
VICTIM WITNESS ASSISTANCE

Making sure that victims of federal crimes are treated with compassion, fairness and respect.

DOJ/Countrywide Settlement Information

Individuals who believe that they may have been victims of lending discrimination by Countrywide and have questions about the settlement may email the Department of Justice at countrywide.settlement@usdoj.gov .



CENTRAL DISTRICT of CALIFORNIA

1200 U.S. Courthouse, 312 North Spring Street - Los Angeles, CA 90012

| HOME | ABOUT | NEWS | MEET THE US ATTORNEY | DIVISIONS | PROGRAMS | CONTACT US |
|------|-------|------|----------------------|-----------|-----------|-----------|
| | The District | Press Releases | | Civil Division | Outreach | Telephone |
| | Employment | News Archive | | Criminal Division | Victim Witness | Mail |
| | | | | Tax Division | Countrywide | |
| | | | | Administrative Division | Settlement | |

JUSTICE.GOV/USAO

Accessibility          Justice.gov
FOIA                   USA.gov
Privacy Policy
Legal Policies & Disclaimers