**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| LANCE ARMSTRONG, <br><br>     *Plaintiff,* <br><br> *v.* <br><br> UNITED STATES ANTI-DOPING AGENCY and TRAVIS TYGART, In His Official Capacity as Chief Executive Officer of the United States Anti-Doping Agency, <br><br>     *Defendants.* | Civ. Action No. 1:12-cv-00606-SS |

## AFFIDAVIT OF RANA K. DERSHOWITZ

I, Rana K. Dershowitz, under penalty of perjury, declare and state:

1.      I am the General Counsel for the United States Olympic Committee ("USOC"). Prior to being named to my current position in March of 2008, I served the USOC in the positions of Interim General Counsel from May 2007 through March 2008 and Deputy General Counsel from April 2007 through May 2007.  I am also the Corporate Secretary for the USOC.

2.      The statements contained in this affidavit are based on personal knowledge or upon my review of the corporate and other records of the USOC.

3.      As part of my regular duties for the USOC, I serve as one of the USOC's primary contacts with the United States Anti-Doping Agency ("USADA"), and am familiar with the relevant USOC and USADA anti-doping documents.  As part of my regular duties for the

USOC, I am also familiar with actions taken by the USOC's Board of Directors, and am

generally advised of the actions of the Athlete's Advisory Council ("AAC") and the National

Governing Bodies Council ("NGB Council") with respect to USADA and anti-doping matters.

4.     The AAC is a body composed of, and selected by, amateur athletes in accordance

with the Ted Stevens Olympic and Amateur Sports Act ("Sports Act") and the USOC Bylaws.

The NGB Council is a body composed of representatives of each the National Governing

Bobody (NGB) of each Olympic and Pan American sport which is a member of the USOC.  Both

USA Cycling and USA Triathlon are recognized as NGBs by the USOC and have been since

prior to the creation of USADA.

5.     With respect to each policy or rule referred to herein and made an attachment to

this affidavit, I can confirm that according to the records of the USOC the policy or rule is a true

and accurate copy of the policy or rule in force at the time indicated.

6.     With respect to each set of minutes referred to in this affidavit, I can confirm that

it is a regularly conducted activity of the USOC Board, AAC and NGBC to hold meetings, that it

is the practice of the USOC Board, AAC and NGBC to keep minutes of their meetings, and that

it is standard practice that those minutes be prepared at or near the time of the meeting by

someone with knowledge of what occurred at the meeting, and for those minutes to be reviewed

and to be approved by the members of the body whose minutes they are.

7.     USADA was created in 2000 as an independent, nongovernmental anti-doping

agency for Olympic and Paralympic sports in the United States as the result of recommendations

made by the USOC Select Task Force on Externalization.  A copy of USOC Board Minutes

2

dated October 23-24, 1999, approving the attached Report of the USOC Select Task Force on Drug Externalization, is attached hereto as Exhibit A.

8.      As the National Olympic Committee (NOC) for the United States, the USOC is a signatory to the World Anti-Doping Code.

9.      Since 2000, USADA has entered into contracts with the USOC pursuant to which USADA was to execute a national anti-doping program encompassing testing, adjudication, education, and research, and to develop programs, policies, and procedures in these areas. The most recent contract between the USOC and USADA became effective on January 1, 2011 following authorization by the USOC Board of Directors. A copy of USOC Board Minutes dated December 16, 2010, approving the contract between USADA and the USOC is attached hereto as Exhibit B.

10.      In April of 2000, the USOC adopted a specific bylaw (Chapter XXIII, Section 2(G)) mandating that, as a condition of membership and recognition as an NGB, each NGB "comply with the procedures pertaining to drug testing and adjudication of related doping offenses of the independent anti-doping organization designated by the USOC to conduct drug testing." A copy of the relevant pages of the USOC's bylaws in effect in 2000 is attached hereto as Exhibit C. A variation of this requirement has continued in the USOC's bylaws through today, with the current USOC bylaws providing that "in order to fulfill its membership obligations and to be considered a member in good standing" each NGB shall "comply with the anti-doping policies of the corporation and with the policies and procedures of the independent anti-doping organization designated by the corporation to conduct drug testing and adjudicate anti-doping

3

rule violations…" A copy of Section 8.7 of the current USOC's bylaws is attached hereto as Exhibit D.

11.     The USOC has also adopted National Anti-Doping Policies, the most recent of which was adopted by the USOC Board of Directors on October 12, 2008 to be effective January 1, 2009. A copy of USOC Board Minutes dated October 12, 2008 is attached hereto as Exhibit E. As referenced in the USOC's minutes, the USOC worked with the AAC, the NGBC and USADA to ensure that all of those constituents were supportive of the proposed National Anti-Doping Policies prior to them being provided to the USOC Board. The current National Anti-Doping Policies of the USOC require that each NGB, including USA Cycling and USA Triathlon, "shall not have any anti-doping rule which is inconsistent with these Policies or the USADA Protocol, and NGB compliance with these Policies and the USADA Protocol shall be a condition of USOC funding and recognition." (A copy of the current version of the USOC's National Anti-Doping Policies is attached hereto as Exhibit F.) This provision was also contained in the preceding version of the USOC Anti-Doping Policies which became effective August 13, 2004, a copy of which is attached hereto as Exhibit G.

12.     The USOC's National Anti-Doping Policies also provide that every athlete member of an NGB, including USA Cycling and USA Triathlon, "by virtue of their membership in an NGB, license from a NGB, participation in an *Event* or *Competition* [as defined in the WADA Code] organized or sanctioned by an NGB, selection for a national team, receipt of benefits from an NGB or the USOC or by virtue of their inclusion in the USADA RTP… "agree[s] to be bound by the USOC National Anti-Doping Policies and the USADA Protocol." (See Exhibit F.) This language was likewise contained in the prior version of the USOC's policies. (See Exhibit G.)

4

13.    Since at least August 13, 2004, the USOC's National Anti-Doping Policies in Section 1 have adopted verbatim certain items from the World Anti-Doping Code into the USOC's National Anti-Doping Policies including the Definition of Doping (Article 1), Anti-Doping Rule Violations (Article 2), Proof of Doping (Article 3), and Sanctions on Individuals (Article 10) as set out in the Annex to the USOC's National Anti-Doping Policies.

14.    The USOC's National Anti-Doping Policies since 2004 have provided that the "requirements and consequences [therein] shall be in addition to those obligations imposed by the various IFs," referring to International Federations.  See Exhibit G (section 7) and Exhibit F (section 6).

15.    The AAA Supplementary Procedures are based upon the Commercial Arbitration Rules of the AAA as modified.  Under the Sports Act, the Commercial Arbitration Rules serve as the model for procedural rules to be used by arbitrators considering athletic eligibility disputes. The Sports Act provides that these rules may be modified if the AAC and NGBC concur.

16.    Pursuant to the Sports Act each NGB must agree to submit to binding arbitration any controversy involving--

**(B)** the opportunity of any amateur athlete, coach, trainer, manager, administrator or official to participate in amateur athletic competition, upon demand of the corporation or any aggrieved amateur athlete, coach, trainer, manager, administrator or official, conducted in accordance with the Commercial Rules of the American Arbitration Association, as modified and provided for in the corporation's constitution and bylaws, except that if the Athletes' Advisory Council and National Governing Bodies' Council do not concur on any modifications to such Rules, and if the corporation's executive committee is not able to facilitate such concurrence, the Commercial Rules of Arbitration shall apply unless at least two-thirds of the corporation's board of directors approves modifications to such Rules;

5

36 U.S.C.A. § 220522(a)(4)(B). For purposes of doping controversies, although the NGBs are not directly involved in the adjudication process, this basic structure has been followed.

17.     Arbitration is the preferred method of dispute resolution for both domestic and international athletic eligibility disputes in the Olympic Movement.

18.     The current AAA Supplementary Procedures were adopted in 2009 following discussions which occurred among representatives of the USOC, USADA, the AAC and the NGBC.

19.     The USOC maintains copies of the minutes kept at meetings of the AAC and the NGBC.  According to the records kept by the USOC, the NGBC approved the current AAA Supplementary Procedures at its March 18, 2009 telephonic meeting. A copy of the minutes of the March 18, 2009, telephonic meeting of the NGBC is attached hereto as Exhibit H. According to the records kept by the USOC, the AAC approved the current AAA Supplementary Procedures at its meeting on April 4-5, 2009 in Denver, Colorado. A copy of the minutes of the April 4-5, 2009, meeting of the AAC is attached hereto as Exhibit I.

20.     Following approval by the AAC and NGBC, the AAA Supplementary Procedures went into effect on May 1, 2009.

#224060 v1 csp

21.     As set forth above, through its Bylaws and Policies, the USOC requires that all US NGBs adhere to USADA's procedures (including the USADA Protocol and AAA Supplementary Procedures) for the adjudication of doping offenses by the NGB's members.

Dated this ___19___ day of ___July___, 2012.

_____

Rana K. Dershowitz

#224060 v1 csp

STATE OF COLORADO )
) ss.
COUNTY OF EL PASO )

Subscribed and sworn to before me by *Rama Dershowitz July 19th* on this _____ day of 2012.

Witness my hand and official seal.

My commission expires: *12-17-2012*    *Anita Langdon*
Notary Public

Address: *1700 Lincoln St.*
*Denver, Co 80203*

*[Notary seal: ANITA LANGDON NOTARY PUBLIC STATE OF COLORADO]*

My Commission Expires Dec. 17, 20*12*

8

#224060 v1 csp

# EXHIBIT A

# UNITED STATES OLYMPIC COMMITTEE

*United States Olympic Committee*
*Board of Directors Meeting*
*Colorado Springs, Colorado*
*October 23-24, 1999*

**1.   CALL TO ORDER**

President Hybl called the meeting to order at 8:00 a.m. on Saturday, October 23, 1999; the meeting adjourned at 1:00; reconvened at 4:45 and recessed at 6:15 p.m., reconvening on Sunday, October 24, 1999 at 8:00 a.m., adjourning at 11:35 a.m.

**2.   PRESENTATION OF COLORS**

The National Anthem was sung by Sam Samarzia-Bonham.

**3.   ROLL CALL**

Secretary Andy Kostanecki called the roll. A quorum was determined to be present. Attendees list attached. (Exhibit A)

**4.   MEMORIAL RESOLUTION**

Resolution 4.0 was moved, seconded and approved. (Exhibit B)

**5.   PRESENTATIONS**
    **5.1 BID COMMITTEE PRESENTATION**
Betsy Saye introduced the Bid Committee Task Force and the presenters from Raleigh-Durham, North Carolina and San Antonio, Texas. Both cities gave detailed bid presentations for the 2007 Pan American Games.

   **5.2 AWARDS**
President Hybl presented the Douglas MacArthur Award to John Krimsky. President's Awards were presented to: Rod Hernley, from the Sports for the Disabled; John Garnsey, USOC Committee member; Gayle Bodin Petty, formerly of the United States Olympic Committee's Media office; and DeeDee Corradini, the Mayor of Salt Lake City.

**6.   APPROVAL OF MINUTES**
   **6.1 APPROVAL OF APRIL 1999, NEW ORLEANS**
Secretary Andy Kostanecki moved approval of the April 10-11, 1999 Board of Directors minutes. Seconded and approved. Mr. Kostanecki moved for ratification of the August 29-30, 1999 Executive Committee minutes. Seconded and approved.

Dr. Kearney asked for approval of Item 10.5, moved by Paul DePace, seconded and approved. (Exhibit K)

### 10.6 TEAM AND STAFF SELECTION PROCEDURES FOR THE 2000 SUMMER OLYMPIC GAMES

Dr. Kearney requested approval of Item 10.6; moved by Paul DePace; seconded and approved. (Exhibit L)

### 10.7 SELECTION OF THE U.S. CANDIDATE CITY FOR THE 2007 PAN AMERICAN GAMES

San Antonio was selected by the body to be the Candidate City for the 2007 Pan American Games. President Hybl congratulated both cities on their excellent presentations.

### 10.8 DRUG EXTERNALIZATION

President Hybl introduced Frank Marshall and Baaron Pittenger, who gave a presentation on the work of the USOC Select Task Force on Drug Externalization. The recommendation is that an independent organization be created to conduct a comprehensive antidoping program in the United States on behalf of the USOC. Frank Marshall made a motion to accept the proposal. Seconded and approved. (Exhibit M)

## 11. SPECIAL REPORTS

### 11.1 U.S. OLYMPIC FOUNDATION REPORT

R. Thayer Tutt, Jr., reported that as of August 31, 1999, the U.S. Olympic Foundation investment portfolio totaled over $274 million; $58 million of this is managed for 34 USOC member organizations and $216 million is managed for the U.S. Olympic Foundation. The Foundation was established in 1985 and, through December of 1998, had an annualized return of 12 percent.

### 11.2 1999 PAN AMERICAN GAMES

Herman Frazier, Chef de Mission, thanked Assistant Chefs Dr. Evie Dennis and Sandy Knapp for their commitment and hard work. The Pan Am Games were held in Winnipeg, Canada from July 23 – August 8, 1999. We had 700 athletes in attendance and our total delegation was 1200-plus. We won 296 medals. Mr. Frazier thanked Greg Harney and Dr. Joe Kearney from Games Prep and Doug Ingram and Barbara Emener and their staffs for their excellent work. He also thanked the body for allowing him to serve as the Chef.

### 11.3 1999 SUMMER WORLD UNIVERSITY GAMES

Steve Saye reported that approximately 400 athletes participated in the Summer World University Games in Spain and we came home with 63 medals, 30 of them gold. Mr. Saye thanked all of the staff that supported the Games.

### 11.4 SALT LAKE CITY OLYMPIC ORGANIZING COMMITTEE

Mitt Romney gave a thorough, updated report on Salt Lake City, to include venues, accommodations, ceremonies, ticketing, broadcast and corporate sponsors. Mr. Romney also reported that there has been more money raised for Salt Lake City's Games in this

# UNITED STATES OLYMPIC COMMITTEE

**ITEM: 10.8**
**DATE: 10/8/99**
**PAGE: 1 of 10**

## RESOLUTION FOR BOARD OF DIRECTORS ACTION

### COLORADO SPRINGS, CO
### OCTOBER 23-24, 1999

**SUBMITTED BY:**

USOC SELECT TASK FORCE ON DRUG EXTERNALIZATION

**BACKGROUND INFORMATION:**

On June 15, 1999, President William J. Hybl created the USOC Select Task Force on Drug Externalization ("Task Force"). The Task Force investigated whether the USOC should externalize its anti-doping program and, if so, how that should be accomplished. The Task Force believes that a new system needs to be implemented that would enhance the credibility of U.S. efforts in the anti-doping area and that would resolve inherent problems in the existing USOC program. Accordingly, the Task Force is recommending the creation of an Independent Organization that will be responsible for conducting a comprehensive anti-doping program in the United States on behalf of the USOC. Attached is a report dated September 30, 1999 that sets forth the Task Force's findings.

**SPECIFIC ACTION REQUESTED:**

BE IT RESOLVED, that the USOC Board of Directors approves the creation, along the guidelines as set forth in the Report of the USOC Select Task Force on Drug Externalization, of an Independent Organization that will be responsible for conducting a comprehensive anti-doping program, including assumption of the current responsibilities of the USOC Drug Control Administration, in the United States on behalf of the USOC.

**BUDGETARY IMPACT STATEMENT:**

Year 2000 (March startup):     $1,196,000*
2001-2004 Quadrennium:        $3,005,000 per year

*No research for 2000 included in this impact.



# REPORT OF THE USOC SELECT TASK FORCE
## ON DRUG EXTERNALIZATION
### September 30, 1999

## I.    INTRODUCTION

United States Olympic Committee ("USOC") President William J. Hybl created the USOC Select Task Force on Drug Externalization ("Task Force") on June 15, 1999. The Task Force was directed to investigate whether the USOC should externalize its anti-doping program and, if so, to recommend how that should be accomplished.

The following individuals served as members on the Task Force: Frank Marshall, Task Force Chair, USOC Public Sector Board Member and Producer/Director, Kennedy Marshall Co.; Baaron Pittenger, Task Force Vice Chair, Chair, USOC Anti-Doping Committee; Brian Derwin, President, USA Weightlifting; James M. Betts, MD, Children's Hospital Oakland; Thomas H. Murray, Ph.D., President, The Hastings Center; Rachel Mayer Godino, USOC AAC Athlete Representative/Figure Skating; Mary McCagg, USOC AAC Representative/Rowing. Herman Frazier, USOC Vice President and Evie Dennis, Ph.D., USOC Special Assistant to the President served as liaisons to the USOC Executive Committee and the USOC President. Terry Madden, Chief of Staff to the USOC President, and Gary Johansen, USOC Associate General Counsel, served as USOC staff liaisons. The Task Force held three meetings and numerous telephone conference calls. The Task Force met with and reviewed information provided by USOC personnel, representatives of the two International Olympic Committee ("IOC") approved laboratories located in the United States, National Governing Bodies ("NGBs"), athletes and government representatives.

## II.    RECOMMENDATION

The Task Force recommends that an Independent Organization be created to conduct a comprehensive anti-doping program in the United States on behalf of the USOC.

The Task Force makes this recommendation based on a number of factors. Foremost is that externalization will alleviate the perception, inherent in any system of self-regulation, that the USOC and NGBs are not doing everything within their power to eliminate doping by U.S. athletes. The creation of an organization that is independent from the USOC and NGBs will enhance international credibility of US anti-doping efforts. Additionally, a new organization can start fresh without the burden of defending current practices and can expand and improve upon the programs for anti-doping that currently exist. Further, the current system that calls for NGBs to prosecute doping related infractions depletes their administrative and financial resources and creates an inherent conflict between the NGBs and their athletes. Finally, as a result of the different procedures and practices of the NGBs and their International Federations ("IFs"), there is disparate treatment of athletes in doping-related cases.



This new organization shall have the authority and obligation to:

1) develop a national anti-doping program in the United States relating to U.S. participation in the Olympic, Pan American and Paralympic Games;

2) test for the prohibited use of performance enhancing drugs by U.S. athletes who meet the eligibility standards for participation in the Olympic, Pan American and Paralympic Games, World championships, other international competitions and development programs related to these events;

3) interface with the USOC, NGBs, Paralympic Sports Organizations ("PSOs"), the IOC, the Pan American Sport Organization ("PASO"), the International Paralympic Committee ("IPC"), World Anti-Doping Agency ("WADA"), U.S. sport organizations, public and governmental organizations, private entities and athletes;

4) manage research in the area of doping, doping methods and testing procedures and methods;

5) develop ethical principles in the area of drug use, doping methods and testing procedures;

6) compile and provide a list of prohibited substances and doping methods to U.S. athletes consistent with the IOC, IPC, IF, and WADA prohibited lists;

7) develop and promote informational education programs designed to inform U.S. athletes about the rules governing use of performance enhancing drugs, the ethics of such use and the ill effects such drugs could have on their health;

8) develop and provide for a fair, timely and impartial adjudication system that will hear cases of alleged doping;

9) impart and communicate sanctions when improper use of performance enhancing drug use is found to exist; and

10) enter into bilateral and multilateral agreements with other anti-doping agencies.

## III.   DISCUSSION REGARDING STRUCTURE AND OPERATION OF NEW INDEPENDENT ORGANIZATION



The Task Force considered a number of important issues relating to the creation of an Independent Organization to conduct a U.S. anti-doping program. Some are defined more specifically than others in this report. All will require further deliberation and input by individuals and organizations that will be affected by the externalization process. As the process proceeds, other issues may arise and should be addressed. However, the purpose of this report is to set forth the guiding principles that the Task Force recommends the USOC, the NGBs and the new Independent Organization follow.

Since the Task Force determined that the central focus of its recommendation is the creation of an Independent Organization, this report will first discuss a proposed structure for the new entity. Following that is a discussion of issues relating to adjudication of doping infractions, doping-related research, education, rehabilitation, collection and testing of samples and financial requirements. Finally, the report discusses a transition phase from the current USOC anti-doping program to the new Independent Organization.





## A. Governance Structure for Independent Organization.

The Task Force recommends that the Independent Organization incorporate as a non-profit non-member corporation. As part of its organizational structure and management, the Task Force proposes that the Independent Organization take the following form:

1. The Independent Organization's Board of Directors shall be comprised of nine individuals. The composition of the Board shall consist of two athlete members elected by the USOC Athletes' Advisory Council, two NGB members elected by the USOC NGB Council, and five public sector members. Initially, the five public sector members of the Independent Organization shall be appointed by the six public sector members of the USOC Board of Directors. The USOC public sector members will be ineligible to serve on the initial Board of the Independent Organization. Thereafter, the Board will appoint new public sector members.

2. Terms for Board members shall be staggered and run for three years. So as to produce staggered terms, the terms of the initial Board members will expire as follows:
   a) After the third year of service, one athlete member, one NGB member, and one public sector member.
   b) After the fourth year of service, three public sector members.
   c) After the fifth year of service, one athlete member, one NGB member, and one public sector member.

3. No Board member may serve for more than two consecutive terms. In order to assure participation by the best possible individuals, each Board member shall be compensated for each meeting attended, however, a member's total compensation shall not exceed $10,000.00 per year.

4. The Officers of the Board shall consist of a Chair, Vice-Chair, Secretary and Treasurer, which shall be elected by the Board.

5. The Chair shall convene the meetings. The Chair is bound to convene a meeting at the written request of at least three Board members. All Board meetings shall be open to the public, unless the Board votes to meet in executive session for consideration of matters pertaining to personnel and litigation. Except for adopting or amending its articles of incorporation or bylaws, which shall require a two-thirds vote, all other decisions of the Board shall be by majority vote.

6. The USOC shall provide an initial capital contribution to the new Independent Organization of $6 million for each of the first four years. The Independent Organization shall also solicit and obtain from any private or public source additional funding, including possible continued support from the USOC, to sustain its duties and obligations.



## B. Adjudication.

The Task Force found that for a variety of reasons, NGBs no longer want to be involved in holding hearings and prosecuting athletes for doping related cases. The process is often cumbersome, time consuming, expensive and results in multiple hearings before a variety of tribunals. Furthermore, the NGBs are put in an adversarial role against their athletes.



The focus of the Task Force was to develop an efficient, fair, and effective adjudication system. The Task Force used the current Australian system, which provides for one initial hearing with an appeal to the Court of Arbitration in Sport ("CAS"), as a model. Pursuant to the Ted Stevens Olympic and Amateur Sports Act, initial hearings in the U.S. are to be conducted pursuant to the rules of the American Arbitration Association ("AAA"). However, the Task Force felt that in order to gain international recognition of our hearing procedures, CAS must be made a part of the process. Thus, the Task Force proposes that the AAA, in conjunction with CAS, develop an administrative system for handling all U.S. doping cases, including appeals to CAS. Initial discussions with both organizations indicate that they are willing to join in this endeavor.

