IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

LANCE ARMSTRONG,

    *Plaintiff,*

v.

UNITED STATES ANTI-DOPING
AGENCY and TRAVIS TYGART, In His
Official Capacity as Chief Executive Officer
of the United States Anti-Doping Agency,

    *Defendants.*

Civ. Action No. 1:12-cv-00606-SS

## AFFIDAVIT OF TRAVIS T. TYGART

I, Travis T. Tygart, under penalty of perjury, declare and state:

1.    I am the Chief Executive Officer of the United States Anti-Doping Agency ("USADA"). I have been employed by USADA since October 2002. Prior to my employment at USADA, I served as one of USADA's outside counsel since its inception in 2000.

2.    The statements contained in this affidavit are based on my personal knowledge or my review of the corporate records of USADA.

3.    I have been involved with, and am intimately familiar with, USADA's anti-doping protocols, including results management adjudication of anti-doping rule violations from its inception to the present time.

4.      USADA is an independent, non-governmental anti-doping agency for Olympic and Paralympic sports in the United States.  USADA is a nonprofit Colorado corporation with its office in Colorado Springs, Colorado.  It was created as the result of recommendations made by the United States Olympic Committee's (USOC") Select Task Force on Externalization to uphold the Olympic ideal of fair and ethical competition and to represent the interests of Olympic, Pan American, and Paralympic athletes and to protect their rights to a safe, level and drug-free playing field.  The USOC has given USADA full authority to execute a comprehensive national anti-doping program encompassing testing, adjudication, education, and research, and to develop programs, policies, and procedures in each of these areas.

5.      USADA began operations on October 1, 2000.  Its board of directors consists of ten members--two athlete board members, two National Governing Body board members, one coach board member and five independent board members.  USADA's professional staff is responsible for managing and coordinating the agency's day to day operations.

6.      Although USADA receives some of its funding by way of a grant from the Office of National Drug Control Policy ("ONDCP"), the ONDCP does not exercise any operational control or direction over USADA.  Further, the ONDCP recognizes USADA as an "independent, non-governmental organization."  (A true and correct copy of a letter dated March 26, 2007 from John Walters, Director of the ONDCP, is attached hereto as Exhibit A.)  No other governmental agency or organization controls or directs USADA's operations or activities in any way.

7.      USADA's formation was preceded by the creation of the World Anti-Doping Agency ("WADA").  WADA, formed in 1999, was established to promote and coordinate the international fight against doping in sport.  In 2004, with input from stakeholders around the

world, WADA adopted the World Anti-Doping Code ("Code"), a body of rules harmonizing the anti-doping rules implemented by the International Federations ("IFs") responsible for governing every Olympic sport. (A true and correct copy of the current World Anti-Doping Code is attached hereto as Exhibit B.)

8.      In 2000, the USOC, with the approval of its Athletes' Advisory Council, first adopted the USADA Protocol and AAA Supplementary Procedures for the Arbitration of Olympic Sport Doping Disputes ("AAA Supplementary Procedures"). The Protocol and AAA Supplementary Procedures set forth the procedures applicable to anti-doping rule violations, results management and adjudication of doping matters by USADA. (A true and correct copy of the current USADA Protocol and AAA Supplementary Procedures is attached hereto as Exhibit C.)

9.      Since their adoption and implementation in 2000, the USADA Protocol and AAA Supplementary Procedures for the Arbitration of Olympic Sports Doping Disputes have been used in the adjudication of every doping case that has gone to arbitration (more than fifty (50) cases overall) involving athletes who are members of the USOC's National Governing Bodies. The AAA Supplementary Procedures are modeled on, and closely follow, the Commercial Arbitration Rules of the American Arbitration Association ("AAA") which, under the Ted Stevens Olympic and Amateur Sports Act ("Sports Act"), are established as the model for procedures to be used by arbitrators in athletic eligibility disputes in the United States. All differences between the Standard AAA Commercial Rules and the AAA Supplementary Procedures have been approved by the USOC and its Athletes' Advisory Council.

3

10.     In 2005, Lance Armstrong was a claimant in arbitration proceedings against SCA Promotions, Inc.  Mr. Armstrong, through his counsel, requested that I provide an affidavit, in my capacity as Senior Managing Director, General Counsel for USADA, in support of his position in the arbitration.  I agreed to do so.  Mr. Armstrong's counsel drafted an affidavit for my signature.  (A true and correct copy of the April 28, 2005 email from Mr. Armstrong's counsel to me, attaching a draft affidavit for my signature, is attached hereto as Exhibit D.)  After some revisions were made to the draft affidavit, I signed the affidavit on May 3, 2005, and provided it to Mr. Armstrong's counsel.  (A true and correct copy of my signed affidavit dated May 3, 2005, with exhibits, is attached hereto as Exhibit E.)  Mr. Armstrong's counsel subsequently informed me that the affidavit was submitted to the arbitration panel in support of Mr. Armstrong's claims in the arbitration in which he was seeking a $7.5 million payout for having won the 2005 Tour de France.

11.     The affidavit signed by me and submitted by Mr. Armstrong and his counsel to the arbitration panel in 2005 includes the following statements:

> USADA is an independent, nongovernmental anti-doping agency for Olympic and Paralympic sports in the United States.  USADA is a nonprofit Colorado corporation with its office in Colorado Springs, Colorado.  USADA was created as the result of recommendations made by the United States Olympic Committee's ("USOC") Select Task Force on Externalization to uphold the Olympic ideal of fair and ethical competition and to represent the interests of Olympic, Pan American, and Paralympic athletes.  USADA is not subject to the control of the USOC but has contracted with the USOC to administer its entire anti-doping program.  The USOC has given USADA full authority to execute a comprehensive national anti-doping program encompassing testing, adjudication, education, and research, and to develop programs, policies, and procedures in each of these areas.

* * *

4

All athletes in U.S. Olympic sports, including athlete members of U.S. national governing bodies such as USA Cycling, are subject to the programs of USADA. Because USA Cycling is the U.S. national federation of the Union Cycliste Internationale ("UCI"), the sport of cycling's international sanctioning body, all U.S. cyclists including professional cyclists are subject to testing by USADA. To be recognized as a national federation by the UCI and the USOC, USA Cycling is legally required to follow the protocols of USADA. A true and correct copy of the USADA Protocol for Olympic Movement Testing is attached hereto as Exhibit A. USADA performs out-of-competition (OOC) testing on elite USA Cycling athletes and also performs testing at USA Cycling-sanctioned events, such as the Tour of Georgia.

By being a licensed member of USA Cycling, like all licensed members, Mr. Lance Armstrong ("Mr. Armstrong") has an obligation to participate in the drug testing programs of USADA. Further, since Mr. Armstrong competes internationally and is an elite U.S. cyclist, he is in the USA Cycling/USADA OOC drug testing pool. As part of Mr. Armstrong's obligation for being in the OOC testing pool, he must submit to USADA his location information of where be can be located for testing at anytime and anywhere, 24-hours a day, 7-days a week, 365 days a year, with no advance notice of the test. The USADA system of anywhere, anytime no advance notice testing builds in three unavailable attempts or missed tests in an 18 month period before the athlete is subject to a potential sanction for not being at the location for testing. This OOC testing system is one of the strictest in the world by requiring athletes to be available anywhere and anytime for no advance notice testing.

* * *

When a sample is taken from an athlete, it is sent to an independent World Anti-doping Agency ("WADA") accredited laboratory. If the laboratory reports an adverse analytical result (positive test), USADA notifies the athlete, the USOC, and the sport's national governing body such as USA Cycling. The athlete can then request that his or her "B" sample be tested. If the "B" sample is also positive, then an independent review board reviews the documentary evidence and recommends whether sufficient evidence exists to proceed to a doping hearing. After receiving the review board's recommendation, USADA decides whether or not to charge the athlete with a doping violation. If USADA charges an athlete, the athlete can contest the charge through arbitration before a panel of American Arbitration Association ("AAA") and the Court of Arbitration for Sport ("CAS") arbitrators.

USADA also has the ability to proceed against an athlete for committing a doping violation not involving a positive test. In the event an athlete refuses to test,

distributes a prohibited drug or is unavailable for testing, USADA would charge
the athlete with a doping violation through the same process described previously.

(See Exhibit E attached hereto.)

12.     Based on my interaction with Mr. Armstrong's counsel in preparing the affidavit,
it was clear to me that Mr. Armstrong's counsel understood and agreed that Mr. Armstrong, as a
licensed member of a National Governing Body (USA Cycling), agreed to be subject to
USADA's results management and adjudication system including the USADA Protocol and
AAA Supplementary Procedures.

13.     Having been involved in anti-doping matters for USADA on a full time basis for
nearly a decade I am familiar with drug testing procedures and methods, with limitations in the
ability of drug testing to detect instances of doping and with the methods used by elite athletes to
use performance enhancing drugs and attempt to avoid detection.

14.     I have also had frequent opportunities to meet with athletes who have admitted
using performance enhancing drugs and to discuss with them the strategies they have employed
to beat drug testing.

15.     While some may assume that a negative drug test constitutes proof that an athlete
is not doping, this is unfortunately not the case.  Some doping methods, such as blood
transfusions, are not currently detectable through a laboratory test.  Other substances such as
erythropoietin ("EPO") are detectable in bodily fluids only for short periods of time, and EPO's
detection time can be reduced even further through altering the manner of administration and the
amount of the substance used.

16.     Moreover, not all prohibited substances are tested for in all drug tests.  For instance, my understanding is that most blood draws conducted by the Union Cycliste Internationale (UCI) for their biological monitoring system, while technically referred to as "drug tests," do not include testing for specific drugs but are rather taken for the purpose of acquiring data in order to evaluation an athlete's blood parameters over time.

17.     With respect to the analysis of urine samples it is also the case that most samples collected worldwide are not evaluated for the presence of EPO, this is because EPO analysis requires specialized and more expensive techniques.  Similarly, the carbon isotope ratio ("CIR") test used to distinguish between endogenous (i.e., naturally produced) and exogenous (synthetic) testosterone is considered "special analysis" and is more expensive than standard gas chromatography/mass spectrometry techniques.  Therefore, CIR testing for synthetic testosterone only occurs in a minority of samples collected.

18.     Also, with specialized scientific assistance available to sophisticated cheaters there are a variety of ways to seek to beat standard testing methodologies or mask the use of a prohibited substance.

19.     As a result of these and other factors, it is unfortunately the case that the mere number of drug tests taken by an athlete without a positive drug test having been successfully adjudicated does not provide compelling evidence that the athlete has not doped.

20.     Limitations in testing methodologies coupled with sophisticated efforts to exploit those limitations have always meant that an important aspect of the efforts to combat the use of performance enhancing drugs in sport is the use of reliable evidence of doping acquired through

means other than laboratory testing such as information from the internet, emails, admissions, corroborating scientific evidence and eye witness testimony. Cases involving primarily evidence other than a positive drug test are sometimes referred to as "non-analytical cases" because they do not result from a positive laboratory analysis of a sample.

21.     For the past decade USADA has been successful in pursuing numerous "non-analytical cases" in which there was strong evidence of doping but no positive drug test. These cases have resulted in accountability for drug violations and significant suspensions for coaches, agents, and athletes.

22.     The "non-analytical cases" that perhaps resulted in the most public attention came from USADA's investigation into doping in the Bay Area Laboratory Cooperative (BALCO) doping conspiracy which resulted in USADA's detection of several previously undiscovered designer drugs and ultimately sporting sanctions for two dozen individuals, including several lifetime bans for coaches.

23.     USADA also recently pursued a series of cases involving the distribution of EPO and human growth hormone (primarily to cyclists) by a Chinese internet distributor known as EPOSINO.

24.     These cases and others have afforded USADA significant experience in investigating and proving doping violations based on evidence other than, or in addition to, positive laboratory test results.

25.     To encourage uncovering doping through eye witness testimony, Article 10.5.3 of the World Anti-Doping Code provides for the reduction of sanctions to athletes and others who

8

come forward and provide "substantial assistance" in anti-doping cases. USADA has only proceeded with cases based on the testimony of witnesses providing substantial assistance where USADA was confident of the truthfulness of the cooperating witness's testimony and where the witness understood that significant penalties could attach to inaccurate testimony.

26.     It has been my experience that where a witness may have the opportunity to seek a substantial assistance reduction arbitrators permit extensive examination regarding the witness's credibility. Therefore, the Plaintiff's stated concerns regarding cross examination of witnesses are not supported by our experiences in these types of cases.

27.     I am also aware of the contention in the Plaintiff's complaint that "[a]part from violating the WADA Code, inducements to witnesses by Defendants [allegedly] raise serious concerns under federal criminal law of violations of the federal bribery statute . . ." Am. Compl. ¶ 30(b). Counsel for the Plaintiff made a similar allegation in 2007 and sent a letter to the USOC contending that USADA's use of Article 10.5.3 of the Code violated the federal anti-bribery statute. At that time both USADA and the USOC independently hired outside legal counsel to assess the merits of Plaintiff's counsel's contention and both law firms found that the claim lacked merit.

28.     The USADA Protocol provides a multi-step review process for positive drug tests and so-called "non-analytical cases". As a general matter, once USADA receives a laboratory report confirming an "adverse analytical finding" or otherwise determines that an anti-doping violation may have occurred, the athlete is notified and given an opportunity to make a written submission to the Anti-Doping Review Board (ADRB). (*See* Exhibit C attached hereto, USADA Protocol, § 11.) The ADRB is a USADA-approved panel of experts otherwise independent from

9

USADA, which reviews the laboratory analysis or other evidence of an anti-doping rule violation, plus any submission by the athlete, and recommends whether sufficient information exists for USADA to proceed with a charge of an anti-doping rule violation against the athlete. (*Id*.) As expressly stated in the USADA Protocol, the ADRB process is not considered a "hearing" and no evidence about the ADRB process (including its recommendation) may be introduced at the arbitration hearing. (*Id.*, § 11(c)(vi).)

29.   In the event that USADA decides to proceed following receipt of the ADRB recommendation, USADA formally charges the athlete with an anti-doping rule violation, notifies the athlete of the period of ineligibility USADA is seeking, and informs the athlete that he or she has ten (10) days to either accept the proposed sanction or contest the charge and request an arbitration hearing before a panel of the American Arbitration Association (AAA). (*Id.*, § 11(e).) If the athlete requests arbitration and elects to have it heard by a panel of three arbitrators, USADA and the athlete each select an arbitrator and these two panel members select the third arbitrator who chairs the arbitration panel. *See* Exhibit C attached hereto, USADA Protocol, Annex E (AAA Supplementary Procedures for the Arbitration of Olympic Sport Doping Disputes), Rule R-11.) The arbitration then proceeds very much like any commercial arbitration under the AAA Supplementary Procedures which closely follow the AAA's Commercial Rules  Proceedings under the AAA Supplementary Rules include prehearing identification of witnesses and exhibits and the opportunity for cross-examination. (*See* Affidavit of Matthew S. Barnett attached hereto as Exhibit F). Following the hearing and closing of the arbitration, the panel is required to issue a written reasoned award. (*Id.*, Rule R-39.)

30.     Subsequently, any party to the AAA's award or the relevant IF and/or WADA may appeal the AAA decision to the CAS. (*See* Exhibit C attached hereto, USADA Protocol, § 15.) As in the AAA process, the athlete may select an arbitrator from the CAS panel, the other party (or parties) to the appeal select the second arbitrator, and the President of CAS selects the third arbitrator. (*See* Code of Sports-Related Arbitration ("CAS Code"), a true and accurate copy of which is attached hereto as Exh. G .) The CAS hearing is a hearing *de novo*. (*See* Declaration of Matthieu Reeb, Secretary General of CAS, confirming that the parties are guaranteed the right to a hearing in appeals involving disputed issues of fact, attached hereto as Exhibit H.) The parties may introduce evidence from the prior hearing as well as any additional evidence desired by the parties and may raise new arguments for the first time before CAS should they so choose. For the convenience of American athletes, the hearing for any CAS appeal under the USADA Protocol is conducted in the United States, although the seat of CAS is in Switzerland and a CAS arbitration is an international arbitration. (*See* Exhibit C attached hereto, USADA Protocol, § 15; Exhibit G attached hereto, CAS Code.)

31.     By letter dated June 12, 2012, USADA notified Mr. Armstrong that, based on the evidence described in the letter, it was initiating the process set forth in the Protocol for the anti-doping rule violations specified. (A true and correct copy of the June 12, 2012 letter is attached hereto as Exhibit I,) The letter stated the matter would be forwarded to the ADRB for its consideration. Plaintiff was invited to make written submittals to the ADRB on or before June 22, 2012, which Plaintiff did. The ADRB reviewed the written submittals and made its recommendation to USADA.

32.     Upon receipt of the ADRB recommendation, USADA sent Mr. Armstrong a letter
dated June 28, 2012.  (A true and correct copy of the June 28, 2012 letter is attached hereto as
Exhibit J.)  The letter informed Mr. Armstrong that USADA was charging him with specified
anti-doping rule violations, USADA would seek specified sanctions against him, and described
his procedural rights under the Protocol.  As provided by the Protocol, the letter stated Mr.
Armstrong would have ten days, or until July 9, 2012, to respond to USADA's charges by either
accepting the sanctions or requesting an arbitration hearing before the AAA pursuant to the
Protocol.  By counsel Mr. Armstrong subsequently requested and was granted a five (5) day
extension of time until July 14, 2012, in which he could elect to have his case heard by a AAA
panel.  Plaintiff thereafter filed this lawsuit, and the parties subsequently agreed to extend the
July 9, 2012 deadline by up to thirty days.

33.     In the event that USADA elects to submit a matter to the ADRB, USADA is
required by the World Anti-Doping Code to provide notice to the IF of the athlete or other
person who is alleged to have committed an anti-doping rule violation.  Upon receipt of
USADA's June 12, 2012, notice letter, WTC, which runs the Ironman triathlon series, notified
Mr. Armstrong and USADA that the WTC was suspending Mr. Armstrong until the resolution of
his anti-doping case.

