# EXHIBIT D

Johncie Wingard

| | |
|---|---|
| From: | Travis Tygart |
| Sent: | Friday, April 29, 2005 4:05 PM |
| To: | Lawrence Temple |
| Cc: | Johncie Wingard |
| Subject: | RE: Travis Tygart Affidavit |

Lawrence-

I have made some edits and hope to have it to you early Monday...when do you need to file? Also, is this being filed in an arbitration or court?  If arbitration, is it a confidential or will this document potentially become public?  No worries either way just curious.

Travis T. Tygart, Esq.
Senior Managing Director, General Counsel United States Anti-Doping Agency 2550 Tenderfoot Hill Street, Suite 200 Colorado Springs, Colorado 80906
(T) 719-785-2031
(F) 719-785-2001
Email: TTygart@usantidoping.org
www.usantidoping.org

CONFIDENTIALITY NOTICE - This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain information that is confidential or legally privileged.  If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that you must not read this transmission and that any disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED.  If you have received this transmission in error, please immediately notify the sender by telephone or return e-mail and delete the original transmission and its attachments without reading or saving in any manner.  Thank you.

-----Original Message-----
From: Lawrence Temple [mailto:ltemple@planetcse.com]
Sent: Thursday, April 28, 2005 10:34 AM
To: Travis Tygart; Tim Herman (E-mail); Sean Breen (E-mail); Bill Stapleton
Subject: Travis Tygart Affidavit

Guys,

      Let me start by identifying (introducing) everyone on this e-mail.  Travis Tygart is the general counsel for USADA who has kindly agreed to provide an affidavit for the SCA lawsuit.  Tim Herman and Sean Breen are the attorneys representing Tailwind and Armstrong in the lawsuit against SCA.  I won't introduce Bill since everyone knows him, and I'm not sure how I would describe him.  I don't want to get my ass fired.

      Attached to this e-mail is a very rough draft of an affidavit for Travis.  Everyone is seeing this for the first time.  Travis has not seen it yet to determine if I accurately described what he and I discussed, and Tim and Sean have not seen it to determine if it covers what they want.  I am not a litigator (thank God) and so there are some decisions about what to include or not include that I will leave to the experts.  In the interest of time, I wanted to get this to everyone at once so that we all have time to review it.

      Take a look and give me your thoughts.

      Lawrence

<<Tygart Affidavit.doc>>

1

IN THE MATTER OF:

| | | |
|---|---|---|
| LANCE ARMSTRONG AND | § | |
| TAILWIND SPORTS, INC. | § | |
| | § | BEFORE THE HONORABLE |
| | § | RICHARD FAULKNER, RICHARD |
| v. | § | CHERNICK AND TED LYON, |
| | § | ARBITRATORS |
| | § | |
| SCA PROMOTIONS, INC. | § | |

## AFFIDAVIT OF TRAVIS T. TYGART

Before me this day personally appeared Travis T. Tygart, a person to me well known who, upon his oath, stated as follows:

"My name is Travis T. Tygart. I am a resident and citizen of United State; I am over the age of eighteen (18) years, have never been convicted of a criminal offense, and am fully competent to make this Affidavit.

I am Senior Managing Director and General Counsel for the United States Anti-Doping Agency ("USADA"). In this capacity, I am involved with, and intimately familiar with, the testing protocols and results of antidoping tests administered by USADA.

USADA is an independent anti-doping agency for Olympic related sports in the United States. It is headquartered in Colorado Springs, Colorado. It was created as the result of recommendations made by the United States Olympic Committee's ("USOC") Select Task Force on Externalization to uphold the Olympic ideal of fair play, and to represent the interests of Olympic, Pan American Games, and Paralympic athletes. USADA is not subject to the control of the USOC but has contracted with the USOC. The USOC has given USADA full authority to execute a comprehensive national anti-

doping program encompassing testing, adjudication, education, and research, and to develop programs, policies, and procedures in each of those areas.

USADA began operations Oct. 1, 2000. Its board consists of nine members, five of whom come from outside the Olympic family and four of whom are elected by the Athlete Advisory Council and National Governing Body Council. USADA's professional staff is responsible for managing and coordinating the agency's program initiatives including testing, adjudication, research and education

All athletes in US Olympic Sports, including USA Cycling, are subject to testing by USADA. Because the Union Cycliste Internationale ("UCI") is recognized by the Olympics, professional cyclists are subject to testing by USADA. To be recognized as a member federation by the UCI and to receive funding by the USOC, USA Cycling is required to participate in testing done by USADA. USADA performs out of competition (OOC) testing for USA Cycling and also performs testing for USA Cycling-sanctioned events, such as the Tour of Georgia.

By being a part of USA Cycling, Lance Armstrong has an obligation to participate in the testing performed by USADA. Four times a year, all athletes (including Armstrong) that are subject to testing, must provide an Athlete Location Form, which informs USADA where the athlete will be. The athlete must also provide updates to USADA to inform USADA if the athlete will be in some location other than identified on the Athlete Location Form. USADA should be able to find an athlete 24-hours a day, 7-days a week.

The testing of athletes is not random. It is part of a computerized system, and the sports, based on international standards, are broken into high, medium, and low risk sports based on the likelihood that performance-enhancing drugs are used in that sport. The higher the risk a sport is, the more likely that an athlete will be tested. **[It is my**

**understanding from Travis that cycling is one of the high risk sports. Time, do we want to include this. It may hurt because it's high risk, but it also shows that Armstrong was subject to many tests.]**

If an athlete's name is generated for testing, then there are procedures for the Doping Control Officer ("DCO") to follow in obtaining a test from the athlete. Attached as Exhibit A to this Affidavit is a true and correct copy of the instructions for a DCO to follow in locating an athlete.

When a sample is taken from an athlete, it is sent to an independent lab, but the lab is not informed who the athlete is. If an athlete fails a test (or refuses to take a test), then USADA informs the athlete, the USOC, and the sports national governing body, which in the case of cycling would be USA Cycling. The athlete can then request that his "B" sample be tested. If the "B" sample also comes back positive, then a review board (which is similar to a grand jury) reviews the evidence and can sharge or not charge an athlete. If an athlete still maintains his innocence, then an arbitrator is appointed. Ultimately, the arbitrator can recommend a punishment, and if there is a punishment, it is imposed by the particular sport's federation.

USADA also has the ability to proceed against an athlete for "non-analytical" reasons. In other words, an athlete may not test positive, but based on other compelling evidence, there is reason to believe the athlete is guilty of doping. This occurred with Alvin Harrison in track and field. He did not test positive, but based on his relationship with BALCO and extensive documentary evidence (including e-mails), there was compelling proof that he doped. **[Tim, I don't know if we include this. On the one hand, it shows that USADA is serious about doping and looks beyond just tests. On**

**the other hand, it shows that sometimes athletes may pass drug tests but are still guilty of doping.  What are your thoughts?]**

It is possible that an athlete might "miss" a drug test.  This can occur if a DCO is unable to find an athlete despite looking for him at the locations on the Athlete Location Form.  If an athlete misses three drug tests in an 18 month period, then this is deemed a "failed" test.

Athletes that are subject to USADA's jurisdiction are subject to the most stringent testing in the sports world.

I have reviewed USADA's files regarding Lance Armstrong.  USADA has tested Armstrong 12 times, and every single test has been negative.  Armstrong has never been subject to a positive test administered by USADA.  I also checked his "misses", and within the last 18 months, Armstrong has not missed any test.  **[I believe that Lance has "missed" at least one test in the past.  I think it was resolved with USADA to USADA's satisfaction, but do we address it?]**

Further affiant sayeth not.

_____

TRAVIS T. TYGART


SUBSCRIBED AND SWORN TO before me this _____ day of April, 2005.


_____

NOTARY PUBLIC

# EXHIBIT E

IN THE MATTER OF:

| | |
|---|---|
| LANCE ARMSTRONG AND | § |
| TAILWIND SPORTS, INC. | § |
| | § |
| | § |
| v. | § |
| | § |
| | § |
| SCA PROMOTIONS, INC. | § |

BEFORE THE HONORABLE
RICHARD FAULKNER, RICHARD
CHERNICK AND TED LYON,
ARBITRATORS

## <u>AFFIDAVIT OF TRAVIS T. TYGART</u>

Before me this day personally appeared Travis T. Tygart, who identified himself to me and, upon his oath, swore to the following:

"My name is Travis T. Tygart.  I am a resident and citizen of the United States; I am over the age of eighteen (18) years, have never been convicted of a criminal offense, and am fully competent to make this Affidavit.  The facts stated in this affidavit are true and correct and within my personal knowledge.

I am Senior Managing Director, General Counsel for the United States Anti-Doping Agency ("USADA").  In this capacity, I am involved with, and intimately familiar with, the drug testing protocols and results management of anti-doping tests administered by USADA.

USADA is an independent, nongovernmental anti-doping agency for Olympic and Paralympic sports in the United States.  USADA is a nonprofit Colorado corporation with its office in Colorado Springs, Colorado.  USADA was created as the result of recommendations made by the United States Olympic Committee's ("USOC") Select Task Force on Externalization to uphold the Olympic ideal of fair and ethical competition and to represent the interests of Olympic, Pan American, and Paralympic athletes.

*Page 1 of 5*

CL 0311

USADA is not subject to the control of the USOC but has contracted with the USOC to administer its entire anti-doping program. The USOC has given USADA full authority to execute a comprehensive national anti-doping program encompassing testing, adjudication, education, and research, and to develop programs, policies, and procedures in each of these areas.

USADA began operations October 1, 2000. Its board of directors consists of nine members, five of whom are independent; two of whom are recommended by the Athlete Advisory Council; and, two of whom are recommended by the National Governing Body Council. USADA's professional staff is responsible for managing and coordinating the agency's day to day operations.

All athletes in U.S. Olympic sports, including athlete members of U.S. national governing bodies such as USA Cycling, are subject to the programs of USADA. Because USA Cycling is the U.S. national federation of the Union Cycliste Internationale ("UCI"), the sport of cycling's international sanctioning body, all U.S. cyclists including professional cyclists are subject to testing by USADA. To be recognized as a national federation by the UCI and the USOC, USA Cycling is legally required to follow the protocols of USADA. A true and correct copy of the USASDA Protocol for Olympic Movement Testing is attached hereto as Exhibit A. USADA performs out-of-competition (OOC) testing on elite USA Cycling athletes and also performs testing at USA Cycling-sanctioned events, such as the Tour of Georgia.

By being a licensed member of USA Cycling, like all licensed members, Mr. Lance Armstrong ("Mr. Armstrong") has an obligation to participate in the drug testing programs of USADA. Further, since Mr. Armstrong competes internationally and is an

*Page 2 of 5*

CL 0312

elite U.S. cyclist, he is in the USA Cycling/USADA OOC drug testing pool. As part of
Mr. Armstrong's obligation for being in the OOC testing pool, he must submit to
USADA his location information of where he can be located for testing at anytime and
anywhere, 24-hours a day, 7-days a week, 365 days a year, with no advance notice of the
test. The USADA system of anywhere, anytime no advance notice testing builds in three
unavailable attempts or missed tests in an 18 month period before the athlete is subject to
a potential sanction for not being at the location for testing. This OOC testing system is
one of the strictest in the world by requiring athletes to be available anywhere and
anytime for no advance notice testing.

The selection of athletes by USADA for OOC testing is done on a weighted
computerized system based in part on international standards. Each sport under
USADA's jurisdiction is broken into high, medium, or low risk. Based on this and given
USADA's resources, a certain number of tests are allocated to that sport based on these
factors. The higher the risk a sport is, the more likely that athlete will be selected for
OOC testing. USADA also has the authority to target test athletes.

If an athlete's name is selected for OOC testing, there are steps for the USADA
Doping Control Officer ("DCO") to follow in obtaining the sample from the athlete.
Attached as Exhibit B to this Affidavit is a true and correct copy of the instructions for a
DCO to follow in locating the selected athlete for OOC testing.

USADA also conducts testing at USA Cycling sanctioned events. USADA
generally follows the selection criteria for competition testing set forth by UCI but has
authority to make its own selections. Generally, the top finishers and additional random
selections out of the entire field of athletes are the athletes selected for testing.

*Page 3 of 5*

CL 0313

When a sample is taken from an athlete, it is sent to an independent World Anti-doping Agency ("WADA") accredited laboratory.  If the laboratory reports an adverse analytical result (positive test), USADA notifies the athlete, the USOC, and the sport's national governing body such as USA Cycling.  The athlete can then request that his or her "B" sample be tested.  If the "B" sample is also positive, then an independent review board reviews the documentary evidence and recommends whether sufficient evidence exists to proceed to a doping hearing.  After receiving the review board's recommendation, USADA decides whether or not to charge the athlete with a doping violation.  If USADA charges an athlete, the athlete can contest the charge through arbitration before a panel of American Arbitration Association ("AAA") and the Court of Arbitration for Sport ("CAS") arbitrators.

USADA also has the ability to proceed against an athlete for committing a doping violation not involving a positive test.  In the event an athlete refuses to test, distributes a prohibited drug or is unavailable for testing, USADA would charge the athlete with a doping violation through the same process described previously.

Athletes that are subject to USADA's jurisdiction are subject to one of the most stringent anti-doping programs in the sports world.

I have reviewed USADA's files regarding Mr. Armstrong.  USADA has drug tested Mr. Armstrong twelve (12) separate times on the following dates:  November 20, 2001, December 6, 2001, October 22, 2002, November 18, 2003, April 22, 2004, April 23, 2004, April 24, 2004, April 25, 2004, December 7, 2004, January 26, 2005, February 19, 2005, and April 5, 2005.  Mr. Armstrong has never had an adverse analytical finding

*Page 4 of 5*

CL 0314

reported to USADA.  USADA has never charged Mr. Armstrong with a doping violation

for a positive test or being unavailable for testing or otherwise.

    Further affiant sayeth not.

TRAVIS C. TYGART

SUBSCRIBED AND SWORN TO before me this 3rd day of May, 2005.

NOTARY PUBLIC

My Commission Expires: 7/5/08

*Page 5 of 5*

CL 0315



# PROTOCOL FOR OLYMPIC MOVEMENT TESTING



EXHIBIT

**A**

## TABLE OF CONTENTS

| | **Page** |
|---|---|
| USADA Protocol | 1 |
| **Annex A**<br>World Anti-Doping Code Articles | 13 |
| **Annex B**<br>Athlete Location Forms | 31 |
| **Annex C**<br>"A" Laboratory Documentation Package | 35 |
| **Annex D**<br>"B" Laboratory Documentation Package | 37 |
| **Annex E**<br>American Arbitration Association Supplementary<br>Procedures for Arbitration | 39 |
| **Annex F**<br>Time Line. This timeline is for general guidance<br>only and does not create any obligation, requirement<br>or right under the USADA Protocol. | 59 |
| **Annex G**<br>Language to be set forth in USADA correspondence<br>offering an athlete the opportunity to waive analysis<br>of the athlete's B specimen | 61 |
| **Annex H**<br>Retirement Rules | 63 |

i

CL 0317

**UNITED STATES ANTI-DOPING AGENCY
PROTOCOL FOR OLYMPIC MOVEMENT TESTING
(effective as revised August 13, 2004)**

1. **USADA's Relationship with the United States Olympic Committee ("USOC")**

   USADA is an independent legal entity not subject to the control of the USOC. The USOC has contracted with USADA to conduct drug testing, manage test results and adjudicate disputes for participants in the Olympic movement within the United States and to provide educational information to those participants. For purposes of transmittal of information by USADA, the USOC is USADA's client. However, the USOC has authorized USADA to transmit information simultaneously to the relevant National Governing Body ("NGB"), International Federation ("IF") the World Anti-Doping Agency ("WADA") and involved athlete or other person.

2. **Athletes Subject to Testing by USADA**

   The USOC, NGBs and the World Anti-Doping Code (the "WADA Code") have authorized USADA to test the following athletes:

   a. Any athlete who is a member of a NGB;

   b. Any athlete participating at a competition sanctioned by the USOC or a NGB;

   c. Any foreign athlete who is present in the United States; or

   d. Any other athlete who has given his/her consent to testing by USADA or who has submitted an out-of-competition testing location form to USADA or an IF within the previous twelve months and has not given his or her NGB and USADA written notice of retirement;

   e. Any athlete who has been named by the USOC or an NGB to an international team or who is included in the USADA Registered Testing Pool or is competing in a qualifying event to represent the USOC or NGB in international competition;

1

**USADA MISSION**

USADA is dedicated to preserving the well-being of Olympic sport, the integrity of competition, and ensuring the health of athletes.

**HOW TO CONTACT USADA**

United States Anti-Doping Agency (USADA)
2550 Tenderfoot Hill St., Suite 200
Colorado Springs, CO 80906

*Phone:* (719) 785-2000
*Fax:* (719) 785-2001
*Toll-Free Phone:* (866) 601-2632
*E-mail:* usada@usantidoping.org
*Web site:* www.usantidoping.org

**USADA DRUG REFERENCE LINE**

For information and clarification on the status of specific U.S. pharmaceutical products and over-the-counter medicinal products, please contact USADA's Drug Reference Line at

*Toll-Free Phone:* (800) 233-0393 (inside the U.S.)
*Phone:* (719) 785-2020 (outside the U.S.)
*E-mail:* drugreference@usantidoping.org

**PLAY CLEAN LINE**

The Play Clean line at 877-PLAY CLEAN (877-752-9253) is a direct link for individuals who are interested in drug-free competition. Please call USADA when you believe the integrity of your sport is being compromised by doping.

The USOC Anti-Doping Policies can be found in the education section of the official Web site of the USOC (http://www.usolympicteam.com).

USADA and the USADA logo are registered trademarks of the U.S. Anti-Doping Agency. All Rights Reserved.

(c) 2004 USADA. All Rights Reserved.

CL 0318

f. Any United States athlete or foreign athlete present in the United States who is serving a period of ineligibility on account of an anti-doping rule violation and who has not given prior written notice of retirement from all sanctioned competition to the applicable NGB and USADA, or the applicable foreign anti-doping agency or foreign sport association.

USADA will not allow the testing process to be used to harass any athlete. In selecting athletes for testing, USADA will focus primarily on athletes who are participating, or have the potential to participate, in international competition.

3. **Choice of Rules**

In conducting drug testing and results management under this Protocol for Olympic Movement Testing (the "Protocol"), USADA will be bound by the following rules:

a. Those Articles of the WADA Code which must be incorporated into the rules of every Anti-Doping Organization and are set forth in Annex A. Annex A is incorporated by reference into this Protocol.

b. The selection and collection procedures set forth in paragraphs 4, 5 & 6 herein shall apply to all testing conducted by USADA unless different procedures are agreed to between USADA and the party requesting the test for a particular event.

c. All tests performed by USADA shall be analyzed in WADA accredited laboratories or as otherwise approved by WADA. In analyzing samples for USADA, those laboratories shall follow the established WADA International Standard for Laboratory Analysis.

d. Samples tested by USADA shall be analyzed for the substances and methods included on the WADA Prohibited List or in the WADA Monitoring Program.

e. USADA shall be responsible for results management of the following: 1) tests initiated by USADA, unless otherwise referred by USADA to a foreign sports organization having jurisdiction over the athlete or other person, 2) all other tests for which the applicable IF rules require the initial adjudication to be done by a domestic body, and 3) other potential violations of Annex A, IF or USOC Anti-Doping Policies ("USOC ADP") involving any athlete described in paragraph 2, their support personnel and other NGB members, unless otherwise referred by USADA to a foreign sports organization having jurisdiction over the athlete or other person. Where, pursuant to an agreement, USADA executes tests initiated by an IF, regional or continental sports organization or other Olympic movement sporting body, other than the USOC or a NGB, then results management shall be governed by the rules of that sporting body.

f. Any IF or NGB procedural rule inconsistent with this Protocol shall be superceded by this Protocol.

g. The USOC has adopted the USOC ADP which affect athletes' or other persons' eligibility for USOC teams and benefits.

4. **Selection of Athletes to be Tested In-Competition**

USADA shall have the authority to determine which athletes will be selected for testing in all competitions tested by USADA. In making this determination, USADA will follow NGB or IF selection procedures when available and will include at a minimum the selection formulas or requests for target selection of particular athletes which are proposed by the USOC or a particular NGB or IF. Notwithstanding the foregoing sentence, USADA retains the right to test any athlete subject to testing as provided in paragraph 2 that it chooses with or without cause or explanation.

5. **Selection of Athletes to be Tested Out-of-Competition**

USADA shall have the authority to determine which athletes will be selected for out-of-competition testing by USADA. In making this determination, USADA will carefully consider selection formulas or requests for target selection of particular athletes which are proposed by the USOC or a particular NGB. USADA retains the right to test any athlete subject to testing as provided in paragraph 2 that it chooses,with or without cause or explanation. USADA will not allow the testing process to be used to harass any athlete.

CL 0319

    ii.    Until such time as WADA has developed International Standards applicable to retesting of samples, the laboratory shall have the burden of establishing that any adverse analytical finding was not the result of changes to the sample during storage and that the chain of custody for the sample from the original analysis through retesting remained intact.

Upon receipt of a laboratory analytical report from the retesting of a sample, USADA shall follow the regular procedures applicable to USADA's receipt of all other analytical reports.

8.    **Notification**

USADA will provide the following notification with respect to each specimen collected or attempted to be collected by USADA:

a.    Upon receipt of a negative laboratory report, USADA will promptly forward that result to the athlete at the address on the Athlete Location Form on file or if no form is on file to the address on the Doping Control Notification/Signature Form, the USOC and the applicable NGB.

b.    Upon receipt of a positive laboratory A report or a report indicating an elevated testosterone to epitestosterone ratio or epitestosterone concentration, USADA will promptly notify the USOC, the applicable NGB, and the athlete at the address on the Athlete Location Form on file, or if no form is on file to the address on the Doping Control Notification/Signature Form and shall advise the athlete of the date on which the laboratory will conduct the B sample analysis. The athlete may attend the B sample analysis accompanied by a representative, or may have a representative appear on his or her behalf, at the expense of the athlete. Prior to the B sample opening, USADA shall provide to the athlete the A sample laboratory documentation as set forth on Annex C, a copy of the Protocol and a copy of the World Code. A sample shall not be considered positive until after the B sample analysis confirms the A sample analysis or the athlete has expressly waived the B sample analysis. In any correspondence offering the athlete the opportunity to waive testing the B Sample, USADA shall include the language set forth in Annex G.

5

Each NGB will provide USADA with an updated list of athletes at least quarterly, unless otherwise agreed by USADA, to be included in the USADA Registered Testing Pool. With respect to each athlete on such list and such additional athletes as may be designated by USADA for inclusion in the USADA Registered Testing Pool, the NGB will provide USADA with the initial information as set forth on the athlete location form attached as Annex B. Thereafter it shall be the responsibility of each individual athlete to forward to USADA his or her athlete location forms and to provide USADA with updated information specifying his or her whereabouts.

USADA shall maintain on its website, a list of all athletes or other persons in the USADA Registered Testing Pool and all athletes tested by USADA. The list shall include the number of times each athlete has been tested by USADA.

6.    **Sample Collection**

Sample collection by USADA, and third parties authorized by USADA to collect samples for USADA including other national anti-doping agencies pursuant to bilateral or multilateral agreements, will conform to the standards set forth in the International Standard for Testing.

7.    **Laboratory Analysis**

All samples collected by USADA shall be analyzed only in WADA-accredited laboratories or as otherwise approved by WADA.

a.    Sample analytical results should normally be reported by the Laboratory to USADA within ten (10) working days of the laboratory's receipt of the sample. In no event shall the reporting period exceed three months.

b.    The laboratory may retest previously reported samples under the following conditions:

    i.    The retesting is either directed or authorized by USADA pursuant to guidelines developed by USADA for the retesting of samples.

4

c. Upon receipt of the laboratory's B sample report, USADA shall promptly notify the athlete, the USOC, and the applicable NGB. USADA shall then provide to the athlete the B sample documentation package set forth on Annex D. The laboratory shall not be required to produce any documentation in addition to Annexes C and D unless ordered to do so by an arbitrator(s) during adjudication, in which case it shall be produced at the athlete's expense unless ordered otherwise by an arbitrator(s).

d. In special circumstances where USADA is conducting testing for an IF, regional or continental sports organization or other Olympic movement sporting body, other than the USOC or an NGB, the notification described in this section shall be made as provided in the agreement between USADA and that sporting body or as required by WADA.

e. If USADA determines that an athlete or other person may have committed an anti-doping rule violation as described in Annex A other than a positive test or other violation of IF rules or the USOC ADP, then at such time as USADA initiates the Anti-Doping Review Board process, USADA shall provide notice of such potential violation to the athlete or other person, the USOC and the applicable NGB.

f. Notice to an athlete or other person, for all purposes of this Protocol except for notice of negative laboratory reports, shall be effective when delivered by overnight courier to the athlete's or other person's most recent address on file with USADA. If USADA is not able to deliver the notice at such address, then USADA shall contact the NGB and send notice by overnight courier to the athlete's or other person's most recent address on file with the NGB if that is a different address than the most recent address on file with USADA. If the athlete's or other person's most recent address on file with USADA and the NGB is the same, or if USADA is unable to obtain delivery at the athlete's or other person's most recent address on file with the NGB, then notice to the athlete or other person shall be effective upon the courier's last attempt to deliver.

g. At such time as WADA has implemented the Doping Control Information Clearinghouse described in Article 14.5 of the World Code, USADA will report to WADA the athlete whereabouts and testing information described in Articles 14.3 and 14.5 of the WADA Code.

9. **Results Management / Anti-Doping Review Board**

When USADA receives a laboratory report confirming an adverse analytical finding, or when USADA has otherwise determined that an anti-doping rule violation may have occurred, such as admitted doping, refusal to test, trafficking or other violation of Annex A, IF rules or the USOC ADP, then USADA shall address that case through the following results management procedures:

a. The USADA Anti-Doping Review Board ("Review Board") shall be comprised of experts independent of USADA with medical, technical and legal knowledge of anti-doping matters. The Review Board members shall be appointed for two-year terms by the USADA Board of Directors. The Review Board shall review all sample test results reported by the laboratory as analytically positive or elevated in accordance with section 9(c)(i) below. Such review shall be undertaken by between three and five Review Board members appointed in each case by USADA's Chief Executive Officer and composed of at least one technical, one medical and one legal expert.

b. The Review Board shall also review all potential anti-doping rule violations, including violations of Annex A, IF rules or the USOC ADP, not based on adverse analytical findings, which are brought forward by USADA. Review of potential violations other than adverse analytical findings shall be undertaken by three Review Board members appointed in each case by USADA's Chief Executive Officer.

c. Upon USADA's receipt of a laboratory B sample report confirming an adverse analytical finding (or test result of the A sample when analysis of the B sample has been expressly waived by the athlete or other person), or when USADA determines that a potential violation of other applicable anti-doping rules has occurred, the following steps shall be taken:

CL 0321

i.   USADA's Chief Executive Officer shall appoint a Review Board as provided in Section 9(a) or 9(b) above.

ii.  The Review Board shall be provided the laboratory documentation and any additional information which USADA deems appropriate. Copies of this information shall be provided simultaneously to the athlete or other person and the athlete or other person shall be entitled to file a response with the Review Board. The athlete's or other person's name will not be provided to the Review Board by USADA and will be redacted from any documents submitted to the Review Board by USADA.

iii. The athlete or other person shall be promptly notified that within ten (10) days of the date of notice he or she may submit to the Review Board, through USADA, any written materials for the Review Board's consideration. The athlete or other person shall also be provided the name, telephone number, email address and website URL of the Athlete Ombudsman.

iv.  The Review Board shall be entitled to request additional information from either USADA or the athlete or other person.

v.   Notwithstanding the forgoing, the process before the Review Board shall not be considered a "hearing." The Review Board shall only consider written submittals. Submittals to the Review Board shall not be used in any further hearing or proceeding without the consent of the party making the submittal. No evidence concerning the proceeding before the Review Board, including but not limited to the composition of the Review Board, what evidence may or may have not been considered by it, its deliberative process or its recommendations shall be admissible in any further hearing or proceeding.

vi.  The Review Board shall consider the written information submitted to it and shall, by majority vote, make a signed, written recommendation to USADA with a copy to the athlete or other person whether or not there is sufficient evidence of doping to proceed with the adjudication process.

vii. USADA shall also forward the Review Board's recommendation to the USOC, the applicable NGB and IF and WADA.

