# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

LANCE ARMSTRONG,

     *Plaintiff,*

*v.*

UNITED STATES ANTI-DOPING
AGENCY and TRAVIS TYGART, In His
Official Capacity as Chief Executive Officer
of the United States Anti-Doping Agency,

     *Defendants.*

Civ. Action No. 1:12-cv-00606-SS

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR, IN THE ALTERNATIVE, MOTION TO DISMISS OR STAY UNDER THE FEDERAL ARBITRATION ACT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

TABLE OF ABBREVIATED TERMS ......................................................................... iv

I.     INTRODUCTION ........................................................................................... 1

II.    ARMSTRONG ADMITTEDLY AGREED TO ARBITRATE UNDER THE USADA
       PROTOCOL; THE SCOPE OF THE ARBITRATION AGREEMENT IS A MATTER
       FOR ARBITRATION .................................................................................... 1

       A.     Armstrong Concedes He Agreed to Arbitrate Under the USADA Protocol for at
              Least Some Alleged Doping Violations. ................................................. 1

       B.     Given that Armstrong Admittedly Agreed to Arbitrate Some Disputes under the
              USADA Protocol, Whether the Scope of the Arbitration Agreement Extends to
              the Claims in this Case is a Matter for the Arbitrators to Decide. .......... 2

III.   THE SPORTS ACT PREEMPTS ARMSTRONG'S CLAIMS. ...................... 7

IV.    ARMSTRONG HAS FAILED TO EXHAUST ADMINSITRATIVE REMEDIES. ........ 9

V.     ALTERNATIVELY, ARMSTRONG'S CLAIMS SHOULD BE DISMISSED OR
       STAYED UNDER SECTION 3 OF THE FEDERAL ARBITRATION ACT. ............... 10

## **TABLE OF AUTHORITIES**

### **CASES**

*Behagen v. Amateur Basketball Ass'n,*
    884 F.2d 524 (10th Cir. 1989) ........................................................ 9

*Belom v. Nat'l Futures Ass'n,*
    284 F.3d 795 (7th Cir. 2002) ..................................................... 9 n.9

*Caley v. Gulfstream Aerospace Corp.,*
    428 F.3d 1359 (11th Cir. 2005) ................................................. 2 n.2

*ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.,*
    726 F. Supp. 2d 961 (N.D. Ill. 2010) .............................................. 7

*In re Olshan Foundation Repair Co., LLC,*
    328 S.W. 3d 883 (Tex. 2010) ....................................................... 9

*J. Aron & Co. v. Cargill Marine Terminal, Inc.,*
    Civil Action No. 94-1696, 1995 WL 384488 (E.D. La. June 27, 1995) ........... 2

*Jacobs v. USA Track & Field,*
    374 F.3d 85 (2d Cir. 2004) .................................................. 3 n.3, 8

*Jacobs v. U.S. Track & Field,*
    04 Civ. 1163, 2004 WL 5003951 (S.D.N.Y. May 19, 2004) ........................ 8

*Louis Dreyfus Corp. v. 27,946 Long Tons of Corn,*
    830 F.2d 1321 (5th Cir. 1987) ............................................... 4, 5, 9

*Medical Dev. Corp. v. Indus. Molding Corp.,*
    479 F.2d 345 (10th Cir. 1973) ................................................. 2 n.2

*Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,*
    460 U.S. 1 (1983) ................................................................ 10

*Perez v. Lemarroy,*
    592 F. Supp. 2d 924 (S.D. Tex. 2008) ........................................... 10

*R.J. O'Brien & Assoc. v. Pipkin,*
    64 F.3d 257 (7th Cir. 1995) ...................................................... 2

*Slaney v. The Int'l Amateur Athletic Fed'n,*
    244 F.3d 580 (7th Cir. 2001) ................................................ 9 & n.9

*Snap-On Tools Corp. v. Mason,*
    18 F.3d 1261 (5th Cir. 1994) .................................................... 10

*Wick v. Atlantic Marine, Inc.,*
    605 F.2d 166 (5th Cir. 1979) ............................................................................... 4

## FEDERAL STATUTES

36 U.S.C. § 220501(b)(1) ...................................................................................... 7
36 U.S.C. § 220501(b)(2) ...................................................................................... 8
36 U.S.C. § 220521.......................................................................................... 5 n.6
36 U.S.C. § 220522(a) ........................................................................................... 8
36 U.S.C. § 220522(a)(4)................................................................................... 7, 8
36 U.S.C. § 220522(a)(4)(B) ................................................................................. 8

## OTHER SECONDARY AUTHORITY

Daniel Gandert & Harry Epstein, *The Court's Yellow Card for the United States
    Soccer Federation*, 11 Va. Sports & Ent. L.J 1 (2011) .................................... 7

## <u>TABLE OF ABBREVIATED TERMS</u>

| | |
|---|---|
| AAA | American Arbitration Association |
| ADRB | Anti-Doping Review Board |
| CAS | Court of Arbitration for Sport |
| IOC | International Olympic Committee |
| NGB | National Governing Body |
| RTP | Registered Testing Pool |
| UCI | International Cycling Union or Union Cycliste Internationale |
| USADA | United States Anti-Doping Agency |
| USOC | United States Olympic Committee |
| WADA | World Anti-Doping Agency |

## I.      INTRODUCTION

Armstrong's Opposition to the Motion rests entirely on a single premise – that UCI is the sole entity with anti-doping jurisdiction over Armstrong and may simply decree that its rules trump any contrary rules of the USOC, USA Cycling and USADA.  This basic premise is false.

As a member of USA Cycling (which was granted its NGB status by the USOC under authority granted by the Sports Act), Armstrong falls under the USOC's authority.  The USOC's jurisdiction over U.S. cyclists is separate and independent from any jurisdiction asserted by UCI. In the anti-doping arena, the USOC delegated its authority to USADA and exercised its authority over NGBs to require that every athlete member is "bound by the …USADA Protocol."

These undisputed facts establish USADA's jurisdiction over Armstrong is independently derived from the USOC.  Armstrong provides no legal theory by which a foreign entity such as UCI has unilateral power to limit or extinguish the USOC's authority over U.S. athletes.

Armstrong's opposition fails for additional reasons.  As a direct result of Armstrong's membership in USA Cycling: he agreed to be bound by the USADA Protocol for at least some doping violations, and all questions regarding the scope of arbitration under the Protocol must be resolved in arbitration; his claims are preempted by the Sports Act because he is an "amateur athlete" as defined by the Act; he failed to exhaust administrative arbitral remedies established by the Act; and his claims should be dismissed or stayed under Section 3 of the FAA.

## II.     ARMSTRONG ADMITTEDLY AGREED TO ARBITRATE UNDER THE USADA PROTOCOL; THE SCOPE OF THE ARBITRATION AGREEMENT IS A MATTER FOR ARBITRATION.

### A.      Armstrong Concedes He Agreed to Arbitrate Under the USADA Protocol for at Least Some Alleged Doping Violations.

In his Opposition, Armstrong concedes that, during the relevant time periods: (i) he was a member of USA Cycling; (ii) he was a member of USADA's Registered Testing Pool; (iii) USA

Cycling's regulations incorporated the USADA Protocol; and (iv) as a result, he "agreed 'to comply with and to be bound by … anti-doping regulations … as foreseen by … the U.S. Anti-Doping Agency ("USADA"), provided such regulations comply with the World Anti-Doping Code.'"  Opp., pp. 2, 4, 13, 24.  Armstrong further admits by necessary implication that he agreed to arbitrate under the USADA Protocol for any alleged anti-doping rule violation "discovered" by USADA.  Opp., p. 12.

Even if Armstrong had not conceded he is subject to the USADA Protocol, the law leaves no room for dispute.  By voluntarily becoming a member of USA Cycling[1], Armstrong agreed to be bound by its regulations, including the USADA Protocol which USA Cycling's regulations explicitly adopt by reference.  *See R.J. O'Brien & Assoc. v. Pipkin*, 64 F.3d 257, 260 (7th Cir. 1995) (party was bound by association's mandatory arbitration regulation even though membership form did not specifically mention arbitration – "a contract … need not contain an explicit arbitration clause if it validly incorporates by reference an arbitration clause in another document"); *J. Aron & Co. v. Cargill Marine Terminal, Inc.*, Civil Action No. 94-1696, 1995 WL 384488, at *1 (E.D. La. June 27, 1995) ("arbitration provisions [contained in association's bylaws] were agreed to by [plaintiffs] when they became members of the [association]").[2]

**B.      Given that Armstrong Admittedly Agreed to Arbitrate Some Disputes under the USADA Protocol, Whether the Scope of the Arbitration Agreement Extends to the Claims in this Case is a Matter for the Arbitrators to Decide.**

---

[1] Several of the license applications signed by Armstrong or his lawyer-agent, former USOC Vice President Bill Stapleton, as well as the most recent cycling license given Armstrong by USA Cycling are attached to the Second Affidavit of Shawn Farrell, submitted with Plaintiff's Unopposed Motion for Leave to File [docket #47].

[2] The same legal principles defeat Armstrong's suggestion that he is not bound to arbitrate under the USADA Protocol because he "never signed an arbitration agreement with USADA." Opp., p. 24.  *See Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005) ("[W]hile the FAA requires that the arbitration agreement be in writing, it does not require that it be signed by the parties."); *Medical Dev. Corp. v. Indus. Molding Corp.*, 479 F.2d 345, 348 (10th Cir. 1973) ("[It is] not necessary that there be a simple integrated writing or that a party sign the writing containing the arbitration clause.  All that is required is that the arbitration provision be in writing.") (internal citations omitted).

While conceding he agreed to arbitration under the USADA Protocol if USADA had "discovered" the violation or performed the test, Armstrong argues the particular claims here do not fall within the scope of his agreement because USADA "is violating the applicable rules" and "he never agreed to arbitrate charges brought by USADA that violate the WADA Code and are outside USADA's jurisdiction under the governing rules."  Opp., pp. 19, 25.  Armstrong then asserts, "The question whether the Protocol has any application here is a threshold matter for the Court to address in determining whether Mr. Armstrong has any agreement to arbitrate with USADA."  Opp., p. 28.  This argument regarding the proper scope of the arbitration agreement fails for two reasons.

