IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2012 AUG 20   AM 10: 32
CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY

LANCE ARMSTRONG,

           Plaintiff,

-vs-

TRAVIS TYGART, in his official capacity as
Chief Executive Officer of the United States Anti-
Doping Agency, and UNITED STATES ANTI-
DOPING AGENCY,

           Defendants.

Case No. A-12-CA-606-SS

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendant Travis Tygart and United States Anti-Doping Agency (collectively, "USADA")'s Motion to Dismiss [#33], Plaintiff Lance Armstrong's response [#45] thereto,[1] the affidavit of Shawn Farrell [#49], USADA's reply [#50], Armstrong's surreply [#51], and the parties' letter briefs [##54, 55]. Having reviewed the documents, the relevant law, and the file as a whole, the Court now enters the following opinion and orders GRANTING USADA's motion to dismiss.

### Background

USADA has charged Armstrong with violating various anti-doping rules, and given him the option of either contesting the charges through arbitration or accepting sanctions, potentially including lifetime ineligibility from certain athletic competitions and forfeiture of any competitive results, medals, points and prizes he obtained on or after the date of his first alleged violation. In this

---

[1] Armstrong's motion for leave to exceed page limits [#44] is thus GRANTED.

lawsuit, Armstrong challenges USADA's authority to bring such charges against him, disputes he has a valid agreement to arbitrate such matters with USADA, and alleges USADA's charging and arbitration procedures violate his due process rights.[2]  Armstrong seeks monetary, declaratory, and injunctive relief.  The Court finds: (1) Armstrong's due process claims lack merit; and (2) the Court lacks jurisdiction over Armstrong's remaining claims, or alternatively declines to grant equitable relief on those claims.  Accordingly, the Court GRANTS USADA's motion and DISMISSES this case without prejudice.

## I.     National and International Sports Regulation

Before addressing Armstrong's specific allegations, the Court provides a basic outline of the various entities and regulations related to this case.  The Court looks first at the international bodies involved in the regulation of Olympic sports such as cycling.

## A.     International Entities

As relevant to this case, at the apex of the international hierarchy is the Olympic Movement, which is made up of three main constituents: the International Olympic Committee (IOC), the International Sports Federations (IFs) for each participating sport, and the National Olympic Committees (NOCs) for each participating country.[3]

---

[2]More precisely, Armstrong alleges four causes of action: (1) a declaratory judgment action as to both Defendants; (2) tortious interference with contract as to USADA only; (3) a Fifth Amendment due process challenge as to both Defendants; and (4) a common law due process challenge as to both Defendants.

[3]*Introduction*, OLYMPIC.ORG, http://www.olympic.org/content/The-IOC/Governance/Introductionold/ (last visited August 7, 2012).

The IOC bills itself as "the supreme authority of the Olympic Movement," and describes its role as including both "encourag[ing] and support[ing] the organisation, development and coordination of sport and sports competitions," and "lead[ing] the fight against doping in sport."[4]

Consistent with this latter objective, the IOC recognizes the World Anti-Doping Agency (WADA), a Swiss private law Foundation which has its seat in Lausanne, Switzerland and its headquarters in Montreal, Canada.[5] One of WADA's objectives, according to its constitution, is "to promote harmonized rules, disciplinary procedures, sanctions and other means of combating doping in sport, and contribute to the unification thereof, taking into account the rights of the athletes."[6] As discussed further below, WADA also drafted a uniform set of anti-doping rules, called the World Anti-Doping Code (WADC, often referred to by the parties simply as "the Code"), which went into effect on January 1, 2004, and was revised on January 1, 2009.[7] The WADC requires international and national Olympic sports organizations to incorporate most of its anti-doping provisions by reference, though some provisions need not be adopted verbatim, provided they are complied with in substance.

---

[4] *International Olympic Committee, About the Institution*, OLYMPIC.ORG, http://www.olympic.org/about-ioc-institution (last visited August 7, 2012).

[5] *Recognised Organisations*, OLYMPIC.ORG, http://www.olympic.org/ioc-governance-affiliate-organisations?tab=WADA (last visited August 7, 2012); *Statutes*, WORLD ANTI-DOPING AGENCY, http://www.wada-ama.org/en/About-WADA/Statutes/ (last visited August 7, 2012).

[6] WORLD ANTI-DOPING AGENCY, CONSTITUTIVE INSTRUMENT OF FOUNDATION, Art. 4, § 6 (2009).

[7] *See The Code*, WORLD ANTI-DOPING AGENCY, http://www.wada-ama.org/en/World-Anti-Doping-Program/Sports-and-AntiDoping-Organizations/The-Code/ (last visited August 7, 2012).

The IF for cycling is the Union Cycliste Internationale (UCI), also known as the International Cycling Union.[8]  According to the Olympic Movement website:

> The International Sports Federations are international non-governmental organisations recognised by the International Olympic Committee (IOC) as administering one or more sports at world level. The national federations administering those sports are affiliated to them. While conserving their independence and autonomy in the administration of their sports, International Sports Federations seeking IOC recognition must ensure that their statutes, practice and activities conform with the Olympic Charter.

> The IFs have the responsibility and duty to manage and to monitor the everyday running of the world's various sports disciplines, including for those on the programme, the practical organisation of events during the Games. The IFs must also supervise the development of athletes practising these sports at every level. Each IF governs its sport at world level and ensures its promotion and development. They monitor the everyday administration of their sports and guarantee the regular organisation of competitions as well as respect for the rules of fair play.[9]

UCI has issued its own set of anti-doping rules (the UCI ADR) based upon, but not identical to, the WADC. *See* Pl.'s Resp. [#45], Attach. 24.

**B.   National Entities**

Transitioning to domestic entities, the NOC for the United States is the United States Olympic Committee (USOC).[10]  Among other things, NOCs are responsible for selecting competitors and teams to send to the Olympic Games, and naming potential host cities for the Games.[11]  The USOC is a federally chartered corporation under the terms of the Ted Stevens Olympic and Amateur

---

[8]*See Federation*, OLYMPIC.ORG, http://www.olympic.org/uci-cycling-bmx (last visited August 7, 2012).

[9]*International Sports Federations (IFs)*, OLYMPIC.ORG, http://www.olympic.org/content/The-IOC/Governance/International-Federations/ (last visited August 7, 2012).

[10]*See About the USOC*, TEAMUSA.ORG, http://www.teamusa.org/About-the-USOC.aspx (last visited August 7, 2012).

[11]*See National Olympic Committees (NOCs)*, OLYMPIC.ORG, http://www.olympic.org/ioc-governance-national-olympic-committees?tab=mission (last visited August 7, 2012).