Further, the Task Force recommends that NGBs no longer prosecute doping infraction cases. Instead, the obligation to prosecute doping infraction cases will be placed entirely on the Independent Organization. It is hoped that this new system will gain the confidence of the IFs and will therefore eliminate additional hearings by an IF following the initial U.S. hearing. IFs should be encouraged to be participants at the initial hearing stage.

The adjudication system that the Task Force recommends shall encompass the following:



1. The Independent Organization shall notify the athlete of an adverse finding or a presumed positive of the A sample. Notification should include the name(s) and quantity of the detected substance(s). The athlete or his/her representative will have the opportunity to attend the analysis of the B sample.
2. In cases of an adverse finding, e.g., elevated Testosterone/Epitestosterone ("T/E") ratio, the Independent Organization shall conduct any further investigation and make a determination confirming the test.
3. The Independent Organization shall commence a doping related infraction case upon any one of the following circumstances: a confirmed adverse finding or presumed positive (B confirmation of the A sample), an athlete's refusal or failure to comply with a doping control test, a written admission of a doping infraction, or a request for a determination based upon evidence of a doping infraction made by a recognized sport organization (such as a national or international sport governing body, a major sports organization or the national anti-doping organization of another country). Upon commencement of a case, the Independent Organization shall immediately notify the athlete of the particulars of the infraction by certified letter, overnight delivery service with a signed receipt or by personal service.
4. Upon commencement of a case, the Independent Organization shall convene a panel of three impartial individuals (the "Review Panel") to review evidence of a doping related infraction and to make a determination as to whether there is probable cause for a finding of a doping related infraction. This review shall be done in the strictest "confidence." The Independent Organization shall develop and maintain a list of impartial individuals who are expert in the field of drug testing, sport science, medicine, legal matters and ethics who shall be available to serve on the Review Panel. The Review Panel shall be paid on a per case basis.



5. The standard documentation package shall be furnished to the Review Panel for its review. This information shall also be furnished to the athlete. The Review Panel may request additional material if it determines that such material would be helpful to it in its deliberations. The athlete may submit a written statement to the Review Panel, but shall have no right to otherwise appear before or participate in the Review Panel's deliberations.

6. The Review Panel shall either find probable cause that a doping related infraction has occurred or that the case be closed and no further action taken. All decisions of the Review Panel shall be by majority vote. The Review Panel shall inform the Independent Organization and the athlete of its decision in writing. This finding shall not be admitted into evidence in any subsequent hearing.

7. Upon a finding of probable cause, the athlete may either admit the doping infraction or deny the doping infraction. If the doping infraction is admitted, the Independent Organization will forward the admission, including the sanction to be imposed, to the USOC, and to the appropriate NGB and IF for action.

8. If the doping infraction is denied, the matter shall be set for a hearing. A standard documentation package compiled by the testing laboratory shall immediately be forwarded to all participating parties.

9. The Independent Organization shall prosecute all doping infraction cases.

10. The AAA, in conjunction with and as the local arm of CAS, shall be responsible for the administration of doping infraction hearings in the United States. The AAA and CAS shall develop a process for the administration of doping infraction cases that satisfies both organizations. The AAA and CAS shall establish a pool of arbitrators that is approved by both organizations. The AAA/CAS shall be responsible for setting hearing dates and locations. The AAA/CAS shall make provisions for having an expedited hearing process.

11. Three arbitrators (the "Hearing Panel") shall be empaneled to hear each case. Selection of the arbitrators shall be conducted in such a way so as to provide for agreement of the parties on the arbitrators or for the opportunity to strike arbitrators. The Hearing Panel shall decide all issues relating to discovery, motions and other procedural matters. The Hearing Panel may, on its own initiative, appoint a scientific expert as a "friend of the court."

12. In all cases, the USOC and the NGB shall be bound by the determination of the hearing panel.

13. The appropriate IF shall be notified of the hearing. The IF shall be invited to participate in the hearing. The IF can appear, but take no part, appear on behalf of the athlete or appear on behalf of the Independent Organization. If the IF chooses to appear, it shall be bound by the determination of the Hearing Panel.

14. An individual accused of a doping infraction shall be afforded due process rights commonly provided under U.S. law. The burden and standard of proof shall be determined by the Hearing Panel upon consideration of the particulars of the case. All decisions of the Hearing Panel shall be by majority vote.

15. If the Hearing Panel finds a doping infraction, it will then consider the penalty to be imposed, taking into consideration the rules of the appropriate NGB and IF. The Hearing Panel will forward its decision, including the sanction to be imposed, to the USOC and to the appropriate NGB and IF for action.



16. The decision of the Hearing Panel shall be communicated to all parties in writing.

17. Any party to the hearing may appeal the Hearing Panel's decision to CAS, which shall then hear the case *de novo* and pursuant to its procedures (a CAS appeal arbitration proceeding).

## C. Research

The Task Force concludes that research is the cornerstone of an effective anti-doping program. Research to create tests for substances such as Erythropoietin ("EPO") and Human Growth Hormone ("HGH"), and research to better support adverse findings related to elevated T/E ratios is especially critical as the 2000 Olympic Games in Sydney approach. However, an effective anti-doping research program should extend beyond these focused projects.

The Task Force recommends the following with respect to anti-doping research:

1. Of the $6 million that the USOC is providing to the Independent Organization annually over the next four years, $2 million per year shall be earmarked for research in the following areas: applied research and basic research. Some research would be investigator-initiated and some would be commissioned.

2. It is estimated that at least $5 million per year is necessary to conduct a highly effective anti-doping research program.[1] Therefore, the Independent Organization, in cooperation with the USOC, shall pursue federal and sponsorship funding to conduct additional research.

3. The Independent Organization shall create a highly qualified expert research review panel to direct and manage research.

4. A portion of the research moneys shall be directed to the IOC accredited labs located in the U.S.

## D. Education



An increasingly effective anti-doping program must be coupled with an effective education program. For example, athletes must be fully informed about the risk of taking over-the-counter medications and/or supplements that may contain banned substances. Current education programs will likely need to be expanded to be more fully effective. To ensure that proper information is distributed, communication and coordination between the Independent Organization and the USOC will be essential.

1. The Independent Organization shall be responsible for gathering, producing and distributing technical information necessary to NGBs and athletes at the elite level with respect to the IOC Medical Code, the list of prohibited substances, information on testing procedures, crew chief training, and other such pertinent information.

---

[1] This estimate is based on information gathered from the USOC Drug Control Administration and the two IOC accredited laboratories located in the U.S., both of which conduct research programs.



2.  The USOC shall maintain a broadened, value-based Drug Education program aimed at elementary, junior high, and high school age groups, incorporated as a part of the USOC's general education program. This educational effort would include general information on the dangers of drug use for performance enhancement, but would have a strong ethical message emphasizing fair play and sportsmanship consistent with the ideals of the Olympic Movement.

3.  The USOC shall formally request that the IOC send information and updates to both the Independent Organization and the USOC. The NGBs shall formally request that their respective IFs send information and updates to the Independent Organization. The Independent Organization shall promptly forward copies to the NGBs.

4.  The Independent Organization shall operate the drug reference line and ensure, by providing ample resources, that the information provided by the drug reference line is accurate 100 per cent of the time.

## E. Rehabilitation

The Independent Organization and the USOC must never lose sight of the possibility that an individual athlete may fall victim to the temptation of doping or drug use. The Independent Organization, in cooperation with the USOC, must make athletes aware of resources that can assist them in dealing with the short and long term ill effects of doping or in overcoming any drug dependence.



## F. Collection and Testing

Collection and testing is at the heart of any anti-doping effort. Currently, the USOC program has developed detailed procedures and trained a number of individuals to handle the collection process. Two laboratories in the U.S. are currently certified by the IOC to conduct doping tests.

The Task Force recommends the following with respect to collection and testing:

1.  The USOC shall have an oversight role to ensure that NGBs are working with the Independent Organization to carry out an effective anti-doping program including significant increases in no-advanced notice ("NAN") testing. The Independent Organization shall conduct the NAN testing program and the in-competition testing program, some of which shall be random.

2.  The collection process shall be carried out in accordance with the International Anti-Doping Agreement ("IADA") Quality project standards and shall remain International Standard Organization ("ISO") 9002 certified.

3.  Recognizing that most trained crew chiefs currently carry out their job effectively, the Independent Organization shall utilize this resource to the fullest extent possible.

4.  The USOC shall amend its Constitution and Bylaws to require, as a condition of membership, that each NGB shall enter into a standardized agreement with the Independent Organization within 90 days of the establishment of the Independent Organization. Exceptions to the standard agreement shall only be allowed if it is in conflict with the affected IF protocol or if a professional players association is



involved. In addition to the standard language, the agreement shall identify the events and athletes to be tested (testing matrix) pursuant to a negotiated agreement between the USOC and each NGB. Until such time as new agreements are in place, existing agreements will be observed, and the Independent Organization shall carry out tests in accordance with the existing program.

5. The Independent Organization shall have discretion to conduct a certain number of tests in addition to those agreed upon by the USOC and each NGB.

6. Upon entering athletes into the NAN pool, it shall be the responsibility of each NGB to submit the initial contact information for those athletes to the Independent Organization. Thereafter, it will be the responsibility of the athlete to update the Independent Organization on changes of address and phone numbers and travel schedules. The Independent Organization shall maintain updated information for each athlete in the NAN pool.

7. The Independent Organization shall maintain IF and USOC medical waiver forms. With the athlete's consent, the medical waiver shall be copied to the NGB and the IF.

## G. Finance

Currently, the USOC spends $3.05 million per year on the anti-doping program. The task force estimates that the initial annual budget for the Independent Organization will be at least $6 million per year (an increase of approximately $3 million per year). The budget should include but not be limited to the following: research and development (estimated at $2 million per year), collection and testing (estimated at $2.4 million for 6,000-8,000 tests per year), salaries, legal and consulting fees, Board compensation, liability insurance, and overhead. The vast majority of these funds will initially come from the USOC. However, the task force recommends that the Independent Organization, in cooperation with the USOC, actively pursue funding from sponsors and other sources.

## IV.   TRANSITION

The Task Force acknowledges that a seamless transition from the existing program to an externalized program is necessary to ensure an effective anti-doping program leading up to the 2000 Olympic Games. Because of the extreme time constraints, the Task Force recognizes that it may be desirable to maintain the current collection system through the 2000 Olympic Games.

The Task Force recommends the following:

1. The USOC shall provide financial incentives to retain the current staff of Drug Control Administration to facilitate a transition.

2. To the degree possible, the strong points of the current Drug Control Administration program shall be incorporated into the Independent Organization.

3. The current Drug Control Administration program shall provide the Independent Organization with any information needed by the Independent Organization to carry out its responsibilities.



4. The USOC shall have an active oversight role to ensure that NGBs are working with the Independent Organization to carry out an effective anti-doping program. This oversight role will be formally implemented through review of the High Performance Plans ("HPPs"). At the first HPP review after December 31, 2000, all NGBs should amend their HPPs to include: a) an anti-doping education program, and b) a statement that they will continue to test the appropriate athletes and events through their agreement with the Independent Organization.

5. The USOC shall have the responsibility of reviewing the anti-doping aspects of the HPPs for each NGB.

6. The USOC shall retain the following responsibilities: work with the Independent Organization in establishing an anti-doping policy, maintaining and updating an anti-doping protocol, and creating an education Program for non-elite athletes.

7. The USOC shall have the ability to make recommendations to the Independent Organization and shall coordinate and communicate with the Independent Organization.

8. The Independent Organization shall increase the level of communication with IOC accredited labs to facilitate research and improve collection and testing.

## V.    CONCLUSION

Drugs in sport is one of the greatest problems affecting the Olympic Movement today. The Task Force, after reviewing the current USOC anti-doping efforts, believes that a new system needs to be implemented, which would enhance the credibility of U.S. efforts and resolve inherent problems in existing programs. The Task Force recommends that an Independent Organization be created that would be responsible for conducting a comprehensive anti-doping program in the United States on behalf of the USOC.

# EXHIBIT B

Minutes

**Board of Directors Meeting**
**December 16, 2010**
**Redwood City, CA**
**8:00 am – 3:00 pm PST**

A meeting of the Board of Directors (the "Board") of the United States Olympic Committee ("USOC") occurred on December 16, 2010, commencing at 8:00 a.m. local time, pursuant to notice duly given pursuant to the USOC Bylaws. The Chair called the meeting to order at approximately 8:00 a.m. The following members of the Board were present in person at the meeting's commencement: Larry Probst (Chair), Scott Blackmun (CEO), Bob Bowlsby, Ursula Burns, John Hendricks, Jair Lynch, Mary McCagg, and Mike Plant. Anita DeFrantz joined the meeting shortly after it commenced. Angela Ruggiero joined the meeting by teleconference at approximately 1:00 p.m. Jim Easton did not attend. The above present members constitute a quorum of the Board under the USOC Bylaws Section 3.15.

Present for the meeting from USOC management were: Norman Bellingham, Rana Dershowitz, Walt Glover, Lisa Baird, Alan Ashley, Rick Adams, Patrick Sandusky and Michelle Stuart.

The minutes were recorded by Rana Dershowitz, Secretary.

**1.      Call to Order and Welcome**

The Chair called the meeting to order and welcomed the Board.

**2.      YTD Financial Results**

The Chair requested that Walt Glover, Chief Financial Officer, report on the USOC's financial results, which he did by providing a report on the USOC's financial results as of November 30, 2010 and a report on projected year end results. Mr. Glover advised the Board that the USOC continues to operate favorably to budget with regard to revenue. Expenses are also currently favorable, but this is expected to normalize by year end.

Mr. Glover then explained to the Board some of the details of the USOC's financial results, including how certain items, such as Paralympic funding and the USOC's headquarters deal, are being booked. Mr. Glover also explained to the Board the reasons behind certain variances shown in the USOC's projections (positive and negative). Mr. Glover finally provided the Board with a summary of the USOC's financial results compared to the organization's performance screen goals. Mr. Glover also updated the Board on the USOC's cash flow projections and headcount. A

discussion occurred regarding headcount in the Paralympic division and then the USOC's financial results generally.

### 3.   Marketing Update

Lisa Baird, Chief Marketing Officer, updated the Board on several aspects of the USOC's marketing efforts.

#### a.  Current Status

Ms. Baird first reported to the Board on the USOC's current sponsorship and marketing efforts. She noted that the USOC has had a good year from a sponsor perspective, with four new domestic signings. A discussion occurred regarding the USOC's retail partner and licensed merchandise plans.

#### b.  2013-2016 Marketing Plan

Ms. Baird then walked the Board through the USOC's 2013-2016 marketing plan. She started by comparing the USOC's current marketing situation to the situation at the beginning of the 2009-2012 quadrennium. Since 2009 the USOC has sixteen new sponsor and licensee signings. Ms. Baird advised the Board regarding her expectations for the remainder of the 2009-2012 quad. She then explained to the Board her strategy regarding future sponsor sales. A discussion occurred regarding the involvement of NBC in the USOC's sponsor sales efforts.

Ms. Baird explained that one key for the USOC will be to have a more disciplined approach to its trademarks model, including incorporating a new brand architecture, which Ms. Baird presented to the Board. In addition, the USOC will need to invest in a platform that will allow it to deliver against specific fan segments. The USOC will need to critically assess the terms of the deals it signs. Finally, the USOC will look to include NGB rights and events in USOC deals where appropriate and beneficial for all involved.

Ms. Baird discussed with the Board the valuation of USOC domestic and TOP deals as well as her projections regarding the upside opportunity potentially available to the USOC. She also explained the challenges facing the USOC to reach this potential. As part of this discussion, the Board discussed the USOC's open categories, as well as its status on renewals of both domestic and TOP deals. Ms. Baird next discussed with the Board the nature of USOC fans as social influencers. A discussion then occurred regarding use of the USOC's marks to build an appropriate media platform.

#### c.  Digital Media Strategy

Ms. Baird discussed with the Board the USOC's current digital media presence and walked the Board through the organization's digital media options going forward. She explained the challenges facing the USOC in this area, including the complex rights landscape in which the USOC operates. Key will be the development of compelling

content for the right platforms. A discussion occurred regarding the resources that would need to be allocated to the digital media strategy.

### d. USOC - NGB Marketing Relations

Finally, Ms. Baird reminded the Board that in 2009 an ACES survey showed a high level of dissatisfaction with USOC Marketing and in order to address this, in March 2010 the USOC had begun working with representatives of the NGBs to come up with a plan to work more effectively with the NGBs around marketing initiatives. Ms. Baird explained to the Board that the group approached the issues through a structured, transparent process. It was recognized that although the goal of building sustainable revenue models for all NGBs is the same, the way to achieve this varies by NGB. Ideally, the USOC will create a basic, but adaptable, marketing charter, acceptable to NGBs that can then be used to measure progress on an annual basis. Ms. Baird also advised the Board that the USOC will be working with NGBs to enhance athlete and agent education, particularly around Rule 41 issues, to help address some of the athlete marketing issues that arise.

### 4.   High Performance Funding Discussion

### a. Funding Philosophy

Norman Bellingham, Chief Operating Officer and Alan Ashley, Chief of Sport Performance, reported to the Board on the USOC's strategy regarding high performance funding. They walked the Board through the USOC's efforts, plans and goals regarding high performance funding, as well as how this had been undertaken historically.

Mr. Bellingham and Mr. Ashley then explained to the Board the more structured approach that they had begun to employ. Under the new approach, the USOC identified sports as "Foundation", "Medal Opportunity" or "Development" sports. Mr. Ashley explained to the Board the differences between these different categories. He also spoke to the Board about some of the challenges facing certain NGBs. Mr. Bellingham then explained to the Board that the USOC had worked with Deloitte over the summer to undertake a data driven analysis of how effective the USOC's resource allocation process is, how beneficial the sport services the USOC provides are, and how valuable OTC usage really is. Mr. Bellingham explained to the Board the initial hypotheses used, as well as the results obtained. Generally, it was recognized that the USOC's efforts were not being tracked based upon objective, calculable metrics.

The reorganization of the Sport department was undertaken as a partial response to Deloitte's findings, with the new structure allowing for greater focus on developing metrics and accountability. A discussion occurred among the Board regarding how athletes choose where to train, how expenses should be allocated and potential funding models that might be employed.

The discussion then turned to the resource allocation process. Following discussion, the Board suggested that the matter should be reexamined in March once the new Board

members are in place. In addition, the Board will also examine the USOC's philosophy of funding more broadly, including whether the USOC's current approach to non-Olympic sports results in optimal use of resources.

The discussion then turned to the USOC's facilities and an examination of whether the USOC's current investment of resources in facilities is optimal. Mr. Ashley noted that the USOC must adopt a transparent and objective decision-making process to better understand the strengths and weaknesses of the USOC facilities and services in the sports area. This will be done in partnership with the NGB Business Development division.

### 5.   CEO Report

#### a.   Safe Sport Environment Implementation Plan

Scott Blackmun asked Mr. Ashley to update the Board on the USOC's plans to implement the recommendations of the Working Group on Safe Training Environments. Mr. Ashley advised the Board that, subject to Board authorization of the necessary resources as part of the 2011 budget, the USOC intends to take a leadership role in this area for the US Olympic Movement.

The USOC would like, subject to Board approval, to hire an individual to spend half of his/her time as the USOC's Ethics Officer and half of his/her time in a new role as the USOC's Safe Sport Officer. With regard to the Safe Sport Officer function, this individual would partner with the Sport Performance group to create a safe environment for athletes as well as work to ensure that the USOC is operating at the highest levels internally in this space, with up to date codes of conduct and frequent training. The Safe Sport Officer would be charged with working with other organizations to create and disseminate a set of training curriculum that could be used by NGBs, coaches, parents and athletes. The curriculum would be available on line, and the USOC's goal will be to ensure that this curriculum squares with the work of organizations like the NCAA and APHERT to enhance the overall culture of sport. The USOC's focus will be on leadership, education, resources and making services available. In order to make this happen the USOC has built a specific line item in the 2011 budget, which will be reviewed by the Board later in the meeting.

#### b.   IOC and International Relations Update

Mr. Blackmun updated the Board regarding ongoing discussions with the IOC as well as the USOC's implementation of the International Relations strategy.

#### c.   OTC Capital projects

Mr. Blackmun next provided the Board with a presentation laying out a possible way to reinvigorate and enhance the Visitor's Center at the Colorado Springs OTC. By enhancing the Visitor's Center and turning it into a multimedia experience focusing on inspiring excellence, telling the stories of the athletes, explaining the history of the

Olympic Movement and allowing visitors to experience aspects of the sports science behind the work at the OTC, the USOC might be able to expand the number of visitors and more effectively convey its message to the American public. However, to go this route would take significant resources. A discussion then occurred regarding the concept, the costs, the benefits and the challenges with adopting this approach.

Following the discussion, the Board requested that staff run the concept through a more in-depth critical assessment and bring the results back to the Board. The Board directed that the assessment include at least the following analysis of the concept: 1) Is it strategic; 2) Does it support the Mission; 3) Does the USOC have the necessary expertise to make it work; and 4) Is it affordable given the USOC's existing resources.

### d. NGB Organizational Development Update

Mr. Blackmun then introduced Rick Adams, Director of NGB Organizational Development, to the Board and asked Mr. Adams to share with the Board the work he has been doing. Mr. Adams advised the Board of his background and the perspective he brings to the work he is doing. He explained to the Board that his goal is to work with the NGBs to drive self-sufficiency. He intends to undertake a targeted approach focusing on a small subset of NGBs in need of support. With regard to shared services, Mr. Adams will be focusing on areas where functions and processes may be consolidated across NGBs. Under his direction, the USOC will work to provide customized deliverables for different NGBs, with detailed staff and Board level engagement by Mr. Adams directly.

### e. Diversity and Inclusion Proposal

Mr. Adams next advised the Board regarding work he has been involved in relating to diversity. The USOC intends to create a Diversity Task Force including USOC representatives, NGB representatives, AAC representatives and independent experts. The purpose will be to help NGBs to recruit and retain high performing, diverse talent. Mr. Adams explained that ideally this will also result in a new means for NGBs to grow their businesses by expanding their athlete and membership pipelines and introducing them into new markets.

### f. USADA Agreement

Mr. Blackmun requested that Rana Dershowitz, General Counsel, explain to the Board the proposed new contract between the USOC and the US Anti-Doping Agency. Ms. Dershowitz did so, advising the Board of the basic terms being proposed, the economics of the Agreement and history of the USOC's relationship with USADA. A discussion then occurred regarding the Agreement, the work of USADA and the USOC's relationship with USADA going forward. Following the discussion a motion was made to authorize the new Agreement with USADA. The motion passed unanimously.

### g. Olympic and Paralympic Assembly

Mr. Blackmun reported to the Board on the feedback received regarding the restructured Olympic Assembly.  He advised the Board that all of the feedback received was very good.  He further informed the Board that he had put a Committee in place to develop the 2011 Olympic and Paralympic Assembly, and the Committee would again be led by Carol Brown, the former Board liaison.