34.     USADA has no rule that bars Mr. Armstrong from competing in advance of an
arbitration hearing determination on the merits of USADA's doping charges and USADA does
not support the imposition of sanctions in advance of a hearing on the merits of doping
allegations unless the athlete has had at least some opportunity for a provisional suspension
hearing.  Thus, while Mr. Armstrong alleges that USADA intended that he would be suspended

12

upon the transmittal of a letter stating USADA's allegations of his doping, USADA did not have such an intent or purpose.

35.     USADA's letter dated June 28, 2012 also included charges of anti-doping rule violations against former United States Postal Service (USPS) Cycling Team Director Johan Bruyneel, former USPS Cycling Team Doctor. Pedro Celaya Lezama, former USPS Cycling Team Doctor Luis Garcia del Moral, former USPS Cycling Team Consulting Doctor Michele Ferrari and former USPS Cycling Team Trainer Jose "Pepe" Marti. (See Exhibit J attached hereto.) Both Mr. Bruyneel and Dr. Celaya have elected to proceed to a hearing before the AAA under the USADA Protocol and AAA Supplementary Procedures. USADA has imposed lifetime periods of ineligibility upon Drs. del Moral and Ferrari and Mr. Marti as a result of their anti-doping rule violations.

36.     While I am aware that the Plaintiff has alleged in his Amended Complaint that USADA is asserting jurisdiction over him pursuant to the UCI Anti-Doping Rules ("UCI ADR"), the Amended Complaint fails to even recognize that in USADA's June 28, 2012, letter to Mr. Armstrong USADA also set forth claims for violations of the USADA Protocol, USOC National Anti-Doping Policies, USA Cycling Anti-Doping Rules and the World Anti-Doping Code (which is incorporated into the USADA Protocol and USOC National Anti-Doping Policies). Therefore, Plaintiff entirely misses that USADA's claims are not exclusively premised upon USADA's jurisdiction under the UCI ADR but is also founded upon USADA's responsibility to enforce the rules of USADA, the USOC and USA Cycling to which Mr. Armstrong was clearly subject as a USA Cycling member and licensee, and as a member of the USADA registered testing pool.

13

Dated this _19th_ day of _July_, 2012.

_____
Travis T. Tygart

STATE OF COLORADO          )
                           )  ss.
COUNTY OF EL PASO          )

Subscribed and sworn to before me by Travis T. Tygart on this 19th day of July, 2012.

Witness my hand and official seal.

My commission expires: _8-12-12_

Notary Public

Address: _5555 Tech Center Dr. #200_
_Colorado Springs, CO 80919_

JOHNCIE B. WINGARD
NOTARY PUBLIC
STATE OF COLORADO
My Commission Expires 08/12/12

14

# EXHIBIT A



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF NATIONAL DRUG CONTROL POLICY
Washington, D.C.  20503

March 26, 2007

The Honorable Richard Durbin
Committee on Appropriations
Chairman, Subcommittee on Financial Services and General Government
United States Senate
The Capitol, S-131
Washington, D.C. 20510

Dear Mr. Chairman:

Thank you for your recent correspondence regarding efforts to eliminate drug use from the Olympic Movement.  The Office of National Drug Control Policy (ONDCP) shares your commitment to promoting drug-free sport.  ONDCP works closely with a number of domestic and international sport stakeholders to combat the health and ethical implications of doping in sport, particularly among young people.  I appreciate your personal commitment to this important initiative.

Your letter raised a series of questions about the rules and procedures utilized by the United States Anti-Doping Agency (USADA) in investigating and sanctioning athletes for doping. USADA is the independent, non-governmental organization responsible for the drug testing of United States Olympic and Paralympic athletes.  As you know, USADA receives a federal grant utilizing funding from ONDCP.  However, the ONDCP Reauthorization Act of 2006 and Congressional direction has consistently emphasized that ONDCP ensure USADA functions as a grantee, and not as an agency or extension of the Federal government.  Accordingly, while the Federal government exercises customary fiscal and administrative oversight of the grant funds provided to USADA, it does not impose operational or programmatic control over the organization.

As the subject matter experts on the procedural questions raised in your letter, attached please find responses prepared by USADA.  I understand that these answers have previously been provided to you by USADA.  While I would encourage you to direct any specific procedural questions to USADA, I would be pleased to discuss ONDCP's strong support of USADA and our shared efforts to eliminate performance enhancing drugs from Olympic sport.

If you or your staff has any questions, please contact me at (202) 395-6700, or Mrs. Sally Buikema with my Office of Legislative Affairs at (202) 395-9866.

Respectfully,

John P. Walters
Director

# EXHIBIT B



# WORLD ANTI-DOPING CODE



**WORLD ANTI-DOPING AGENCY**

play true

2 0 0 9

## World Anti-Doping Code

The World Anti-Doping Code was first adopted in 2003 and became effective in 2004. The enclosed incorporates revisions to the World Anti-Doping Code that were approved by the World Anti-Doping Agency Foundation Board on November 17, 2007. The revised World Anti-Doping Code is effective as of January 1, 2009.

Published by:

World Anti-Doping Agency
Stock Exchange Tower
800 Place Victoria (Suite 1700)
PO Box 120
Montreal, Quebec,
Canada H4Z 1B7

URL:        www.wada-ama.org

Tel:        +1 514 904 9232
Fax:        +1 514 904 8650
E-mail:     code@wada-ama.org

# Table of Contents

PURPOSE, SCOPE AND ORGANIZATION OF
THE WORLD ANTI-DOPING PROGRAM AND THE *CODE* ............................11

    THE *CODE* ..............................................................11

    THE WORLD ANTI-DOPING PROGRAM ...............................12

    *INTERNATIONAL STANDARD*S...........................................12

    MODELS OF BEST PRACTICE AND GUIDELINES ................13

FUNDAMENTAL RATIONALE FOR THE WORLD ANTI-DOPING *CODE* ............14

## PART ONE: *DOPING CONTROL*

INTRODUCTION.........................................................................16

ARTICLE 1:   DEFINITION OF DOPING...........................................18

ARTICLE 2:   ANTI-DOPING RULE VIOLATIONS.............................18

    2.1   PRESENCE OF A *PROHIBITED SUBSTANCE* OR ITS
        *METABOLITE*S OR *MARKER*S IN AN *ATHLETE'S SAMPLE*........19

    2.2   *USE* OR *ATTEMPTED USE* BY AN *ATHLETE* OF A
        *PROHIBITED SUBSTANCE* OR A *PROHIBITED METHOD*..........21

    2.3   REFUSING OR FAILING WITHOUT COMPELLING
        JUSTIFICATION TO SUBMIT TO *SAMPLE* COLLECTION.............22

    2.4   VIOLATION OF APPLICABLE REQUIREMENTS
        REGARDING *ATHLETE* AVAILABILITY FOR
        *OUT-OF-COMPETITION TESTING*................................................23

    2.5   *TAMPERING* OR *ATTEMPTED TAMPERING*
        WITH ANY PART OF *DOPING CONTROL*......................................23

    2.6   *POSSESSION* OF *PROHIBITED SUBSTANCE*S
        AND *PROHIBITED METHOD*S........................................................24

    2.7   *TRAFFICKING* OR *ATTEMPTED TRAFFICKING* IN ANY
        *PROHIBITED SUBSTANCE* OR *PROHIBITED METHOD*..............25

    2.8   ADMINISTRATION OR *ATTEMPT*ED ADMINISTRATION
        TO ANY *ATHLETE IN-COMPETITION* OF ANY
        *PROHIBITED METHOD* OR *PROHIBITED SUBSTANCE*..............25

ARTICLE 3:    PROOF OF DOPING ............................................. 26
    3.1    BURDENS AND STANDARDS OF PROOF ............................. 26
    3.2    METHODS OF ESTABLISHING FACTS AND PRESUMPTIONS ....... 26

ARTICLE 4:    THE *PROHIBITED LIST* ...................................... 29
    4.1    PUBLICATION AND REVISION OF THE *PROHIBITED LIST* ........ 29
    4.2    *PROHIBITED SUBSTANCES* AND *PROHIBITED METHODS* IDENTIFIED ON THE *PROHIBITED LIST* .............. 30
    4.3    CRITERIA FOR INCLUDING SUBSTANCES AND METHODS ON THE *PROHIBITED LIST* ....................................... 32
    4.4    THERAPEUTIC USE .................................................. 34
    4.5    MONITORING PROGRAM ........................................... 36

ARTICLE 5:    *TESTING* ....................................................... 37
    5.1    TEST DISTRIBUTION PLANNING ................................... 37
    5.2    STANDARDS FOR *TESTING* ....................................... 38
    5.3    RETIRED *ATHLETE*S RETURNING TO *COMPETITION* .......... 38

ARTICLE 6:    ANALYSIS OF *SAMPLES* ....................................... 39
    6.1    USE OF APPROVED LABORATORIES ............................... 39
    6.2    PURPOSE OF COLLECTION AND ANALYSIS OF *SAMPLE*S ...... 39
    6.3    RESEARCH ON *SAMPLE*S .......................................... 40
    6.4    STANDARDS FOR *SAMPLE* ANALYSIS AND REPORTING ..... 40
    6.5    RETESTING *SAMPLE*S ............................................. 40

ARTICLE 7:    RESULTS MANAGEMENT ......................................... 41
    7.1    INITIAL REVIEW REGARDING *ADVERSE ANALYTICAL FINDINGS* ......................................................... 41
    7.2    NOTIFICATION AFTER INITIAL REVIEW REGARDING *ADVERSE ANALYTICAL FINDING*S ............................. 41
    7.3    REVIEW OF *ATYPICAL FINDING*S ............................... 42
    7.4    REVIEW OF OTHER ANTI-DOPING RULE VIOLATIONS NOT COVERED BY ARTICLES 7.1–7.3 ......................... 44
    7.5    PRINCIPLES APPLICABLE TO *PROVISIONAL SUSPENSION*S ...... 45
    7.6    RETIREMENT FROM SPORT ....................................... 47

ARTICLE 8:   RIGHT TO A FAIR HEARING.................................48

8.1    FAIR HEARINGS.................................................48

8.2    *EVENT* HEARINGS .............................................49

8.3    WAIVER OF HEARING ...........................................49

ARTICLE 9:   AUTOMATIC *DISQUALIFICATION* OF INDIVIDUAL RESULTS ......50

ARTICLE 10:   SANCTIONS ON INDIVIDUALS.................................51

10.1   *DISQUALIFICATION* OF RESULTS IN *EVENT* DURING
WHICH AN ANTI-DOPING RULE VIOLATION OCCURS .........51

10.2   *INELIGIBILITY* FOR PRESENCE, *USE* OR *ATTEMPTED USE*,
OR *POSSESSION* OF *PROHIBITED SUBSTANCE*S
AND *PROHIBITED METHOD*S ................................52

10.3   *INELIGIBILITY* FOR OTHER ANTI-DOPING RULE VIOLATIONS .....53

10.4   ELIMINATION OR REDUCTION OF THE PERIOD OF
*INELIGIBILITY* FOR SPECIFIED SUBSTANCES
UNDER SPECIFIC CIRCUMSTANCES....................................54

10.5   ELIMINATION OR REDUCTION OF PERIOD OF *INELIGIBILITY*
BASED ON EXCEPTIONAL CIRCUMSTANCES ......................56

10.6   AGGRAVATING CIRCUMSTANCES WHICH MAY INCREASE
THE PERIOD OF *INELIGIBILITY* ...............................65

10.7   MULTIPLE VIOLATIONS ..........................................66

10.8   *DISQUALIFICATION* OF RESULTS IN *COMPETITION*S
SUBSEQUENT TO *SAMPLE* COLLECTION OR COMMISSION
OF AN ANTI-DOPING RULE VIOLATION ...................71

10.9   COMMENCEMENT OF *INELIGIBILITY* PERIOD ....................72

10.10  STATUS DURING *INELIGIBILITY*.................................74

10.11  REINSTATEMENT *TESTING*......................................76

10.12  IMPOSITION OF FINANCIAL SANCTIONS.............................76

ARTICLE 11:   *CONSEQUENCES* TO TEAMS .................................77

11.1   *TESTING* OF *TEAM SPORT*S...................................77

11.2   *CONSEQUENCES* FOR *TEAM SPORT*S ...........................77

11.3   *EVENT* RULING BODY MAY ESTABLISH STRICTER
*CONSEQUENCES* FOR *TEAM SPORT*S...........................77

ARTICLE 12:   SANCTIONS AGAINST SPORTING BODIES .....................78

ARTICLE 13: APPEALS .......................................................... 78

13.1    DECISIONS SUBJECT TO APPEAL .......................................78

13.2    APPEALS FROM DECISIONS REGARDING ANTI-DOPING
        RULE VIOLATIONS, *CONSEQUENCES*, AND
        *PROVISIONAL SUSPENSION*S .................................79

13.3    FAILURE TO RENDER A TIMELY DECISION BY AN
        *ANTI-DOPING ORGANIZATION* .................................82

13.4    APPEALS FROM DECISIONS GRANTING OR DENYING
        A THERAPEUTIC USE EXEMPTION .................................83

13.5    APPEALS FROM DECISIONS UNDER PART THREE
        AND PART FOUR OF THE *CODE* .................................83

13.6    APPEALS FROM DECISIONS SUSPENDING OR
        REVOKING LABORATORY ACCREDITATION .........................84

ARTICLE 14: CONFIDENTIALITY AND REPORTING ........................... 84

14.1    INFORMATION CONCERNING *ADVERSE ANALYTICAL
        FINDINGS*, *ATYPICAL FINDINGS*, AND OTHER
        POTENTIAL ANTI-DOPING RULE VIOLATIONS ....................84

14.2    PUBLIC DISCLOSURE .............................................86

14.3    *ATHLETE* WHEREABOUTS INFORMATION ..........................87

14.4    STATISTICAL REPORTING ........................................88

14.5    *DOPING CONTROL* INFORMATION CLEARINGHOUSE .........88

14.6    DATA PRIVACY .................................................89

ARTICLE 15: CLARIFICATION OF *DOPING CONTROL* RESPONSIBILITIES ......90

15.1    *EVENT TESTING* ..............................................90

15.2    *OUT-OF-COMPETITION TESTING* .................................91

15.3    RESULTS MANAGEMENT, HEARINGS AND SANCTIONS .....92

15.4    MUTUAL RECOGNITION ..........................................94

ARTICLE 16: *DOPING CONTROL* FOR ANIMALS COMPETING IN SPORT .......95

ARTICLE 17: STATUTE OF LIMITATIONS .................................95

# PART TWO: EDUCATION AND RESEARCH

ARTICLE 18: EDUCATION ........................................................... 98

18.1   BASIC PRINCIPLE AND PRIMARY GOAL ............................ 98

18.2   PROGRAMS AND ACTIVITIES ..................................... 98

18.3   PROFESSIONAL CODES OF CONDUCT ............................. 100

18.4   COORDINATION AND COOPERATION ............................. 100

ARTICLE 19: RESEARCH ........................................................... 101

19.1   PURPOSE AND AIMS OF ANTI-DOPING RESEARCH ........... 101

19.2   TYPES OF RESEARCH ............................................. 101

19.3   COORDINATION OF RESEARCH AND SHARING OF RESULTS ..... 101

19.4   RESEARCH PRACTICES ............................................ 102

19.5   RESEARCH USING *PROHIBITED SUBSTANCE*S
        AND *PROHIBITED METHOD*S ...................................... 102

19.6   MISUSE OF RESULTS .............................................. 102

# PART THREE: ROLES AND RESPONSIBILITIES

ARTICLE 20: ADDITIONAL ROLES AND RESPONSIBILITIES
            OF *SIGNATORIES* .................................................. 104

20.1   ROLES AND RESPONSIBILITIES OF
        THE INTERNATIONAL OLYMPIC COMMITTEE ................... 104

20.2   ROLES AND RESPONSIBILITIES OF
        THE INTERNATIONAL PARALYMPIC COMMITTEE .............. 105

20.3   ROLES AND RESPONSIBILITIES OF
        INTERNATIONAL FEDERATIONS .................................. 106

20.4   ROLES AND RESPONSIBILITIES OF *NATIONAL OLYMPIC
        COMMITTEE*S AND NATIONAL PARALYMPIC COMMITTEES ..... 108

20.5   ROLES AND RESPONSIBILITIES OF
        *NATIONAL ANTI-DOPING ORGANIZATION*S ..................... 110

20.6   ROLES AND RESPONSIBILITIES OF
        *MAJOR EVENT ORGANIZATIONS* .................................. 110

20.7   ROLES AND RESPONSIBILITIES OF *WADA* ...................... 111

ARTICLE 21: ADDITIONAL ROLES AND RESPONSIBILITIES
OF *ATHLETES* AND OTHER *PERSONS*......................................112

21.1   ROLES AND RESPONSIBILITIES OF *ATHLETES*...............112

21.2   ROLES AND RESPONSIBILITIES OF
*ATHLETE SUPPORT PERSONNEL*.......................................113

ARTICLE 22: INVOLVEMENT OF GOVERNMENTS..................................113

22.1   EACH GOVERNMENT WILL TAKE ALL ACTIONS
AND MEASURES NECESSARY TO COMPLY WITH
THE *UNESCO CONVENTION*................................................113

22.2   EACH GOVERNMENT WILL ENCOURAGE ALL OF
ITS PUBLIC SERVICES OR AGENCIES TO SHARE
INFORMATION WITH ANTI-DOPING ORGANIZATIONS.......113

22.3   EACH GOVERNMENT WILL RESPECT ARBITRATION
AS THE PREFERRED MEANS OF RESOLVING DOPING
RELATED DISPUTES ...........................................................114

22.4   ALL OTHER GOVERNMENTAL INVOLVEMENT
WITH ANTI-DOPING WILL BE BROUGHT INTO
HARMONY WITH THE *CODE*................................................114

22.5   GOVERNMENTS SHOULD MEET THE EXPECTATIONS
OF THIS ARTICLE BY JANUARY 1, 2010............................114

22.6   FAILURE BY A GOVERNMENT TO RATIFY, ACCEPT,
APPROVE OR ACCEDE TO THE *UNESCO CONVENTION*
BY JANUARY 1, 2010 ..........................................................114

# PART FOUR: ACCEPTANCE, COMPLIANCE, MODIFICATION AND INTERPRETATION

ARTICLE 23: ACCEPTANCE, COMPLIANCE AND MODIFICATION..................116

23.1   ACCEPTANCE OF THE *CODE*..............................................116

23.2   IMPLEMENTATION OF THE *CODE*........................................117

23.3   COMPLIANCE WITH THE *CODE*...........................................118

23.4   MONITORING COMPLIANCE WITH THE *CODE*
         AND *UNESCO CONVENTION*...............................................118

23.5   ADDITIONAL CONSEQUENCES OF
         A *SIGNATORY'S* NONCOMPLIANCE WITH THE *CODE*........120

23.6   MODIFICATION OF THE *CODE*............................................121

23.7   WITHDRAWAL OF ACCEPTANCE OF THE *CODE*................121

ARTICLE 24: INTERPRETATION OF THE *CODE*....................................122

ARTICLE 25: TRANSITIONAL PROVISIONS...........................................123

25.1   GENERAL APPLICATION OF THE 2009 *CODE*....................123

25.2   NON-RETROACTIVE UNLESS PRINCIPLE
         OF "LEX MITIOR" APPLIES...................................................123

25.3   APPLICATION TO DECISIONS RENDERED
         PRIOR TO THE 2009 *CODE*...................................................123

25.4   APPLICATION TO SPECIFIC PRE-*CODE* VIOLATIONS.........124

25.5   ADDITIONAL *CODE* AMENDMENTS ....................................124

# APPENDIX 1

DEFINITIONS...........................................................................................126

## PURPOSE, SCOPE AND ORGANIZATION OF THE WORLD ANTI-DOPING PROGRAM AND THE *CODE*

The purposes of the World Anti-Doping *Code* and the World Anti-Doping Program which supports it are:

- To protect the *Athlete*s' fundamental right to participate in doping-free sport and thus promote health, fairness and equality for *Athlete*s worldwide, and

- To ensure harmonized, coordinated and effective anti-doping programs at the international and national level with regard to detection, deterrence and prevention of doping.