10.  **Results Management / Adjudication**

a.   Following receipt of the Review Board recommendation, USADA shall notify the athlete or other person in writing whether USADA considers the matter closed or alternatively what specific charges or alleged violations will be adjudicated and what sanction, consistent with Annex A, IF rules or the USOC ADP, USADA is seeking to have imposed. The notice shall also include a copy of the Protocol and the American Arbitration Association Supplementary Procedures for Adjudication of Doping Disputes (the "Supplementary Procedures") attached as Annex E. Within ten (10) days following the date of such notice, the athlete or other person must notify USADA in writing if he or she desires a hearing to contest the sanction sought by USADA. The athlete or other person shall be entitled to a five (5) day extension if requested within such ten (10) day period. If the sanction is not contested in writing within such ten (10) or fifteen (15) day period, then the sanction shall be communicated by USADA to the athlete or other person, USOC, the applicable NGB and IF and WADA and thereafter imposed by the NGB. Such sanction shall not be reopened or be subject to appeal unless the athlete or other person can demonstrate by a preponderance of the evidence in a subsequent appeal to CAS that he or she did not receive either actual or constructive notice of the opportunity to contest the sanction. The athlete or other person may also elect to avoid the necessity for hearing by accepting the sanction proposed by USADA. If the sanction is contested by the athlete or other person, then a hearing shall be conducted pursuant to the procedure set forth below.

8

9

CL 0322

g.   The results of all hearings, including written decisions, shall be communicated by USADA to the athlete or other person, the USOC, the applicable NGB and IF and WADA. The NGB and/or USOC shall impose any sanction resulting from the adjudication process. The NGB and/or the USOC shall not impose any sanctions until after the athlete or other person has had the opportunity for a hearing pursuant to section 10(b).

11.  **Ownership and Use of Samples**

All samples collected by USADA shall be the property of USADA, but shall only be used for purposes outlined in this Protocol. Samples collected after August 13, 2004 shall not be used for research without the Athlete's written consent. Samples collected prior to August 13, 2004 shall not be used for research unless all markings on the sample which identify the sample as coming from a particular athlete are obliterated.

12.  **Confidentiality**

USADA shall not publicly disclose or comment on any athlete's positive test result or any information related to any alleged doping violation (including violations not involving adverse analytical finding) until after the athlete or other person 1) has been found to have committed an anti-doping rule violation in a hearing conducted under either article 10(b) above, or 2) has failed to request a hearing within the time set forth in 10(a), or 3) has agreed in writing to the sanction sought by USADA. However, USADA may provide notification to the USOC, NGB, IF and WADA (or other sporting body ordering the test) as provided for in this Protocol. USADA does not control how information provided by USADA to the USOC, NGBs, IFs and WADA is disseminated but will include statements to each organization requesting that any organization receiving such information keep it confidential until disclosed by USADA. USADA may comment publicly on any aspect of the results management/adjudication process or the applicable rules without making specific reference to any athlete or other person alleged to have committed an anti-doping rule violation. USADA may also release aggregate statistics of testing and adjudication results.

11

b.   The hearing will take place in the United States before the American Arbitration Association ("AAA") using the Supplementary Procedures. The parties will be USADA and the athlete or other person. USADA shall also invite the applicable IF and WADA to participate either as a party or as an observer. The athlete or other person shall have the sole right to request that the hearing be open to the public subject to such limitations as may be imposed by the arbitrator(s). For their information only, notice of the hearing date shall also be sent to the USOC, the Athlete Ombudsman and the applicable NGB. If the athlete or other person requests, the Athlete Ombudsman shall be invited as an observer.

c.   The final decision by the AAA/CAS arbitrator(s) may be appealed to the Court of Arbitration for Sport ("CAS") as set forth in Article 13 of Annex A. The appeal procedure set forth in Article 13 of Annex A shall apply to all appeals not just appeals by International-Level athletes or other persons. A CAS appeal shall be filed with the CAS Administrator, the CAS hearing will automatically take place in the U.S. and CAS shall conduct a de novo review of the matter on appeal which, among other things, shall specifically include the power to increase, decrease or void the sanctions imposed by the previous AAA/CAS Panel. Otherwise the regular CAS appellate rules apply. The decision of CAS shall be final and binding on all parties and shall not be subject to further review or appeal.

d.   In all hearings conducted pursuant to the Protocol, the requirements set forth in the WADA Code shall apply. If no WADA Code requirement is applicable, then, subject to paragraph 3(f), the IF anti-doping rules, the USOC ADP and the Protocol shall apply.

e.   All administrative costs of USADA relating to the testing and management of athletes' samples will be borne by USADA. Administrative costs of the USADA adjudication process (AAA filing fee, AAA administrative costs, AAA arbitrator fees and costs) will be borne by the USOC.

f.   If the athlete or other person files an appeal with CAS, the CAS appeal fee will be paid by the athlete or other person and refunded to the athlete by the USOC should the athlete prevail on appeal.

10

USADA shall publicly report the disposition of anti-doping matters no later than five (5) business days after: 1) it has been determined in a hearing in accordance with the Protocol that an anti-doping rule violation has occurred, 2) such hearing has been waived, 3) the assertion of an anti-doping rule violation has not been timely challenged, or 4) the athlete or other person has agreed in writing to the sanction sought by USADA. In all cases, the disposition shall be reported to the USOC, NGB, IF, WADA and, if applicable, the other sporting body referring the matter to USADA.

13. **Expedited Procedures**
USADA may shorten any time period set forth in these procedures where doing so is reasonably necessary to resolve an athlete's or other person's eligibility before a protected competition. The shortened time periods shall continue to protect the right of the athlete or other person to a fair hearing and shall not prohibit the athlete's or other person's right to request three (3) arbitrators or choose a neutral arbitrator.

14 **Retirement**
The notice regarding retirement attached as Annex H shall be posted on the USADA website and included in the initial packet of information provided to athletes in the Registered Testing Pool. Such notice will automatically be included by USADA with any notice to an athlete of a second missed test.

15. **Effective Date**
The revisions to this Protocol incorporated herein shall go into effect on August 13, 2004. Revisions to the Protocol as previously published shall not apply retrospectively to matters pending before August 13, 2004.

## ANNEX A

**Articles from the World Anti-Doping Code that are Incorporated Verbatim into the USOC Anti-Doping Policies and the USADA Protocol for Olympic Movement Testing**

### ARTICLE 1: DEFINITION OF DOPING

Doping is defined as the occurrence of one or more of the anti-doping rule violations set forth in Article 2.1 through Article 2.8 of the *Code*.

### ARTICLE 2: ANTI-DOPING RULE VIOLATIONS

The following constitute anti-doping rule violations:

2.1   The presence of a *Prohibited Substance* or its *Metabolites* or *Markers* in an *Athlete's* bodily *Specimen*.

2.1.1   It is each *Athlete's* personal duty to ensure that no *Prohibited Substance* enters his or her body. *Athletes* are responsible for any *Prohibited Substance* or its *Metabolites* or *Markers* found to be present in their bodily *Specimens*. Accordingly, it is not necessary that intent, fault, negligence or knowing *Use* on the *Athlete's* part be demonstrated in order to establish an anti-doping violation under Article 2.1.

2.1.2   Excepting those substances for which a quantitative reporting threshold is specifically identified in the *Prohibited List*, the detected presence of any quantity of a *Prohibited Substance* or its *Metabolites* or *Markers* in an *Athlete's Sample* shall constitute an anti-doping rule violation.

2.1.3   As an exception to the general rule of Article 2.1, the *Prohibited List* may establish special criteria for the evaluation of *Prohibited Substances* that can also be produced endogenously.

CL 0324

2.2 Use or Attempted Use of a Prohibited Substance or a Prohibited Method.

2.2.1 The success or failure of the Use of a Prohibited Substance or Prohibited Method is not material. It is sufficient that the Prohibited Substance or Prohibited Method was Used or Attempted to be Used for an anti-doping rule violation to be committed.

2.3 Refusing, or failing without compelling justification, to submit to Sample collection after notification as authorized in applicable anti-doping rules or otherwise evading Sample collection.

2.4 Violation of applicable requirements regarding Athlete availability for Out-of-Competition Testing including failure to provide required where abouts information and missed tests which are declared based on reasonable rules.

2.5 Tampering, or Attempting to tamper, with any part of Doping Control.

2.6 Possession of Prohibited Substances and Methods:

2.6.1 Possession by an Athlete at any time or place of a substance that is prohibited in Out-of-Competition Testing or a Prohibited Method unless the Athlete establishes that the Possession is pursuant to a therapeutic use exemption granted in accordance with Article 4.4 (Therapeutic Use) or other acceptable justification.

2.6.2 Possession of a substance that is prohibited in Out-of-Competition Testing or a Prohibited Method by Athlete Support Personnel in connection with an Athlete, Competition or training, unless the Athlete Support Personnel establishes that the Possession is pursuant to a therapeutic use exemption granted to an Athlete in accordance with Article 4.4 (Therapeutic Use) or other acceptable justification.

2.7 Trafficking in any Prohibited Substance or Prohibited Method.

14

2.8 Administration or Attempted administration of a Prohibited Substance or Prohibited Method to any Athlete, or assisting, encouraging, aiding, abetting, covering up or any other type of complicity involving an anti-doping rule violation or any Attempted violation.

ARTICLE 3: PROOF OF DOPING

3.1 Burdens and Standards of Proof.
The Anti-Doping Organization shall have the burden of establishing that an anti-doping rule violation has occurred. The standard of proof shall be whether the Anti-Doping Organization has established an anti-doping rule violation to the comfortable satisfaction of the hearing body bearing in mind the seriousness of the allegation which is made. This standard of proof in all cases is greater than a mere balance of probability but less than proof beyond a reasonable doubt. Where the Code places the burden of proof upon the Athlete or other Person alleged to have committed an anti-doping rule violation to rebut a presumption or establish specified facts or circumstances, the standard of proof shall be by a balance of probability.

3.2 Methods of Establishing Facts and Presumptions.
Facts related to anti-doping rule violations may be established by any reliable means, including admissions. The following rules of proof shall be applicable in doping cases:

3.2.1 WADA-accredited laboratories are presumed to have conducted Sample analysis and custodial procedures in accordance with the International Standard for laboratory analysis. The Athlete may rebut this presumption by establishing that a departure from the International Standard occurred.
If the Athlete rebuts the preceding presumption by showing that a departure from the International Standard occurred, then the Anti-Doping Organization shall have the burden to establish that such departure did not cause the Adverse Analytical Finding.

15

CL 0325

Case 1:12-cv-00606-SS   Document 33-5   Filed 07/19/12   Page 23 of 121

3.2.2 Departures from the *International Standard for Testing* which did not cause an *Adverse Analytical Finding* or other anti-doping rule violation shall not invalidate such results. If the *Athlete* establishes that departures from the *International Standard* occurred during *Testing* then the *Anti-Doping Organization* shall have the burden to establish that such departures did not cause the *Adverse Analytical Finding* or the factual basis for the anti-doping rule violation.

## ARTICLE 9: AUTOMATIC DISQUALIFICATION OF INDIVIDUAL RESULTS

An anti-doping rule violation in connection with an *In-Competition* test automatically leads to *Disqualification* of the individual result obtained in that *Competition* with all resulting consequences, including forfeiture of any medals, points and prizes.

## ARTICLE 10: SANCTIONS ON INDIVIDUALS

10.1 *Disqualification of Results in Event During which an Anti-Doping Rule Violation Occurs*
An anti-doping rule violation occurring during or in connection with an *Event* may, upon the decision of the ruling body of the *Event*, lead to *Disqualification* of all of the *Athlete's* individual results obtained in that *Event* with all consequences, including forfeiture of all medals, points and prizes, except as provided in Article 10.1.1.

10.1.1 If the *Athlete* establishes that he or she bears *No Fault or Negligence* for the violation, the *Athlete's* individual results in the other *Competitions* shall not be *Disqualified* unless the *Athlete's* results in *Competitions* other than the *Competition* in which the anti-doping rule violation occurred were likely to have been affected by the *Athlete's* anti-doping rule violation.

16

10.2 Imposition of *Ineligibility* for *Prohibited Substances and Prohibited Methods*
Except for the specified substances identified in Article 10.3, the period of *Ineligibility* imposed for a violation of Articles 2.1 (presence of *Prohibited Substance* or its *Metabolites* or *Markers*), 2.2 (*Use* or *Attempted Use of Prohibited Substance or Prohibited Method*) and 2.6 (*Possession of Prohibited Substances and Methods*) shall be:
o First violation: Two (2) years' *Ineligibility*.
o Second violation: Lifetime *Ineligibility*.

However, the *Athlete* or other *Person* shall have the opportunity in each case, before a period of *Ineligibility* is imposed, to establish the basis for eliminating or reducing this sanction as provided in Article 10.5.

10.3 Specified Substances
The *Prohibited List* may identify specified substances which are particularly susceptible to unintentional anti-doping rules violations because of their general availability in medicinal products or which are less likely to be successfully abused as doping agents. Where an *Athlete* can establish that the *Use* of such a specified substance was not intended to enhance sport performance, the period of *Ineligibility* found in Article 10.2 shall be replaced with the following:
o First violation: At a minimum, a warning and reprimand and no period of *Ineligibility* from future *Events*, and at a maximum, one (1) year's *Ineligibility*.
o Second violation: Two (2) years' *Ineligibility*.
o Third violation: Lifetime *Ineligibility*.

However, the *Athlete* or other *Person* shall have the opportunity in each case, before a period of *Ineligibility* is imposed, to establish the basis for eliminating or reducing (in the case of a second or third violation) this sanction as provided in Article 10.5.

10.4 *Ineligibility for Other Anti-Doping Rule Violations*
The period of *Ineligibility* for other anti-doping rule violations shall be:

10.4.1 For violations of Article 2.3 (refusing or failing to submit to Sample collection) or Article 2.5 (*Tampering with Doping Control*), the *Ineligibility* periods set forth in Article 10.2 shall apply.

17

CL 0326

10.4.2 For violations of Articles 2.7 (*Trafficking*) or 2.8 (administration of *Prohibited Substance* or *Prohibited Method*), the period of *Ineligibility* imposed shall be a minimum of four (4) years up to lifetime *Ineligibility*. An anti-doping rule violation involving a *Minor* shall be considered a particularly serious violation, and, if committed by *Athlete Support Personnel* for violations other than specified substances referenced in Article 10.3, shall result in lifetime *Ineligibility* for such *Athlete Support Personnel*. In addition, violations of such Articles which also violate non-sporting laws and regulations, may be reported to the competent administrative, professional or judicial authorities.

10.4.3 For violations of Article 2.4 (whereabouts violation or missed test), the period of *Ineligibility* shall be at a minimum 3 months and at a maximum 2 years in accordance with the rules established by the *Anti-Doping Organization* whose test was missed or whereabouts requirement was violated. The period of *Ineligibility* for subsequent violations of Article 2.4 shall be as established in the rules of the *Anti-Doping Organization* whose test was missed or whereabouts requirement was violated.

10.5 Elimination or Reduction of Period of *Ineligibility* Based on Exceptional Circumstances.

10.5.1 *No Fault or Negligence*

If the *Athlete* establishes in an individual case involving an anti-doping rule violation under Article 2.1 (presence of *Prohibited Substance* or its *Metabolites or Markers*) or *Use* of a *Prohibited Substance or Prohibited Method* under Article 2.2 that he or she bears *No Fault or Negligence* for the violation, the otherwise applicable period of *Ineligibility* shall be eliminated. When a *Prohibited Substance or its Markers or Metabolites* is detected in an *Athlete's Specimen* in violation of Article 2.1 (presence of *Prohibited Substance*), the *Athlete* must also establish how the *Prohibited Substance* entered his or her system in order to have the period of *Ineligibility* eliminated. In the Event this Article is applied and the

18

period of *Ineligibility* otherwise applicable is eliminated, the anti-doping rule violation shall not be considered a violation for the limited purpose of determining the period of *Ineligibility* for multiple violations under Articles 10.2, 10.3 and 10.6.

10.5.2 *No Significant Fault or Negligence*

This Article 10.5.2 applies only to anti-doping rule violations involving Article 2.1 (presence of *Prohibited Substance* or its *Metabolites or Markers*), *Use* of a *Prohibited Substance or Prohibited Method* under Article 2.2, failing to submit to *Sample* collection under Article 2.3, or administration of a *Prohibited Substance or Prohibited Method* under Article 2.8. If an *Athlete* establishes in an individual case involving such violations that he or she bears *No Significant Fault or Negligence*, then the period of *Ineligibility* may be reduced, but the reduced period of *Ineligibility* may not be less than one-half of the minimum period of *Ineligibility* otherwise applicable. If the otherwise applicable period of *Ineligibility* is a lifetime, the reduced period under this section may be no less than 8 years. When a *Prohibited Substance* or its *Markers or Metabolites* is detected in an *Athlete's Specimen* in violation of Article 2.1 (presence of *Prohibited Substance*), the *Athlete* must also establish how the *Prohibited Substance* entered his or her system in order to have the period of *Ineligibility* reduced.

10.5.3 *Athlete's Substantial Assistance in Discovering or Establishing Anti-Doping Rule Violations by Athlete Support Personnel and Others.*

An *Anti-Doping Organization* may also reduce the period of *Ineligibility* in an individual case where the *Athlete* has provided substantial assistance to the *Anti-Doping Organization* which results in the *Anti-Doping Organization* discovering or establishing an anti-doping rule violation by another *Person* involving *Possession* under Article 2.6.2 (*Possession* by *Athlete Support Personnel*), Article 2.7 (*Trafficking*), or Article 2.8 (administration to an *Athlete*). The reduced period of *Ineligibility* may not, however, be less than one-half of the minimum period of *Ineligibility* otherwise applicable. If

19

10.10    Reinstatement *Testing*

As a condition to regaining eligibility at the end of a specified period of *Ineligibility*, an *Athlete* must, during any period of *Provisional Suspension* or *Ineligibility*, make him or herself available for *Out-of-Competition Testing* by any *Anti-Doping Organization* having testing jurisdiction, and must, if requested, provide current and accurate whereabouts information. If an *Athlete* subject to a period of *Ineligibility* retires from sport and is removed from *Out-of-Competition Testing* pools and later seeks reinstatement, the *Athlete* shall not be eligible for reinstatement until the *Athlete* has notified relevant *Anti-Doping Organizations* and has been subject to *Out-of-Competition Testing* for a period of time equal to the period of *Ineligibility* remaining as of the date the *Athlete* had retired.

## ARTICLE 11 CONSEQUENCES TO TEAMS

Where more than one team member in a *Team Sport* has been notified of a possible anti-doping rule violation under Article 7 in connection with an *Event*, the Team shall be subject to *Target Testing* for the *Event*. If more than one team member in a *Team Sport* is found to have committed an anti-doping rule violation during the *Event*, the team may be subject to *Disqualification* or other disciplinary action. In sports which are not *Team Sports* but where awards are given to teams, *Disqualification* or other disciplinary action against the team when one or more team members have committed an anti-doping rule violation shall be as provided in the applicable rules of the International Federation.

## ARTICLE 13 APPEALS

13.1    Decisions Subject to Appeal

Decisions made under the *Code* or rules adopted pursuant to the *Code* may be appealed as set forth below in Articles 13.2 through 13.4. Such decisions shall remain in effect while under appeal unless the appellate body orders otherwise. Before an appeal is commenced, any post-decision review provided in the *Anti-Doping Organization's* rules must be exhausted, provided that such review respects the principles set forth in Article 13.2.2 below.

22

13.2    Appeals from Decisions Regarding Anti-Doping Rule Violations, Consequences, and *Provisional Suspensions*

A decision that an anti-doping rule violation was committed, a decision imposing *Consequences* for an anti-doping rule violation, a decision that no anti-doping rule violation was committed, a decision that an *Anti-Doping Organization* lacks jurisdiction to rule on an alleged anti-doping rule violation or its *Consequences*, and a decision to impose a *Provisional Suspension* as a result of a *Provisional Hearing* or in violation of Article 7.5 may be appealed exclusively as provided in this Article 13.2.

13.2.1    Appeals Involving *International-Level Athletes*

In cases arising from competition in an *International Event* or in cases involving *International-Level Athletes*, the decision may be appealed exclusively to the Court of Arbitration for Sport ("CAS") in accordance with the provisions applicable before such court.

13.2.3    *Persons Entitled to Appeal*

In cases under Article 13.2.1, the following parties shall have the right to appeal to CAS: (a) the *Athlete* or other *Person* who is the subject of the decision being appealed; (b) the other party to the case in which the decision was rendered; (c) the relevant *International Federation* and any other *Anti-Doping Organization* under whose rules a sanction could have been imposed; (d) the International Olympic Committee or International Paralympic Committee, as applicable, where the decision may have an effect in relation to the Olympic Games or Paralympic Games, including decisions affecting eligibility for the Olympic Games or Paralympic Games; and (e) *WADA*. In cases under Article 13.2.2, the parties having the right to appeal to the national-level reviewing body shall be as provided in the *National Anti-Doping Organization's* rules but, at a minimum, shall include: (a) the *Athlete* or other *Person* who is the subject of the decision being appealed; (b) the other party to the case in which the decision was rendered; (c) the relevant *International Federation*; and (d) *WADA*. For cases under Article 13.2.2, *WADA* and the *International Federation* shall also have the right to appeal to CAS with respect to the decision of the national-level reviewing body. Notwithstanding any other provision herein, the only *Person* that may appeal from a *Provisional Suspension* is the *Athlete* or other *Person* upon whom the *Provisional Suspension* is imposed.

23

13.3   Appeals from Decisions Granting or Denying a Therapeutic Use Exemption

Decisions by *WADA* reversing the grant or denial of a therapeutic use exemption may be appealed exclusively to CAS by the *Athlete* or the *Anti-Doping Organization* whose decision was reversed. Decisions by *Anti-Doping Organizations* other than *WADA* denying therapeutic use exemptions, which are not reversed by *WADA*, may be appealed by *International-Level Athletes* to CAS and by other *Athletes* to the national level reviewing body described in Article 13.2.2. If the national level reviewing body reverses the decision to deny a therapeutic use exemption, that decision may be appealed to CAS by *WADA*.

13.4   Appeals from Decisions Imposing Consequences under Part Three of the *Code*

With respect to consequences imposed under Part Three (Roles and Responsibilities) of the *Code*, the entity upon which consequences are imposed under Part Three of the *Code* shall have the right to appeal exclusively to CAS in accordance with the provisions applicable before such court.

13.5   Appeals from Decisions Suspending or Revoking Laboratory Accreditation

Decisions by *WADA* to suspend or revoke a laboratory's *WADA* accreditation may be appealed only by that laboratory with the appeal being exclusively to CAS.

## ARTICLE 17 STATUTE OF LIMITATIONS

No action may be commenced against an *Athlete* or other *Person* for a violation of an anti-doping rule contained in the *Code* unless such action is commenced within eight years from the date the violation occurred.

24

## DEFINITIONS

***Adverse Analytical Finding:*** A report from a laboratory or other approved *Testing* entity that identifies in a *Specimen* the presence of a *Prohibited Substance* or its *Metabolites* or *Markers* (including elevated quantities of endogenous substances) or evidence of the *Use* of a *Prohibited Method*.

***Anti-Doping Organization:*** A *Signatory* that is responsible for adopting rules for initiating, implementing or enforcing any part of the *Doping Control* process. This includes, for example, the International Olympic Committee, the International Paralympic Committee, other Major Event Organizations that conduct *Testing* at their *Events*, *WADA*, International Federations, and *National Anti-Doping Organizations*.

***Athlete:*** For purposes of *Doping Control*, any *Person* who participates in sport at the international level (as defined by each International Federation) or national level (as defined by each *National Anti-Doping Organization*) and any additional *Person* who participates in sport at a lower level if designated by the *Person's National Anti-Doping Organization*. For purposes of anti-doping information and education, any *Person* who participates in sport under the authority of any *Signatory*, government, or other sports organization accepting the *Code*.

***Athlete Support Personnel:*** Any coach, trainer, manager, agent, team staff, official, medical or para-medical *Personnel* working with or treating *Athletes* participating in or preparing for sports competition.

***Attempt:*** Purposely engaging in conduct that constitutes a substantial step in a course of conduct planned to culminate in the commission of an anti-doping rule violation. Provided, however, there shall be no anti-doping rule violation based solely on an *Attempt* to commit a violation if the *Person* renunciates the attempt prior to it being discovered by a third party not involved in the *Attempt*.

***Code:*** The World Anti-Doping Code.

***Competition:*** A single race, match, game or singular athletic contest. For example, the finals of the Olympic 100-meter dash. For stage races and other athletic contests where prizes are awarded on a daily or other interim basis the distinction between a *Competition* and an *Event* will be as provided in the rules of the applicable International Federation.

25

CL 0329

***Consequences of Anti-Doping Rules Violations:*** An Athlete's or other Person's violation of an anti-doping rule may result in one or more of the following: (a) *Disqualification* means the *Athlete's* results in a particular *Competition* or *Event* are invalidated, with all resulting consequences including forfeiture of any medals, points and prizes; (b) *Ineligibility* means the *Athlete* or other *Person* is barred for a specified period of time from participating in any *Competition* or other activity or funding as provided in Article 10.9; and (c) *Provisional Suspension* means the *Athlete* or other *Person* is barred temporarily from participating in any *Competition* prior to the final decision at a hearing conducted under Article 8 (Right to a Fair Hearing).

***Disqualification:*** See Consequences of Anti-Doping Rules Violations above.

***Doping Control:*** The process including test distribution planning, *Sample* collection and handling, laboratory analysis, results management, hearings and appeals.

***Event:*** A series of individual *Competitions* conducted together under one ruling body (e.g., the Olympic Games, FINA World Championships, or Pan American Games).

***In-Competition:*** For purposes of differentiating between *In-Competition* and *Out-of-Competition Testing*, unless provided otherwise in the rules of an *International Federation* or other relevant *Anti-Doping Organization*, an *In-Competition* test is a test where an *Athlete* is selected for testing in connection with a specific *Competition*.

***Independent Observer Program:*** A team of observers, under the supervision of *WADA*, who observe the *Doping Control* process at certain *Events* and report on observations. If *WADA* is testing *In-Competition* at an *Event*, the observers shall be supervised by an independent organization.

***Ineligibility:*** See Consequences of Anti-Doping Rules Violations above.

***International Event:*** An *Event* where the International Olympic Committee, the International Paralympic Committee, an *International Federation*, a *Major Event Organization*, or another international sport organization is the ruling body for the *Event* or appoints the technical officials for the *Event*.