First, the AAA Supplementary Procedures under the USADA Protocol include the AAA rule that provides, "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."  Tygart Aff., ex. C, p. 64 (Annex D, AAA Supplementary Procedures, R-7).  In its Motion, USADA cites cases uniformly holding that this precise AAA rule constitutes a clear and unmistakable agreement that all questions of arbitrability shall be decided in arbitration rather than court.  Motion, pp. 16-17.  Armstrong cites no contrary authority.  Based on the unambiguous language of Rule R-7, any question whether this specific dispute falls within the USADA Protocol is removed from this Court's jurisdiction. [3]

Second, even if the Court had jurisdiction to rule on the scope of the arbitration agreement under the USADA Protocol, Armstrong fails to meet his requisite burden to show "with positive assurance that [the] arbitration clause is not susceptible of an interpretation which

---

[3] *See also Jacobs v. USA Track & Field*, 374 F.3d 85, 88 (2d Cir. 2004) (where athlete agreed to arbitration under either AAA Commercial Rules or AAA Supplementary Procedures, district court properly held that the AAA rule on arbitrability means that "the parties have agreed that all questions of arbitrability, including the validity and scope of the arbitration agreement, are reserved for arbitral rather than Court determination").

would cover the dispute at issue." *Louis Dreyfus Corp. v. 27,946 Long Tons of Corn,* 830 F.2d

1321, 1329 (5th Cir. 1987) (quoting *Wick v. Atlantic Marine, Inc.*, 605 F.2d 166, 168 (5th Cir.

1979).  Armstrong's entire argument on the allegedly limited scope of the Protocol is that UCI's

rules (according to UCI's self-serving letters[4]) permit no jurisdiction for USADA in this case.

        In his single-minded focus to show that the UCI, through its own rules, purports to give

itself exclusive jurisdiction, Armstrong misses a critical point – the USADA Protocol, which was

adopted by the USOC and incorporated by USA Cycling in its regulations as required by the

USOC's National Anti-Doping Policies, provides an independent basis for jurisdiction over U.S.

athletes charged with anti-doping rule violations.[5]   Specifically, the Protocol states

unambiguously, "USADA shall be responsible for results management [for anti-doping

violations] involving any Athlete" who "is a member or license holder of a NGB" or "is included

in the USADA Registered Testing Pool."   Tygart Aff., ex. C, pp. 2-3, §§ 2(a),(e), § 3(c).

Armstrong also overlooks the fact that USA Cycling's regulations and the Protocol explicitly

state the Protocol takes precedence over any rule to the contrary.   USA Cycling's regulations

state, "Any investigation, prosecution, and hearings shall be the responsibility of [USADA]," and

---

        [4] Through the affidavit of Tim Herman, Armstrong submitted UCI's letters dated July 13, 2012, USADA's July 26, 2012, response, and UCI's August 3, 2012, follow up.  USADA responded to UCI by letter dated August 8, 2012; in addition, the World Anti-Doping Agency, through its Director General, disagreed with UCI's jurisdictional argument by letter dated August 7, 2012.  These response letters are attached hereto with the Second Affidavit of Molly Tomlonovic (Exhibit 6) as exhibits BB and CC.

        Furthermore, UCI's position in its recent correspondence is contradicted by public statements given last month.   *See*  July  11,  2012  video  interview  given  by  UCI  Pat  McQuaid,  available  at http://www.sporza.be/cm/sporza/videozone/MG_sportnieuws/MG_wielrennen/1.1363787;   *see  also*   Second Tomlonovic Aff. ¶ 5, ex. DD (transcript of McQuaid interview) ("The position of UCI is that we're not involved in this, and it's a USADA investigation.  They're doing all the process in the United States.  It's nothing to do with UCI, and we'll wait and see what the eventual outcome is.").

        [5] Contrary to Armstrong's assertion, USADA's June 28, 2012, "charging letter" specifically references violations of the USOC National Anti-Doping Policies, the USADA Protocol, and the World Anti-Doping Code. Tygart Aff., ¶ 32, ex. J at p. 1.  Likewise, USADA's June 12, 2012 letter alleges violations of the USADA Protocol and World Anti-Doping Code (which is incorporated in the Protocol as Annex A), in addition to the UCI anti-doping rules.  Tygart Aff., ex. I at p.2.

"[t]he USADA protocol is incorporated herein by reference and shall prevail over any USA Cycling Regulation to the contrary."   Tomlonovic Aff., ex. X, pp. 249-250 (USA Cycling Regulations, Policy II. Medical Control §§ 1, 5).[6]   Similarly, the Protocol states, "Any [International Federation] procedural rule inconsistent with this Protocol shall be superseded by this Protocol."  Tygart Aff., ex. C, p. 3, § 3(d).

Based on the plain language of USA Cycling's regulation and the Protocol, the scope of the arbitration agreement covers the charges against Armstrong.  The Court need not make this finding, however, to dismiss the Amended Complaint; it is sufficient, instead, to conclude that Armstrong cannot establish "with positive assurance that [the Protocol] is not susceptible of an interpretation which would cover the dispute at issue."  *Louis Dreyfus Corp.*, 830 F.2d at 1329.

Nor does the World Anti-Doping Code support Armstrong.  Under the plain language of Article 15.3, the Code gives results management responsibility for non-analytical violations (*i.e.*, violations where "no Sample collection is involved") to USADA in any case where it "discovered the violation" by a U.S. athlete.  Tygart Aff., ex. B at p. 92.  This Code provision applies equally to UCI, USOC and USADA as signatories to the Code.  Nothing in the Code grants UCI the unilateral power to adopt an unreasonably broad definition of "discovered" in order to give itself greater jurisdiction while diminishing the jurisdiction of an athlete's National Olympic Committee (in this case, the USOC) or other anti-doping organization.

As described in its notice letter to Armstrong and the other respondents dated June 12, 2012, USADA's doping allegations are based on extensive evidence gathered by USADA,

---

[6] USA Cycling's authority as the NGB for cycling in the U.S. is given (and can be removed) by the USOC pursuant to the Sports Act.  *See* 36 U.S.C. § 220521 (granting authority to the USOC to recognize NGBs).  As a USOC member, USA Cycling must comply with the USOC's Bylaws and National Anti-Doping Policies which provide that USA Cycling "shall not have any anti-doping rule which is inconsistent with…the USADA Protocol." Dershowitz Aff., ¶¶ 11-12, exs. F, G.  Since USA Cycling's rules also incorporate certain UCI ADR rules, violations of those rules (including the violations itemized in USADA's letters) are subject to "investigation, prosecution, and hearings" by USADA under the Protocol.

including its face-to-face interviews of more than ten cyclists and other eyewitnesses.  Tygart Aff., ex. I, pp. 1-2.  Although neither UCI nor USA Cycling contributed to or participated in any way in USADA's investigation or its witness interviews, Armstrong asserts "UCI 'discovered' the alleged violations" based solely on a single email dated April 30, 2010 from Floyd Landis, a U.S. cyclist, to USA Cycling's Steve Johnson, who in turn forwarded the email to Travis Tygart with a copy to UCI.  Opp., pp. 8-9.[7]  Based on this single fact that USA Cycling copied UCI when it forwarded Landis' email to USADA, Armstrong contends UCI "discovered" all of the doping violations alleged by USADA (which, again, are based in large part on evidence obtained in USADA's interviews of more than ten eyewitnesses) even though UCI immediately dismissed Mr. Landis' 2010 email as libelously false and not meriting any further investigation.[8]

While these facts amply demonstrate the implausibility of Armstrong's position with respect to "discovery" under Article 15.3 of the World Anti-Doping Code, the Court need not and should not render a determination as to whether UCI or USADA "discovered the violation." Rather, these competing jurisdictional arguments should be addressed in the first instance by the arbitrators as required by the USADA Protocol, with Armstrong having the right to appeal any adverse decision to CAS.[9]  Again, Armstrong fails to carry his burden to demonstrate that Article 15.3 of the Code is not susceptible of any interpretation that would give USADA jurisdiction.

---

[7] Mr. Johnson's cover letter to USADA explained, "The information contained in Mr. Landis' communication pertains to activities that are clearly the domain of USADA . . . ." Herman Aff., ex. 6.

[8] Armstrong's position that UCI "discovered" the doping violations charged by USADA is further contradicted by his Amended Complaint, where he alleges, "[USADA's] investigators have worked for two years in concert with multiple agencies of the United States to investigate and bring criminal and anti-doping charges against Mr. Armstrong," and "the charges brought against Mr. Armstrong by [USADA] are based on evidence gathered as part of a joint investigation with the United States government." Amended Complaint, ¶¶ 34, 69.

[9] Armstrong implicitly concedes CAS is an appropriate forum to determine whether USADA or UCI has jurisdiction when he cites CAS decisions as authoritative precedent on jurisdictional issues. Opp., p. 6. All of the CAS cases cited by Armstrong, however, pre-date adoption of the World Anti-Doping Code in 2004 and are therefore inapplicable here. Tygart Aff., ¶ 7.

## III.    THE SPORTS ACT PREEMPTS ARMSTRONG'S CLAIMS.

Armstrong admits the Sports Act requires arbitration of any controversy involving a NGB and the opportunity of any amateur athlete to participate in amateur athletic competition.  Opp., p. 14.  He nonetheless asserts the Act does not apply because (i) he is not an "amateur athlete"; (ii) his claims do not involve his eligibility to compete in "amateur competition"; and (iii) the Act requires arbitration only with NGBs, not USADA.  Opp., p. 14.  Armstrong is wrong.

Armstrong's claim that it would be absurd to classify him as an "amateur athlete" ignores the Act's definition of the term.  Under § 220501(b)(1), the Act defines "amateur athlete" as "an athlete who meets the eligibility standards established by the national governing body … for the sport in which the athlete competes."  In order to compete in international competitions such as the Tour de France, Armstrong was required to meet (and did meet) the eligibility standards for membership in USA Cycling, the organization recognized by the USOC as the NGB for the sport of cycling.  Armstrong remained a member of USA Cycling throughout the relevant time periods.  As a result, Armstrong is an "amateur athlete" under the Sports Act.[10]

Similarly, Armstrong is covered by the dispute resolution procedures of the Sports Act. Section 220522(a)(4) of the Act requires arbitration under the Commercial Rules of the AAA (as may be modified by the USOC) for any dispute involving the opportunity of any "amateur athlete" to participate in any "amateur athletic competition."  Contrary to Armstrong's argument, the Act does not limit the mandated arbitration procedure to disputes involving "protected competition" but rather to any "amateur athletic competition," which the Act defines as any

---

[10] *See* Daniel Gandert & Harry Epstein, *The Court's Yellow Card for the United States Soccer Federation*, 11 VA. SPORTS & ENT. L.J 1, at *10 (2011) (noting definition of "amateur athlete" and concluding, "based upon the language of the act, many professional athletes should be considered as amateur and thus under the jurisdiction of the [Sports Act]."  The case cited by Armstrong, *ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*, 726 F. Supp. 2d 961 (N.D. Ill. 2010) is easily distinguished – the plaintiff there was neither an athlete nor a member of a NGB, but rather an independent soccer organization unaffiliated with any NGB.

"contest, game, meet, match, tournament, regatta or other event in which amateur athletes compete." 36 U.S.C. § 220501(b)(2). This definition includes Armstrong's competition in any international events where his eligibility requires membership in a NGB; and by his membership in two NGBs (USA Cycling/USA Triathlon), Armstrong agreed to arbitration under the Protocol.