Sports Act (the Sports Act), 36 U.S.C. §§ 220501–220529. *See* 36 U.S.C. § 220502(a). As relevant here, the USOC's powers include "recogniz[ing] eligible amateur sports organizations as national governing bodies for any sport that is included on the program of the Olympic Games or the Pan-American Games," and

> facilitat[ing] . . . the resolution of conflicts or disputes that involve any of its members and any amateur athlete, coach, trainer, manager, administrator, official, national governing body, or amateur sports organization and that arise in connection with their eligibility for and participation in the Olympic Games, the Paralympic Games, the Pan-American Games, world championship competition, the Pan-American world championship competition, or other protected competition as defined in the constitution and bylaws of the corporation . . . .

*Id.* § 220505(c)(4), (5).  National governing bodies (NGBs) are essentially the United States' domestic equivalents of International Federations—organizations which are responsible for governing one or more Olympic sports on a national level. *See id.* § 220521.

The NGB for cycling is USA Cycling. *See* Defs.' Mot. Dism. [#33], Ex. 2 ¶ 4. USA Cycling is also a member of its international counterpart, UCI. *See id.*, Attach. 7 at 128.  The Sports Act empowers NGBs such as USA Cycling to

> conduct amateur athletic competition, including national championships, and international amateur athletic competition in the United States, and establish procedures for determining eligibility standards for participation in competition . . . .

36 U.S.C. § 2250523(a)(5).  The Act defines "amateur athletic competition" to mean "a contest, game, meet, match, tournament, regatta, or other event in which amateur athletes compete." *Id.* § 220501(b)(2).  "Amateur athlete," in turn, is defined broadly to mean "an athlete who meets the eligibility standards established by the national governing body or paralympic sports organization for the sport in which the athlete competes." *Id.* § 220501(b)(1).

Like the international sports organizations, the United States has its own set of anti-doping regulations. Defendant USADA has implemented a set of anti-doping rules, called the USADA Protocol for Olympic Movement Testing (the USADA Protocol), which has been incorporated into the USOC national anti-doping policies, and which USADA is responsible for implementing. *See* Defs.' Mot. Dism. [#33], Ex. 2 at 63. The USOC anti-doping policies, which are "in addition to" those imposed by the IFs, require adherence to their terms by NGBs such as USA Cycling:

> NGBs shall not have any antidoping rule which is inconsistent with these Policies or the USADA Protocol, and NGB compliance with these Policies and the USADA Protocol shall be a condition of USOC funding and recognition.[12]

*Id.* These policies, including the agreement to be bound by the USADA Protocol, apply to, among others, NGB members and license-holders, and those included in the USADA registered testing pool (RTP). *See id.* USA Cycling's regulations echo this requirement:

> USA Cycling has adopted and participates in the United States Anti-Doping Agency (USADA) protocol for Olympic Movement testing (USADA protocol). The USADA protocol is incorporated herein by reference and shall prevail over any USA Cycling Regulation to the contrary.
> . . . .
> All testing and results will be the responsibility of the United States Anti-Doping Agency (USADA).

*Id.*, Attach. 7 at 70. However, USA Cycling's Bylaws, while also affirming USA Cycling will adhere to the requirements imposed upon it by the Sports Act and the USOC, further require "[a]ll Directors, Sport Committee members, employees, and other agents of USA Cycling" to "[e]nsure

---

[12]The USADA Protocol contains a similar requirement: "Any IF or NGB procedural rule inconsistent with this Protocol shall be superceded by this Protocol." Defs.' Mot. Dism. [#33], Attach. 4 at 56.

that USA Cycling adheres to the applicable rules, regulations, and policies of . . . international sport

governing bodies with which [it is] affiliated."[13]  Pl.'s Resp. [#45], Attach. 25 at 11, 13.

## II.   USADA's Allegations Against Armstrong

On June 12, 2012, USADA sent a notice letter to Armstrong, informing him it was opening

formal action against him and five others for their alleged roles in a doping conspiracy beginning in

January 1998.  Specifically, USADA indicated it intended to pursue the following charges against

Armstrong:

> (1) Use and/or attempted use of prohibited substances and/or methods including EPO,[14] blood transfusions, testosterone, corticosteroids and masking agents.
>
> (2) Possession of prohibited substances and/or methods including EPO, blood transfusions and related equipment (such as needles, blood bags, storage containers and other transfusion equipment and blood parameters measuring devices), testosterone, corticosteroids and masking agents.
>
> (3) Trafficking of EPO, testosterone, and corticosteroids . . . .
>
> (4) Administration and/or attempted administration to others of EPO, testosterone, and cortisone.
>
> (5) Assisting, encouraging, aiding, abetting, covering up and other complicity involving one or more anti-doping rule violations and/or attempted anti-doping rule violations.
>
> (6) Aggravating circumstances justifying a period of ineligibility greater than the standard sanction.

Defs.' Mot. Dism. [#33], Attach. 5 at 99.  USADA claimed these alleged actions by Armstrong

violated the UCI ADR, WADC, and the USADA Protocol.  *Id.* at 91.  The letter further stated:

---

[13]In quoting USA Cycling's Bylaws, the Court is not indicating it believes Armstrong may sue to enforce them; it includes them simply to illustrate one of the many potential conflicts in the rules USA Cycling has agreed to follow.

[14]Erythropoietin, a prohibited substance which increases the number of red blood cells in the circulatory system available to carry oxygen.

With respect to Lance Armstrong, numerous riders, team personnel and others will testify based on personal knowledge acquired either through observing Armstrong dope or through Armstrong's admissions of doping to them that Lance Armstrong used EPO, blood transfusions, testosterone and cortisone during the period from before 1998 through 2005, and that he had previously used EPO, testosterone and hGH through 1996.

Numerous riders will also testify that Lance Armstrong gave to them, encouraged them to use and/or assisted them in using doping products and/or methods, including EPO, blood transfusions, testosterone and cortisone during the period from 1999 through 2005.

Representatives of USADA have interviewed Dr. Martial Saugy, Director of the Lausanne Anti-Doping Laboratory which analyzed the urine samples from the 2001 Tour of Switzerland. Dr. Saugy stated that Lance Armstrong's urine sample results from the 2001 Tour of Switzerland were indicative of EPO use. Multiple witnesses have also told USADA that Lance Armstrong told them he had tested positive in 2001 and that the test result had been covered up.

Lance Armstrong's doping is further evidenced by the data from blood collections obtained by the UCI from Lance Armstrong in 2009 and 2010. This data is fully consistent with blood manipulation including EPO use and/or blood transfusions.

*Id.* at 99–100.