### 6.     Strategic Plan

The Board then turned to a discussion of the proposed Strategic Plan for 2011.  Mr. Blackmun began the discussion by inquiring whether the Board remained comfortable with the USOC's current mission statement.  The Board confirmed that it did not want to revise the mission statement at this time.

Mr. Blackmun advised the Board that the proposed 2011 Strategic Plan had been built off of the 2010 Strategic Plan previously approved by the Board.  The pillars remain the same, but the strategic assessments have been updated, some of the strategies refined, and the tactics tailored for the next year.

Mr. Blackmun walked the Board through the proposed Plan and a discussion ensued.  As a part of the discussion the Board requested a minor rewording of the 2024 vision contained in the Plan, and requested the inclusion of one additional strategy.

A further discussion then occurred regarding how best to engage the Board in the ongoing development of the Strategic Plan.  The suggestion was made to set up informal conversations between individual Board members and individuals on staff relating to particular strategies about which the Board member might have insight or a specific perspective.  The Board asked Mr. Blackmun to ensure that the foundational elements of the Strategic Plan are communicated to the Councils in the first quarter of 2011.

### 7.     2011 Budget

Mr. Glover presented the Board with the USOC's proposed 2011 Budget.  The Budget was created based upon the proposed 2011 Strategic Plan, utilizing the same guiding principles as were used in 2010.  Those guiding principles include: not damaging athlete performance; only relying on contractually committed funds; only spending amounts already in hand; and budgeting so that the USOC will not need a line of credit at any point during the quad.

Mr. Glover further expanded upon the financial picture he had presented to the Board at the beginning of the Board meeting, and explained to the Board how the picture has changed since 2009, both with regard to revenue and with regard to expenses.  Mr. Glover explained that if the Board approved the 2011 budget as presented, and if everything played out as forecast, the USOC would generate a modest surplus in the 2009-2012 quad.  Mr. Glover advised the Board of the existing risks identified by the USOC that might affect the USOC's ability to end the quad as projected.  A board

member then inquired about certain athlete and NGB funding changes in 2011, which Mr. Ashley explained.

A motion was made to approve the 2011 budget and the 2011 Strategic Plan. The motion passed unanimously.

At approximately 12:15 the Board adjourned for lunch.

The Board reconvened at 1:00 pm in Executive Session, with Ms. Dershowitz present from USOC management. Ms. Ruggiero joined the meeting at is time by teleconference.

## 8.   Nominating and Governance Committee Report

Jair Lynch, Chair of the Nominating and Governance Committee, provided the Board with a report on the Committee's activities. Mr. Lynch reminded the Board of the current membership of the Committee, noting that the terms of several members of the Committee will expire at the end of the year. Mr. Lynch explained that the primary focus of the Committee for the last several months has been to find, vet and recommend new members for the Board following the new process laid out in the Bylaws approved at the September Board meeting.

The Committee met at the September Assembly and established written criteria for Board candidates, which had previously been discussed with the Board. Notice that the USOC was seeking new Board members was posted on October 1, with independent nominations due November 1 and nominations from the AAC and NGBC due December 1. The Committee worked electronically and telephonically to review and vet the independent nominees received. The Committee then met in person over two days to interview a final subset of the independent nominees, as well as all of the candidates submitted by the AAC and NGBC. Following the interview process, the Nominating Committee made its recommendations to the Board, with its written recommendations contained in the Board book and posted publicly.

Mr. Lynch expressed his appreciation for the work the Committee had undertaken, and noted that the Committee was extremely pleased and impressed with the quality of the candidates received. Mr. Hendricks, also a member of the Committee, confirmed how enthusiastic the entire Committee had been about the candidates received.

Mr. Lynch then provided the Board with further information regarding each of the candidates that the Committee was recommending to the Board, noting specifically, together with Mr. Hendricks, that the Committee was particularly enthusiastic about the Paralympic and disabled sport perspectives that could be brought to the Board by Jim Benson, Dave Ogrean and Nina Kemppel. Mr. Lynch then asked whether any Board members had any questions regarding the candidates or the process. A discussion occurred regarding the need to make the recommended slate public in advance of the Board's decision and the Board expressed its concern that following this course could create uncomfortable or inappropriate dynamics.

Following its discussion, the Board then voted on each of the candidates recommended by the Nominating and Governance Committee: Ms. Nina Kemppel (AAC representative), Mr. Dave Ogrean (NGB representative), Mr. Jim Benson (independent), Ms. Susanne Lyons (independent) and Mr. Robbie Bach (independent, recommended to replace the seat vacated when Ms. Stephanie Streeter resigned from the Board). With regard to each candidate, the Board confirmed the recommendation of the Committee and voted unanimously to elect the recommended candidate. Mr. Probst confirmed that he would call each new Board member to offer congratulations and welcome them to the Board.

Finally, Mr. Lynch advised the Board that the AAC, NGBC and MSOC would need to name new representatives to the Nominating and Governance Committee for 2011, and that the next focus of the NGC would be to find two new members for the Ethics Committee. Absent a Board member resignation, the NGC will not need to undertake a search for new Board members again until 2012.

### 9.    Audit Committee Report

Ms. Ursula Burns, Chair of the Audit Committee, reported to the Board on the activities of the Committee, which had met earlier that morning. Ms. Burns advised the Board that the Committee had walked through the financial report which the Board heard from Mr. Glover, received a litigation report from the General Counsel, and reviewed the audits undertaken by the USOC's internal auditors. The Committee also met in executive session, during which they noted that the USOC should continue to be careful with its expenses and headcount given the current state of the global economy.

The Board then discussed the fact that the new Board members will need to be given Committee assignments and Chairman Probst committed to handling this.

### 10.    Compensation Committee Report

Mr. Bob Bowlsby, Chair of the Compensation Committee, reported to the Board on the activities of the Committee, which had met the day before the Board meeting. The Committee first discussed certain fees owed to the search firm Spenser Stuart, and agreed upon a course of action. The Committee then went through the USOC's 2010 Performance Screen, and agreed upon a capture percentage about which Mr. Bowlsby advised the full Board. The Committee also reviewed Mr. Blackmun's performance. The Committee next discussed and agreed upon the level of funding to authorize for merit increases. The Committee discussed with staff how merit increases should be handled as part of the organization's efforts to implement a performance culture. Finally, the Committee noted that the organization will need to spend some time on succession planning and a discussion on this issue occurred among the Board. Following Mr. Bowlsby's report, the Board unanimously expressed its support for the decisions of the Compensation Committee.

**11.   Ethics Committee Report**

Ms. Mary McCagg, Chair of the Ethics Committee, reported to the Board on the activities of the Committee.  She noted that a proposed revised Code of Conduct and Gift Policy have been drafted and circulated for review by the Ethics Committee.  The Committee expects to meet in early January to discuss these proposed policies. Ms. McCagg noted that several members of the Committee will be rolling off of the Committee, but expressed that the group as currently constituted provides a good mix of perspectives.

**12.   Administrative Matters**

Ms. Dershowitz provided the Board with a brief litigation report.  She then advised the Board regarding the USOC's planned Board orientation, noting that a draft agenda for the session was provided in the Board book. Ms. DeFrantz expressed her interest, schedule permitting, in participating in the Board orientation to provide new Board members with an IOC perspective.

Ms. Dershowitz next advised the Board that the USOC will be undertaking a wholesale assessment of its current policies in order to create a better understanding of which policies are in place as well as who has the authority to create and disseminate policies. Mr. Blackmun explained that he wants to make sure there is clear guidance from the Board as to the limits on the authority of the professional staff.

**13.   International Conference Update**

Ms. DeFrantz updated the Board regarding planning efforts for the 5th IOC World Conference on Women and Sport, being held in Los Angeles February 16-18, 2012. The theme for the conference will be "Together, Stronger: the Future of Sport." Registration will open eight months before the Conference, and it is expected that approximately 600 people will participate.  The local organizing committee has begun actively fundraising.

Mr. Blackmun updated the Board regarding planning efforts for the 2011 IOC Athletes Forum, being held in Colorado Springs October 9-12, 2011.  Ms. Ruggiero advised that the IOC is considering shortening the dates to make the conference more affordable.

**14.   Board Member Retention**

With the changes to the Bylaws adopted in September, it was noted that Bob Bowlsby, John Hendricks and Mary McCagg would all be completing their first four year term of service at the end of 2010.  The Board unanimously voted to retain each of them for a second four year term, with each abstaining from the vote on themselves.

**15.   Adjournment**

There being no further business, the meeting was adjourned at approximately 1:50 p.m. PST.

This document constitutes a true and correct copy of the minutes of the meeting of the Board of Directors of the United States Olympic Committee.

Rana Dershowitz
Secretary

Date

# EXHIBIT C

1  Directors and Executive Committee shall be elected by members of the AAC from within that
2  body.  Athlete representatives on other USOC committees, task forces and other such groups
3  shall be appointed with the approval of the AAC from among the athletes who meet the
4  standard in Section 1.
5
6
7  **CHAPTER XXIII – NATIONAL GOVERNING BODIES**
8
9  **Section 1.**  The National Governing Bodies and Paralympic Sports Organizations which are
10  responsible for the technical rules for each sport on the program of the Olympic, Pan American
11  and Paralympic Games shall have the following authority and responsibility --
12          (A) Establish an operating procedure within the National Governing Bodies to insure
13  continuity of international, Olympic, Pan American and Paralympic Games programs for the
14  quadrennial period;
15          (B) Establish a written procedure, subject to the approval of the Executive Committee, to
16  fairly select athletes, coaches, and team leaders for the Olympic, Pan American and Paralympic
17  Games Teams, that after having been approved by the Executive Committee, shall be
18  disseminated
19  as early as possible to the athletes, coaches, and team leaders pursuant to procedures
20  promulgated by the  Chief Executive Officer;
21          (C) Select site(s) and date(s) to qualify for the Olympic, Pan American and Paralympic
22  Games Teams;
23          (D) Nominate for appointment by the Executive Committee of the USOC those coaches,
24  team leaders and other team officials for the Olympic, Pan American and Paralympic Games
25  Teams;
26          (E) Recommend a plan for training Olympic, Pan American and Paralympic Games
27  Team members;
28          (F) Establish a program for the development of its sport;
29          (G) Formulate and present budgets for development, team preparation, team selection,
30  and sports liaison expenses;
31          (H) Recommend a program for the use of the USOC Training Centers;
32          (I) Screen and recommend athletes for participation in the USOC Job Opportunities
33  Program;
34          (J) Recommend athletes for consideration of awards under the USOC Medical
35  Scholarship Program;
36          (K) Nominate in writing persons for appointment to standing committees of the USOC;
37          (L) Prepare the requirements of its sport for submission to the Chief Executive Officer in
38  each of the following areas to  service the Olympic, Pan American and Paralympic Teams --
39                  (1) apparel, supplies and equipment;
40                  (2) food and housing;
41                  (3) medical and training services;
42                  (4) tickets; and

Bylaws
Chapter XXIII

1       (5) transportation;
2       (M) Participate in the international federation activities of its sport and carry out those
3   responsibilities required by the respective international federations;
4       (N) Disseminate to its member athletes information relating to its sport;
5       (O) Present to the USOC the organizational structure within the National Governing
6   Bodies designated to carry out its Olympic, Pan American and Paralympic Games
7   responsibilities;
8       (P) Authorize or approve all programs prior to submission by its liaison representatives
9   to the USOC for review and approval;
10      (Q) Adopt and submit to the USOC the procedure whereby it will elect its
11  representative(s) to the Board of Directors.
12
13  **Section 2.**
14      (A) Each National Governing Body and Paralympic Sports Organization, subject to the
15  policy directives and procedures prescribed by the Executive Committee and subject to review
16  by the Chief Executive Officer, shall have the authority and duty to devise and determine the
17  method of selecting athletes and team officials  (coaches, team leaders, etc.) who will be
18  recommended to the Executive Committee for appointment to the team that will represent the
19  United States in the particular sport or event of the Olympic, Pan American or Paralympic
20  Games.
21      (B) Each National Governing Body and Paralympic Sports Organization, no less than 18
22  months prior to each Olympic, Pan American or Paralympic Games, shall submit to the Chief
23  Executive Officer for review and report to the  Executive Committee, a written proposal
24  concerning the participation of the United States in the particular sport or event of the
25  forthcoming Olympic, Pan American or Paralympic Games.  This proposal shall include the
26  number of athletes and team officials to be nominated for appointment to the United States
27  delegation for such Games;  the procedures to be followed for preparing and conditioning
28  candidates for the team;  the program of tryouts and the method of selecting the athletes to be
29  recommended for appointment to the team;  the special requirements of the particular sport or
30  event with respect to sports equipment and supplies, services of physicians and trainers and such
31  special personnel as authorized by the USOC; and any other matters that may be relevant for
32  effective planning of the United States' participation in the particular sport or event of the
33  National Governing Body or Paralympic Sports Organization.  Each National Governing Body
34  or Paralympic Sports Organization shall be given timely notice with respect to the
35  recommendations for approval, modifications or rejection of specific items in its proposal to be
36  made by the Chief Executive Officer to the Executive Committee.  If a National Governing
37  Body or Paralympic Sports Organization is unwilling to accept an adverse recommendation of
38  the Chief Executive Officer , it may appeal in writing to the Executive Committee, whose
39  decision by a majority vote of the members present shall be final.
40      (C) Each National Governing Body or Paralympic Sports Organization shall put into
41  effect the plan approved by the Executive Committee for participation of the United States in its

58

particular sport or event in the forthcoming Olympic, Pan American or Paralympic Games.  The National Governing Body or Paralympic Sports Organization, as early as practicable in accordance with the plan, shall announce the method of selecting the athletes to be recommended for appointment to the team, establish the times and places of tryouts thereof, and perform whatever other duties may be indicated under the plan as approved by the Executive Committee.

(D) Each National Governing Body or Paralympic Sports Organization, subject to the Bylaws, shall make appropriate contractual or other arrangements for holding such local or regional, preliminary or semifinal tryouts as may be necessary under the plan approved by the Executive Committee.  Arrangements for final tryouts shall in all cases be cleared specifically with the Chief Executive Officer.

(E) Each National Governing Body or Paralympic Sports Organization, at least twelve (12) months prior to the date of the final tryouts, shall submit for review by the Chief Executive Officer its list of eligible persons (one (1) nominee and one (1) alternate), together with a resume for each authorized position from which it is proposed to select team officials in its particular sport or event to be recommended for appointment by the Executive Committee.  The Chief Executive Officer, after such investigation and further  consultation with each National Governing Body or Paralympic Sports Organization as he or she deems appropriate, may recommend approval or rejection of any and all names on such list. In the event a name is recommended for rejection, the National Governing Body or Paralympic Sports Organization may submit a new nomination, or it may appeal to the Executive Committee, whose decision by a majority of the members present shall be final.

(F) Each National Governing Body or Paralympic Sports Organization shall cooperate in every way possible with the Executive Committee and the Chief Executive Officer in preventing the unauthorized use of the names and trademarks of the USOC, or the word "Olympic" and its derivatives, as well as symbolic equivalents thereof, or the United States Olympic Emblem as described in the Act.

. (G)     As a condition of membership in the USOC and recognition as a National Governing Body or Paralympic Sports Organization, each National Governing Body or Paralympic Sports Organization shall comply with the procedures pertaining to drug testing and adjudication of related doping offenses of the independent anti-doping organization designated by the USOC to conduct drug testing.  No exceptions to such procedures shall be allowed unless granted by the Executive Committee, or its designee, after a hearing at which the National Governing Body is allowed to present the reasons for such exception.

**Section 3.** Members of National Governing Bodies or Paralympic Sports Organizations or other organizations cooperating with the USOC in raising of funds from any source, shall turn over such funds to the Treasurer of the USOC as promptly as possible.  Funds collected over a continuous period of time shall be forwarded to the Treasurer at least once a month, and in the sixty (60) days prior to the Olympic, Pan American or Paralympic Games at least once a week, with a detailed report indicating sources, amounts, and purposes.

**Bylaws**
**Chapter XXIII**

1  **Section 4.**   The Chief Executive Officer shall approve suitable contract forms for the
2  administration of the various Olympic, Pan American or Paralympic Games tryouts and other
3  authorized benefits.  Each contract for a tryout shall be made in triplicate and shall specify the
4  types of expenses that may be  legitimately charged, the desirable administrative procedures, the
5  minimum guarantee, adequate accounting, and careful fixing of local financial responsibility.
6  Whenever possible, guarantees shall be by security bonds.  One (1) copy of each contract shall
7  be filed with the  Chief Executive Officer;  one (1) copy shall be retained by the National
8  Governing Body or Paralympic Sports Organization;  and one (1) copy shall be retained by the
9  organization sponsoring the tryouts.   The National Governing Bodies or Paralympic Sports
10  Organizations shall submit to the  Chief Executive Officer, a detailed and certified statement of
11  receipts and disbursements.
12
13  **Section 6.**   All funds raised by any National Governing Body or Paralympic Sports
14  Organization where the word "Olympic" or a derivative thereof is used in any connection shall
15  belong to the United States Olympic Committee fund and shall be accounted for accordingly.

16  **Section 7.**
17       A.   Athlete representatives shall equal at least 20% of all NGB boards of directors,
18  executive committees and other governing boards, as well as those committees which are
19  "Designated Committees" within the meaning of these Bylaws.  For purposes of these Bylaws,
20  the phrase "Designated Committees" means nominating and budget committees, panels
21  empowered to resolve grievances and committees which prepare, approve or implement
22  programs in the following areas:
23       (1) expenditures of funds allocated to National Governing Bodies by the USOC; and
24       (2) selection of international, Olympic and Pan American Games Team members
25  including athletes, coaches, administrators and sports staff.
26  If approved by the USOC Membership & Credentials Committee, NGBs may use proportional
27  or weighted voting to achieve the necessary level of athlete representation in extraordinarily
28  large legislative bodies such as "Houses of Delegates" or "Boards of Governors."
29  B.   Athlete representatives on those NGB boards or committees described in Section 7A
30  above shall meet the following standards:
31       (1)  At least one-half of the individuals serving as athlete representatives shall have
32  competed in the NGB's events or disciplines that are on the sport's program in the Olympic or
33  Pan American Games.
34       (2)  Up to one-half of the individuals serving as athlete representatives may have
35  competed in (i) an event or discipline not on the program of the Olympic or Pan American
36  Games, provided that such event or discipline is recognized by the International Federation of
37  the NGB or is regularly included in the  international competition program of the International
38  Federation, or (ii) the Paralympic Games, or an International Paralympic Committee-
39  recognized World Championship in events on the Paralympic Games program.
40       (3)  At the time of election, all NGB athlete representatives shall have demonstrated
41  their qualifications as athletes by having:
60

1       (i)  Within the ten (10) years preceding election, represented the United States
2   in the Olympic or Pan American Games, or an Operation Gold event, or a World
3   Championship recognized by the NGB's International Federation for which a
4   competitive selection process was administered by the NGB, or, in a team sport, an
5   international championship recognized by the International Federation of the NGB; or
6       (ii)  Within the twenty-four (24) months before election, demonstrated that they
7   are actively engaged in amateur athletic competition by finishing in the top half of the
8   NGB's national championships  or team  selection competition for the events outlined
9   in subparagraphs (1) or (2) or in a team sport, have been a member of the NGB's
10  national team; or
11      (iii)  For the purposes of the standards outlined in Section 7(B)(2)(ii) only,
12  within the ten (10)  years preceding election, represented the United States in the
13  Paralympic Games, or an International Paralympic Committee-recognized World
14  Championship in events on the Paralympic Games program.
15      (4)  Athlete representatives may not be drawn from events that categorize entrants in
16  age-restricted classifications commonly known as "Juniors," "Masters," "Seniors," "Veterans"
17  or other similarly designated age-restricted competition.  This provision is not meant to
18  exclude from eligibility athletes who compete in an event for which the IOC or an
19  International Federation has established an age restriction but who otherwise meet the
20  standard set forth in Section 7(B).
21  C. Athlete representatives shall also equal at least 20% of those NGB committees which are
22  not Designated Committees, except that qualification as an "athlete representative" shall be
23  determined as follows:
24      (1)  At least one-half of the individuals serving as athlete representatives shall have
25  competed in the NGB's events or disciplines that are on the sport's program in the Olympic or
26  Pan American Games.
27      (2)  Up to one-half of the individuals serving as athlete representatives may have
28  competed in (i) an event or discipline not on the program of the Olympic or Pan American
29  Games, provided that such event or discipline is recognized by the International Federation of
30  the NGB or is regularly included in the  international competition program of the International
31  Federation, or (ii) the Paralympic Games, or an International Paralympic Committee-
32  recognized World Championship in events on the Paralympic Games program.
33      (3)  At the time of selection, all NGB athlete representatives under Section 7(C) shall
34  have demonstrated their qualifications as athletes by having:
35      (i)  Within the ten (10) years preceding selection, represented the United States
36  in the Olympic or Pan American Games, or an Operation Gold event, or a World
37  Championship recognized by the NGB's International Federation . for which a
38  competitive selection  process was administered by the NGB, or, in a team sport, an
39  international championship recognized by the International Federation of the NGB; or
40  the Paralympic Games, or an International Paralympic Committee-recognized World
41  Championship in events on the Paralympic Games program; or

Bylaws
Chapter XXIV

1    (ii)  Within the twenty-four (24) months before selection, demonstrated that
2    they are actively engaged in amateur athletic competition; or
3    (iii)  For the purposes of the standards outlined in Section 7(C)(2)(ii) only,
4    within the ten (10)  years preceding selection, represented the United States in the
5    Paralympic Games, or an International Paralympic Committee-recognized World
6    Championship in events on the Paralympic Games program.
7    (4)  Athlete representatives may not be drawn from events that categorize entrants in
8    age-restricted classifications commonly known as "Masters," "Seniors," "Veterans" or other
9    similarly designated age-restricted competition.  This provision is not meant to exclude from
10   eligibility athletes who compete in an event for which the IOC or International Federation has
11   established an age restriction but who otherwise meet the standard set forth in Sections 7(B)
12   or 7(C).
13   D.    An NGB may set standards for its athlete representatives that are higher than those in
14   Sections 7(B) and 7(C) provided that such standards are not in conflict with the Ted Stevens
15   Olympic and Amateur Sports Act or the USOC Constitution and Bylaws.
16   E.  Athlete representatives to an NGB's board of directors, executive committee, and other
17   such governing boards as defined in Section 7(A) shall be directly elected by athletes who
18   meet the standards set forth in Section 7(B).  Athlete Representatives to all other NGB
19   committees and task forces shall be selected by the NGB with the approval of the athletes, or a
20   representative group of athletes, who meet the standards set forth in Section 7(C).
21   F.  Any NGB may submit an Application for Review ("Application") to the Membership and
22   Credentials Committee.  The Application shall set forth:  (1) the reasons why the NGB
23   believes it cannot meet the requirements of Section 7; and (2) the NGB's proposed alternative
24   plan for compliance with Section 7, which should expand on the standards set forth in
25   Sections 7(B) and 7(C) only to the extent necessary to achieve the required 20% athlete
26   representation.  If the Application is not approved by the Membership and Credentials
27   Committee, the provisions of this Section 7 shall apply.  An NGB may appeal the decision of
28   the Membership and Credentials Committee on the Application to a five-person panel
29   composed of two individuals appointed by the AAC Chair, two appointed by the NGB
30   Council Chair, and one person appointed by the USOC Chair.
31
32
33   **CHAPTER XXIV – ELECTION OF MEMBERS TO ATHLETES' ADVISORY**
34   **COUNCIL**
35
36   **Section 1.** Each National Governing Body shall adopt and submit to the USOC, consistent with
37   policies established by the Athletes' Advisory Council, a procedure whereby eligible athletes as
38   defined in Chapter XXII above  shall elect an active athlete to represent the sport on the
39   Athletes' Advisory Council.  No individual shall serve on the Athletes' Advisory Council for
40   more than two (2) full quadrennial periods.  At least sixty (60) days prior to the Quadrennial
41   Meeting of the Board of Directors, the National Governing Body shall forward the name of the
42   elected athlete representing that sport to the Chief Executive Officer of the USOC and certify the

# EXHIBIT D

BYLAWS OF THE UNITED STATES OLYMPIC COMMITTEE

Effective as of September 24, 2011

## SECTION 8

## MEMBERS

Section 8.1 Board Authority. The Board has the power to elect properly qualified organizations to membership in each of the categories of membership listed in this Section 8, to transfer a member organization from one membership category to another and to terminate a member organization's membership. The Board shall specify the date upon which the rights and duties of new and transferred members shall become effective. If no date is specified, such rights and duties shall become effective immediately.