**The *Code***

The *Code* is the fundamental and universal document upon which the World Anti-Doping Program in sport is based. The purpose of the *Code* is to advance the anti-doping effort through universal harmonization of core anti-doping elements. It is intended to be specific enough to achieve complete harmonization on issues where uniformity is required, yet general enough in other areas to permit flexibility on how agreed-upon anti-doping principles are implemented.

[Comment: The Olympic Charter in force as from July 7, 2007, and the UNESCO Convention adopted in Paris on October 19, 2005, both recognize the prevention of and the fight against doping in sport as a critical part of the mission of the International Olympic Committee and UNESCO and also recognize the fundamental role of the Code.]

## The World Anti-Doping Program

The World Anti-Doping Program encompasses all of the elements needed in order to ensure optimal harmonization and best practice in international and national anti-doping programs. The main elements are:

**Level 1:** The *Code*

**Level 2:** *International Standard*s

**Level 3:** Models of Best Practice and Guidelines

### *International Standard*s

*International Standard*s for different technical and operational areas within the anti-doping program will be developed in consultation with the *Signatories* and governments and approved by *WADA*. The purpose of the *International Standard*s is harmonization among *Anti-Doping Organization*s responsible for specific technical and operational parts of the anti-doping programs. Adherence to the *International Standard*s is mandatory for compliance with the *Code*. The *International Standard*s may be revised from time to time by the *WADA* Executive Committee after reasonable consultation with the *Signatories* and governments. Unless provided otherwise in the *Code*, *International Standard*s and all revisions shall become effective on the date specified in the *International Standard* or revision.

[Comment: The International Standards contain much of the technical detail necessary for implementing the Code. International Standards, while expressly incorporated into the Code by reference, will, in consultation with the Signatories and governments, be developed by experts and set forth in separate technical documents. It is important that the WADA Executive Committee be able to make timely changes to the International Standards without requiring any amendment of the Code or individual stakeholder rules and regulations.]

## Models of Best Practice and Guidelines

Models of best practice and guidelines based on the *Code* have been and will be developed to provide solutions in different areas of anti-doping. The models will be recommended by *WADA* and made available to *Signatories* upon request but will not be mandatory. In addition to providing models of anti-doping documentation, *WADA* will also make some training assistance available to the *Signatories*.

[Comment: Following the adoption of the 2009 Code, WADA will prepare amended model anti-doping rules and regulations tailored to the needs of each of the major groups of Signatories (e.g., International Federations and National Anti-Doping Organizations, etc.). These model rules and regulations will conform with and be based on the Code, will be state of the art examples of best practices and will contain all of the detail (including reference to International Standards) necessary to conduct an effective anti-doping program.

These model rules and regulations will provide alternatives from which stakeholders may select. Some stakeholders may choose to adopt the model rules and regulations and other models of best practices verbatim. Others may decide to adopt the models with modifications. Still other stakeholders may choose to develop their own rules and regulations consistent with the general principles and specific requirements set forth in the Code.

Other model documents or guidelines for specific parts of the anti-doping work may be developed based on generally recognized stakeholder needs and expectations. This could include models or guidelines for national anti-doping programs, results management, Testing (beyond the specific requirements set forth in the International Standard for Testing), education programs, etc. All models of best practice will be reviewed and approved by WADA before they are included in the World Anti-Doping Program.]

## FUNDAMENTAL RATIONALE
## FOR THE WORLD ANTI-DOPING *CODE*

Anti-doping programs seek to preserve what is intrinsically valuable about sport. This intrinsic value is often referred to as "the spirit of sport", it is the essence of Olympism; it is how we play true. The spirit of sport is the celebration of the human spirit, body and mind, and is characterized by the following values:

- Ethics, fair play and honesty
- Health
- Excellence in performance
- Character and education
- Fun and joy
- Teamwork
- Dedication and commitment
- Respect for rules and laws
- Respect for self and other *Participant*s
- Courage
- Community and solidarity

Doping is fundamentally contrary to the spirit of sport.

To fight doping by promoting the spirit of sport, the *Code* requires each *Anti-Doping Organization* to develop and implement educational programs for *Athlete*s, including youth, and *Athlete Support Personnel.*

# PART ONE:
## *DOPING CONTROL*



# INTRODUCTION

Part One of the *Code* sets forth specific anti-doping rules and principles that are to be followed by organizations responsible for adopting, implementing or enforcing anti-doping rules within their authority, e.g., the International Olympic Committee, International Paralympic Committee, International Federations, *Major Event Organizations*, and *National Anti-Doping Organization*s. All such organizations are collectively referred to as *Anti-Doping Organization*s.

All provisions of the *Code* are mandatory in substance and must be followed as applicable by each *Anti-Doping Organization* and *Athlete* or other *Person*. The *Code* does not, however, replace or eliminate the need for comprehensive anti-doping rules adopted by each *Anti-Doping Organization*. While some provisions of the *Code* must be incorporated without substantive change by each *Anti-Doping Organization* in its own anti-doping rules, other provisions of the *Code* establish mandatory guiding principles that allow flexibility in the formulation of rules by each *Anti-Doping Organization* or establish requirements that must be followed by each *Anti-Doping Organization* but need not be repeated in its own anti-doping rules.

[Comment: Those Articles of the Code which must be incorporated into each Anti-Doping Organization's rules without substantive change are set forth in Article 23.2.2. For example, it is critical for purposes of harmonization that all Signatories base their decisions on the same list of anti-doping rule violations, the same burdens of proof and impose the same Consequences for the same anti-doping rule violations. These rules must be the same whether a hearing takes place before an International Federation, at the national level or before the Court of Arbitration for Sport.

Code provisions not listed in Article 23.2.2 are still mandatory in substance even though an Anti-Doping Organization is not required to incorporate them verbatim. Those provisions generally fall into two categories. First, some provisions direct Anti-Doping Organizations to take certain actions but there is no need to restate the provision in the Anti-Doping Organization's

*continued*

Anti-doping rules, like *Competition* rules, are sport rules governing the conditions under which sport is played. *Athlete*s or other *Person*s accept these rules as a condition of participation and shall be bound by these rules. Each *Signatory* shall establish rules and procedures to ensure that all *Athlete*s or other *Person*s under the authority of the *Signatory* and its member organizations are informed of and agree to be bound by anti-doping rules in force of the relevant *Anti-Doping Organization*s.

Each *Signatory* shall establish rules and procedures to ensure that all *Athlete*s or other *Person*s under the authority of the *Signatory* and its member organizations consent to the dissemination of their private data as required or authorized by the *Code* and are bound by and compliant with *Code* anti-

own anti-doping rules. As an example, each Anti-Doping Organization must plan and conduct Testing as required by Article 5, but these directives to the Anti-Doping Organization need not be repeated in the Anti-Doping Organization's own rules. Second, some provisions are mandatory in substance but give each Anti-Doping Organization some flexibility in the implementation of the principles stated in the provision. As an example, it is not necessary for effective harmonization to force all

Signatories to use one single results management and hearing process. At present, there are many different, yet equally effective processes for results management and hearings within different International Federations and different national bodies. The Code does not require absolute uniformity in results management and hearing procedures; it does, however, require that the diverse approaches of the Signatories satisfy principles stated in the Code.]

[Comment: By their participation in sport, Athletes are bound by the competitive rules of their sport. In the same manner, Athletes and Athlete Support Personnel should be bound by anti-doping rules based on Article 2 of the Code by virtue of their agreements for membership, accreditation, or participation in

sports organizations or sports Events subject to the Code. Each Signatory, however, shall take the necessary steps to ensure that all Athletes and Athlete Support Personnel within its authority are bound by the relevant Anti-Doping Organization's anti-doping rules.]

doping rules, and that the appropriate *Consequences* are imposed on those *Athlete*s or other *Person*s who are not in conformity with those rules. These sport-specific rules and procedures aimed at enforcing anti-doping rules in a global and harmonized way are distinct in nature from and are, therefore, not intended to be subject to or limited by any national requirements and legal standards applicable to criminal proceedings or employment matters. When reviewing the facts and the law of a given case, all courts, arbitral hearing panels and other adjudicating bodies should be aware and respect the distinct nature of the anti-doping rules in the *Code* and the fact that those rules represent the consensus of a broad spectrum of stakeholders around the world with an interest in fair sport.

## ARTICLE 1: DEFINITION OF DOPING

Doping is defined as the occurrence of one or more of the anti-doping rule violations set forth in Article 2.1 through Article 2.8 of the *Code*.

## ARTICLE 2: ANTI-DOPING RULE VIOLATIONS

*Athlete*s or other *Person*s shall be responsible for knowing what constitutes an anti-doping rule violation and the substances and methods which have been included on the *Prohibited List*.

The following constitute anti-doping rule violations:

*[Comment 'a' to Article 2: The purpose of Article 2 is to specify the circumstances and conduct which constitute anti-doping rule violations. Hearings in doping cases will proceed based on the assertion that one or more of these specific rules has been violated.]*

## 2.1 Presence of a *Prohibited Substance* or its *Metabolite*s or *Marker*s in an *Athlete*'s *Sample*

### 2.1.1 It is each *Athlete*'s personal duty to ensure that no *Prohibited Substance* enters his or her body. *Athlete*s are responsible for any *Prohibited Substance* or its *Metabolite*s or *Marker*s found to be present in their *Sample*s. Accordingly, it is not necessary that intent, fault, negligence or knowing *Use* on the *Athlete*'s part be demonstrated in order to establish an anti-doping violation under Article 2.1.

[Comment to Article 2.1.1: For purposes of anti-doping rule violations involving the presence of a Prohibited Substance (or its Metabolites or Markers), the Code adopts the rule of strict liability which was found in the Olympic Movement Anti-Doping Code ("OMADC") and the vast majority of pre-Code anti-doping rules. Under the strict liability principle, an Athlete is responsible, and an anti-doping rule violation occurs, whenever a Prohibited Substance is found in an Athlete's Sample. The violation occurs whether or not the Athlete intentionally or unintentionally Used a Prohibited Substance or was negligent or otherwise at fault. If the positive Sample came from an In-Competition test, then the results of that Competition are automatically invalidated (Article 9 (Automatic Disqualification of Individual Results)). However, the Athlete then has the possibility to avoid or reduce sanctions if the Athlete can demonstrate that he or she was not at fault or significant fault (Article 10.5 (Elimination or Reduction of Period of Ineligibility Based on Exceptional Circumstances)) or in certain circumstances did not intend to enhance his or her sport performance (Article 10.4 (Elimination or Reduction of the Period of Ineligibility for Specified Substances under Specific Circumstances)).

The strict liability rule for the finding of a Prohibited Substance in an Athlete's Sample, with a possibility that sanctions may be modified based on specified criteria, provides a reasonable balance between effective anti-doping enforcement for the benefit of all "clean" Athletes and fairness in the exceptional circumstance where a Prohibited Substance entered an Athlete's system through No Fault or Negligence or No Significant Fault or Negligence on the Athlete's part. It is important to emphasize that while the determination of whether the anti-doping rule violation has occurred is based on strict liability, the imposition of a fixed period of Ineligibility is not automatic. The strict liability principle set forth in the Code has been consistently upheld in the decisions of CAS.]

2.1.2 Sufficient proof of an anti-doping rule violation under Article 2.1 is established by either of the following: presence of a *Prohibited Substance* or its *Metabolite*s or *Marker*s in the *Athlete*'s A *Sample* where the *Athlete* waives analysis of the B *Sample* and the B *Sample* is not analyzed; or, where the *Athlete*'s B *Sample* is analyzed and the analysis of the *Athlete*'s B *Sample* confirms the presence of the *Prohibited Substance* or its *Metabolite*s or *Marker*s found in the *Athlete*'s A *Sample*.

2.1.3 Excepting those substances for which a quantitative threshold is specifically identified in the *Prohibited List*, the presence of any quantity of a *Prohibited Substance* or its *Metabolite*s or *Marker*s in an *Athlete*'s *Sample* shall constitute an anti-doping rule violation.

2.1.4 As an exception to the general rule of Article 2.1, the *Prohibited List* or *International Standard*s may establish special criteria for the evaluation of *Prohibited Substance*s that can also be produced endogenously.

*[Comment to Article 2.1.2: The Anti-Doping Organization with results management responsibility may in its discretion choose to have the B Sample analyzed even if the Athlete does not request the analysis of the B Sample.]*

## 2.2 *Use* or *Attempted Use* by an *Athlete* of a *Prohibited Substance* or a *Prohibited Method*

2.2.1 It is each *Athlete*'s personal duty to ensure that no *Prohibited Substance* enters his or her body. Accordingly, it is not necessary that intent, fault, negligence or knowing *Use* on the *Athlete*'s part be demonstrated in order to establish an anti-doping rule violation for *Use* of a *Prohibited Substance* or a *Prohibited Method*.

[Comment to Article 2.2: It has always been the case that Use or Attempted Use of a Prohibited Substance or Prohibited Method may be established by any reliable means. As noted in the Comment to Article 3.2 (Methods of Establishing Facts and Presumptions), unlike the proof required to establish an anti-doping rule violation under Article 2.1, Use or Attempted Use may also be established by other reliable means such as admissions by the Athlete, witness statements, documentary evidence, conclusions drawn from longitudinal profiling, or other analytical information which does not otherwise satisfy all the requirements to establish "Presence" of a Prohibited Substance under Article 2.1. For example, Use may be established based upon reliable analytical data from the analysis of an A Sample (without confirmation from an analysis of a B Sample) or from the analysis of a B Sample alone where the Anti-Doping Organization provides a satisfactory explanation for the lack of confirmation in the other Sample.]

2.2.2  The success or failure of the *Use* or *Attempted Use* of a *Prohibited Substance* or *Prohibited Method* is not material. It is sufficient that the *Prohibited Substance* or *Prohibited Method* was *Used* or *Attempted* to be *Used* for an anti-doping rule violation to be committed.

## 2.3   Refusing or failing without compelling justification to submit to *Sample* collection after notification as authorized in applicable anti-doping rules, or otherwise evading *Sample* collection

[Comment to Article 2.2.2: Demonstrating the "Attempted Use" of a Prohibited Substance requires proof of intent on the Athlete's part. The fact that intent may be required to prove this particular anti-doping rule violation does not undermine the strict liability principle established for violations of Article 2.1 and violations of Article 2.2 in respect of Use of a Prohibited Substance or Prohibited Method.

An Athlete's Use of a Prohibited Substance constitutes an anti-doping rule violation unless such substance is not prohibited Out-of-Competition and the Athlete's Use takes place Out-of-Competition. (However, the presence of a Prohibited Substance or its Metabolites or Markers in a Sample collected In-Competition is a violation of Article 2.1 (Presence of a Prohibited Substance or its Metabolites or Markers) regardless of when that substance might have been administered.)]

[Comment to Article 2.3: Failure or refusal to submit to Sample collection after notification was prohibited in almost all pre-Code anti-doping rules. This Article expands the typical pre-Code rule to include "otherwise evading Sample collection" as prohibited conduct. Thus, for example, it would be an anti-doping rule violation if it were established that an Athlete was hiding from a Doping Control official to evade notification or Testing. A violation of "refusing or failing to submit to Sample collection" may be based on either intentional or negligent conduct of the Athlete, while "evading" Sample collection contemplates intentional conduct by the Athlete.]

2.4    Violation of applicable requirements regarding *Athlete* availability for *Out-of-Competition Testing*, including failure to file required whereabouts information and missed tests which are declared based on rules which comply with the *International Standard* for *Testing*. Any combination of three missed tests and/or filing failures within an eighteen-month period as determined by *Anti-Doping Organization*s with jurisdiction over the *Athlete* shall constitute an anti-doping rule violation

2.5    *Tampering* or *Attempt*ed *Tampering* with any part of *Doping Control*

[Comment to Article 2.4: Separate whereabouts filing failures and missed tests declared under the rules of the *Athlete's International Federation* or any other *Anti-Doping Organization* with authority to declare whereabouts filing failures and missed tests in accordance with the *International Standard for Testing* shall be combined in applying this Article. In appropriate circumstances, missed tests or filing failures may also constitute an anti-doping rule violation under Article 2.3 or Article 2.5.]