***International-Level Athlete:*** *Athletes* designated by one or more *International Federations* as being within the *Registered Testing Pool* for an International Federation.

26

***International Standard:*** A standard adopted by *WADA* in support of the *Code*. Compliance with an *International Standard* (as opposed to another alternative standard, practice or procedure) shall be sufficient to conclude that the procedures addressed by the *International Standard* were performed properly.

***Major Event Organizations:*** This term refers to the continental associations of *National Olympic Committees* and other international multi-sport organizations that function as the ruling body for any continental, regional or other *International Event*.

***Marker:*** A compound, group of compounds or biological parameters that indicates the *Use* of a *Prohibited Substance* or *Prohibited Method*.

***Metabolite:*** Any substance produced by a biotransformation process.

***Minor:*** A natural *Person* who has not reached the age of majority as established by the applicable laws of his or her country of residence.

***National Anti-Doping Organization:*** The entity(ies) designated by each country as possessing the primary authority and responsibility to adopt and implement anti-doping rules, direct the collection of *Samples*, the management of test results, and the conduct of hearings, all at the national level. If this designation has not been made by the competent public authority(ies), the entity shall be the country's *National Olympic Committee* or its designee. [In the United States, this entity is USADA.]

***National Event:*** A sport *Event* involving international or national-level *Athletes* that is not an *International Event*.

***National Olympic Committee:*** The organization recognized by the International Olympic Committee. The term National Olympic Committee shall also include the National Sport Confederation in those countries where the National Sport Confederation assumes typical National Olympic Committee responsibilities in the anti-doping area. [In the United States, this entity is the United States Olympic Committee.]

***No Advance Notice:*** A *Doping Control* which takes place with no advance warning to the *Athlete* and where the *Athlete* is continuously chaperoned from the moment of notification through *Sample* provision.

27

CL 0330

*No Fault or Negligence:* The *Athlete's* establishing that he or she did not know or suspect, and could not reasonably have known or suspected even with the exercise of utmost caution, that he or she had *Used* or been administered the Prohibited Substance or Prohibited Method.

*No Significant Fault or Negligence:* The *Athlete* establishing that his or her fault or negligence, when viewed in the totality of the circumstances and taking into account the criteria for *No Fault or Negligence*, was not significant in relationship to the anti-doping rule violation.

*Out-of-Competition:* Any *Doping Control* which is not *In-Competition*.

*Participant:* Any *Athlete* or *Athlete Support Personnel*.

*Person:* A natural *Person* or an organization or other entity.

*Possession:* The actual, physical possession, or the constructive *Possession* (which shall be found only if the *Person* has exclusive control over the *Prohibited Substance/Method* or the premises in which a *Prohibited Substance/Method* exists); provided, however, that if the *Person* does not have exclusive control over the *Prohibited Substance/Method* or the premises in which a *Prohibited Substance/Method* exists, constructive possession shall only be found if the *Person* knew about the presence of the *Prohibited Substance/Method* and intended to exercise control over it. Provided, however, there shall be no anti-doping rule violation based solely on possession if, prior to receiving notification of any kind that the *Person* has committed an anti-doping rule violation, the *Person* has taken concrete action demonstrating that the *Person* no longer intends to have *Possession* and has renounced the *Person's* previous *Possession*.

*Prohibited List:* The List identifying the *Prohibited Substances* and *Prohibited Methods*.

*Prohibited Method:* Any method so described on the *Prohibited List*.

*Prohibited Substance:* Any substance so described on the *Prohibited List*.

*Provisional Hearing:* For purposes of Article 7.5, an expedited abbreviated hearing occurring prior to a hearing under Article 8 (Right to a Fair Hearing) that provides the *Athlete* with notice and an opportunity to be heard in either written or oral form.

28

*Provisional Suspension:* See *Consequences* above.

*Publicly Disclose or Publicly Report:* To disseminate or distribute information to the general public or *Persons* beyond those *Persons* entitled to earlier notification in accordance with Article 14.

*Registered Testing Pool:* The pool of top level *Athletes* established separately by each International Federation and National *Anti-Doping Organization* who are subject to both *In-Competition* and *Out-of-Competition Testing* as part of that International Federation's or Organization's test distribution plan.

*Sample Specimen:* Any biological material collected for the purposes of *Doping Control*.

*Signatories:* Those entities signing the Code and agreeing to comply with the Code, including the International Olympic Committee, International *Federations*, International Paralympic Committee, National Olympic Committees, National Paralympic Committees, *Major Event Organizations*, National Anti-Doping Organizations, and *WADA*.

*Tampering:* Altering for an improper purpose or in an improper way; bringing improper influence to bear; interfering improperly to alter results or prevent normal procedures from occurring.

*Target Testing:* Selection of *Athletes* for *Testing* where specific *Athletes* or groups of *Athletes* are selected on a non-random basis for *Testing* at a specified time.

*Team Sport:* A sport in which the substitution of players is permitted during a *Competition*.

*Testing:* The parts of the *Doping Control* process involving test distribution planning, *Sample* collection, *Sample* handling, and *Sample* transport to the laboratory.

*Trafficking:* To sell, give, administer, transport, send, deliver or distribute a *Prohibited Substance* or *Prohibited Method* to an *Athlete* either directly or through one or more third parties, but excluding the sale or distribution (by medical personnel or by *Persons* other than an *Athlete's Support Personnel*) of a *Prohibited Substance* for genuine and legal therapeutic purposes.

*Use:* The application, ingestion, injection or consumption by any means whatsoever of any *Prohibited Substance* or *Prohibited Method*.

*WADA:* The World Anti-Doping Agency.

29

Annex B



31

30

CL 0332

## ANNEX C

The following documents will accompany the initial notification to the athlete or other person of a positive "A" sample analysis:

1. A standard notice setting forth the review procedures, athlete's or other person's rights, and contact information for the USOC Athlete Ombudsman (including name, telephone number, e-mail address and website URL).

2. Notification of the prohibited substance at issue which could result in a doping violation. In those cases where an administrative threshold concentration is employed, that threshold will be noted. When possible, the degree to which the athlete's or other person's sample exceeds the threshold will be reported.

3. An abbreviated analytical report to the "A" confirmation analysis. The abbreviated data should include applicable analytical confirmation technique (e.g., gas chromatography/mass spectrometric) graphical data for negative control urine, a positive control urine (including quantitative data where relevant), and the athlete's or other person's sample. The purpose of this data is to allow the athlete or other person or their representative to determine a course of action. It is understood that due to time constraints involved, there is typically less time to review and organize this data prior to transmittal than with the documentation package to accompany the "B" sample which will also address documents related to the "A" analysis.

4. For EPO cases, provide the Basic Area Percentage (BAP) of r-EPO, stated as a percentage term.

5. A cover page summarizing, in plain English, the following data contained in the laboratory documentation package: (i) the test collection date; (ii) the name of the substance reported positive or elevated; and (iii) quantification information as follows: (a) for substances where WADA has established a reporting threshold, an estimate of the concentration relative to the threshold; (b) for T/E ratios, the approximate screen concentrations of T and E [note that T/E ratios are reported based on a comparison of the relative signals of T and E not a comparison of absolute quantities of T and E]; (c) for non-threshold substances, a statement whether the concentration is relatively "high," "medium" or "low" with a reference range provided for the positive or elevated substance in question. Note that for non-threshold substances the presence of any quantity of the prohibited substance is an anti-doping rule violation.

35

34

CL 0334

## ANNEX D

The following documentation will be supplied as the standard documentation package:

Table of contents

List of laboratory staff involved in the test, including signatures and/or initials and
 position title(s)

Sample identification information

Organization requesting the test

Date of sample collection and site identification

USADA sample identification number

Laboratory sample identification number

Urine integrity test results (if completed)

Chain of custody documentation for sample container

Doping Control Notification form (Laboratory copy)

Transportation chain of custody (e.g., courier documentation, laboratory
 receipt of container)

"A" sample container chain(s) of custody

Documentation of any deviations from the written screening procedures, if any

"A" Sample Screening Results

Relevant aliquot chain(s) of custody

Screening procedure data, including chromatograms (or other relevant data), for Negative
control urine

Positive control urine (with concentration indicated, if relevant)

Sample urine aliquot(s)

Analytical run instrument validation data (e.g.: tune data)

Documentation of any deviations from the written screening procedures, if any

"A" Sample Confirmation Results

Summary of the analytical principles of the confirmation method

Aliquot chain of custody

Sequence verification data

Confirmation procedure data, including chromatograms (or other relevant data), for
Negative control urine

Positive control urine (with concentration indicated, if relevant)

Standard(s)/calibrator(s) (if relevant)

Sample urine aliquot(s)

Analytical run instrument validation data (e.g.: tune data)

"A" sample report (including numerical data for threshold substances*)
 pH, Specific Gravity, and other urine integrity test results (if applicable,
 including abnormal appearance of sample) performed in laboratory.

36

37

ANNEX E

Documentation of any deviations from the written screening procedures, if any
"B" Sample Confirmation Results
"B" sample container chain(s) of custody
Summary of the analytical principles of the confirmation method (if different than "A")
Aliquot chain of custody
Sequence verification data
Confirmation procedure data, including chromatograms (or other relevant data), for
Negative control urine
Positive control urine (with concentration indicated, if relevant)
Standard(s)/calibrator(s) (if relevant)
Sample urine aliquot(s)
Analytical run instrument validation data (e.g., tune data)
"B" sample report (including numerical data for threshold substances")
Documentation of any deviations from the written screening procedures, if any
Reports and Correspondence
All facsimiles or letters related to analysis and reporting of sample results

*For threshold substances, an estimate of the ratio or concentration or an estimate of
the concentration relative to the threshold (i.e. 20 times the threshold concentration) is
deemed acceptable.

American Arbitration Association Supplementary Procedures for the
Arbitration of Olympic Sport Doping Disputes

Table of Contents

R-1. Applicability
R-2. AAA and Delegation of Duties
R-3. National Panel of Arbitrators
R-4. Initiation under an Arbitration Provision in a Contract
R-5. Initiation under a Submission
R-6. Changes of Claim
R-7. Applicable Procedures
R-8. Jurisdiction
R-9. Mediation
R-10. Administrative Conference
R-11. Fixing of Locale
R-12. Qualifications of an Arbitrator
R-13. Appointment from Panel
R-14. Direct Appointment by a Party
R-15. Appointment of Neutral Arbitrator by Party-Appointed Arbitrators or Parties
R-16. Nationality of Arbitrator
R-17. Number of Arbitrators
R-18. Notice to Arbitrator of Appointment
R-19. Disclosure and Challenge Procedure
R-20. Communication with Arbitrator
R-21. Vacancies
R-22. Preliminary Hearing
R-23. Exchange of Information
R-24. Date, Time, and Place of Hearing
R-25. Attendance at Hearings
R-26. Representation
R-27. Oaths
R-28. Stenographic Record
R-29. Interpreters
R-30. Postponements
R-31. Arbitration in the Absence of a Party or Representative

CL 0336

**American Arbitration Association Supplementary Procedures for the Arbitration of Olympic Sport Doping Disputes [1]**

### R-1. Applicability

The Commercial Arbitration Rules of the AAA, as modified by these Supplementary Procedures for the Arbitration of Olympic Sport Doping Disputes (Supplementary Procedures) shall apply to arbitrations, which arise out of the USADA Protocol. To the extent that there is any variance between the Commercial Arbitration Rules and the Supplementary Procedures, the Supplementary Procedures shall control.

### R-2. AAA and Delegation of Duties

Doping cases shall be administered by the AAA through the AAA Vice President then serving as the Secretary for the North American/Central American/Caribbean Islands Decentralized Office of The Court of Arbitration for Sport or his/her designee (Administrator).

### R-3. National Pool of Arbitrators

*The Pool of Arbitrators for doping cases shall consist of the North American Court of Arbitration for Sport (CAS) Arbitrators who shall also be AAA Arbitrators (the Arbitrator Pool). Any reference to arbitrator in these rules shall also refer to an arbitration panel consisting of three arbitrators, if applicable. All arbitrators in the Arbitrator Pool shall be offered training by the AAA.*

Table of Contents (continued)
R-32.   Conduct of Proceedings
R-33.   Evidence
R-34.   Evidence by Affidavit and Posthearing Filing of Documents or Other Evidence

R-35.   Inspection or Investigation
R-36.   Interim Measures
R-37.   Closing of Hearing
R-38.   Reopening of Hearing
R-39.   Waiver of Rules
R-40.   Extensions of Time
R-41.   Serving of Notice
R-42.   Majority Decision
R-43.   Time of Award
R-44.   Form of Award
R-45.   Scope of Award
R-46.   Award upon Settlement
R-47.   Delivery of Award to Parties
R-48.   Modification of Award
R-49.   Release of Documents for Judicial Proceedings
R-49A.  Appeal Rights
R-50.   Applications to Court and Exclusion of Liability
R-51.   Administrative Fees
R-52.   Expenses
R-53.   Neutral Arbitrator's Compensation
R-54.   Deposits
R-55.   Interpretation and Application of Rules
R-56.   Suspension for Nonpayment

[1] The provisions in italics are modifications specifically adopted for proceedings under the United States Anti-Doping Agency (USADA) Protocol for Olympic Movement Testing (USADA Protocol) and supersede the provisions set forth in the Commercial Arbitration Rules of the American Arbitration Association (AAA) (which are otherwise set forth in regular non-italic type).

CL 0337

## R-4. Initiation by USADA

*Arbitration proceedings shall be initiated by USADA by sending a notice to the athlete or other person charged with a doping offense and the Administrator, which sets forth the sanction, consistent with the applicable International Federation rules, the mandatory Articles from the World Anti-Doping Code (Annex A of the USADA Protocol) and the United States Olympic Committee ("USOC") National Anti-Doping Policies, which USADA is seeking to have imposed and other possible sanctions, which could be imposed under the applicable International Federation rules the mandatory Articles from the World Anti-Doping Code (Annex A of the USADA Protocol) and the USOC National Anti-Doping Policies. The notice shall also advise the athlete of the name, telephone number and website of the Athlete Ombudsman and shall include a copy of the USADA Protocol and these Supplemental Procedures. The parties to the proceeding shall be USADA and the athlete or other person charged with a doping offense. The applicable International Federation shall also be invited to join in the proceeding as a party or as an observer. The athlete shall have the right to invite the Athlete Ombudsman as an observer, but under no circumstances may any party or arbitrator compel the Athlete Ombudsman to testify as a witness. If the parties agree or the athlete or other person charged with a doping offense requests and the arbitrator agrees, the hearing shall be open to the public.*

## R-5. Initiation under a Submission

Parties to any existing dispute may commence an arbitration under these rules by filing at any office of the AAA two copies of a written submission to arbitrate under these rules, signed by the parties. It shall contain a statement of the nature of the dispute, the names and addresses of all parties, any claims and counterclaims, the amount involved, if any, the remedy sought, and the hearing locale requested, together with the appropriate filing fee as provided in the schedule included with these rules. Unless the parties state otherwise in the submission, all claims and counterclaims will be deemed to be denied by the other party.

## R-6. Changes of Claim

After filing of a claim, if any party desires to make any new or different claim or counterclaim, it shall be made in writing and filed with the AAA. The party asserting such a claim or counterclaim shall provide a copy to the other party, who shall have 15 days from the date of such transmission within which to file an answering statement with the AAA. After the arbitrator is appointed, however, no new or different claim may be submitted except with the arbitrator's consent.

## R-7. Applicable Procedures

*All cases shall be administered in accordance with Sections R-1 through R-56 of these rules.*

The applicable procedure shall be the regular procedure (as opposed to the Expedited or Complex procedures) set forth in the AAA Commercial Arbitration Rules. At the request of any party, any time period set forth in these procedures may be shortened by the arbitrator(s) where doing so is reasonably necessary to resolve any athlete's eligibility before a protected competition, while continuing to protect the right of an athlete or other person charged with a doping offense to a fair hearing. The shortened time periods shall not prohibit the athlete's or other person's right to request three (3) arbitrators or choose a neutral arbitrator.

If a request to expedite the adjudication process is made prior to the arbitration panel being appointed, the AAA shall randomly select 1 arbitrator from the Arbitrator Pool, who shall determine whether the adjudication process shall be expedited and the schedule pursuant to which the process shall proceed. This randomly selected arbitrator shall not sit on the panel.

If a request to expedite the adjudication process is made after the arbitration panel is appointed, the arbitration panel shall determine whether the adjudication process shall be expedited and the schedule pursuant to which the process shall proceed.

The AAA shall immediately notify the Athlete Ombudsman and the USOC General Counsel's office of any arbitration that may be or has been initiated under these expedited procedures.

## R-8. Jurisdiction

(a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.

(b) The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

42

43

(c) A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

## R-9. Mediation

The reference to mediation has been deleted.

## R-10. Administrative Conference

At the request of any party or upon the AAA's own initiative, the AAA may conduct an administrative conference, in person or by telephone, with the parties and/or their representatives. The conference may address such issues as arbitrator selection, potential mediation of the dispute, potential exchange of information, a timetable for hearings and any other administrative matters. *There is no administrative fee for this service.*

## R-11. Fixing of Locale

*The locale of the arbitration shall be in the United States at a location determined by the Administrator using criteria established by the AAA but making every effort to give preference to the choice of the athlete or other person charged with a doping offense.*

## R-12. Qualifications of an Arbitrator

(a) Any neutral arbitrator appointed pursuant to Section R-13, R-14, R-15, or selected by mutual choice of the parties or their appointees, shall be subject to disqualification for the reasons specified in Section R-19. If the parties specifically so agree in writing, the arbitrator shall not be subject to disqualification for those reasons.

(b) Party-appointed arbitrators are expected to be neutral and may be disqualified for the reasons set forth in R-19.

## R-13. Appointment of the Arbitration Panel

*The arbitrator(s) shall be appointed in the following manner:*

(a) Immediately after the initiation of a proceeding by USADA (as set forth in R-4), the AAA shall send simultaneously to each party to the dispute an identical list of all names of persons in the Arbitrator Pool.

44

(b) *The proceeding shall be heard by 1 arbitrator from the list of persons in the Arbitrator Pool (as set forth in R-3), unless within 5 days following the initiation of the proceeding by USADA, a party elects instead to have the matter heard by a panel of 3 arbitrators from the Arbitrator Pool (Arbitration Panel). Such election shall be in writing and served on the Administrator and the other parties to the proceeding.*

(c) If the proceeding is to be heard by 1 arbitrator, that arbitrator shall be appointed as follows:

(i) *Within 10 days following receipt of the Arbitrator Pool list provided by the Administrator under R-13(a), the parties shall notify the Administrator of the name of the person who is mutually agreeable to the parties to serve as the arbitrator.*

(ii) *If the parties are unable to agree upon an arbitrator by the time set forth in paragraph (c)(i) of this rule, each party to the dispute shall have 5 additional days in which to strike up to one third of the Arbitrator Pool, rank the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable. From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve. If the parties fail to agree on any of the persons named, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists, the AAA shall have the power to make the appointment from among other members of the panel without the submission of additional lists.*

(d) If the proceeding is to be heard by a panel of three arbitrators, those arbitrators shall be appointed as follows:

(i) *Within 5 days following receipt of the Arbitrator Pool list provided by the Administrator under R-13(a) or from receipt of notice of the request to have a three (3) arbitrator panel, whichever is later, USADA, or USADA and the International Federation, if a party, shall designate 1 arbitrator from the Arbitrator Pool. The athlete or other person charged with a doping offense shall have an additional 5 days following receipt of the arbitrator choice from USADA, or from USADA and the International Federation, if a party, to designate 1 arbitrator from the Arbitrator Pool.*

45

CL 0339

(ii)    *The 2 arbitrators chosen by the parties shall choose the third arbitrator from among the remaining members of the Arbitrator Pool. The AAA shall furnish to the party-appointed arbitrators the Arbitrator Pool list. If the 2 arbitrators chosen by the parties are unable, within 7 days following their selection, to choose the third arbitrator, then the party-appointed arbitrators shall so notify the AAA which shall notify the parties. Within 5 days of receipt of notice from the AAA that the party-selected arbitrators are unable to reach or have not reached agreement, the parties shall then each strike up to one third of the Arbitrator Pool and rank the remaining members in order of preference. From among the persons who have not been stricken by the parties, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of 1 arbitrator to serve. The third arbitrator shall serve as Chair of the Arbitration Panel.*

### R-14. Direct Appointment by a Party

*The reference to Direct Appointment by a Party has been deleted.*

### R-15. Appointment of Neutral Arbitrator by Party-Appointed Arbitrators or Parties

*The reference to Appointment of Neutral Arbitrator by Party-Appointed Arbitrators or Parties has been deleted.*

### R-16. Nationality of Arbitrator

Where the parties are nationals or residents of different countries, the AAA, at the request of any party or on its own initiative, may appoint as a neutral arbitrator a national of a country other than that of any of the parties. The request must be made prior to the time set for the appointment of the arbitrator as agreed by the parties or set by these rules.

### R-17. Number of Arbitrators

*The number of arbitrators shall be 1 unless any party requests three.*

### R-18. Notice to Arbitrator of Appointment

*Notice of the appointment of the neutral arbitrator, whether appointed mutually by the parties or by the AAA, shall be sent to the arbitrator by the AAA, together with a copy of these rules, and the signed acceptance of the arbitrator shall be filed with the AAA prior to the opening of the first hearing.*

46

### R-19. Disclosure and Challenge Procedure

(a) Any person appointed as a neutral arbitrator shall disclose to the AAA any circumstance likely to affect impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives.

(b) Upon receipt of such information from the arbitrator or another source, the AAA shall communicate the information to the parties and, if it deems it appropriate to do so, to the arbitrator and others.

(c) Upon objection of a party to the continued service of a neutral arbitrator, the AAA shall determine whether the arbitrator should be disqualified and shall inform the parties of its decision, which shall be conclusive.

### R-20. Communication with Arbitrator

(a) *No party and no one acting on behalf of any party shall communicate unilaterally concerning the arbitration with a neutral arbitrator or a candidate for neutral arbitrator. Unless the parties agree otherwise or the arbitrator so directs, any communication from the parties to a neutral arbitrator shall be sent to the AAA for transmittal to the arbitrator. No party and no one acting on behalf of any party shall communicate with any arbitrator concerning the selection of the third arbitrator.*

(b) Once the panel has been constituted, no party and no one acting on behalf of any party shall communicate unilaterally concerning the arbitration with any arbitrator.

### R-21. Vacancies

(a) If for any reason an arbitrator is unable to perform the duties of the office, the AAA may, on proof satisfactory to it, declare the office vacant. Vacancies shall be filled in accordance with the applicable provisions of these rules.

(b) In the event of a vacancy in a panel of neutral arbitrators after the hearings have commenced, the remaining arbitrator or arbitrators may continue with the hearing and determination of the controversy, unless the parties agree otherwise.

(c) In the event of the appointment of a substitute arbitrator, the panel of arbitrators shall determine in its sole discretion whether it is necessary to repeat all or part of any prior hearings.

47

CL 0340

## R-22. Preliminary Hearing

(a) At the request of any party or at the discretion of the arbitrator or the AAA, the arbitrator may schedule as soon as practicable a preliminary hearing with the parties and/or their representatives. The preliminary hearing may be conducted by telephone at the arbitrator's discretion. *There is no administrative fee for the first preliminary hearing.*

(b) During the preliminary hearing, the parties and the arbitrator should discuss the future conduct of the case, including clarification of the issues and claims, a schedule for the hearings and any other preliminary matters.

## R-23. Exchange of Information

(a) At the request of any party or at the discretion of the arbitrator, consistent with the expedited nature of arbitration, the arbitrator may direct (i) the production of documents and other information, and (ii) the identification of any witnesses to be called.

(b) *Unless otherwise agreed by the parties or ordered by the arbitrator,* at least 5 business days prior to the hearing, the parties shall exchange copies of all exhibits they intend to submit at the hearing.

(c) The arbitrator is authorized to resolve any disputes concerning the exchange of information.

## R-24. Date, Time, and Place of Hearing

*Except as may be mutually agreed by the parties or upon the request of a single party for good cause as may be determined by the arbitrator, the hearing, including any briefing ordered by the arbitrator, shall be completed within three months of the appointment of the arbitrator. On good cause shown by any party, the hearing process shall be expedited as may be necessary in order the resolve the determination of an athlete's eligibility prior to any protected competition or team selection for a protected competition.*

## R-25. Attendance at Hearings

The arbitrator and the AAA shall maintain the privacy of the hearings unless the law provides to the contrary or the hearing is open to the public as prescribed in R-4. *(The athlete or other person charged with a doping offense shall have the right to invite the Athlete Ombudsman as an observer regardless).* Any person having a direct interest in the arbitration is entitled to attend hearings. The arbitrator shall otherwise have the power

to require the exclusion of any witness, other than a party or other essential person, during the testimony of any other witness. It shall be discretionary with the arbitrator to determine the propriety of the attendance of any other person other than a party and its representatives. *If the parties agree, or the athlete or other person charged with a doping offense requests and the arbitrator agrees, hearings may also be conducted telephonically.*

## R-26. Representation

Any party may be represented by counsel or other authorized representative. A party intending to be so represented shall notify the other party and the AAA of the name and address of the representative at least three days prior to the date set for the hearing at which that person is first to appear. When such a representative initiates an arbitration or responds for a party, notice is deemed to have been given.

## R-27. Oaths

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if it is required by law or requested by any party, shall do so.

## R-28. Stenographic Record

*Any party desiring a stenographic record of all or a portion of the hearing shall make arrangements directly with a stenographer and shall notify the other parties of these arrangements at least 3 days in advance of the start of the hearing or as required by the arbitrator. The requesting party or parties shall pay the cost of the transcript they request, whether full or partial. If a party seeks a copy of a transcript, full or partial, requested by another party, then the other party shall pay half the costs of the transcript to the requesting party. If the entire transcript is requested by the parties jointly, or if all or a portion of the transcript is determined by the arbitrator to be the official record of the proceeding or necessary to the arbitrator's decision, it must be provided to the arbitrator and made available to the other parties for inspection, at a date, time, and place determined by the arbitrator with the costs of transcription divided equally between the parties.* The arbitrator may award the costs of transcription for a transcript requested by the arbitration as expenses of the arbitration pursuant to R-45 and R-52.

**R-29. Interpreters**

Any party wishing an interpreter shall make all arrangements directly with the interpreter and shall assume the costs of the service.

**R-30. Postponements**

The arbitrator may postpone any hearing upon agreement of the parties, upon request of a party for good cause shown, or upon the arbitrator's own initiative. *A party or parties causing a postponement of a hearing will be charged a postponement fee, as set forth in the administrative fee schedule.*

**R-31. Arbitration in the Absence of a Party or Representative**

Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement. An award shall not be made solely on the default of a party. The arbitrator shall require the party who is present to submit such evidence as the arbitrator may require for the making of an award.

**R-32. Conduct of Proceedings**

(a) The claimant shall present evidence to support its claim. The respondent shall then present evidence to support its defense. Witnesses for each party shall also submit to questions from the arbitrator and the adverse party. The arbitrator has the discretion to vary this procedure, provided that the parties are treated with equality and that each party has the right to be heard and is given a fair opportunity to present its case.

(b) The arbitrator, exercising his or her discretion, shall conduct the proceedings with a view to expediting the resolution of the dispute and may direct the order of proof, bifurcate proceedings and direct the parties to focus their presentations on issues the decision of which could dispose of all or part of the case.

(c) The parties may agree to waive oral hearings in any case.