Nor can Armstrong escape the mandatory arbitration procedures contemplated by the Act on the basis that the doping allegations are brought by USADA rather than USA Cycling. Section 220522(a)(4) of the Act requires NGBs to submit to binding arbitration under the AAA Commercial Rules, as may be modified by the USOC. Here, the USOC gave USADA anti-doping responsibilities previously shared by the USOC and NGBs, while at the same time approving the Protocol and AAA Supplementary Procedures (which are the AAA Commercial Rules with some modifications) and adopting a specific bylaw mandating that NGBs comply with these procedures. Dershowitz Aff., ¶¶ 9-16. *See Jacobs v. U.S. Track & Field*, 04 Civ. 1163, 2004 WL 5003951, at *1 (S.D.N.Y. May 19, 2004) ("As the [Sports Act] allows, this requirement [for arbitration under § 220522(a)(4)(B)] was modified by a USOC bylaw mandating that all NGBs, ... 'comply with the procedures pertaining to drug testing and adjudication of related doping offenses of the independent anti-doping organization designated by the USOC to conduct drug testing.' … USADA is the 'independent anti-doping organization' referred to in the USOC's bylaws."), *aff'd*, 374 F.3d 85 (2d Cir. 2004). Moreover, the matter does involve USA Cycling, as it is required to enforce the sanction, if any, imposed as a result of the adjudication under the USADA Protocol. Tomlonovic Aff., ex. X, p. 250 (USA Cycling Regulations, Policy II. Medical Control § 5).

For these reasons, the Act preempts Armstrong's claims, just as it preempted claims by other "professional" athletes. *Behagen v. Amateur Basketball Ass'n*, 884 F.2d 524, 530-32 (10th Cir. 1989); *Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 596 (7th Cir. 2001).[11]

## IV.   ARMSTRONG HAS FAILED TO EXHAUST ADMINSITRATIVE REMEDIES.

Armstrong argues he "is not required to participate in a proceeding over which USADA lacks jurisdiction in order for the Court to address USADA's jurisdiction." Opp., p. 21.  This is no different than a party saying he should not have to go through arbitration because it *might* turn out the claim is not within the scope of the agreement.   Again, Armstrong must exhaust his arbitral remedies "unless it can be said with positive assurance that [the Protocol] is not susceptible of an interpretation which would cover the dispute at issue." *Louis Dreyfus Corp.*, 830 F.2d at 1329.  The federal policy favoring arbitration directs that "all doubts regarding the arbitrability of disputes be resolved in favor of arbitration," even where this may result in "inefficient or duplicative proceedings." *Id.* at 1329; *see also In re Olshan Foundation Repair Co., LLC*, 328 S.W.3d 883, 898 (Tex. 2010) (given policy favoring arbitration, courts must resist temptation "to avoid the unnecessary costs that would accompany an allegedly unnecessary arbitration").

---

[11] Armstrong also contends the Sports Act, even if applicable, would not preempt his common law claims because he does not seek adjudication of his eligibility to compete.  Opp., p. 20.  The same argument was rejected by the Seventh Circuit.  *Slaney*, 244 F.3d at 596 ("Slaney cannot escape the fact that her state-law claims, whether framed as breach of contract, negligence, breach of fiduciary duty, fraud, constructive fraud, or negligent misrepresentation, are actually challenges to the method by which the USOC determines eligibility of athletes."). Furthermore, Armstrong's arguments concerning Article III of the United States Constitution have no bearing on the Federal Arbitration Act analysis, which derives from his *agreement* to arbitrate his claims.  *See Belom v. Nat'l Futures Ass'n*, 284 F.3d 795, 799 (7th Cir. 2002) (holding an employee plaintiff "waived his right to an Article III forum by accepting employment" from an employer that required his consent to arbitration).

V.    **ALTERNATIVELY, ARMSTRONG'S CLAIMS SHOULD BE DISMISSED OR STAYED UNDER SECTION 3 OF THE FEDERAL ARBITRATION ACT.**

Armstrong asks the Court to deny the Motion under Section 3 of the FAA based on his contention that the doping violations alleged by USADA are within UCI's exclusive jurisdiction and therefore outside the scope of the Protocol.

Given Armstrong's admission that, as a member of USA Cycling and USADA's Registered Testing Pool, he agreed to arbitrate at least some doping disputes under the Protocol, the undisputed facts establish an agreement to arbitrate for purposes of the FAA. *See* discussion above at 1-2. Thus, USADA's motion should be decided summarily, and no jury trial as requested by Armstrong is required. *See Snap-On Tools Corp. v. Mason*, 18 F.3d 1261, 1265 n.4 (5th Cir. 1994) (district court's refusal to compel arbitration "cannot be sustained on the basis that determining whether Snap-On is entitled to arbitrate would require a 'full-fledged trial,' since in FAA suits, the federal courts conduct 'an expeditious and summary hearing, with only restricted inquiry into factual issues' bearing on the making of the arbitration agreement") (quoting *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983)).

As discussed above, all questions regarding the *scope* of the Protocol should be decided in arbitration. In any event, the Protocol on its face gives USADA jurisdiction over Armstrong's alleged doping violations, so there is no way to say with "positive assurance" that the dispute is not covered by the Protocol.

Finally, Armstrong's other arguments relating to procedural and evidentiary issues under the Protocol (*e.g.*, consolidation of actions, limitations period, adequacy of notice, and discovery) should be decided by the arbitrators pursuant to Rule R-7 of the AAA Supplementary Procedures and case law under the FAA. *Perez v. Lemarroy*, 592 F. Supp. 2d 924, 937 (S.D. Tex. 2008).

Respectfully submitted,

 /s/ John J. McKetta, III
John J. McKetta, III (State Bar No. 13711500)
Matthew C. Powers (State Bar No. 24046650)
GRAVES, DOUGHERTY, HEARON &
MOODY, P.C.
401 Congress Avenue, Suite 2200
P.O. Box 98
Austin, TX 78767-0098
Phone: 512-480-5616
Fax:    512-480-5816
mmcketta@gdhm.com
mpowers@gdhmcom

 /s/ William Bock, III
William Bock, III (admitted *pro hac vice*)
KROGER, GARDIS & REGAS
111 Monument Circle, Suite 900
Indianapolis, IN 46204-5125
Phone: (317) 692-9000
Fax: (317) 264-6824
wb@kgrlaw.com

 /s/ Brent Rychener
Richard R. Young (admitted *pro hac vice*)
Brent E. Rychener (admitted *pro hac vice*)
BRYAN CAVE HRO
90 South Cascade Avenue, Suite #1300
Colorado Springs, Colorado 80903
Phone:  719-473-3800
Fax:  719-633-1518
richard.young@bryancave.com
brent.rychener@bryancave.com

**COUNSEL FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2012, I electronically filed **DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR, IN THE ALTERNATIVE, MOTION TO DISMISS OR STAY UNDER THE FEDERAL ARBITRATION ACT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Timothy J. Herman
Sean E. Breen
HOWRY BREEN & HERMAN, LLP
1900 Pearl Street
Austin, Texas 75705
therman@howrybreen.com


Mark S. Levinstein
Marcie R. Ziegler
Ana C. Reyes
WILLIAMS & CONNOLLY LLP
725 12th St., NW
Washington, DC 20005
mlevinstein@wc.com

Robert D. Luskin
Patrick J. Slevin
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037
rluskin@pattonboggs.com


                                         /s/ Matthew C. Powers
                                        Matthew C. Powers

# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

LANCE ARMSTRONG,

     *Plaintiff,*

*v.*

                                        Civ. Action No. 1:12-cv-00606-SS

UNITED STATES ANTI-DOPING
AGENCY and TRAVIS TYGART, In His
Official Capacity as Chief Executive Officer
of the United States Anti-Doping Agency,

     *Defendants.*

**SECOND AFFIDAVIT OF MOLLY TOMLONOVIC**

I, Molly Tomlonovic, under penalty of perjury, declare and state:

1.     I am the Doping Control Manager for the United States Anti-Doping Agency

("USADA"). I have been employed by USADA since October 15, 2007. I have been USADA's

Doping Control Manager since the Fall of 2008.

2.     The statements contained in this affidavit are based on my personal knowledge or

my review of the corporate records of USADA.

3.     On August 8, 2012, William Bock, III, General Counsel for USADA, transmitted

a letter to Pat McQuaid, President of the Union Cycliste Internationale ("UCI"). A true and

accurate copy of this correspondence is attached to this Affidavit as Exhibit **BB**).

4.      On August 7, 2012, David Howman, Director General of the World Anti-Doping

Agency, transmitted a letter to Pat McQuaid, President of UCI.  A true and accurate copy of this

correspondence is attached to this Affidavit as Exhibit **CC**).

5.      On July 11, 2012, Sporza, a Belgian media outlet, posted to its website a video

interview of Pat McQuaid.  A true and accurate transcription of this interview is attached as

Exhibit **DD**).  As of the date of this Affidavit, this video interview of Pat McQuaid was

accessible at

http://www.sporza.be/cm/sporza/videozone/MG_sportnieuws/MG_wielrennen/1.1363787.

Dated this **8**th day of **August, 2012**.

Molly Tomlonovic

STATE OF COLORADO          )
                                                   )  ss.
COUNTY OF EL PASO          )

Subscribed and sworn to before me by Molly Tomlonovic on this 8/8 day of 2012.

Witness my hand and official seal.

My commission expires:    8-12-12

Notary Public

Address: 815 Greenbrier Dr.
Colo. Spgs. CO 80916

JOHNCIE B. WINGARD
NOTARY PUBLIC
STATE OF COLORADO
My Commission Expires 08/12/12

2

# EXHIBIT BB



*Preserving the integrity of competition. Inspiring true sport. Protecting the rights of athletes.*

*VIA ELECTRONIC MAIL TO PAT.MCQUAID@UCI.CH AND FLORENCE.BARBER@UCI.CH*

August 8, 2012

Mr. Patrick McQuaid, President
UNION CYCLISTE INTERNATIONALE
Ch. de la Mêlée 12
1860 Aigle
Switzerland

**Re:** *Your letter dated August 3, 2012*

Dear Mr. McQuaid:

I write in response to your letter dated August 3, 2012, in order to comment further upon our view of the results management authority allocated to the United States Anti-Doping Agency (USADA) and other independent national anti-doping organizations under the World Anti-Doping Code (the "Code").

While your most recent letter and the highly inflammatory and polemic press statement of the Union Cycliste Internationale (UCI) on August 4, 2012, would appear to indicate a settled resolve of the UCI to not cooperate with USADA's results management of the U.S. Postal Service Cycling Team doping cases, I will nonetheless endeavor to keep this communication focused on the rules which should govern in this matter in furtherance of our efforts on behalf of clean athletes.