On June 28, 2012, USADA sent Armstrong a second letter, which informed him that a panel

of the USADA Anti-Doping Review Board had determined there was sufficient evidence of rules

violations to justify adjudication thereof.  As relevant to Armstrong, the letter stated:

Therefore, at this time, reserving all rights to amend this charge, USADA charges you with anti-doping rules violations under the Union Cycliste International ("UCI") Anti-Doping Rules 1997 to present ("UCI ADR"), the World Anti-Doping Code 2003 to present (the "Code"), the USADA Protocol for Olympic and Paralympic Movement Testing 2000 to present (the "USADA Protocol"), the USOC National Anti-Doping Policies 1997 to present (the "USOC NADP"), and the USA Cycling Anti-Doping Rules 1997 to present (collectively, the "Applicable Rules") as follows:
. . . .
Charges against Lance Armstrong (Rider):

-8-

(1) Use and/or attempted use of prohibited substances and/or methods including EPO, blood transfusions, testosterone, corticosteroids and/or saline, plasma or glycerol infusions.

(2) Possession of prohibited substances and/or methods including EPO, blood transfusions and related equipment (such as needles, blood bags, storage containers and other transfusion equipment and blood parameters measuring devices), testosterone, corticosteroids and/or saline, plasma or glycerol infusions.

(3) Trafficking and/or attempted trafficking of EPO, testosterone, and/or corticosteroids.

(4) Administration and/or attempted administration to others of EPO, testosterone, and/or cortisone.

(5) Assisting, encouraging, aiding, abetting, covering up and other complicity involving one or more anti-doping rule violations and/or attempted anti-doping rule violations.

(6) Aggravating circumstances justifying a period of ineligibility greater than the standard sanction.

Mr. Armstrong's violations commenced on or before August 1, 1998, with multiple violations thereafter, including violations after June 28, 2004, and, at a minimum, with respect to cover-up activities Mr. Armstrong's violations have continued through the present.[15]

*Id.* at 106–07, 110–11 (footnote omitted).

Armstrong claims USADA sent the June 12 notice letter to the World Triathlon Corporation (WTC), with which Armstrong apparently has a contract to participate in athletic events, and the

---

[15] As the Court noted during the August 10 hearing, this "charging document" is so vague and unhelpful it would not pass muster in any court in the United States. The Court is assured, however, that Armstrong will be given adequate notice of the specific allegations against him in a timely fashion prior to arbitration, and proceeds under the assumption this will actually occur. Indeed, the Court has serious doubts whether USADA's arbitration procedures would comport with due process if Armstrong were not to receive such notice sufficiently in advance of his arbitration to allow him to prepare a defense. *Cf. Harding v. U.S. Figure Skating Ass'n*, 851 F. Supp. 1476, 1478–79 (D. Or. 1994) (finding it was "arbitrary and manifestly unreasonable" for U.S. Figure Skating Association to set a hearing three days after athlete's reply to disciplinary charges was due, when bylaws required the hearing be set after the reply was actually received, and at a time "reasonably convenient for all parties").

WTC consequently suspended him from competition. Armstrong further claims USADA's intended sanctions would, if imposed, bar him from future WTC competitions.

**III.    Armstrong's Challenges to USADA's Authority**

Armstrong alleges USADA lacks jurisdiction to bring these charges against him for several reasons. First, he claims, the UCI ADR dictate that, "because Mr. Armstrong retired from cycling before Defendants initiated the charges against him, the organization that had jurisdiction over him during the time of the alleged violations has jurisdiction to determine whether to proceed against Mr. Armstrong. That organization is UCI, not USADA." Am. Compl. [#18] ¶ 25. Second, Armstrong claims USADA lacks authority to bring charges for his alleged conduct prior to 2004, both because "Mr. Armstrong's license agreements with UCI prior to 2004 made no reference to USADA and contained no agreement conferring any authority on USADA," and because "prior to August 13, 2004, UCI's ADR conferred no authority on USADA." *Id.* ¶ 26. Armstrong alleges UCI retained jurisdiction after this date "over Doping Control (including investigations, charges, and hearings) relating to testing at international events and testing performed by UCI outside of competition." *Id.* ¶ 27. Third, Armstrong contends USADA lacks jurisdiction to bring these charges because they were "discovered," within the meaning of the UCI ADR, not by USADA, but by UCI. Finally, Armstrong claims, UCI has not delegated its jurisdiction to USADA because "none of the requirements for a delegation of authority has been satisfied," including an independent conclusion by UCI that a violation of the UCI ADR has likely occurred. *Id.* ¶ 29.

Armstrong also claims USADA's charges were brought in violation of its own rules, the Protocol for Olympic and Paralympic Movement Testing. Specifically, Armstrong claims: (1) many of USADA's charges are time-barred under its internal 8-year limitations period; (2) USADA has

given improper inducements to potential witnesses; and (3) USADA's review board was not impartial, considered a biased version of the evidence, and did not give meaningful consideration to Armstrong's response to the charges.

## IV.  Armstrong's Due Process Challenges

Armstrong further alleges USADA's arbitration procedures do not comport with due process. Specifically, he complains of the following alleged procedural deficiencies: (1) he was not provided an adequate charging document; (2) he has no guarantee of a hearing by the appellate arbitral panel;[16] (3) he has no right to cross-examine or confront witnesses against him; (4) he has no right to an impartial arbitration panel; (5) he has no right to disclosure of exculpatory evidence; (6) he has no right to disclosure of cooperation agreements or inducements provided by USADA; (7) he has no right to obtain investigative witness statements; (8) he has no right to obtain full disclosure of laboratory analyses or an impartial assessment of their accuracy; and (9) he has no right to judicial review of the arbitrators' decision by a United States court.[17]

## V.  USADA's Motion to Dismiss

USADA argues the Court should dismiss Armstrong's claims for four reasons: (1) the Court lacks subject matter jurisdiction because the Sports Act preempts Armstrong's claims; (2) the Court lacks subject matter jurisdiction because Armstrong has failed to exhaust his administrative remedies; (3) Armstrong's due process challenges must be arbitrated or, alternatively, fail on their

---

[16]Appeals from USADA hearings are heard by the Court of Arbitration for Sport (CAS), which is headquartered in Lausanne, Switzerland.

[17]It appears the only appeal from a CAS decision is to the courts of Switzerland.

merits; and (4) USADA is entitled to dismissal or a stay of proceedings in this Court under the

Federal Arbitration Act (FAA).

With respect to Armstrong's due process challenges, the Court agrees they are without merit

and therefore dismisses them without prejudice for failure to state a claim upon which relief can be

granted.  The Court further agrees the Sports Act and Armstrong's arbitration agreement preclude

his remaining claims, and the Court therefore dismisses those claims without prejudice for lack of

subject matter jurisdiction.   Alternatively, even if the Court has jurisdiction over Armstrong's

remaining claims, the Court finds they are best resolved through the well-established system of

international arbitration, by those with expertise in the field, rather than by the unilateral edict of a

single nation's courts; the Court thus declines to grant equitable relief on Armstrong's remaining

claims on this alternative basis.