Also, the Board has the power to recognize qualified organizations as NGBs or PSOs. Further, the Board has the power to review all matters relating to the continued recognition of an NGB or PSO and may take such action as it considers appropriate, including, but not limited to, placing conditions upon the continued recognition of an NGB or PSO, placing an NGB or PSO on probation, suspending an NGB or PSO or terminating the recognition of an NGB or PSO, provided that notice of any such proposed action shall be given to the NGB or PSO.

Section 8.2 General Membership Requirements. Organizations eligible for membership shall be those that take some active part in the administration of one or more sports or competitions on the program of the Olympic, Pan American or Paralympic Games, organizations that administer other sports that are widely practiced in the United States and organizations (patriotic, educational, or cultural) that are engaged in efforts to promote the participation in, or preparation for, amateur athletic competition.

Organizations that are purely commercial or political in character are not eligible for membership.

Section 8.3 Olympic Sport Organizations. Eligibility for membership as Olympic Sport Organizations shall be limited to those amateur sports organizations that are recognized by the corporation as the NGBs for sports that have competed on the program of the Olympic Games or competed in medal sports in the immediate past Olympic Games. The term "sports that have competed on the program" means sports that have been approved by the IOC to participate as medal sports at an upcoming Olympic Games. An Olympic Sport Organization that has participated in the immediate past Olympic Games is eligible to remain an Olympic Sport Organization until determined that it is not included on the program of the next Games. Each Olympic Sport Organization shall be identified with a sport included on the program of the Olympic Games. In accordance with the IOC's Olympic Charter, the corporation shall not recognize more than one (1) NGB in each sport. Olympic Sport Organizations shall be United States members of IFs recognized by the IOC.

No amateur sports organization is eligible to be recognized as an Olympic Sport NGB, or is it eligible to continue to be recognized as an Olympic Sport NGB, unless it complies with Sections 220522 through 220525 of the Act.

Section 8.4 Pan American Sport Organizations. Eligibility for membership as Pan American Sport Organizations shall be limited to those amateur sports organizations that are recognized by the corporation as the NGBs for sports that have competed on the program of the Pan American Games, but which are not competing at the Olympic Games.  The term "sports that have competed on the program" means sports that have been approved by PASO to participate as medal sports at an upcoming Pan American Games or competed as medal sports in the immediate past Pan American Games.  A Pan American Sport Organization that has participated in the immediate past Pan American Games is eligible to remain a Pan American Sport Organization until determined that it is not included on the program of the next Games. Each Pan American Sport Organization shall be identified with a sport included on the program of the next Pan American Games.  In accordance with the IOC's Olympic Charter, the corporation shall not recognize more than one (1) Pan American Sport Organization in each sport.  Pan American Sport Organizations shall be United States members of IFs recognized by the IOC. No amateur sports organization is eligible to be recognized as a Pan American Sport NGB, or is it eligible to continue to be recognized as a Pan American Sport NGB, unless it complies with Sections 220522 through 220525 of the Act.

Section 8.5 Designation to Govern a Paralympic Sport. For any sport that is included on the program of the Paralympic Games, the corporation is authorized to designate, where feasible and when such designation would serve the best interest of the sport, and with the approval of the affected NGB, an NGB recognized under this Section 8 to govern such sport.

Section 8.6 Paralympic Sport Organizations. Where designation of an NGB is not feasible or would not serve the best interest of the sport, the corporation is authorized to recognize an amateur sports organization as a PSO to govern a sport that is included on the program of the Paralympic Games.  The term "sports that are included on the program" means sports that have been approved by the IPC to participate as medal sports at an upcoming Paralympic Games.  A PSO, with the approval of the corporation, may govern more than one sport included on the program of the Paralympic Games.  Any such PSO shall comply with the criteria for NGBs applicable to Olympic and Pan American Sport Organization members, and shall perform those duties, and have those powers that the corporation, in its sole discretion, determines are appropriate to meet the objects and purposes of the Act and these Bylaws. A PSO shall be a member of each IF or International Sports Organization of the sport or sports it governs.

Section 8.7 NGB and PSO Membership Requirements. An Olympic, Pan American and Paralympic Sport Organization, in order to fulfill its membership obligations and to be considered a member in good standing with the corporation shall:

    a)  fulfill its responsibilities as an NGB or PSO as set forth in the Act;

    b)  be recognized by the Internal Revenue Service ("IRS") as a tax-exempt

31

organization under the Internal Revenue Code;

c) develop a strategic plan that is capable of supporting athletes in achieving sustained competitive excellence, and in growing the sport;

d) adopt a code of conduct for its employees, members, board of directors and officers;

e) cooperate with the corporation in preventing the unauthorized use of the names and trademarks of the corporation, the words "Olympic," "Paralympic" and "Pan American," and their derivatives, as well as their symbolic equivalents;

f) establish a written procedure, approved by a Designated Committee (as defined in Section 8.8.1 of these Bylaws) of the NGB or PSO, or if no such Designated Committee exists, by the NGB or PSO Board, and thereafter approved by the corporation, to fairly select athletes and team officials for the Olympic, Paralympic or Pan American Games teams, and, upon approval, timely disseminate such procedure to the athletes and team officials;

g) conduct, in accordance with approved selection procedures, a selection process, including any Games trials, to select athletes for the Olympic, Paralympic and Pan American Games teams (no Games trials shall be conducted unless the NGB or PSO first contracts with the corporation to hold such trials, or the corporation otherwise gives its assent to hold such trials);

h) recommend to the corporation athletes and team officials for the Olympic, Paralympic and Pan American Games teams;

i) establish and implement a plan for successfully training Olympic, Paralympic and Pan American Games athletes;

j) comply with the anti-doping policies of the corporation and with the policies and procedures of the independent anti-doping organization designated by the corporation to conduct drug testing and adjudicate anti-doping rule violations (no exceptions to such procedures shall be allowed unless granted by the CEO, or his or her designee, after allowing the NGB or PSO to present the reasons for such exception);

k) actively seek, in good faith, to generate revenue, in addition to any resources that may be provided by the corporation, sufficient to achieve financial sustainability;

l) be financially and operationally transparent and accountable to its members and to the corporation;

m) adopt a budget and maintain accurate accounting records in accordance with accounting principles generally accepted in the United States of America (GAAP);

n) permit the corporation to conduct an organization-wide audit of its financial and managerial capabilities;

o) submit its complete IRS Form 990 and audited financial statements, including management letter and budget, to the corporation annually;

p) post on its website its current bylaws and other organic documents;

q) post on its website its IRS Form 990 for the three most recent years;

r) post on its website its audited financial statements for the three most recent years;

32

s) obtain and keep current insurance policies in such amount and for such risk management as the corporation considers necessary or appropriate;

t) permit the corporation, at its request, to have reasonable access to all files, records and personnel necessary to make such membership and governance reviews as the corporation deems necessary or appropriate; and

u) satisfy such other requirements as are set forth by the corporation.

**Section 8.8 Athlete Representation on NGB Boards and Committees.** Additionally, an Olympic and Pan American Sport Organization, in order to fulfill its membership obligations and to be considered a member in good standing with the corporation, shall comply with the athlete representation requirements as set forth below.

**Section 8.8.1 Representation on Boards and Designated Committees.** Athlete representatives shall equal at least 20 percent of all NGB boards of directors, executive boards, and other governing boards, as well as those committees that are "Designated Committees" within the meaning of these Bylaws. For purposes of these Bylaws, the phrase "Designated Committees" means nominating and budget committees, panels empowered to resolve grievances and committees that prepare, approve or implement programs in the following areas:

a) expenditures of funds allocated to NGBs by the corporation; and

b) selection of international, Olympic, Paralympic and Pan American Games Team members including athletes, coaches, administrators and sports staff.

If approved by the corporation, NGBs may use proportional or weighted voting to achieve the necessary level of athlete representation in extraordinarily large legislative bodies such as "Houses of Delegates" or "Boards of Governors."

**Section 8.8.2 Standards.** Athlete representatives on those NGB boards or committees described in Section 8.8.1 of these Bylaws shall meet the following standards:

a) at least one-half of the individuals serving as athlete representatives shall have competed in the NGB's events or disciplines that are on the sport's program in the Olympic or Pan American Games;

b) up to one-half of the individuals serving as athlete representatives may have competed in (i) an event or discipline not on the program of the Olympic or Pan American Games, provided that such event or discipline is recognized by the IF of the NGB or is regularly included in the international competition program of the IF, or (ii) the Paralympic Games, or an IPC-recognized World Championship in events on the Paralympic Games program; and

c) at the time of election, all NGB athlete representatives shall have demonstrated their qualifications as athletes by having:

1. within the ten (10) years preceding election, represented the United States in the Olympic or Pan American Games, or an Operation Gold event, or a World Championship recognized by the NGB's IF for which a competitive selection process was administered by the NGB, or, in a team sport, an international championship recognized by the IF of the NGB; or

33

# EXHIBIT E

Minutes [DRAFT]

— CONFIDENTIAL —

**Board of Directors Meeting**
**October 12, 2008**
**8:00 a.m. Eastern Daylight Time**

A regular meeting of the Board of Directors (the "Board") of the United States Olympic Committee ("USOC") occurred on October 12, 2008, from 8:00 a.m. to 1:30 p.m. Eastern Daylight Time pursuant to notice as set forth in the USOC Bylaws. The Chair called the meeting to order at approximately 8:10. The following members of the Board were present at the meeting: Peter Ueberroth (Chair/Honorary President), Larry Probst (Newly Seated Chair), Anita DeFrantz, Jim Easton, Jair Lynch, Mary McCagg, Mike Plant and Stephanie Streeter. Erroll Davis participated in the first half of the meeting telephonically. Bob Bowlsby and John Hendricks were not able to participate. Ursula Burns, who was selected upon Erroll Davis' resignation part way through the meeting, was also unable to attend. The above present members constituted a quorum of the Board under the USOC Bylaws.

Also present from the USOC was Bob Ctvrtlik, USOC First Vice President, as well as management team members Jim Scherr, Norman Bellingham, Rana Dershowitz, Walt Glover, Darryl Seibel, Janine Alfano, Damani Short, Steve Roush, Rick Burton, Debra Yoshimura, and Charlie Huebner. Also present were Chris Duplanty, Liaison from the Board to the Olympic Assembly, Stephanie Quesada, Executive Assistant to the Chair/Honorary President, Michelle Stuart, Executive Assistant to the CEO and COO, and Nancy Balty. The minutes were recorded by Rana Dershowitz, Secretary.

1.    **Welcomes**

Mr. Ueberroth opened the meeting and thanked everyone for their support and their responsiveness to his leadership. He noted that the organization had just come through a terrific Olympic Games where it served the athletes and the country very well. Mr. Ueberroth noted that as the organization moves in to the next quadrennium it is time for a change in Board leadership. Mr. Ueberroth advised that he will be taking on a new, reduced role with the organization, but pledged to do everything he can to help the organization. In his new role, Mr. Ueberroth expressed that he will follow the lead of the new Board leadership.

Mr. Davis then expressed his appreciation to the Board. He noted that while there have been challenges to the USOC during his time on the Board, when one looks at what has been accomplished under Mr. Ueberroth's leadership, it has been transformative. Mr. Davis noted that he will remain a supporter of the USOC and expressed his sincere appreciation to the Board and the organization for their support.

1

Ms. DeFrantz spoke to express her thanks to Mr. Ueberroth for his leadership and guidance on behalf of the Board. Ms. DeFrantz made a point that under Mr. Ueberroth's leadership, US athletes could rest assured that they would always be served by the organization.

### 2.    Audit Report

As his last act as a member of the Board, Mr. Davis gave the Audit Committee report. The Audit Committee had met on Saturday, October 11. Mr. Davis expressed his particular satisfaction with the uptick in professionalism that the USOC has shown in the audit area. Mr. Davis explained that the main audit related issue discussed during the Committee meeting was whether the NGBs are generally in compliance with USOC requirements, and how to rectify the situation when they are not. The USOC is making substantial progress, but there are still a few NGB holdouts that refuse to comply. The USOC needs to begin to get tougher on these holdouts. It is recommended that the USOC begin to use the power of the purse against those NGBs that are disregarding our requirements, such as posting of 990s and Board size.

Mr. Davis reported that the Audit Committee had also received operating reports, financial reports and a preliminary report regarding the outlook for the next year. The Audit Committee also approved the USOC's auditors for 2009, but confirmed that the USOC must send out its audit requirements for bid for the following year (the 2009 audit, which will occur in 2010). The Audit Committee also received a litigation report from the General Counsel and discussed risk management concerns, particularly regarding AIG, in light of the current economic conditions.

A discussion then ensued among the Board regarding the Audit Committee structure going forward. Ms. Burns will be joining the Committee, with Jim Easton acting as Chair. Jair Lynch is the third member of the Committee.

### 3.    Board Transition

At this time Mr. Ueberroth and Mr. Davis resigned from the Board. In light of these resignations, Mr. Probst and Ms. Burns were officially seated on the Board. Ms. Burns was not able to attend the Board meeting, but will participate as a full Board member going forward. In taking his seat on the Board of Directors, following the Board's vote during the October 2, 2008 teleconference call, Mr. Probst officially became Chairman of the Board of the US Olympic Committee. Mr. Probst requested that Mr. Ueberroth continue to lead the meeting on his behalf.

### 4.    Approval of Minutes

A motion was made and seconded to approve the Minutes from the Board of Directors meeting on May 14, 2008, as well as the telephonic Board of Directors meetings on July 1, 2008 and October 2, 2008. The motion was unanimously approved.

5.    **Leadership and Organization**

Mr. Scherr thanked Mr. Ueberroth and Mr. Davis for their service to the organization. Mr. Scherr expressed his satisfaction with the growth of the organization and the management team over the last quadrennium. Mr. Scherr specifically thanked Steve Roush and Charlie Huebner, as well as the Olympic and Paralympic Chef de Missons, Judge Charles Lee and Mr. Jeff Underwood, for their leadership of our Olympic and Paralympic delegations to Beijing.

Mr. Scherr discussed the incident that occurred in Beijing involving the Bachman family and expressed his thanks and appreciation for the leadership shown by the management team and Board in Beijing in addressing this situation.

6.    **Beijing Olympic Report**

Mr. Roush gave the Board a report on the Beijing Olympic Games. Mr. Roush discussed the key issues that have changed over the quadrennium that were effective in Beijing.

Mr. Roush noted particularly that the selection procedure process has been substantially improved, utilizing a cross functional group within the USOC in cooperation with the NGBs. This vetting process resulted in substantially improved selection criteria, which withstood all legal challenges in the lead up to the Games. Mr. Roush also expressed his satisfaction with how the Olympic Trials were run. Having a consistent look and feel across different sports was very effective.

On site in Beijing there were a number of elements of the USOC's strategic approach that worked very well. First, was Beijing Normal University. BNU gave US athletes a place to train on their own time with their own coaches and training partners, whether or not those coaches or training partners were accredited. Second, was USA House. USA House worked exceptionally well to allow for positive interaction between the business side of the USOC and the sport side. Third, was the Hilton. The USOC worked very well with our partner to create a compact and effective operational headquarters. In Vancouver we will unfortunately be a bit more spread out and will not be able to have a venue like BNU.

Mr. Roush expressed that the reception of our athletes upon their return was overwhelming. The Oprah season premier really embodied the way the athletes were received. A copy of this show will be sent to all Board members. The White House visit also went exceptionally well.

Mr. Roush pointed out that 262 of our 597 Olympians came home with medals – 44% of the athletes. It is a testament to the fact that our team sports had an amazing Games. Although it does not reflect fully in the medal count, those are all athletes going back to their home towns espousing the values of Olympism.

A Board member requested that Mr. Roush comment upon the lessons that had been learned from the Beijing Games. Mr. Roush noted that it is important to involve the Athlete Ombudsman in all sensitive athlete issues. Further, Team Processing can be made better. He further noted the need to work at our information flow from team leaders and coaches.

The behavior of the athletes overall was then commended by the Board. Mr. Roush commented that this really ties back to the Ambassador program that was run throughout the lead up to the Games. Mr. Ueberroth credited Mr. Seibel for his championing of this program.

A Board member noted that some performances were not at the level we wanted or expected them to be. Mr. Roush agreed and explained that we will be meeting with those NGBs that underperformed, pushing them to change their plans going forward. If these NGBs do not think change is needed, unless they convince us they are correct, we will be less financially supportive of them going forward.

A discussion ensued regarding how Great Britain focused on one sport, cycling, and made a huge jump. There is a two-day seminar next month to discuss what other NOCs can learn from this. Mr. Ueberroth asked that the data regarding spending of Team GB be sent to the Board.

Ms. McCagg inquired about the late timing of the Olympic Trials and whether this ultimately had a negative effect on team performance. Mr. Roush explained that the issue had been discussed with those NGBs that desired late Trials, but that the USOC has been willing to take direction on this point from the NGBs, who feel it has an overall positive effect on athlete performance.

Mr. Scherr then noted that funding is only a part of the assessment we do of NGBs. Mr. Ueberroth noted that we should look very carefully at sports well funded outside of us – for example baseball, basketball and tennis.

### 7. Vancouver Outlook

Mr. Roush gave the Board a brief update on our outlook for Vancouver. There will be challenges because there will be two separate areas – snow sports in the mountains, and ice sports in the City. It is a two-hour drive between the two areas. It will really be two separate operations. Two villages, two USA Houses, two strength and conditioning sites, etc. These will be an expensive games.

Mr. Ueberroth noted that we need to be smart and aggressive about security costs. We should not be paying for long term benefits to the organizing country.

4

8.    **Paralympic Beijing Report**

Mr. Heubner next gave the Board a report on the Paralympic Games. The key term for the Paralympics is progress. We were hoping to climb to second in the medal count. We fell short of this by a few medals, but we did move up to third. We still need to further develop the pipeline of disabled athletes in this country. To do this we must enhance the access of children with disabilities to sport. This will continue to be our focus, together with training at our national team level. Our Government invested $7M in our Paralympic team this year and we will continue to look to the Government to help fund our Paralympic programs.

Ms. Streeter and Mr. Ctvrtlik both attended the Paralympics on behalf of the Board. Mr. Ctvrtlik commented on how proud he is of what we have done. Mr. Ctvrtlik noted that as a Board we need to provide Mr. Heubner with greater support. Ms. Streeter agreed with Mr. Ctvrtlik's comments. Ms. Streeter also commended the Chinese for their work during the Paralympics. Mr. Underwood, as Chef, did a solid job being effectively engaged with both the athletes and the sponsors. The athletes also represented us extremely well. Ms. Streeter commented that we need to better integrate the Paralympics into our thinking. Mr. Ueberroth commented that if you read the Chinese press, they believed that the opening ceremonies of the Paralympics was actually the number one event of the summer – followed by the opening of the Olympics. We may need to rely more on volunteers for the Paralympics going forward.

At 10:10 Mr. Duplanty, Liaison from the Board to the Olympic Assembly, joined the meeting.

Mr. Ueberroth opined that we need to be careful about our Government funding, making sure that we keep pure to the notion that our Olympic programs do not receive Federal funding; while still seeking to increase our funding on the Paralympic side. We have $10M of Paralympic support authorized each year for the next four (4) years. We expect to have our first appropriation of this money in the first quarter of 2009. US Paralympics is also seeking to expand its funding to cover non-military/veteran efforts as well. We are now close to 50% of the US Paralympics budget coming from the government (if you include budget relieving items that were not funding directly provided to us).

A discussion then ensued regarding the relationship between the IOC and the IPC.

It was noted that Ann Cody is on the IPC Board and that we must work closely with her. Bob Balk was also just elected to the IPC Board as an athlete representative. We must work with him as well.

9.    **Media**

Mr. Seibel gave the Board a media update. The Beijing games were the most covered and reported games in history. 4.7 Billion people watched some portion of the

Games (70% of the world). In the United States, the Games were the most watched event in US history, with 2/3 of the country tuning in at some point. NBC saw a huge lift across its various platforms – cable, internet etc. In addition there has been a halo effect across other NBC programming. There were substantial increases across digital media beyond NBC as well, including, for example, yahoo.com and espn.com.

We partnered with NBC to ensure that they began their coverage earlier than ever before by bringing athletes to them so that NBC could begin to tell their stories. Our media summit in April 2008 was also a key launching point. We will be having our Vancouver media summit in September 2009 in Chicago.

Mr. Seibel next discussed some of the challenges being seen in the media arena. First, newspapers are having dramatic difficulties. Second, the balance of digital rights among telecasters, newscasters and athletes continues to be a difficult one to strike. The logistical and geographic split in Vancouver will create its own unique media challenges. Our final challenge will be in how we define our success. We expect that there will be a number of countries that surge for the Vancouver Games.

Yahoo is seeing Olympic coverage as how it defines itself in the sports world (much like USA Today in the print space). NBC has been resistant to this, but we have been working with them to address all parties' concerns. Mr. Plant noted that NBC has taken a view opposed to digital media for years, and it hurts us. The real force that is coming next is what athletes will be able to do themselves.

Mr. Ueberroth asked how we expect athlete behavior to be in Vancouver. A discussion ensued regarding how best to ensure that the rules of the delegation are followed by all athletes. This will be made clear early to all athletes.