[Comment to Article 2.5: This Article prohibits conduct which subverts the *Doping Control* process but which would not otherwise be included in the definition of *Prohibited Methods*. For example, altering identification numbers on a *Doping Control* form during *Testing*, breaking the B Bottle at the time of B Sample analysis or providing fraudulent information to an *Anti-Doping Organization*.]

## 2.6 *Possession* of *Prohibited Substances* and *Prohibited Methods*

2.6.1 *Possession* by an *Athlete In-Competition* of any *Prohibited Method* or any *Prohibited Substance*, or *Possession* by an *Athlete Out-of-Competition* of any *Prohibited Method* or any *Prohibited Substance* which is prohibited *Out-of-Competition* unless the *Athlete* establishes that the *Possession* is pursuant to a therapeutic use exemption granted in accordance with Article 4.4 (Therapeutic Use) or other acceptable justification.

2.6.2 *Possession* by an *Athlete Support Personnel In-Competition* of any *Prohibited Method* or any *Prohibited Substance*, or *Possession* by an *Athlete Support Personnel Out-of-Competition* of any *Prohibited Method* or any *Prohibited Substance* which is prohibited *Out-of-Competition* in connection with an *Athlete*, *Competition* or training, unless the *Athlete Support Personnel* establishes that the *Possession* is pursuant to a therapeutic use exemption granted to an *Athlete* in accordance with Article 4.4 (Therapeutic Use) or other acceptable justification.

*[Comment to Article 2.6.1 and 2.6.2: Acceptable justification would not include, for example, buying or Possessing a Prohibited Substance for purposes of giving it to a friend or relative, except under justifiable medical circumstances where that Person had a physician's prescription, e.g., buying insulin for a diabetic child.]*

*[Comment to Article 2.6.2: Acceptable justification would include, for example, a team doctor carrying Prohibited Substances for dealing with acute and emergency situations.]*

2.7    *Trafficking* or *Attempted Trafficking* in any
       *Prohibited Substance* or *Prohibited Method*

2.8    Administration or *Attempt*ed administration to any
       *Athlete In-Competition* of any *Prohibited Method* or
       *Prohibited Substance*, or administration or *Attempt*ed
       administration to any *Athlete Out-of-Competition* of
       any *Prohibited Method* or any *Prohibited Substance*
       that is prohibited *Out-of-Competition*, or assisting,
       encouraging, aiding, abetting, covering up or any
       other type of complicity involving an anti-doping rule
       violation or any *Attempt*ed anti-doping rule violation

*[Comment 'b' to Article 2: The Code does not make it an anti-doping rule violation for an Athlete or other Person to work or associate with Athlete Support Personnel who are serving a period of Ineligibility. However, a sport organization may adopt its own rules which prohibit such conduct.]*

# ARTICLE 3: PROOF OF DOPING

## 3.1   Burdens and Standards of Proof

The *Anti-Doping Organization* shall have the burden of establishing that an anti-doping rule violation has occurred. The standard of proof shall be whether the *Anti-Doping Organization* has established an anti-doping rule violation to the comfortable satisfaction of the hearing panel bearing in mind the seriousness of the allegation which is made. This standard of proof in all cases is greater than a mere balance of probability but less than proof beyond a reasonable doubt. Where the *Code* places the burden of proof upon the *Athlete* or other *Person* alleged to have committed an anti-doping rule violation to rebut a presumption or establish specified facts or circumstances, the standard of proof shall be by a balance of probability, except as provided in Articles 10.4 and 10.6 where the *Athlete* must satisfy a higher burden of proof.

## 3.2   Methods of Establishing Facts and Presumptions

Facts related to anti-doping rule violations may be established by any reliable means, including admissions. The following rules of proof shall be applicable in doping cases:

[Comment to Article 3.1: This standard of proof required to be met by the Anti-Doping Organization is comparable to the standard which is applied in most countries to cases involving professional misconduct. It has also been widely applied by courts and hearing panels in doping cases. See, for example, the CAS decision in N., J., Y., W. v. FINA, CAS 98/208, 22  December 1998.]

[Comment to Article 3.2: For example, an Anti-Doping Organization may establish an anti-doping rule violation under Article  2.2 (Use or Attempted Use of a Prohibited Substance or Prohibited Method) based on the Athlete's admissions, the credible testimony of third Persons, reliable documentary evidence, reliable analytical data from either an A or B Sample as provided in the Comments to Article  2.2, or conclusions drawn from the profile of a series of the Athlete's blood or urine Samples.]

3.2.1 *WADA*-accredited laboratories are presumed to have conducted *Sample* analysis and custodial procedures in accordance with the *International Standard* for Laboratories. The *Athlete* or other *Person* may rebut this presumption by establishing that a departure from the *International Standard* for Laboratories occurred which could reasonably have caused the *Adverse Analytical Finding*.

If the *Athlete* or other *Person* rebuts the preceding presumption by showing that a departure from the *International Standard* for Laboratories occurred which could reasonably have caused the *Adverse Analytical Finding*, then the *Anti-Doping Organization* shall have the burden to establish that such departure did not cause the *Adverse Analytical Finding*.

3.2.2 Departures from any other *International Standard* or other anti-doping rule or policy which did not cause an *Adverse Analytical Finding* or other anti-doping rule violation shall not invalidate such results. If the *Athlete* or other *Person* establishes that a departure from another *International Standard* or other anti-doping rule or policy which could reasonably have caused the *Adverse Analytical Finding* or

*[Comment to Article 3.2.1: The burden is on the Athlete or other Person to establish, by a balance of probability, a departure from the International Standard for Laboratories that could reasonably have caused the Adverse Analytical Finding. If the Athlete or other Person does so, the burden shifts to the Anti-Doping Organization to prove to the comfortable satisfaction of the hearing panel that the departure did not cause the Adverse Analytical Finding.]*

other anti-doping rule violation occurred, then the *Anti-Doping Organization* shall have the burden to establish that such departure did not cause the *Adverse Analytical Finding* or the factual basis for the anti-doping rule violation.

3.2.3   The facts established by a decision of a court or professional disciplinary tribunal of competent jurisdiction which is not the subject of a pending appeal shall be irrebuttable evidence against the *Athlete* or other *Person* to whom the decision pertained of those facts unless the *Athlete* or other *Person* establishes that the decision violated principles of natural justice.

3.2.4   The hearing panel in a hearing on an anti-doping rule violation may draw an inference adverse to the *Athlete* or other *Person* who is asserted to have committed an anti-doping rule violation based on the *Athlete*'s or other *Person*'s refusal, after a request made in a reasonable time in advance of the hearing, to appear at the hearing (either in person or telephonically as directed by the hearing panel) and to answer questions from the hearing panel or the *Anti-Doping Organization* asserting the anti-doping rule violation.

*[Comment to Article 3.2.4. Drawing an adverse inference under these circumstances has been recognized in numerous CAS decisions.]*

# ARTICLE 4: THE *PROHIBITED LIST*

### 4.1    Publication and Revision of the *Prohibited List*

*WADA* shall, as often as necessary and no less often than annually, publish the *Prohibited List* as an *International Standard.* The proposed content of the *Prohibited List* and all revisions shall be provided in writing promptly to all *Signatories* and governments for comment and consultation.  Each annual version of the *Prohibited List* and all revisions shall be distributed promptly by *WADA* to each *Signatory* and government and shall be published on *WADA*'s Web site, and each *Signatory* shall take appropriate steps to distribute the *Prohibited List* to its members and constituents.  The rules of each *Anti-Doping Organization* shall specify that, unless provided otherwise in the *Prohibited List* or a revision, the *Prohibited List* and revisions shall go into effect under the *Anti-Doping Organization*'s rules three (3) months after publication of the *Prohibited List* by *WADA* without requiring any further action by the *Anti-Doping Organization.*

*[Comment to Article 4.1: The Prohibited List will be revised and published on an expedited basis whenever the need arises. However, for the sake of predictability, a new Prohibited List will be published every year whether or not changes have been made. WADA will always have the most current Prohibited List published on its Web site. The Prohibited List is an integral part of the International Convention against Doping in Sport. WADA will inform the Director-General of UNESCO of any change to the Prohibited List.]*

## 4.2 *Prohibited Substance*s and *Prohibited Method*s Identified on the *Prohibited List*

### 4.2.1 *Prohibited Substance*s and *Prohibited Method*s

The *Prohibited List* shall identify those *Prohibited Substance*s and *Prohibited Method*s which are prohibited as doping at all times (both *In-Competition* and *Out-of-Competition*) because of their potential to enhance performance in future *Competition*s or their masking potential and those substances and methods which are prohibited *In-Competition* only. The *Prohibited List* may be expanded by *WADA* for a particular sport. *Prohibited Substance*s and *Prohibited Method*s may be included in the *Prohibited List* by general category (e.g., anabolic agents) or by specific reference to a particular substance or method.

[Comment to Article 4.2.1: There will be one *Prohibited List*. The substances which are prohibited at all times would include masking agents and those substances which, when *Used* in training, may have long-term performance enhancing effects such as anabolics. All substances and methods on the *Prohibited List* are prohibited *In-Competition*. *Out-of-Competition Use* (Article 2.2) of a substance which is only prohibited *In-Competition* is not an anti-doping rule violation unless an *Adverse Analytical Finding* for the substance or its *Metabolites* is reported for a *Sample* collected *In-Competition* (Article 2.1).

There will be only one document called the "*Prohibited List*." *WADA* may add additional substances or methods to the *Prohibited List* for particular sports (e.g. the inclusion of beta-blockers for shooting) but this will also be reflected on the single *Prohibited List*. A particular sport is not permitted to seek exemption from the basic list of *Prohibited Substance*s (e.g. eliminating anabolics from the *Prohibited List* for "mind sports"). The premise of this decision is that there are certain basic doping agents which anyone who chooses to call himself or herself an *Athlete* should not take.]

### 4.2.2 Specified Substances

For purposes of the application of Article 10 (Sanctions on Individuals), all *Prohibited Substance*s shall be "Specified Substances" except substances in the classes of anabolic agents and hormones and those stimulants and hormone antagonists and modulators so identified on the *Prohibited List. Prohibited Method*s shall not be Specified Substances.

### 4.2.3 New Classes of *Prohibited Substance*s

In the event *WADA* expands the *Prohibited List* by adding a new class of *Prohibited Substances in* accordance with Article 4.1, *WADA*'s Executive Committee shall determine whether any or all *Prohibited Substance*s within the new class of *Prohibited Substance*s shall be considered Specified Substances under Article 4.2.2.

[Comment to Article 4.2.2: In drafting the Code there was considerable debate among stakeholders over the appropriate balance between inflexible sanctions which promote harmonization in the application of the rules and more flexible sanctions which better take into consideration the circumstances of each individual case. This balance continued to be discussed in various CAS decisions interpreting the Code. After three years experience with the Code, the strong consensus of stakeholders is that while the occurrence of an anti-doping rule violation under Articles 2.1 (Presence of a Prohibited Substance or its Metabolites or Markers) and 2.2 (Use of a Prohibited Substance or Prohibited Method) should still be based on the principle of strict liability, the Code sanctions should be made more flexible where the Athlete or other Person can clearly demonstrate that he or she did not intend to enhance sport performance. The change to Article 4.2 and related changes to Article 10 provide this additional flexibility for violations involving many Prohibited Substances. The rules set forth in Article 10.5 (Elimination or Reduction of Period of Ineligibility Based on Exceptional Circumstances) would remain the only basis for eliminating or reducing a sanction involving anabolic steroids and hormones, as well as the stimulants and the hormone antagonists and modulators so identified on the Prohibited List, or Prohibited Methods.]

## 4.3 Criteria for Including Substances and Methods on the *Prohibited List*

*WADA* shall consider the following criteria in deciding whether to include a substance or method on the *Prohibited List*.

4.3.1 A substance or method shall be considered for inclusion on the *Prohibited List* if *WADA* determines that the substance or method meets any two of the following three criteria:

4.3.1.1 Medical or other scientific evidence, pharmacological effect or experience that the substance or method, alone or in combination with other substances or methods, has the potential to enhance or enhances sport performance;

4.3.1.2 Medical or other scientific evidence, pharmacological effect or experience that the *Use* of the substance or method represents an actual or potential health risk to the *Athlete*;

*[Comment to Article 4.3.1.1: This Article anticipates that there may be substances that, when used alone, are not prohibited but which will be prohibited if used in combination with certain other substances. A substance which is added to the Prohibited List because it has the potential to enhance performance only in combination with another substance shall be so noted and shall be prohibited only if there is evidence relating to both substances in combination.]*

4.3.1.3   *WADA*'s determination that the *Use* of the substance or method violates the spirit of sport described in the Introduction to the *Code*.

4.3.2   A substance or method shall also be included on the *Prohibited List* if *WADA* determines there is medical or other scientific evidence, pharmacological effect or experience that the substance or method has the potential to mask the *Use* of other *Prohibited Substances* or *Prohibited Methods*.

*[Comment to Article 4.3.2. A substance shall be considered for inclusion on the Prohibited List if the substance is a masking agent or meets two of the following three criteria: (1) it has the potential to enhance or enhances sport performance; (2) it represents a potential or actual health risk; or (3) it is contrary to the spirit of sport. None of the three criteria alone is a sufficient basis for adding a substance to the Prohibited List. Using the potential to enhance performance as the sole criterion would include, for example, physical and mental training, red meat, carbohydrate loading and training at altitude. Risk of harm would include smoking. Requiring all three criteria would also be unsatisfactory. For example, the Use of genetic transfer technology to dramatically enhance sport performance should be prohibited as contrary to the spirit of sport even if it is not harmful. Similarly, the potentially unhealthy abuse of certain substances without therapeutic justification based on the mistaken belief they enhance performance is certainly contrary to the spirit of sport regardless of whether the expectation of performance enhancement is realistic. As part of the process each year, all Signatories, governments and other interested Persons are invited to provide comments to WADA on the content of the Prohibited List.]*

4.3.3 *WADA*'s determination of the *Prohibited Substance*s and *Prohibited Method*s that will be included on the *Prohibited List* and the classification of substances into categories on the *Prohibited List* is final and shall not be subject to challenge by an *Athlete* or other *Person* based on an argument that the substance or method was not a masking agent or did not have the potential to enhance performance, represent a health risk or violate the spirit of sport.

## 4.4 Therapeutic Use

*WADA* has adopted an *International Standard* for the process of granting therapeutic use exemptions.

Each International Federation shall ensure, for *International-Level Athlete*s or any other *Athlete* who is entered in an *International Event*, that a process is in place whereby *Athlete*s with documented medical conditions requiring the *Use* of a *Prohibited Substance* or a *Prohibited Method* may request a therapeutic use exemption. *Athlete*s who have been identified as included in their International Federation's *Registered Testing Pool* may only obtain therapeutic use exemptions in accordance with the rules of their International Federation. Each International Federation shall publish a list of those *International Event*s for which a therapeutic use exemption from the International Federation is required. Each *National Anti-Doping Organization* shall ensure, for all *Athlete*s

[Comment to Article 4.3.3: The question of whether a substance meets the criteria in Article 4.3 (Criteria for Including Substances and Methods on the Prohibited List) in a particular case cannot be raised as a defense to an anti-doping rule violation. For example, it cannot be argued that the Prohibited Substance detected would not have been performance enhancing in that particular sport. Rather, doping occurs when a substance on the Prohibited List is found in an Athlete's Sample. Similarly, it cannot be argued that a substance listed in the class of anabolic agents does not belong in that class.]

within its jurisdiction that have not been included in an International Federation *Registered Testing Pool*, that a process is in place whereby *Athlete*s with documented medical conditions requiring the *Use* of a *Prohibited Substance* or a *Prohibited Method* may request a therapeutic use exemption. Such requests shall be evaluated in accordance with the *International Standard* for Therapeutic Use Exemptions. International Federations and *National Anti-Doping Organization*s shall promptly report to *WADA* through *ADAMS* the granting of any therapeutic use exemption except as regards national-level *Athlete*s who are not included in the *National Anti-Doping Organization*'s *Registered Testing Pool*.

*WADA*, on its own initiative, may review at any time the granting of a therapeutic use exemption to any *International-Level Athlete* or national-level *Athlete* who is included in his or her *National Anti-Doping Organization*'s *Registered Testing Pool*. Further, upon the request of any such *Athlete* who has been denied a therapeutic use exemption, *WADA* may review such denial. If *WADA* determines that such granting or denial of a therapeutic use exemption did not comply with the *International Standard* for Therapeutic Use Exemptions, *WADA* may reverse the decision.

If, contrary to the requirement of this Article, an International Federation does not have a process in place where *Athlete*s may request therapeutic use exemptions, an *International-Level Athlete* may request *WADA* to review the application as if it had been denied.

Presence of a *Prohibited Substance* or its *Metabolite*s or *Marker*s (Article 2.1), *Use* or *Attempt*ed *Use* of a *Prohibited Substance* or a *Prohibited Method* (Article 2.2), *Possession* of *Prohibited Substance*s and *Prohibited Method*s (Article 2.6) or Administration or *Attempt*ed Administration of a *Prohibited Substance* or

*Prohibited Method* (Article 2.8) consistent with the provisions of an applicable therapeutic use exemption issued pursuant to the *International Standard* for Therapeutic Use Exemptions shall not be considered an anti-doping rule violation.