**R-33. Evidence**

(a) The parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator may deem necessary to an understanding and determination of the dispute. Conformity to legal rules of evidence shall not be necessary. All evidence shall be taken in the presence of all of the arbitrators and all of the parties, except where any of the parties is absent, in default or has waived the right to be present.

(b) The arbitrator shall determine the admissibility, relevance, and materiality of the evidence offered and may exclude evidence deemed by the arbitrator to be cumulative or irrelevant.

(c) The arbitrator shall take into account applicable principles of legal privilege, such as those involving the confidentiality of communications between a lawyer and client.

(d) An arbitrator or other person authorized by law to subpoena witnesses or documents may do so upon the request of any party or independently.

(e) *Hearings conducted pursuant to these rules shall incorporate mandatory Articles from the World Anti-Doping Code (Annex A of the USADA Protocol). If the World Anti-Doping Code is silent on an issue, then the USADA Protocol, the USOC National Anti-Doping Policies, and the International Federation's anti-doping rules shall apply as determined by the arbitrator.*

**R-34. Evidence by Affidavit and Post-hearing Filing of Documents or Other Evidence**

(a) The arbitrator may receive and consider the evidence of witnesses by declaration or affidavit, but shall give it only such weight as the arbitrator deems it entitled to after consideration of any objection made to its admission.

(b) If the parties agree, *if any party requests and the arbitrator agrees, or if* the arbitrator directs that documents or other evidence be submitted to the arbitrator after the hearing, the documents or other evidence shall be filed with the AAA for transmission to the arbitrator. All parties shall be afforded an opportunity to examine and respond to such documents or other evidence.

50

51

CL 0342

**R-35. Inspection or Investigation**

An arbitrator finding it necessary to make an inspection or investigation in connection with the arbitration shall direct the AAA to so advise the parties. The arbitrator shall set the date and time and the AAA shall notify the parties. Any party who so desires may be present at such an inspection or investigation. In the event that one or all parties are not present at the inspection or investigation, the arbitrator shall make an oral or written report to the parties and afford them an opportunity to comment.

**R-36. Interim Measures**

(a) The arbitrator may take whatever interim measures he or she deems necessary, including injunctive relief and measures for the protection or conservation of property and disposition of perishable goods.

(b) Such interim measures may take the form of an interim award, and the arbitrator may require security for the costs of such measures.

(c) A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

**R-37. Closing of Hearing**

The arbitrator shall specifically inquire of all parties whether they have any further proofs to offer or witnesses to be heard. Upon receiving negative replies or if satisfied that the record is complete, the arbitrator shall declare the hearing closed. If briefs are to be filed, the hearing shall be declared closed as of the final date set by the arbitrator for the receipt of briefs. If documents are to be filed as provided in Section R-34 and the date set for their receipt is later than that set for the receipt of briefs, the later date shall be the closing date of the hearing. The time limit within which the arbitrator is required to make the award shall commence, in the absence of other agreements by the parties, upon the closing of the hearing.

**R-38. Reopening of Hearing**

The hearing may be reopened on the arbitrator's initiative, or upon application of a party, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed on by the parties in the contract(s) out of which the controversy has arisen, the matter may not be reopened unless the parties agree on an extension of time. When no specific date is fixed in the contract, the arbitrator may reopen the hearing and shall have *10 days* from the closing of the reopened hearing within which to make an award. *The 30 day period for re-opening a hearing [under rule 38 of the Commercial Arbitration Rules] shall be reduced to 10 days.*

52

**R-39. Waiver of Rules**

Any party who proceeds with the arbitration after knowledge that any provision or requirement of these rules has not been complied with and who fails to state an objection in writing shall be deemed to have waived the right to object.

**R-40. Extensions of Time**

The parties may modify any period of time by mutual agreement. The AAA or the arbitrator may for good cause extend any period of time established by these rules, except the time for making the award. The AAA shall notify the parties of any extension.

**R-41. Serving of Notice**

(a) Any papers, notices, or process necessary or proper for the initiation or continuation of an arbitration under these rules, for any court action in connection therewith, or for the entry of judgment on any award made under these rules may be served on a party by mail addressed to the party, or its representative at the last known address or by personal service, in or outside the state where the arbitration is to be held, provided that reasonable opportunity to be heard with regard to the dispute is or has been granted to the party.

(b) The AAA, the arbitrator and the parties may also use overnight delivery or electronic facsimile transmission (fax), to give the notices required by these rules. Where all parties and the arbitrator agree, notices may be transmitted by electronic mail (Email), or other methods of communication.

(c) Unless otherwise instructed by the AAA or by the arbitrator, any documents submitted by any party to the AAA or to the arbitrator shall simultaneously be provided to the other party or parties to the arbitration.

**R-42. Majority Decision**

When the panel consists of more than one arbitrator, unless required by law or by the arbitration agreement, a majority of the arbitrators must make all decisions.

**R-43. Time of Award**

The award shall be made promptly by the arbitrator and, unless otherwise agreed by the parties or specified by law, no later than *10 days* from the date of closing the hearing, or,

53

if oral hearings have been waived, from the date of the AAA's transmittal of the final statements and proofs to the arbitrator. *The 30 day period given to the arbitrator under rule 43 of the Commercial Arbitration Rules for rendering an award shall be reduced to 10 days.*

### R-44. Form of Award

Any award shall be in writing and signed by a majority of the arbitrators. It shall be executed in the manner required by law. *In all cases, the arbitrator shall render a reasoned award.*

### R-45. Scope of Award

(a) The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract.

(b) In addition to a final award, the arbitrator may make other decisions, including interim, interlocutory, or partial rulings, orders, and awards. In any interim, interlocutory, or partial award, the arbitrator may assess and apportion the fees, expenses, and compensation related to such award as the arbitrator determines is appropriate.

(c) In the final award, the arbitrator shall assess the fees, expenses, and compensation provided in R-51, R-52, and R-53. The arbitrator may apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate.

(d) The award of the arbitrator(s) may include: (a) interest at such rate and from such date as the arbitrator(s) may deem appropriate; and (b) an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement.

(e) *All fees and expenses payable to the AAA, the arbitrator, or for witnesses or proof produced at the direct request of the arbitrator shall be paid solely by the USOC to the AAA.*

### R-46. Award upon Settlement

If the parties settle their dispute during the course of the arbitration and if the parties so request, the arbitrator may set forth the terms of the settlement in a "consent award."

### R-47. Delivery of Award to Parties

Parties shall accept as notice and delivery of the award the placing of the award or a true copy thereof in the mail addressed to the parties or their representatives at the last known addresses, personal or electronic service of the award, or the filing of the award in any other manner that is permitted by law.

*The AAA shall also provide a copy (preferably in electronic form) of the award to the appropriate National Governing body, the USOC General Counsel's office and the Athlete Ombudsman.*

### R-48. Modification of Award

Within 5 days after the transmittal of an award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, to correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already decided. The other parties shall be given 5 days to respond to the request. The arbitrator shall dispose of the request within 5 days after transmittal by the AAA to the arbitrator of the request and any response thereto. *The time periods provided for seeking modification of the award under rule 48 of the Commercial Arbitration Rules shall be reduced to 5 days.*

### R-49. Release of Documents for Judicial Proceedings

The AAA shall, upon the written request of a party, furnish to the party, at the party's expense, certified copies of any papers in the AAA's possession that may be required in judicial proceedings relating to the arbitration. *The AAA shall also furnish copies of documents required in connection with CAS proceedings.*

### R-49A. Appeal Rights

*The arbitration award may be appealed to CAS as provided in Annex A of the USADA Protocol, which incorporates the mandatory Articles on Appeals from the World Anti-Doping Code. Notice of appeal shall be filed with the Administrator within the time period provided in the CAS appellate rules. Appeals to CAS filed under these rules shall be heard in the United States. The decisions of CAS shall be final and binding on all parties and shall not be subject to any further review or appeal except as permitted by the Swiss Federal Judicial Organization Act or the Swiss Statute on Private International Law.*

54

55

**R-50. Applications to Court and Exclusion of Liability**

(a) No judicial proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate.

(b) Neither the AAA nor any arbitrator in a proceeding under these rules is a necessary party in judicial proceedings relating to the arbitration.

(c) Parties to an arbitration under these rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof.

(d) Neither the AAA nor any arbitrator shall be liable to any party for any act or omission in connection with any arbitration conducted under these rules.

**R-51. Administrative Fees**

As a not-for-profit organization, the AAA shall prescribe filing and other administrative fees and service charges to compensate it for the cost of providing administrative services. The fees in effect when the fee or charge is incurred shall be applicable.

The filing fee shall be advanced by the party or parties making a claim or counterclaim, subject to final apportionment by the arbitrator in the award.

The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees.

**R-52. Expenses**

The expenses of witnesses for *any party* shall be paid by the party producing such witnesses. All other expenses of the arbitration, including required travel and other expenses of the arbitrator, AAA representatives, and any witness and the cost of any proof produced at the direct request of the arbitrator, shall be borne *as detailed in R-45.*

**R-53. Neutral Arbitrator's Compensation**

(a) Arbitrators shall be compensated at a rate consistent with the *current CAS rates.*

(b) If there is disagreement concerning the terms of compensation, an appropriate rate shall be established with the arbitrator by the AAA and confirmed to the parties.

(c) Any arrangement for the compensation of a neutral arbitrator shall be made through the AAA and not directly between the parties and the arbitrator.

**R-54. Deposits**

The AAA may require the parties to deposit in advance of any hearings such sums of money as it deems necessary to cover the expense of the arbitration, including the arbitrator's fee, if any, and shall render an accounting to the parties and return any unexpended balance at the conclusion of the case.

**R-55. Interpretation and Application of Rules**

The arbitrator shall interpret and apply these rules insofar as they relate to the arbitrator's powers and duties. When there is more than one arbitrator and a difference arises among them concerning the meaning or application of these rules, it shall be decided by a majority vote. If that is not possible, either an arbitrator or a party may refer the question to the AAA for final decision. All other rules shall be interpreted and applied by the AAA.

**R-56. Suspension for Nonpayment**

If arbitrator compensation or administrative charges have not been paid in full, the AAA may so inform the parties in order that one of them may advance the required payment. If such payments are not made, the arbitrator may order the suspension or termination of the proceedings. If no arbitrator has yet been appointed, the AAA may suspend the proceedings.

CL 0345

ANNEX F



Time Line

## Approximate Timelines and Notices Under USADA Protocol
(This timeline is for general guidance only and does not create any obligation, requirement or right under the USADA Protocol)

| STEP IN PROCESS | NOTICE GOES TO |
|---|---|
| Urine provided by Athlete | |
| ~ 2 weeks | |
| Negative A laboratory report | Athlete, NGB & USOC[*] |
| Positive (A, Adverse) A lab report | Athlete, NGB & USOC |
| ~ 2 weeks | |
| B lab report (positive or negative) Notice of other potential doping violations | Athlete, NGB & USOC |
| ~ 3 weeks | |
| Review Panel Recommendation | Athlete, NGB, USOC, IF & WADA |
| ~ 10 days | |
| Notice that the athlete has accepted a sanction proposed by USADA | Athlete, NGB, USOC, IF & WADA - Public announcement of sanction |
| Notice of hearing | Athlete, IF (NGB, USOC & WADA but not as parties) |
| ~ 3 months | |
| AAA/CAS Decision | Athlete, IF, NGB, USOC & WADA Public announcement of sanction |
| 20 days | |
| Appeal of Athlete, USADA, WADA or IF of AAA decision to CAS | Athlete, IF, NGB, USOC & WADA |
| 3 months | |
| Decision by CAS on appeal | CAS decision is a public document |

Notes from USADA will include the date and location of the sample collection, the athlete's private number and name and the laboratory test result. The WADA accredited laboratories are required to give notice to WADA and release it directly any time there is a positive A or B test. However, that notice does not include the athlete's name (sample seal to be blacked out submitted only by number and by name). Most NGBs will, upon request, routinely forward the athlete's name to the IF and update the IF on the status of proceedings.

59

58

CL 0346

ANNEX G

**Language to be set forth in USADA correspondence offering an athlete the opportunity to waive analysis of the athlete's B specimen**

- The prohibited substance (or method) [identify substance or method] was reported by the laboratory as being present in the A specimen of your sample.

- The USADA Protocol requires that for a sample to be considered positive, the prohibited substance or method must be found by the laboratory in both the A specimen and B specimen of the athlete's sample.

- You and/or your representative have the right to be present, at your expense, to observe the B specimen opening and analysis.

- By waiving the testing of the B specimen, you accept the laboratory results, including the finding of [the substance or method identified] in your sample. Under applicable anti-doping rules, the finding of a prohibited substance or method in an athlete's sample constitutes a doping violation.

- The sanctions which may be imposed on you if a doping violation is found include [describe potential sanctions].

- You may wish to contact John Ruger, the USOC Athlete Ombudsman, who is completely independent of USADA, or your own personal attorney, for assistance or further information. Mr. Ruger may be reached at One Olympic Plaza, Colorado Springs, CO 80909; by telephone at (888)-ATHLETE; by fax at (303) 444-8626; or by email at john.ruger@usoc.org.

- A copy of the USADA Protocol with attachments is enclosed with this letter.

61

60

CL 0347

ANNEX H

Retirement Rules

In accordance with the USOC ADP, any athlete or other person enrolled in the USADA Out of Competition ("OOC") testing program who wishes to be removed from the program on account of retirement, must promptly notify in writing, USADA and the applicable National Governing Body ("NGB"). **Additionally, it is important for you to check with your particular International Federation ("IF") to ensure compliance with any required IF retirement procedures or policies.**

If you retire, you will be removed immediately from the USADA OOC testing program. In accordance with the USOC ADP, if you ever want to come out of retirement and return to eligible status, you must enroll in the USADA OOC testing program for at least six (6) months in advance of regaining eligible status. Furthermore, pursuant to the USOC policies, all athletes or other persons who are candidates for membership on the U.S. Olympic, Paralympic or Pan American teams must be enrolled in the USADA OOC testing program for a period up to twelve (12) months before the commencement of the competition. Additionally, it is important for you to confirm whether your particular IF has additional requirements in order for you to regain eligibility after retirement.

63

62

CL 0348

NOTES

65

NOTES

64

CL 0349

NOTES

67

NOTES

66

CL 0350



**UNITED STATES ANTI-DOPING AGENCY**

2550 Tenderfoot Hill Street, Suite 200

Colorado Springs, CO 80906

Phone: 1-719-785-2000

Fax: 1-719-785-2001

Toll-Free Phone: 1-866-601-2632

E-mail: usada@usantidoping.org

Web site: www.usantidoping.org

**USADA DRUG REFERENCE LINE**

1-800-233-0393 (within the U.S.)

1-719-785-2020 (outside the U.S.)

E-mail: drugreference@usantidoping.org.

CL 0351

### DCO Instructions for Locating Athletes for Out of Competition Testing

**Introduction**

1. These instructions are written for the sole purpose of guiding the Doping Control Officer ("DCO") in his/her attempt to locate an Athlete for OOC testing. These instructions do not supercede, replace or in any way modify the United States Anti-Doping Agency ("USADA") Procedures Regarding Missed Tests or the USADA Protocol for Olympic Movement Testing ("USADA Protocol"). While substantial variations from these Instructions may be raised by an Athlete as a defense to being assigned a missed test for being unavailable, these Instructions may not be raised as a defense to a positive test or a refusal to test.

2. Under the USADA Protocol, USADA has the authority to test any Athlete that it chooses, with or without cause or explanation. See USADA Protocol Sections 2, 4 and 5.

3. Unannounced OOC testing is at the core of effective doping control. See World Anti-Doping Code Article 5.1.2.

4. In conducting OOC testing, USADA balances the need for effective unannounced OOC testing and its responsibility to make reasonable efforts to locate an Athlete against the importance of minimizing disruption to the Athlete's training and personal schedule.

5. USADA will not allow the testing process to be used to harass any Athlete. See USADA Protocol Section 2.

**OOC Testing Hours and Locations**

6. USADA reserves the right to test an Athlete who is subject to USADA testing at any time and at any location.

7. The DCO may attempt to locate an Athlete for OOC testing at any location even if that location is not identified by the Athlete on his/her *Athlete Location Form* or update. However, the DCO is not required to go to locations other than those locations identified on the Athlete's *Athlete Location Form* or update.

8. The DCO is not required to visit locations identified by an Athlete on his/her *Athlete Location Form* or update in any particular order.

9. The DCO's first contact with an Athlete for OOC testing (including the time the first telephone message is left as described in Section 15) should normally occur between the hours of 6:30 a.m. and 9:30 p.m. Typical

Rev. December 10, 2003


EXHIBIT
**B**

DCO Instructions for Locating Athletes for OOC Testing

exceptions to this normal practice include, but are not limited to, the following:

   A.  The *Athlete Location Form*, update or other information provided by the Athlete indicates that the Athlete will be available for testing at times outside of these hours.

   B.  The Athlete, the Athlete's support personnel or another reliable source has indicated that the Athlete will be available for testing outside of these hours.

   C.  With prior approval or direction from USADA, the DCO may conduct testing outside of these hours if he/she has already been unsuccessful in attempts to locate the Athlete at the locations and times specified for that day on the *Athlete Location Form*, update or other information provided by the Athlete.

**Standards for Locating Athletes Prior to the DCO Reporting the Athlete Unavailable**

10. On the date of the attempt to test, the DCO must visit all locations identified by the Athlete for that date on the quarterly *Athlete Location Form* or update provided during the times listed by the Athlete. Although not required, it is recommended that the DCO's testing attempt be on a day that the Athlete is scheduled to be at more than one identified location.

11. The DCO is not required to visit unidentifiable locations or unspecific geographic locations listed by an Athlete.  For example, the DCO is not required to make an attempt to visit:  "P.O. Box," "roads surrounding my house," or "Mt. Hood."

12. The DCO must spend a reasonable amount of time at each location (approximately 45 minutes).

13. After one visit at each identified location during the time identified by the Athlete for that date, the DCO must attempt to contact the Primary Contact and/or the Athlete by telephone.

14. The DCO should attempt telephone contact in the following order (if provided by the Athlete):

   A.  Number for Primary Contact (if face-to-face contact is made with the Primary Contact during the attempt, the DCO does not have to call this number).

CL 0353

DCO Instructions for Locating Athletes for OOC Testing

    B.  Number of Athlete's cell phone.

    C.  Number of Athlete's home [if the Athlete's home is the final location attempted and face-to-face contact is made with a resident (roommate, family member or any other person at the residence), the DCO does not have to call the Athlete's home number, but should leave a message as described below with the person contacted at the home].

15. If contact is made at any of the contact numbers, the DCO should invite the Athlete to come to a specified location within two hours to be tested or leave a message to that effect. The specified location should be one of the locations identified by the Athlete on the *Athlete Location Form*, unless otherwise agreed to by the Athlete and the DCO.

16. The following are examples of several different types of messages:

    A.  Direct communication with the Primary Contact or a voice message left for the Primary Contact:

> "Hello, this is *<state your name>*. I am a Doping Control Officer with the United States Anti-Doping Agency. You were identified as the Primary Contact for *<state Athlete's name>*. This Athlete has been selected for out-of-competition testing. I have attempted to locate the Athlete for testing at the locations provided, and (s)he was not available for testing. The time is *<state time>* and I am located at *<state exact location and address>*. The Athlete has two hours to report for testing. If (s)he does not report for testing prior to *<two hours from time stated above>*, this attempt will be concluded."

    B.  Direct communication with the Athlete or a voice message left for the Athlete:

> "Hello, this is *<state your name>*. I am a Doping Control Officer with the United States Anti-Doping Agency. You have been selected for out-of-competition testing. I have attempted to locate you for testing at the locations you provided. The time is *<state time>* and I am located at *<state exact location and address>*. You have two hours to report for testing. If you do not report for testing prior to *<two hours from time stated above>*, this attempt will be concluded."

17. The two-hour time period starts after the DCO speaks to a person at any one of the telephone contact numbers or leaves a voice message at any one of the contact numbers.

                          Rev. December 10, 2003

CL 0354

DCO Instructions for Locating Athletes for OOC Testing

18. The DCO should only conclude a testing mission without waiting the two-hour period if the DCO is advised by the Athlete or the Athlete's Primary Contact that the Athlete will not be available for testing within the two-hour period.  No other individual is a valid source on which to conclude a test.

19. The following is an example of the message that should be left for the Athlete in the event the Primary Contact has stated that the Athlete will be unable to report for testing during the two-hour time period:

> "Hello, this is <state your name>. I am a Doping Control Officer with the United States Anti-Doping Agency.  You have been selected for out-of-competition testing.  I have attempted to locate you for testing at the locations you provided.  I have also spoken with your Primary Contact and (s)he told me that you are out of the area and unable to report for testing.  The time is <state time> and I have concluded my attempt."

20. Upon conclusion of an attempt to locate an Athlete for OOC testing, if an Athlete is unavailable for testing, the DCO should complete an *Unavailable Athlete Form* and submit it to USADA.

21. The DCO may contact USADA for assistance at any point prior to or during an attempt to locate an Athlete for OOC testing.

CL 0355

# EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| LANCE ARMSTRONG,<br><br>    *Plaintiff,*<br><br>*v.*<br><br>UNITED STATES ANTI-DOPING<br>AGENCY and TRAVIS TYGART, In His<br>Official Capacity as Chief Executive Officer<br>of the United States Anti-Doping Agency,<br><br>    *Defendants.* | Civ. Action No. 1:12-cv-00606-SS |

**AFFIDAVIT OF MATTHEW S. BARNETT**

I, Matthew Barnett, under penalty of perjury, declare and state:

1.      I am currently the President of 54 West Group, a sports consulting and sponsorship agency and a principle in the Law Offices of Matthew Barnett.

2.      I was a partner at the law firm of Holme Roberts & Owen during the American Arbitration Association ("AAA") and Court of Arbitration for Sport ("CAS") proceedings between the U.S. Anti-Doping Agency ("USADA") and Floyd Landis, and was deeply involved in both proceedings.

3.      I have read Mr. Armstrong's Amended Complaint and Jury Demand, where he states that:

> "Mr. Armstrong would also have no right to cross-examine witnesses and confront his accusers.  Defendants have, in past proceedings, permitted a witness to refuse to answer questions on cross-examination from an athlete's attorney, and yet denied respondent's motion to strike his testimony."

As his original Memorandum of Points and Authorities in Support of His Motion for Temporary Restraining Order and Preliminary Injunction to Preserve the Status Quo makes clear, the previous proceeding to which Mr. Armstrong is referring is the Floyd Landis case:

> "As applied here, USADA's processes are unfair because, among many other deficiencies, Mr. Armstrong would have . . . . No right to cross-examine witnesses and confront his accusers.  As an example, in the Floyd Landis USADA arbitration, Greg LeMond testified as a witness for USADA against Mr. Landis, but refused to answer certain questions on cross-examination from Mr. Landis's attorney.  The arbitration panel denied respondent's motion to strike his testimony.  *See USADA v. Landis*, No. 30 190 00847 06, ¶¶ 83, 291 (AAA Sept 20, 2007).  (Memorandum of Points and Authorities, p. 13)

It is ironic that Mr. Armstrong would point to the Landis case as an example of an AAA proceeding in which the athlete did not receive due process.  Indeed, the arbitration panel in *Landis* went to extraordinary lengths to provide a very fair hearing process for Mr. Landis.

4.      In the Landis case, counsel for Landis filed at least ten different motions, comprising more than 1000 pages of motions, briefs, and supporting documents.  The panel held multiple telephone hearings in relation to these motions, and a two-day in-person hearing on Landis's discovery requests and other matters in Los Angeles.  Before the arbitration hearing even started, the panel had issued four Procedural Orders and three Interlocutory Awards.

5.      The AAA panel's Procedural Orders required, *inter alia*, that:

- A summary of the testimony to be offered by any proposed witness be submitted by a specified date well in advance of the hearing.
- All proposed witnesses be made available for cross-examination.
- Any document upon which a party intended to rely be submitted by a date well in advance of the hearing.

6.     In its Procedural Orders and Interlocutory Awards, the panel also directed the following

measures, which were requested by Mr. Landis's counsel:

- That the hearing be conducted in the Pepperdine Law School Moot Courtroom and television cameras be permitted (USADA doping proceedings are normally not public); and
- That USADA produce live at the hearing six witnesses from the Paris laboratory identified by counsel for Mr. Landis to be available for cross-examination.
- USADA, the Paris laboratory, and the World Anti-Doping Agency ended up producing more than 3,000 pages of additional documents not required by the World Anti-Doping Code.
- The panel appointed its own independent expert (who had been recommended to the panel as an expert by Mr. Landis) to observe the retesting of samples, to supervise the reanalysis of electronic data files, and assist the panel during the hearing.

7.     The AAA hearing took place in May 2007, over the course of nine hearing days.  A

substantial part of the hearing was consumed by Mr. Landis's counsel's cross-examination of

Paris laboratory witnesses—including one not called by USADA on direct, but called by

Mr. Landis solely for cross-examination.  So much time was consumed by Mr. Landis's counsel

on cross-examination that, although the panel had ordered that the available time be allocated

equally between the parties, USADA ended up voluntarily ceding some of its allotted time to Mr.

Landis.

8.     The order of the majority of the AAA panel, in favor of USADA, consists of 84 single-

spaced pages, addressing in detail each of Mr. Landis's defenses.  The dissent written by the

third arbitrator, Mr. Campbell, is 26 pages long.  (Contrary to Mr. Armstrong's assertion, there is

no limitation on dissenting opinions in proceedings before the AAA.)

9.     The AAA panel's position on Landis's motion to strike the testimony of Mr. LeMond had

no impact on the fairness of the hearing.  As paragraphs 291 through 295 of the panel's Order in

*Landis* make clear (at pages 77-78 of the attached majority order), USADA called Greg LeMond,

a previous winner of the Tour de France, to testify on two points:  1) a statement made to him by

Floyd Landis which could be considered an admission of doping; and 2) threats made against

Mr. LeMond by Mr. Landis and his agent.  USADA's direct examination of Mr. Landis was

limited to these two points.  Mr. Landis's attorney was allowed to freely cross-examine

Mr. LeMond with respect to his direct testimony and all other points, except when he sought to

question Mr. LeMond's credibility by asking about a deposition that Mr. LeMond had given in

the insurance dispute between SCA and Lance Armstrong (where Mr. LeMond had purportedly

testified that Lance Armstrong told him that everyone used EPO), Mr. LeMond's personal

attorney refused to let the witness answer questions on the limited subject of Mr. Armstrong and

this deposition.   (We were advised by Mr. LeMond's counsel that, given the contentious history

between Mr. LeMond and Mr. Armstrong, he did not want his client to get sued by

Mr. Armstrong.)  Counsel for Mr. Landis immediately requested that the panel strike all of

Mr. LeMond's testimony.  The panel, in fact, gave Mr. Landis what he wanted with respect to

Mr. LeMond's testimony when it dismissed Mr. LeMond as a witness for refusing to answer the

Armstrong-related questions from Mr. Landis's attorney and found, in its order in favor of

Mr. Landis on all of the issues which were the subject of Mr. LeMond's testimony:

> "The panel is in no way making a determination regarding the credibility of Mr.
> LeMond's testimony for his cross-examination was inchoate when he was
> dismissed by the panel as a witness for refusing to answer questions ruled to have
> been proper cross-examination.  The Panel does accept the statement and
> explanation of Mr. Landis.  It places a characterisation on the conversation that it
> cannot amount to an admission.  Therefore, the Panel concludes that the
> Respondent's comment to Mr. LeMond did not amount to an admission of guilt or
> doping.  The facts here can be easily distinguished from those in *USADA v.
> Montgomery* CAS 2004/O/645."