## USADA Has Jurisdiction to Conduct Results Management

In your most recent letter you state that, "USADA was investigating on behalf of UCI." In fact, however, USADA is not a member of the UCI and did not receive a request to investigate from the UCI.

Perhaps your statement reflects a misunderstanding of the role of National Anti-Doping Organizations (NADOs) under the Code. NADOs do not exist to do the bidding of, or be under the command of, International Federations (IFs) such as the UCI. Pursuant to Article 20.5.1 of the Code, NADOs are independent of IFs and exist with co-equal authority to "adopt and implement anti-doping rules and policies which conform with the *Code*."

Like all NADOs, USADA is specifically required to "vigorously pursue all potential anti-doping rule violations within its jurisdiction." Code Art. 20.5.6. USADA was specially created in part to conduct results management of anti-doping rule violations and results management authority

*United States Anti-Doping Agency*

*5555 Tech Center Drive, Suite 200, Colorado Springs, CO 80919 ■ Tel: 719.785.2000 ■ Fax: 719.785.2001*
*usada@usada.org ■ www.usada.org*

  


*Preserving the integrity of competition. **Inspiring** true sport. **Protecting** the rights of athletes.*

is provided for in both the United States Olympic Committee (USOC) National Anti-Doping Policies and in the USADA Protocol for Olympic and Paralympic Movement Testing (the "USADA Protocol").

USADA's rules expressly vest in it results management authority over "potential violations of [the Code], IF [rules] the USOC National Anti-Doping Policies or the USADA Protocol . . . unless otherwise referred by USADA to a foreign sports organization having jurisdiction of the Athlete or other Person."  USADA Protocol § 3(c).  USADA's results management authority encompasses both positive drug tests and "admitted doping, refusal to test, evasion of doping control, trafficking, a whereabouts failure or other violation of [the Code], IF rules or the USOC NADP."  USADA Protocol § 11.

Stating that USADA has results management authority and can conduct results management under the Code, under USADA's own rules, under the USOC's rules or under the anti-doping rules of any IF is not to denigrate any IF.  In fact, with most IFs, including the IAAF, FINA, ITF, and many others, we have had a very productive and mutually beneficial and respectful partnership mostly due to the fact that their interests in clean sport and the rights of clean athletes align completely and fully with USADA's interests and those of clean athletes.  Sports federations play an important role in governing their sport.  However, when it comes to anti-doping within their sport, a sports federation's authority is not exclusive.  As the USADA Protocol makes clear, USADA can both conduct results management under its own and other domestic rules and under the rules of any IF.

### The Rules of the UCI Do Not Prevail Over the World Anti-Doping Code

You have asserted on page 2 of your letter that even if the USADA Protocol grants jurisdiction to USADA in the case against Lance Armstrong that "the rules of the UCI prevail" and that "according to CAS case law the rules of the International Federation take precedence of the rules of a national organization."   Interestingly, on the very same day that you forwarded your letter, Lance Armstrong's attorneys made this identical claim in a brief filed in their lawsuit against USADA in federal court in the United States.  Mr. Armstrong's attorneys even cited four CAS cases (all involving the UCI or its members) in support of this contention.[1]

This coincidence is even more interesting given the fact that on July 11, 2012, just two days before you sent your initial letter to USADA challenging USADA's results management jurisdiction you stated that in relation to the "ongoing USADA Armstrong case" the "position of

---

[1] Mr. Armstrong's attorneys cited *CONI*, CAS 2000/C/255 (2000); *UCI/S., Damarks Cykle Union (DCU) and Danmarks Idraets-Forbund (DIF)*, CAS 98/192 (1998); *M./Italian Cycling Federation (ICF)*, CAS 97/169 (1997), and *UCI/CONI*, CAS 94/128 (1994).  The CAS cases referred to by you and cited by Mr. Armstrong's attorneys are not applicable because they were all decided well before the Code was adopted and changed the rules.



*Preserving the integrity of competition. Inspiring true sport. Protecting the rights of athletes.*

UCI is that we're not involved in this, and it's a USADA investigation.  They're doing all the process in the United States.  It's nothing to do with UCI, and we'll wait and see what the eventual outcome is."

In my earlier letter to you I pointed out that after USADA initiated its cases you had publicly confirmed that USADA had results management jurisdiction.  However, in your August 3 response you expressed concern about my reference to your comments as quoted by reporters.  Therefore, with respect to the above quote used in this letter I have provided a certified transcript as Exhibit "**A**" to this letter and you may refer to the transcript in order to confirm that you were quoted correctly.  I further believe that you will find that there is no question that these were your words and that no mistake has been made about the context in which they were spoken, because the video of you making this statement is available online at: **http://www.sporza.be/cm/sporza/videozone/MG_sportnieuws/MG_wielrennen/1.1363787.**

I, therefore, reiterate the statement in my July 26, 2012, letter, that the first position taken by the UCI, confirming USADA's results management jurisdiction, was the correct position.  The Code now trumps the rules of both IFs and national sport bodies.  Because the Code specifically requires National Olympic Committees (NOCs) and NADOs to adopt and implement their own anti-doping rules and puts them on equal footing with IFs as anti-doping organizations, it is clear that the rules of an IF do not automatically trump the anti-doping rules of any NOC or NADO.  While there were instances before implementation of the Code when, in specific cases, certain IF rules were found by CAS to trump national rules, the Code changes that.  Under the Code, specifically Article 15.3, NADOs have authority to conduct results management under their own rules and IF rules, and any IF rule to the contrary is simply not enforceable.

As the Code makes clear at the very outset, "[a]ll provisions of the *Code* are mandatory in substance and must be followed as applicable by each *Anti-Doping Organization* and *Athlete* or other *Person*."  Code, Part One, Intro.  Therefore, any UCI provisions which conflict with any aspect of the Code cannot be enforced.  Any UCI rule which purports to overturn or modify the results management outcomes provided for in Code Art. 15.3 is void.

## The Rules of the UCI Do Not Prevail Over the Rules of the USOC and USADA

As explained above, the Code places all Anti-Doping Organizations(ADOs) including IFs (such as UCI), NOCs (such as the USOC) and National Anti-Doping Organizations (such as USADA) on an equal footing on anti-doping matters.

The Code requires each signatory, including UCI, the USOC and USADA, to "establish rules and procedures to ensure that all *Athlete*s or other *Person*s under the authority of the *Signatory* and its member organizations are informed of and agree to be bound by anti-doping rules in force



*Preserving* the integrity of competition. *Inspiring* true sport. *Protecting* the rights of athletes.

of the relevant *Anti-Doping Organizations*." *Code*, Part One, Intro.[2]   Therefore, *each* signatory to the Code is required to establish anti-doping rules applicable to athletes and athlete support personnel under their jurisdiction.

Therefore, both implicitly and explicitly, and contrary to the claim in your letter and to the claims of Mr. Armstrong's attorneys, the anti-doping rules of each signatory to the Code are not subject to some general principle of deference to IF anti-doping rules.  Nor can any ADO claim exclusive competence over any kinds of rule violations.[3]  Rather, in Article 15.3, the Code establishes rules of precedence based *not upon* the status of an ADO but on who discovered the violation in the case of non-analyticals and who collected the sample for violations based on a positive drug test.[4]

It is also clear that UCI's effort set forth in your August 3 letter to attempt to obstruct USADA's cases and to attempt to "den[y] USADA any authority to act or proceed on the basis of [the UCI] ADR or any other rule of the UCI or otherwise on behalf of UCI and/or USA Cycling" is offensive to clean sport and clean athlete's rights and repugnant to the Code and in direct conflict with UCI's duties under the Code.  Under the Code UCI's duty is "cooperation" with USADA in support of USADA's exercise of its anti-doping responsibilities under the Code.  Code, Art. 20.3.12 (UCI's duty as an IF is "[t]o cooperate with relevant national organizations and agencies and other Anti-Doping Organizations.");  *Code* Art. 15, Comment ("Rather than limiting the responsibilities of one group in favor of the exclusive competency of the other; the *Code* manages potential problems associated with overlapping responsibilities, first by creating a much

---

[2]  Pursuant to Article 20.5.1 of the Code, USADA and each National Anti-Doping Organization must "adopt and implement anti-doping rules and policies which conform with the *Code*."

[3] *See* Code Art. 15, Comment ("Rather than limiting the responsibilities of one group in favor of the *exclusive competency* of the other; the *Code* manages potential problems associated with overlapping responsibilities, first by creating a much higher level of overall harmonization and, second, by establishing rules of precedence and cooperation in specific areas.") (emphasis added).

[4] The text of Code Article 15.3.1 provides additional confirmation that because Mr. Armstrong is a U.S. athlete USADA can initiate results management over Mr. Armstrong's non-analytical violations under both domestic rules and under the UCI ADR.  Article 15.3.1 states that results management for a rule violation discovered by a NADO and "involving an *Athlete* who is not a national, resident, license-holder or member of a sport organization of that country shall be administered as directed by the rules of the applicable International Federation."  Obviously, Article 15.3.1 would be superfluous if NADOs' results management authority over athletes from the NADOs' own country was limited to results management authority granted in the rules of the applicable IF.



*Preserving the integrity of competition. Inspiring true sport. Protecting the rights of athletes.*

higher level of overall harmonization and, second, by establishing rules of precedence and cooperation in specific areas.").

### USADA Has Results Management Authority Pursuant to Article 15.3 of the Code

Article 15.3 of the Code provides clearly and sensibly that:

> . . . results management and hearings shall be the responsibility of and shall be governed by the procedural rules of the *Anti-Doping Organization* that initiated and directed *Sample* collection [or, if no *Sample* collection is involved, the organization which **discovered the violation**].

(emphasis added).

Thus, under the Code USADA is fully authorized to conduct results management of any anti-doping rule violation it discovers where no sample collection is involved (and so long as other limiting principles contained in Article 15 are not offended).

Although USADA does not claim that all or even most of its evidence of rule violations is from conduct that occurred in relation to the *Tour de France* or in other professional cycling races outside the United States, there nonetheless exists no territorial limitation or limitation based on the nature of the competitions in which the athlete is engaged which restricts or limits the exercise of USADA's results management authority.  Just as the UCI may exercise results management over conduct occurring within the United States, USADA may exercise results management over anti-doping rule violations it discovers which may have occurred outside the U.S. or in connection with some international competition.  The straightforward Code determinant that assigns results management authority in a case not involving sample collection is: which ADO discovered the violation?

### UCI's Discovery Rule Is Overruled by Article 15.3 of the Code

While the UCI claims to have "discovered" the rule violations at issue, this is not through application of Article 15.3 of the Code but rather through application of Article 10 of the UCI Anti-Doping Rules ("UCI ADR").  However, in Article 10 of the UCI ADR the UCI has impermissibly overlaid upon Article 15.3 qualifications to that Code Article which greatly expand the likelihood that the UCI and not other ADOs such as NOCs or NADOs will be considered the discoverer of rule violations where no sample collection is involved.