### Analysis

**I.      Due Process Claims**

**A.      Rule 12(b)(6) Dismissal — Legal Standard**

Federal Rule of Civil Procedure 8(a)(2) requires a complaint contain "a short and plain

statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).   A

motion under Federal Rule of Civil Procedure 12(b)(6) asks a court to dismiss a complaint for

"failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).   In deciding a

motion to dismiss under 12(b)(6), a court generally accepts as true all factual allegations contained

within the complaint. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507

U.S. 163, 164 (1993).   However, a court is not bound to accept legal conclusions couched as factual

allegations.  *Papasan v. Allain*, 478 U.S. 265, 286 (1986).   Although all reasonable inferences will

be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). The plaintiff must plead sufficient facts to state a claim for relief that is facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although a plaintiff's factual allegations need not establish the defendant is probably liable, they must establish more than a "sheer possibility" that a defendant has acted unlawfully. *Id.* Determining plausibility is a "context-specific task," that must be performed in light of a court's "judicial experience and common sense." *Id.* at 679. In deciding a motion to dismiss, courts may consider the complaint, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, such as documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## B.    Application

Armstrong's due process claims fail as a matter of law, and must be dismissed.[18]

"An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland*

---

[18]For purposes of this discussion, the Court assumes the relevant entities are government actors and therefore subject to the requirements of the Due Process Clause. The Court notes, however, it is very possible neither USADA nor USA Cycling qualify as government actors for constitutional purposes. *See San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 546 (1987) ("Because the USOC is not a governmental actor, the SFAA's claim that the USOC has enforced its rights in a discriminatory manner must fail."); *Behagen v. Amateur Basketball Ass'n of U.S.*, 884 F.2d 524, 531 (10th Cir. 1989) ("Proceeding from this certain ground that the USOC is not a governmental actor, it follows a fortiori that the ABA/USA [an NGB] is also not a governmental actor.").

*Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Cent. Hanover Bank &*

*Trust Co.*, 339 U.S. 306, 313 (1950)).   The Supreme Court has "described 'the root requirement' of

the Due Process Clause as being 'that an individual be given an opportunity for a hearing before he

is deprived of any significant property interest.'" *Id.* (quoting *Boddie v. Connecticut*, 401 U.S. 371,

379 (1971)).   The Supreme Court has identified three factors which must be considered in

determining whether particular government procedures comply with "the specific dictates of due

process":

> First, the private interest that will be affected by the official action; second, the risk
> of an erroneous deprivation of such interest through the procedures used, and the
> probable value, if any, of additional or substitute procedural safeguards; and finally,
> the Government's interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute procedural requirement would
> entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

The Court begins by recognizing the substantial private interest involved: it is no

exaggeration to say the future of Armstrong's career, and maybe also its past, will likely be

determined by the result of USADA's arbitration.   Balanced against this, of course, is USADA's

strong interest in fulfilling its mandate to root out doping in Olympic sports[19]—an interest which is

shared by other athletes, and the international sports community as a whole.   Further, though the

Court has no hard data at its disposal on this issue, the increase in fiscal and administrative costs

associated with "fixing" many of the alleged defects in USADA's arbitration process would likely

be non-trivial.

---

[19]As discussed further below, USADA's conduct raises serious questions about whether its real interest in
charging Armstrong is to combat doping, or if it is acting according to less noble motives.   Ultimately, however, the
subjective motivations of the parties cannot control the Court's due process analysis, or give this Court jurisdiction over
claims Congress and Armstrong have decided should be resolved through arbitration.

The Court turns now to Armstrong's challenges to the arbitration procedures themselves, and the risk they will result in an erroneous deprivation of Armstrong's considerable liberty and property interests. As noted above, Armstrong's challenges are as follows: (1) he was not provided an adequate charging document; (2) he has no guarantee of a hearing by CAS; (3) he has no right to cross-examine or confront witnesses against him; (4) he has no right to an impartial arbitration panel; (5) he has no right to disclosure of exculpatory evidence; (6) he has no right to disclosure of cooperation agreements or inducements provided by USADA; (7) he has no right to obtain investigative witness statements; (8) he has no right to obtain full disclosure of laboratory analyses or an impartial assessment of their accuracy; and (9) he has no right to judicial review of the arbitrators' decision by a United States court.[20]

The Supreme Court has already rejected challenges to arbitration based on speculation of bias by arbitration panels (challenge 4, above), the relatively narrow discovery available in arbitration as compared to judicial proceedings (challenges 5, 6, 7, and 8), and limited judicial review options (challenge 9). *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30–32 & n.4 (1991). This Court does likewise, and also rejects Armstrong's other challenges.

---

[20]To the extent Armstrong's due process claims encompass the issues of whether USADA or UCI rules apply to his alleged violations, or which entity has authority to pursue charges based on his alleged conduct, the Court finds those issues are, at least in part, subsumed by the question of whether USADA's arbitration procedures comply with the constitutional requirements of due process. *See Ramirez v. Ahn*, 843 F.3d 864, 867 (5th Cir. 1988) ("[E]ven if an action by a government entity violates its own rules or those of the state, there is no *constitutional* deprivation unless the conduct also trespasses on federal constitutional safeguards."). However, to the extent Armstrong's due process claims—particularly his common law due process claim—raise questions not answered by the Court's constitutional due process analysis, the Court finds they are precluded by the Sports Act and Armstrong's arbitration agreement, as explained below.

Like the Supreme Court, this Court declines to assume either the pool of potential arbitrators, or the ultimate arbitral panel itself,[21] will be unwilling or unable to render a conscientious decision based on the evidence before it.[22] Further, Armstrong has ample appellate avenues open to him, first to the Court of Arbitration for Sport (CAS), where he is entitled to de novo review, and then to the courts of Switzerland, as permitted by Swiss law, if he so elects.[23] Further, the record shows CAS routinely grants hearings in cases such as Armstrong's, and this Court declines to presume it will break with tradition in this particular instance. Thus, the Court rejects challenges (2), (4), and (9). With respect to challenges (5), (6), and (7), as Armstrong admits, such disclosures are only applicable to criminal matters, and there is no reason to believe they would be required under UCI's rules (which Armstrong argues are applicable and, presumably, valid), much less the Federal Rules of Civil Procedure. Challenge (8) again asks this Court to predict what may occur at arbitration, and

---

[21]By default, a single arbitrator will be appointed; however, either party may elect to have the matter heard by a panel of three arbitrators. The Court's use of the word "panel" simply echoes the language in Armstrong's complaint.