Mr. Ueberroth next commented upon his concerns about the Assembly. He noted that next year should be planned earlier and better. It should be held in Chicago.

Mr. Scherr commended Mr. Seibel's team for their support at the Games.

**10.     International Relations**

Mr. Scherr noted that Mr. Fasulo, Chief of International Relations, was not present because he is continuing to labor on behalf of the organization in Mexico. Mr. Ctvrtlik will instead give the Board the International Relations update. The International Relations team, including both Bob and Robert, have spent tremendous amounts of time traveling on behalf of the USOC.

With regard to the Chicago 2016 bid, Mr. Ctvrtlik explained that we are now at the stage where we can start providing the message of Chicago to the world. Our first presentation was at PASO yesterday. In the upcoming six weeks Chicago will be taking their message on the road throughout the world directly to the IOC membership.

Chicago 2016 is also actively developing its bid books.   The bid books, addressing 240 questions posed to each city by the IOC, are due in February 2009. Chicago will be the first of the four Candidate Cities to be visited by the Evaluation Committee (April 2-April 8, 2009).   In addition, for the first time, there will be a presentation by all four Candidate Cities in Lausanne in June 2009.  This was set up by the IOC in response to Bid City complaints that they had insufficient contact with IOC members.  There is no obligation, however, for any IOC members to actually attend this presentation.

The 2016 election is October 2009 in Copenhagen.

The joint IR team of the USOC and Chicago 2016 has now met with every IOC member at least once. The team has also met with representatives of all of the International Federations.

Ms. McCagg noted that the Board is available to support the bid effort as needed. The International Relations team needs to reach out to the Board for any support it needs.

In Acapulco, Bob Ctvrtlik was voted on to the PASO Executive Committee. Mr. Easton noted how well Bob Ctvrtlik has done in the IOC as well. He is well respected and has done a great deal of work. Ms. DeFrantz wanted full Board recognition of how well Bob has done. There was general support for this notion. A question was raised as to whether Bob could be given full ex officio status and be entitled to participate in Board meetings. It was determined that this should better be discussed in Executive Session.

Mr. Ctvrtlik next advised the Board regarding the status of the Olympic Village in Chicago as there have been some inaccurate press reports. Mr. Ctvrtlik explained that the original Village space is still intact.  Negotiations have broken down with respect to certain additional space Chicago 2016 was seeking that could have enhanced the Village and decreased its cost.  There is still hope that the deal will come together, but it is not critical to the bid if it does not.

Mr. Ctvrtlik noted the effective job being done by the entire International Relations department. The personal relationships that they have built have been critical and is having an impact on the bottom line, on athlete performance and across the organization.  It is dramatically changing how the US is viewed internationally. This allows us to address issues as they come up effectively and behind the scenes.

Ms. DeFrantz brought up her concerns about the fact that Ms. Foudy was not elected as an athlete representative to the IOC.  She believes that the Board owes Ms. Foudy an apology. Mr. Ctvrtlik noted that he has been in contact with Mr. Foudy and she understands what happened. Mr. Ueberroth is comfortable delivering an apology.

Mr. Ctvrtlik noted that we have put Ms. Foudy into a pool of the seven athletes that can be appointed by the IOC President (at his discretion) to one of two non-voting IOC Board positions.  We will know in December whether Ms. Foudy obtains one of

these positions. In addition, the World Olympians Association has the right to put someone forward for a similar non-voting Board position and we might be able to use this route as well if Ms. Foudy is not selected through the athlete route. Ms. DeFrantz noted that we can put forth an athlete to be elected as a full voting IOC member at the Vancouver Games.

Mr. Ueberroth asked Ms. DeFrantz to provide the Board with a summary of the election process and what the rules are for the next Board meeting. Ms. DeFrantz agreed to do so.

### 11. Anti-doping Rules

Ms. Dershowitz explained to the Board that the USOC Anti-doping Policies must be amended to come into compliance with the new WADA Code (which becomes effective on January 1, 2009). The USOC worked with the NGB Council, the AAC and USADA to ensure that all constituencies were in support of the proposed rules that have been provided to the Board. One major change that is being proposed is the requirement that all athletes go through an on-line education program annually. The USOC is working with USADA to develop this education program, with USADA providing the technical knowledge and the USOC ensuring that the module is accessible, understandable and effective for the athletes.

A discussion then ensued regarding the USOC's requirement that athletes be in the Out of Competition testing pool for 6 months prior to returning to competition after they retire. The USOC also requires that athletes be in the Out of Competition testing pool for 12 months prior to being named to the US Olympic Team. In the event an athlete wants to return or be named to the Olympic Team before the requisite waiting period, the USOC has generally granted a waiver if it is believed that the athlete is not trying to shorten the period for purposes of avoiding testing.

A discussion occurred requiring standardization across the globe and how the IOC and WADA intend to ensure that all countries are, in fact, complying with the rules. Ms. Dershowitz explained the changes that will be implemented under the new Code that should create more standardization.

A motion was made to approve the revised US Anti-doping Policies. The motion was unanimously approved.

### 12. Partnership For Clean Competition

Mr. Scherr gave the Board an update on the progress of the PCC. Mr. Scherr commended the work of Chris Duplanty, Jill Zeldin and Rana Dershowitz in getting the entity up and running. The corporate documentation is completed. The Scientific Advisory Board (SAB) has been named. We have contractual commitments of $2.8M and soft commitments taking it up potentially to $3.2M per year for the next four years. We anticipate the PCC being able to issue its first grants prior to the end of the year.

The focus of the organization will be to obtain more effective testing as well as cheaper testing. One of the first tasks of the SAB will be to further focus the research goals of the organization. Mr. Ueberroth noted that one of the biggest services that this organization would be able to do, is to get cheaper testing to help the youth of our country. Additionally the PCC may enable the sports community to get ahead of, and stay ahead of, those doping.

At this time, 11:05 am, the Board took a break. The Board came back to order at 11:15.

Mr. Scherr advised the Board that we had received the gold medal of Alvin Harrison and will be returning it to the IOC. This medal was voluntarily returned, although the IOC then "stripped" it as well.

### 13.    Marketing Update

Mr. Burton gave the Board an update on the marketing programs of the USOC. Mr. Burton explained that we have separated our focus into two areas: the first being related to TOP sponsors, where we assist the IOC on world-wide deals, and the second being with respect to domestic deals. We have also taken the view that there are a number of entities that may be considering a TOP sponsorship, but, if they decide not to join TOP, may do well as domestic sponsors. For example, with Kodak, the IOC did not reach a deal with them, and we are now poised to sign them domestically.

There are several TOP sponsors actively in renewal negotiations with the IOC, and several other entities the IOC is actively pursuing as new TOP sponsors. For example, the IOC is actively in discussions with J&J to return for two Quads. In addition, the IOC is in negotiation with Dow Chemical with a two Quad deal being explored. Although Mr. Burton believes that a TOP deal with Dow will ultimately be signed, he thinks it may end up at a slightly lower economic level then what the IOC is hoping. The IOC is also discussing a diamonds TOP deal with the Russian company Al Rosa and an automobile TOP deal with both BMW and Volkswagen. With regard to the automotive category, there is concern that this deal will be focused on London, and the IOC may then try and come back to us and ask us to take less.

On the domestic front, there are a number of deals that remain to be finalized. Mr. Burton explained that we are close to a Partner level ($20-25M per quad) renewal with AT&T, and a new deal at the Partner level for two Quads with Exxon Mobile. We are also close to a Sponsor level ($12-20M per quad) agreement with Bank of America. These negotiations are going very well, but with the economic crisis that has occurred, the negotiations are currently on hold. We are in renewal discussions with Kodak, Kimberly Clark, and Kellogg's. The Hartford, which is a Paralympic sponsor at a lower level, has committed to renew.

Mr. Burton advised the Board that meaningful dialog is ongoing with 5-10 other companies, including Kohls, Home Depot, Office Depot, Target, and HP. We have had

discussions with both Walmart and Target, but we would need to obtain a waiver from Coca-Cola before we could sell a sponsor in the retail market. Mr. Burton noted that the International Relations team has been very helpful in the negotiations with Exxon Mobile.

Mr. Plant noted that there is a lot of money that is still "at risk" based upon the Performance Screen estimates that have been provided to the Board. Mr. Burton explained that since the Performance Screen summary was put together, both United and Orowheat could be considered locked in. Mr. Burton noted that he is optimistic that a number of the other sponsors will execute agreements at the target levels noted in the Screen. Mr. Burton stated that he believes he can bring in another $80M of committed sponsorships before the end of the year.

With regard to Kodak (not on the performance screen), Mr. Burton has a meeting with them next week, and hopes to come out of it with a commitment. Mr. Ueberroth requested that Mr. Burton obtain that commitment in writing.

Mr. Burton noted that our account management efforts have gotten better, which is helping us in our renewal negotiations. However, there is still significant work to be done. Mr. Plant then noted that he is skeptical that the USOC will be able to close $80M worth of sponsorships in the next 10 weeks.

### 14. US Olympic Network

Mr. Bellingham advised the Board that while Discovery is still interested in working with us, they are on the sidelines at the moment as we have entered into discussions with NBC about a conversion of Universal Sports. This discussion was precipitated by Discovery in part and there is the potential for a three-way deal among the parties. We are working to solve the outstanding issues on the business side.

Mr. Bellingham explained that a concern with NBC is that their philosophy has historically been to go dark on Olympic exposure outside the Games period. Our efforts to launch our own network have caused them to alter their strategy in the build up to the Beijing Games with the launch of Universal Sports. They have begun buying up NGB rights and are driving content. This is good for the Movement regardless of whether we end up partnering with them. Mr. Plant noted that Universal Sports does not yet have sufficient distribution for our needs and that perhaps Discovery would be of help on this front. Mr. Probst noted that three-way deals are often extremely difficult to effectuate successfully.

A discussion then ensued regarding some of the rights issues that will need to be worked out. Mr. Ueberroth pointed out that what the USOC really brings to the table is less about content, and more about the brand.

Mr. Probst asked whether we have established a drop dead date with NBC. There is no set date, however, if the new parallel meetings do not create movement in the next

several weeks, we will need to re-engage with Discovery or other potential partners. If we get traction with NBC, we will engage for as long as progress seems to be occurring.

### 15.   Real Estate Update

Mr. Bellingham advised the Board that the Headquarters building and NGB building construction are generally on schedule, although the NGB building is behind by a few weeks. The USOC has some concerns regarding the financing for the Headquarters building by the City. The City is intending to issue Certificates of Participation, which act much like municipal bonds, and for which there is currently no market. The USOC has similar concerns with regard to the funding for the OTC. We are working closely with LandCo to protect ourselves and ensure that we are not at risk given the financial markets.

A discussion ensued regarding the funding mechanisms and the likelihood that funding will be obtained in the short term. The Board requested management make sure that Jim Didion is fully engaged to help in this regard as needed.

Mr. Bellingham then turned to the Chula Vista OTC, where we are working to try and build the facility out in a more robust fashion, with greater access. We are working to try and reduce the land use restrictions the OTC currently operates under so that the USOC would be able to use a portion of the land to generate revenue.

### 16.   Litigation Update

Ms. Dershowitz gave the Board a litigation update.

### 17.   NGC Update

Mr. Lynch gave the Board a brief update on the status of Committee membership across the USOC Board Committees. Ms. Streeter's term on the NGC will end at the end of 2008, however, she can be reappointed for an additional term if the USOC Board so desires. Ms. Foudy's term expires as well. The AAC will determine who fills her seat. In addition, the terms of two members of the Ethics Committee will expire at the end of the year. These positions will need to be filled by the NGC.

Mr. Lynch noted that the NGC is also engaged in the process of appointing a new Board Liaison. The NGC will select a candidate from among six nominees put forth by the AAC, NGBC and MSOC (two from each). The NGC needs clear guidance from the Board regarding the job description of the Board Liaison position so that the appropriate candidates are considered. The NGC is looking at dates in January for interviews.

### 18.   Executive Session

At this time, 12:15, the Board requested that management leave the room and went into executive session. Executive session ended at 1:25.

**19.    Adjournment**

There being no further business, the Board adjourned its meeting at approximately 1:25 pm.

This document constitutes a true and correct copy of the minutes of the meeting of the Board of Directors of the United States Olympic Committee.

Rana Dershowitz
Secretary

12/8/08
Date

# EXHIBIT F

# United States Olympic Committee
# National Anti-Doping Policies

(Revisions effective as of January 1, 2009, unless otherwise noted)

**1.**     **Adoption of Rules from the World Anti-Doping Code.**

The World Anti-Doping Code (the "Code") requires each *National Olympic Committee*[1] and National Paralympic Committee to adopt certain Articles from the Code without substantive change into its own rules. The United States Olympic Committee ("USOC") hereby adopts the provisions from the Code set forth in Annex A which are incorporated herein by reference.

**2.**     **Retirement.**

Any *Athlete* who has ever been enrolled in a *No Advance Notice* testing program, *Registered Testing Pool* or other *Out-of-Competition* testing program of an International Federation ("IF"), the USOC or the United States Anti-Doping Agency ("USADA") or who has represented the United States, the USOC or any NGB at any world championship, Paralympic Games or Olympic Games who wishes to retire, notifies the appropriate entities in writing of this intent and is removed from the *No Advance Notice* testing program(s), and then wishes to compete in any *Competition* or *Event* sanctioned or organized by the USOC, any national or regional championship sanctioned by an NGB or any other member of the USOC or who wishes to participate on any team organized or nominated by the USOC, or in any *International Event* must enroll in the USADA Registered Testing Pool ("USADA RTP") at least 6 months in advance of the *Competition* or *Event*. Notwithstanding the foregoing rule, in exceptional circumstances, for good cause shown in writing, the USOC CEO may waive a portion of this 6 month period.

As more fully set out in Article 7.6 of the Code, USADA shall not suspend or terminate the prosecution of a doping offense as a result of an athlete's subsequent retirement.

**3.**     **Suspension by an NGB or International Federation.**

*Athletes* and *Athlete Support Personnel* shall be ineligible within the meaning of paragraph 5 of these policies while serving a period of *Ineligibility* for violating anti-doping rules imposed by a NGB, or as the result of proceedings by USADA or by an IF or other *Signatory* to the Code or by another body whose rules are consistent with the Code.

**4.**     **Prior Participation in USADA's Registered Testing Pool Program by Potential Members of the U.S. Olympic and Paralympic Teams.**

---

[1] Capitalized and italicized terms have the meaning set forth in the Definitions Section of the Code.

It shall be the policy of the USOC, in addition to the provisions of Section 2 above, to require participation by all *Athletes* who are candidates for membership on the U.S. Olympic, or Paralympic Teams in the USADA RTP for a period of at least 12 months before the commencement of the Games, provided, however, in exceptional circumstances, for good cause shown in writing, the USOC CEO may waive a portion of this 12 month period. In some sports, potential team candidates are not generally members of the NGB for their sport and are not otherwise subject to the jurisdiction of the NGB. The terms and conditions for testing *Athletes* who are not subject to the jurisdiction of a NGB, which may vary based upon the circumstances existing in each sport, shall be determined by the USOC Chief Executive Officer. Any such *Athlete* who is invited to participate in the USADA RTP under the terms and conditions established by the USOC Chief Executive Officer and declines such invitation shall not be eligible, subject to the right to a hearing set forth in paragraph 8 of these policies, to participate on the USOC's Team at the next Olympic or Paralympic Games (Summer or Winter) and shall otherwise be ineligible within the meaning of paragraph 5 of these policies for a period of 12 months following that invitation.

5.    **Ineligibility and Loss of USOC and NGB Opportunities and Benefits.**

As provided in the Code, the term "ineligibility" means the *Athlete* or other *Person* is barred for a specified period of time from participating in any *Competition* or *Event* or other activity or funding. For purposes of these rules the terms "ineligible" and "ineligibility" include the same meaning as set forth in the Code and, in addition, and for the avoidance of doubt, mean that the *Athlete* or other *Person* is barred from (i) participating in the Olympic, Pan American, or Paralympic Games, trials, or qualifying events; (ii) being a member of an Olympic, Pan American or Paralympic Games Team or staff; (iii) being a member of, or a coach or staff member for, any team selected, organized, nominated or funded in whole or in part by the USOC or any NGB; (iv) having access to the training facilities of an Olympic Training Center, other programs and activities of the USOC or any NGB and any funding of the USOC or any NGB, including, but not limited to, grants, stipends, insurance, awards or employment all as and to the extent more fully set out in Annex B. The applicable USOC policy on suspension of benefits in circumstances addressed by this rule, including on suspension of NGB benefits, is attached as Annex B and is incorporated herein by this reference.

6.    **Rules of International Federations.**

The requirements and consequences set forth in this Policy shall be in addition to those obligations imposed by the various IFs and shall not relieve any *Athlete* or *Athlete Support Personnel* of the consequence of failing to comply with the anti-doping rules of his or her IF.

7.    **Right to Hearing.**

No *Athlete* or *Athlete Support Personnel* shall be denied eligibility within the meaning of paragraph 5 of these policies without first being afforded the opportunity for a hearing pursuant to the USADA Protocol for Olympic Movement Testing ("USADA Protocol")

incorporated into the contract between the USOC and USADA or other hearing process which respects the principles in Article 8 of the Code.

8. **Pre Games Testing.**

All *Athletes* nominated for appointment to a U.S. Team for the Olympic, Paralympic or Pan American Games (the "Games") shall have been tested for doping at some time not more than 150 days prior to the *Athlete* competing in the Games. No *Athlete* may compete for the United States in any Games, whether by trials, substitution or otherwise, unless he or she has been tested for doping and found negative within this 150 day period. It shall be the USOC's and USADA's obligation to ensure that the required *Testing* occurs within the 150 day period. After appointment, *Athletes* on the U.S. Team may also be subject to additional *Testing* through said Games. For purposes of this Article, if a *Specimen* is collected at trials or another *Event* or *Competition*, the *Specimen* analysis shall test for those substances and methods that are prohibited and tested for at any time under the WADA *Prohibited List*; if a *Specimen* is not collected at trials or another *Event* or *Competition*, the *Specimen* analysis shall test for those substances and methods on the WADA *Prohibited List* which are prohibited and tested for *Out-of-Competition*. If an NGB submits an *Athlete* as a replacement after the team has been selected, the NGB shall notify the USADA of such replacement within 48 hours so that USADA may conduct *Testing* pursuant to this section if necessary. The NGB shall also arrange to make the replacement available for *Testing*.

In the event that a specimen is confirmed to have an adverse analytical finding after the U.S. Team has been nominated by the NGB and approved by the USOC for the Olympic, Paralympic or Pan American Games, any hearing requested by the athlete for purposes of determining eligibility for the U.S. Team shall be conducted on an expedited basis pursuant the USADA Protocol. In the interest of time, the athlete or USADA may waive the Anti-Doping Review Board process set forth in the USADA Protocol.

9. **Mandatory Education for Members of USADA RTP.**

The USOC has determined that compliance with the Code and other applicable anti-doping rules is most likely to be achieved if Athletes participate in specially formulated educational programs to facilitate their understanding of the applicable anti-doping rules and of their responsibilities under those rules. Each Athlete designated for inclusion in the USADA RTP is required within thirty (30) days of such designation and on an annual basis thereafter to complete a USOC approved USADA online education program (currently in development as of late 2008). Each coach of a national team organized by the USOC or by any NGB must, before coaching in any competition as a national team coach and/or prior to participating in any national team training or preparation sponsored by the USOC or by any NGB, must complete the USOC approved USADA online education program. The foregoing obligations shall not go in to effect until the USADA online education program is approved by the USOC, which approval shall be as to format and method of communication, with the USOC relying on USADA for substantive knowledge of the *Code* and other applicable anti-doping rules.

3

10. **Public Disclosure of Pending Cases.**

No later than 5 business days after it has been determined in a hearing in accordance with the USADA Protocol that an anti-doping rule violation has occurred, or such hearing has been waived, or the assertion of an anti-doping rule violation has not been timely challenged, USADA shall publicly report the disposition of the anti-doping matter.

11. **Agreement by Athletes and Athlete Support Personnel to be Bound by the USOC National Anti-Doping Policies and the USADA Protocol.**

The Code requires that each *Signatory* establish rules and procedures to ensure that all Participants (as that term is defined in the Code) under the authority of the *Signatory* and its member organizations are informed of, and agree to be bound by, anti-doping rules in force of the relevant anti-doping organizations. To implement this requirement, each NGB shall be responsible for informing *Athletes* and *Athlete Support Personnel* in its sport of these USOC National Anti-Doping Policies and the USADA Protocol which is incorporated into the agreement between the USOC and USADA. By virtue of their membership in an NGB, license from a NGB, participation in an *Event* or *Competition* organized or sanctioned by an NGB, selection for a national team, receipt of benefits from an NGB or the USOC or by virtue of their inclusion in the USADA RTP, *Participants* agree to be bound by the USOC National Anti-Doping Policies and the USADA Protocol.

12. **NGB Compliance with USOC National Anti-Doping Policies and the USADA Protocol.**

The Code imposes the obligation on the USOC to require as a condition of funding and recognition of NGBs that NGB rules be in compliance with applicable provisions of the Code. The applicable provisions of the Code have been incorporated into these USOC National Anti-Doping Policies and the USADA Protocol. NGBs shall not have any anti-doping rule which is inconsistent with these Policies or the USADA Protocol, and NGB compliance with these Policies and the USADA Protocol shall be a condition of USOC funding and recognition.

13. **Incorporation into USOC/USADA Agreement.**

USADA's responsibility for implementing the applicable provisions of these Policies shall be incorporated in the Agreement between the USOC and USADA.

14. **Review.**

The USOC will review implementation of these National Anti-Doping Policies on an annual basis.

15. **Effective Date.**

These restated USOC National Anti-Doping Policies, adopted by the USOC Board of Directors on October 12, 2008, shall go into effect on January 1, 2009. Such revisions

4

shall not apply retroactively to matters pending before January 1, 2009 except as provided in Article 25 of the Code. The USOC National Anti-Doping Policies, as modified through August 13, 2004, shall remain in effect until December 31, 2008.

# EXHIBIT G

# UNITED STATES OLYMPIC COMMITTEE (USOC) ANTI-DOPING POLICIES

Revisions effective as of August 13, 2004, unless otherwise noted

# INDEX

USOC Anti-Doping Policies                                        1

**Annex A:** Articles From the World Anti-Doping Code           8

**Annex B:** U.S. Anti-Doping Agency (USADA) Procedure         27
                 Regarding Missed Tests

**Annex C:** Suspension of Benefits                            30

USADA and the USADA logo are registered trademarks of the U.S. Anti-Doping Agency. All Rights Reserved.
©USADA 2004. All Rights Reserved.

**United States Olympic Committee**
**Anti-Doping Policies**
*(Revisions effective as of August 13, 2004, unless otherwise noted)*

1.      <u>Mandatory Rules from the World Anti-Doping Code.</u>

The World Anti-Doping Code requires each National Olympic Committee and National Paralympic Committee to adopt certain Articles from the World Anti-Doping Code verbatim into its own rules. The United States Olympic Committee ("USOC") hereby adopts the rules set forth in Annex A which are incorporated herein by reference.