## 4.5   Monitoring Program

*WADA*, in consultation with *Signatories* and governments, shall establish a monitoring program regarding substances which are not on the *Prohibited List*, but which *WADA* wishes to monitor in order to detect patterns of misuse in sport. *WADA* shall publish, in advance of any *Testing*, the substances that will be monitored. Laboratories will report the instances of reported *Use* or detected presence of these substances to *WADA* periodically on an aggregate basis by sport and whether the *Sample*s were collected *In-Competition* or *Out-of-Competition*. Such reports shall not contain additional information regarding specific *Sample*s. *WADA* shall make available to International Federations and *National Anti-Doping Organization*s, on at least an annual basis, aggregate statistical information by sport regarding the additional substances. *WADA* shall implement measures to ensure that strict anonymity of individual *Athlete*s is maintained with respect to such reports. The reported *Use* or detected presence of a monitored substance shall not constitute an anti-doping rule violation.

# ARTICLE 5: TESTING

## 5.1    Test Distribution Planning

Subject to the jurisdictional limitations for *In-Competition Testing* in Article 15.1, each *National Anti-Doping Organization* shall have *Testing* jurisdiction over all *Athlete*s who are present in that *National Anti-Doping Organization*'s country or who are nationals, residents, license-holders or members of sport organizations of that country. Each International Federation shall have *Testing* jurisdiction over all *Athlete*s who are members of their member National Federations or who participate in their *Event*s. All *Athlete*s must comply with any request for *Testing* by any *Anti-Doping Organization* with *Testing* jurisdiction. In coordination with other *Anti-Doping Organization*s conducting *Testing* on the same *Athlete*s, and consistent with the *International Standard* for *Testing*, each *Anti-Doping Organization* shall:

5.1.1   Plan and conduct an effective number of *In-Competition* and *Out-of-Competition* tests on *Athlete*s over whom they have jurisdiction, including but not limited to *Athlete*s in their respective *Registered Testing Pool*s. Each International Federation shall establish a *Registered Testing Pool* for *International-Level Athlete*s in its sport, and each *National Anti-Doping Organization* shall establish a national *Registered Testing Pool* for *Athlete*s who are present in that *National Anti-Doping Organization*'s country or who are nationals, residents, license-holders or members of sport organizations of that country. In accordance with Article 14.3, any *Athlete* included in a *Registered Testing Pool* shall be subject to the whereabouts requirements set out in the *International Standard* for *Testing*.

5.1.2   Except in exceptional circumstances all *Out-of-Competition Testing* shall be *No Advance Notice*.

5.1.3   Make *Target Testing* a priority.

5.1.4   Conduct *Testing* on *Athlete*s serving a period of *Ineligibility* or a *Provisional Suspension.*

**5.2     Standards for *Testing***

*Anti-Doping Organization*s with *Testing* jurisdiction shall conduct such *Testing* in conformity with the *International Standard* for *Testing.*

**5.3     Retired *Athlete*s Returning to *Competition***

Each *Anti-Doping Organization* shall establish a rule addressing eligibility requirements for *Athlete*s who are not *Ineligible* and retire from sport while included in a *Registered Testing Pool* and then seek to return to active participation in sport.

*[Comment to Article 5.1.3: Target Testing is specified because random Testing, or even weighted random Testing, does not ensure that all of the appropriate Athletes will be tested (e.g., world-class Athletes, Athletes whose performances have dramatically improved over a short period of time, Athletes whose coaches have had other Athletes test positive, etc.).*

*Obviously, Target Testing must not be used for any purpose other than legitimate Doping Control. The Code makes it clear that Athletes have no right to expect that they will be tested only on a random basis. Similarly, it does not impose any reasonable suspicion or probable cause requirement for Target Testing.]*

# ARTICLE 6: ANALYSIS OF SAMPLES

*Sample*s shall be analyzed in accordance with the following principles:

## 6.1   Use of Approved Laboratories

For purposes of Article 2.1 (Presence of a *Prohibited Substance* or its *Metabolite*s or *Marker*s), *Sample*s shall be analyzed only in *WADA*-accredited laboratories or as otherwise approved by *WADA*. The choice of the *WADA*-accredited laboratory (or other laboratory or method approved by *WADA*) used for the *Sample* analysis shall be determined exclusively by the *Anti-Doping Organization* responsible for results management.

## 6.2   Purpose of Collection and Analysis of *Sample*s

*Sample*s shall be analyzed to detect *Prohibited Substance*s and *Prohibited Method*s identified on the *Prohibited List* and other substances as may be directed by *WADA* pursuant to Article 4.5 (Monitoring Program), or to assist an *Anti-Doping Organization* in profiling relevant parameters in an *Athlete*'s urine, blood or other matrix, including DNA or genomic profiling, for anti-doping purposes.

[Comment to Article 6.1: Violations of Article 2.1 (Presence of a Prohibited Substance or its Metabolites or Markers) may be established only by Sample analysis performed by a WADA-approved laboratory or another laboratory specifically authorized by WADA. Violations of other Articles may be established using analytical results from other laboratories so long as the results are reliable.]

[Comment to Article 6.2: For example, relevant profile information could be used to direct Target Testing or to support an anti-doping rule violation proceeding under Article 2.2 (Use or Attempted Use of a Prohibited Substance), or both.]

### 6.3    Research on *Sample*s

No *Sample* may be used for any purpose other than as described in Article 6.2 without the *Athlete*'s written consent. *Sample*s used for purposes other than Article 6.2 shall have any means of identification removed such that they cannot be traced back to a particular *Athlete*.

### 6.4    Standards for *Sample* Analysis and Reporting

Laboratories shall analyze *Doping Control Sample*s and report results in conformity with the *International Standard* for Laboratories.

### 6.5    Retesting *Sample*s

A *Sample* may be reanalyzed for the purpose of Article 6.2 at any time exclusively at the direction of the *Anti-Doping Organization* that collected the *Sample* or *WADA*. The circumstances and conditions for retesting *Sample*s shall conform with the requirements of the *International Standard* for Laboratories.

[Comment to Article 6.5: Although this Article is new, Anti-Doping Organizations have always had the authority to reanalyze Samples. The International Standard for Laboratories or a new technical document which is made a part of the International Standard will harmonize the protocol for such retesting.]

# ARTICLE 7: RESULTS MANAGEMENT

Each *Anti-Doping Organization* conducting results management shall establish a process for the pre-hearing administration of potential anti-doping rule violations that respects the following principles:

## 7.1    Initial Review Regarding *Adverse Analytical Finding*s

Upon receipt of an A *Sample Adverse Analytical Finding*, the *Anti-Doping Organization* responsible for results management shall conduct a review to determine whether: (a) an applicable therapeutic use exemption has been granted or will be granted as provided in the *International Standard* for Therapeutic Use Exemptions, or (b) there is any apparent departure from the *International Standard* for *Testing* or *International Standard* for Laboratories that caused the *Adverse Analytical Finding*.

## 7.2    Notification After Initial Review Regarding *Adverse Analytical Finding*s

If the initial review of an *Adverse Analytical Finding* under Article 7.1 does not reveal an applicable therapeutic use exemption or entitlement to a therapeutic use exemption as provided in the *International Standard* for Therapeutic Use Exemptions, or departure that caused the *Adverse*

*[Comment to Article 7: Various Signatories have created their own approaches to results management. While the various approaches have not been entirely uniform, many have proven to be fair and effective systems for results management. The Code does not supplant each of the Signatories' results management systems. This Article does, however, specify basic principles in order to ensure the fundamental fairness of the results management process which must be observed by each Signatory. The specific anti-doping rules of each Signatory shall be consistent with these basic principles.]*

*Analytical Finding*, the *Anti-Doping Organization* shall promptly notify the *Athlete*, in the manner set out in its rules, of: (a) the *Adverse Analytical Finding*; (b) the anti-doping rule violated; (c) the *Athlete*'s right to promptly request the analysis of the B *Sample* or, failing such request, that the B *Sample* analysis may be deemed waived; (d) the scheduled date, time and place for the B *Sample* analysis if the *Athlete* or *Anti-Doping Organization* chooses to request an analysis of the B *Sample*; (e) the opportunity for the *Athlete* and/or the *Athlete*'s representative to attend the B *Sample* opening and analysis within the time period specified in the *International Standard* for Laboratories if such analysis is requested; and (f) the *Athlete*'s right to request copies of the A and B *Sample* laboratory documentation package which includes information as required by the *International Standard* for Laboratories. The *Anti-Doping Organization* shall also notify the other *Anti-Doping Organization*s described in Article 14.1.2. If the *Anti-Doping Organization* decides not to bring forward the *Adverse Analytical Finding* as an anti-doping rule violation, it shall so notify the *Athlete* and the *Anti-Doping Organization*s as described in Article 14.1.2.

### 7.3   Review of *Atypical Finding*s

As provided in the *International Standard*s, in some circumstances laboratories are directed to report the presence of *Prohibited Substance*s, which may also be produced endogenously, as *Atypical Finding*s subject to further investigation. Upon receipt of an A *Sample Atypical Finding*, the *Anti-Doping Organization* responsible for results management

shall conduct a review to determine whether: (a) an applicable therapeutic use exemption has been granted, or (b) there is any apparent departure from the *International Standard* for *Testing* or *International Standard* for Laboratories that caused the *Atypical Finding*. If that review does not reveal an applicable therapeutic use exemption or departure that caused the *Atypical Finding*, the *Anti-Doping Organization* shall conduct the required investigation. After the investigation is completed, the *Athlete* and other *Anti-Doping Organization*s identified in Article 14.1.2 shall be notified whether or not the *Atypical Finding* will be brought forward as an *Adverse Analytical Finding*. The *Athlete* shall be notified as provided in Article 7.2.

7.3.1   The *Anti-Doping Organization* will not provide notice of an *Atypical Finding* until it has completed its investigation and decided whether it will bring the *Atypical Finding* forward as an *Adverse Analytical Finding* unless one of the following circumstances exist:

(a)   If the *Anti-Doping Organization* determines the B *Sample* should be analyzed prior to the conclusion of its investigation under Article 7.3, the *Anti-Doping Organization* may conduct the B *Sample* analysis after notifying the *Athlete*, with such notice to include a description of the *Atypical Finding* and the information described in Article 7.2(b)-(f).

(b) If the *Anti-Doping Organization* receives a request, either from a *Major Event Organization* shortly before one of its *International Event*s or a request from a sport organization responsible for meeting an imminent deadline for selecting team members for an *International Event*, to disclose whether any *Athlete* identified on a list provided by the *Major Event Organization* or sport organization has a pending *Atypical Finding*, the *Anti-Doping Organization* shall so identify any such *Athlete* after first providing notice of the *Atypical Finding* to the *Athlete*.

## 7.4 Review of Other Anti-Doping Rule Violations Not Covered by Articles 7.1–7.3

The *Anti-Doping Organization* or other reviewing body established by such organization shall conduct any follow-up investigation into a possible anti-doping rule violation as may be required under applicable anti-doping policies and rules adopted pursuant to the *Code* or which the *Anti-Doping Organization* otherwise considers appropriate. At such time as the *Anti-Doping Organization* is satisfied that an anti-doping rule violation has occurred, it shall promptly give the *Athlete* or other *Person* subject to sanction notice, in the manner set out in its rules, of the anti-doping rule violated, and the basis of the violation. Other *Anti-Doping Organization*s shall be notified as provided in Article 14.1.2.

*[Comment to Article 7.3.1(b): Under the circumstance described in Article 7.3.1(b), the option to take action would be left to the Major Event Organization or sport organization consistent with its rules.]*

*[Comment to Article 7.4: As an example, an International Federation typically would notify the Athlete through the Athlete's national sports federation.]*

## 7.5    Principles Applicable to *Provisional Suspension*s

### 7.5.1    Mandatory *Provisional Suspension* after A *Sample Adverse Analytical Finding*

*Signatories* shall adopt rules, applicable to any *Event* for which the *Signatory* is the ruling body or for any team selection process for which the *Signatory* is responsible or where the *Signatory* is the applicable International Federation or has results management authority over the alleged anti-doping rule violation, providing that when an A *Sample Adverse Analytical Finding* is received for a *Prohibited Substance*, other than a Specified Substance, a *Provisional Suspension* shall be imposed promptly after the review and notification described in Articles 7.1 and 7.2.

Provided, however, that a *Provisional Suspension* may not be imposed unless the *Athlete* is given either: (a) an opportunity for a *Provisional Hearing* either before imposition of the *Provisional Suspension* or on a timely basis

[Comment to Article 7.5: Before a *Provisional Suspension* can be unilaterally imposed by an *Anti-Doping Organization*, the internal review specified in the Code must first be completed. In addition, a *Signatory* imposing a *Provisional Suspension* is required to give the *Athlete* an opportunity for a *Provisional Hearing* either before or promptly after the imposition of the *Provisional Suspension*, or an expedited final hearing under Article 8 promptly after imposition of the *Provisional Suspension*. The *Athlete* has a right to appeal under Article 13.2.

In the rare circumstance where the B *Sample* analysis does not confirm the A *Sample* finding, the *Athlete* who had been provisionally suspended will be allowed, where circumstances permit, to participate in subsequent *Competitions* during the *Event*. Similarly, depending upon the relevant rules of the International Federation in a Team Sport, if the team is still in *Competition*, the *Athlete* may be able to take part in future *Competitions*.

*Athletes* shall receive credit for a *Provisional Suspension* against any period of *Ineligibility* which is ultimately imposed as provided in Article 10.9.3.]

after imposition of the *Provisional Suspension*; or (b) an opportunity for an expedited hearing in accordance with Article 8 (Right to a Fair Hearing) on a timely basis after imposition of a *Provisional Suspension*.

7.5.2 Optional *Provisional Suspension* based on A *Sample Adverse Analytical Finding* for Specified Substances or other anti-doping rule violations

A *Signatory* may adopt rules, applicable to any *Event* for which the *Signatory* is the ruling body or for any team selection process for which the *Signatory* is responsible or where the *Signatory* is the applicable International Federation or has results management authority over the alleged anti-doping rule violation, permitting *Provisional Suspension*s to be imposed for anti-doping rule violations other than an *Adverse Analytical Finding*, or after the review and notification described in Articles 7.1 and 7.2 for Specified Substances, but prior to the analysis of the *Athlete*'s B *Sample* or the final hearing as described in Article 8 (Right to a Fair Hearing).

Provided, however, that a *Provisional Suspension* may not be imposed unless the *Athlete* or other *Person* is given either: (a) an opportunity for a *Provisional Hearing* either before imposition of the *Provisional Suspension* or on a timely basis after imposition of the *Provisional Suspension*; or (b) an opportunity for an expedited hearing in accordance with Article 8 (Right to a Fair Hearing) on a timely basis after imposition of a *Provisional Suspension*.

If a *Provisional Suspension* is imposed based on an A *Sample Adverse Analytical Finding* and a

subsequent B *Sample* analysis (if requested by the *Athlete* or *Anti-Doping Organization*) does not confirm the A *Sample* analysis, then the *Athlete* shall not be subject to any further *Provisional Suspension* on account of a violation of Article 2.1 (Presence of a *Prohibited Substance* or its *Metabolite*s or *Marker*s). In circumstances where the *Athlete* (or the *Athlete*'s team as may be provided in the rules of the applicable International Federation) has been removed from a *Competition* based on a violation of Article 2.1 and the subsequent B *Sample* analysis does not confirm the A *Sample* finding, if, without otherwise affecting the *Competition*, it is still possible for the *Athlete* or team to be reinserted, the *Athlete* or team may continue to take part in the *Competition*.

## 7.6   Retirement from Sport

If an *Athlete* or other *Person* retires while a results management process is underway, the *Anti-Doping Organization* conducting the results management process retains jurisdiction to complete its results management process. If an *Athlete* or other *Person* retires before any results management process has begun, the *Anti-Doping Organization* which would have had results management jurisdiction over the *Athlete* or other *Person* at the time the *Athlete* or other *Person* committed an anti-doping rule violation, has jurisdiction to conduct results management.

[Comment to Article 7.6: Conduct by an Athlete or other Person before the Athlete or other Person was subject to the jurisdiction of any Anti-Doping Organization would not constitute an anti-doping rule violation but could be a legitimate basis for denying the Athlete or other Person membership in a sports organization.]

# ARTICLE 8: RIGHT TO A FAIR HEARING

## 8.1 Fair Hearings

Each *Anti-Doping Organization* with responsibility for results management shall provide a hearing process for any *Person* who is asserted to have committed an anti-doping rule violation. Such hearing process shall address whether an anti-doping rule violation was committed and, if so, the appropriate *Consequences*. The hearing process shall respect the following principles:

- a timely hearing;

- a fair and impartial hearing panel;

- the right to be represented by counsel at the *Person*'s own expense;

- the right to be informed in a fair and timely manner of the asserted anti-doping rule violation;

- the right to respond to the asserted anti-doping rule violation and resulting *Consequences*;

- the right of each party to present evidence, including the right to call and question witnesses (subject to the hearing panel's discretion to accept testimony by telephone or written submission);

- the *Person*'s right to an interpreter at the hearing, with the hearing panel to determine the identity, and responsibility for the cost, of the interpreter; and

*[Comment to Article 8.1: This Article contains basic principles relative to ensuring a fair hearing for Persons asserted to have committed anti-doping rule violations. This Article is not intended to supplant each Signatory's own rules for hearings but rather to ensure that each Signatory provides a hearing process consistent with these principles.]*

- a timely, written, reasoned decision, specifically including an explanation of the reason(s) for any period of *Ineligibility*.

## 8.2 *Event* Hearings

Hearings held in connection with *Event*s may be conducted by an expedited process as permitted by the rules of the relevant *Anti-Doping Organization* and the hearing panel.

## 8.3 Waiver of Hearing

The right to a hearing may be waived either expressly or by the *Athlete*'s or other *Person*'s failure to challenge an *Anti-Doping Organization*'s assertion that an anti-doping rule violation has occurred within the specific time period provided in the *Anti-Doping Organization*'s rules. Where no hearing occurs, the *Anti-Doping Organization* with results management responsibility shall submit to the *Person*s described in Article 13.2.3 a reasoned decision explaining the action taken.

[Comment to Article 8.2: For example, a hearing could be expedited on the eve of a major *Event* where the resolution of the anti-doping rule violation is necessary to determine the *Athlete*'s eligibility to participate in the *Event* or during an *Event* where the resolution of the case will affect the validity of the *Athlete*'s results or continued participation in the *Event*.]