The panel then found, based on Mr. Landis's testimony, that Landis's comment to Mr. LeMond did not amount to an admission, thus ruling entirely in Mr. Landis's favor on that point. (¶295 of the AAA Panel's Order in Landis is attached.)

10.    Mr. Landis chose to appeal the AAA decision to CAS, as permitted by the USADA Protocol.  Pursuant to CAS rules, that appeal resulted in a *de novo* hearing in New York, which lasted five days.  The CAS panel rendered a unanimous decision in favor of USADA.

Dated this 19th day of July, 2012.

_____
Matthew S. Barnett

STATE OF COLORADO          )
                           )  ss.
COUNTY OF EL PASO          )

Subscribed and sworn to before me by Matthew S. Barnett on this 19th day of July, 2012.

Witness my hand and official seal.

My commission expires:    12/23/15    _____
                                       Notary Public
                         Address:   90 S Cascade Ave Ste 1300
                                    Colorado Springs CO 80903

Witness my hand and official seal.



_____

#224044 v1 csp

# EXHIBIT G

# Statutes of the Bodies Working for the Settlement of Sports-Related Disputes[*]

**A      Joint Dispositions**

S1      In order to settle sports-related disputes through arbitration and mediation, two bodies are hereby created:

- **the International Council of Arbitration for Sport (the "ICAS")**
- **the Court of Arbitration for Sport (the "CAS").**

The disputes to which a federation, association or other sports-related body is party are a matter for arbitration in the sense of this Code, only insofar as the statutes or regulations of the said sports-related bodies or a specific agreement so provide.

The seat of the ICAS and the CAS is established in Lausanne, Switzerland.

S2      The task of the ICAS is to facilitate the settlement of sports-related disputes through arbitration or mediation and to safeguard the independence of the CAS and the rights of the parties. To this end, it looks after the administration and financing of the CAS.

S3      The CAS, which maintains a list of arbitrators, provides for the arbitral resolution of sports-related disputes through arbitration conducted by Panels composed of one or three arbitrators.

The CAS is comprised of an Ordinary Arbitration Division and an Appeals Arbitration Division.

The CAS, which maintains a list of mediators, provides for the resolution of sports-related disputes through mediation. The mediation procedure is governed by separate rules.

**B      The International Council of Arbitration for Sport (ICAS)**

**1      Composition**

---

[*] NOTE : In this Code, the masculine gender used in relation to any physical person shall, unless there is a specific provision to the contrary, be understood as including the feminine gender.

S4     The ICAS is composed of twenty members, namely high-level jurists appointed in the following manner :

    a.  four members are appointed by the International Sports Federations (the "IFs"), *viz.* three by the Summer Olympic IFs ("ASOIF") and one by the Winter Olympic IFs ("AIWF"), chosen from within or from outside their membership;

    b.  four members are appointed by the Association of the National Olympic Committees ("ANOC"), chosen from within or from outside its membership ;

    c.  four members are appointed by the International Olympic Committee ("IOC"), chosen from within or from outside its membership ;

    d.  four members are appointed by the twelve members of the ICAS listed above, after appropriate consultation with a view to safeguarding the interests of the athletes ;

    e.  four members are appointed by the sixteen members of the ICAS listed above and chosen from among personalities independent of the bodies designating the other members of the ICAS.

S5     The members of the ICAS are appointed for a renewable period of four years. Such nominations shall take place during the last year of the four-year cycle.

Upon their appointment, the members of the ICAS sign a declaration undertaking to exercise their function in a personal capacity, with total objectivity and independence, in conformity with this Code. They are, in particular, bound by the confidentiality obligation provided in Article R43.

The members of the ICAS may not appear on the list of CAS arbitrators nor act as counsel to one of the parties in proceedings before the CAS.

If a member of the ICAS resigns, dies or is prevented from carrying out his functions for any other reason, he is replaced, for the remaining period of his mandate, in conformity with the terms applicable to his appointment.

The ICAS may grant the title of Honorary Member to any former ICAS member who has made an exceptional contribution to the development of ICAS/CAS. The title of Honorary Member may be granted posthumously.

## 2     Attributions

S6     The ICAS exercises the following functions:

    1.     It adopts and amends this Code;

    2.     It elects from among its members for a renewable period of four years:
- the President,
- two Vice-Presidents who shall replace the President if necessary, by order of seniority in age; if the office of President becomes vacant, the senior Vice-President shall exercise the functions and responsibilities of the President until the election of the new President,

- the President of the Ordinary Arbitration Division and the President of the Appeals Arbitration Division of the CAS,
- the deputies of the two Division Presidents who can replace them in the event they are prevented from carrying out their functions;

The election of the President and of the Vice-Presidents shall take place at the ICAS meeting following the appointment of the ICAS members for a period of four years.

The election of the President, Vice-Presidents, Division Presidents and their deputies shall take place at the last ICAS plenary meeting before the end of the four-year cycle.

3.   It appoints the personalities who are to constitute the list of arbitrators and the list of CAS mediators and can remove them from those lists (Article S3);

4.   It exercises those functions concerning the challenge and removal of arbitrators, and any other functions which the Procedural Rules confer upon it;

5.   It looks after the financing of the CAS. To this end, *inter alia*;

5.1   it receives and manages the funds allocated to its operations, in conformity with the financial regulations of the CAS;

5.2   it approves the ICAS budget prepared by the CAS Court Office;

5.3   it approves the annual accounts of the CAS established by the CAS Court Office;

6.   It appoints the CAS Secretary General and terminates his duties upon proposal of the President;

7.   It supervises the activities of the CAS Court Office;

8.   If it deems such action appropriate, it sets up regional or local, permanent or *ad hoc* arbitration structures;

9.   If it deems such action appropriate, it creates a legal aid fund to facilitate access to CAS arbitration for natural persons without sufficient financial means. The operation of the legal aid fund including criteria to access the funds is set out in the CAS legal aid guidelines;

10.   It may take any other action which it deems likely to protect the rights of the parties and, in particular, to best guarantee the total independence of the arbitrators and to promote the settlement of sports-related disputes through arbitration.

S7   The ICAS exercises its functions either itself, or through the intermediary of its Board, comprising the President and two Vice-Presidents of the ICAS, the President of the Ordinary Arbitration Division and the President of the CAS Appeals Arbitration Division.

The ICAS may not delegate to the Board the functions listed under Article S6, paragraphs 1, 2, 5.2 and 5.3.

**3      Operation**

S8   1.   The ICAS meets whenever the activity of the CAS so requires, but at least once a year.

The ICAS constitutes a quorum when at least half its members participate in taking a decision. Decisions are taken during meetings or by correspondence by a majority of the votes cast. Abstentions and blank or spoiled votes are not taken into consideration in the calculation of the required majority. Voting by proxy is not allowed. Voting is held by secret ballot if the President so decides or upon the request of at least a quarter of the members present. The President has the casting vote in the event of a tie.

2. Any modification of this Code requires a majority of two thirds of the ICAS members. Furthermore, the provisions of item 1 above apply.

3. Any ICAS member is eligible to be a candidate for the ICAS Presidency. Registration for candidature shall be made in writing and filed with the Secretary General no later than four months prior to the election meeting.

The election of the ICAS President shall take place at the ICAS meeting following the appointment of the ICAS members for a period of four years. The quorum is three quarters of the ICAS members. The President is elected by an absolute majority of the members present. If there is more than one candidate for the position of President, successive rounds of voting shall be organized. The candidate having the least number of votes in each round shall be eliminated. In the case of a tie among two or more candidates, a vote between those candidates shall be organized and the candidate having the lesser number of votes shall be eliminated. If following this subsequent vote, there is still a tie, the candidate(s) who has(have) seniority of age is(are) selected.

If the quorum is not reached or if the last candidate in the voting rounds, or the only candidate, does not obtain an absolute majority in the last voting round, the current acting president shall remain in his position until a new election. The new election shall be held within four months of the unsuccessful election and in accordance with the above rules, with the exception that the President is elected by a simple majority when two candidates or less remain in competition.

The election is held by secret ballot. An election by correspondence is not allowed.

4. The CAS Secretary General takes part in the decision-making with a consultative voice and acts as Secretary to the ICAS.

S9   The President of the ICAS is also President of the CAS. He is also responsible for the ordinary administrative tasks within the remit of the ICAS.

S10   The Board of the ICAS meets at the invitation of the ICAS President.

The CAS Secretary General participates in the decision-making with a consultative voice and acts as Secretary to the Board.

The Board constitutes a quorum if three of its members participate in taking a decision. Decisions are taken during meetings or by correspondence with a simple majority of those voting; the President has the casting vote in the event of a tie.

S11   A member of the ICAS or the Board may be challenged when circumstances allow legitimate doubt to be cast on his independence *vis-à-vis* one of the parties to an arbitration which must be the subject of a decision by the ICAS or the Board pursuant to Article S6, paragraph 4. He shall spontaneously disqualify himself when the subject of a decision is an arbitration procedure in which a sports-related body to which he belongs appears as a party or in which a member of the law firm to which he belongs is an arbitrator or counsel.

The ICAS, with the exception of the challenged member, shall determine the directions with respect to the procedure for challenge.

The disqualified member shall not take part in the deliberations concerning the arbitration in question and shall not receive any information on the activities of the ICAS and the Board concerning such arbitration.

**C      The Court of Arbitration for Sport (CAS)**

**1      Mission**

S12   The CAS sets in operation Panels which have the task of providing for the resolution by arbitration and/or mediation of disputes arising within the field of sport in conformity with the Procedural Rules (Articles R27 et seq.).

To this end, the CAS attends to the constitution of Panels and the smooth running of the proceedings. It places the necessary infrastructure at the disposal of the parties.

The responsibilities of such Panels are, *inter alia*:

a.      to resolve the disputes that are referred to them through ordinary arbitration ;
b.      to resolve through the appeals arbitration procedure disputes concerning the decisions of federations, associations or other sports-related bodies, insofar as the statutes or regulations of the said sports-related bodies or a specific agreement so provide ;

**2      Arbitrators**

S13     The personalities designated by the ICAS, in conformity with Article S6, paragraph 3, appear on the CAS list for a renewable period of four years. The ICAS reviews the complete list every four years; the new list enters into force on 1 January of the following year.

There are at least one hundred and fifty arbitrators and at least fifty mediators.

S14     In establishing the list of CAS arbitrators, the ICAS shall call upon personalities with full legal training, recognized competence with regard to sports law and/or international arbitration, a good knowledge of sport in general and a good command of at least one CAS working language, whose names and qualifications are brought to the attention of the ICAS, including by the IOC, the IFs and the NOCs.

S15     The proposals for designating such arbitrators that shall constitute the list referred to in Article S14, shall be notified to the ICAS.

The list of CAS arbitrators and all modifications to such list are published.

S16     In appointing the personalities who appear on the list of arbitrators, the ICAS shall, wherever possible, ensure fair representation of the continents and of the different juridical cultures.

S17     Subject to the provisions of the Procedural Rules (Articles R27 et seq.), if a CAS arbitrator resigns, dies or is prevented from carrying out his functions for any other reason, he may be replaced, for the remaining period of his mandate, in conformity with the terms applicable to his appointment.

S18     The personalities who appear on the list of arbitrators may be called upon to serve on Panels constituted by either of the CAS Divisions.

Upon their appointment, the CAS arbitrators and mediators sign a declaration undertaking to exercise their functions personally with total objectivity and independence, and in conformity with the provisions of this Code.

CAS arbitrators and mediators may not act as counsel for a party before the CAS.

S19     CAS arbitrators and mediators are bound by the duty of confidentiality, which is provided for in the Code and in particular shall not disclose to any third party any facts or other information relating to proceedings conducted before CAS.

The ICAS may remove, temporarily or permanently, an arbitrator or a mediator from the list of CAS members if he violates any rule of this Code or if his action affects the reputation of ICAS/CAS.

### 3 Organisation of the CAS

S20 The CAS is composed of two divisions, the Ordinary Arbitration Division and the Appeals Arbitration Division.

    a. **The Ordinary Arbitration Division** constitutes Panels, whose task is to resolve disputes submitted to the ordinary procedure, and performs, through the intermediary of its President or his deputy, all other functions in relation to the smooth running of the proceedings conferred upon it by the Procedural Rules (Articles R27 et seq.).

    b. **The Appeals Arbitration Division** constitutes Panels, whose task is to resolve disputes concerning the decisions of federations, associations or other sports-related bodies insofar as the statutes or regulations of the said sports-related bodies or a specific agreement so provide. It performs, through the intermediary of its President or his deputy, all other functions in relation to the smooth running of the proceedings conferred upon it by the Procedural Rules (Articles R27 et seq.).

Arbitration proceedings submitted to the CAS are assigned by the CAS Court Office to one of these two Divisions according to their nature. Such assignment may not be contested by the parties or raised by them as a cause of irregularity. In the event of a change of circumstances during the procedure, the CAS Court Office, after consultation with the Panel, may assign the arbitration to another Division. Such re-assignment shall not affect the constitution of the Panel or the validity of the proceedings that have taken place prior to such re-assignment.

The CAS has a mediation system that it sets in motion in accordance with its regulations.

S21 The President of one or other of the two Divisions of the CAS may be challenged if circumstances exist that give rise to legitimate doubts with regard to his independence *vis-à-vis* one of the parties to an arbitration assigned to his Division. He shall spontaneously disqualify himself if, in arbitration proceedings assigned to his Division, one of the parties is a sports-related body to which he belongs, or if a member of the law firm to which he belongs is acting as arbitrator or counsel.

The ICAS, with the exception of the challenged member, shall determine the directions with respect to the procedure for challenge.

If the President of one of the two Divisions is challenged, the functions relating to the smooth running of the proceedings conferred upon him by the Procedural Rules (Articles R27 et seq.), are performed by his deputy or by the CAS President if the deputy is also challenged. The persons disqualified shall not receive any information

concerning the activities of the CAS regarding the arbitration proceedings which led to their disqualification.

S22    The CAS includes a Court Office composed of a Secretary General and one or more Counsel, who replace the Secretary General when required.

The CAS Court Office performs the functions which are assigned to it by this Code.

## D    Miscellaneous Provisions

S23    These Statutes are supplemented by the Procedural Rules adopted by the ICAS.

S24    The English text and the French text are authentic. In the event of any divergence, the French text shall prevail.

S25    These Statutes may be amended by decision of the ICAS, in conformity with Article S8.

S26    These Statutes and Procedural Rules come into force through the decision of the ICAS, taken by a two-thirds majority.

## Procedural Rules

### A   General Provisions

R27   Application of the Rules

These Procedural Rules apply whenever the parties have agreed to refer a sports-related dispute to the CAS. Such disputes may arise out of an arbitration clause inserted in a contract or regulations or of a later arbitration agreement (ordinary arbitration proceedings) or involve an appeal against a decision rendered by a federation, association or sports-related body where the statutes or regulations of such bodies, or a specific agreement provides for an appeal to the CAS (appeal arbitration proceedings).

Such disputes may involve matters of principle relating to sport or matters of pecuniary or other interests brought into play in the practice or the development of sport and, generally speaking, any activity related or connected to sport.

R28   Seat

The seat of the CAS and of each Arbitration Panel ("Panel") is Lausanne, Switzerland. However, should circumstances so warrant, and after consultation with all parties, the President of the Panel or, if he has not yet been appointed, the President of the relevant Division may decide to hold a hearing in another place and issues the appropriate directions related to such hearing.

R29   Language

The CAS working languages are French and English. In the absence of agreement between the parties, the President of the Panel or, if he has not yet been appointed, the President of the relevant Division, shall select one of these two languages as the language of the arbitration at the outset of the procedure, taking into account all pertinent circumstances. Thereafter, the procedure is conducted exclusively in the language selected, unless the parties and the Panel agree otherwise.

The parties may request that another language be selected provided that the Panel and the CAS Court Office agree. If agreed, the CAS Court Office determines with the Panel the conditions related to the choice of the language; if necessary, the Panel may order that the parties bear all or part of the translation and interpreting costs.

The Panel may order that all documents submitted in languages other than that of the procedure be filed together with a certified translation in the language of the procedure.

R30    Representation and Assistance

The parties may be represented or assisted by persons of their choice. The names, addresses, telephone and facsimile numbers of the persons representing the parties shall be communicated to the CAS Court Office, the other party and the Panel after its formation. A power of attorney must be provided.


R31    Notifications and Communications

All notifications and communications that the CAS or the Panel intend for the parties shall be made through the CAS Court Office. The notifications and communications shall be sent to the address shown in the arbitration request or the statement of appeal, or to any other address specified at a later date.

All arbitration awards, orders, and other decisions made by the CAS and the Panel shall be notified by any means permitting proof of receipt.

All communications from the parties intended for CAS or the Panel shall be sent by courier or facsimile to the CAS Court Office, failing which they shall be declared inadmissible. The request for arbitration, the statement of appeal and all written submissions must be filed by the parties in as many copies as there are other parties and arbitrators, together with one additional copy for the CAS itself. In case of non-compliance with this rule, the CAS will not proceed. The exhibits attached to any written submissions may be sent to the CAS Court Office by electronic mail; the CAS Court Office may then forward them by the same means.


R32    Time limits

The time limits fixed under this Code shall begin from the day after that on which notification by the CAS is received. Official holidays and non-working days are included in the calculation of time limits. The time limits fixed under this Code are respected if the communications by the parties are sent before midnight on the last day on which such time limits expire. If the last day of the time limit is an official holiday or a non-business day in the country where the notification has been made, the time limit shall expire at the end of the first subsequent business day.

Upon application on justified grounds, either the President of the Panel or, if he has not yet been appointed, the President of the relevant Division, may extend the time limits provided in these Procedural Rules, with the exception of the time limit for the filing of the statement of appeal, if the circumstances so warrant and provided that the initial time limit has not already expired. With the exception of the time limit for the statement of appeal, any request for a first extension of time of a maximum of five days can be decided by the CAS Secretary General.

The Panel or, if it has not yet been constituted, the President of the relevant Division may, upon application on justified grounds, suspend an ongoing arbitration for a limited period of time.

R33    Independence and Qualifications of Arbitrators

Every arbitrator shall be and remain independent of the parties and shall immediately disclose any circumstances likely to affect his independence with respect to any of the parties.

Every arbitrator shall appear on the list drawn up by the ICAS in accordance with the Statutes which are part of this Code, shall have a good command of the language of the arbitration and shall have the availability required to expeditiously complete the arbitration.

R34    Challenge

An arbitrator may be challenged if the circumstances give rise to legitimate doubts over his independence. The challenge shall be brought within seven days after the ground for the challenge has become known.

Challenges are in the exclusive power of the ICAS Board which may decide at its discretion to refer a case to the ICAS. The petition setting forth the facts giving rise to the challenge shall be lodged by a party. The ICAS Board or the ICAS shall rule on the challenge after the other party (-ies), the challenged arbitrator and the other arbitrators have been invited to submit written comments. The ICAS Board or the ICAS shall give brief reasons for its decision and may decide to publish it.

R35    Removal

An arbitrator may be removed by the ICAS if he refuses to or is prevented from carrying out his duties or if he fails to fulfil his duties pursuant to the present Code within a reasonable time. The ICAS may exercise such power through its Board in accordance with the Statutes which form part of this Code. The Board shall invite the parties, the arbitrator in question and the other arbitrators to submit written comments and shall give brief reasons for its decision.

R36    Replacement

In the event of resignation, death, challenge or removal of an arbitrator, such arbitrator shall be replaced in accordance with the provisions applicable to his appointment. Unless otherwise agreed by the parties or otherwise decided by the Panel, the proceedings shall continue without repetition of the procedure which took place prior to the replacement.

R37    Provisional and Conservatory Measures

No party may apply for provisional or conservatory measures under these Procedural Rules before the request for arbitration or the statement of appeal, which implies the exhaustion of internal remedies, has been filed with the CAS.

The President of the relevant Division, prior to the transfer of the file to the Panel, or thereafter the Panel may, upon application by one of the parties, make an order for provisional or conservatory measures. In agreeing to submit to these Procedural Rules any dispute subject to appeal arbitration proceedings, the parties expressly waive their rights to request such measures from state authorities. This waiver does not apply to provisional or conservatory measures in connection with disputes subject to ordinary arbitration proceedings.

If an application for provisional measures is filed, the President of the relevant Division or the Panel invites the opponent to express his position within ten days or within a shorter time limit if circumstances so require. The President of the relevant Division or the Panel shall issue an order within a short time and shall rule first on the CAS jurisdiction. The Division President may terminate the arbitration procedure if he rules that the CAS has manifestly no jurisdiction. In case of utmost urgency, the President of the relevant Division, prior to the transfer of the file to the Panel, or thereafter the President of the Panel may issue an order upon mere presentation of the application, provided that the opponent is heard subsequently.

Provisional and conservatory measures may be made conditional upon the provision of security.

## B      Special Provisions Applicable to the Ordinary Arbitration Procedure

R38      Request for Arbitration

The party intending to submit a reference to arbitration under these Procedural Rules shall file a request with the CAS containing :
- the name and full address of the Respondent(s);
- a brief statement of the facts and legal argument, including a statement of the issue to be submitted to the CAS for determination;
- the Claimant's request for relief;
- a copy of the contract containing the arbitration agreement or of any document providing for arbitration in accordance with these Procedural Rules;
- any relevant information about the number and choice of the arbitrator(s), in particular if the arbitration agreement provides for three arbitrators, the name and address of the arbitrator chosen by the Claimant from the CAS list of arbitrators.

Upon filing its request, the Claimant shall pay the Court Office fee provided in Article R64.1.

If the above-mentioned requirements are not fulfilled when the request for arbitration is filed, the CAS Court Office shall grant once only a short deadline to the Claimant to complete his request, failing which it shall be deemed withdrawn.

R39     Initiation of the Arbitration by the CAS and Answer – CAS Jurisdiction

Unless it is apparent from the outset that there is manifestly no arbitration agreement referring to the CAS, the CAS Court Office shall take all appropriate actions to set the arbitration in motion. To this effect, it shall in particular communicate the request to the Respondent, call upon the parties to express themselves on the law applicable to the merits of the dispute and set time limits for the Respondent to submit any relevant information about the number and choice of the arbitrator(s), in particular to appoint an arbitrator from the CAS list, as well as to file an answer to the request for arbitration. The answer shall contain :

• a brief statement of the defence;
• any defence of lack of jurisdiction;
• any counterclaim.

The Respondent may request that the time limit for the filing of the answer be fixed after the payment by the Claimant of the advance of costs provided by Art. R64.2 of this Code.

The Panel shall rule on its own jurisdiction. It shall rule on its jurisdiction irrespective of any legal action already pending before a State court or another arbitral tribunal relating to the same object between the same parties, unless substantive grounds require a suspension of the proceedings.

When an objection to the CAS jurisdiction is raised, the CAS Court Office or the Panel, if already constituted, shall invite the parties to file written submissions on the CAS jurisdiction. In general, the arbitral tribunal may rule on its jurisdiction either in a preliminary decision or in an award on the merits.

Where a party files a request for arbitration related to an arbitration agreement and facts similar to those being the subject of a pending ordinary procedure before the CAS, the President of the Panel, or if he has not yet been appointed, the President of the Division, may, after consulting the parties, decide to consolidate the two procedures.

R40     Formation of the Panel

R40.1   Number of Arbitrators

The Panel is composed of one or three arbitrators. If the arbitration agreement does not specify the number of arbitrators, the President of the Division shall determine the number, taking into account the amount in dispute and the complexity of the dispute.

R40.2   Appointment of the Arbitrators

The parties may agree on the method of appointment of the arbitrators from the CAS list. In the absence of an agreement, the arbitrators shall be appointed in accordance with the following paragraphs.

If, by virtue of the arbitration agreement or a decision of the President of the Division, a sole arbitrator is to be appointed, the parties may select him by mutual agreement within a time limit of fifteen days set by the CAS Court Office upon receipt of the request. In the absence of an agreement being reached within that time limit, the President of the Division shall proceed with the appointment.

If, by virtue of the arbitration agreement or a decision of the President of the Division, three arbitrators are to be appointed, the Claimant shall nominate its arbitrator in the request or within the time limit set in the decision on the number of arbitrators and the Respondent shall nominate its arbitrator within the time limit set by the CAS Court Office upon receipt of the request. In the absence of such appointment, the President of the Division shall proceed with the appointment in lieu of the parties. The two arbitrators so appointed shall select the President of the Panel by mutual agreement within a time limit set by the CAS Court Office. In the absence of an agreement being reached within that time limit, the President of the Division shall appoint the President of the Panel in lieu of the two arbitrators.

R40.3   Confirmation of the Arbitrators and Transfer of the File

Any arbitrator  nominated by the parties or by other arbitrators shall only be deemed appointed after confirmation by the President of the Division. Before proceeding with such confirmation, the latter shall ascertain that the arbitrator fulfils the requirements of Article R33.

Once the Panel is formed, the CAS Court Office takes notice of the formation and transfers the file to the arbitrators unless none of the parties has paid an advance of costs provided by Art. R64.2 of the Code.

An *ad hoc* clerk may be appointed to assist the Panel. He must be independent from the parties. His fees shall be included in the arbitration costs.

R41   Multiparty Arbitration

R41.1   Plurality of Claimants / Respondents

If the request for arbitration names several Claimants and/or Respondents, the CAS shall proceed with the formation of the Panel in accordance with the number of arbitrators and the method of appointment agreed by all parties. In the absence of such an agreement, the President of the Division shall decide on the number of arbitrators in accordance with Article R40.1.

If a sole arbitrator is to be appointed, Article R40.2 shall apply. If three arbitrators are to be appointed and there are several Claimants, the Claimants shall jointly nominate an arbitrator. If three arbitrators are to be appointed and there are several Respondents, the Respondents shall jointly nominate an arbitrator. In the absence of such a joint nomination, the President of the Division shall proceed with the appointment in lieu of the Claimants/Respondents. If there are three or more parties with divergent interests, both arbitrators shall be appointed in accordance with the agreement between the parties. In the absence of such agreement, the arbitrators shall be appointed by the President of the Division in accordance with Article R40.2. In all cases, the arbitrators shall select the President of the Panel in accordance with Article R40.2.

### R41.2   Joinder

If a Respondent intends to cause a third party to participate in the arbitration, it shall mention it in its answer, together with the reasons therefor, and file an additional copy of its answer. The CAS Court Office shall communicate this copy to the person whose participation is requested and set such person a time limit to state its position on its participation and to submit a response pursuant to Article R39. It shall also set a time limit for the Claimant to express its position on the participation of the third party.

### R41.3   Intervention

If a third party intends to participate as a party to the arbitration, it shall file with the CAS an application to this effect, together with the reasons therefor within 10 days after the arbitration has become known to the intervenor but before the hearing or before the closing of the evidentiary proceedings if no hearing is held. The CAS Court Office shall communicate a copy of this application to the parties and set a time limit for them to express their position on the participation of the third party and to file, to the extent applicable, an answer pursuant to Article R39.

### R41.4   Joint Provisions on Joinder and Intervention

A third party may only participate in the arbitration if it is bound by the arbitration agreement or if itself and the other parties agree in writing.

Upon expiration of the time limit set in Articles R41.2 and R41.3, the President of the Division or the Panel, if it has already been appointed, shall decide on the participation of the third party, taking into account, in particular, the prima facie existence of an arbitration agreement as referred to in Article R39 above. The decision of the President of the Division shall be without prejudice to the decision of the Panel on the same matter.