Thus, under UCI ADR Art. 10 the UCI can ostensibly claim credit for "discovery" of a rule violation by any license holder (meaning most high level athletes and coaches in the sport) and by any official, officer or staff member of a member federation, meaning that virtually any rule violation reported by most anyone within the sport must (regardless of who the violation is



*Preserving the integrity of competition. **Inspiring** true sport. **Protecting** the rights of athletes.*

reported to) be considered to have been discovered by the UCI (presumably even if the UCI was never aware of the discovery or did not become aware of it until much later). This nonsensical wording is not conducive to effective results management. Rather, the wording of UCI ADR Art. 10 serves only to insure that the UCI will be able to claim authority and control the results management (including making the decision not to proceed) in the vast majority of instances in which evidence of doping in the sport of cycling is developed through means other than a positive drug test.[5]

UCI ADR Art. 10 goes on to broaden the definition of "discovery" to "the finding of elements that turn out to be evidence for facts that apparently constitute an anti-doping rule violation, regardless of the Anti-Doping Organization who qualifies that evidence as such." This definition is likewise in impermissible conflict with Code Art. 15.3 and therefore void because it disregards the focus in Article 15.3 of the Code upon discovery of a "violation" and changes the focus to discovery of any "elements that turn out to be evidence for facts" constituting a rule violation, meaning that discovery can be claimed where merely a few items of evidence supportive of a rule violation have been found by any license holder or others associated with any member of the UCI in almost any way. This aspect of UCI ADR Art. 10 works as well to expand the potential rule violations that will be caught in the sweep of UCI ADR Art. 10, all to the benefit of the UCI claiming results management authority to the exclusion of other Code signatories.

As explained above, the UCI cannot broaden its purported results management authority at the expense of other ADOs by attempting to amend Article 15.3 of the Code. Yet, this is exactly what the UCI has sought to do through UCI ADR Art. 10 and this is why this provision in the UCI ADR is unenforceable.

## USADA Discovered the Facts Contained in the April 30 Landis Email Long Before That Email Was Sent

Your stated basis for UCI's demand to control this case and interfere with USADA's ongoing process is that under UCI ADR Art. 10 UCI "discovered" the rule violations which USADA uncovered through many interviews with numerous witnesses simply because Floyd Landis sent an email to USA Cycling on April 30, 2010, which discussed certain acts in violation of anti-doping rules by various cyclists and others. For several reasons UCI's claimed basis for asserting jurisdiction fails.

---

[5] As discussed in my July 26, 2012, letter to you, such efforts to exclude other anti-doping organizations from the results management process creates a "fox guarding the hen house" problem where the UCI, with a vested and deep financial interest in the sport, is attempting to entirely control whether the evidence developed in  investigations of doping in cycling can be brought forward.



*Preserving the integrity of competition. **Inspiring** true sport. **Protecting** the rights of athletes.*

First, UCI can no more take credit for the discovery of the contents of the April 30, 2010, email than can the USOC because USA Cycling is a member of the USOC.

Second, as I have pointed out in prior correspondence, the UCI discovered nothing through the email but rather has contended the email was not evidence of anything and sued Mr. Landis for defamation based on its content.

Third, I have also pointed out to you that this email was not the beginning of USADA's investigation as you erroneously claim. In response, and conceding that if USADA's investigation began before the April 30, 2010, email, UCI did not discover the violations and therefore lacks jurisdiction, you have now asked for further information about USADA's investigation. Accordingly, in response to your request I am providing you a fuller explanation of investigative acts by USADA in advance of Mr. Landis's email.

I can share with you that a USADA representative met with an individual close to Mr. Landis (an individual who has incidentally never been a UCI license holder or official) weeks before the April 30 email was sent and in that meeting USADA received much of the same information from this intermediary that was subsequently contained in the email. USADA also met with Mr. Landis about ten days before the email was sent. Before the email was sent USADA had met with several others with relevant information.

Of course, the UCI is unaware of these meetings because the UCI has never met with Mr. Landis or any of USADA's many other witnesses concerning their observations and the UCI has apparently never conducted even the beginning of an investigation regarding Mr. Landis's evidence or the evidence from any other cyclist on the U.S. Postal Service Cycling team at any time.

The utter lack of investigation into the facts by the UCI lays bare the absurdity of UCI's "discovery" claim under Art. 10 of the UCI ADR. In contrast, Article 15.3 of the Code is the best policy for protecting the integrity of sport and clean athletes because the ADO that actually conducted the investigation and discovered "violations" is certain to be the ADO in the best position to evaluate the evidence and ensure justice prevails. However, under UCI ADR Art. 10 the opposite is true. Under its self-serving discovery rule, the UCI is best situated to be the discoverer of rule violations and yet it is apparently in the worst position to bring non-analytical cases forward – how else to explain the stark infrequency with which the UCI has been involved in bringing non-analytical cases.

The UCI, an entity which knows nothing about what Mr. Landis or any of USADA's many witnesses observed, an entity which never met with any witness and never conducted any investigation, is claiming to have "discovered the violation" and yet at the same time the UCI is, as you said in your July 13, letter, unable to determine "whether or not an anti-doping violation has occurred." So, in your own words UCI claims *both* to have "discovered" a violation and to



*Preserving the integrity of competition. Inspiring true sport. Protecting the rights of athletes.*

not know whether a violation occurred.  This is exactly the sort of "Never, Never Land" created by the UCI's nonsensical discovery rule and it well illustrates why that rule cannot possibly be enforceable under the Code.

### As you Publicly Acknowledged Before the UCI Changed Course to Support Mr. Armstrong's Legal Positions, USADA's Discovery of the Violations Did Not Involve Sample Collection

Your letters and Mr. Armstrong's lawyers also try to fold USADA's case into the first part of Article 15.3 by making the claim that USADA's case somehow involves sample collection merely because witnesses told USADA that Mr. Armstrong stated to them that he had tested positive and had paid for the test results to be hidden.  However, as you publicly acknowledged before the UCI changed course to support the positions of Mr. Armstrong's legal team, reference to these witnesses statements does not mean USADA's case turns on samples, rather, it means that USADA has evidence in the form of witness testimony that Mr. Armstrong told others that he had a positive sample and was able to make it go away.  This is evidence of an admission by Mr. Armstrong not an indication USADA's case rests on samples.

Similarly, USADA's reference to blood test results in 2009 and 2010 as "corroborative of" the testimony of numerous witnesses to a sustained pattern of doping over a long period of time beginning in 1998 does not turn this case into one involving sample collection within the meaning of Code Art. 15.3.

In your July 11, 2012 interview captured on video tape (and for which a transcript has been provided) you acknowledge that USADA's case is not based on sample collection saying, "this is actually outside of that because you're looking at witness testimonies, et cetera, et cetera, which is not within our responsibility.  We can't – we cannot be questioning riders no more and we don't have the authority, nor the judicial authority to question riders and ask them what goes on here, what goes on there."

So again, the UCI has made a complete about face in order to take a position in support of Mr. Armstrong's position in his lawsuit against USADA.  This is contrary to the UCI's responsibilities under the Code.  As an ADO under the Code if UCI was truly interested in ensuring clean sport and protecting the rights of clean athletes the UCI should be supporting USADA's investigation of doping in cycling rather than attempting to subvert and undermine it.

As you know, USADA has access at this time only to Mr. Armstrong's reported blood values in 2009 and 2010 and not to the laboratory documentation pertaining to these blood draws to which only UCI has access.  That is why USADA has asked the UCI for the laboratory documentation related to these blood draws.



*Preserving* the integrity of competition. *Inspiring* true sport. *Protecting* the rights of athletes.

"Corroborative" scientific evidence which supports eyewitness testimony does not turn a non-analytical case into one based on positive samples. Moreover, at this point without UCI cooperation USADA does not have the full laboratory documentation that the parties in the proceeding should have. Therefore, at this stage USADA's cases clearly cannot be premised upon sample collection; they could not be because UCI has exclusive access to the laboratory data and UCI is refusing to cooperate with USADA and, indeed, is actively undertaking to obstruct USADA's results management.

I therefore again urge you to cooperate with USADA and provide the documentation requested in my July 26, 2012, letter to you. Cooperation with USADA and not obstruction of USADA's efforts is UCI's duty under the Code and its responsibility to clean athletes.

### USADA Will Agree to a Single CAS Hearing on the Merits

In your recent letter you request that USADA agree to a CAS hearing in which the comparative results management authority of UCI and USADA is arbitrated. This request makes little sense as it would multiply the proceedings, increase the expense of this case and delay its final outcome. Moreover, as Mr. Armstrong would not be a party in an arbitration between UCI and USADA, the parties could go to the trouble and expense of the arbitration and Mr. Armstrong could still disagree with the outcome.

USADA recognizes, however, that both the UCI and Mr. Armstrong have already confirmed that they have faith in, and have agreed to, CAS arbitration. Accordingly, USADA proposes that it is willing to agree to a single, final and binding CAS hearing with Mr. Armstrong under U.S. law and the USADA Protocol and held in the U.S. but with international CAS arbitrators in which the issues would be whether Mr. Armstrong committed anti-doping rule violations and, if so, the appropriate sanctions. If the parties are truly interested in an efficient, fair and just result based on the evidence, as USADA is, then this proposal would immediately place the case in the hands of neutral CAS arbitrators who could quickly decide it.

### USADA Properly Notified Drs. del Moral and Ferrari and Mr. Marti

Your August 3 letter also references individuals which you call "non-license-holders." These individuals are Dr. Luis Garcia del Moral, Dr. Michele Ferrari and Mr. Jose "Pepe" Marti.

Dr. del Moral was the official team doctor for the U.S. Postal Service Cycling Team, during the period 1999 through 2003. We also have evidence that Dr. del Moral worked for a number of cyclists on UCI licensed cycling teams both before 1999 and after 2003. Dr. del Moral has also served as a physician for athletes in other sports that are signatories to the World Anti-Doping Code, including the International Tennis Federation (ITF).



*Preserving the integrity of competition. **Inspiring** true sport. **Protecting** the rights of athletes.*

Dr. Ferrari served as a paid consultant to numerous individuals on the U.S. Postal Service Cycling and Discovery Channel Cycling Teams, during the period 1999 through 2007.  Dr. Ferrari is understood to have worked with many professional cyclists both before and after this period.

Mr. Jose "Pepe" Marti was the Team Trainer for the U.S. Postal Service Cycling and Discovery Channel Cycling Teams, during the period 1999 through 2007 and thereafter worked for other UCI teams including Astana and Saxo Bank.