[22]Indeed, the only support in the record for the notion that the arbitrators will be biased against Armstrong comes from his allegation that athletes have only won three proceedings since USADA's inception in 2000, and counsel's colorful Biblical analogy during oral argument. In any event, Rule R-14 of the American Arbitration Association Supplementary Procedures for the Arbitration of Olympic Sport Doping Disputes (the "Supplementary Procedures"), incorporated as Annex D to the USADA Protocol, contains provisions requiring arbitrators to disclose any potential bias they may have, and allowing parties to move for disqualification of any arbitrator they find objectionable. *See* Defs.' Mot. Dism. [#33], Attach. 4 at 86 ("Any person appointed as an arbitrator shall disclose to the AAA any circumstance likely to affect impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives. . . . Upon objection of a party to the continued service of an arbitrator, the AAA shall determine whether the arbitrator should be disqualified . . . .").

[23]Specifically, Rule R-45 reads:

The arbitration award may be appealed to CAS as provided in Annex A of the USADA Protocol, which incorporates the mandatory Articles on Appeals from the World Anti-Doping Code. Notice of appeal shall be filed with the Administrator within the time period provided in the CAS appellate rules. Appeals to CAS filed under these rules shall be heard in the United States. The decisions of CAS shall be final and binding on all parties and shall not be subject to any further review or appeal except as permitted by the Swiss Federal Judicial Organization Act or the Swiss Statute on Private International Law.

*Id.* at 91.

to assume the arbitration panel will give undue weight to adverse laboratory findings, both of which the Court declines to do. Though USADA's woefully inadequate charging letter makes it difficult to say with certainty, it appears USADA's evidence will revolve more around eyewitness testimony than lab results. In any case, Armstrong's lawyers will have the opportunity to question the reliability of any adverse test results at arbitration, and the Court must presume the arbitration panel will discount the weight of those results to the extent it finds them unreliable or unpersuasive.[24] Similarly, Armstrong will be able to call into question the reliability of any witness testimony, by affidavit or otherwise, that was not subject to cross-examination, and the panel may discount the weight of that evidence accordingly.[25] The Court thus rejects challenges (3) and (8).

This leaves only challenge (1). As the Court stated at the hearing, and has alluded to above, the deficiency of USADA's charging document is of serious constitutional concern. Indeed, but for two facts, the Court might be inclined to find USADA's charging letter was a violation of due process, and to enjoin USADA from proceeding thereunder. First, it would likely be of no practical effect: USADA could easily issue a more detailed charging letter, at which point Armstrong would presumably once again file suit, and the parties would be back in this exact position some time later, only poorer for their legal fees. Second, and more important, USADA's counsel represented to the Court that Armstrong will, in fact, receive detailed disclosures regarding USADA's claims against him at a time reasonably before arbitration, in accordance with routine procedure. The Court takes

---

[24]Rule R-28 of the Supplementary Procedures gives the arbitrator broad discretion to "determine the admissibility, relevance, and materiality of the evidence offered," and even, under limited circumstances, to retain an expert. *Id.* at 90.

[25]Rule R-29 of the Supplementary Procedures says as much: "The arbitrator may receive and consider the evidence of witnesses by declaration or affidavit, but shall give it only such weight as the arbitrator deems it entitled to after consideration of any objection made to its admission." *Id.*

counsel at his word.[26]  With the understanding Armstrong has received all the process he is due at

this time, and will receive adequate notification of the charges against him in time to prepare a

defense, the Court rejects Armstrong's first challenge.

On balance, the Court finds the USADA arbitration rules, which largely follow those of the

American Arbitration Association (AAA), are sufficiently robust to satisfy the requirements of due

process.[27]  The Court therefore rejects Armstrong's due process claims, to the extent they challenge

USADA's arbitration procedures.  Accordingly, the Court grants USADA's motion and dismisses

those claims without prejudice.  The Court turns now to Armstrong's remaining claims.

## II.      Armstrong's Other Claims

As noted above, and for the following reasons, the Court finds Armstrong's remaining claims

are precluded by both the Sports Act, and his arbitration agreement with USADA.

## A.      Rule 12(b)(1) Dismissal — Legal Standard

Federal district courts are courts of limited jurisdiction, and they may only exercise such

jurisdiction as is expressly conferred by the Constitution and federal statute.  *Kokkonen v. Guardian*

---

[26]The Court does not rely solely on counsel's assurances, however.  The Supplementary Procedures to the USADA Protocol contain two provisions which suggest Armstrong is likely to receive adequate notice of the specific allegations and evidence against him prior to any substantive hearing.  First, Rule R-17 allows a party to request a preliminary hearing, during which "the parties and the arbitrator should discuss the future conduct of the case, including clarification of the issues and claims, a schedule for the hearings and any other preliminary matters." *Id.* at 88.  Second, Rule R-18, governing the exchange of information between the parties, not only requires the parties to exchange all exhibits they intend to submit at the merits hearing five days in advance, but also allows the arbitrators to order "production of documents and other information," including lists of anticipated witnesses. *Id.*

As noted above, however, the Court dismisses Armstrong's claims without prejudice.  If it should come to pass that Armstrong does not actually receive adequate notice sufficiently in advance of the arbitration hearing, and it is brought to this Court's attention in an appropriate manner, USADA is unlikely to appreciate the result.

[27]The Court emphasizes this is a prospective ruling, based on the Court's unwillingness to presume the arbitrators will abdicate their responsibilities to remain neutral and to ensure "that the parties are treated with equality and that each party has the right to be heard and is given a fair opportunity to present its case." *Id.* at 94, 92.  Nor will this Court second-guess the procedural, evidentiary, or substantive determinations of the panel after the fact, if asked to do so—provided, of course, that the arbitration proceedings comport with the dictates of the Constitution.

*Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Federal Rule of Civil Procedure 12(b)(1) provides the vehicle through which subject matter jurisdiction may be challenged. Thus, the burden of establishing subject matter jurisdiction by a preponderance of the evidence rests with the party seeking to invoke it. *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 327 (5th Cir. 2008) (citations omitted).

In evaluating a challenge to subject matter jurisdiction, the Court is free to weigh the evidence and resolve factual disputes so that it may be satisfied that jurisdiction is proper. *See Montez v. Dep't of Navy*, 392 F.3d 147, 149 (5th Cir. 2004). In conducting its inquiry the Court may consider: (1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts plus the Court's resolution of disputed facts. *Id.* The Court must take the allegations of the complaint as true and draw all inferences in the plaintiff's favor. *Saraw P'ship v. United States*, 67 F.3d 567, 569 (5th Cir. 1995); *Garcia v. United States*, 776 F.2d 116, 117 (5th Cir. 1985). Dismissal is warranted if the plaintiff's allegations, together with any undisputed facts, do not establish the Court has subject matter jurisdiction. *See Saraw*, 67 F.3d at 569; *Hobbs v. Hawkins*, 968 F.2d 471, 475 (5th Cir. 1992).