2.      <u>Retirement.</u>

a.      Any athlete enrolled in the United States Anti-Doping Agency's ("USADA") Registered Testing Pool who wishes to be removed from the program on account of retirement must promptly notify USADA and the applicable National Governing Body ("NGB") in writing in order for retirement from the Registered Testing Pool to be effective. Any athlete who has not provided advance written notice of retirement to USADA and then refuses to participate in a USADA test claiming retirement, shall be "ineligible" within the meaning of paragraph 6 of these policies for a period of 2 years following such refusal, subject to the right to a hearing set forth in paragraph 8 of these policies.

b.      Any athlete who has ever been enrolled in a No Advance Notice testing program or Registered Testing Pool of an International Federation ("IF"), the USOC or USADA who retires and then wishes to return to eligible status must enroll in the USADA Registered Testing Pool program at least 6 months in advance of regaining eligible status and, for purposes of participating on a USOC Team in the Olympic Games or Paralympic Games, 12 months before the start of those Games.

1

c.  USADA shall not suspend or terminate the prosecution of a doping offense as a result of an athlete's subsequent retirement.

3.  **Suspension by an NGB or International Federation.**

Athletes and athlete support personnel shall be ineligible within the meaning of paragraph 6 of these policies while serving a period of ineligibility for violating anti-doping rules imposed by a National Governing Body as the result of proceedings by USADA or by an International Federation or other signatory to the World Anti-Doping Code.

4.  **Testing During Ineligibility.**

In order to regain eligibility, within the meaning of paragraph 6 of these policies, any athlete who is declared ineligible for an anti-doping rule violation by a National Governing Body or, International Federation or other signatory to the World Anti-Doping Code must comply with all requirements of the USADA Registered Testing Pool program during the period of ineligibility and must bear the costs associated with any no advance notice tests conducted by USADA on him or her during the period of ineligibility.

If an athlete subject to a period of ineligibility retires and is removed from USADA's Registered Testing Pool, then the athlete shall be subject to the additional reinstatement obligations set forth in Article 10.10 of the World Anti-Doping Code, as set forth in Annex A.

5.  **Prior Participation in USADA's Registered Testing Pool Program by Potential Members of the U.S. Olympic and Paralympic Teams.**

It shall be the policy of the USOC to subject all athletes who are candidates for membership on the U.S. Olympic, or Paralympic Teams to USADA's no-advance-notice drug testing program for a period of at least 12 months before the commencement of the Games. In some sports, potential team candidates are not generally members of the NGB

2

for their sport and are not otherwise subject to the jurisdiction of the NGB. The terms and conditions for testing athletes who are not subject to the jurisdiction of an NGB, which may vary based upon the circumstances existing in each sport, shall be determined by the USOC Chief Executive Officer. Any such athlete who is invited to participate in the USADA Registered Testing Pool program under the terms and conditions established by the USOC Chief Executive Officer and declines such invitation shall not be eligible, subject to the right to a hearing set forth in paragraph 8 of these policies, to participate on the USOC's Team at the next Olympic or Paralympic Games and shall otherwise be ineligible within the meaning of paragraph 6 of these policies for a period of 12 months following that invitation. (Athletes who are members of an NGB shall be automatically included in the USADA Registered Testing Pool after notice to them that they have been so designated by USADA in consultation with their NGB.)

6.    **Ineligibility and Loss of USOC and NGB Opportunities and Benefits.**

If an athlete or athlete support personnel is found to be "ineligible" on account of an anti-doping rule violation, the athlete will not be permitted to (i) participate in the Olympic, Pan American, or Paralympic Games, trials, or qualifying events; (ii) be a member of an Olympic, Pan American or Paralympic Games Team or staff; or (iii) have access to the training facilities of an Olympic Training Center or other programs and activities of the USOC including, but not limited to, grants, awards or employment. The applicable USOC policy on suspension of benefits in circumstances addressed by this rule, including on suspension of NGB benefits, is attached as Annex C and is incorporated herein by this reference.

7.    **Rules of International Federations.**

The requirements and consequences set forth in this Policy shall be in addition to those obligations related to out-of-competition testing imposed by the various International Federations and shall not relieve any athlete of the consequence of failing to comply with the anti-doping rules of his or her International Federation.

3

8.   **Right to Hearing.**

No athlete or athlete support personnel shall be denied eligibility within the meaning of paragraph 6 of these policies without first being afforded the opportunity for a hearing pursuant to the USADA Protocol for Olympic Movement Testing ("USADA Protocol") incorporated into the contract between the USOC and USADA.

9.   **Pre Games Testing.**

All athletes nominated for appointment to a U.S. Team for the Olympic, Paralympic or Pan American Games shall have been tested for doping at some time not more than 120 days prior to the opening ceremonies of such Games with such test or tests not resulting in an anti-doping rule violation. No athlete may be added to the U.S. Team by substitution or otherwise, unless he or she has been tested for doping and found negative within this 120 day period. It shall be the USOC's and USADA's obligation to ensure that the required testing occurs within the 120 day period. After appointment, athlete members of the U.S. Team may also be subject to additional testing through said Games. For purposes of this Article, if a specimen is collected at trials or other competition, the specimen analysis shall test for those substances and methods tested for in the applicable International Federation's In-Competition program; if a specimen is not collected at trials or other competition, the specimen analysis shall test for those substances and methods on the WADA List of Prohibited Substances which are prohibited both in- and out-of-competition. If an NGB submits an athlete as a replacement after the team has been selected, NGB shall notify the USADA of such replacement within 48 hours so that the USADA may conduct testing pursuant to this section if necessary. The NGB shall also arrange to make the replacement available for testing.

In the event that a specimen is confirmed to have an adverse analytical finding after the U.S. Team has been nominated by the NGB and approved by the USOC for the Olympic, Paralympic or Pan American Games, any hearing requested by the athlete for purposes of determining eligibility for the U.S. Team shall be conducted on an

4

expedited basis pursuant to paragraph 9 of the USADA Protocol, but this sentence shall not apply until September 1, 2004. In the interest of time, the athlete may waive the Review Board process set forth in paragraph 9(a) of the USADA Protocol.

10.   **Missed No Advance Notice Tests.**

a.   Under the Registered Testing Pool program implemented by USADA, it is the responsibility of each athlete designated by a National Governing Body for participation in the Registered Testing Pool to provide USADA with up-to-date information on his or her whereabouts so that he or she can be located for no advance notice testing. Athletes identified for no advance notice testing are required to file Athlete Location Forms with USADA on a quarterly basis. They are also responsible for notifying USADA when they will not be available for testing at the location specified on their Athlete Location Form. USADA has provided all athletes in the USADA Registered Testing Pool both a facsimile number and e-mail address to use in updating their Athlete Location Forms or to notify USADA that they will not be available for testing at the specified location at a particular time. The USADA procedure for determining that an athlete participating in the Registered Testing Pool program has a "missed test" is attached as Annex B.

b.   Any athlete having three missed tests within any rolling 18 month period shall be ineligible within the meaning of paragraph 6 of these policies for a period of two years from the athlete's last "missed test." No athlete shall be disciplined for having three missed tests within an 18 month period unless the athlete has been offered an opportunity for a hearing as provided in paragraph 8 of these policies. Missed tests shall not be announced publicly until the conclusion of the hearing process.

5

11.   Public Disclosure of Pending Cases.

No later than 2 business days after it has been determined in a hearing in accordance with the USADA Protocol that an anti-doping rule violation has occurred, or such hearing has been waived, or the assertion of an anti-doping rule violation has not been timely challenged, USADA shall publicly report the disposition of the anti-doping matter.

12.   Agreement by Participants to be Bound by the USOC National Anti-Doping Policies and the USADA Protocol.

The World Anti-Doping Code requires that each signatory establish rules and procedures to ensure that all Participants (as that term is defined in the World Anti-Doping Code) under the authority of the signatory and its member organizations are informed of and agree to be bound by anti-doping rules in force of the relevant anti-doping organizations. To implement this requirement, each NGB shall be responsible for informing Participants in its sport of these USOC National Anti-Doping Policies and the USADA Protocol which is incorporated into the agreement between the USOC and USADA. By virtue of their membership in an NGB or participation in a competition organized or sanctioned by an NGB, Participants agree to be bound by the USOC National Anti-Doping Policies and the USADA Protocol.

13.   NGB Compliance with USOC National Anti-Doping Policies and the USADA Protocol.

The World Anti-Doping Code imposes the obligation on the USOC to require as a condition of funding and recognition of NGBs that NGB rules be in compliance with applicable provisions of the World Anti-Doping Code. The applicable provisions of the World Anti-Doping Code have been incorporated into these USOC National Anti-Doping Policies and the USADA Protocol. NGBs shall not have any anti-doping rule which is inconsistent with these policies or the USADA Protocol, and NGB compliance with these policies and the USADA Protocol shall be a condition of USOC funding and recognition.

6

14.    **Incorporation into USOC/USADA Agreement.**

USADA's responsibility for implementing the applicable provisions of these policies shall be incorporated in the Agreement between the USOC and USADA.

15.    Review.

The USOC will review implementation of these National Anti-Doping Policies on an annual basis.

16.    **Effective Date.**

These restated USOC National Anti-Doping Policies, adopted by the USOC Board of Directors on August 12, 2004, shall go into effect on August 13, 2004. Such revisions shall not apply retroactively to matters pending before August 13, 2004. The USOC National Anti-Doping Policies, as modified through October 5, 2002, shall remain in effect until August 13, 2004.

<u>ANNEX A TO USOC NATIONAL ANTI-DOPING POLICIES</u>

<u>ARTICLES FROM THE WORLD ANTI-DOPING CODE INCORPORATED
VERBATIM INTO THE USOC ANTI-DOPING POLICIES AND THE USADA
PROTOCOL FOR OLYMPIC MOVEMENT TESTING</u>

## ARTICLE 1: DEFINITION OF DOPING

Doping is defined as the occurrence of one or more of the anti-doping rule violations set forth in Article 2.1 through Article 2.8 of the Code.

## ARTICLE 2: ANTI-DOPING RULE VIOLATIONS

The following constitute anti-doping rule violations:

2.1 The presence of a *Prohibited Substance* or its *Metabolites* or *Markers* in an *Athlete's* bodily *Specimen*.

    2.1.1 It is each *Athlete's* personal duty to ensure that no *Prohibited Substance* enters his or her body. Athletes are responsible for any *Prohibited Substance* or its *Metabolites* or *Markers* found to be present in their bodily *Specimens*. Accordingly, it is not necessary that intent, fault, negligence or knowing *Use* on the *Athlete's* part be demonstrated in order to establish an anti-doping violation under Article 2.1.

    2.1.2 Excepting those substances for which a quantitative reporting threshold is specifically identified in the *Prohibited List*, the detected presence of any quantity of a *Prohibited Substance* or its *Metabolites* or *Markers* in an *Athlete's Sample* shall constitute an anti-doping rule violation.

    2.1.3 As an exception to the general rule of Article 2.1, the *Prohibited List* may establish special criteria for the evaluation of *Prohibited Substances* that can also be produced endogenously.

8

2.2     *Use* or *Attempted Use* of a *Prohibited Substance* or a *Prohibited Method*.

    2.2.1   The success or failure of the *Use* of a *Prohibited Substance* or *Prohibited Method* is not material. It is sufficient that the *Prohibited Substance* or *Prohibited Method* was *Used* or *Attempted* to be *Used* for an anti-doping rule violation to be committed.

2.3     Refusing, or failing without compelling justification, to submit to *Sample* collection after notification as authorized in applicable anti-doping rules or otherwise evading *Sample* collection.

2.4     Violation of applicable requirements regarding *Athlete* availability for *Out-of-Competition Testing* including failure to provide required whereabouts information and missed tests which are declared based on reasonable rules.

2.5     *Tampering*, or *Attempting* to tamper, with any part of *Doping Control*.

2.6     *Possession* of *Prohibited Substances* and *Methods*:

    2.6.1   *Possession* by an *Athlete* at any time or place of a substance that is prohibited in *Out-of-Competition Testing* or a *Prohibited Method* unless the *Athlete* establishes that the *Possession* is pursuant to a therapeutic use exemption granted in accordance with Article 4.4 (Therapeutic Use) or other acceptable justification.

    2.6.2   *Possession* of a substance that is prohibited in *Out-of-Competition Testing* or a *Prohibited Method* by *Athlete Support Personnel* in connection with an *Athlete, Competition* or training, unless the *Athlete Support Personnel* establishes that the *Possession* is pursuant to a therapeutic use exemption granted to an *Athlete* in accordance with Article 4.4 (Therapeutic Use) or other acceptable justification.

9

2.7     *Trafficking* in any *Prohibited Substance* or *Prohibited Method*.

2.8     Administration or *Attempted* administration of a *Prohibited Substance* or *Prohibited Method* to any *Athlete*, or assisting, encouraging, aiding, abetting, covering up or any other type of complicity involving an anti-doping rule violation or any *Attempted* violation.

## ARTICLE 3: PROOF OF DOPING

3.1     Burdens and Standards of Proof.
The *Anti-Doping Organization* shall have the burden of establishing that an anti-doping rule violation has occurred. The standard of proof shall be whether the *Anti-Doping Organization* has established an anti-doping rule violation to the comfortable satisfaction of the hearing body bearing in mind the seriousness of the allegation which is made. This standard of proof in all cases is greater than a mere balance of probability but less than proof beyond a reasonable doubt. Where the *Code* places the burden of proof upon the *Athlete* or other *Person* alleged to have committed an anti-doping rule violation to rebut a presumption or establish specified facts or circumstances, the standard of proof shall be by a balance of probability

3.2     Methods of Establishing Facts and Presumptions.
Facts related to anti-doping rule violations may be established by any reliable means, including admissions.  The following rules of proof shall be applicable in doping cases:

3.2.1   *WADA*-accredited laboratories are presumed to have conducted *Sample* analysis and custodial procedures in accordance with the *International Standard* for laboratory analysis. The *Athlete* may rebut this presumption by establishing that a departure from the *International Standard* occurred.

If the *Athlete* rebuts the preceding presumption by showing that a departure from the *International Standard* occurred, then the *Anti-Doping Organization* shall have the burden to establish that such departure did not cause the *Adverse Analytical Finding*.

10

3.2.2   Departures from the *International Standard* for *Testing* which did not cause an *Adverse Analytical Finding* or other anti-doping rule violation shall not invalidate such results. If the *Athlete* establishes that departures from the *International Standard* occurred during *Testing* then the *Anti-Doping Organization* shall have the burden to establish that such departures did not cause the *Adverse Analytical Finding* or the factual basis for the anti-doping rule violation.

## ARTICLE 9: AUTOMATIC DISQUALIFICATION OF INDIVIDUAL RESULTS

An anti-doping rule violation in connection with an *In-Competition* test automatically leads to *Disqualification* of the individual result obtained in that *Competition* with all resulting consequences, including forfeiture of any medals, points and prizes.

## ARTICLE 10: SANCTIONS ON INDIVIDUALS

10.1   *Disqualification* of Results in *Event* During which an Anti-Doping Rule Violation Occurs

An anti-doping rule violation occurring during or in connection with an *Event* may, upon the decision of the ruling body of the *Event*, lead to Disqualification of all of the *Athletes* individual results obtained in that *Event* with all consequences, including forfeiture of all medals, points and prizes, except as provided in Article 10.1.1.

10.1.1   If the *Athlete* establishes that he or she bears *No Fault* or *Negligence* for the violation, the *Athlete's* individual results in the other *Competitions* shall not be *Disqualified* unless the *Athlete's* results in *Competitions* other than the *Competition* in which the anti-doping rule violation occurred were likely to have been affected by the *Athlete's* anti-doping rule violation.

11

10.2   Imposition of *Ineligibility* for *Prohibited Substances* and *Prohibited Methods*

Except for the specified substances identified in Article 10.3, the period of *Ineligibility* imposed for a violation of Articles 2.1 (presence of *Prohibited Substance* or its *Metabolites* or *Markers*), 2.2 (*Use* or *Attempted Use* of *Prohibited Substance* or *Prohibited Method*) and 2.6 (Possession of *Prohibited Substances* and *Methods*) shall be:

- First violation: Two (2) years' *Ineligibility*.
- Second violation: Lifetime *Ineligibility*.

However, the *Athlete* or other *Person* shall have the opportunity in each case, before a period of *Ineligibility* is imposed, to establish the basis for eliminating or reducing this sanction as provided in Article 10.5.

10.3   Specified Substances

The *Prohibited List* may identify specified substances which are particularly susceptible to unintentional anti-doping rules violations because of their general availability in medicinal products or which are less likely to be successfully abused as doping agents. Where an *Athlete* can establish that the *Use* of such a specified substance was not intended to enhance sport performance, the period of *Ineligibility* found in Article 10.2 shall be replaced with the following:

- *First violation:* At a minimum, a warning and reprimand and no period of *Ineligibility* from future *Events*, and at a maximum, one (1) year's *Ineligibility*.

- *Second violation*: Two (2) years' *Ineligibility*.

- *Third violation*: Lifetime *Ineligibility*.

However, the *Athlete* or other *Person* shall have the opportunity in each case, before a period of *Ineligibility* is imposed, to establish the basis for eliminating or reducing (in the case of a second or third violation) this sanction as provided in Article 10.5.

12

10.4    *Ineligibility* for Other Anti-Doping Rule Violations

The period of *Ineligibility* for other anti-doping rule violations shall be:

10.4.1    For violations of Article 2.3 (refusing or failing to submit to *Sample* collection) or Article 2.5 (*Tampering* with *Doping Control*), the *Ineligibility* periods set forth in Article 10.2 shall apply.

10.4.2    For violations of Articles 2.7 (*Trafficking*) or 2.8 (administration of *Prohibited Substance* or *Prohibited Method*), the period of *Ineligibility* imposed shall be a minimum of four (4) years up to lifetime *Ineligibility*. An anti-doping rule violation involving a *Minor* shall be considered a particularly serious violation, and, if committed by *Athlete Support Personnel* for violations other than specified substances referenced in Article 10.3, shall result in lifetime *Ineligibility* for such *Athlete Support Personnel*. In addition, violations of such Articles which also violate non-sporting laws and regulations, may be reported to the competent administrative, professional or judicial authorities.

10.4.3    For violations of Article 2.4 (whereabouts violation or missed test), the period of *Ineligibility* shall be at a minimum 3 months and at a maximum 2 years in accordance with the rules established by the *Anti-Doping Organization* whose test was missed or whereabouts requirement was violated. The period of *Ineligibility* for subsequent violations of Article 2.4 shall be as established in the rules of the *Anti-Doping Organization* whose test was missed or whereabouts requirement was violated.

10.5     Elimination or Reduction of Period of *Ineligibility* Based on Exceptional
         Circumstances.

    10.5.1     *No Fault* or *Negligence*

        If the *Athlete* establishes in an individual case involving an anti-
         doping rule violation under Article 2.1 (presence of *Prohibited
         Substance* or its *Metabolites* or *Markers*) or *Use* of a *Prohibited
         Substance* or *Prohibited Method* under Article 2.2 that he or
         she bears *No Fault* or *Negligence* for the violation, the
         otherwise applicable period of Ineligibility shall be eliminated.
         When a *Prohibited Substance* or its *Markers* or *Metabolites* is
         detected in an Athlete's Specimen in violation of Article 2.1
         (presence of *Prohibited Substance*), the *Athlete* must also
         establish how the *Prohibited Substance* entered his or her
         system in order to have the period of *Ineligibility* eliminated. In
         the *Event* this Article is applied and the period of *Ineligibility*
         otherwise applicable is eliminated, the anti-doping rule violation
         shall not be considered a violation for the limited purpose of
         determining the period of *Ineligibility* for multiple violations
         under Articles 10.2, 10.3 and 10.6.

    10.5.2     No Significant Fault or Negligence

        This Article 10.5.2 applies only to anti-doping rule violations
         involving Article 2.1 (presence of *Prohibited Substance* or its
         *Metabolites* or *Markers*), *Use* of a *Prohibited Substance* or
         *Prohibited Method* under Article 2.2, failing to submit to *Sample*
         collection under Article 2.3, or administration of a *Prohibited
         Substance* or *Prohibited Method* under Article 2.8. If an *Athlete*
         establishes in an individual case involving such violations that
         he or she bears *No Significant Fault* or *Negligence*, then the
         period of Ineligibility may be reduced, but the reduced period of
         *Ineligibility* may not be less than one-half of the minimum
         period of *Ineligibility* otherwise applicable. If the otherwise
         applicable period of *Ineligibility* is a lifetime, the reduced period
         under this section may be no less than 8 years. When a
         *Prohibited Substance* or its *Markers* or *Metabolites* is detected

**14**

in an *Athlete's Specimen* in violation of Article 2.1 (presence of *Prohibited Substance*), the *Athlete* must also establish how the *Prohibited Substance* entered his or her system in order to have the period of *Ineligibility* reduced.

10.5.3   *Athlete's* Substantial Assistance in Discovering or Establishing Anti-Doping Rule Violations by *Athlete Support Personnel* and Others.

An *Anti-Doping Organization* may also reduce the period of *Ineligibility* in an individual case where the *Athlete* has provided substantial assistance to the *Anti-Doping Organization* which results in the *Anti-Doping Organization* discovering or establishing an anti-doping rule violation by another *Person* involving *Possession* under Article 2.6.2 (*Possession by Athlete Support Personnel*), Article 2.7 (*Trafficking*), or Article 2.8 (administration to an *Athlete*). The reduced period of Ineligibility may not, however, be less than one-half of the minimum period of *Ineligibility* otherwise applicable. If the otherwise applicable period of *Ineligibility* is a lifetime, the reduced period under this section may be no less than 8 years.

10.6   Rules for Certain Potential Multiple Violations

10.6.1   For purposes of imposing sanctions under Articles 10.2, 10.3 and 10.4, a second anti-doping rule violation may be considered for purposes of imposing sanctions only if the *Anti-Doping Organization* can establish that the *Athlete* or other Person committed the second anti-doping rule violation after the *Athlete* or other *Person* received notice, or after the *Anti-Doping Organization* made a reasonable *Attempt* to give notice, of the first anti-doping rule violation; if the *Anti-Doping Organization* cannot establish this, the violations shall be considered as one single first violation, and the sanction imposed shall be based on the violation that carries the more severe sanction.

15

10.6.2 Where an *Athlete*, based on the same *Doping Control*, is found to have committed an anti-doping rule violation involving both a specified substance under Article 10.3 and another *Prohibited Substance* or *Prohibited Method*, the *Athlete* shall be considered to have committed a single anti-doping rule violation, but the sanction imposed shall be based on the *Prohibited Substance* or *Prohibited Method* that carries the most severe sanction.