# ARTICLE 9: AUTOMATIC DISQUALIFICATION OF INDIVIDUAL RESULTS

An anti-doping rule violation in *Individual Sport*s in connection with an *In-Competition* test automatically leads to *Disqualification* of the result obtained in that *Competition* with all resulting *Consequences*, including forfeiture of any medals, points and prizes.

*[Comment to Article 9: When an Athlete wins a gold medal with a Prohibited Substance in his or her system, that is unfair to the other Athletes in that Competition regardless of whether the gold medalist was at fault in any way. Only a "clean" Athlete should be allowed to benefit from his or her competitive results.*

*For Team Sports, see Article 11 (Consequences to Teams). In sports which are not Team Sports but where awards are given to teams, Disqualification or other disciplinary action against the team when one or more team members have committed an anti-doping rule violation shall be as provided in the applicable rules of the International Federation.]*

## ARTICLE 10: SANCTIONS ON INDIVIDUALS

**10.1**   *Disqualification* of Results in the *Event* During which an Anti-Doping Rule Violation Occurs

An anti-doping rule violation occurring during or in connection with an *Event* may, upon the decision of the ruling body of the *Event*, lead to *Disqualification* of all of the *Athlete*'s individual results obtained in that *Event* with all *Consequences*, including forfeiture of all medals, points and prizes, except as provided in Article 10.1.1.

**10.1.1**   If the *Athlete* establishes that he or she bears *No Fault or Negligence* for the violation, the *Athlete*'s individual results in the other *Competition*s shall not be *Disqualified* unless the *Athlete*'s results in *Competition*s other than the *Competition* in which the anti-doping rule violation occurred were likely to have been affected by the *Athlete*'s anti-doping rule violation.

[Comment to Article 10.1: Whereas Article 9 (Automatic Disqualification of Individual Results) Disqualifies the result in a single Competition in which the Athlete tested positive (e.g., the 100 meter backstroke), this Article may lead to Disqualification of all results in all races during the Event (e.g., the FINA World Championships). Factors to be included in considering whether to Disqualify other results in an Event might include, for example, the severity of the Athlete's anti-doping rule violation and whether the Athlete tested negative in the other Competitions.]

## 10.2  *Ineligibility* for Presence, *Use* or *Attempted Use*, or *Possession* of *Prohibited Substance*s and *Prohibited Method*s

The period of *Ineligibility* imposed for a violation of Article 2.1 (Presence of *Prohibited Substance* or its *Metabolite*s or *Marker*s), Article 2.2 (*Use* or *Attempt*ed *Use* of *Prohibited Substance* or *Prohibited Method*) or Article 2.6 (*Possession* of *Prohibited Substance*s and *Prohibited Method*s) shall be as follows, unless the conditions for eliminating or reducing the period of *Ineligibility*, as provided in Articles 10.4 and 10.5, or the conditions for increasing the period of *Ineligibility*, as provided in Article 10.6, are met:

<u>First violation</u>: Two (2) years *Ineligibility*.

*[Comment to Article 10.2: Harmonization of sanctions has been one of the most discussed and debated areas of anti-doping. Harmonization means that the same rules and criteria are applied to assess the unique facts of each case. Arguments against requiring harmonization of sanctions are based on differences between sports including, for example, the following: in some sports the Athletes are professionals making a sizable income from the sport and in others the Athletes are true amateurs; in those sports where an Athlete's career is short (e.g., artistic gymnastics) a two-year Disqualification has a much more significant effect on the Athlete than in sports where careers are traditionally much longer (e.g., equestrian and shooting); in Individual Sports, the Athlete is better able to maintain competitive skills through solitary practice during Disqualification than in other sports where practice as part of a team is more important. A primary argument in favor of harmonization is that it is simply not right that two Athletes from the same country who test positive for the same Prohibited Substance under similar circumstances should receive different sanctions only because they participate in different sports. In addition, flexibility in sanctioning has often been viewed as an unacceptable opportunity for some sporting organizations to be more lenient with dopers. The lack of harmonization of sanctions has also frequently been the source of jurisdictional conflicts between International Federations and National Anti-Doping Organizations.]*

### 10.3   *Ineligibility* for Other Anti-Doping Rule Violations

The period of *Ineligibility* for anti-doping rule violations other than as provided in Article 10.2 shall be as follows:

10.3.1   For violations of Article 2.3 (Refusing or Failing to Submit to *Sample* Collection) or Article 2.5 (*Tampering* with *Doping Control*), the *Ineligibility* period shall be two (2) years unless the conditions provided in Article 10.5, or the conditions provided in Article 10.6, are met.

10.3.2   For violations of Articles 2.7 (*Trafficking or Attempted Trafficking*) or 2.8 (Administration or *Attempted* Administration of *Prohibited Substance* or *Prohibited Method*), the period of *Ineligibility* imposed shall be a minimum of four (4) years up to lifetime *Ineligibility* unless the conditions provided in Article 10.5 are met. An anti-doping rule violation involving a *Minor* shall be considered a particularly serious violation and, if committed by *Athlete Support Personnel* for violations other than Specified Substances referenced in Article 4.2.2, shall result in lifetime *Ineligibility* for *Athlete Support Personnel*. In addition, significant violations of Articles 2.7 or 2.8 which may also violate non-sporting laws and regulations, shall be reported to the competent administrative, professional or judicial authorities.

*[Comment to Article 10.3.2: Those who are involved in doping Athletes or covering up doping should be subject to sanctions which are more severe than the Athletes who test positive. Since the authority of sport organizations is generally limited to* *Ineligibility for credentials, membership and other sport benefits, reporting Athlete Support Personnel to competent authorities is an important step in the deterrence of doping.]*

10.3.3   For violations of Article 2.4 (Whereabouts Filing Failures and/or Missed Tests), the period of *Ineligibility* shall be at a minimum one (1) year and at a maximum two (2) years based on the *Athlete*'s degree of fault.

## 10.4   Elimination or Reduction of the Period of *Ineligibility* for Specified Substances under Specific Circumstances

Where an *Athlete* or other *Person* can establish how a Specified Substance entered his or her body or came into his or her *Possession* and that such Specified Substance was not intended to enhance the *Athlete*'s sport performance or mask the *Use* of a performance-enhancing substance, the period of *Ineligibility* found in Article 10.2 shall be replaced with the following:

[Comment to Article 10.3.3: The sanction under Article 10.3.3 shall be two years where all three filing failures or missed tests are inexcusable. Otherwise, the sanction shall be assessed in the range of two years to one year, based on the circumstances of the case.]

[Comment to Article 10.4: Specified Substances are not necessarily less serious agents for purposes of sports doping than other Prohibited Substances (for example, a stimulant that is listed as a Specified Substance could be very effective to an Athlete in competition); for that reason, an Athlete who does not meet the criteria under this Article would receive a two-year period of Ineligibility and could receive up to a four-year period of Ineligibility under Article 10.6. However, there is a greater likelihood that Specified Substances, as opposed to other Prohibited Substances, could be susceptible to a credible, non-doping explanation. This Article applies only in those cases where the hearing panel is comfortably satisfied by the objective circumstances of the case that the Athlete in taking or Possessing a Prohibited Substance did not intend to enhance his or her sport

continued

<u>First violation</u>: At a minimum, a reprimand and no period of *Ineligibility* from future *Event*s, and at a maximum, two (2) years of *Ineligibility*.

To justify any elimination or reduction, the *Athlete* or other *Person* must produce corroborating evidence in addition to his or her word which establishes to the comfortable satisfaction of the hearing panel the absence of an intent to enhance sport performance or mask the *Use* of a performance-enhancing substance. The *Athlete*'s or other *Person*'s degree of fault shall be the criterion considered in assessing any reduction of the period of *Ineligibility*.

performance. Examples of the type of objective circumstances which in combination might lead a hearing panel to be comfortably satisfied of no performance-enhancing intent would include: the fact that the nature of the *Specified Substance* or the timing of its ingestion would not have been beneficial to the *Athlete*; the *Athlete*'s open *Use* or disclosure of his or her *Use* of the *Specified Substance*; and a contemporaneous medical records file substantiating the non sport-related prescription for the *Specified Substance*. Generally, the greater the potential performance-enhancing benefit, the higher the burden on the *Athlete* to prove lack of an intent to enhance sport performance.

While the absence of intent to enhance sport performance must be established to the comfortable satisfaction of the hearing panel,

the *Athlete* may establish how the *Specified Substance* entered the body by a balance of probability.

In assessing the *Athlete*'s or other *Person*'s degree of fault, the circumstances considered must be specific and relevant to explain the *Athlete*'s or other *Person*'s departure from the expected standard of behavior. Thus, for example, the fact that an *Athlete* would lose the opportunity to earn large sums of money during a period of *Ineligibility* or the fact that the *Athlete* only has a short time left in his or her career or the timing of the sporting calendar would not be relevant factors to be considered in reducing the period of *Ineligibility* under this Article. It is anticipated that the period of *Ineligibility* will be eliminated entirely in only the most exceptional cases.]

## 10.5 Elimination or Reduction of Period of *Ineligibility* Based on Exceptional Circumstances

### 10.5.1 *No Fault or Negligence*

If an *Athlete* establishes in an individual case that he or she bears *No Fault or Negligence*, the otherwise applicable period of *Ineligibility* shall be eliminated. When a *Prohibited Substance* or its *Marker*s or *Metabolite*s is detected in an *Athlete*'s *Sample* in violation of Article 2.1 (Presence of *Prohibited Substance*), the *Athlete* must also establish how the *Prohibited Substance* entered his or her system in order to have the period of *Ineligibility* eliminated. In the event this Article is applied and the period of *Ineligibility* otherwise applicable is eliminated, the anti-doping rule violation shall not be considered a violation for the limited purpose of determining the period of *Ineligibility* for multiple violations under Article 10.7.

[Comment to Articles 10.5.1 and 10.5.2: The *Code* provides for the possible reduction or elimination of the period of *Ineligibility* in the unique circumstance where the *Athlete* can establish that he or she had *No Fault or Negligence*, or *No Significant Fault or Negligence*, in connection with the violation. This approach is consistent with basic principles of human rights and provides a balance between those *Anti-Doping Organizations* that argue for a much narrower exception, or none at all, and those that would reduce a two-year suspension based on a range of other factors even when the *Athlete* was admittedly at fault. These Articles apply only to the imposition of sanctions; they are not applicable to the determination of whether an anti-doping rule violation has occurred. Article 10.5.2 may be applied to any anti-doping rule violation even though it will be especially difficult to meet the criteria for a reduction for those anti-doping rule violations where knowledge is an element of the violation.

Articles 10.5.1 and 10.5.2 are meant to have an impact only in cases where the circumstances are truly exceptional and not in the vast majority of cases.

To illustrate the operation of Article 10.5.1, an example where *No Fault or Negligence* would result in the total elimination of a sanction is where an *Athlete* could prove that, despite all due care, he or she was sabotaged by a competitor. Conversely, a sanction could not be completely eliminated on the basis of *No Fault or Negligence* in the following circumstances: (a) a

*continued*

10.5.2   *No Significant Fault or Negligence*

If an *Athlete* or other *Person* establishes in an individual case that he or she bears *No Significant Fault or Negligence,* then the otherwise applicable period of *Ineligibility* may be reduced, but the reduced period of *Ineligibility* may not be less than one-half of the period of *Ineligibility* otherwise applicable. If the otherwise applicable period of *Ineligibility* is a lifetime, the reduced period under this Article may be no less than eight (8) years. When a *Prohibited Substance* or its *Marker*s or *Metabolite*s is detected in an *Athlete*'s *Sample* in violation of Article 2.1 (Presence of a *Prohibited Substance* or its *Metabolite*s or *Marker*s), the *Athlete* must

positive test resulting from a mislabeled or contaminated vitamin or nutritional supplement (*Athletes* are responsible for what they ingest (Article 2.1.1) and have been warned against the possibility of supplement contamination); (b) the administration of a *Prohibited Substance* by the *Athlete's* personal physician or trainer without disclosure to the *Athlete* (*Athletes* are responsible for their choice of medical personnel and for advising medical personnel that they cannot be given any *Prohibited Substance*); and (c) sabotage of the *Athlete's* food or drink by a spouse, coach or other *Person* within the *Athlete's* circle of associates (*Athletes* are responsible for what they ingest and for the conduct of those *Persons* to whom they entrust access to their food and drink). However, depending on the unique facts of a particular case, any of the referenced illustrations could result in a reduced sanction based on *No Significant Fault or Negligence*. (For example, reduction may well be appropriate in illustration (a) if the *Athlete* clearly establishes that the cause of the positive test was contamination in a common multiple vitamin purchased from a source with no connection to *Prohibited Substances* and the *Athlete* exercised care in not taking other nutritional supplements.) For purposes of assessing the *Athlete's* or other *Person's* fault under Articles 10.5.1 and 10.5.2, the evidence considered must be specific and relevant to explain the *Athlete's* or other *Person's* departure from the expected standard of behavior. Thus, for example, the fact that an *Athlete* would lose the opportunity to earn large sums of money during a period of *Ineligibility* or the fact that the *Athlete* only has a short time left in his or her career or the timing of the sporting calendar would not be relevant factors to be considered in reducing the period of *Ineligibility* under this Article.

continued

also establish how the *Prohibited Substance* entered his or her system in order to have the period of *Ineligibility* reduced.

10.5.3    *Substantial Assistance* in Discovering or Establishing Anti-Doping Rule Violations

An *Anti-Doping Organization* with results management responsibility for an anti-doping rule violation may, prior to a final appellate decision under Article 13 or the expiration of the time to appeal, suspend a part of the period of *Ineligibility* imposed in an individual case where the *Athlete* or other *Person* has provided *Substantial Assistance* to an *Anti-Doping Organization*, criminal authority or professional disciplinary body which results in the *Anti-Doping Organization* discovering or establishing an anti-doping rule violation by another *Person* or which results in a criminal or disciplinary body discovering or establishing a criminal offense or the breach of

While *Minors* are not given special treatment per se in determining the applicable sanction, certainly youth and lack of experience are relevant factors to be assessed in determining the *Athlete's* or other *Person's* fault under Article 10.5.2, as well as Articles 10.3.3, 10.4 and 10.5.1

Article 10.5.2 should not be applied in cases where Articles 10.3.3 or 10.4 apply, as those Articles already take into consideration the *Athlete's* or other *Person's* degree of fault for purposes of establishing the applicable period of *Ineligibility*.]

[Comment to Article 10.5.3: The cooperation of *Athletes*, *Athlete Support Personnel* and other *Persons* who acknowledge their mistakes and are willing to bring other anti-doping rule violations to light is important to clean sport.

Factors to be considered in assessing the importance of the *Substantial Assistance* would include, for example, the number of individuals implicated, the status of those individuals in the sport, whether a scheme involving *Trafficking* under Article 2.7 or administration under

continued

professional rules by another *Person*. After a final appellate decision under Article 13 or the expiration of time to appeal, an *Anti-Doping Organization* may only suspend a part of the otherwise applicable period of *Ineligibility* with the approval of *WADA* and the applicable International Federation. The extent to which the otherwise applicable period of *Ineligibility* may be suspended shall be based on the seriousness of the anti-doping rule violation committed by the *Athlete* or other *Person* and the significance of the *Substantial Assistance* provided by the *Athlete* or other *Person* to the effort to eliminate doping in sport. No more than three-quarters of the otherwise applicable period of *Ineligibility* may be suspended. If the otherwise applicable period of *Ineligibility* is a lifetime, the non-suspended period under this section must be no less than eight (8) years. If the *Anti-Doping Organization* suspends any part of the otherwise applicable period of *Ineligibility* under this Article, the *Anti-Doping Organization* shall promptly provide a written justification for its decision to each *Anti-Doping Organization* having a right to appeal the decision. If the *Anti-Doping Organization* subsequently reinstates any part of

Article 2.8 is involved and whether the violation involved a substance or method which is not readily detectible in Testing. The maximum suspension of the Ineligibility period shall only be applied in very exceptional cases. An additional factor to be considered in connection with the seriousness of the anti-doping rule violation is any performance-enhancing benefit which the Person providing

Substantial Assistance may be likely to still enjoy. As a general matter, the earlier in the results management process the Substantial Assistance is provided, the greater the percentage of the otherwise applicable period of Ineligibility may be suspended.

If the Athlete or other Person who is asserted to have committed an anti-doping rule violation claims

continued

the suspended period of *Ineligibility* because the *Athlete* or other *Person* has failed to provide the *Substantial Assistance* which was anticipated, the *Athlete* or other *Person* may appeal the reinstatement pursuant to Article 13.2.

entitlement to a suspended period of Ineligibility under this Article in connection with the Athlete's or other Person's waiver of a hearing under Article 8.3 (Waiver of Hearing), the Anti-Doping Organization shall determine whether a suspension of a portion of the period of Ineligibility is appropriate under this Article. If the Athlete or other Person claims entitlement to a suspended period of Ineligibility before the conclusion of a hearing under Article 8 on the anti-doping rule violation, the hearing panel shall determine whether a suspension of a portion of the otherwise applicable period of Ineligibility is appropriate under this Article at the same time the hearing panel decides whether the Athlete or other Person has committed an anti-doping rule violation. If a portion of the period of Ineligibility is suspended, the decision shall explain the basis for concluding the information provided was credible and was important to discovering or proving the anti-doping rule violation or other offense. If the Athlete or other Person claims entitlement to a suspended period of Ineligibility after

a final decision finding an anti-doping rule violation has been rendered and is not subject to appeal under Article 13, but the Athlete or other Person is still serving the period of Ineligibility, the Athlete or other Person may apply to the Anti-Doping Organization which had results management responsibility for the anti-doping rule violation to consider a suspension in the period of Ineligibility under this Article. Any such suspension of the otherwise applicable period of Ineligibility shall require the approval of WADA and the applicable International Federation. If any condition upon which the suspension of a period of Ineligibility is based is not fulfilled, the Anti-Doping Organization with results management authority shall reinstate the period of Ineligibility which would otherwise be applicable. Decisions rendered by Anti-Doping Organizations under this Article may be appealed pursuant to Article 13.2.