If the President of the Division accepts the participation of the third party, the CAS shall proceed with the formation of the Panel in accordance with the number of arbitrators and the method of appointment agreed by all parties. In the absence of such an agreement between the parties, the President of the Division shall decide on the

number of arbitrators in accordance with Article R40.1. If a sole arbitrator is to be appointed, Article R40.2 shall apply. If three arbitrators are to be appointed, the arbitrators shall be appointed by the President of the Division and shall nominate the President of the Panel in accordance with Article R40.2.

Regardless of the decision of the Panel on the participation of the third party, the formation of the Panel cannot be challenged. In the event that the Panel accepts the participation, it shall, if required, issue related procedural directions.

After consultation with the parties, the Panel shall determine the status of the third party and its rights in the procedure.

After consultation with the parties, the Panel may allow the filing of *amicus curiae* briefs.

R42   Conciliation

The President of the Division, before the transfer of the file to the Panel, and thereafter the Panel may at any time seek to resolve the dispute by conciliation. Any settlement may be embodied in an arbitral award rendered by consent of the parties.

R43   Confidentiality

Proceedings under these Procedural Rules are confidential. The parties, the arbitrators and the CAS undertake not to disclose to any third party any facts or other information relating to the dispute or the proceedings without the permission of the CAS. Awards shall not be made public unless all parties agree or the Division President so decides.

R44   Procedure before the Panel

R44.1   Written Submissions

The procedure before the Panel comprises written submissions and, if the Panel deems it appropriate, an oral hearing. Upon receipt of the file, the President of the Panel, if appropriate, shall issue directions in connection with the written submissions. As a general rule, there shall be one statement of claim, one response and, if the circumstances so require, one reply and one second response. The parties may, in the statement of claim and in the response, raise claims not contained in the request for arbitration and in the answer to the request. Thereafter, no party may raise any new claim without the consent of the other party.

Together with their written submissions, the parties shall produce all written evidence upon which they intend to rely. After the exchange of the written submissions, the parties shall not be authorized to produce further written evidence, except by mutual agreement or if the Panel so permits on the basis of exceptional circumstances.

In their written submissions, the parties shall list the name(s) of any witnesses, including a brief summary of their expected testimony, and the name(s) of any experts, stating their area of expertise, which they intend to call and state any other evidentiary measure which they request. Any witness statements shall be filed together with the parties' submissions.

If a counterclaim and/or jurisdictional objection is filed, the CAS Court Office shall fix a time limit for the filing of an answer to the counterclaim and/or jurisdictional objection by the Claimant.

R44.2  Hearing

The President of the Panel shall issue directions with respect to the hearing as soon as possible and in particular set the hearing date. As a general rule, there shall be one hearing during which the Panel hears the parties, the witnesses and the expert as well as the parties' final oral arguments, for which the Respondent has the floor last.

The President of the Panel shall conduct the hearing and ensure that the statements made are concise and limited to the subject of the written presentations, to the extent that these presentations are relevant. Unless the parties agree otherwise, the hearings are not public. Minutes of the hearing may be taken. Any person heard by the Panel may be assisted by an interpreter at the cost of the party which called such person.

The parties call to be heard by the Panel such witnesses and experts which they have specified in their written submissions. The parties are responsible for the availability and costs of the witnesses and experts called to be heard.

The President of the Panel may decide to conduct a hearing by video-conference or to hear some parties, witnesses and experts via tele- or video-conference. With the agreement of the parties, he may also exempt a witness/expert from appearing at the hearing if the latter has previously filed a statement.

The Panel may limit or disallow the appearance of any witness or expert, or any part of their testimony, on the grounds of irrelevance.

Before hearing any witness, expert or interpreter, the Panel shall solemnly invite such person to tell the truth, subject to the sanctions of perjury.

Once the hearing is closed, the parties shall not be authorized to produce further written pleadings, unless the Panel so orders.

After consulting the parties, the Panel may, if it deems itself to be sufficiently well informed, decide not to hold a hearing.

R44.3  Evidentiary Proceedings Ordered by the Panel

A party may request the Panel to order the other party to produce documents in its custody or under its control. The party seeking such production shall demonstrate that the documents are likely to exist and to be relevant.

If it deems it appropriate to supplement the presentations of the parties, the Panel may at any time order the production of additional documents or the examination of witnesses, appoint and hear experts, and proceed with any other procedural act. The Panel may order the parties to contribute to any additional costs related to the hearing of witnesses and experts.

The Panel shall consult the parties with respect to the appointment and terms of reference of such expert. The expert appointed by the Panel shall be and remain independent of the parties and shall immediately disclose any circumstances likely to affect his independence with respect to any of the parties.

R44.4   Expedited Procedure

With the consent of the parties, the Division President or the Panel may proceed in an expedited manner and shall issue appropriate directions therefor.

R44.5   Default

If the Claimant fails to submit its statement of claim in accordance with Article R44.1 of the Code, the request for arbitration shall be deemed withdrawn.

If the Respondent fails to submit its response in accordance with Article R44.1 of the Code, the Panel may nevertheless proceed with the arbitration and deliver an award.

If any of the parties is duly summoned yet fails to appear at the hearing, the Panel may nevertheless proceed with the hearing.

R45   Law Applicable to the Merits

The Panel shall decide the dispute according to the rules of law chosen by the parties or, in the absence of such a choice, according to Swiss law. The parties may authorize the Panel to decide ex aequo et bono.

R46   Award

The award shall be made by a majority decision, or, in the absence of a majority, by the President alone. The award shall be written, dated and signed. Unless the parties agree otherwise, it shall briefly state reasons. The signature of the President of the Panel shall suffice. Before the award is signed, it shall be transmitted to the CAS Secretary General who may make rectifications of pure form and may also draw the attention of the Panel to fundamental issues of principle. Dissenting opinions are not recognized by the CAS and are not notified.

The award notified by the CAS Court Office shall be final and binding upon the parties. It may not be challenged by way of an action for setting aside to the extent that the parties have no domicile, habitual residence, or business establishment in Switzerland and that they have expressly excluded all setting aside proceedings in the arbitration agreement or in an agreement entered into subsequently, in particular at the outset of the arbitration.

## C    Special Provisions Applicable to the Appeal Arbitration Procedure

**R47    Appeal**

An appeal against the decision of a federation, association or sports-related body may be filed with the CAS insofar as the statutes or regulations of the said body so provide or as the parties have concluded a specific arbitration agreement and insofar as the Appellant has exhausted the legal remedies available to him prior to the appeal, in accordance with the statutes or regulations of the said sports-related body.

An appeal may be filed with the CAS against an award rendered by the CAS acting as a first instance tribunal if such appeal has been expressly provided by the rules applicable to the procedure of first instance.

**R48    Statement of Appeal**

The Appellant shall submit to the CAS a statement of appeal containing :

- the name and full address of the Respondent(s);
- a copy of the decision appealed against;
- the Appellant's request for relief;
- the nomination of the arbitrator chosen by the Appellant from the CAS list, unless the parties have agreed to a Panel composed of a sole arbitrator;
- if applicable, an application to stay the execution of the decision appealed against, together with reasons;
- a copy of the provisions of the statutes or regulations or the specific agreement providing for appeal to the CAS.

Upon filing the statement, the Appellant shall pay the Court Office fee provided for under Article R64.1 or Article R65.2.

If the above-mentioned requirements are not fulfilled when the statement of appeal is filed, the CAS Court Office shall grant once only a short deadline to the Appellant to complete his statement, failing which it shall be deemed withdrawn.

**R49    Time limit for Appeal**

In the absence of a time limit set in the statutes or regulations of the federation, association or sports-related body concerned, or of a previous agreement, the time limit for appeal shall be twenty-one days from the receipt of the decision appealed against. After having consulted the parties, the Division President may refuse to entertain an appeal if it is manifestly late.

R50    Number of Arbitrators

The appeal shall be submitted to a Panel of three arbitrators, unless the Appellant establishes at the time of the statement of appeal that the parties have agreed to a Panel composed of a sole arbitrator or, in the absence of any agreement between the parties regarding the number of arbitrators, the President of the Division decides to submit the appeal to a sole arbitrator, taking into account the circumstances of the case.

When two or more cases have manifestly the same object, the President of the Appeals Arbitration Division may invite the parties to agree to refer these cases to the same Panel; in the absence of agreement between the parties, the President of the Division shall decide.

R51    Appeal Brief

Within ten days following the expiry of the time limit for the appeal, the Appellant shall file with the CAS a brief stating the facts and legal arguments giving rise to the appeal, together with all exhibits and specification of other evidence upon which he intends to rely or shall inform the CAS Court Office in writing that the statement of appeal shall be considered as the appeal brief, failing which the appeal shall be deemed withdrawn.

In his written submissions, the Appellant shall specify the name(s) of any witnesses, including a brief summary of their expected testimony, and the name(s) of any experts, stating their area of expertise, whom he intends to call and state any other evidentiary measure which he requests. The witness statements, if any, shall be filed together with the appeal brief, unless the President of the Panel decides otherwise.

R52    Initiation of the Arbitration by the CAS

Unless it is apparent from the outset that there is manifestly no arbitration agreement referring to the CAS or that the agreement is manifestly not related to the dispute at stake, the CAS shall take all appropriate actions to set the arbitration in motion. To this effect, the CAS Court Office shall, in particular, communicate the statement of appeal to the Respondent, and the President of the Division shall proceed with the formation of the Panel in accordance with Articles R53 and R54. If applicable, he shall also decide promptly on an application for a stay or for interim measures.

The CAS shall send a copy of the statement of appeal and appeal brief, for information, to the authority which has issued the decision challenged.

With the agreement of the parties, the Panel or, if it has not yet been appointed, the President of the Division may proceed in an expedited manner and shall issue appropriate directions for such procedure.

Where a party files a statement of appeal in connection with a decision which is the subject of a pending appeal before the CAS, the President of the Panel, or if he has not yet been appointed, the President of the Division, may, after consulting the parties, decide to consolidate the two procedures.

R53      Nomination of Arbitrator by the Respondent

Unless the parties have agreed to a Panel composed of a sole arbitrator or the President of the Division considers that the appeal should be submitted to a sole arbitrator, the Respondent shall  nominate an arbitrator within ten days after receipt of the statement of appeal. In the absence of a nomination within such time limit, the President of the Division shall proceed with the appointment in lieu of the Respondent.

R54      Appointment of the Sole Arbitrator or of the President and Confirmation of the Arbitrators by the CAS

If, by virtue of the parties' agreement or of a decision of the President of the Division, a sole arbitrator is to be appointed, the President of the Division shall appoint the sole arbitrator upon receipt of the motion for appeal.

If three arbitrators are to be appointed, the President of the Division shall appoint the President of the Panel upon  nomination of the arbitrator by the Respondent and after having consulted the arbitrators. The arbitrators  nominated by the parties shall only be deemed appointed after confirmation by the President of the Division. Before proceeding with such confirmation, the President of the Division shall ensure that the arbitrators fulfil the requirements of Article R33.

Once the Panel is formed, the CAS Court Office takes notice of the formation of the Panel and transfers the file to the arbitrators, unless none of the parties has paid an advance of costs in accordance with Article R64.2 of the Code.

An *ad hoc* clerk may be appointed to assist the Panel. He must be independent from the parties. His fees shall be included in the arbitration costs.

In addition, Article R41 is applicable mutatis mutandis to the appeals arbitration procedure, except that the President of the Panel is appointed by the President of the Appeals Division.

R55      Answer of the Respondent – CAS Jurisdiction

Within twenty days from the receipt of the grounds for the appeal, the Respondent shall submit to the CAS an answer containing :

- a statement of defence;
- any defence of lack of jurisdiction;
- any exhibits or specification of other evidence upon which the Respondent intends to rely;
- the name(s) of any witnesses, including a brief summary of their expected testimony; the witness statements, if any, shall be filed together with the answer, unless the President of the Panel decides otherwise;
- the name(s) of any experts, stating their area of expertise, whom he intends to call and state any other evidentiary measure which he requests.

If the Respondent fails to submit its response by the given time limit, the Panel may nevertheless proceed with the arbitration and deliver an award.

The Respondent may request that the time limit for the filing of the answer be fixed after the payment by the Appellant of the advance of costs in accordance with Art. R64.2 of this Code.

The Panel shall rule on its own jurisdiction. It shall rule on its jurisdiction irrespective of any legal action already pending before a State court or another arbitral tribunal relating to the same object between the same parties, unless substantive grounds require a suspension of the proceedings.

When an objection to the CAS jurisdiction is raised, the CAS Court Office or the Panel, if already constituted, shall invite the parties to file written submissions on the CAS jurisdiction. In general, the arbitral tribunal may rule on its jurisdiction either in a preliminary decision or in an award on the merits.

R56    Appeal and answer complete - Conciliation

Unless the parties agree otherwise or the President of the Panel orders otherwise on the basis of exceptional circumstances, the parties shall not be authorized to supplement or amend their requests or their argument, nor to produce new exhibits, nor to specify further evidence on which they intend to rely after the submission of the appeal brief and of the answer.

The Panel may at any time seek to resolve the dispute by conciliation. Any settlement may be embodied in an arbitral award rendered by consent of the parties.

R57    Scope of Panel's Review, Hearing

The Panel shall have full power to review the facts and the law. It may issue a new decision which replaces the decision challenged or annul the decision and refer the case back to the previous instance. Upon transfer of the file, the President of the Panel shall issue directions in connection with the hearing for the examination of the parties, the witnesses and the experts, as well as for the oral arguments. He may also request communication of the file of the federation, association or sports-related body, whose decision is the subject of the appeal. Articles R44.2 and R44.3 shall apply.

After consulting the parties, the Panel may, if it deems itself to be sufficiently well informed, decide not to hold a hearing. At the hearing, the proceedings take place in camera, unless the parties agree otherwise.

If any of the parties is duly summoned yet fails to appear, the Panel may nevertheless proceed with the hearing.

R58   Law Applicable to the merits

The Panel shall decide the dispute according to the applicable regulations and the rules of law chosen by the parties or, in the absence of such a choice, according to the law of the country in which the federation, association or sports-related body which has issued the challenged decision is domiciled or according to the rules of law, the application of which the Panel deems appropriate. In the latter case, the Panel shall give reasons for its decision.

R59   Award

The award shall be rendered by a majority decision, or in the absence of a majority, by the President alone. It shall be written, dated and signed. The award shall state brief reasons. The signature of the President shall suffice.

Before the award is signed, it shall be transmitted to the CAS Secretary General who may make rectifications of pure form and may also draw the attention of the Panel to fundamental issues of principle. Dissenting opinions are not recognized by the CAS and are not notified.

The Panel may decide to communicate the operative part of the award to the parties, prior to the reasons. The award shall be enforceable from such written communication.

The award, notified by the CAS Court Office, shall be final and binding upon the parties. It may not be challenged by way of an action for setting aside to the extent that the parties have no domicile, habitual residence, or business establishment in Switzerland and that they have expressly excluded all setting aside proceedings in the arbitration agreement or in an agreement entered into subsequently, in particular at the outset of the arbitration.

The operative part of the award shall be communicated to the parties within three months after the transfer of the file to the Panel. Such time limit may be extended by the President of the Appeals Arbitration Division upon a reasoned request from the President of the Panel.

The award, a summary and/or a press release setting forth the results of the proceedings shall be made public by the CAS, unless both parties agree that they should remain confidential.

**D      Special Provisions Applicable to the Consultation Proceedings**

R60      [abrogated]

R61      [abrogated]

R62      [abrogated]

**E      Interpretation**

R63      A party may apply to the CAS for the interpretation of an award issued in an ordinary or appeals arbitration, whenever the operative part of the award is unclear, incomplete, ambiguous or whenever its components are self-contradictory or contrary to the reasons, or whenever the award contains clerical mistakes or a miscalculation of figures.

When an application for interpretation is filed, the President of the relevant Division shall review whether there are grounds for interpretation. If so, he shall submit the request to the Panel which has rendered the award for interpretation. Any Panel members who are unable to act shall be replaced in accordance with Article R36. The Panel shall rule on the request within one month following the submission of the request to the Panel.

**F      Costs of the Arbitration Proceedings**

R64      In general

R64.1    Upon filing of the request/statement of appeal, the Claimant/Appellant shall pay a Court Office fee of Swiss francs 1000.—, without which the CAS shall not proceed. The CAS shall in any event keep this fee. The Panel shall take it into account when assessing the final amount of costs.

If an arbitration procedure shall be terminated before a Panel has been constituted, the Division President shall rule on costs in the termination order. However, he can order the payment of legal costs only upon request of a party and after all parties have been given the opportunity to file written submissions on costs.

R64.2 Upon formation of the Panel, the CAS Court Office shall fix, subject to later changes, the amount and the method of payment of the advance of costs. The filing of a counterclaim, where applicable, or a new claim shall result in the calculation of separate advances.

To determine the amount to be paid in advance, the CAS Court Office shall fix an estimate of the costs of arbitration, which shall be borne by the parties in accordance with Article R64.4. The advance shall be paid in equal shares by the Claimant/Appellant and the Respondent. If a party fails to pay its share, the other may substitute for it; in case of non-payment within the time limit fixed by the CAS, the request/appeal shall be deemed withdrawn and the CAS shall terminate the arbitration; this provision shall also apply to any counterclaim, where applicable.

R64.3 Each party shall advance the cost of its own witnesses, experts and interpreters.

If the Panel appoints an expert or an interpreter or orders the examination of a witness, it shall issue directions with respect to an advance of costs, if appropriate.

R64.4 At the end of the proceedings, the CAS Court Office shall determine the final amount of the cost of arbitration, which shall include the CAS Court Office fee, the administrative costs of the CAS calculated in accordance with the CAS scale, the costs and fees of the arbitrators calculated in accordance with the CAS fee scale, a contribution towards the expenses of the CAS, and the costs of witnesses, experts and interpreters. The final account of the arbitration costs may either be included in the award or communicated separately to the parties.

R64.5 In the arbitral award, the Panel shall determine which party shall bear the arbitration costs or in which proportion the parties shall share them. As a general rule, the Panel has discretion to grant the prevailing party a contribution towards its legal fees and other expenses incurred in connection with the proceedings and, in particular, the costs of witnesses and interpreters. When granting such contribution, the Panel shall take into account the outcome of the proceedings, as well as the conduct and the financial resources of the parties.

R65    Appeals against decisions issued by international federations in disciplinary

R65.1 The present Article R65 is applicable to appeals against decisions which are exclusively of a disciplinary nature and which are rendered by an international federation or sports-body.

R65.2 Subject to Articles R65.2, para. 2 and R65.4, the proceedings shall be free. The fees and costs of the arbitrators, calculated in accordance with the CAS fee scale, together with the costs of the CAS are borne by the CAS.

Upon submission of the statement of appeal, the Appellant shall pay a Court Office fee of Swiss francs 1000.— without which the CAS shall not proceed and the appeal shall be deemed withdrawn. The CAS shall in any event keep this fee.

If an arbitration procedure shall be terminated before a Panel has been constituted, the Division President shall rule on costs in the termination order. However, he can order the payment of legal costs only upon request of a party and after all parties have been given the opportunity to file written submissions on costs.

R65.3   The costs of the parties, witnesses, experts and interpreters shall be advanced by the parties. In the award, the Panel shall decide which party shall bear them or in what proportion the parties shall share them, taking into account the outcome of the proceedings, as well as the conduct and financial resources of the parties.

R65.4   If all circumstances so warrant, the President of the Appeals Arbitration Division may decide to apply Article R64 to an appeals arbitration, either ex officio or upon request of the President of the Panel.

R66   Consultation Proceedings

[abrogated]

**G   Miscellaneous Provisions**

R67   The present Rules are applicable to all procedures initiated by the CAS as from 1 January 2010. The procedures which are pending on 1 January 2010 remain submitted to the Rules in force before 2010, unless both parties request the application of the present Rules.

R68   Neither the CAS arbitrators, nor the CAS mediators, nor the ICAS and its members, nor the CAS and its employees shall be liable to any person for any act or omission in connection with any CAS procedure.

R69   The French text and the English text are authentic. In the event of any discrepancy, the French text shall prevail.

R70   The Procedural Rules may be amended by the decision of the Council, in conformity with Article S8.

# EXHIBIT H

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

LANCE ARMSTRONG,

  *Plaintiff,*

*v.*

UNITED STATES ANTI-DOPING
AGENCY and TRAVIS TYGART, In His
Official Capacity as Chief Executive Officer
of the United States Anti-Doping Agency,

  *Defendants.*

Civ. Action No. 1:12-cv-00606-SS

**DECLARATION OF MATTHIEU REEB**

1.  I am the Secretary General of the Court of Arbitration for Sport ("CAS"), having served

in that capacity since 2000.  Previously, from 1995 to 1999, I served as the Counsel to the CAS.

2.  From its inception in 1984, CAS has heard appeals in a wide range of sports-related

disputes, including doping cases.  To date, CAS has heard more than 500 appeals involving

doping.  These doping cases have included sport participants in virtually all of the sports

included in the Olympic Games, as well as many other non-Olympic sports.  These cases have

included sport participants from countries all around the world.

3.  I have been advised by the United States Anti-Doping Agency that counsel for Lance

Armstrong has made the following written statement to the United States District for the Western

District of Texas (*Lance Armstrong v. Travis Tygart and United States Anti-Doping Agency,*

Case No. A-12-CA-606SS):

"No right to an appellate hearing.  As discussed above, the result of
any USADA hearing is appealable to CAS, which supposedly
conducts a *de novo* review.  But once the matter proceeds to CAS,
that arbitration panel need not hold a hearing at all:  "After
consulting the parties, the Panel ***may***, if it deems itself to be
sufficiently well informed, ***decide not to hold a hearing***."  CAS
Rules §44.2 & R57 (emphases added).  Thus, Mr. Armstrong is not
guaranteed a hearing by the tribunal with final say over USADA's
claim."

4.     Article R57 of the Code of Sports-related Arbitration (CAS Appeals procedure) is in
place to recognize that in some cases, the only issue in dispute is legal, not factual, and therefore
the issue can appropriately be resolved on the basis of the written submissions of the parties.  In
my 17 years with CAS and to the best of my knowledge, I am not aware of any doping case that
has been decided without an evidentiary hearing, unless because of the unique circumstances of a
case, all parties agreed to forego a hearing. Certainly, all appeals of doping cases to CAS
involving disputed facts are guaranteed to be heard *de novo* in a new evidentiary hearing before
CAS.

I declare under penalty of perjury under the laws of the United States of America that the
foregoing is in accordance with my sincere beliefs.

Dated this 19th day of July, 2012.

_____

Matthieu Reeb

# EXHIBIT I



*Preserving the integrity of competition. Inspiring true sport. Protecting the rights of athletes.*

**VIA ELECTRONIC MAIL and**
**VIA OVERNIGHT DELIVERY *(where full address is indicated)***

June 12, 2012

Mr. Johan Bruyneel
Team Manager
RadioShack Nissan Trek Cycling Team
1 rue Peternelchen
L-2370 Howald
Luxembourg

and to: bruyneel@radioshacknissantrek.com and johanbruyneel@johanbruyneel.com

Dr. Pedro Celaya
Team Doctor
RadioShack Nissan Trek Cycling Team
1 rue Peternelchen
L-2370 Howald
Luxembourg

and to: celaya@radioshacknissantrek.com

Dr. Luis Garcia del Moral
Instituto de Medicina del Deporte
Complejo Deportivo Cultural Petxina
Paseo de la Petxina 42
46008 Valencia
SPAIN

and to: luisg.moral@imedep.com

Dr. Michele Ferrari
Via Pomposa, 286
Ferrara
ITALY   44100

Mr. Pepe Marti
c/o UNION CYCLISTE INTERNATIONALE
Ch. de la Mêlée 12
1860 Aigle
Switzerland

June 12, 2012
Page 2

Mr. Lance Armstrong
c/o Robert D. Luskin
Patton Boggs, LLP
2500 M Street, NW
Washington, D.C.  20037-1350
U.S.A.

and to: rluskin@pattonboggs.com

    *Re:*    *Anti-Doping Rules Violations*

Dear Mr. Bruyneel, Dr. Celaya, Dr. del Moral, Dr. Ferrari, Mr. Marti, and Mr. Armstrong:

This letter is to notify each of you (collectively referred to as the "Respondents") that the United States Anti-Doping Agency ("USADA") is hereby opening a formal action against each of you based on evidence that, as described below, you engaged in anti-doping rule violations under the Union Cycliste International ("UCI") Anti-Doping Rules from 1998 to present ("UCI ADR"), World Anti-Doping Code from inception to present (the "Code") and USADA Protocol for Olympic and Paralympic Movement Testing from inception to present (the "USADA Protocol") (collectively, the "Applicable Rules").[1]

This notice letter describes a portion of the evidence gathered by USADA in its investigation of potential doping on the United States Postal Service (USPS) (1996 – 2004), Discovery Channel (2005-2007), Astana (2009) and RadioShack (2010) cycling teams.  The witnesses to the conduct described in this letter include more than ten (10) cyclists as well as cycling team employees.

An important aspect of USADA's investigation has been face to face meetings between USADA representatives and riders on the above referenced cycling teams.  USADA sought to give the riders an opportunity to be a part of the solution in moving cycling forward by being truthful and honest regarding their past experiences with doping in cycling.

With the exception of Mr. Armstrong, every other U.S. rider contacted by USADA regarding doping in cycling agreed to meet with USADA and to truthfully and fully describe their involvement in doping and all doping by others of which they were aware.  Mr. Armstrong was likewise contacted through his legal counsel and given the opportunity to meet with USADA to fully and truthfully disclose all knowledge of anti-doping rule

---

[1] Copies of the Applicable Rules are provided as Attachments A (versions of UCI ADR), B (versions of the World Anti-Doping Code), and C (the current version of the USADA Protocol).

June 12, 2012
Page 3

violations committed in the sport of cycling. However, Mr. Armstrong declined USADA's offer.

Information set forth herein also comes from a number of other eyewitnesses to the conduct described. In every instance the conduct described in this letter has only been relied upon by USADA and described in this letter if the witness has confirmed to USADA that the information is based on his or her first hand knowledge.

## Prohibited Substances and Methods

The evidence in the possession of USADA and relevant to violations of the Applicable Rules, by the Respondents reflects a pervasive pattern of doping involving the following prohibited substances and methods:

1. **Erythropoietin (EPO)**, also known as "E," "Po," "Edgar" or "Edgar Allen Poe," among other names. EPO is used by athletes to increase the number of red blood cells in their circulatory system which are available to carry oxygen. EPO use is prohibited under the Applicable Rules. Even after the EPO urine test was developed and implemented in sport in late 2000 EPO was difficult to detect and the Respondents implemented a number of means to avoid detection of EPO use, including: micro-dosing (i.e., using smaller amounts of EPO to reduce the clearance time of the drug), intravenous injections (i.e., injecting the drug directly into the vein rather than subcutaneously to reduce clearance time), saline, plasma or glycerol infusions (described below) and various efforts to avoid testing by drug testers at times that EPO might still be detectable in the riders' urine. Multiple riders who competed on the USPS and Discovery Channel teams from 1998 through 2007 have reported to USADA that Team Director Johan Bruyneel, Team Trainer Jose Pepe Marti and co-conspirator, Dr. Michele Ferrari, a consultant to the USPS and Discovery Channel teams and their riders, developed training plans dependent upon EPO use and instructed riders to use the drug. USADA has received eyewitness statements that EPO injections were administered by Dr. Luis Garcia del Moral, Dr. Pedro Celaya and Dr. Ferrari. Multiple riders with first hand knowledge will testify that between 1998 and 2005 Armstrong personally used EPO and on multiple occasions distributed EPO to other riders.