You state that, "[w]ith respect to [these] persons you state correctly that they may waive a hearing.  Yet UCI doesn't know whether they did so or not.  If these persons may not have requested a hearing within the deadline set by USADA there may be other reasons for that than a waiver, for example that they were not notified or not notified in time."

In response to your inquiry as to whether Dr. del Moral waived a hearing or was notified by USADA, I can advise you that prior to imposing the sanction upon Dr. del Moral Dr. del Moral's legal counsel forwarded a letter to USADA advising that Dr. del Moral would not participate in a AAA hearing under the USADA Protocol.  In response, the undersigned corresponded with Dr. del Moral's legal counsel advising him that as a consequence of Dr. del Moral's refusal to participate in the hearing process USADA would impose sanctions against him.

As you know, Dr. del Moral also falls under the jurisdiction of the ITF.  Yesterday, the ITF announced that it had formally recognized USADA's sanction against Dr. del Moral and imposed lifetime ineligibility against Dr. del Moral based on USADA's sanction.  Attached hereto as Exhibit "**B**" is the ITF's announcement of Dr. del Moral's sanction.

In response to your inquiry as to whether Dr. Ferrari waived a hearing or was notified by USADA, I can confirm that USADA is in the process of obtaining an affidavit from the individual who sought to deliver USADA's notice letter to Dr. Ferrari.  This affidavit will confirm that the courier went to Dr. Ferrari's residence and spoke with him and that Dr. Ferrari was told that the contents sought to be delivered was a letter to him from USADA and that Dr. Ferrari refused delivery of the letter.

In response to your inquiry as to Mr. Marti, attached hereto as Exhibit "**C**" is an arbitration agreement, pursuant to which Mr. Marti has agreed that USADA's charges against him should be heard in an American Arbitration Association arbitration conducted under the USADA Protocol.

I trust that the foregoing puts to rest any concerns you have had with respect to any procedural issues in USADA's cases involving Drs. del Moral and Ferrari and Mr. Marti.



*Preserving the integrity of competition. **Inspiring** true sport. **Protecting** the rights of athletes.*

## <u>Conclusion</u>

Mr. McQuaid, in your recent media interview referenced in this letter (transcript attached) you stated that "the UCI are working very hard and with our stakeholders, with the organizers like ASO, RCS, and with the teams and with the riders, too, that we can present a platform to the world of a very credible, professional, well-organized, and very attractive sport." In contrast, however, through UCI's attempt to obstruct USADA's cases, through its hasty and ill considered decisions to adopt positions inconsistent with the Code that are supportive of Mr. Armstrong's legal positions, and through its failure to date to provide documents requested by USADA, the UCI has taken unfortunate and misguided steps away from your stated goals. I would, therefore, urge you to do all that you can to redirect the UCI towards a position of credibility and Code compliance, and would request that you begin that process by providing to USADA the documents sought in my July 26, 2012, letter to you.

While my recent letters to you have been direct, I trust that upon reflection you will appreciate that the UCI's actions and the importance of clean sport have permitted no other course. As ADOs with important responsibilities under the Code, it is necessary that the UCI and USADA work together on many issues. Although the UCI is disqualified from results management in these cases both by the applicable rules and by its conflicts of interest as explained in my earlier letter, I can assure you that you can trust USADA to fulfill its responsibilities under the Code in these cases and that we are committed to working with the UCI in the future, as with all ADOs, to promote clean sport.

If you have any questions regarding the foregoing please do not hesitate to contact me.

Very truly yours,

UNITED STATES ANTI-DOPING AGENCY

William Bock, III
General Counsel

WB/ljm

Enclosure (Exhibits A, B, C)

cc:     David Howman, Director General, WADA (David.Howman@wada-ama.org)
        Olivier Niggli, CFO, Legal Director, WADA (Olivier.Niggli@wada-ama.org)

# EXHIBIT A

Original

VIDEO INTERVIEW


OF:


PAT McQUAID
UCI President




Conducted On:   July 11, 2012










A STENOGRAPHIC RECORD BY:
James P. Connor, RPR, CSR, CRR
Notary Public
Stenographic Reporter








Connor Reporting, Inc.
*Reporting and Videoconferencing*
1650 One American Square
Indianapolis, IN 46282
(317) 236-6022

1    *The following transcript has been created*

2    *from a video interview of Pat McQuaid of UCI*

3    *conducted on July 11, 2012, by an unidentified*

4    *interviewer:*

5

6  Q  There's the ongoing USADA Armstrong case, what's

7     the position of UCI?

8  A  The position of UCI is that we're not involved

9     in this, and it's a USADA investigation.

10    They're doing all the process in the United

11    States.  It's nothing to do with UCI, and we'll

12    wait and see what the eventual outcome is.

13 Q  How disastrous will it be for the sport if Lance

14    Armstrong was stripped of his seven Tour

15    victories?

16 A  To be quite honest with you, I don't think at

17    this point in time it would be disastrous for

18    the sport, because I think it's an affair that

19    started, that goes back 15 years.  And I think

20    most people involved in the sport or most

21    people, the fans of the sport and the people who

22    follow the sport realize that the cycling of

23    today is completely different than the cycling

24    of five years ago and the cycling of ten years

25    ago, and 15 years ago.

1    So I think people want to -- to be honest,
2    I think people prefer to concentrate on the
3    cycling of today and the future, which is what I
4    prefer to do rather than going back into the
5    past.  So I don't think -- I think it would be a
6    24-hour, one-day wonder, and it would pass over.
7  Q  Does cycling has to get rid of those extra legal
8    issues?
9  A  Of course, cycling has to get rid of -- I mean,
10    cycling has to, has to continue to work as it
11    does in the fight against doping and in ethical
12    areas and so forth to improve the sport.  I
13    think the world is a changed place.  And as our
14    sport develops around the world, becomes more of
15    a global sport, it needs to have that very high
16    ethics, very high transparency, and people --
17    and needs to have that credibility.
18    And we in the UCI are working very hard and
19    with our stakeholders, with the organizers like
20    ASO, RCS, and with the teams and with the
21    riders, too, that we can present a platform to
22    the world of a very credible, professional,
23    well-organized, and very attractive sport.
24  Q  If Armstrong is punished, has UCI done its job
25    correctly, then, in the years before?

1  A    Yes, of course, it has, yeah.  I mean, there's a
2       lot of talk about the amount of controls that
3       Armstrong did and was never positive.  But the
4       same applied to Marion Jones, the same applied
5       to Tim Montgomery.
6            We can only work within the system that's
7       there.  We can only work with what WADA
8       produces.  WADA produces and supervises and
9       oversees the laboratories and spends a lot of
10      money on research and testing, et cetera.  All
11      our -- all our samples go to those laboratories.
12      And if those laboratories tell us it's negative,
13      so we have to accept it's negative.
14           And so we can only work within the system,
15      and the system so far has never tested Lance
16      Armstrong positive.  And so -- and it's the same
17      for every other athlete.  Athletes are positive
18      or negative.  Now we have the biological
19      passport, which goes even further in terms of
20      examining and looking at the riders.
21           As I say, it does -- the UCI does its work
22      and always has done its work, and will continue
23      to do its work.  So this is, this is actually
24      outside of that because you're looking at
25      witness testimonies, et cetera, et cetera, which

1       is not within our realm, not within our

2       responsibility.  We can't -- we cannot be

3       questioning riders no more and we don't have the

4       authority, nor the judicial authority to

5       question riders and ask them what goes on here,

6       what goes on there.

7    Q  Last question.  How long do you stay on the

8       Tour?  And when do you leave for the big London

9       party?

10   A  No, I go back to work in Geneva today because

11      with the Olympic games coming up, it's very busy

12      in the office at the moment.  I come back up to

13      the finish of the Tour, and then on Sunday

14      evening I don't go to the Sky -- the winner's

15      party, I go straight to London because I've got

16      to be there for Monday morning.

17   Q  Wishing you the best Olympics.

18   A  Okay.  I'll see you indeed there.

19                    (End of video clip.)

20

21

22

23

24

25

6

```
 1  STATE OF INDIANA   )
                       )    SS:
 2  COUNTY OF MARION   )

 3

 4       I, James P. Connor, RPR, CRR, CSR #93-R-1023

 5  and a Notary Public and Stenographic Reporter

 6  within and for the County of Marion, State of

 7  Indiana at large, do hereby certify that on the 6th

 8  day of August, 2012, I listened to the best of my

 9  ability to a video clip provided to me and

10  transcribed the aforementioned video clip from my

11  stenographic notes into the foregoing statement;

12       That the transcript is a full, true and

13  correct transcript made from my stenograph notes

14  during this process.

15       IN WITNESS WHEREOF, I have hereunto set my

16  hand and affixed my notarial seal this 6th day of

17  August, 2012.

18

19

20                        _____
                                N O T A R Y   P U B L I C
21

22  My Commission Expires:
    September 18, 2017
23  County of Residence:
    Marion County
24

25
```

# EXHIBIT B

International Tennis Federation - The World Governing Body of Tennis      JUMP to more ITF websites

ITF tennis.com          ANTI-DOPING

News & Information    Rules    About the Programme    Whereabouts    TUEs    Education    FAQ

All Latest News

Search Articles

Decisions

Suspensions

Statistics

Retired Players

### ITF Press Release

**Decision in the case of Dr Luis Garcia del Moral**

*London, UK, 07 Aug 2012* - Decision in the case of Dr Luis Garcia del Moral

The International Tennis Federation announced today that it recognises and respects the lifetime ban imposed on Dr Luis Garcia del Moral by the United States Anti-Doping Agency (USADA) for various Anti-Doping Rule Violations. Dr Garcia del Moral practices sports medicine in Valencia, Spain, and in that capacity has worked with various tennis players.

The Anti-Doping Rule Violations for which Dr Garcia del Moral was banned by USADA included:

(1) Possession of prohibited substances and/or methods including EPO, blood transfusions and related equipment, testosterone, hGH, corticosteroids, and masking agents.

(2) Trafficking of EPO, blood transfusions, testosterone, hGH, corticosteroids and masking agents.

(3) Administration and/or attempted administration of EPO, blood transfusions, testosterone, hGH, corticosteroids, and masking agents.

(4) Assisting, encouraging, aiding, abetting, covering up and other complicity involving one or more anti-doping rule violations and/or attempted anti-doping rule violations.

As a Signatory to the WADA Code, the ITF (and, therefore, its member National Associations) is obliged to recognise and respect decisions of other Code Signatories that are consistent with the Code and within that Signatory's authority (Article 15.4).

The Tennis Anti-Doping Programme is a comprehensive and internationally recognised drug-testing programme that applies to all players competing at tournaments sanctioned by the ITF, ATP, and WTA. Players are tested for substances prohibited by the World Anti-Doping Agency and, upon a finding that a Doping Offence has been committed, sanctions are imposed in accordance with the requirements of the World Anti-Doping Code. More background information on the Programme, sanctions, tennis statistics and related information can be found at www.itftennis.com/antidoping.