**B.      The Sports Act Precludes Armstrong's Remaining Claims**

As recited previously, the Sports Act not only created the USOC as a federally chartered corporation, but also authorized it to recognize NGBs for Olympic Sports. *See* 36 U.S.C. §§ 220502(a), 220505(c)(4), 220521(a). Under this grant of authority, the USOC has recognized USA Cycling as the NGB for cycling.

In turn, the Sports Act empowers NGBs such as USA Cycling to "establish procedures for determining eligibility standards for participation in competition." *Id.* § 220523(a)(5). However,

the Act does not leave the choice of procedures entirely up to NGBs, instead requiring them to "agree[] to submit to binding arbitration in any controversy involving . . . the opportunity of any amateur athlete . . . to participate in amateur athletic competition, upon demand of the [USOC] or any aggrieved amateur athlete . . . ."[28] *Id.* § 220522(a)(4)(B). In particular, in the area of doping, USOC's national policies require USA Cycling, as well as its members and license-holders, to comply with the USADA Protocol—including its arbitration procedures[29]—over any other inconsistent rule. Defs.' Mot. Dism. [#33], Ex. 2 at 63.

There can be little doubt, as other courts have observed, *see, e.g., Barnes v. Int'l Amateur Athletic Fed'n*, 862 F. Supp. 1537, 1544 (S.D. W. Va. 1993) ("Congress made clear choices to keep disputes regarding the eligibility of amateur athletes to compete out of the federal courts."), Congress intended for eligibility questions to be decided through arbitration, rather than federal lawsuits. Whether or not this was a good choice is, of course, debatable—but it is not this Court's place to judge the wisdom of Congress's enactments, so long as they are constitutional.

The Seventh Circuit has taken a similarly limited view of the role of federal courts with respect to eligibility determinations in Olympic sports. *See Slaney v. The Int'l Amateur Athletic*

---

[28]Armstrong argues this provision is inapplicable because neither he nor the USOC have demanded binding arbitration in this case. The Court rejects this argument. As noted above, the USOC has incorporated the USADA Protocol into its own anti-doping policies, and delegated implementation of those policies to USADA. *See* Defs.' Mot. Dism. [#33], Ex. 2 at 63. USADA thus acts with the authority of the USOC in the area of enforcing the USADA Protocol, and USADA has obviously demanded arbitration of this matter. Even if USOC has the *option* to instruct USADA whether or not to arbitrate a particular doping case—a proposition about which the Court has some doubt, not least because it raises concerns about selective enforcement of anti-doping rules—there is no reason to *require* USOC's direct involvement in every such case.

[29]Specifically, the USADA Protocol states: "If [USADA's desired] sanction is contested by the Athlete or other Person, then a hearing shall be conducted pursuant to the procedures set forth below in sections 14 and 15." *Id.*, Attach. 4 at 60. Section 15 contains the bulk of the arbitration provisions, including the requirements that: (1) hearings take place before the AAA using the Supplementary Procedures; (2) WADA and the relevant IF be invited to participate as parties or observers; (3) the accused athlete be given the "sole right" to request the hearing be open to the public; and (4) final awards may be appealed to CAS. *See id.* at 61–62.

*Fed'n*, 244 F.3d 580 (7th Cir. 2001). In *Slaney*, an amateur athlete brought a variety of Indiana state

law contract and tort claims against the USOC in relation to the International Amateur Athletic

Federation (IAAF)[30] arbitral panel's determination she had committed a doping offense. 244 F.3d

at 586–88. In affirming the district court's dismissal of Slaney's claims for lack of subject matter

jurisdiction, the Seventh Circuit stated, "when it comes to challenging the eligibility determination

of the USOC, only a very specific claim will avoid the impediment to subject matter jurisdiction that

[36 U.S.C.] § 220503(3) poses."[31]  *Id.* at 595, 595–96. In describing exactly which claims might

survive, the Seventh Circuit cited a federal district court case from the District of Oregon:

> There, the court cautioned that "courts should rightly hesitate before intervening in
> disciplinary hearings held by private associations. . . . Intervention is appropriate only
> in the most extraordinary circumstances, where the association has clearly breached
> its own rules, that breach will imminently result in serious and irreparable harm to
> the plaintiff, and the plaintiff has exhausted all internal remedies." Yet, while carving
> out this limited exception to the preemption created by the Amateur Sports Act, the
> opinion forewarned that while examining whether internal rules had been complied
> with, the courts "should not intervene in the merits of the underlying dispute."

*Id.* at 595–96 (quoting *Harding v. U.S. Figure Skating Ass'n*, 851 F. Supp. 1476, 1479 (D. Or.

1994)).

The Court agrees with the reasoning of *Slaney* and *Harding*, that federal courts should not

interfere with an amateur sports organization's disciplinary procedures unless the organization shows

wanton disregard for its rules, to the immediate and irreparable harm of a plaintiff, where the

---

[30]The IAAF, now named the International Association of Athletics Federations, is recognized by the IOC as
the IF for the sport of "Athletics," which includes track and field events.

[31]Of course, *Slaney* is not directly on point for at least two reasons. First, Slaney's doping violation predated
the existence of USADA, so that entity's jurisdiction was not at issue. Second, Slaney's violation occurred during the
national trials for the Olympic games, and therefore implicated USOC's exclusive jurisdiction, under § 220503, over all
matters relating to the United States' representation at the Games. However, considering the similar authority granted
by Congress to the various national governing bodies with regard to regulation of their respective sports, *see generally*
36 U.S.C. §§ 220523–220525, the Court nevertheless finds *Slaney* relevant and persuasive.

plaintiff has no other available remedy.  To hold otherwise would be to turn federal judges into referees for a game in which they have no place, and about which they know little.

This case does not present the "extraordinary circumstances" necessary to justify federal court intervention, however.  First, it is unclear whether (and if so, to what extent) USADA has violated its own rules.  Even assuming USADA is obligated to follow UCI anti-doping rules over its own and those of USOC and USA Cycling, that does not necessarily mean UCI has exclusive authority to pursue charges against Armstrong for his alleged doping violations.  Indeed, the UCI ADR contain provisions—most notably, the "discovery rule," whereby the entity that "discovered" the alleged violation is responsible for pursuing it, *see* Pl.'s Resp. [#45], Attach. 24 at 8—under which USADA may have jurisdiction over Armstrong's alleged violations.  Resolution of this question alone may require extensive evidentiary findings and, as explained below, is one Armstrong agreed should be answered by the arbitrators themselves.