10.6.3 Where an *Athlete* is found to have committed two separate anti-doping rule violations, one involving a specified substance governed by the sanctions set forth in Article 10.3 (Specified Substances) and the other involving a *Prohibited Substance* or *Prohibited Method* governed by the sanctions set forth in Article 10.2 or a violation governed by the sanctions in Article 10.4.1, the period of *Ineligibility* imposed for the second offense shall be at a minimum two years' *Ineligibility* and at a maximum three years' *Ineligibility*. Any Athlete found to have committed a third anti-doping rule violation involving any combination of specified substances under Article 10.3 and any other anti-doping rule violation under 10.2 or 10.4.1 shall receive a sanction of lifetime *Ineligibility*.

10.7   *Disqualification* of Results in *Competitions* Subsequent to *Sample* Collection

In addition to the automatic *Disqualification* of the results in the *Competition* which produced the positive *Sample* under Article 9 (Automatic *Disqualification* of Individual Results), all other competitive results obtained from the date a positive *Sample* was collected (whether *In-Competition* or *Out-of-Competition*), or other doping violation occurred, through the commencement of any *Provisional Suspension* or *Ineligibility* period, shall, unless fairness requires otherwise, be *Disqualified* with all of the resulting consequences including forfeiture of any medals, points and prizes.

16

10.8    Commencement of *Ineligibility* Period

The period of *Ineligibility* shall start on the date of the hearing decision providing for *Ineligibility* or, if the hearing is waived, on the date *Ineligibility* is accepted or otherwise imposed. Any period of *Provisional Suspension* (whether imposed or voluntarily accepted) shall be credited against the total period of *Ineligibility* to be served. Where required by fairness, such as delays in the hearing process or other aspects of *Doping Control* not attributable to the *Athlete*, the body imposing the sanction may start the period of *Ineligibility* at an earlier date commencing as early as the date of *Sample* collection.

10.9    Status During *Ineligibility*

No *Person* who has been declared *Ineligible* may, during the period of *Ineligibility*, participate in any capacity in a *Competition* or activity (other than authorized anti-doping education or rehabilitation programs) authorized or organized by any *Signatory* or *Signatory's* member organization. In addition, for any anti-doping rule violation not involving specified substances described in Article 10.3, some or all sport-related financial support or other sport-related benefits received by such *Person* will be withheld by Signatories, Signatories' member organizations and governments. A *Person* subject to a period of *Ineligibility* longer than four years may, after completing four years of the period of *Ineligibility*, participate in local sport *Events* in a sport other than the sport in which the *Person* committed the anti-doping rule violation, but only so long as the local sport event is not at a level that could otherwise qualify such Person directly or indirectly to compete in (or accumulate points toward) a national championship or *International Event*.

10.10   Reinstatement Testing

As a condition to regaining eligibility at the end of a specified period of *Ineligibility*, an *Athlete* must, during any period of *Provisional Suspension* or *Ineligibility*, make him or herself available for *Out-of-Competition Testing* by any *Anti-Doping Organization* having testing jurisdiction, and must, if requested, provide current and accurate whereabouts information. If an *Athlete* subject to a period of *Ineligibility*

17

retires from sport and is removed from *Out-of-Competition Testing* pools and later seeks reinstatement, the *Athlete* shall not be eligible for reinstatement until the *Athlete* has notified relevant *Anti-Doping Organizations* and has been subject to *Out-of-Competition Testing* for a period of time equal to the period of *Ineligibility* remaining as of the date the *Athlete* had retired.

## ARTICLE 11 CONSEQUENCES TO TEAMS

Where more than one team member in a *Team Sport* has been notified of a possible anti-doping rule violation under Article 7 in connection with an *Event*, the Team shall be subject to *Target Testing* for the *Event*. If more than one team member in a *Team Sport* is found to have committed an anti-doping rule violation during the *Event*, the team may be subject to *Disqualification* or other disciplinary action. In sports which are not *Team Sports* but where awards are given to teams, *Disqualification* or other disciplinary action against the team when one or more team members have committed an anti-doping rule violation shall be as provided in the applicable rules of the International Federation.

## ARTICLE 13 APPEALS

13.1    Decisions Subject to Appeal

Decisions made under the *Code* or rules adopted pursuant to the *Code* may be appealed as set forth below in Articles 13.2 through 13.4. Such decisions shall remain in effect while under appeal unless the appellate body orders otherwise. Before an appeal is commenced, any post-decision review provided in the *Anti-Doping Organization's* rules must be exhausted, provided that such review respects the principles set forth in Article 13.2.2 below.

13.2    Appeals from Decisions Regarding Anti-Doping Rule Violations, *Consequences*, and *Provisional Suspensions*

A decision that an anti-doping rule violation was committed, a decision imposing *Consequences* for an anti-doping rule violation, a decision that

18

no anti-doping rule violation was committed, a decision that an *Anti-Doping Organization* lacks jurisdiction to rule on an alleged anti-doping rule violation or its *Consequences*, and a decision to impose a Provisional Suspension as a result of a *Provisional Hearing* or in violation of Article 7.5 may be appealed exclusively as provided in this Article 13.2.

13.2.1   Appeals Involving *International-Level* Athletes

In cases arising from competition in an *International Event* or in cases involving *International-Level* Athletes, the decision may be appealed exclusively to the Court of Arbitration for Sport ("CAS") in accordance with the provisions applicable before such court.

13.2.3   *Persons* Entitled to Appeal

In cases under Article 13.2.1, the following parties shall have the right to appeal to CAS: (a) the *Athlete* or other *Person* who is the subject of the decision being appealed; (b) the other party to the case in which the decision was rendered; (c) the relevant International Federation and any other *Anti-Doping Organization* under whose rules a sanction could have been imposed; (d) the International Olympic Committee or International Paralympic Committee, as applicable, where the decision may have an effect in relation to the Olympic Games or Paralympic Games, including decisions affecting eligibility for the Olympic Games or Paralympic Games; and (e) *WADA*. In cases under Article 13.2.2, the parties having the right to appeal to the national-level reviewing body shall be as provided in the *National Anti-Doping Organization's* rules but, at a minimum, shall include: (a) the *Athlete* or other *Person* who is the subject of the decision being appealed; (b) the other party to the case in which the decision was rendered; (c) the relevant International Federation; and (d) *WADA*. For cases under Article 13.2.2, *WADA* and the International Federation shall also have the right to appeal to CAS with respect to the decision of the national-level reviewing body.

19

Notwithstanding any other provision herein, the only Person that may appeal from a *Provisional Suspension* is the *Athlete* or other *Person* upon whom the *Provisional Suspension* is imposed.

13.3    Appeals from Decisions Granting or Denying a Therapeutic *Use* Exemption

Decisions by *WADA* reversing the grant or denial of a therapeutic use exemption may be appealed exclusively to CAS by the *Athlete* or the *Anti-Doping Organization* whose decision was reversed. Decisions by *Anti-Doping Organizations* other than *WADA* denying therapeutic use exemptions, which are not reversed by *WADA*, may be appealed by *International-Level Athletes* to CAS and by other Athletes to the national level reviewing body described in Article 13.2.2. If the national level reviewing body reverses the decision to deny a therapeutic use exemption, that decision may be appealed to CAS by *WADA*.

13.4    Appeals from Decisions Imposing *Consequences* under Part Three of the Code

With respect to *consequences* imposed under Part Three (Roles and Responsibilities) of the *Code*, the entity upon which *consequences* are imposed under Part Three of the *Code* shall have the right to appeal exclusively to CAS in accordance with the provisions applicable before such court.

13.5    Appeals from Decisions Suspending or Revoking Laboratory Accreditation

Decisions by *WADA* to suspend or revoke a laboratory's *WADA* accreditation may be appealed only by that laboratory with the appeal being exclusively to CAS.

20

## ARTICLE 17 STATUTE OF LIMITATIONS

No action may be commenced against an Athlete or other Person for a violation of an anti-doping rule contained in the Code unless such action is commenced with eight years from the date the violation occurred.

## DEFINITIONS

**Adverse Analytical Finding:** A report from a laboratory or other approved Testing entity that identifies in a *Specimen* the presence of a *Prohibited Substance* or its *Metabolites* or *Markers* (including elevated quantities of endogenous substances) or evidence of the *Use* of a *Prohibited Method*.

**Anti-Doping Organization:** A *Signatory* that is responsible for adopting rules for initiating, implementing or enforcing any part of the *Doping Control* process. This includes, for example, the International Olympic Committee, the International Paralympic Committee, other *Major Event Organizations* that conduct *Testing* at their *Events*, *WADA*, International Federations, and *National Anti-Doping Organizations*.

**Athlete:** For purposes of *Doping Control*, any *Person* who participates in sport at the international level (as defined by each International Federation) or national level (as defined by each *National Anti-Doping Organization*) and any additional *Person* who participates in sport at a lower level if designated by the *Person's National Anti-Doping Organization*. For purposes of anti-doping information and education, any Person who participates in sport under the authority of any *Signatory*, government, or other sports organization accepting the *Code*.

**Athlete Support Personnel:** Any coach, trainer, manager, agent, team staff, official, medical or para-medical *Personnel* working with or treating *Athletes* participating in or preparing for sports competition.

**Attempt:** Purposely engaging in conduct that constitutes a substantial step in a course of conduct planned to culminate in the commission of an anti-doping rule violation. Provided, however, there shall be no anti-doping rule violation based solely on an *Attempt* to commit a violation if the *Person* renunciates the attempt prior to it being discovered by a third party not involved in the *Attempt*.

**Code:**   The World Anti-Doping *Code*.

21

**Competition:** A single race, match, game or singular athletic contest. For example, the finals of the Olympic 100-meter dash. For stage races and other athletic contests where prizes are awarded on a daily or other interim basis the distinction between a *Competition* and an *Event* will be as provided in the rules of the applicable International Federation.

**Consequences of Anti-Doping Rules Violations:** An *Athletes* or other *Person's* violation of an anti-doping rule may result in one or more of the following: (a) **Disqualification** means the *Athletes* results in a particular *Competition* or *Event* are invalidated, with all resulting consequences including forfeiture of any medals, points and prizes; (b) **Ineligibility** means the *Athlete* or other *Person* is barred for a specified period of time from participating in any Competition or other activity or funding as provided in Article 10.9; and (c) **Provisional Suspension** means the *Athlete* or other *Person* is barred temporarily from participating in any *Competition* prior to the final decision at a hearing conducted under Article 8 (Right to a Fair Hearing).

**Disqualification:** See *Consequences* of *Anti-Doping Rules Violations* above.

**Doping Control:** The process including test distribution planning, *Sample* collection and handling, laboratory analysis, results management, hearings and appeals.

**Event:** A series of individual *Competitions* conducted together under one ruling body (e.g., the Olympic Games, FINA World Championships, or Pan American Games).

**In-Competition:** For purposes of differentiating between *In-Competition* and *Out-of-Competition Testing*, unless provided otherwise in the rules of an International Federation or other relevant Anti-Doping Organization, an *In-Competition* test is a test where an *Athlete* is selected for testing in connection with a specific *Competition*.

**Independent Observer Program:** A team of observers, under the supervision of *WADA*, who observe the *Doping Control* process at certain *Events* and report on observations. If *WADA* is testing *In-Competition* at an *Event*, the observers shall be supervised by an independent organization.

22

*Ineligibility:* See *Consequences* of *Anti-Doping Rules Violations* above.

*International Event:* An *Event* where the International Olympic Committee, the International Paralympic Committee, an International Federation, a *Major Event Organization*, or another international sport organization is the ruling body for the *Event* or appoints the technical officials for the *Event*.

*International-Level Athlete: Athletes* designated by one or more International Federations as being within the *Registered Testing Pool* for an International Federation.

*International Standard:* A standard adopted by WADA in support of the *Code*. Compliance with an International Standard (as opposed to another alternative standard, practice or procedure) shall be sufficient to conclude that the procedures addressed by the International Standard were performed properly.

*Major Event Organizations:* This term refers to the continental associations of *National Olympic Committees* and other international multi-sport organizations that function as the ruling body for any continental, regional or other *International Event*.

*Marker:* A compound, group of compounds or biological parameters that indicates the *Use* of a *Prohibited Substance* or *Prohibited Method*.

*Metabolite:* Any substance produced by a biotransformation process.

*Minor:* A natural *Person* who has not reached the age of majority as established by the applicable laws of his or her country of residence.

*National Anti-Doping Organization:* The entity(ies) designated by each country as possessing the primary authority and responsibility to adopt and implement anti-doping rules, direct the collection of *Samples*, the management of test results, and the conduct of hearings, all at the national level. If this designation has not been made by the competent public authority(ies), the entity shall be the country's *National Olympic Committee* or its designee. [In the United States, this entity is USADA.]

*National Event:* A sport *Event* involving international or national-level *Athletes* that is not an *International Event*.

23

**National Olympic Committee:** The organization recognized by the International Olympic Committee. The term *National Olympic Committee* shall also include the National Sport Confederation in those countries where the National Sport Confederation assumes typical *National Olympic Committee* responsibilities in the anti-doping area.   [In the United States, this entity is the United States Olympic Committee.]

**No Advance Notice:** A *Doping Control* which takes place with no advance warning to the *Athlete* and where the *Athlete* is continuously chaperoned from the moment of notification through *Sample* provision.

**No Fault or Negligence:** The *Athlete's* establishing that he or she did not know or suspect, and could not reasonably have known or suspected even with the exercise of utmost caution, that he or she had *Used* or been administered the *Prohibited Substance* or *Prohibited Method*.

**No Significant Fault or Negligence:** The *Athletes* establishing that his or her fault or negligence, when viewed in the totality of the circumstances and taking into account the criteria for *No Fault* or *Negligence*, was not significant in relationship to the anti-doping rule violation.

**Out-of-Competition:** Any *Doping Control* which is not *In-Competition*.

**Participant:** Any *Athlete* or *Athlete Support Personnel*.

**Person:** A natural *Person* or an organization or other entity.

**Possession:** The actual, physical possession or the constructive *Possession* (which shall be found only if the *Person* has exclusive control over the *Prohibited Substance/Method* or the premises in which a *Prohibited Substance/Method* exists); provided, however, that if the *Person* does not have exclusive control over the *Prohibited Substance/Method* or the premises in which a *Prohibited Substance/Method* exists, constructive possession shall only be found if the *Person* knew about the presence of the *Prohibited Substance/Method* and intended to exercise control over it. Provided, however, there shall be no anti-doping rule violation based solely on possession if, prior to receiving notification of any kind that the *Person* has committed an anti-doping rule violation, the *Person* has taken concrete action demonstrating that the *Person* no longer intends to have *Possession* and has renounced the *Person's* previous *Possession*.

24

**Prohibited List:** The List identifying the *Prohibited Substances* and *Prohibited Methods.*

**Prohibited Method:** Any method so described on the *Prohibited List.*

**Prohibited Substance:** Any substance so described on the *Prohibited List.*

**Provisional Hearing:** For purposes of Article 7.5, an expedited abbreviated hearing occurring prior to a hearing under Article 8 (Right to a Fair Hearing) that provides the *Athlete* with notice and an opportunity to be heard in either written or oral form.

**Provisional Suspension:** See *Consequences* above.

**Publicly Disclose or Publicly Report:** To disseminate or distribute information to the general public or *Persons* beyond those *Persons* entitled to earlier notification in accordance with Article 14.

**Registered Testing Pool:** The pool of top level *Athletes* established separately by each International Federation and *National Anti-Doping Organization* who are subject to both *In-Competition* and *Out-of-Competition Testing* as part of that International Federation's or Organization's test distribution plan.

**Sample Specimen:** Any biological material collected for the purposes of *Doping Control.*

**Signatories:** Those entities signing the Code and agreeing to comply with the *Code,* including the International Olympic Committee, International Federations, International Paralympic Committee, *National Olympic Committees,* National Paralympic Committees, *Major Event Organizations, National Anti-Doping Organizations,* and *WADA.*

**Tampering:** Altering for an improper purpose or in an improper way; bringing improper influence to bear; interfering improperly to alter results or prevent normal procedures from occurring.

25

**Target Testing:** Selection of *Athletes* for *Testing* where specific *Athletes* or groups of *Athletes* are selected on a non-random basis for *Testing* at a specified time.

**Team Sport:** A sport in which the substitution of players is permitted during a *Competition*.

**Testing:** The parts of the *Doping Control* process involving test distribution planning, *Sample* collection, *Sample* handling, and *Sample* transport to the laboratory.

**Trafficking:** To sell, give, administer, transport, send, deliver or distribute a *Prohibited Substance* or *Prohibited Method* to an Athlete either directly or through one or more third parties, but excluding the sale or distribution (by medical personnel or by *Persons* other than an *Athlete's Support Personnel*) of a *Prohibited Substance* for genuine and legal therapeutic purposes.

**Use:** The application, ingestion, injection or consumption by any means whatsoever of any *Prohibited Substance* or *Prohibited Method*.

**WADA:** The World Anti-Doping Agency.

26

## ANNEX B TO USOC NATIONAL ANTI-DOPING POLICIES

### USADA PROCEDURE REGARDING MISSED TESTS

A.    **Athlete is not at the location(s) listed by the athlete on the USADA Athlete Location Form.**

Step 1.   The DCO is obligated to make a reasonable effort to locate the athlete for testing.  Before reporting to USADA that an athlete is unavailable for testing the DCO is specifically required to visit within a 24 hour period all locations on the Athlete Location Form and any applicable Athlete Change of Plan Form provided by the athlete.  If the DCO cannot locate the athlete, the DCO is required to fill out an Unavailable Athlete Form establishing that reasonable attempts were made to locate the athlete.

Step 2.   USADA CEO reviews the DCO's Unavailable Athlete Forms and the Athlete Location Form and any Athlete Change of Plan Form on file with USADA.  If there appears to be a reasonable basis for calling this a missed test, then within 30 days after receipt of the Unavailable Athlete Forms the CEO will send notice by letter to the athlete, with a copy to the NGB, inviting the athlete to provide  a written explanation why this should not be counted as a "missed test".

Step 3.   Based on the athlete's written response, and further investigation if necessary, the CEO shall evaluate whether to treat the attempt to test as a "missed test."  In this evaluation the burden shall be on the DCO to establish that the DCO's attempts to locate the athlete for testing were reasonable.  The burden shall be on the athlete to establish in his or her written response that he or she was reasonably prevented from notifying USADA that he or she would not be available for testing at the locations set forth on the Athlete Location Form or any applicable Athlete Change of Plan Form.

27

Step 4.   The athlete shall be notified by letter of the CEO's decision.  The NGB shall receive a copy of the decision.   The CEO's determination of a missed test is not final and shall be subject to the review and appeal process set forth below.   If the athlete wishes to contest a missed test decision at a subsequent hearing, then the athlete must file a written objection with USADA within 30 days of notice of USADA's decision. The athlete will also have the right to challenge any finding of any "missed test"  objected to within 30 days of notice of the USADA CEO's decision in a hearing brought to impose discipline as a result of three missed tests.   The hearing shall be conducted pursuant to the USADA Adjudication Protocol which shall be a part of the Contract between USADA and the USOC ("the USADA Adjudication Protocol").  In addition, within 30 days of notice of the USADA's CEO's decision, the athlete may also request an administrative review of the CEO's determination of a missed test.   This administrative review shall be conducted by a three member panel composed of members of the USADA Board of Directors or their designees.   Such review shall be based on written submittals only and shall not be considered a hearing. The decision of the panel shall not be binding in any subsequent hearing initiated by the athlete to contest the determination that the athlete has three missed tests.   An athlete shall not be held responsible for subsequent missed tests which occur before the athlete receives notice under Step 2 above of a prior missed test.

B.   <u>Athlete is selected for testing from the NGB's Out of Competition ("OOC") pool but the athlete has not filed an Athlete Location Form for the quarter in which the draw takes place (the "current quarter").</u>

Step 1.   USADA confirms that the athlete is in the NGB OOC pool and that the athlete was notified in writing of the requirement to submit a quarterly Athlete Location Form to USADA.

Step 2.   USADA confirms that the athlete is past the specified deadline for submitting an Athlete Location Form for the current quarter and has had a reasonable time to do so.

Step 3.   Athlete is notified by letter and invited to provide an explanation to USADA why no Athlete Location Form was filed for the current quarter.

28

Step 4.   USADA's CEO determines whether to declare a missed test because the athlete's name was drawn for OOC testing and the athlete failed to file an Athlete Location Form for the current quarter.

Step 5.   The athlete shall be notified by letter of the CEO's decision.  The NGB shall receive a copy of the decision.   The CEO's determination of a missed test is not final and shall be subject to the review and appeal process set forth below.  If the athlete wishes to contest a missed test decision at a subsequent hearing, then the athlete must file a written objection with USADA within 30 days of notice of USADA's decision. The athlete will also have the right to challenge any finding of any "missed test" within 30 days of notice of the USADA CEO's decision objected to in a hearing brought to impose discipline as a result of three missed tests.  The hearing shall be conducted pursuant to the USADA Adjudication Protocol which shall be a part of the Contract between USADA and the USOC ("the USADA Adjudication Protocol").  In addition, within 30 days of notice of the USADA CEO's decision, the athlete may also request an administrative review of the CEO's determination of a missed test.  This administrative review shall be conducted by a three member panel composed of members of the USADA Board of Directors or their designees.   Such review shall be based on written submittals only and shall not be considered a hearing. The decision of the panel shall not be binding in any subsequent hearing initiated by the athlete to contest the determination that the athlete has three missed tests.  An athlete shall not be held responsible for subsequent missed tests which occur before the athlete receives notice under Step 3 above of a prior missed test.

**C.**      **Notice.**

For all purposes of this USADA Procedure Regarding Missed Tests, where USADA is required to send notice to the athlete, USADA will send the notice by overnight courier to the athlete's most recent address on file with USADA.   If USADA is not able to obtain delivery at such address, then USADA shall contact the NGB and send notice by overnight courier to the athlete's most recent address on file with the NGB if that is a different address than the most recent address on file with USADA.  If the athlete's most recent address on file with USADA and the NGB is the same, or if USADA is unable to obtain delivery at the athlete's most recent address on file with the NGB, then notice to the athlete shall be effective upon the courier's last attempt to deliver.