This is the only circumstance under the Code where the suspension of an otherwise applicable period of Ineligibility is authorized.]

10.5.4   Admission of an Anti-Doping Rule Violation in the Absence of Other Evidence

Where an *Athlete* or other *Person* voluntarily admits the commission of an anti-doping rule violation before having received notice of a *Sample* collection which could establish an anti-doping rule violation (or, in the case of an anti-doping rule violation other than Article 2.1, before receiving first notice of the admitted violation pursuant to Article 7) and that admission is the only reliable evidence of the violation at the time of admission, then the period of *Ineligibility* may be reduced, but not below one-half of the period of *Ineligibility* otherwise applicable.

10.5.5   Where an *Athlete* or Other *Person* Establishes Entitlement to Reduction in Sanction Under More than One Provision of this Article

Before applying any reduction or suspension under Articles 10.5.2, 10.5.3 or 10.5.4, the otherwise applicable period of *Ineligibility*

[Comment to Article 10.5.4: This Article is intended to apply when an *Athlete* or other *Person* comes forward and admits to an anti-doping rule violation in circumstances where no *Anti-Doping Organization* is aware that an anti-doping rule violation might have been committed. It is not intended to apply to circumstances where the admission occurs after the *Athlete* or other *Person* believes he or she is about to be caught.]

[Comment to Article 10.5.5: The appropriate sanction is determined in a sequence of four steps. First, the hearing panel determines which of the basic sanctions (Article 10.2, Article 10.3, Article 10.4 or Article 10.5) applies to the particular anti-doping rule violation. In a second step, the hearing panel establishes whether there is a basis for suspension, elimination or reduction of the sanction (Articles 10.5.1

*continued*

shall be determined in accordance with Articles 10.2, 10.3, 10.4 and 10.6. If the *Athlete* or other *Person* establishes entitlement to a reduction or suspension of the period of *Ineligibility* under two or more of Articles 10.5.2, 10.5.3 or 10.5.4, then the period of *Ineligibility* may be reduced or suspended, but not below one-fourth of the otherwise applicable period of *Ineligibility*.

through 10.5.4). Note, however, not all grounds for suspension, elimination or reduction may be combined with the provisions on basic sanctions. For example, Article 10.5.2 does not apply in cases involving Articles 10.3.3 or 10.4, since the hearing panel, under Articles 10.3.3 and 10.4, will already have determined the period of Ineligibility based on the Athlete's or other Person's degree of fault. In a third step, the hearing panel determines under Article 10.5.5 whether the Athlete or other Person is entitled to elimination, reduction or suspension under more than one provision of Article 10.5. Finally, the hearing panel decides on the commencement of the period of Ineligibility under Article 10.9.

The following four examples demonstrate the proper sequence of analysis:

Example 1:

Facts: An Adverse Analytical Finding involves the presence of an anabolic steroid; the Athlete promptly admits the anti-doping rule violation as asserted; the Athlete establishes No Significant Fault (Article 10.5.2); and the Athlete provides Substantial Assistance (Article 10.5.3).

Application of Article 10:

1. The basic sanction would be two years under Article 10.2. (Aggravating Circumstances (Article 10.6) would not be considered because the Athlete promptly admitted the violation. Article 10.4 would not apply because a steroid is not a Specified Substance.)

2. Based on No Significant Fault alone, the sanction could be reduced up to one-half of the two years. Based on Substantial Assistance alone, the sanction could be reduced up to three-quarters of the two years.

3. Under Article 10.5.5, in considering the possible reduction for No Significant Fault and Substantial Assistance together, the most the sanction could be reduced is up to three-quarters of the two years. Thus, the minimum sanction would be a six-month period of Ineligibility.

4. Under Article 10.9.2, because the Athlete promptly admitted the anti-doping rule violation, the period of Ineligibility could start as early as the date of Sample collection, but in any event the

continued

Athlete would have to serve at least one-half of the Ineligibility period (minimum three months) after the date of the hearing decision.

*Example 2:*

*Facts:* An Adverse Analytical Finding involves the presence of an anabolic steroid; aggravating circumstances exist and the Athlete is unable to establish that he did not knowingly commit the anti-doping rule violation; the Athlete does not promptly admit the anti-doping rule violation as alleged; but the Athlete does provide Substantial Assistance (Article 10.5.3).

*Application of Article 10:*

1. The basic sanction would be between two and four years Ineligibility as provided in Article 10.6.

2. Based on Substantial Assistance, the sanction could be reduced up to three-quarters of the maximum four years.

3. Article 10.5.5 does not apply.

4. Under Article 10.9.2, the period of Ineligibility would start on the date of the hearing decision.

*Example 3:*

*Facts:* An Adverse Analytical Finding involves the presence of a Specified Substance; the Athlete establishes how the Specified Substance entered his body and that he had no intent to enhance his sport performance; the Athlete establishes that he had very little fault; and the Athlete provides Substantial Assistance (Article 10.5.3).

*Application of Article 10:*

1. Because the Adverse Analytical Finding involved a Specified Substance and the Athlete has satisfied the other conditions of Article 10.4, the basic sanction would fall in the range between a reprimand and two years Ineligibility. The hearing panel would assess the Athlete's fault in imposing a sanction within that range. (Assume for illustration in this example that the panel would otherwise impose a period of Ineligibility of eight months.)

2. Based on Substantial Assistance, the sanction could be reduced up to three-quarters of the eight months. (No less than two months.) No Significant Fault (Article 10.2) would not be applicable because the Athlete's degree of fault was already taken into consideration in establishing the eight-month period of Ineligibility in step 1.

3. Article 10.5.5 does not apply.

4. Under Article 10.9.2, because the Athlete promptly admitted the anti-doping rule violation, the period of Ineligibility could start as early as the date of Sample collection, but in any event, the Athlete would have to serve at least half of the Ineligibility period after the date of the hearing decision. (Minimum one month.)

*Example 4:*

*Facts:* An Athlete who has never had an Adverse Analytical Finding or been confronted with an anti-doping

*continued*

rule violation spontaneously admits that he intentionally used multiple Prohibited Substances to enhance his performance. The Athlete also provides Substantial Assistance (Article 10.5.3).

*Application of Article 10:*

1. While the intentional Use of multiple Prohibited Substances to enhance performance would normally warrant consideration of aggravating circumstances (Article 10.6), the Athlete's spontaneous admission means that Article 10.6 would not apply. The fact that the Athlete's Use of Prohibited Substances was intended to enhance performance would also eliminate the application of Article 10.4 regardless of whether the Prohibited Substances Used were Specified Substances. Thus, Article 10.2 would be applicable and the basic period of Ineligibility imposed would be two years.

2. Based on the Athlete's spontaneous admissions (Article 10.5.4) alone, the period of Ineligibility could be reduced up to one-half of the two years.

Based on the Athlete's Substantial Assistance (Article 10.5.3) alone, the period of Ineligibility could be reduced up to three-quarters of the two years.

3. Under Article 10.5.5, in considering the spontaneous admission and Substantial Assistance together, the most the sanction could be reduced would be up to three-quarters of the two years. (The minimum period of ineligibility would be six months.)

4. If Article 10.5.4 was considered by the hearing panel in arriving at the minimum six-month period of Ineligibility at step 3, the period of ineligibility would start on the date the hearing panel imposed the sanction. If, however, the hearing panel did not consider the application of Article 10.5.4 in reducing the period of Ineligibility in step 3, then under Article 10.9.2, the commencement of the period of Ineligibility could be started as early as the date the anti-doping rule violation was committed, provided that at least half of that period (minimum of three months) would have to be served after the date of the hearing decision.)

### 10.6 Aggravating Circumstances Which May Increase the Period of *Ineligibility*

If the *Anti-Doping Organization* establishes in an individual case involving an anti-doping rule violation other than violations under Articles 2.7 (*Trafficking or Attempted Trafficking*) and 2.8 (Administration or *Attempted* Administration) that aggravating circumstances are present which justify the imposition of a period of *Ineligibility* greater than the standard sanction, then the period of *Ineligibility* otherwise applicable shall be increased up to a maximum of four (4) years unless the *Athlete* or other *Person* can prove to the comfortable satisfaction of the hearing panel that he or she did not knowingly commit the anti-doping rule violation.

An *Athlete* or other *Person* can avoid the application of this Article by admitting the anti-doping rule violation as asserted promptly after being confronted with the anti-doping rule violation by an *Anti-Doping Organization*.

[Comment to Article 10.6: Examples of aggravating circumstances which may justify the imposition of a period of Ineligibility greater than the standard sanction are: the Athlete or other Person committed the anti-doping rule violation as part of a doping plan or scheme, either individually or involving a conspiracy or common enterprise to commit anti-doping rule violations; the Athlete or other Person Used or Possessed multiple Prohibited Substances or Prohibited Methods or Used or Possessed a Prohibited Substance or Prohibited Method on multiple occasions; a normal individual would be likely to enjoy the performance-enhancing effects of the anti-doping rule violation(s) beyond the otherwise applicable period of Ineligibility; the Athlete or Person engaged in deceptive or obstructing conduct to avoid the detection or adjudication of an anti-doping rule violation.

For the avoidance of doubt, the examples of aggravating circumstances described in this Comment to Article 10.6 are not exclusive and other aggravating factors may also justify the imposition of a longer period of Ineligibility. Violations under Articles 2.7 (Trafficking or Attempted Trafficking) and 2.8 (Administration or Attempted Administration) are not included in the application of Article 10.6 because the sanctions for these violations (from four years to lifetime Ineligibility) already build in sufficient discretion to allow consideration of any aggravating circumstance.]


## 10.7   Multiple Violations

### 10.7.1   Second Anti-Doping Rule Violation

For an *Athlete*'s or other *Person*'s first anti-doping rule violation, the period of *Ineligibility* is set forth in Articles 10.2 and 10.3 (subject to elimination, reduction or suspension under Articles 10.4 or 10.5, or to an increase under Article 10.6). For a second anti-doping rule violation the period of *Ineligibility* shall be within the range set forth in the table below.

| Second Violation / First Violation | RS | FFMT | NSF | St | AS | TRA |
|---|---|---|---|---|---|---|
| RS | 1–4 | 2–4 | 2–4 | 4–6 | 8–10 | 10–life |
| FFMT | 1–4 | 4–8 | 4–8 | 6–8 | 10–life | life |
| NSF | 1–4 | 4–8 | 4–8 | 6–8 | 10–life | life |
| St | 2–4 | 6–8 | 6–8 | 8–life | life | life |
| AS | 4–5 | 10–life | 10–life | life | life | life |
| TRA | 8–life | life | life | life | life | life |

*[Comment to Article 10.7.1: The table is applied by locating the Athlete's or other Person's first anti-doping rule violation in the left-hand column and then moving across the table to the right to the column representing the second violation. By way of example, assume an Athlete receives the standard period of Ineligibility for a first violation under Article 10.2 and then commits a second violation for which he receives a reduced sanction for a Specified Substance under Article 10.4. The table is used to determine the period of Ineligibility for the second violation. The table is applied to this example by starting in the left-hand column and going down to the fourth row which is "St" for standard sanction, then moving across the table to the first column which is "RS" for reduced sanction for a Specified Substance, thus resulting in a 2-4 year range for the period of Ineligibility for the second violation. The Athlete's or other Person's degree of fault shall be the criterion considered in assessing a period of Ineligibility within the applicable range.]*

Definitions for purposes of the second anti-doping rule violation table:

**RS** (Reduced sanction for Specified Substance under Article 10.4): The anti-doping rule violation was or should be sanctioned by a reduced sanction under Article 10.4 because it involved a Specified Substance and the other conditions under Article 10.4 were met.

**FFMT** (Filing Failures and/or Missed Tests): The anti-doping rule violation was or should be sanctioned under Article 10.3.3 (Filing Failures and/or Missed Tests).

**NSF** (Reduced sanction for *No Significant Fault or Negligence*): The anti-doping rule violation was or should be sanctioned by a reduced sanction under Article 10.5.2 because *No Significant Fault or Negligence* under Article 10.5.2 was proved by the *Athlete*.

**St** (Standard sanction under Articles 10.2 or 10.3.1): The anti-doping rule violation was or should be sanctioned by the standard sanction of two (2) years under Articles 10.2 or 10.3.1.

**AS** (Aggravated sanction): The anti-doping rule violation was or should be sanctioned by an aggravated sanction under Article 10.6 because the *Anti-Doping Organization* established the conditions set forth under Article 10.6.

**TRA** (*Trafficking* or *Attempt*ed *Trafficking* and administration or *Attempt*ed administration): The anti-doping rule violation was or should be sanctioned by a sanction under Article 10.3.2.

*[Comment to Article 10.7.1 RS Definition: See Article 25.4 with respect to application of Article 10.7.1 to pre-Code anti-doping rule violations.]*

10.7.2 Application of Articles 10.5.3 and 10.5.4 to Second Anti-Doping Rule Violation

Where an *Athlete* or other *Person* who commits a second anti-doping rule violation establishes entitlement to suspension or reduction of a portion of the period of *Ineligibility* under Article 10.5.3 or Article 10.5.4, the hearing panel shall first determine the otherwise applicable period of *Ineligibility* within the range established in the table in Article 10.7.1, and then apply the appropriate suspension or reduction of the period of *Ineligibility*. The remaining period of *Ineligibility*, after applying any suspension or reduction under Articles 10.5.3 and 10.5.4, must be at least one-fourth of the otherwise applicable period of *Ineligibility*.

10.7.3 Third Anti-Doping Rule Violation

A third anti-doping rule violation will always result in a lifetime period of *Ineligibility*, except if the third violation fulfills the condition for elimination or reduction of the period of *Ineligibility* under Article 10.4 or involves a violation of Article 2.4 (Filing Failures and/or and Missed Tests). In these particular cases, the period of *Ineligibility* shall be from eight (8) years to life ban.

### 10.7.4   Additional Rules for Certain Potential Multiple Violations

- For purposes of imposing sanctions under Article 10.7, an anti-doping rule violation will only be considered a second violation if the *Anti-Doping Organization* can establish that the *Athlete* or other *Person* committed the second anti-doping rule violation after the *Athlete* or other *Person* received notice pursuant to Article 7 (Results Management), or after the *Anti-Doping Organization* made reasonable efforts to give notice, of the first anti-doping rule violation; if the *Anti-Doping Organization* cannot establish this, the violations shall be considered together as one single first violation, and the sanction imposed shall be based on the violation that carries the more severe sanction; however, the occurrence of multiple violations may be considered as a factor in determining aggravating circumstances (Article 10.6).

- If, after the resolution of a first anti-doping rule violation, an *Anti-Doping Organization* discovers facts involving an anti-doping

[Comment to Article 10.7.4: In a hypothetical situation, an Athlete commits an anti-doping rule violation on January 1, 2008, which the Anti-Doping Organization does not discover until December 1, 2008. In the meantime, the Athlete commits another anti-doping rule violation on March 1, 2008, and the Athlete is notified of this violation by the Anti-Doping Organization on March 30, 2008, and a hearing panel rules on June 30, 2008 that the Athlete committed the March 1, 2008 anti-doping rule violation. The later-discovered violation which occurred on January 1, 2008 will provide the basis for aggravating circumstances because the Athlete did not voluntarily admit the violation in a timely basis after the Athlete received notification of the later violation on March 30, 2008.]

rule violation by the *Athlete* or other *Person* which occurred prior to notification regarding the first violation, then the *Anti-Doping Organization* shall impose an additional sanction based on the sanction that could have been imposed if the two violations would have been adjudicated at the same time. Results in all *Competition*s dating back to the earlier anti-doping rule violation will be *Disqualified* as provided in Article 10.8. To avoid the possibility of a finding of aggravating circumstances (Article 10.6) on account of the earlier-in-time but later-discovered violation, the *Athlete* or other *Person* must voluntarily admit the earlier anti-doping rule violation on a timely basis after notice of the violation for which he or she is first charged. The same rule shall also apply when the *Anti-Doping Organization* discovers facts involving another prior violation after the resolution of a second anti-doping rule violation.

10.7.5   Multiple Anti-Doping Rule Violations During an Eight-Year Period

For purposes of Article 10.7, each anti-doping rule violation must take place within the same eight-year period in order to be considered multiple violations.

### 10.8 *Disqualification* of Results in *Competition*s Subsequent to *Sample* Collection or Commission of an Anti-Doping Rule Violation

In addition to the automatic *Disqualification* of the results in the *Competition* which produced the positive *Sample* under Article 9 (Automatic *Disqualification* of Individual Results), all other competitive results obtained from the date a positive *Sample* was collected (whether *In-Competition* or *Out-of-Competition*), or other anti-doping rule violation occurred, through the commencement of any *Provisional Suspension* or *Ineligibility* period, shall, unless fairness requires otherwise, be *Disqualified* with all of the resulting *Consequences* including forfeiture of any medals, points and prizes.

10.8.1   As a condition of regaining eligibility after being found to have committed an anti-doping rule violation, the *Athlete* must first repay all prize money forfeited under this Article.

10.8.2   Allocation of Forfeited Prize Money

Unless the rules of the International Federation provide that forfeited prize money shall be reallocated to other *Athlete*s, it shall be allocated first to reimburse the collection expenses of the *Anti-Doping Organization* that performed the necessary steps to collect the prize money back, then to reimburse the expenses of the *Anti-Doping Organization* that conducted results management in the case, with the balance, if any, allocated in accordance with the International Federation's rules.

[Comment to Article 10.8.2: Nothing in the Code precludes clean Athletes or other Persons who have been damaged by the actions of a Person who has committed an anti-doping rule violation from pursuing any right which they would otherwise have to seek damages from such Person.]

## 10.9   Commencement of *Ineligibility* Period

Except as provided below, the period of *Ineligibility* shall start on the date of the hearing decision providing for *Ineligibility* or, if the hearing is waived, on the date *Ineligibility* is accepted or otherwise imposed. Any period of *Provisional Suspension* (whether imposed or voluntarily accepted) shall be credited against the total period of *Ineligibility* imposed.