2. **Blood transfusions** (a/k/a "**blood doping**"). Blood transfusions generally involve the extraction of an athlete's own blood pre-competition and re-infusion of that blood shortly before or during competition (e.g., in the evening or on a rest day in a multi-stage race) to increase the athlete's oxygen carrying red blood cells. By increasing the number of circulating red blood cells transfusions increase the oxygen carrying capacity of the blood and enhance endurance and recovery. No effective anti-doping test has yet been implemented to detect autologous transfusions (i.e.,

June 12, 2012
Page 4

transfusions of an athlete's own blood). Blood transfusions, however, carry substantial health risks and due to the need to transport the blood in appropriate conditions generally require support. Blood transfusions became more important to the conspiracy described herein after the urine EPO test was introduced in 2000. Multiple riders who competed on the USPS and Discovery Channel teams from 1998 through 2007 have reported to USADA that Team Director Johan Bruyneel, Team Trainer Jose Pepe Marti and co-conspirator, Dr. Michele Ferrari, a consultant to the USPS and Discovery Channel teams and their members, developed training plans dependent upon blood transfusions. Blood transfusions were facilitated by Johan Bruyneel, Pepe Marti, Dr. del Moral, Dr. Celaya, and Dr. Ferrari. Multiple riders will testify that during the period from 2000 – 2005 Armstrong used blood transfusions, was observed having blood re-infused, including during the Tour de France, and had blood doping equipment at his residence.

3.    **Testosterone.** Also known on the USPS and Discovery Channel cycling teams as "oil." Testosterone is an anabolic agent and can increase muscle mass and strength. In smaller doses anabolic agents such as testosterone can promote muscle recovery from strenuous exercise and increase endurance. Andriol consists of testosterone undecanoate a steroid which can be mixed with oil and taken orally. Taken in this way the drug can be absorbed into the lymphatic system without being transported to the liver, making the drug more effective and reducing the prospect of liver damage. Multiple riders who competed on the USPS and Discovery Channel teams from 1998 through 2007 have reported that Dr. Ferrari developed a method of mixing testosterone (i.e., andriol) with olive oil for oral administration and that this testosterone-olive oil mixture was frequently administered to team members. Riders called this testosterone-olive oil mixture, the "oil." Numerous USPS and Discovery Channel riders have also reported the frequent use of testosterone patches by team members and that oral testosterone (pills or oil), testosterone injections or testosterone patches were provided by Johan Bruyneel, Pepe Marti and Drs. del Moral, Celaya and Ferrari. USADA has eyewitness statements from multiple sources that Lance Armstrong used testosterone and administered the testosterone-olive oil mixture to himself and other riders.

4.    **Human Growth Hormone (hGH).** Human growth hormone is improperly used in sport to increase strength and lean muscle mass, to assist in weight loss and to promote recovery. Multiple riders who competed on the USPS and Discovery Channel teams from 1998 through 2007 have reported to USADA that team director Johan Bruyneel, team trainer Jose Pepe Marti and team doctors Luis del Moral and Pedro Celaya provided human growth hormone to team members.

June 12, 2012
Page 5

5.   **Corticosteroids** (e.g., **cortisone**).  These drugs reduce inflammation, assist
     in recovery and can provide a burst of energy and create a temporary feeling
     of increased energy and wellbeing.  Throughout the relevant time period
     corticosteroids were improperly provided to cyclists by team doctors and
     trainers to increase energy and enhance performance.  Although
     corticosteroids can be legally administered to treat a localized injury,
     numerous USPS and Discovery Channel team members and employees
     report that prescriptions for corticosteroids were regularly fabricated by Drs.
     Celaya and del Moral to cover the improper administration of
     corticosteroids to athletes without a legitimate medical need for the drugs
     and using techniques of administration barred by UCI anti-doping rules and
     that Johan Bruyneel and Pepe Marti encouraged the unauthorized use of
     corticosteroids for performance enhancement and gave these drugs to riders.
     USADA will also rely upon first hand testimony from witnesses who were
     aware of Armstrong's use of cortisone without medical authorization.

6.   **Saline and plasma infusions.**  Throughout much of the relevant period the
     UCI employed a blood monitoring program and would not permit riders to
     compete if the rider's hematocrit (i.e., percentage of mature red blood cells)
     exceeded 50%.  To avoid exceeding the 50% hematocrit threshold and to
     prevent detection of the rider's EPO use and/or blood transfusions,
     Respondents used the prohibited technique of saline, plasma or glycerol
     infusions to mask their use of prohibited substances and/or methods.
     Multiple riders who competed on the USPS and Discovery Channel teams
     from 1998 through 2007 have reported to USADA that each rider's
     hematocrit level was always of primary interest to team director Johan
     Bruyneel and that team trainer Jose Pepe Marti and team doctors del Moral
     and Celaya administered saline and plasma infusions to team members.
     USADA will also present testimony concerning infusions given to
     numerous USPS riders, including Lance Armstrong.

<u>**Rule Violations**</u>

Numerous former riders and employees of the United States Postal Service, Discovery
Channel, Astana, RadioShack, Phonak and/or ONCE cycling teams will testify that the
below individuals committed anti-doping rule violations[2] as follows:

--------------------

[2] As identified in this letter,

Rules applicable to <u>**use**</u> and/or <u>**attempted use**</u> of prohibited substances or methods include:
UCI ADR 2 (1997-2000); UCI ADR 130 (2001-2004); UCI ADR 15.2 (2005-2008); UCI
ADR 21.2 (2009-present); and Code Article 2.2 (2003-present);

June 12, 2012
Page 6

By **Johan Bruyneel** (Team Director):

(1) **Possession** of prohibited substances and/or methods including EPO, blood transfusions and related equipment (such as needles, blood bags, storage containers and other transfusion equipment and blood parameters measuring devices), testosterone, hGH, corticosteroids, and masking agents, as described in more detail above.

(2) **Trafficking** of EPO, blood transfusions, testosterone, hGH, corticosteroids and masking agents as described in more detail above.

(3) **Administration** and/or **attempted administration** of EPO, blood transfusions, testosterone, hGH, corticosteroids, and masking agents as described in more detail above.

(4) **Assisting**, **encouraging**, **aiding**, **abetting**, **covering up** and **other complicity** involving one or more anti-doping rule violations and/or attempted anti-doping rule violations.

(5) **Aggravating circumstances** justifying a period of ineligibility greater than the standard sanction.

---

Rules applicable to the **possession** of prohibited substances and/or methods include: UCI ADR 135 (2001-2004); UCI ADR 15.6.1 (2005-2008); UCI ADR 21.6.1 (2009-present); and Code Article 2.6.1 (2003-present);

Rules applicable to **trafficking** include: UCI ADR 135 (2001-04); UCI ADR 15.7 (2005-2008); UCI ADR 21.7 (2009-present); and Code Article 2.7 (2003-present);

Rules applicable to **administration** and/or **attempted administration** include: UCI ADR 54, §1-2 (1997-2000); UCI ADR 133 (2001-2004); UCI ADR 15.8 (2005-2008); UCI ADR 21.8 (2009-present); and Code Article 2.8 (2003-present);

Rules applicable to **assisting**, **encouraging**, **aiding**, **abetting**, **covering up** and **other complicity** involving one or more anti-doping rule violations and/or attempted anti-doping rule violations include: each of the above listed provisions and UCI ADR 54, §1-2 (1997-2000); UCI ADR 133 (2001-2004); UCI ADR 15.8 (2005-2008); UCI ADR 21.8 (2009-present); Code Article 2.8 (2003-present); and

Rules applicable to **aggravating circumstances** include: UCI ADR 305 (2009-present) and Code Article 10.6 (2009-present).

June 12, 2012
Page 7

Mr. Johan Bruyneel was a rider with the ONCE team in 1998.  In 1999 Mr. Bruyneel became Team Director with the USPS Cycling Team, a position he held through 2007 (although the team name was changed to the Discovery Channel Cycling Team for the period 2005-2007).  During 2008-2009 Mr. Bruyneel was Director of the Astana Cycling Team.  Since 2010 he has been the Team Director or Team Manager for the RadioShack Team (now referred to as the RadioShack Nissan Trek Cycling Team).

With respect to Mr. Bruyneel, numerous riders will testify that Mr. Bruyneel gave to them and/or encouraged them to use doping products and/or prohibited methods, including EPO, blood transfusions, testosterone, hGH and cortisone during the period from 1999 through 2007.  Riders and other witnesses will also testify that Bruyneel worked actively to conceal rule violations by himself and others throughout the period from 1999 through the present.

By **Dr. Pedro Celaya** (Team Doctor):

    (1) **Possession** of prohibited substances and/or methods including EPO, blood transfusions and related equipment (such as needles, blood bags, storage containers and other transfusion equipment and blood parameters measuring devices), testosterone, hGH, corticosteroids, and masking agents, as described in more detail above.

    (2) **Trafficking** of EPO, blood transfusions, testosterone, hGH, corticosteroids and masking agents as described in more detail above.

    (3) **Administration** and/or **attempted administration** of EPO, blood transfusions, testosterone, hGH, corticosteroids, and masking agents as described in more detail above.

    (4) **Assisting**, **encouraging**, **aiding**, **abetting**, **covering up** and **other complicity** involving one or more anti-doping rule violations and/or attempted anti-doping rule violations.

    (5) **Aggravating circumstances** justifying a period of ineligibility greater than the standard sanction.

Dr. Pedro Celaya was a Team Doctor for the USPS Cycling Team from 1997 through 1998 and from 2004 through 2007, by which time the team had come to be known as the Discovery Channel Cycling Team.  During all or part of the period from 1999 through 2003 Dr. Celaya was a team doctor for the ONCE cycling team.  Dr. Celaya is currently a Team Doctor for the RadioShack Nissan Trek Cycling Team.

With respect to Dr. Celaya, numerous riders will testify that Dr. Celaya gave to them and/or encouraged them to use doping products and/or prohibited methods, including EPO, blood transfusions, testosterone, hGH, cortisone and infusions of saline, plasma and/or glycerol during the period from 1998 through 2007. Riders and other witnesses will also

June 12, 2012
Page 8

testify that Celaya worked actively to conceal rule violations by himself and others throughout the period from 1998 through the present.

By **Dr. Luis del Moral** (Team Doctor):

> (1) **Possession** of prohibited substances and/or methods including EPO, blood transfusions and related equipment (such as needles, blood bags, storage containers and other transfusion equipment and blood parameters measuring devices), testosterone, hGH, corticosteroids, and masking agents, as described in more detail above.

> (2) **Trafficking** of EPO, blood transfusions, testosterone, hGH, corticosteroids and masking agents as described in more detail above.

> (3) **Administration** and/or **attempted administration** of EPO, blood transfusions, testosterone, hGH, corticosteroids, and masking agents as described in more detail above.

> (4) **Assisting**, **encouraging**, **aiding**, **abetting**, **covering up** and **other complicity** involving one or more anti-doping rule violations and/or attempted anti-doping rule violations.

> (5) **Aggravating circumstances** justifying a period of ineligibility greater than the standard sanction.

Dr. Luis Garcia del Moral was the Team Doctor for the USPS Cycling Team for the period from 1999 through 2003. Subsequently, Dr. del Moral continued to serve as a physician for many cyclists. He currently works as a sports doctor in Valencia, Spain.

With respect to Dr. del Moral, numerous riders will testify that Dr. del Moral gave to them, encouraged them to use and/or assisted them in using doping products and/or prohibited methods, including EPO, blood transfusions, testosterone, hGH, cortisone and infusions of saline, plasma and/or glycerol during the period from 1999 through 2005. Riders and other witnesses will also testify that del Moral worked actively to conceal rule violations by himself and others throughout the period from 1999 through the present.

By **Dr. Michele Ferrari** (Consulting Doctor):

> (1) **Possession** of prohibited substances and/or methods including EPO, blood transfusions and related equipment (such as needles, blood bags, storage containers and other transfusion equipment and blood parameters measuring devices), and testosterone as described in more detail above.

June 12, 2012
Page 9

    (2) **Trafficking** of EPO, blood transfusions, testosterone, and corticosteroids as described in more detail above.

    (3) **Administration** and/or **attempted administration** of EPO, blood transfusions, testosterone, and corticosteroids as described in more detail above.

    (4) **Assisting**, **encouraging**, **aiding**, **abetting**, **covering up** and **other complicity** involving one or more anti-doping rule violations and/or attempted anti-doping rule violations.

    (5) **Aggravating circumstances** justifying a period of ineligibility greater than the standard sanction.

Dr. Michele Ferrari is a sports doctor who has worked with numerous cyclists and cycling teams.  Dr. Ferrari served as a consultant and doctor to the USPS Cycling Team and many of its riders during the period from 1999 through 2007.  Dr. Ferrari has developed, and is currently associated with, the website 53x12.com which is devoted to providing training information to road cyclists.

With respect to Dr. Ferrari, numerous riders will testify that Dr. Ferrari gave to them, encouraged them to use and/or assisted them in using doping products and/or prohibited methods, including EPO, blood transfusions, and testosterone during the period from 1999 through 2006.  Riders and other witnesses will also testify that Ferrari taught them how to avoid detection of their drug use, actively working to conceal rule violations by himself and others throughout the period from 1999 through the present.

By **Jose Pepe Marti** (Team Trainer):

    (1) **Possession** of prohibited substances and/or methods including EPO, blood transfusions and related equipment (such as needles, blood bags, storage containers and other transfusion equipment and blood parameters measuring devices), testosterone, hGH, corticosteroids, and masking agents, as described in more detail above.

    (2) **Trafficking** of EPO, blood transfusions, testosterone, hGH, corticosteroids, and masking agents as described in more detail above.

    (3) **Administration** and/or **attempted administration** of EPO, blood transfusions, testosterone, hGH, corticosteroids, and masking agents as described in more detail above.

    (4) **Assisting**, **encouraging**, **aiding**, **abetting**, **covering up** and **other complicity** involving one or more anti-doping rule violations and/or attempted anti-doping rule violations.

June 12, 2012
Page 10

    (5) **Aggravating circumstances** justifying a period of ineligibility greater than the standard sanction.

Mr. Jose Pepe Marti was the Team Trainer for the USPS Cycling Team beginning in 1999 and continued in that position until 2007. Thereafter, Mr. Marti became a trainer with the Astana Cycling Team in 2008, and it is believed that he continued in this capacity through 2010 and was subsequently employed in cycling until sometime earlier this year.

With respect to Mr. Marti, numerous riders will testify that Mr. Marti gave to them and/or encouraged them to use doping products and/or prohibited methods, including EPO, blood transfusions, testosterone, hGH and cortisone during the period from 1999 through 2007. Riders and other witnesses will also testify that Marti worked actively to conceal rule violations by himself and others throughout the period from 1999 through the present.

By **Lance Armstrong** (Rider):

    (1) **Use** and/or **attempted use** of prohibited substances and/or methods including EPO, blood transfusions, testosterone, corticosteroids and masking agents.

    (2) **Possession** of prohibited substances and/or methods including EPO, blood transfusions and related equipment (such as needles, blood bags, storage containers and other transfusion equipment and blood parameters measuring devices), testosterone, corticosteroids and masking agents.

    (3) **Trafficking** of EPO, testosterone, and corticosteroids as described in more detail above.

    (4) **Administration** and/or **attempted administration** to others of EPO, testosterone, and cortisone.

    (5) **Assisting, encouraging, aiding, abetting, covering up** and **other complicity** involving one or more anti-doping rule violations and/or attempted anti-doping rule violations.

    (6) **Aggravating circumstances** justifying a period of ineligibility greater than the standard sanction.

Mr. Lance Armstrong was a cyclist with the USPS Cycling Team (and later the Discovery Channel team) during the period of 1998 through 2005. He rode on the Astana Cycling Team in 2009 and on the RadioShack Cycling Team during 2010 and early 2011.

With respect to Lance Armstrong, numerous riders, team personnel and others will testify based on personal knowledge acquired either through observing Armstrong dope or through Armstrong's admissions of doping to them that Lance Armstrong used EPO, blood

June 12, 2012
Page 11

transfusions, testosterone and cortisone during the period from before 1998 through 2005, and that he had previously used EPO, testosterone and hGH through 1996.

Numerous riders will also testify that Lance Armstrong gave to them, encouraged them to use and/or assisted them in using doping products and/or methods, including EPO, blood transfusions, testosterone and cortisone during the period from 1999 through 2005.

Representatives of USADA have interviewed Dr. Martial Saugy, Director of the Lausanne Anti-Doping Laboratory which analyzed the urine samples from the 2001 Tour of Switzerland. Dr. Saugy stated that Lance Armstrong's urine sample results from the 2001 Tour of Switzerland were indicative of EPO use. Multiple witnesses have also told USADA that Lance Armstrong told them he had tested positive in 2001 and that the test result had been covered up.

Lance Armstrong's doping is further evidenced by the data from blood collections obtained by the UCI from Lance Armstrong in 2009 and 2010. This data is fully consistent with blood manipulation including EPO use and/or blood transfusions.

## USPS Conspiracy

This action is being brought as a single consolidated action because for a significant part of the period from January 1, 1998, through the present, each of the Respondents has been part of a doping conspiracy involving team officials, employees, doctors, and elite cyclists of the United States Postal Service and Discovery Channel Cycling Teams who committed numerous violations of the Applicable Rules (the "USPS Conspiracy" or the "Conspiracy").

The purpose of the USPS Conspiracy was to engage in the use of doping substances and techniques, which were either undetectable or difficult to detect in routine drug testing in order to advance the athletic and sporting achievements, financial wellbeing and status of the teams and their riders, employees, members and investors and to engage in techniques to avoid detection of the athletes' use of banned performance enhancing drugs as well as to prevent the truth regarding doping on the teams and by the riders and their support personnel from being revealed. After December 31, 2007, the Conspiracy continued as various members of the Conspiracy continued to engage in conduct to cover up the doping and violations of the Applicable Rules.

Because of the nature of the USPS Conspiracy, the fact that each of the Respondents actively participated together in a long running doping conspiracy and due to the close integration of the evidence against each of the Respondents as described herein this proceeding is being brought as a consolidated case.

June 12, 2012
Page 12

## Common Practices and Acts of the Conspiracy

USADA anticipates testimony from one or more witnesses or other participants in the USPS Conspiracy who will testify to the following:

1. The acquisition of banned performance enhancing drugs by high ranking team officials and riders including Bruyneel, Celaya, del Moral, Ferrari, Marti and Armstrong.

2. The distribution of drugs by Bruyneel, Celaya, del Moral, Ferrari, Marti and Armstrong to elite cyclists included in the Conspiracy.

3. The use of secretive methods, including code names, and the use of masking agents to avoid detection of banned performance enhancing drugs and prohibited methods.

4. The expectation that elite athletes on the Tour de France team would use EPO and/or blood transfusions to improve their ability to help the team leader(s) perform in the general classification of the Tour de France.

5. The provision of drugs to elite athletes in preparation for, and during, other races important to the teams in an effort to enhance the performance of the riders and the team in those races.

6. The use of fear, intimidation and coercion to attempt to enforce a code of silence (or omerta) by team members and employees to prevent detection of the Conspiracy or the prosecution of co-conspirators for anti-doping rule violations.

## Cover-Up

Beginning in 1999 and continuing through the present it has been an object of the Conspiracy to conceal and cover-up the doping conduct of the USPS Conspiracy. Numerous witnesses will testify that as part of this cover-up Johan Bruyneel, Pedro Celaya, Michele Ferrari, Lance Armstrong and other co-conspirators engaged in activities to conceal their conduct and mislead anti-doping authorities including false statements to the media, false statements and false testimony given under oath and in legal proceedings, and attempts to intimidate, discredit, silence and retaliate against witnesses.

## USADA's Results Management Authority

Pursuant to the UCI ADR, USADA has results management authority, including authority to conduct hearings, for any anti-doping rule violations where no sample collection is involved and where USADA is the Anti-Doping Organization which discovered "elements that turn out to be evidence for facts that apparently constitute an anti-doping rule

June 12, 2012
Page 13

violation." UCI ADR, art. 10; *see also* UCI ADR, art. 13. Also pursuant to the UCI ADR, the results management and hearing process in such cases is to be administered by and under the USADA Protocol. UCI ADR, art. 13. USADA's jurisdiction extends to both UCI and USA Cycling license-holders and also to:

a) Any *Person* who, without being a holder of a license, participates in a cycling *Event* in any capacity whatsoever, including, without limitation, as a rider, coach, trainer, manager, team director, team staff, agent, official, medical or para-medical personnel or parent and;

b) Any *Person* who, without being a holder of a license, participates, in the framework of a club, trade team, national federation or any other structure participating in *Races*, in the preparation or support of riders for sports competitions[.]

UCI ADR, art. 18.

### Review Board Process

The USADA Protocol provides that USADA is to make a written submittal to the Anti-Doping Review Board (the "Review Board") setting forth information which USADA deems appropriate related to the anti-doping rule violation(s). USADA Protocol, clause 11(c)(ii). As noted in the USADA Protocol, the process before the Review Board is not the hearing stage and the Review Board may only consider "written submittals." *See* USADA Protocol, clause 11(c)(vi). The function of the Review Board is to review the written submittals to recommend whether "there is sufficient evidence of doping to proceed with the adjudication process." USADA Protocol, clause 11(c)(vii).

As in most so called "non-analytical cases" (i.e., cases that are not premised entirely upon positive laboratory test results) and as provided in the USADA Protocol, weighing the evidence, assessing the credibility of witnesses and resolving factual disputes is to be done exclusively by *the arbitration panel* that will ultimately hear the case. Assessing the weight of the evidence and addressing factual disputes, however, is not part of the process before the Review Board as only written submittals may be made to the Review Board.

USADA is required to redact the name of persons responding to alleged rule violations from the submittal made to the Review Board. *See* USADA Protocol, clause 11(c)(ii). Accordingly, USADA will redact the names of Mr. Bruyneel, Mr. Marti, Dr. Celaya, Dr. del Moral, Dr. Ferrari and Mr. Armstrong from this letter upon submission of the letter to the Review Board. Consistent with this aspect of the USADA Protocol, USADA has not set forth in this letter the names of its witnesses.

In this case anonymity of the witnesses at the Review Board stage is also important to shield them from the retaliation and attempted witness intimidation that cooperating witnesses have faced in other matters related to the USPS Conspiracy. As in every case

June 12, 2012
Page 14

under the USADA Protocol, should this matter proceed to a hearing USADA will file a complete list of its witnesses at the appropriate time in advance of the arbitration hearing.

Finally, it may be noted that the conduct of the USPS Conspiracy and doping by its participants has spanned a period in excess of eight (8) years and there currently exists an eight year statute of limitations in the Code and UCI ADR. With respect to each of the Respondents there exists substantial evidence in the form of eyewitness testimony of doping that occurred within eight years of the date of this letter.

It is also the law that evidence of doping throughout the entire time period described is relevant and will be admissible in any eventual hearing for at least two reasons: (1) evidence of doping and evidence of conspiratorial acts outside any applicable limitations period can be used to corroborate evidence within the limitations period, and (2) as explained in *USADA v. Hellebuyck* (copy provided as Attachment D) results outside the limitations period can be disqualified where reliance on the statute of limitations has been waived through false statements, fraudulent concealment or other wrongful conduct.

### Commencement of Action for Anti-Doping Rule Violations

Pursuant to the Applicable Rules and based on the evidence collected to date, including, but not limited to, the evidence described above, USADA is initiating the process set forth in the Protocol concerning your anti-doping rules violations.

At this time, we are forwarding this matter to a panel of the USADA Anti-Doping Review Board for its consideration and recommendation as set forth in the USADA Protocol. Pursuant to the Protocol, you have the right to make written submittals to the Review Board for its consideration. Any written submittals from you must be received by USADA for transmittal to the Review Board by **June 22, 2012**. You must provide USADA with four (4) copies of all submitted materials, so that a copy may be distributed to each member of the Review Board. If you wish to file your submission in advance of **June 22, 2012**, please indicate that your submission is complete. The documents submitted by USADA to the Review Board will have your name redacted. USADA will not redact any documents you submit to the Review Board.

If this case proceeds beyond the Anti-Doping Review Board, USADA will recommend a sanction under the Applicable Rules which may include up to a lifetime period of ineligibility from participation in sport. If you choose to contest the consequence recommended by USADA, you will have the right to request a hearing. If a hearing is held in the regular course, you should anticipate a hearing date before November, 2012.

If you or your representatives have any questions or need additional information, please feel free to contact William Bock, USADA's General Counsel at 719-785-2061 or Onye Ikwuakor, USADA's Legal Affairs Director at 719-785-2037.

June 12, 2012
Page 15

You may also contact John Ruger, the USOC Athlete Ombudsman who is completely
independent of USADA, at One Olympic Plaza, Colorado Springs, CO 80909, by
telephone at (719) 866-5000, by fax at (719) 866-3000, by website at
www.athleteombudsman.org or by e-mail at John.Ruger@usoc.org and you are
encouraged to contact your own personal attorney.  Where your counsel is known to
USADA they have been served with this notice as a courtesy and in order to expedite
notice to you and your counsel.

Except as provided in the USADA Protocol, USADA will not publicly disclose or
comment on the specifics of your case until it has been resolved.  By copy of this letter,
USADA is notifying UCI, WTC, USA Cycling, USA Triathlon and the USOC of this
matter and requests that these organizations not comment publicly concerning this
information until disclosed as provided in the Protocol.

Because only Mr. Armstrong currently participates in the sport of triathlon, the letters
provided to WTC and USA Triathlon have the names of Mr. Bruyneel, Dr. Celaya, Dr. del
Moral, Dr. Ferrari and Mr. Marti redacted from them.

USADA reserves the right to amend this notice as needed or as additional information
becomes available.

Sincerely,

Lisa McCumber
Testing Results Manager

Enclosures

cc (w/o encls.):    Olivier Niggli, WADA Legal Director
                    Mario Zorzoli, UCI Chief Medical Officer
                    Francesca Rossi, UCI Anti-Doping Manager
                    Andrew Messick, CEO, WTC (names of certain Respondents redacted)
                    Rana Dershowitz, USOC General Counsel
                    Gary Johansen, USOC Associate General Counsel
                    John Ruger, USOC Athlete Ombudsman
                    Steve Johnson, USA Cycling CEO
                    Sean Petty, USA Cycling COO
                    Rob Urbach, USA Triathlon CEO(names of certain Respondents
                    redacted)

# EXHIBIT J



Preserving the integrity of competition. **Inspiring** true sport. **Protecting** the rights of athletes.

*VIA ELECTRONIC MAIL and*
*VIA OVERNIGHT DELIVERY (where legal counsel is not indicated)*

June 28, 2012

Mr. Johan Bruyneel
c/o legal counsel

Dr. Pedro Celaya Lezama

Dr. Luis García del Moral
c/o legal counsel

Dr. Michele Ferrari

Mr. José Martí Martí
c/o legal counsel

Mr. Lance Armstrong
c/o legal counsel

      **Re:**   *Charges of Anti-Doping Rules Violations*

Dear Mr. Bruyneel, Dr. Celaya, Dr. del Moral, Dr. Ferrari, Mr. Martí, and Mr. Armstrong:

The Panel of the United States Anti-Doping Agency ("USADA") Anti-Doping Review Board ("Review Board") met concerning evidence that Mr. Johan Bruyneel, Dr. Pedro Celaya Lezama, Dr. Luis García del Moral, Dr. Michael Ferrari, Mr. José (Pepe) Martí Martí and Mr. Lance Armstrong (collectively, the "Respondents") engaged in anti-doping rules violations during the period from 1998 through the present as set forth in the June 12, 2012, notice letter previously provided to you, which is incorporated into this charging letter by reference as if fully set forth. The Review Board determined there was sufficient evidence of anti-doping rules violations and recommended that the adjudication process proceed.