- ENDS -

Media enquiries:
Communications Department, International Tennis Federation
Tel: +44 (0)20 8392 4632; Email: communications@itftennis.com.

^ Back to Top

What is RSS?       Contact Us

© Copyright by ITF Licensing (UK) Ltd. All rights reserved. No portion of this website may be duplicated, redistributed, or manipulated in any form. By accessing any information beyond this page, you agree to abide by the itftennis.com Privacy Policy and Terms and Conditions.

# EXHIBIT C

<u>Arbitration Agreement</u>

   This arbitration agreement is between Mr. José "Pepe" Martí Martí  ("Mr. Martí") and the United States Anti-Doping Agency ("USADA") who for good and valuable consideration have agreed as follows:

   1.    Mr. Martí is represented in this matter by Mr. Jesús Morant Vidal and the law firm of Bufete Sempere Jaén SL (hereafter, "Mr. Martí's Legal Counsel").

   2.    USADA sent a communication to Mr. Martí's Legal Counsel dated June 28, 2012, at the email address bufetesj@bufetesj.com  (hereafter referred to as the "June 28 USADA Letter").  A copy of the June 28 USADA Letter (and the June 12, 2012, letter referenced in and incorporated into the June 28 USADA Letter) is attached to this arbitration agreement.

   3.    Although the email address bufetesj@bufetesj.com  is an appropriate email address at which to send correspondence to Mr. Martí's Legal Counsel and although Mr. Martí's Legal Counsel had received other communications from USADA at the email address bufetesj@bufetesj.com , Mr. Martí's Legal Counsel has stated to USADA that he did not receive the June 28 USADA Letter and that prior to July 10, 2012, neither Mr. Martí's Legal Counsel nor Mr. Martí received either actual or constructive notice of the opportunity to contest Mr. Martí's sanction before an arbitration panel of the American Arbitration Association (AAA).

   4.    Had Mr. Martí's Legal Counsel and Mr. Martí received notice of the opportunity to contest Mr. Martí's sanction before an arbitration panel of the AAA, Mr. Martí's Legal Counsel would have notified USADA in writing on or before Monday, July 9, 2012, that Mr. Martí wished to contest the sanction sought by USADA in an arbitration hearing before a panel of AAA arbitrators, as provided in the USADA Protocol for Olympic and Paralympic Movement Testing (the "USADA Protocol").

   5.    Mr. Martí and Mr. Martí's Legal Counsel are requesting that because they allege that they did not timely receive a copy of USADA's June 28 USADA Letter that Mr. Martí now be permitted to contest USADA's charges against him as set forth in the June 28 USADA Letter on the ground that they allege that neither Mr. Martí's Legal Counsel nor Mr. Martí received either actual or constructive notice of the opportunity to contest Mr. Martí's sanction before an arbitration panel of the AAA.

   6.    Mr. Martí and Mr. Martí's Legal Counsel agree both that USADA's use of the email address bufetesj@bufetesj.com  to send the June 28 USADA Letter and USADA's public announcement of a sanction based on not receiving notification from Mr. Martí's Legal Counsel on before July 9, 2012 that Mr. Martí wished to contest the sanction sought by USADA were in good faith and Mr. Martí and Mr. Martí's Legal Counsel agree that if Mr. Martí is permitted to contest Mr. Martí's sanction before an arbitration panel of the AAA that Mr. Martí will not rely upon or raise USADA's public announcement of a sanction against him as a basis for either seeking to avoid or contest USADA's charges against him or as a basis for any claim or legal action of any sort (whether in arbitration, in court or otherwise) against USADA.

7.      The parties' agreement to reopen this matter and permit a AAA arbitration is being made so that the merits of USADA's claims against Mr. Martí and the merits of Mr. Martí's defenses may be heard and decided by AAA arbitrators.

8.      For the foregoing reasons, Mr. Martí and Mr. Martí's Legal Counsel have agreed to enter this arbitration agreement allowing Mr. Martí to contest the charges against him in a AAA arbitration hearing conducted under the USADA Protocol.

9.      Within seven (7) days of Mr. Martí and Mr. Martí's Legal Counsel signing this agreement USADA will provide a copy of this agreement to the Union Cycliste Internationale (UCI) and the World Anti-Doping Agency (WADA).  This arbitration agreement is not confidential and may be provided by USADA or Mr. Martí to any person or entity.  A copy of this arbitration agreement may be used as an original.

The foregoing has been agreed to by the undersigned on this 25th day of July, 2012, as evidenced by their signatures below.

UNITED STATES ANTI-DOPING AGENCY

_____
William Bock, III
General Counsel

Mr. José "Pepe" Martí Martí

_____
Mr. José "Pepe" Martí Martí

Bufete Sempere Jaén SL

_____
Mr. Jesús Morant Vidal

# EXHIBIT CC



**WORLD
ANTI-DOPING
AGENCY**

play true

August 7, 2012


*By email only:* Pat.McQuaid@uci.ch


**Mr. Patrick McQuaid**
President
Union Cycliste Internationale
Ch. de la Mêlée 12
1860 Aigle, Switzerland


**Re:    U.S. Postal Service Cycling Team Cases**


Dear President, dear Pat:

We have followed with interest your correspondence with the United States Anti-Doping Agency (USADA) on the topic of USADA's results management jurisdiction in cases involving Lance Armstrong, Johan Bruyneel and others associated with the U.S. Postal Service Cycling Team (the "USPS Cases").  Thank you for copying us on the communications you initiated on 13 July 2012, and on your follow up letter to USADA dated 3 August 2012.  As you know, USADA copied us on their General Counsel's letter to you dated 26 July 2012.

We have seen the press statement made by the Union Cycliste Internationale (UCI) on 4 August 2012, in which UCI claims that "[a]ccording to the World Anti-Doping Code and UCI's Anti-Doping Rules that UCI is the authority having results management for this case."  UCI's press statement also asserts that, "USADA claims an authority that it does not have and uses procedures that violate basic principles of due process."

We do not agree with the public comments made by UCI and we therefore respond in a public manner.

With respect to your statements that the UCI has results management authority in connection with the USPS Cases you have misinterpreted the *Code*.  *Code* Article 15.3 is quite clear that where anti-doping rule violations are not premised upon a specific *Sample,* that results management and hearings are governed by the procedural rules of the *Anti-Doping Organization* (*ADO*) "which discovered the violation."  In this case, and based on the fact known to us at this stage, there seems to be no question that the *ADO* which discovered the violations is USADA.  Therefore, USADA's results management procedure (*i.e.*, the "USADA Protocol") is controlling.

**World Anti-Doping Agency**
Stock Exchange Tower
800 Place Victoria
Suite 1700
PO Box 120
Montreal (Quebec) H4Z 1B7

Phone:  + 1 514 904 9232
Fax:  + 1 514 904 8650
www.wada-ama.org



- 2 -

Your letters stating that the UCI is the results management authority in these cases purport to base that conclusion on UCI rules which in this case would conflict with the plain meaning of *Code* Article 15.3 and would, under your interpretation, broaden UCI's results management authority to cases where merely evidence supportive of a rule violation was discovered by a UCI license holder or member.  We do not believe that UCI has accurately interpreted its own rules in this regard. Rules need to be interpreted in light of the Code and the clear language of Article 15.3 of the *Code* leaves no room for the interpretation that UCI is making of its own rules.

"All provisions of the *Code* are mandatory in substance and must be followed as applicable by each *Anti-Doping Organization* and *Athlete* or other *Person*."  *Code*, Part One, Introduction.  Therefore, any UCI provisions, if interpreted to conflict with *Code* Article 15.3 (or any other provision of the *Code*) cannot and should not be enforced following that wrong interpretation.

The *Code* confers results management authority on the *ADO* "which discovered the violation," not on the *ADO* which discovered the first shred of evidence that led to an investigation which then led to the discovery of violations.  Moreover, it is clear that the UCI did not in any sense "discover" the 30 April 2010, email from Floyd Landis which was sent to USA Cycling President Steve Johnson and which was transmitted to USADA on 1 May 2010 with a request by Mr. Johnson for USADA to investigate.  UCI cannot add language in its rules altering Article 15.3 of the *Code* and crediting UCI with the "discovery" of evidence that was actually discovered by another organization.  Further, WADA understands from USADA that USADA's communications with Mr. Landis about the topics in his email predated that email by several weeks.  Accordingly, there is no basis under the Code or in common sense for the UCI's assertion that it, rather than USADA, has results management authority in this case.

In addition to the UCI rules, we also understand that USADA's authority to proceed against U.S. athlete Lance Armstrong derives independently from USADA's substantive anti-doping rules and USADA's results management authority under USADA's own *Code* compliant rules.  Pursuant to the *Code*, USADA's rules are applicable to Mr. Armstrong by virtue of Mr. Armstrong's membership in the USADA *Registered Testing Pool*, his former membership in USA Cycling and his current membership in USA Triathlon.

As *Code Signatories* both USADA and the UCI were required to develop substantive anti-doping rules in compliance with the *Code,* and Mr. Armstrong was accountable under both sets of rules.  An important feature of the Code is that it "harmonized" the rules applicable to Athletes.  Thus, whereas both before and after the *Code* Mr. Armstrong and other athletes like him are subject to anti-doping rules promulgated by their *International Federation*(s) (IF), *National Olympic Committee* (*NOC*), *National Anti-Doping Organization* (*NADO*) and National Federation(s), a significant value of the *Code* is that those rules have been "harmonized," meaning that the rules of each organization must be substantively compliant with the *Code*, making the rules clearer and interpreted in a consistent manner.  Indeed, many provisions of the Code are adopted virtually verbatim by *ADO*s, greatly reducing even any textual or semantic differences in the applicable rules.

- 3 -

As required by the *Code*, USADA adopted substantive anti-doping rules in its Protocol.  The USADA Protocol also sets forth USADA's authority to apply those rules to all athletes subject to USADA's testing jurisdiction, including "[a]ny Athlete who is a member or license holder of a NGB," and "[a]ny Athlete . . . who is included in the USADA Registered Testing Pool." Under the USADA Protocol all U.S. athletes under USADA's testing jurisdiction must comply with USADA's anti-doping rules, including rules related to non-analyticals, and USADA has results management responsibility for all violations of those rules, including results management responsibility for violations that are not based upon a positive drug test.

The United States Olympic Committee (USOC) is also a *Signatory* to the *Code*.  The rules of the USOC adopted pursuant to the *Code*, and which like USADA's rules WADA also reviews and approves, also confer upon USADA results management authority over Mr. Armstrong's case.  Therefore, as a *Signatory* to the *Code* the USOC was required to establish rules and procedures to ensure that U.S. *Athlete*s under the authority of USA Cycling and/or USA Triathlon were informed of, and agree to be bound by, the anti-doping rules of USADA.