Second, whether Armstrong will suffer any harm, much less imminent, serious, and irreparable harm, remains to be seen.  Indeed, given the apparent disagreement between USADA and both UCI and USA Cycling,[32] it is unclear whether Armstrong will be required to proceed to arbitration at all.  Further, if Armstrong does proceed to arbitration, and wins on his jurisdictional argument, he will have suffered no harm at all, beyond a relatively modest expenditure of time and

---

[32] By letter dated August 17, 2012, USA Cycling told USADA it "believes that UCI has the power to express its interpretation of WADA's Anti-Doping Code, its application to international cycling events, and the Code's jurisdictional provisions in matters within the scope of its authority." Pl.'s Brief [#54], Ex. 1 at 4.  The letter continued: "When acting as a National Federation of the UCI, [USA Cycling] is bound by that interpretation in matters involving international cycling doping control." *Id.* at 4–5.  However, the letter closed by acknowledging that USA Cycling "understands that there are substantial disagreements concerning whether USADA's charges involve test results over which UCI has jurisdiction," and that USA Cycling did not "intend to express any opinion on those arguments." *Id.* at 5.  Whether USA Cycling's position is binding on USADA, in light of USADA's delegated authority from USOC, is, like most of the matters in this case, a matter that must be decided by the relevant parties, not this Court.

money.  The same result obtains if Armstrong loses his jurisdictional argument but nevertheless is found by the USADA panel not to have committed an anti-doping violation.  Nor would Armstrong necessarily be seriously and irreparably harmed, even if he were found by the panel to have committed an anti-doping violation, if that determination was reversed on appeal to CAS or the Swiss courts.  In short, any harm Armstrong may suffer is, at this point, entirely speculative.

Which leads directly to the last and most obvious point, that Armstrong has not exhausted his internal remedies, namely the arbitration procedures in the USADA Protocol.  As explained below, Armstrong's challenges to USADA's jurisdiction, and his arguments about which rules govern, can and should be made in arbitration.  If the panel's resolution of those issues is manifestly unjust and devoid of any reasonable legal basis, Armstrong may have a judicial remedy; but this Court cannot act on the basis of a hypothetical injury.

The Court thus concludes it cannot consider Armstrong's remaining claims at this time.  Whether the Sports Act's arbitration requirements completely preempt Armstrong's non-due process claims, or are simply an administrative precondition to their filing, is a question the Court need not answer now, in light of Armstrong's undisputed failure to submit to arbitration: the result is that this Court lacks jurisdiction to consider Armstrong's remaining claims.[33]  Accordingly, the Court grants USADA's motion and dismisses those claims without prejudice.

---

[33]The Court rejects Armstrong's argument that the Sports Act does not apply to him, because he is not an "amateur athlete" under the Act.  As noted above, the Sports Act defines that term to mean "an athlete who meets the eligibility standards established by the national governing body . . . for the sport in which the athlete competes."  36 U.S.C. § 220501(b)(1).  This definition clearly encompasses Armstrong who, it is undisputed, held licenses from USA Cycling during the years relevant to this lawsuit.  The Court declines Armstrong's invitation to depart from the plain meaning of the Sports Act, particularly in light of his longstanding relationship with, and prior recognition of the authority of, USA Cycling.

**C.      Armstrong's Arbitration Agreement Precludes His Remaining Claims**

The Court further finds Armstrong's arbitration agreement with USADA entrusts resolution of his non-due process claims to the arbitrators themselves, and thus precludes presentation of those claims to this Court.

The Federal Arbitration Act (FAA) states, in part:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.[34]

9 U.S.C. § 2. The FAA's "purpose was to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." *Gilmer*, 500 U.S. at 24. "Accordingly, the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Co.*, 460 U.S. 1, 24–25 (1983). "Thus, as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi*, 473 U.S. at 626.

---

[34]The FAA, which "seeks broadly to overcome judicial hostility to arbitration agreements," reaches to the limit of Congress's Commerce Clause power. *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 272, 272–77 (1995). Armstrong admits he raced in "professional international cycling competitions," Pl.'s Resp. [#45] at 14, and does not deny USADA's allegation "he has earned more prize money and endorsement income than nearly any other competitor in sport," Defs.' Mot. Dism. [#33] at 4. Further, although Armstrong maintains he has no binding agreement to arbitrate with USADA, he does not appear to argue the FAA would be inapplicable if he had such an agreement. Under the circumstances, therefore, the Court finds the FAA applies to Armstrong's international racing license applications and accompanying agreements to abide by USA Cycling and USOC rules.

The rule is different, however, when the question is whether the parties have agreed to arbitrate the question of arbitrability itself: "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quoting *AT&T Techs. v. Commc'ns Workers*, 475 U.S. 643, 649 (1986)). The typical presumption is reversed in this situation because "a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration," and the law recognizes "[a] party often might not focus upon [the question of who should decide arbitrability] or upon the significance of having arbitrators decide the scope of their own powers." *Id.* at 945.

First, of course, the Court must decide whether Armstrong agreed to a contract which contained a clause relating to arbitration with USADA. The Court finds he did.

The record shows Armstrong agreed, in at least some of his international cycling license applications during the relevant period, to abide by USA Cycling's rules, among others. *See* Farrell Aff. [#49] at 6–14. For instance, Armstrong agreed in one such application that it was his "sole responsibility to be familiar with . . . [several entities, including USA Cycling]'s rules, and any special regulations for a USA Cycling event," and further agreed "to comply with all such rules and regulations," including that he "must submit to drug testing, if required." *Id.* at 6. As noted above, USA Cycling's regulations incorporate the USADA Protocol and give USADA the authority to implement it. Defs.' Mot. Dism. [#33], Attach. 7 at 70. In turn, the USADA Protocol requires athletes to contest threatened doping sanctions through arbitration.[35] *See id.*, Attach. 4 at 60–62. The

---

[35]The World Anti-Doping Code, incorporated into the USADA Protocol, has a broad, almost draconian, temporal reach. Specifically, it allows an anti-doping agency to bring charges against athletes for offenses committed up to eight years prior. *See id.*, Attach. 4 at 79 ("No action may be commenced against an Athlete or other Person for

Court thus concludes Armstrong has agreed to arbitrate with USADA at least some disputes relating to his alleged doping violations.