29

## ANNEX C TO USOC NATIONAL ANTI-DOPING POLICIES

### SUSPENSION OF BENEFITS

*a)  Suspension of USOC Benefits After Adjudication, Admission, or Acceptance*

   The below chart summarizes the disposition of athlete access to USOC benefits after adjudication, admission, or acceptance of having committed a doping offense.  Should an individual other than an athlete be found to have committed a doping offense, by adjudication, admission, or acceptance, that individual shall be treated in a manner consistent with the dispositions set forth in the below chart.

| USOC Benefits | Disposition |
|---|---|
| 1. Direct Athlete Support that is not based on a single competitive result. | For all violations resulting in a period of suspension, loss of benefit for period of suspension.  After the conclusion of the suspension, the athlete will have to re-qualify for athlete support programs (e.g., attain appropriate rank, etc.) |
| 2.  Op Gold and single competitive result-based athlete support | If an athlete loses a competitive result as a result of an anti-doping rule violation from in-competition testing, the athlete will lose the Direct Athlete Support based solely on that event (and the result at that event). |
| 3.  Tuition Grants | For all violations, loss of benefit for period of suspension.  If punishment is loss of result only, there will be no loss of benefit. Athletes cannot be considered for a tuition grant during any period of suspension. |
| 4.  Olympic Training Center and Olympic Training Sites Access (camps, etc.) | For all first time violations of section 10.3 of the World Anti-Doping Code, no loss of benefit.  For all other violations, loss of benefit for period of suspension. |

30

| USOC Benefits | Disposition |
|---|---|
| 5.  Olympic Training Center Residence | For all first time violations of section 10.3 of the World Anti-Doping Code, no loss of benefit.  For all other violations, loss of benefit for period of suspension.<br><br>Recreational drugs not included in the prohibited list, and other conduct issues, and resulting penalties, will be handled through the OTC Code of Conduct. |
| 6.  Other USOC Services<br>    Alumni Relations<br>    Athlete Marketing (including access<br>        to sponsor programs and OJOP)<br>    Athlete Service Centers<br>    Career Consultation<br>    Media Services<br>    Peak Performers Workshops<br>    Personal Development Programs<br>    Resource Library Access<br>    Sports Medicine<br>    Sports Science and Coaching<br>    SUMMITs<br>    TeamUSA.net Website | For all first time violations of section 10.3 of the World Anti-Doping Code no loss of benefit.  For all other violations, loss of benefit for period of suspension.<br><br>Participation in the OJOP program and sponsor programs will also be depend-ent on employer or sponsor views. |
| 7.  USOC Events<br>    Olympic, Pan American,<br>    Paralympic Games teams,<br>    trials, and qualifying events<br>    Titan Games and similar events | For all violations, loss of benefit or eligi-bility for benefit for period of suspension. This issue may be controlled by IF or IOC or other rules, which may cause a different result. |
| 8.  Elite Athlete Health Insurance | For all first time violations of section 10.3 of the World Anti-Doping Code, no loss of benefit.  For all other violations, loss of benefit for period of suspension. |

31

If a doping offense results in no period of suspension (i.e., only loss of result), then the athlete will lose the result-dependent USOC benefits set forth in the second category of the chart above but no other benefits will be lost.

All USOC benefits are contingent on participation in the anti-doping testing program. Should the case arise where cash benefits of athlete support and tuition grants are paid before an athlete is suspended and the athlete is later determined to have committed a doping offense during the period in which the athlete received benefits, the athlete will have a repayment obligation to the USOC equal to the amount of the benefit received.

To the extent the USOC creates a benefit not listed in the above chart, the USOC will endeavor to classify the new benefit in accordance with similar benefits in the above chart and will publish an addendum to this Annex or restate the entire Annex reflecting that change.

### b) Suspension of USOC Benefits Prior to Adjudication, Admission, or Acceptance

After an A sample is declared positive or when an anti-doping case is proceeding:

1. Cash benefits of athlete support that are based on single results (such as Operation Gold or other NGB-specific programs) should be suspended if they have not already been paid when an "A" positive is reported to the USOC for the event that forms the basis of the award. Should the case arise where such result-dependent benefits of athlete grants are paid before suspension and the athlete is determined to have committed an anti-doping rule violation, the athlete will have a repayment obligation to the USOC equal to the amount of the benefit received. The USOC, seeking AAC and other appropriate input, and USADA will together develop: 1) a timeline, and 2) a reporting mechanism for processing and reporting results-dependent event testing. The timeline developed will be recommended for adoption as a National Anti-Doping Policy of the USOC and published as such. Such timeline will allow for test results to be processed and reported, but shall not unreasonably delay payment to athletes.

32

2.  Athlete support payments will be temporarily held by the USOC if there is any outstanding information due to the USOC and USADA until that information is provided. [1]

3.  For all other USOC-provided benefits or circumstances not falling within the above two categories, no benefits impact would occur until after an admission by an athlete or the conclusion of an adjudication or acceptance of a penalty adverse to an athlete, in which case the benefits would be addressed in accordance with the above chart.

4.  Under no circumstances, except those described specifically above will the USOC withhold athlete support benefits or monies, unless otherwise required by law or superior regulation.

## c) Access to NGB Benefits and Services

Under the World Anti-Doping Code, NGBs, as members of a Code signatory (the USOC), must engage in the same or similar suspensions of benefits and access as the USOC.  NGBs are to adopt policies similar to those adopted by the USOC within this policy, subject to USOC approval.

---

[1]  The information referred to in this paragraph is limited to USOC paperwork required to provide the athlete support benefit, athlete location information required by USADA, and similar information that might be requested in the future to allow administration of these programs.

33

# EXHIBIT H

# NGB Council Meeting Minutes
# Conference Call
# March 18, 2009

## I.    Call to Order

NGB Council (NGBC) Chair Skip Gilbert called the meeting to order at 5:05 p.m.

A roll call by sport was taken.  The following NGBs were represented on the call:

Badminton
Baseball
Basketball
Bowling
Canoe/Kayak
Curling
Cycling
Diving
Equestrian
Fencing
Field Hockey
Figure Skating
Gymnastics
Ice Hockey
Racquetball
Roller Sports
Soccer
Softball
Swimming
Team Handball
Tennis
Triathlon
Volleyball
Water Polo
Wrestling

Other:
Mike English – Interim, Chief of Sport Performance
Chris Vadala – USOC Staff Liaison

NGBs Not Represented:

Archery
Biathlon
Bobsled/Skeleton
Boxing
Judo
Karate
Luge
Rowing
Sailing
Shooting
Ski & Snowboard
Squash
Speedskating
Synchronized Swimming
Table Tennis
Taekwondo
Track & Field
Water Skiing
Weightlifting

Were previous meeting minutes approved during the call?  If so, include the motion to approve minutes here.

## II.   USOC Update

Mike English gave a brief report on the USOC staff positions that were eliminated earlier in the day.  There was a total of 54 positions eliminated (13 percent of the USOC workforce), and every division within the organization was impacted.  For those employees whose positions were eliminated, the USOC is providing a severance package (as determined by length of service with the organization).

## III.  American Arbitration Association Rule Changes

Ron Van Pool presented on the proposed rule changes to the AAA procedures as identified by the sub-committee that was created.  Mr. Van Pool indicated the reasons for the proposed changes are as follows:

1. Supplementary procedures are needed as the initial rules were taken from the commercial AAA rules and those are too generic for these purposes;
2. Since the inception of the program, USADA, the USOC and AAA have seen areas of improvement and now is the time to make the changes;
3. There have been some situations and experiences that require these proposed changes.

2

Mr. Van Pool pointed out the five sections (R-28, R-29, R-38, R-48 and R-50) that have the most significant changes.

The sub-committee consisted of two AAC representatives and two NGBC representatives (Ron Van Pool and Alex Natt). Mr. Van Pool reported that the committee had good legal minds and the sub-committee supports all the proposed changes. It should be noted that USADA is in favor of the changes as well.

It was **MOVED** and **SECONDED** to approve the AAA Supplementary Procedures for the Arbitration of Anti-Doping Rule Violations as submitted. Motion **APPROVED UNANIMOUSLY**.

## IV. Gilbert/Penny Meeting Overview

Skip Gilbert and Steve Penny met with Larry Probst, Mike Plant and Bob Bowlsby. The three topics discussed were:

1. USOC CEO Change
2. Board Liaison position
3. Support of 2016 Bid

CEO Search
Mr. Gilbert said that Mr. Probst indicated that there will be a national search for a CEO. The search will not be immediate and notice will be given at a later date of when the USOC will begin the search. Mr. Probst wanted Stephanie Streeter to stay on the Board of Directors, because if she stepped down it would have given the perception that it was a permanent position. However, this is being referred to the Ethics committee for an interpretation. Mr. Gilbert and Mr. Penny were comfortable with Mr. Probst's position and will give Ms. Streeter their full support during her interim position.

Board Liaison
It is the opinion of Mr. Gilbert and Mr. Penny that there may be a disconnect between the Board Liaison position and the NGBs. Consequently, the NGBs would like to have a representative invited to future board meetings. Mr. Probst indicated it seems appropriate and will discuss this with other board members and at the same time taking into consideration the other USOC constituent groups.

Chicago 2016
Mr. Gilbert and Mr. Penny asked how the NGBs can help Chicago 2016 and the bid. If there is anything the NGBs can do to assist, please let them know and the NGBs will do everything they can.

## V. Adjournment

The conference call adjourned at 5:40pm.

# EXHIBIT I

# UNITED STATES OLYMPIC COMMITTEE
## ATHLETES' ADVISORY COUNCIL MEETING MINUTES
### Denver, Colorado
### April 4-5, 2009

## Roll Call – Trischa Zorn-Hudson

Mr. Matt Van Houten called the meeting to order at 0800 hrs and Trischa Zorn-Hudson conducted roll call.

PRESENT:

| | |
|---|---|
| Matt Van Houten, Chair | Mark Henderson ('05-'08 Chair) – Sat. only |
| Nina Kemppel, Vice Chair | Brian Whitcomb ('05-'08 Vice Chair) – Sat. only |
| Jon McCullough, Vice Chair | Nick Peterson ('05-'08 At-Large) |
| Ashoo Jain, At-Large | Courtney Johnson ('05-'08 At-Large) – Sat. only |
| Kate Johnson, At-Large | Ann Swisshelm-Silver ('05-'08 At-Large) – Sat. only |
| Trischa Zorn-Hudson, At-Large | |

REPRESENTATIVES:

| | |
|---|---|
| Archery | Phyllis Shipman (Member '05-'08) |
| Archery | Jenny Nichols (Member '09-'12) |
| Badminton | Mesinee Mangkalakiri (Member '09-'12) |
| Biathlon | Chad Salmela (Member '05-'08) |
| Biathlon | Sarah Konrad (Member '09-'12) |
| Bobsled/Skeleton | Curt Tomasevicz (Member '09-'12) |
| Canoe/Kayak | Brett Heyl (Alternate '09-'12) |
| Curling | Richard Maskel (Member '09-'12) |
| Cycling | Anton Quist (Member '09-'12) |
| Diving | Justin Wilcock (Member '09-'12) |
| Equestrian | Amy Tryon (Substitute) |
| Field Hockey | Kate Barber (Member '09-'12) |
| Field Hockey | Pat Cota (Member '05-'08) |
| Figure Skating | Jerod Swallow (Member '05-'08) |
| Figure Skating | Danielle Minnis (Member '09-'12) |
| Figure Skating | Aaron Parchem (Alternate '09-'12) – Sat. only |
| Gymnastics | Larissa Fontaine (Member '05-'08) – Sat. only |
| Gymnastics | David Durante (Member '09-'12) – Sun. only |
| Ice Hockey | Cindy Curley (Member '05-'08) |
| Ice Hockey | Jamie Hagerman (Member '09-'12) – Sat. only |
| Judo | Reno Reser (Member '09-'12) |
| Karate | Clay Morton (Member '09-'12) – Sat. only |
| Luge | Brenna Payne (Member '09-'12) |
| Modern Pentathlon | Skip Connors (Member '05-'08) |
| Paralympics – Summer | Derek Arneaud (Member '09-'12) |
| Paralympics – Winter | Muffy Davis (Alternate '09-'12) |
| Paralympics – Winter | James Lagerstrom (Member '05-'08) – Sat. only |
| Rowing | Tyler Winklevoss (Member '09-'12) |
| Sailing | Carol Cronin (Member '09-'12) |
| Shooting | Connie Smotek (Member '09-'12) |
| Squash | Meredith Quick (Alternate '09-'12) |
| Swimming | Tom Dolan (Member '05-'08) – Sun. only |
| Swimming | Neil Walker (Member '09-'12) |
| Synchro Swimming | Sara Lowe (Member '09-'12) |
| Taekwondo | Eric Laurin (Member '09-'12) |

| Team Handball | David Thompson (Member '09-'12) |
| Track & Field | Gary Morgan (Alternate '09-'12) |
| Triathlon | Andy Kelsey (Alternate '05-'08) |
| Volleyball | Scott Fortune (Member '05-'08) -- Sat. only |
| Water Polo | Ellen Lee (Member '09-'12) |
| Water Polo | Brad Schumacher (Member '05-'08) – Sun. only |
| Weightlifting | Tara Cunningham (Member '05-'08) |
| Weightlifting | Emmy Vargas (Member '09-'12) |
| Wrestling | Kerry McCoy (Member '09-'12) |

SPORTS NOT REPRESENTED:

| Baseball | Roller Sports |
| Basketball | Speedskating |
| Boxing | Tennis |
| Fencing | Waterskiing |
| Racquetball | |

GUESTS:

| John Ruger | USOC, Ombudsman |
| Chris Vadala | USOC, Sport Performance |
| Sheri Escher | USOC, Sport Performance |
| Stephanie Isley | USOC, Sport Performance |
| Joe Walsh | USOC, US Paralympics |
| Robert Balk | IOC Athlete Commission |
| Carol Lewis | US Olympians Association |
| Travis Tygart | USADA, CEO |
| Carl Swenson | USADA Board of Directors |
| Annette Salmeen | USADA Board of Directors |
| Mary McCagg | Athlete Member of USOC Board of Directors (by teleconference) |

**Approval of Minutes**
Motion to approve minutes of the December 13-14, 2008, Athletes' Advisory Council Meeting was MOVED by Courtney Johnson, SECONDED by Ann Swisshelm. Motion PASSED unanimously.

**Introductory Remarks – Mr. Matt Van Houten**
Mr. Van Houten addressed the group, encouraged everyone's participation, and outlined general objectives for the quadrennial, specifically being open-minded and transparent. Each member of the new Leadership then briefly introduced him/herself.

**History and Background of the AAC – Mr. John Ruger** (Attachment 1)
Mr. Ruger provided new members of the AAC with a historical perspective of the Athletes' Advisory Council. Summaries of the accomplishments made by each quad's AAC were highlighted and the presentation also included insight into "Where Are They Now?" for the past AAC members who have continued to play a role within the Olympic Movement.

**USADA – Mr. Travis Tygart**
Mr. Tygart introduced two athlete members of USADA's Board of Directors (Carl Swenson and Annette Salmeen) who were recommended by the AAC. Mr. Tygart expressed his appreciation of the input USADA has received from the AAC during the last quad. In particular, Mr. Tygart valued the feedback received through a survey regarding anti-doping education and applied the feedback by creating an online module that details the changes to the WADA Code.

2

An overview of USADA's "Game Plan for 2012" and its broad mission of preserving integrity, inspiring true sport and protecting clean athletes were outlined for the AAC. In addition, major objectives for the 2009-2012 quad include taking the necessary steps toward a solution to the supplement issue, holding coaches accountable, and athlete compliance with whereabouts filings.

Mr. Tygart encouraged AAC members to reach out to the athletes in their sport's Registered Testing Pool to take the online survey that closes on April 10th.

**IOC Athlete Commission Candidate – Ms. Nina Kemppel**
Ms. Kemppel thanked the AAC for their input and announced that Angela Ruggiero (Ice Hockey) is the AAC's Nominee for the IOC Athlete Commission. Ms. Kemppel solicited volunteers who are interested in promoting Angela's election to come forth with campaign ideas and ways to encourage athletes to vote. Ms. Kemppel stressed the importance of this election and that getting Angela elected for an eight-year term is one of the highest priorities for the AAC in 2009.

Motion to unanimously support as a group, Angela Ruggiero's nomination to the IOC Athlete Commission, and that the AAC will do everything in its power to help get her elected. So MOVED by Kate Johnson, SECONDED by Matt Van Houten. Motion PASSED unanimously.

If interested in forming a small working group to promote Angela Ruggiero's campaign, send an email to kemppel@usathlete.org.

**Sport Performance Report – Mr. Chris Vadala** (Attachment 2)
Mr. Vadala extended apologies from Mike English, who is serving as the interim Chief of Sport Performance, for not being able to attend and present to the AAC.

The purpose and details of the consolidation and restructure of the Sport Performance Division were presented, as was an overview of the team structure and breakdown of sports. In addition, the general plan to re-evaluate and improve the resource allocation process was shared with the AAC. A working group has been established that includes several key USOC staff members and NGB representatives to focus specifically on NGB funding. The USOC plans to work with AAC Leadership in the creation of a working group whose purpose will be to provide input on the process and to provide recommendations.

Mr. Vadala opened the floor for discussion and answered the group's questions.

**USOC AAC Attendance Policy – Ms. Courtney Johnson** (Attachment 3)
Ms. Johnson presented the attendance requirements as outlined in the bylaws regarding USOC AAC meetings. It was also encouraged to keep AAC Alternates up-to-date on issues discussed at meetings in the case that alternates need to attend in the AAC Representative's place.

**USOC Board Liaison Report – Ms. Mary McCagg**
Ms. McCagg reiterated the important role the AAC plays and encouraged the AAC to reach out to her as a fellow athlete and member of the USOC's Board of Directors with any questions or concerns.

**Athlete Services Coordinator (ASC) Report & Recommendation – Mr. Jon McCullough**
Mr. McCullough explained that there are currently two credentials allotted for the Athlete Services Coordinator (ASC) positions for the Vancouver Olympic and Paralympic Games, however, the AAC Leadership will work with the USOC to obtain a third credential for each Games. The following candidates were presented to the AAC:

      Vancouver Olympic Games
      Sarah Konrad (BIA) and Sloan DuRoss (ROW) as Primary ASCs

Mary Whipple (ROW) as recommended 3rd ASC position, if approved
Rusty Smith (SSK) as Alternate ASC

<u>Vancouver Paralympic Games</u>
Amber Darland (SHO) and Candice Cable (Paralympic – Summer and Winter) as Primary ASCs
Jessica Galli (Paralympic – Summer) as recommended 3rd ASC position, if approved
Rusty Smith (SSK) as Alternate ASC

Motion to ratify this list of Vancouver Olympic and Paralympic Games ASC recommendations was MOVED by Jon McCullough, SECONDED by Anton Quist.  Motion PASSED unanimously.

**Website Report – Ms. Kate Johnson, Mr. Nick Peterson and Ms. Larissa Fontaine**
Ms. Johnson made an announcement to AAC members to submit their bios as soon as possible which will be posted to the AAC website under each member's specific sport.

Nick Peterson and Larissa Fontaine walked the AAC through a tutorial and the new AAC website.  AAC members were encouraged to set up their forwarding email and to personalize their accounts.  Kate Johnson is to send an email to all AAC members with instructions and details following the meeting.

**Mentor Program – Ms. Trischa Zorn-Hudson**
A mentor program to allow those out-going AAC members to assist in the transition of incoming members is being established and will be managed by the AAC Leadership.  An evaluation of the program will be conducted after six months to determine future directions.  Interested AAC members were encouraged to email Trischa Zorn-Hudson to indicate whether they would like to participate in the mentor program.

**CESEP – Ms. Crissy Perham**
Ms. Perham with the Culture, Education, Sports and Ethics Program (CESEP) conducted on-site interviews with those AAC members who were interested in sharing their thoughts on ethics, integrity and sportsmanship.  Ms. Perham will provide an electronic document with more information to the AAC so that it can be posted on the AAC website.

**Elections**
A motion to approve Matt Van Houten as the AAC Chair for the 2009-2012 Quad was MOVED by Ann Swisshelm, and SECONDED by Cindy Curley.  Motion PASSED unanimously.

There were three candidates for the two Vice Chair positions: Ms. Nina Kemppel, Mr. Jon McCullough and Ms. Trischa Zorn-Hudson.  Once each candidate was provided the opportunity to address the group, votes were cast by paper ballot by the eligible AAC members.

Elected as the new Vice Chairs of the AAC are Ms. Nina Kemppel and Mr. Jon McCullough.

**AAC Vision 2009-2012 – Matt Van Houten**
The new AAC Chair presented his thoughts on the direction for the AAC during the 2009-2012 quad.  A short-term priority for the AAC is to support the Chicago 2016 bid.  In addition, the AAC Vision will focus on the following:

1. Governance (bylaws, selection procedures, etc.) – Ms. Trischa Zorn-Hudson will chair this division
2. Athlete Support (redefining the OJOP program, etc.) – Ms. Nina Kemppel and Mr. Jon McCullough will chair this division
3. Anti-Doping (education, procedures, forms, etc.) – Mr. Ashoo Jain will chair this division
4. Communications (AAC website, etc.) – Ms. Kate Johnson will chair this division

4

**Roundtable Discussions**
Roundtable Discussion Topics:
1. What goals or objectives would you like the AAC to achieve over the next four years?
2. What are the issues that you are facing within your NGB?
3. What are the roles and responsibilities of an AAC Representative?
4. Are there any major topics that we have not touched on in this meeting that you would like the AAC to address over the next four years?

Summary of highlights provided in the full-group recap of Roundtable Discussions:
1. Discuss and learn from other NGBs that have "best practices" in certain areas (e.g., selection procedures, etc.).
2. Address post-career support for athletes after retiring from their sport and specifically would like to be involved in the restructure of the OJOP program.
3. Ensure the new Sport Performance Team Leaders attend all AAC meetings and have roundtable discussions with them on Sunday mornings.
4. Ensure there is athlete involvement in the selection of the Chief of Sport Performance and CEO of the USOC.
5. Gain a better understanding of how USOC resources are allocated and, in particular, athlete support.
6. Develop a program that reaches further down the NGB's pipeline to address ethics and educate youth.
7. Evaluate the expansion of the Elite Athlete Health Insurance Program.

Each group was instructed to email their notes from the round table discussions to Johnson@usathlete.org.

**Old Business - None**

**New Business – AAA Supplementary Procedures**
The revisions made to the AAA Supplementary Procedures for the Arbitration of Anti-Doping Rule Violations were discussed. The chances were described as non-controversial and focus primarily on the time it takes to resolve pending cases.

A motion that the AAC ratifies the AAA Supplementary Procedures was MOVED by Mr. Jon McCullough and SECONDED by Ms. Sara Conrad. Motion PASSED unanimously.

**New Business – Olympic Liaison**
A statement of support was proposed in relation to the Olympic Liaison position:

> The AAC has derived significant value from the interaction with the Olympic Liaison over the last 4 years and we appreciate all of the efforts that have been undertaken in this role to support athletes' rights. The AAC strongly advocates for the continuation of this position as we believe it will help us to effectively communicate with the USOC Board of Directors.

A motion to approve the position statement was MOVED by Connie Smotek and SECONDED by Cindy Curley. Motion PASSED unanimously.

If interested in participating on a task force for selecting nominees for the Olympic Liaison position, send an email to kemppel@usathlete.org.

**New Business – Next AAC Meeting**
The next AAC meeting will take place in conjunction with the Olympic Assembly and is scheduled to be held in Chicago on September 12-13, 2009.

Meeting was adjourned at 1115 hrs.