### 10.9.1   Delays Not Attributable to the *Athlete* or other *Person*

Where there have been substantial delays in the hearing process or other aspects of *Doping Control* not attributable to the *Athlete* or other *Person*, the body imposing the sanction may start the period of *Ineligibility* at an earlier date commencing as early as the date of *Sample* collection or the date on which another anti-doping rule violation last occurred.

### 10.9.2   Timely Admission

Where the *Athlete* or other *Person* promptly (which, in all events, for an *Athlete* means before the *Athlete* competes again) admits the anti-doping rule violation after being confronted with the anti-doping rule violation by the *Anti-Doping Organization*, the period of *Ineligibility* may start as early as the date of *Sample* collection or the date on which another anti-doping rule violation last occurred. In each case, however, where this Article is applied, the *Athlete* or other *Person* shall serve at least one-half of the period of *Ineligibility* going forward from the date the *Athlete* or other *Person* accepted the imposition of a sanction, the date

*[Comment to Article 10.9.2: This Article shall not apply where the period of Ineligibility already has been reduced under Article 10.5.4 (Admission of an Anti-Doping Rule Violation in the Absence of Other Evidence).]*

of a hearing decision imposing a sanction, or the date the sanction is otherwise imposed.

10.9.3   If a *Provisional Suspension* is imposed and respected by the *Athlete*, then the *Athlete* shall receive a credit for such period of *Provisional Suspension* against any period of *Ineligibility* which may ultimately be imposed.

10.9.4   If an *Athlete* voluntarily accepts a *Provisional Suspension* in writing from an *Anti-Doping Organization* with results management authority and thereafter refrains from competing, the *Athlete* shall receive a credit for such period of voluntary *Provisional Suspension* against any period of *Ineligibility* which may ultimately be imposed. A copy of the *Athlete*'s voluntary acceptance of a *Provisional Suspension* shall be provided promptly to each party entitled to receive notice of a potential anti-doping rule violation under Article 14.1.

10.9.5   No credit against a period of *Ineligibility* shall be given for any time period before the effective date of the *Provisional Suspension* or voluntary *Provisional Suspension* regardless of whether the *Athlete* elected not to compete or was suspended by his or her team.

*[Comment to Article 10.9.4: An Athlete's voluntary acceptance of a Provisional Suspension is not an admission by the Athlete and shall not be used in any way as to draw an adverse inference against the Athlete.]*

*[Comment to Article 10.9: The text of Article 10.9 has been revised to make clear that delays not attributable to the Athlete, timely admission by the Athlete and Provisional Suspension are the only justifications for starting the period of Ineligibility earlier than the date of the hearing decision. This amendment corrects inconsistent interpretation and application of the previous text.]*

## 10.10 Status During *Ineligibility*

### 10.10.1 Prohibition Against Participation During *Ineligibility*

No *Athlete* or other *Person* who has been declared *Ineligible* may, during the period of *Ineligibility*, participate in any capacity in a *Competition* or activity (other than authorized anti-doping education or rehabilitation programs) authorized or organized by any *Signatory*, *Signatory*'s member organization, or a club or other member organization of a *Signatory*'s member organization, or in *Competition*s authorized or organized by any professional league or any international- or national-level *Event* organization.

An *Athlete* or other *Person* subject to a period of *Ineligibility* longer than four (4) years may, after completing four (4) years of the period of *Ineligibility*, participate in local sport events in a sport other than the sport in which the *Athlete* or other *Person* committed the anti-doping rule violation, but only so long as the local sport event is not at a level that could otherwise qualify such *Athlete* or other *Person* directly or indirectly to compete in (or accumulate points toward) a national championship or *International Event*.

An *Athlete* or other *Person* subject to a period of *Ineligibility* shall remain subject to *Testing*.

*[Comment to Article 10.10.1: For example, an ineligible Athlete cannot participate in a training camp, exhibition or practice organized by his or her National Federation or a club which is a member of that National Federation. Further, an ineligible Athlete may not compete in a non-Signatory professional league (e.g., the National Hockey League, the National Basketball Association, etc.), Events organized by a non-Signatory International Event organization or a non-Signatory national-level event organization without triggering the consequences set forth in Article 10.10.2. Sanctions in one sport will also be recognized by other sports (see Article 15.4 Mutual Recognition).]*

10.10.2   Violation of the Prohibition of Participation During *Ineligibility*

Where an *Athlete* or other *Person* who has been declared *Ineligible* violates the prohibition against participation during *Ineligibility* described in Article 10.10.1, the results of such participation shall be *Disqualified* and the period of *Ineligibility* which was originally imposed shall start over again as of the date of the violation. The new period of *Ineligibility* may be reduced under Article 10.5.2 if the *Athlete* or other *Person* establishes he or she bears *No Significant Fault or Negligence* for violating the prohibition against participation. The determination of whether an *Athlete* or other *Person* has violated the prohibition against participation, and whether a reduction under Article 10.5.2 is appropriate, shall be made by the *Anti-Doping Organization* whose results management led to the imposition of the initial period of *Ineligibility*.

10.10.3   Withholding of Financial Support during *Ineligibility*

In addition, for any anti-doping rule violation not involving a reduced sanction for Specified

[Comment to Article 10.10.2: If an *Athlete* or other *Person* is alleged to have violated the prohibition against participation during a period of *Ineligibility*, the *Anti-Doping Organization* which had results management responsibility for the anti-doping rule violation which resulted in the period of *Ineligibility* shall determine whether the *Athlete* or other *Person* violated the prohibition and, if so, whether the *Athlete* or other *Person* has established grounds for a reduction in the restarted period of *Ineligibility* under Article 10.5.2. Decisions rendered by *Anti-Doping Organizations* under this Article may be appealed pursuant to Article 13.2.

Where an *Athlete Support Personnel* or other *Person* substantially assists an *Athlete* in violating the prohibition against participation during *Ineligibility*, an *Anti-Doping Organization* with jurisdiction over such *Athlete Support Personnel* or other *Person* may appropriately impose sanctions under its own disciplinary rules for such assistance.]

Substances as described in Article 10.4, some or all sport-related financial support or other sport-related benefits received by such *Person* will be withheld by *Signatories, Signatories'* member organizations and governments.

## 10.11  Reinstatement Testing

As a condition to regaining eligibility at the end of a specified period of *Ineligibility*, an *Athlete* must, during any period of *Provisional Suspension* or *Ineligibility*, make him or herself available for *Out-of-Competition Testing* by any *Anti-Doping Organization* having *Testing* jurisdiction, and must, if requested, provide current and accurate whereabouts information. If an *Athlete* subject to a period of *Ineligibility* retires from sport and is removed from *Out-of-Competition Testing* pools and later seeks reinstatement, the *Athlete* shall not be eligible for reinstatement until the *Athlete* has notified relevant *Anti-Doping Organization*s and has been subject to *Out-of-Competition Testing* for a period of time equal to the period of *Ineligibility* remaining as of the date the *Athlete* had retired.

## 10.12  Imposition of Financial Sanctions

*Anti-Doping Organization*s may, in their own rules, provide for financial sanctions on account of anti-doping rule violations. However, no financial sanction may be considered a basis for reducing the period of *Ineligibility* or other sanction which would otherwise be applicable under the *Code*.

[Comment to Article 10.12: For example, if a hearing panel were to find in a case that the cumulative effect of the sanction applicable under the Code and a financial sanction provided in the rules of an Anti-Doping Organization would result in too harsh a consequence, then the Anti-Doping Organization's financial sanction, not the other Code sanctions (e.g., Ineligibility and loss of results), would give way.]

# ARTICLE 11: CONSEQUENCES TO TEAMS

## 11.1  *Testing* of *Team Sport*s

Where more than one member of a team in a *Team Sport* has been notified of an anti-doping rule violation under Article 7 in connection with an *Event*, the ruling body for the *Event* shall conduct appropriate *Target Testing* of the team during the *Event Period*.

## 11.2  *Consequences* for *Team Sport*s

If more than two members of a team in a *Team Sport* are found to have committed an anti-doping rule violation during an *Event Period*, the ruling body of the *Event* shall impose an appropriate sanction on the team (e.g., loss of points, *Disqualification* from a *Competition* or *Event*, or other sanction) in addition to any *Consequences* imposed upon the individual *Athletes* committing the anti-doping rule violation.

## 11.3  *Event* Ruling Body May Establish Stricter *Consequences* for *Team Sport*s

The ruling body for an *Event* may elect to establish rules for the *Event* which impose *Consequences* for *Team Sport*s stricter than those in Article 11.2 for purposes of the *Event*.

[Comment to Article 11.3: For example, the International Olympic Committee could establish rules which would require Disqualification of a team from the Games of the Olympiad based on a lesser number of anti-doping rule violations during the period of the Games of the Olympiad.]

# ARTICLE 12: SANCTIONS AGAINST SPORTING BODIES

Nothing in the *Code* precludes any *Signatory* or government accepting the *Code* from enforcing its own rules for the purpose of imposing sanctions on another sporting body over which the *Signatory* or government has authority.

# ARTICLE 13: APPEALS

## 13.1 Decisions Subject to Appeal

Decisions made under the *Code* or rules adopted pursuant to the *Code* may be appealed as set forth below in Articles 13.2 through 13.4 or as otherwise provided in the *Code*. Such decisions shall remain in effect while under appeal unless the appellate body orders otherwise. Before an appeal is commenced, any post-decision review provided in the *Anti-Doping Organization*'s rules must be exhausted, provided that such review respects the principles set forth in Article 13.2.2 below (except as provided in Article 13.1.1).

*[Comment to Article 12: This Article makes it clear that the Code does not restrict whatever disciplinary rights between organizations may otherwise exist.]*

13.1.1 *WADA* Not Required to Exhaust Internal Remedies

Where *WADA* has a right to appeal under Article 13 and no other party has appealed a final decision within the *Anti-Doping Organization's* process, *WADA* may appeal such decision directly to *CAS* without having to exhaust other remedies in the *Anti-Doping Organization* process.

## 13.2 Appeals from Decisions Regarding Anti-Doping Rule Violations, *Consequences*, and *Provisional Suspension*s

A decision that an anti-doping rule violation was committed, a decision imposing *Consequences* for an anti-doping rule violation, or a decision that no anti-doping rule violation was committed; a decision that an anti-doping rule violation proceeding cannot go forward for procedural reasons (including, for example, prescription); a decision under Article 10.10.2 (Violation of the Prohibition of Participation during *Ineligibility*); a decision that an *Anti-Doping Organization* lacks jurisdiction to rule on an alleged anti-doping rule violation or its *Consequences*; a decision by an *Anti-Doping Organization* not to bring forward an *Adverse Analytical Finding* or an *Atypical Finding* as an anti-doping rule violation, or a decision not to go forward with an anti-doping rule violation after an investigation under Article 7.4; and a decision to impose a *Provisional Suspension* as a result of a *Provisional Hearing* or in violation of Article 7.5, may be appealed exclusively as provided in this Article 13.2.

[Comment to Article 13.1.1: Where a decision has been rendered before the final stage of an Anti-Doping Organization's process (e.g., a first hearing) and no party elects to appeal that decision to the next level of the Anti-Doping Organization's process (e.g., the Managing Board), then WADA may bypass the remaining steps in the Anti-Doping Organization's internal process and appeal directly to CAS.]

### 13.2.1 Appeals Involving *International-Level Athlete*s

In cases arising from participation in an *International Event* or in cases involving *International-Level Athlete*s, the decision may be appealed exclusively to CAS in accordance with the provisions applicable before such court.

### 13.2.2 Appeals Involving National-Level *Athlete*s

In cases involving national-level *Athlete*s, as defined by each *National Anti-Doping Organization*, who do not have a right to appeal under Article 13.2.1, the decision may be appealed to an independent and impartial body in accordance with rules established by the *National Anti-Doping Organization.* The rules for such appeal shall respect the following principles:

- a timely hearing;

- a fair, impartial and independent hearing panel;

- the right to be represented by counsel at the *Person*'s own expense; and

- a timely, written, reasoned decision.

*[Comment to Article 13.2.1: CAS decisions are final and binding except for any review required by law applicable to the annulment or enforcement of arbitral awards.]*

*[Comment to Article 13.2.2: An Anti-Doping Organization may elect to comply with this Article by giving its national-level Athletes the right to appeal directly to CAS.]*

### 13.2.3   *Person*s Entitled to Appeal

In cases under Article 13.2.1, the following parties shall have the right to appeal to *CAS*: (a) the *Athlete* or other *Person* who is the subject of the decision being appealed; (b) the other party to the case in which the decision was rendered; (c) the relevant International Federation; (d) the *National Anti-Doping Organization* of the *Person*'s country of residence or countries where the *Person* is a national or license holder; (e) the International Olympic Committee or International Paralympic Committee, as applicable, where the decision may have an effect in relation to the Olympic Games or Paralympic Games, including decisions affecting eligibility for the Olympic Games or Paralympic Games; and (f) *WADA*.

In cases under Article 13.2.2, the parties having the right to appeal to the national-level reviewing body shall be as provided in the *National Anti-Doping Organization*'s rules but, at a minimum, shall include the following parties: (a) the *Athlete* or other *Person* who is the subject of the decision being appealed; (b) the other party to the case in which the decision was rendered; (c) the relevant International Federation; (d) the *National Anti-Doping Organization* of the *Person*'s country of residence; and (e) *WADA*. For cases under Article 13.2.2, *WADA* and the International Federation shall also have the right to appeal to *CAS* with respect to the decision of the national-level reviewing body. Any party filing an appeal shall be entitled to assistance from *CAS* to obtain all relevant information from the *Anti-Doping Organization* whose decision is being

appealed and the information shall be provided if *CAS* so directs.

The filing deadline for an appeal or intervention filed by *WADA* shall be the later of:

(a)  Twenty-one (21) days after the last day on which any other party in the case could have appealed, or

(b)  Twenty-one (21) days after *WADA*'s receipt of the complete file relating to the decision.

Notwithstanding any other provision herein, the only *Person* who may appeal from a *Provisional Suspension* is the *Athlete* or other *Person* upon whom the *Provisional Suspension* is imposed.

## 13.3  Failure to Render a Timely Decision by an *Anti-Doping Organization*

Where, in a particular case, an *Anti-Doping Organization* fails to render a decision with respect to whether an anti-doping rule violation was committed within a reasonable deadline set by *WADA*, *WADA* may elect to appeal directly to *CAS* as if the *Anti-Doping Organization* had rendered a decision finding no anti-doping rule violation. If the *CAS* hearing panel determines that an anti-doping rule violation was

*[Comment to Article 13.3: Given the different circumstances of each anti-doping rule violation investigation and results management process, it is not feasible to establish a fixed time period for an Anti-Doping Organization to render a decision before WADA may intervene by appealing directly to CAS. Before taking such action, however, WADA will consult with the Anti-Doping Organization and give the Anti-Doping Organization an opportunity to explain why it has not yet rendered a decision. Nothing in this Article prohibits an International Federation from also having rules which authorize it to assume jurisdiction for matters in which the results management performed by one of its National Federations has been inappropriately delayed.]*

committed and that *WADA* acted reasonably in electing to appeal directly to CAS, then *WADA's* costs and attorneys fees in prosecuting the appeal shall be reimbursed to *WADA* by the *Anti-Doping Organization*.

### 13.4 Appeals from Decisions Granting or Denying a Therapeutic Use Exemption

Decisions by *WADA* reversing the grant or denial of a therapeutic use exemption may be appealed exclusively to *CAS* by the *Athlete* or the *Anti-Doping Organization* whose decision was reversed. Decisions by *Anti-Doping Organization*s other than *WADA* denying therapeutic use exemptions, which are not reversed by *WADA*, may be appealed by *International-Level Athlete*s to CAS and by other *Athlete*s to the national-level reviewing body described in Article 13.2.2. If the national-level reviewing body reverses the decision to deny a therapeutic use exemption, that decision may be appealed to *CAS* by *WADA*.

When an *Anti-Doping Organization* fails to take action on a properly submitted therapeutic use exemption application within a reasonable time, the *Anti-Doping Organization*'s failure to decide may be considered a denial for purposes of the appeal rights provided in this Article.

### 13.5 Appeals from Decisions under Part Three and Part Four of the *Code*

With respect to a *WADA* report of noncompliance under Article 23.4.5 or any *Consequences* imposed under Part Three (Roles and Responsibilities) of the *Code*, the entity to which the *WADA* report pertains or upon which *Consequences* are imposed under Part Three of the *Code* shall have the right to appeal exclusively to *CAS* in accordance with the provisions applicable before such court.

### 13.6   Appeals from Decisions Suspending or Revoking Laboratory Accreditation

Decisions by *WADA* to suspend or revoke a laboratory's *WADA* accreditation may be appealed only by that laboratory with the appeal being exclusively to *CAS*.

# ARTICLE 14: CONFIDENTIALITY AND REPORTING

The principles of coordination of anti-doping results, public transparency and accountability and respect for the privacy interests of individuals alleged to have violated anti-doping rules are:

### 14.1   Information Concerning *Adverse Analytical Finding*s, *Atypical Finding*s, and Other Potential Anti-Doping Rule Violations

#### 14.1.1   Notice to *Athlete*s and Other *Person*s

An *Athlete* whose *Sample* is brought forward as an *Adverse Analytical Finding* after the initial review under Articles 7.1 or 7.3, or an *Athlete* or other *Person* who is asserted to have committed an anti-doping rule violation after the initial review under Article 7.4, shall be notified by the *Anti-Doping Organization* with results management responsibility as provided in Article 7 (Results Management).

[Comment to Article 13: The object of the Code is to have anti-doping matters resolved through fair and transparent internal processes with a final appeal. Anti-doping decisions by Anti-Doping Organizations are made transparent in Article 14. Specified Persons and organizations, including WADA, are then given the opportunity to appeal those decisions. Note that the definition of interested Persons and organizations with a right to appeal under Article 13 does not include Athletes, or their federations, who might benefit from having another competitor disqualified.]