## Rule Violations Charged

Therefore, at this time, reserving all rights to amend this charge, USADA charges you with anti-doping rules violations under the Union Cycliste International ("UCI") Anti-Doping Rules 1997 to present ("UCI ADR"), the World Anti-Doping Code 2003 to present (the "Code"), the USADA Protocol for Olympic and Paralympic Movement Testing 2000 to present (the "USADA Protocol"), the USOC National Anti-Doping Policies 1997 to present

*United States Anti-Doping Agency*
5555 Tech Center Drive, Suite 200, Colorado Springs, CO 80919 ■ Tel: 719.785.2000 ■ Fax: 719.785.2001
usada@usada.org ■ www.usada.org

June 28, 2012
Page 2 of 10

(the "USOC NADP"), and the USA Cycling Anti-Doping Rules 1997 to present (collectively, the "Applicable Rules")[1] as follows:

Charges against **Johan Bruyneel** (Team Director):

(1) **Possession** of prohibited substances and/or methods including EPO, blood transfusions and related equipment (such as needles, blood bags, storage containers and other transfusion equipment and blood parameters measuring devices), testosterone, hGH, corticosteroids, and/or saline, plasma or glycerol infusions.

(2) **Trafficking** and/or **attempted trafficking** of EPO, blood transfusions, testosterone, hGH, corticosteroids and/or saline, plasma or glycerol infusions.

_____

[1] As identified in this charging letter,

Rules applicable to **use** and/or **attempted use** of prohibited substances or methods include: UCI ADR 2, 52 (1997-2000); UCI ADR 4, 6, 7, 8, 130, 131, 133 (2001-2004); UCI ADR 15.2 (2005-2008); UCI ADR 21.1 and 21.2 (2009-present); and Code Article 2.1 and 2.2 (2003-present);

Rules applicable to the **possession** of prohibited substances and/or methods include:  UCI ADR 52, 54, 93 (1997-2000); UCI ADR 130, 131, 135 (2001-2004); UCI ADR 15.6 (2005-2008); UCI ADR 21.6 (2009-present); and Code Article 2.6 (2003-present);

Rules applicable to **trafficking** and **attempted trafficking** include: UCI ADR 3, 135, 136 (2001-04); UCI ADR 15.7 (2005-2008); UCl ADR 21.7 (2009-present); and Code Article 2.7 (2003-present);

Rules applicable to **administration** and/or **attempted administration** include: UCI ADR 1, 2, 54, 93 (1997-2000); UCI ADR 3, 133 (2001-2004); UCI ADR 15.8 (2005-2008); UCI ADR 21.8 (2009-present); and Code Article 2.8 (2003-present);

Rules applicable to **assisting**, **encouraging**, **aiding**, **abetting**, **covering up** and **other complicity** involving one or more anti-doping rule violations and/or attempted anti-doping rule violations include: each of the above listed provisions and UCI ADR 1, 2, 54, 93 (1997-2000); UCI ADR 3, 131,133 (2001-2004); UCI ADR 15.8 (2005-2008); UCl ADR 21.8 (2009-present); Code Article 2.8 (2003-present); and

Rules applicable to **aggravating circumstances** include: UCI ADR 130 (4 years to life for intentional doping) (2001-2004); UCI ADR 305 (2009-present) and Code Article 10.6 (2009-present).

June 28, 2012
Page 3 of 10

(3) **Administration** and/or **attempted administration** of EPO, blood transfusions, testosterone, hGH, corticosteroids, and/or saline, plasma or glycerol infusions.

(4) **Assisting**, **encouraging**, **aiding**, **abetting**, **covering up** and **other complicity** involving one or more anti-doping rule violations and/or attempted anti-doping rule violations.

(5) **Aggravating circumstances** justifying a period of ineligibility greater than the standard sanction.

Mr. Bruyneel's violations commenced on or before January 1, 1999, with multiple violations thereafter, including violations after June 28, 2004, and, at a minimum, with respect to cover-up activities Mr. Bruyneel's violations have continued through the present.

Charges against **Dr. Pedro Celaya Lezama** (Team Doctor):

(1) **Possession** of prohibited substances and/or methods including EPO, blood transfusions and related equipment (such as needles, blood bags, storage containers and other transfusion equipment and blood parameters measuring devices), testosterone, hGH, corticosteroids, and/or saline, plasma or glycerol infusions.

(2) **Trafficking** and/or **attempted trafficking** of EPO, blood transfusions, testosterone, hGH, corticosteroids and/or saline, plasma or glycerol infusions.

(3) **Administration** and/or **attempted administration** of EPO, blood transfusions, testosterone, hGH, corticosteroids, and/or saline, plasma or glycerol infusions.

(4) **Assisting**, **encouraging**, **aiding**, **abetting**, **covering up** and **other complicity** involving one or more anti-doping rule violations and/or attempted anti-doping rule violations.

(5) **Aggravating circumstances** justifying a period of ineligibility greater than the standard sanction.

Dr. Celaya's violations commenced on or before January 1, 1997, with multiple violations thereafter, including violations after June 28, 2004, and, at a minimum, with respect to cover-up activities Dr. Celaya's violations have continued through the present.

Charges against **Dr. Luis García del Moral** (Team Doctor):

June 28, 2012
Page 4 of 10

(1) **Possession** of prohibited substances and/or methods including EPO, blood transfusions and related equipment (such as needles, blood bags, storage containers and other transfusion equipment and blood parameters measuring devices), testosterone, hGH, corticosteroids, and/or saline, plasma or glycerol infusions.

(2) **Trafficking** and/or **attempted trafficking** of EPO, blood transfusions, testosterone, hGH, corticosteroids and/or saline, plasma or glycerol infusions.

(3) **Administration** and/or **attempted administration** of EPO, blood transfusions, testosterone, hGH, corticosteroids, and/or saline, plasma or glycerol infusions.

(4) **Assisting**, **encouraging**, **aiding**, **abetting**, **covering up** and **other complicity** involving one or more anti-doping rule violations and/or attempted anti-doping rule violations.

(5) **Aggravating circumstances** justifying a period of ineligibility greater than the standard sanction.

Dr. del Moral's violations commenced on or before January 1, 1999, with multiple violations thereafter, including violations after June 28, 2004, and, at a minimum, with respect to cover-up activities Dr. del Moral's violations have continued through the present.

Charges against **Dr. Michele Ferrari** (Consulting Doctor):

(1) **Possession** of prohibited substances and/or methods including EPO, blood transfusions and related equipment (such as needles, blood bags, storage containers and other transfusion equipment and blood parameters measuring devices), and/or testosterone.

(2) **Trafficking** and/or **attempted trafficking** of EPO, blood transfusions, testosterone, and/or corticosteroids.

(3) **Administration** and/or **attempted administration** of EPO, blood transfusions, testosterone, and/or corticosteroids.

(4) **Assisting**, **encouraging**, **aiding**, **abetting**, **covering up** and **other complicity** involving one or more anti-doping rule violations and/or attempted anti-doping rule violations.

(5) **Aggravating circumstances** justifying a period of ineligibility greater than the standard sanction.

June 28, 2012
Page 5 of 10

Dr. Ferrari's violations commenced on or before January 1, 1999, with multiple violations thereafter, including violations after June 28, 2004, and, at a minimum, with respect to cover-up activities Dr. Ferrari's violations have continued through the present.

Charges against **José (Pepe) Martí Martí** (Team Trainer):

> (1) **Possession** of prohibited substances and/or methods including EPO, blood transfusions and related equipment (such as needles, blood bags, storage containers and other transfusion equipment and blood parameters measuring devices), testosterone, hGH, corticosteroids, and/or saline, plasma or glycerol infusions.

> (2) **Trafficking** and/or **attempted trafficking** of EPO, blood transfusions, testosterone, hGH, corticosteroids, and/or saline, plasma or glycerol infusions.

> (3) **Administration** and/or **attempted administration** of EPO, blood transfusions, testosterone, hGH, corticosteroids, and/or saline, plasma or glycerol infusions.

> (4) **Assisting**, **encouraging**, **aiding**, **abetting**, **covering up** and **other complicity** involving one or more anti-doping rule violations and/or attempted anti-doping rule violations.

> (5) **Aggravating circumstances** justifying a period of ineligibility greater than the standard sanction.

Mr. Martí's violations commenced on or before January 1, 1999, with multiple violations thereafter, including violations after June 28, 2004, and, at a minimum, with respect to cover-up activities Mr. Martí's violations have continued through the present.

Charges against **Lance Armstrong** (Rider):

> (1) **Use** and/or **attempted use** of prohibited substances and/or methods including EPO, blood transfusions, testosterone, corticosteroids and/or saline, plasma or glycerol infusions.

> (2) **Possession** of prohibited substances and/or methods including EPO, blood transfusions and related equipment (such as needles, blood bags, storage containers and other transfusion equipment and blood parameters measuring devices), testosterone, corticosteroids and/or saline, plasma or glycerol infusions.

> (3) **Trafficking** and/or **attempted trafficking** of EPO, testosterone, and/or corticosteroids.

June 28, 2012
Page 6 of 10

(4) **Administration** and/or **attempted administration** to others of EPO, testosterone, and/or cortisone.

(5) **Assisting**, **encouraging**, **aiding**, **abetting**, **covering up** and **other complicity** involving one or more anti-doping rule violations and/or attempted anti-doping rule violations.

(6) **Aggravating circumstances** justifying a period of ineligibility greater than the standard sanction.

Mr. Armstrong's violations commenced on or before August 1, 1998, with multiple violations thereafter, including violations after June 28, 2004, and, at a minimum, with respect to cover-up activities Mr. Armstrong's violations have continued through the present.

### Sanctions Sought

USADA applies the sanctions found in the Applicable Rules; pursuant to these rules each of you are subject to a sanction for a first doping violation,[2] as follows:

- Up to a lifetime period of ineligibility as described in the Applicable Rules, beginning on the day you accept a sanction or fail to respond, or the date of the hearing decision in this matter; and,

- Disqualification of any and all competitive results obtained on and subsequent to the earliest date on which the evidence at the hearing indicates that you engaged in an anti-doping rule violation, including forfeiture of any medals, points and prizes consistent with the UCI ADR and/or Articles 10.1 and 10.8 of the Code; and,

- Costs and fines as provided for in the Applicable Rules.

- And, to the extent you are subject to the USOC NADP, you will additionally be subject to up to lifetime ineligibility, beginning on the day you accept this sanction or fail to respond, or the date of the hearing decision in this matter, from participating or coaching in U.S. Olympic, Pan American Games or Paralympic Games Trials, being a member of any U.S. Olympic, Pan American Games or Paralympic Team and having access to the training facilities of the United States Olympic Committee ("USOC") Training Centers or other programs and activities of the USOC including, but not limited to benefits, grants, awards or employment as set forth in Section 5 of the USOC National Anti-Doping Policies and further defined by Annex B therein.

---

[2] In the event you have previously been found to have committed an anti-doping rule violation you would potentially be accountable for an additional sanction as provided in the Applicable Rules.

June 28, 2012
Page 7 of 10

As required in every doping case, your doping violation and the resulting sanction will be publicly announced.

Should you fail to respond to USADA's charges by signing the enclosed USADA Acceptance of Sanction Form or by requesting a hearing as provided below, a sanction will be imposed under the Applicable Rules which will include lifetime ineligibility and disqualification of all competitive results (if any) achieved from the date on which your anti-doping rules violation commenced as identified in the foregoing section of this letter titled "Rule Violations Charged." Alternatively, if you are willing to accept this sanction, please inform us in writing by **July 9, 2012 at 5:00 p.m., EDT**, by executing and returning the attached USADA Acceptance of Sanction Form. Please return it by fax to 719-785-2028 or by e-mail to **lmccumber@usada.org**.

## USPS Conspiracy

As you were previously notified, this action is being brought as a single consolidated action because for a significant part of the period from January 1, 1998, through the present, each of the Respondents has been part of a doping conspiracy involving team officials, employees, doctors, and elite cyclists of the United States Postal Service and Discovery Channel Cycling Teams who committed numerous violations of the Applicable Rules (the "USPS Conspiracy" or the "Conspiracy").

The purpose of the USPS Conspiracy was to engage in the use of doping substances and techniques, which were either undetectable or difficult to detect in routine drug testing in order to advance the athletic and sporting achievements, financial wellbeing and status of the teams and their riders, employees, members and investors and to engage in techniques to avoid detection of the athletes' use of banned performance enhancing drugs as well as to prevent the truth regarding doping on the teams and by the riders and their support personnel from being revealed. USADA charges that your participation in the USPS Conspiracy involved your violations of the foregoing rules that strictly forbid doping.

Because of the nature of the USPS Conspiracy, the fact that each of the Respondents actively participated together in a long running doping conspiracy and due to the close integration of the evidence against each of the Respondents, this proceeding is being brought as a consolidated case. For the foregoing reasons, and, as explained below, should you request a hearing, USADA anticipates making a request to the arbitrators ultimately appointed, to hear the evidence in this matter at a single consolidated hearing.

## Right to AAA Arbitration Hearing

If you choose to contest the sanction proposed by USADA, you have the right to request a hearing to contest USADA's proposed sanction. As described in the USADA Protocol, you

June 28, 2012
Page 8 of 10

must inform us in writing by **July 9, 2012**, if you elect to proceed to a hearing before the American Arbitration Association (AAA).  I have enclosed a copy of the USADA Protocol, the USOC NADP and the AAA Supplementary Procedures for the Arbitration of Anti-Doping Rule Violations for your reference.  You have previously received copies of the UCI ADR.

If you fail to notify USADA in writing your intention to contest this sanction before **July 9, 2012**, or have not requested a five (5) day extension as described in 11(e) of the Protocol, the sanction will go into effect on that date and USADA will make a public announcement concerning your rules violations and the resulting consequences.

In the event you contest USADA's proposed sanction you should expect a hearing prior to November, 2012.

### Arbitrator Selection

In the event that you request an arbitration hearing USADA anticipates your case will be heard by a three (3) member arbitration panel as provided in R-11(b) of the American Arbitration Association Supplementary Procedures for the Arbitration of Olympic Sport Doping Disputes (the "Supplementary Procedures").  Pursuant to the Supplementary Procedures, in the event a party requests a hearing before a panel of three (3) arbitrators USADA will first designate an arbitrator and you will then have five (5) days following USADA's arbitrator choice in which to select an arbitrator.

In the event that more than one of the Respondents requests an arbitration hearing then, as provided under the Supplementary Procedures, USADA will provide notice of its arbitrator selection to each Respondent requesting a hearing.  Each Respondent will then have five (5) days in which to individually select an arbitrator for that Respondent's case. In order to provide the fullest possible range of party appointed arbitrators USADA will request that no panel chair for any arbitration panel be selected until after the party appointed arbitrators have been selected and qualified for all cases in which a hearing has been requested.

### Provisional Suspension Process

Additionally, in accordance with the Applicable Rules, you have the right, at this time, to accept a provisional suspension.  A USADA Acceptance of Provisional Suspension Form is enclosed for this purpose.  Should you accept a provisional suspension you will be immediately suspended from participating in any activity of the UCI, WTC, or any other signatory of the Code or their members until your case is deemed not to be a doping offence or until you accept a sanction or a hearing has been held in this matter.  If you choose to accept this provisional suspension, in accordance with the Applicable Rules, the period of the provisional suspension will be deducted from any period of ineligibility you might receive in the event that you receive less than a lifetime suspension.  If you do

June 28, 2012
Page 9 of 10

not choose to accept a provisional suspension, any period of ineligibility you might receive will begin on the date of your acceptance of the sanction, the hearing panel's decision or the date your sanction is otherwise imposed.

If you accept the provisional suspension, USADA will give notice to WADA, the UCI, the WTC, USA Cycling, USA Triathlon, and the USOC as well as the national anti-doping agency in your home country of your acceptance of the provisional suspension. Your decision to accept a provisional suspension is purely optional. You do not have to accept a provisional suspension in order to proceed with your case. If you are willing to accept a provisional suspension, please inform us in writing by **July 9, 2012**, by executing and returning the attached USADA Acceptance of Provisional Suspension Form.

### Additional Information

If you or your representatives have any questions or need additional information, please feel free to contact William Bock, USADA's General Counsel at 719-785-2061 or Onye Ikwaukor, USADA's Legal Affairs Director at 719-785-2037.

Also of importance, if you are an active athlete and have not retired you are still subject to testing pending the outcome of this matter.

You may also wish to contact John Ruger, the USOC Athlete Ombudsman who is completely independent of USADA, for assistance or further information. Mr. Ruger may be reached at the US Olympic Committee, 1 Olympic Plaza, Colorado Springs, CO, 80909, by telephone at (719) 866-5000, by fax at (719) 866-3000, by website at **www.athleteombudsman.org** or by e-mail at **John.Ruger@usoc.org**.

Because only Mr. Armstrong currently participates in the sport of triathlon, the letters provided to WTC and USA Triathlon have the names of Mr. Bruyneel, Dr. Celaya, Dr. del Moral, Dr. Ferrari and Mr. Martí redacted from them.

By copy of this letter, USADA is requesting that WADA, UCI, ITU, WTC, USA Cycling, USA Triathlon, and the USOC not comment publicly concerning this information until your case has been resolved as provided in the Protocol.

Sincerely,

Lisa McCumber
Testing Results Manager

June 28, 2012
Page 10 of 10

cc (w/o encls.):  Olivier Niggli, WADA Legal Director
Mario Zorzoli, UCI Chief Medical Officer
Francesca Rossi, UCI Anti-Doping Manager
Andrew Messick, CEO, WTC (names of certain Respondents redacted)
Rana Dershowitz, USOC General Counsel
Gary Johansen, USOC Associate General Counsel
John Ruger, USOC Athlete Ombudsman
Steve Johnson, USA Cycling CEO
Sean Petty, USA Cycling COO
Rob Urbach, USA Triathlon CEO (names of certain Respondents  redacted)

June 27, 2012

Travis T. Tygart
Chief Executive Officer
United States Anti-Doping Agency
5555 Tech Center Drive, Suite 200
Colorado Springs, CO 80919

> Re:   Jun 12, 2012 Notice Letter
>       Anti-Doping Rules Violations

Dear Travis:

The following members of the United States Anti-Doping Agency's Anti-Doping Review Board Panel met by teleconference June 25-27, 2012, to review the above referenced matter.

This Panel considered the written information submitted to it, and concluded that there was sufficient evidence of doping violations to proceed with the adjudication process as set forth in USADA's Protocol for Olympic and Paralympic Movement Testing.

_____
Ross Wales, Esq.


_____
Clark Griffith, Esq.


_____
Robert Dimeff, M.D.

June 27, 2012

Travis T. Tygart
Chief Executive Officer
United States Anti-Doping Agency
5555 Tech Center Drive, Suite 200
Colorado Springs, CO  80919

Re:   Jun 12, 2012 Notice Letter
      Anti-Doping Rules Violations

Dear Travis:

The following members of the United States Anti-Doping Agency's Anti-Doping Review Board Panel met by teleconference June 25-27, 2012, to review the above referenced matter.

This Panel considered the written information submitted to it, and concluded that there was sufficient evidence of doping violations to proceed with the adjudication process as set forth in USADA's Protocol for Olympic and Paralympic Movement Testing.

_____

Ross Wales, Esq.

_____

Clark Griffith, Esq.

_____

Robert Dimeff, M.D.

June 27, 2012

Travis T. Tygart
Chief Executive Officer
United States Anti-Doping Agency
5555 Tech Center Drive, Suite 200
Colorado Springs, CO  80919

    Re:  Jun 12, 2012 Notice Letter
       Anti-Doping Rules Violations

Dear Travis:

The following members of the United States Anti-Doping Agency's Anti-Doping
Review Board Panel met by teleconference June 25-27, 2012, to review the above
referenced matter.

This Panel considered the written information submitted to it, and concluded
that there was sufficient evidence of doping violations to proceed with the
adjudication process as set forth in USADA's Protocol for Olympic and
Paralympic Movement Testing.


_____
Ross Wales, Esq.


_____
Clark Griffith, Esq.

Robert J. Dimeff, MD
Digitally signed by Robert J. Dimeff, MD
DN: cn=Robert J. Dimeff, MD, o=UT Southwestern Medical
Center, ou=Professor Orthopaedic Surgery, Pediatrics, &
Family Medicine, email=robert.dimeff@utsw.edu, c=US
Date: 2012.06.27 21:53:01 -05'00'
_____
Robert Dimeff, M.D.

UNITED STATES ANTI-DOPING AGENCY

## ACCEPTANCE OF PROVISIONAL SUSPENSION

I, Lance Armstrong, accept a <u>Provisional Suspension</u> as a result my alleged Anti-doping Rule Violations as set forth in the June 12, 2012, notice letter previously provided to me.  By accepting a provisional suspension I understand that I am not admitting a rules violation but am agreeing for the duration of my case to be temporarily barred from any activity or competition organized by or under the jurisdiction of, and from participation in any activity of or organized by, the Union Cycliste Internationale ("UCI"), World Triathlon Corporation ("WTC"), USA Cycling, USA Triathlon, the United States Olympic Committee ("USOC") and any other Signatory of the World Anti-Doping Code (the "Code"), and/or any entity which has accepted the Code and/or any entity whose rules are consistent with the Code and/or any of the clubs, member associations or affiliates of these entities while serving this Provisional Suspension.

Among other things, this Provisional Suspension bars me from serving as an athlete or as a coach, trainer, team director, team manager, team doctor, team employee, team owner, athlete support person.  This Provisional Suspension also bars me from serving as an athlete representative, agent, or employee of any athlete management or athlete representation firm, entity or association or in any governance capacity, paid or unpaid, with any Signatory, or any member or affiliate of a Signatory or any member of a member.

I understand that the period of the Provisional Suspension, beginning on the date I accept this Provisional Suspension <u>and</u> notify the United States Anti-Doping Agency ("USADA") of such, will be deducted from any period of ineligibility that I might receive in my case.

I understand and accept that USADA will notify UCI, WTC, USA Cycling, USA Triathlon, the USOC and other sports organizations and/or event organizers as appropriate my acceptance of this Provisional Suspension.

I understand and accept that my acceptance of a Provisional Suspension is purely voluntary and optional. I understand and accept that I am entitled to proceed with my case, to a hearing if necessary, regardless of whether I accept this Provisional Suspension.

I understand and accept that I may serve this Provisional Suspension and it may ultimately be determined that no doping offense has occurred through a hearing or otherwise.

I understand and accept that I am still subject to testing pending the outcome of this matter.


_____          _____
*Signature of Lance Armstrong*                                        *Date*


_____
*Printed Name of Lance Armstrong*

UNITED STATES ANTI-DOPING AGENCY

# ACCEPTANCE OF SANCTION

I, Lance Armstrong, accept the following sanction as a result of my anti-doping rules violations during the period from August 1, 1998 through the present as set forth in the June 28, 2012, charging letter which is attached as Exhibit A. I acknowledge that I have violated the applicable rules, including the Union Cycliste Internationale ("UCI") Anti-Doping Rules ("UCI ADR"), the World Anti-Doping Code (the "Code"), the United States Anti-Doping Agency ("USADA") Protocol for Olympic and Paralympic Movement Testing (the "Protocol"), and the United States Olympic Committee ("USOC") National Anti-Doping Policies ("USOC NADP"), and I accept the following:

- A Lifetime period of Ineligibility as described in the Code and current UCI ADR, beginning on the day I accept this sanction, from participation in any activity or competition organized by or under the auspices of any signatory to the Code or any member of any signatory, and,

- Disqualification of any and all competitive results obtained on and subsequent to August 1, 1998, including forfeiture of any medals, titles, winnings, finishes, points and prizes consistent with Articles 10.1 and 10.8 of the Code and the UCI Anti-Doping Rules.

- Lifetime Ineligibility from participating or coaching in U.S. Olympic, Pan American Games or Paralympic Games Trials, being a member of any U.S. Olympic, Pan American Games or Paralympic Team and having access to the training facilities of the USOC Training Centers or other programs and activities of the USOC including, but not limited to benefits, grants, awards or employment as set forth in Section 5 of the USOC National Anti-Doping Policies and further defined by Annex B therein.

I do not contest the above sanction determined by USADA under the applicable rules, and I have agreed to the violation and resulting sanction. I knowingly and voluntarily waive any further right to contest or challenge my violation or this sanction.

I understand that USADA will communicate my acceptance to the World Anti-Doping Agency ("WADA"), UCI, WTC, USA Cycling, USA Triathlon who, with USADA and any other appropriate organization(s), will impose this sanction, and to the USOC and such other sports organizations and event organizers as may be appropriate. I understand that neither UCI nor WADA is bound by this resolution and that either or both may appeal this resolution to the Court of Arbitration for Sport ("CAS"). In the event of an appeal, UCI or WADA has the authority to impose any sanction it chooses in accordance with the applicable rules. Also, in the event of such an appeal I reserve the right to file a cross-appeal with CAS and request that the sanction be reduced or eliminated.

In the event it is determined that I participated in any activity or competition organized by or under the auspices of any signatory to the Code or competed during my period of ineligibility I understand that my entire period of ineligibility will be extended and restarted from the last date of any such participation. Also, in the event it is later determined that my anti-doping rules violation(s) began earlier than the date set forth above I understand and agree that any results, prizes, points, money or other winnings obtained between the first date of such

participation will be disqualified and, to the extent possible, promptly returned by me to USADA.

It is my sole responsibility to investigate and determine the effect of this sanction on my eligibility for future competitions or teams. I understand and accept that entities other than the USOC, UCI, WTC, USA Cycling and USA Triathlon, will give effect to this sanction including potentially, but not limited to, the International Olympic Committee ("IOC"), signatories to the Code, the National Collegiate Athletic Association, National Association of Intercollegiate Athletics, or any clubs, member associations or affiliates of the World Anti-Doping Code, the USOC or US Paralympics, and other organizations if applicable. I understand and accept that it is my obligation to investigate the effect of this sanction on me by other entities.

I understand that Article 10.1 of the Code and the anti-doping rules of certain international federations permit disqualification of results obtained prior to Sample collection or an attempt at Sample collection and/or prior to the occurrence of an anti-doping rule violation, particularly where the collection, attempted collection or occurrence of a rule violation occurred in connection with an Event, consisting of more than a single Competition. It is my responsibility to investigate the possibility that certain of my prior competitive results could be disqualified under Article 10.1 of the Code and/or the rules of my international federation and I accept that such disqualification may be a consequence of my acceptance of sanction.

I also understand and accept that under the Protocol, my doping violations and the resulting sanction will be publicly announced.

BY SIGNING BELOW I AFFIRM THAT I HAVE READ AND FULLY UNDERSTAND THIS ACCEPTANCE OF SANCTION AND AGREE TO THE ABOVE TERMS AND ALL OTHER PROVISIONS IN THE CODE, THE PROTOCOL THE USOC NADP AND THE ANTI-DOPING RULES OF MY INTERNATIONAL FEDERATION(S) THAT RELATE TO MY ANTI-DOPING RULE VIOLATION.

_____          _____
*Signature of Lance Armstrong*                      *Date*


_____
*Printed Name of Lance Armstrong*