The USOC addressed the foregoing *Code* requirements through the USOC National Anti-Doping Policies ("USOC NADP") which WADA has reviewed and found to be *Code* compliant and which provide that:

> each NGB shall be responsible for informing *Athlete*s . . . in its sport of these USOC National Anti-Doping Policies and the USADA Protocol which is incorporated in the agreement between the USOC and USADA.  By virtue of their membership in an NGB, license from a NGB, participation in an *Event* or *Competition* organized or sanctioned by an NGB, selection for a national team, receipt of benefits from an NGB or the USOC or by virtue of their inclusion in the USADA *RTP*, Participants agree to be bound by the USOC National Anti-Doping Policies and the USADA Protocol.

Therefore, as explained above, and based on the facts known to us at this stage,  it seems clear under the *Code* that USADA has results management authority to proceed in the Armstrong case.  We must say that the clarity and common acceptance of the principles I have outlined above make UCI's efforts to deny USADA's results management authority frankly incomprehensible.

In your letter to USADA's General Counsel, dated 3 August 2012, you further state that "UCI denies any authority to act or proceed on the basis of [UCI's Anti-Doping Rules] or any other rule of the UCI or otherwise on behalf of UCI and/or USA Cycling." There is clearly no basis in the *Code* for the UCI's attempt to interfere with and shut down USADA's results management of the USPS Cases by purporting to withdraw the right to rely upon UCI's anti-doping rules.   First, as explained above USADA has the right to pursue its case against Mr. Armstrong under the rules of the USOC and USADA.

Second, it seems to us that pursuant to the *Code* and as a co-equal *ADO* to the UCI, USADA is entitled to rely upon and enforce the UCI's anti-doping rules.  There is no provision in the

- 4 -

*Code* which permits the UCI to attempt to withdraw another *ADO*'s right to rely upon the UCI ADR if these are applicable.

On the topic of USADA's processes *WADA* has regularly reviewed USADA's processes and consistently found them compliant with the World Anti-Doping Program, including the *World Anti-Doping Code* and the *WADA International Standards*. *WADA* regularly exercises appropriate review of USADA decisions under the *Code* and *International Standards* and has consistently found USADA to be fair minded, conscientious and to make rigorous efforts to adhere to the rules. This is not to say that *WADA* has agreed with every decision that USADA has ever made. WADA has indeed appealed some USADA decisions; but it is fair to say that *WADA* has found that USADA approaches its responsibilities in a professional manner that makes it one of the leading national anti-doping organizations in the world.

We have further seen nothing in your letters or in USADA's response that justifies UCI's characterization that USADA's processes "violate basic principles of due process." In the past WADA, supported by decisions from CAS, has always found that USADA's processes provide due process as required by the Code.

In fact, the UCI itself has regularly shown to be quite satisfied with the due process provided in USADA hearings. In both the *Tyler Hamilton* and *Floyd Landis* cases, involving top UCI pro team riders, UCI fully entrusted USADA with handling both the American Arbitration Association (AAA) hearings (which as you know involve Court of Arbitration for Sport (CAS) arbitrators) and the CAS appeals. In both of these high profile cases, one of which ultimately resulted in the loss of a *Tour de France* title, UCI had the opportunity to participate as a party or an observer and, despite requests to participate and assist with the costs, chose not to do so and left the cases completely up to USADA. We can only imagine that if UCI had real concern about the USADA processes it would have taken part in those cases. We have never previously heard any complaint from you or anyone associated with the UCI in relation to the due process given in USADA proceedings which have to date been exemplary in terms of the process given to athletes and take place in front of reputable arbitration institutions.

We add in response to the claims in your letters and UCI's recent press statement that there is nothing in the *Code* that requires USADA to turnover its witnesses and evidence in advance of the arbitration process. At an appropriate time in the arbitration process evidence is exchanged, and there is no requirement that such an exchange take place in advance of the arbitration.

Like the UCI, *WADA* has been copied on USADA's correspondence in this case and I am therefore aware that the UCI has received more information from USADA "than that it opened disciplinary proceedings against six respondents on 12 June 2012" as stated in UCI's 4 July (we think it should have been dated 4 August) 2012 press statement. USADA has copied *WADA* on the same correspondence that UCI has received. Therefore, I am aware that USADA has kept the UCI and *WADA* advised throughout the process to the extent required under the *Code*.



- 5 -

Further it has not escaped us that the due process and results management arguments raised by the UCI were not forwarded by the UCI until after those arguments were first advanced by Lance Armstrong's legal team in a lawsuit against USADA.

Finally UCI's efforts to limit the application and scope of its anti-doping rules which it was required by the *Code* to adopt for general applicability and reliance by *ADO*s and yet which it is now attempting to prevent USADA and USA Cycling from relying upon, and UCI's refusal to cooperate with USADA appear to me to be against article 23.2.3 of the Code.

We therefore urge you to reconsider your position and to provide all support to USADA in the conduct of this case, including all documents required by them. By adopting its current position UCI is sadly destroying the credibility it has slowly been regaining in the past years in the fight against doping.

Sincerely,

**David Howman**
Director General

Cc.     Mr William Bock III, General Counsel, USADA *(wbock@kgrlaw.com)*
        Mr Steve Johnson, CEO, USA Cycling *(sjohnson@usacycling.org)*
        Mr Mike Morgan, Counsel to Mr J. Bruyneel *(mike.morgan@squiresanders.com)*
        Mr Mark Levinstein, Counsel to Mr L. Armstrong *(MLevinstein@wc.com)*

# EXHIBIT DD

Original

1

2                          VIDEO INTERVIEW

3

4                               OF:

5

                           PAT McQUAID
6                          UCI President

7

8

9

10           Conducted On:   July 11, 2012

11

12

13

14

15

16

                      A STENOGRAPHIC RECORD BY:
17            James P. Connor, RPR, CSR, CRR
                          Notary Public
18                    Stenographic Reporter

19

20

21

22     _____

       Connor Reporting, Inc.
23     *Reporting and Videoconferencing*
       1650 One American Square
24     Indianapolis, IN 46282
       (317) 236-6022

25

1          *The following transcript has been created*

2          *from a video interview of Pat McQuaid of UCI*

3          *conducted on July 11, 2012, by an unidentified*

4          *interviewer:*

5

6    Q    There's the ongoing USADA Armstrong case, what's

7          the position of UCI?

8    A    The position of UCI is that we're not involved

9          in this, and it's a USADA investigation.

10         They're doing all the process in the United

11         States.  It's nothing to do with UCI, and we'll

12         wait and see what the eventual outcome is.

13   Q    How disastrous will it be for the sport if Lance

14         Armstrong was stripped of his seven Tour

15         victories?

16   A    To be quite honest with you, I don't think at

17         this point in time it would be disastrous for

18         the sport, because I think it's an affair that

19         started, that goes back 15 years.  And I think

20         most people involved in the sport or most

21         people, the fans of the sport and the people who

22         follow the sport realize that the cycling of

23         today is completely different than the cycling

24         of five years ago and the cycling of ten years

25         ago, and 15 years ago.

3

1        So I think people want to -- to be honest,

2    I think people prefer to concentrate on the

3    cycling of today and the future, which is what I

4    prefer to do rather than going back into the

5    past.  So I don't think -- I think it would be a

6    24-hour, one-day wonder, and it would pass over.

7  Q  Does cycling has to get rid of those extra legal

8    issues?

9  A  Of course, cycling has to get rid of -- I mean,

10    cycling has to, has to continue to work as it

11    does in the fight against doping and in ethical

12    areas and so forth to improve the sport.  I

13    think the world is a changed place.  And as our

14    sport develops around the world, becomes more of

15    a global sport, it needs to have that very high

16    ethics, very high transparency, and people --

17    and needs to have that credibility.

18        And we in the UCI are working very hard and

19    with our stakeholders, with the organizers like

20    ASO, RCS, and with the teams and with the

21    riders, too, that we can present a platform to

22    the world of a very credible, professional,

23    well-organized, and very attractive sport.

24  Q  If Armstrong is punished, has UCI done its job

25    correctly, then, in the years before?

1   A   Yes, of course, it has, yeah.  I mean, there's a
2       lot of talk about the amount of controls that
3       Armstrong did and was never positive.  But the
4       same applied to Marion Jones, the same applied
5       to Tim Montgomery.
6           We can only work within the system that's
7       there.  We can only work with what WADA
8       produces.  WADA produces and supervises and
9       oversees the laboratories and spends a lot of
10      money on research and testing, et cetera.  All
11      our -- all our samples go to those laboratories.
12      And if those laboratories tell us it's negative,
13      so we have to accept it's negative.
14          And so we can only work within the system,
15      and the system so far has never tested Lance
16      Armstrong positive.  And so -- and it's the same
17      for every other athlete.  Athletes are positive
18      or negative.  Now we have the biological
19      passport, which goes even further in terms of
20      examining and looking at the riders.
21          As I say, it does -- the UCI does its work
22      and always has done its work, and will continue
23      to do its work.  So this is, this is actually
24      outside of that because you're looking at
25      witness testimonies, et cetera, et cetera, which

```
 1        is not within our realm, not within our
 2        responsibility.  We can't -- we cannot be
 3        questioning riders no more and we don't have the
 4        authority, nor the judicial authority to
 5        question riders and ask them what goes on here,
 6        what goes on there.
 7   Q    Last question.  How long do you stay on the
 8        Tour?  And when do you leave for the big London
 9        party?
10   A    No, I go back to work in Geneva today because
11        with the Olympic games coming up, it's very busy
12        in the office at the moment.  I come back up to
13        the finish of the Tour, and then on Sunday
14        evening I don't go to the Sky -- the winner's
15        party, I go straight to London because I've got
16        to be there for Monday morning.
17   Q    Wishing you the best Olympics.
18   A    Okay.  I'll see you indeed there.
19                    (End of video clip.)
20
21
22
23
24
25
```

```
1   STATE OF INDIANA   )
                       )   SS:
2   COUNTY OF MARION   )

3

4        I, James P. Connor, RPR, CRR, CSR #93-R-1023

5   and a Notary Public and Stenographic Reporter

6   within and for the County of Marion, State of

7   Indiana at large, do hereby certify that on the 6th

8   day of August, 2012, I listened to the best of my

9   ability to a video clip provided to me and

10  transcribed the aforementioned video clip from my

11  stenographic notes into the foregoing statement;

12       That the transcript is a full, true and

13  correct transcript made from my stenograph notes

14  during this process.

15       IN WITNESS WHEREOF, I have hereunto set my

16  hand and affixed my notarial seal this 6th day of

17  August, 2012.

18

19

20                              _____
                                 N O T A R Y   P U B L I C
21

22  My Commission Expires:
    September 18, 2017
23  County of Residence:
    Marion County
24

25
```