The Court now considers the scope of the USADA Protocol's arbitration provisions, and concludes Armstrong clearly and unmistakably agreed to arbitrate the question of arbitrability. Rule R-7 of the Supplementary Procedures broadly authorizes the arbitrators to decide their own jurisdiction: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." *Id.* at 87. Rule R-7 further provides that "[t]he arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part"—here, that contract is the USADA Protocol, incorporated by reference into the USA Cycling regulations, and agreed to by Armstrong in his license applications. Finally, the Rule specifically contemplates objections by parties to the arbitrability of claims: "A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection." *Id.* Accordingly, to the extent Armstrong wishes to challenge the validity of USA Cycling's regulations or the USADA Protocol, or to argue their provisions are inconsistent with UCI's rules, the Court finds he has agreed to do so through

---

an anti-doping rule violation contained in the Code unless such action is commenced within eight (8) years from the date the violation is asserted to have occurred."). It further allows disqualification of results in competitions subsequent to an athlete's doping offense, presumably even if it is not shown that the athlete committed any further offenses during those competitions:

> In addition to the automatic Disqualification of the results in the Competition which produced the positive Sample under Article 9 (Automatic Disqualification of Individual Results), all other competitive results obtained from the date a positive Sample was collected . . . , or other anti-doping rule violation occurred, through the commencement of any Provisional Suspension or Ineligibility period, shall, unless fairness requires otherwise, be Disqualified with all of the resulting Consequences including forfeiture of any medals, points and prizes.

*Id.* at 75.

arbitration with USADA.

The record shows Armstrong has agreed to arbitrate some doping matters with USADA, and that the USADA Protocol requires challenges to the existence, scope, or validity of the agreement to be made in the course of arbitration. Despite its many misgivings about USADA's conduct leading up to and during this case,[36] the Court is bound to honor Armstrong's agreement. While the Court would typically stay this case pending the outcome of arbitration, the Court has already decided dismissal is warranted for independent reasons; accordingly, the Court dismisses Armstrong's non-due process claims without prejudice.

**D.     Abstention**

Alternatively, even if the Court has jurisdiction to grant equitable relief, it declines to do so. As described above, Armstrong's allegations do not demonstrate he is entitled to equitable relief: even ignoring the question of his likelihood of success on the merits of his claims, he has not demonstrated he will suffer irreparable harm if an injunction does not issue.

Moreover, considerations of international comity militate against injunctive relief. Armstrong is asking a court of the United States to decide matters which are designed to be resolved by, and with direct input from, members of the international community. If Armstrong proceeds to arbitration with USADA, all relevant parties, including WADA and UCI, can be joined and heard, and the issues decided by people with expertise in the field. If any party is unsatisfied with the

---

[36]Among the Court's concerns is the fact that USADA has targeted Armstrong for prosecution many years after his alleged doping violations occurred, and intends to consolidate his case with those of several other alleged offenders, including—incredibly—several over whom USA Cycling and USOC apparently have no authority whatsoever. Further, if Armstrong's allegations are true, and USADA is promising lesser sanctions against other allegedly offending riders in exchange for their testimony against Armstrong, it is difficult to avoid the conclusion that USADA is motivated more by politics and a desire for media attention than faithful adherence to its obligations to USOC.

result, the matter can be appealed to CAS,[37] and then to the courts of Switzerland, to the extent permitted by that country's law. Instead, Armstrong would have this Court decide many of the relevant issues in the first instance, even though at least one apparently interested party has not been joined, and any appeals would be to courts exclusively within the United States. The Court declines to circumvent the longstanding system of international arbitration in Olympic sports by unilaterally enjoining that system's operation.

Because Armstrong has not shown he is entitled to equitable relief, and because his claims should be decided through international arbitration rather than by this Court, the Court declines to issue injunctive relief as to his non-due process claims. Those claims are therefore dismissed on this basis, in the alternative to the reasons described above.

### Conclusion

As the Court has indicated, there are troubling aspects of this case, not least of which is USADA's apparent single-minded determination to force Armstrong to arbitrate the charges against him, in direct conflict with UCI's equally evident desire not to proceed against him. Unfortunately, the appearance of conflict on the part of both organizations creates doubt the charges against Armstrong would receive fair consideration in either forum. The issue is further complicated by USA Cycling's late-breaking show of support for UCI, and apparent opposition to USADA's proceedings—a wrinkle which does not change the Court's legal analysis, but only confirms that these matters should be resolved internally, by the parties most affected, rather than by edict of this

---

[37]Armstrong has argued to this Court that CAS precedent recognizes the supremacy of international rules over national ones, when there is a conflict between the two. Indeed, Armstrong has attached several such cases to his response, though the Court notes they are distinguishable from the present suit. *See* Pl.'s Resp. [#45], Attach. 16–19. Thus, if Armstrong's arguments before this Court are correct, there is no reason to believe he will not prevail before either USADA's panel, or on appeal to CAS.

Court.[38]

The events in USADA's charging letter date back fourteen years, span a multitude of international competitions, and involve not only five non-citizens of the United States who were never licensed in this country, but also one of the most well-known figures in the history of cycling. As mystifying as USADA's election to proceed at this date and in this manner may be, it is equally perplexing that these three national and international bodies are apparently unable to work together to accomplish their shared goal—the regulation and promotion of cycling. However, if these bodies wish to damage the image of their sport through bitter infighting, they will have to do so without the involvement of the United States courts.

For the foregoing reasons, the Court concludes Armstrong agreed to arbitrate with USADA, and its arbitration rules are sufficient, if applied reasonably, to satisfy due process. Whether USADA will attempt to force Armstrong to arbitration against USA Cycling's will, whether the USADA arbitrators will apply the rules reasonably if the matter does proceed to arbitration, and whether Armstrong will actually receive a fair hearing, are questions that remain to be answered; but what is certain is that this Court cannot interfere, contrary to both the will of Congress and Armstrong's agreement to arbitrate, on the basis of a speculative injury. Armstrong's claims are therefore dismissed.

Accordingly,

IT IS ORDERED that Defendant Travis Tygart and United States Anti-Doping

---

[38]Indeed, it is hard to imagine a situation more illustrative of Judge Posner's famous words, that "there can be few less suitable bodies than the federal courts for determining the eligibility, or the procedures for determining the eligibility, of athletes to participate in the Olympic Games." *Michels v. U.S. Olympic Comm.*, 741 F.2d 155, 159 (7th Cir. 1984) (Posner, J., concurring). By the same token, this Court simply has no business telling national and international amateur athletic organizations how to regulate their respective sports.

Agency's Motion to Dismiss [#33] is GRANTED;

   IT IS FINALLY ORDERED that the above-styled cause is DISMISSED WITHOUT

PREJUDICE.

SIGNED this the __*20*__ day of August 2012.


                                        _____
                                        SAM SPARKS
                                        UNITED STATES DISTRICT JUDGE